**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 26-5006**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

CENTER FOR TAXPAYER RIGHTS, *et al.*,

*Plaintiffs-Appellees,*

v.

INTERNAL REVENUE SERVICE, *et al.*,

*Defendants-Appellants.*

---

On Appeal from the
United States District Court for the District of Columbia
Case No. 1:25-cv-00457 (Hon. Colleen Kollar-Kotelly)

---

**Brief for Appellees**

---

Simon C. Brewer
Madeline H. Gitomer
Daniel A. McGrath
Steven Y. Bressler
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Appellees*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), undersigned counsel for appellees Center for Taxpayer Rights et al. hereby provide the following information:

### I.    Parties Appearing Below and in this Court

The plaintiffs in the district court, and appellees in this Court, are the Center for Taxpayer Rights; Main Street Alliance; National Federation of Federal Employees, IAM AFL-CIO; and Communication Workers of America, AFL-CIO.

The defendants in the district court, and appellants in this Court, are the Internal Revenue Service; the Commissioner of the Internal Revenue Service; U.S. Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the Treasury; U.S. Digital Service (U.S. DOGE Service); U.S. DOGE Service Temporary Organization; Amy Gleason, in her purported official capacity as Acting Administrator of the U.S. DOGE Service and U.S. DOGE Service Temporary Organization; Elon Musk, in his official capacity as the leader of DOGE; Steve Davis, in his official capacity as Chief Operating Officer of DOGE; U.S. Department of the Treasury DOGE Team; U.S. Office of Personnel

i

Management; Scott Kupor, in his official capacity as Director of the Office of Personnel Management; General Services Administration; Edward C. Frost, in his official capacity as Administrator of the General Services Administration.[1]

Amici appearing in the district court were several Members of Congress (Representative Adriano Espaillat of New York, Representative Joaquin Castro of Texas, Representative Gil Cisneros of California, Representative Sylvia Garcia of Texas, Representative Rob Menendez of New Jersey, Representative Andrea Salinas of Oregon, and Representative Norma Torres of California).

To date, only the Federation for American Immigration Reform has submitted an amicus brief in this Court. Lawyers Defending American Democracy has filed a notice of intention to participate as amicus curiae.

## II.    Rulings Under Review

The ruling under review in this case is the order of the district court (Kollar-Kotelly, J.), dated November 21, 2025, that granted plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, for a

---

[1] Parties sued in their official capacities have had their successors in office automatically substituted pursuant to Fed. R. Civ. P. 25(d) and Fed. R. App. P. 43(c).

preliminary injunction. That order is unpublished but is available on Westlaw at 2025 WL 3251044 (D.D.C. Nov. 21, 2025).

## III.  Related Cases

This case has not previously been before this Court or any other court. Undersigned counsel are aware of the following related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C): *Centro de Trabajadores Unidos v. Bessent*, No. 25-5181 (D.C. Cir.); *Alliance for Retired Americans v. Bessent*, No. 25-cv-313 (D.D.C.).

## CORPORATE DISCLOSURE STATEMENT

Appellees are nonprofit and labor organizations. They have no parent corporations, and no publicly held corporation owns any portion of any of them.

## TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases ...............................i

Corporate Disclosure Statement...............................................................iv

Table of Authorities .................................................................................. vi

Glossary of Abbreviations .......................................................................xii

Introduction ................................................................................................ 1

Jurisdictional Statement............................................................................2

Issues Presented .........................................................................................2

Pertinent Statutes ......................................................................................3

Statement of the Case ................................................................................3

    I.    Statutory and Regulatory Background ......................................3

    II.   Factual Background and Prior Proceedings.............................6

    III.  Indicative Ruling ....................................................................... 11

Summary of Argument.............................................................................13

Standard of Review ..................................................................................16

Argument ..................................................................................................16

    I.    The district court correctly held that Plaintiffs are likely
to succeed on the merits. ..........................................................17

        A.   Plaintiffs are likely to establish Article III standing.........17

        B.   The APA provides for judicial review. ...............................30

    II.   The district court correctly balanced the equitable
factors in granting preliminary relief.......................................56

Conclusion.................................................................................................66

Certificate of Compliance

Certificate of Service

Addendum

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967)..........................................37

*Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789
    F.2d 931 (D.C. Cir. 1986) ...............................................................20

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594
    U.S. 758 (2021) ..............................................................................62

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314
    (D.C. Cir. 2024).............................................................................58

*Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615
    (D.C. Cir. 2020).............................................................................20

*Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162 (4th Cir. 2025) ..............28

*Bennett v. Spear*, 520 U.S. 154 (1997) ....................................................34

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
    972 F.3d 83 (D.C. Cir. 2020) .........................................................33

*Bowen v. Massachusetts*, 487 U.S. 879 (1988)..................................37, 38

*Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218
    (D.C. Cir. 2026)........................................... 7, 17, 25, 36, 41, 43, 52

*Church of Scientology of Cal. v. IRS*, 484 U.S. 9 (1987) ..........................4

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
    603 U.S. 799 (2024) .......................................................................65

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
    144 F.4th 296 (D.C. Cir. 2025).......................................................22

*Darby v. Cisneros*, 509 U.S. 137 (1993) ..................................................36

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)..........................21, 59, 61

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ........................................................51, 52, 55

*Doe v. Stephens*, 851 F.2d 1457 (D.C. Cir. 1988).......................................38

*El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't
  of Health & Hum. Servs.*, 396 F.3d 1265 (D.C. Cir. 2005).36, 37, 38

*Equal Rts. Ctr. v. Post Props., Inc.,* 633 F.3d 1136
  (D.C. Cir. 2011)..........................................................................21

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .....................51

*FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) .....................18, 22

*Flyers Rts. Educ. Fund, Inc. v. Dep't of Transp.,* 957 F.3d 1359
  (D.C. Cir. 2020)..........................................................................24

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ..........................18

*Her Majesty the Queen in Right of Ontario v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990) ......................................................31

*Hisp. Affs. Project v. Acosta*, 901 F.3d 378 (D.C. Cir. 2018) ...................31

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022) ..................16

*Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4 (D.C. Cir. 2015)..........37

*Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167
  (D.C. Cir. 2025)..........................................................................18

*Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059
  (D.C. Cir. 2019)..........................................................................29

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1
(D.C. Cir. 2016)..................................................................24, 62

*Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313
(D.C. Cir. Nov. 22, 2025) .......................................63, 65, 66

*Maryland v. King*, 567 U.S. 1301 (2012) .................................63

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ............23, 24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.*, 463 U.S. 29 (1983)....................................51

*Nat. Res. Def. Council v. EPA*, 643 F.3d 311 (D.C. Cir. 2011)................35

*Nat'l Automatic Laundry & Cleaning Council v. Shultz*,
443 F.2d 689 (D.C. Cir. 1971) .........................................34

*Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*,
791 F.2d 183 (D.C. Cir. 1986) ....................................4, 30

*Nowicki v. Comm'r*, 262 F.3d 1162 (11th Cir. 2001) .............................39

*People for the Ethical Treatment of Animals v. Dep't of Agric.*,
797 F.3d 1087 (D.C. Cir. 2015) .......................................20

*Reuters Ltd. v. FCC*, 781 F.2d 946 (D.C. Cir. 1986)..............................40

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ...........................................28

*Students for Fair Admissions, Inc. v. President & Fellows of
Harvard Coll.*, 600 U.S. 181 (2023) .................................25

*Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676
(7th Cir. 2012).................................................................58

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ..........................27, 28

# TABLE OF AUTHORITIES—continued

**Page(s)**

*Trump v. CASA*, 606 U.S. 831 (2025) ...................................................... 65

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ............. 40

*United States v. Michaelian,* 803 F.2d 1042 (9th Cir. 1986) .................. 39

*United States v. Orlando*, 281 F.3d 586 (6th Cir. 2002) ........................ 39

*Valero Energy Corp. v. EPA*, 927 F.3d 532 (D.C. Cir. 2019) .................. 35

*Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925
 (D.C. Cir. 2008) ............................................................... 31, 34, 53, 54

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ......................... 33

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ....................... 57

*Wis. Valley Improvement v. FERC*, 236 F.3d 738
 (D.C. Cir. 2001) ................................................................................. 51

*Young v. U.S. Dep't of Just.*, 882 F.2d 633 (2d Cir. 1989) ...................... 29

**Statutes, Rules, and Regulations**

26 U.S.C. § 6011 .................................................................................... 30

26 U.S.C. § 6103 ............... 4, 5, 6, 12, 29, 41, 42, 43, 44, 45, 47, 48, 53, 54

26 U.S.C. § 6110 .................................................................................... 39

26 U.S.C. § 7213 .................................................................................... 37

26 U.S.C. § 7213A .................................................................................. 37

26 U.S.C. § 7431 ............................................................................... 37, 38

26 U.S.C. § 7526 ............................................................................... 19, 22

# TABLE OF AUTHORITIES—continued

**Page(s)**

28 U.S.C. § 1292.................................................................................2

28 U.S.C. § 1331.................................................................................2

5 U.S.C. § 551 ............................................................................. 32, 33

5 U.S.C. § 703 ...................................................................................36

5 U.S.C. § 704 ............................................................................. 30, 36

5 U.S.C. § 705 .......................................................................... 2, 10, 57

8 U.S.C. § 1253 ......................................................... 8, 9, 45, 47, 50

8 U.S.C. § 1325 ...................................................................................8

Fed. R. App. P. 12.1 .........................................................................13

Fed. R. App. P. 4 ................................................................................2

Pub. L. No. 94-455, 90 Stat. 1520 (1976)........................................3

## Other Authorities

Erin Slowey, *IRS Head, Privacy Chief to Quit After
      Immigration Data Deal (1)*, Bloomberg Tax (Apr. 8, 2025),
      https://perma.cc/HMF6-FYLL........................................................8

Internal Revenue Manual (revised April 17, 2025),
      https://perma.cc/4T8Q-H5U9 .......................................................32

Internal Revenue Manual,
      https://web.archive.org/web/20250403125859/https://www.
      irs.gov/irm/part11/irm_11-003-028 (archived Apr. 3, 2025)..........32

Restatement (Second) of Torts § 652B (1977) .......................................28

# TABLE OF AUTHORITIES—continued

**Page(s)**

Staff of J. Comm. on Tax'n, 94th Cong., General Explanation of
  the Tax Reform Act of 1976, JCS-33-76
  (J. Comm. Print 1976) ................................................................ 4, 28

# GLOSSARY OF ABBREVIATIONS

APA             Administrative Procedure Act

ICE             Immigration and Customs Enforcement

IRS             Internal Revenue Service

MOU             Memorandum of Understanding

## INTRODUCTION

The Internal Revenue Service (IRS) collects sensitive information about millions of American taxpayers each year. Congress, recognizing the potential for misuse of that information, enacted a restrictive statute that carefully details whether, and how, the IRS may share information with other federal agencies, including for law-enforcement purposes. Those safeguards are critical to the proper functioning of our tax system, as they allow taxpayers to feel confident that their information will not be disseminated—regardless of their immigration status—without adherence to the proper procedures.

For decades, the IRS scrupulously abided by these statutory requirements—until last year. Under a newly adopted policy, the agency began sharing address information with Immigration and Customs Enforcement (ICE) in an unprecedented manner. This Address-Sharing Policy flouts the statutory restrictions and was adopted arbitrarily and capriciously.

Plaintiffs—two nonprofit organizations and two unions—obtained a stay of the Address-Sharing Policy. As the district court concluded, they will suffer irreparable harm if the Policy remains in effect. Erosion of trust in the tax system will be difficult or impossible to repair, and

1

Plaintiffs' members face an unjustifiable risk that their information will be improperly shared and illegally used for civil immigration enforcement. The district court correctly granted preliminary relief to avert those harms, and this Court should affirm that order.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law, including the APA. On November 21, 2025, the district court entered an order granting a stay pursuant to 5 U.S.C. § 705 and a preliminary injunction. A1827-1830. The IRS filed a timely notice of appeal on January 5, 2026, and an amended notice of appeal on January 6, 2026. A1931-1932; *see* Fed. R. App. P. 4(a)(1)(B).

The government invokes this Court's jurisdiction under 28 U.S.C. § 1292(a).

## ISSUES PRESENTED

The district court concluded that an unprecedented IRS Address-Sharing Policy likely both violated statutory restrictions on data-sharing and was adopted in an arbitrary and capricious fashion. To preserve the status quo, and to prevent irreparable harm to Plaintiffs, it granted preliminary relief staying that policy. The issues presented are:

2

1. Whether the district court correctly held that Plaintiffs are likely to demonstrate Article III standing.

2. Whether the district court correctly concluded that the APA provides for judicial review of the IRS's novel Address-Sharing Policy.

3. Whether the district court correctly concluded Plaintiffs are likely to show that the Address-Sharing Policy is unlawful because it:

a. fails to comply with the statutory requirements setting forth what constitutes a valid request; or

b. was adopted in an arbitrary and capricious fashion, without considering relevant factors and reliance interests.

4. Whether the district court properly entered preliminary relief after considering the equitable factors and the appropriate scope of its order.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### I.    Statutory and Regulatory Background

In the wake of the Watergate scandal, Congress enacted significant new privacy protections for taxpayers. *See* Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 90 Stat. 1520, 1667-1688 (codified, *inter alia*, at

26 U.S.C. § 6103). These reforms established a general rule that tax "returns" and "return information" "shall be confidential." *Church of Scientology of Cal. v. IRS*, 484 U.S. 9, 10 (1987); *see* 26 U.S.C. § 6103(a). Congress determined that "[t]he assurance of privacy" provided by this general rule "is fundamental to a tax system that relies upon self-reporting." *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 791 F.2d 183, 184 (D.C. Cir. 1986).

At the same time, Congress recognized that in certain limited situations, other federal agencies would have legitimate needs for information protected by § 6103. Congress, therefore, enacted a series of carefully delineated exceptions to the general rule against disclosure. *See Church of Scientology*, 484 U.S. at 15 (observing that "in some circumstances, and with special safeguards, returns and return information can be made available to . . . other federal agencies"). These exceptions are narrowly drawn to particular circumstances where Congress deemed the relevant interest sufficiently weighty to overcome the attendant intrusion of privacy. *See, e.g.*, Staff of J. Comm. on Tax'n, 94th Cong., General Explanation of the Tax Reform Act of 1976, JCS-33-76, at 315 (J. Comm. Print 1976) ("With respect to each of these areas, the Congress strove to balance the particular office or agency's

4

need for the information involved with the citizen's right to privacy and the related impact of the disclosure upon the continuation of compliance with our country's voluntary tax assessment system.").

As particularly relevant here, Congress authorized the disclosure of certain information for use in federal criminal proceedings and investigations. *See* 26 U.S.C. § 6103(i)(2). To obtain that information, a written request must be submitted by the head of an agency (or other enumerated person), and the request must set forth:

(i) "the name and address of the taxpayer" to whom the request relates;

(ii) "the taxable period or periods" to which the request relates;

(iii) "the statutory authority under which the proceeding or investigation" is being conducted; and

(iv) "the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation."

*Id.* § 6103(i)(2)(B).

If and only if those requirements are met, the IRS is authorized to "disclose return information (other than taxpayer return information)" to the other agency. *Id.* § 6103(i)(2)(A). For purposes of these provisions, "a taxpayer's identity" is not treated as taxpayer return information. *Id.*

5

§ 6103(i)(2)(C). In turn, "taxpayer identity" is defined as "name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number . . . , or a combination thereof." *Id.* § 6103(b)(6).

The IRS is authorized to disclose information under this provision only "to officers and employees of such agency who are personally and directly engaged in" the relevant proceeding or investigation. *Id.* § 6103(i)(2)(A). The receiving agency must safeguard the information sought. *See id.* § 6103(p)(4) (proscribing safeguards the receiving agency must implement "as a condition for receiving . . . return information").

## II.    Factual Background and Prior Proceedings

**A.** For decades, the IRS has carefully safeguarded taxpayer information in accordance with the statutory protections described above. In 2025, however, the agency decided to share sensitive taxpayer information with Immigration and Customs Enforcement (ICE), purportedly pursuant to § 6103(i)(2). In February 2025, ICE requested information including addresses, relatives, and internet protocol information for approximately 700,000 noncitizens with deportation orders. A346. The IRS declined to process this request because it did not comply with § 6103. A1911.

6

The IRS then entered a memorandum of understanding (MOU) with ICE that established a framework for data-sharing. *See* A371-385. The MOU requires any request by ICE under Section 6103(i)(2) to include the statutorily required information. *See Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1226-27 (D.C. Cir. 2026). On its face, the MOU limited permissible data-sharing to the investigation or enforcement of criminal law, as required by § 6103(i)(2). A372. The MOU was motivated, however, by Executive Order 14161, which it described as directing the Department of Homeland Security "to identify, exclude, or remove aliens illegally present in the United States." A372. That apparent reference to civil deportation proceedings—not criminal law-enforcement—was confirmed by the White House, which described the MOU as "part of President Trump's promise to carry out the mass deportation" of noncitizens. A144.

The IRS then revised the Internal Revenue Manual's sections setting out the process for responding to requests under Section 6103(i)(2). The changes were necessary to allow for the disclosures contemplated by the MOU. A1896. ICE then submitted another request for taxpayer information—this time, for the "full alien population" of over 7.5 million individuals. A1840; *see* A423. This request, too, was

7

deficient in multiple respects. When the IRS prompted ICE to furnish additional information, ICE stated that "the primary goal" of its request was "to enrich the data" in ICE's own databases. A421. It also stated that a single official was "personally and directly engaged" in investigating whether millions of people had violated 8 U.S.C. § 1325, a statute that criminalizes certain improper entry to the United States. A421. The IRS declined to process this request as well. A1840. All the while, senior leaders at the IRS that resisted this data sharing were pushed out of the agency. A1913.[2] ICE then submitted a third bulk taxpayer data request, this time for the last known address of approximately 1.28 million individuals. A1878-1879. This request again listed a single individual as "personally and directly engaged" in the ostensible investigation justifying the request. A1878; *see* A322-323. ICE invoked a different criminal statute, 8 U.S.C. § 1253(a)(1), which criminalizes a noncitizen's willful failure to depart the United States following a final order of removal. A1890.

---

[2] *See also* Erin Slowey, *IRS Head, Privacy Chief to Quit After Immigration Data Deal (1)*, Bloomberg Tax (Apr. 8, 2025), https://perma.cc/HMF6-FYLL.

ICE's request did not furnish the information required by the plain text of Section 6103 and the MOU.[3] For example, ICE did not necessarily furnish an address for each individual included in the data request. Rather, it supplied a non-blank field that included a five- or nine-digit number, which the IRS assumed to be a zip code. *See* A1926; *see also* A462 (noting that the address field "[m]ust not be empty and must contain zip code"); Dkt. No. 66-1, ¶ 13 (explaining that the IRS treated "a five-digit or nine-digit number . . . as a proxy for a zip code"). ICE also did not identify a particular taxable year, but instead submitted, for every request, a range of years ("January 2022 to present"). A1928 n.6. And for the "specific reason" why the disclosure was relevant to the investigation, ICE stated that "the requested information may contain address information which is potentially at issue with respect to investigating or proving a violation under 8 U.S.C. § 1253(a)(1)." A326.

The IRS processed this request using an automated procedure and returned address information for approximately 47,000 individuals.

---

[3] As described further below, the IRS did not accurately represent to the district court how this process worked. The description provided here is supported by the administrative record, as well as the subsequent corrections to the record filed by the IRS. *See infra* pp. 11-13.

A1840. The IRS's legal approval was first assigned to the attorney who had determined that ICE's prior request was noncompliant, however Treasury directed IRS officials to bypass him, A1838, and he was forced out of his job. A142. A newly assigned individual approved the request the same day. A1838.

**B.** Plaintiffs sought a stay under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction against IRS's data-sharing policies and practices.

The district court granted Plaintiffs' motion and entered preliminary relief. A1827-1830 (order). The district court determined that Plaintiffs satisfied each of the factors for preliminary relief. *See* A1831-1924. In particular, the court held that Plaintiffs were likely to demonstrate Article III standing; that the Address-Sharing Policy was a final agency action subject to APA review; that Policy likely contravened § 6103 and was not the product of reasoned decisionmaking; and that the balance of the equities favored interim relief given the need to prevent irreparable harm to Plaintiffs and their members. *Id.* The court did not grant the full relief Plaintiffs sought, but instead entered a narrower order that the court determined would balance the statutory command to protect

taxpayer privacy with the government's legitimate law-enforcement interests. A1920-1922.

The court therefore stayed the Address-Sharing Policy. A1828. It also preliminarily enjoined the IRS from disclosing statutorily-protected information except in strict compliance with § 6103, and it required the agency to file under seal a notification with the court if the Department of Homeland Security requested return information under § 6103(i)(2), or if the IRS determined that such sharing would be lawful. A1828-1829.

Five weeks later, the IRS noticed this appeal. A1931-1932.

## III.    Indicative Ruling

While this appeal was pending, following press reports, the IRS made significant new factual disclosures that contradicted its prior representations to the district court regarding its data-sharing with ICE. The IRS filed in district court a declaration by Dottie A. Romo, IRS Chief Risk and Control Officer, "to modify certain prior statements made by Defendants in this case." Dkt. No. 66-1, ¶ 3. Although IRS did not specifically identify the statements that required modification, it admitted that the IRS supplied addresses to ICE even when the "address" supplied by ICE "was either incomplete or insufficiently

11

populated." *Id.* ¶ 11. For example, the IRS disclosed addresses in some circumstances where ICE supplied an "address" with "language indicating that the address was not complete," as long as the request included a five- or nine-digit number (which IRS assumed, but did not confirm, to be a zip code). *Id.* ¶ 13. This admission directly contradicted prior representations that the IRS had made to the district court about how the data-sharing policy operated. *See, e.g.*, A1820-1822 (asserting that ICE supplied the IRS with "complete addresses").

In response to these revelations, the district court issued an indicative ruling under Federal Rule of Civil Procedure 62.1. The court indicated that, if it had jurisdiction, it would supplement the record to include the Romo Declaration, given the "significance of this new information." Dkt. No. 74, at 13. The court observed that the Romo Declaration reveals that "the IRS violated the [Internal Revenue Code] approximately 42,695 times" by disclosing taxpayer addresses "without confirming that ICE's request set forth the 'address of the taxpayer with respect to whom the requested return information relate[d].'" *Id.* at 5 (quoting 26 U.S.C. § 6103(i)(2)(B)(i)). As the district court explained, the Romo Declaration reveals that under IRS's process for disclosing taxpayer addresses, "ICE could have submitted a request with an

12

'address' like 'Don't Care 12345,' or, '00000,' and still received a taxpayer's address" back from IRS. *Id.* at 7.

The district court further indicated that there is a "substantial issue" whether these revelations justify discovery. *Id.* at 13. The court noted the presumption against discovery in APA cases. *Id.* at 10-11. But it concluded that "Plaintiffs have raised a genuine question as to whether an exception to this general rule should apply," either because the administrative record is incomplete or because Defendants have engaged in bad faith or improper behavior. *Id.* The district court indicated that it would prefer to resolve that question only if this Court "agrees that it would be useful." *Id.* at 13.

Accordingly, Plaintiffs moved for a limited remand to permit the district court to exercise jurisdiction over the issues identified in its indicative ruling. *See* Fed. R. App. P. 12.1(b). That motion remains pending as of this filing.

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that Plaintiffs are likely to succeed on the merits.

**A.** Plaintiffs are likely to demonstrate that they have Article III standing for two reasons. The Center for Taxpayer Rights (the Center) is

13

likely to demonstrate organizational standing because the Address-Sharing Policy directly causes injuries to the organization's mission, including by making it less likely that its clients will engage with its core business activities. In turn, the Center must devote resources to counteracting these programmatic harms, which constitutes an Article III injury in fact.

The other Plaintiffs are also likely to demonstrate associational standing. Their members face an imminent risk that the IRS will improperly share their confidential information with third parties outside the agency. That injury closely resembles the harms recognized at common law by the torts of intrusion upon seclusion and breach of confidence, which indicates that those injuries are concrete.

**B.** The Address-Sharing Policy is subject to APA review as a final agency action for which Plaintiffs have no other adequate remedy. The Policy represents the culmination of the agency's decisionmaking regarding how and how much to protect the data in its possession and governs how the agency will respond to ICE's requests for address information. By determining whether and in what circumstances the agency will maintain the confidentiality of that information, the Policy carries legal consequences for both taxpayers and agency personnel.

14

Plaintiffs lack an adequate alternative remedy for the violation of the statutory restrictions on data-sharing. The statutes that the IRS points to do not offer the opportunity for prospective relief, and none offers a remedy of the same genre as the APA.

**C.** The Address-Sharing Policy is unlawful for multiple, independent reasons. It is contrary to law because it disregards the statutory prerequisites for data sharing, including by failing to require that a requesting agency provide the minimum information Congress deemed necessary to state a valid request for IRS data. Under the law, a valid request must state the address of the person whose information is sought, the relevant taxable period, the reason such information may be relevant to an ongoing investigation, and the person personally and directly engaged in the investigation. The Address-Sharing Policy authorized data-sharing that deviated from each of those requirements.

The IRS adopted the Policy in an arbitrary and capricious fashion. The agency failed to consider relevant factors and reliance interests in its previous policy that strictly limited how and when the agency would respond to data-sharing requests. The failure to consider and explain such matters violates the APA's requirement of reasoned decisionmaking.

**II.** In light of the Address-Sharing Policy's illegality, the district court appropriately considered the remaining equitable factors in fashioning preliminary relief. The court correctly held that Plaintiffs would suffer irreparable harm absent preliminary relief, and it rightly concluded that the balance of the equities decisively favors Plaintiffs.

The court also correctly concluded that relief should operate against the Policy itself rather than in some plaintiff-specific manner. That is consistent with foundational administrative law principles regarding the scope of relief under the APA. There is no basis for reversing or narrowing the relief entered.

## STANDARD OF REVIEW

The district court's order granting preliminary relief is reviewed for abuse of discretion, with its factual findings reviewed for clear error and its legal conclusions reviewed de novo. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 726 (D.C. Cir. 2022).

## ARGUMENT

This Court should affirm the district court's order granting preliminary relief. The district court correctly concluded that Plaintiffs are likely to succeed in showing that the IRS's novel Address-Sharing Policy violates the APA because it is contrary to law and arbitrary and

16

capricious. And the court appropriately balanced the critical need to protect taxpayer privacy, as dictated by statute, with legitimate governmental interests in investigating potential criminal cases.

## I. The district court correctly held that Plaintiffs are likely to succeed on the merits.

As the district court concluded, Plaintiffs are likely to succeed on the merits. They are likely to establish Article III standing because the Address-Sharing Policy inflicts harm on the Center for Taxpayer Rights directly and on the members of the associational Plaintiffs. The Address-Sharing Policy is subject to APA review because it is a final agency action for which there is no other adequate remedy. And the Policy is unlikely to be lawful because it contravenes the fundamental requirements of § 6103 and is arbitrary and capricious.

### A. Plaintiffs are likely to establish Article III standing.

To obtain preliminary relief, Plaintiffs need only demonstrate that they are "likely to be able to demonstrate standing at the summary judgment stage." *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1229-30 (D.C. Cir. 2026). The district court correctly held that Plaintiffs have met this burden in two ways: the Center for Taxpayer Rights demonstrated organizational standing, and the other Plaintiffs have demonstrated associational standing.

17

### 1.    *The Center's organizational standing.*

The district court correctly concluded that the Center itself likely has Article III standing. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393-94 (2024) (explaining that "organizations may have standing to sue on their own behalf for injuries they have sustained," as long as they "satisfy the usual standards for injury in fact, causation, and redressability" (quotation marks omitted)); *see Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (holding organization had standing where the challenged action "perceptibly impaired [its] ability to provide counseling and referral services for low-and moderate-income homeseekers").

As most relevant here, this Court has articulated a two-part test to determine whether an organizational plaintiff has suffered a sufficiently concrete injury: (1) "whether the [plaintiff] has shown an injury to its organizational interests," and (2) "whether the [plaintiff] has used its resources to counteract that harm." *Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1172 (D.C. Cir. 2025) (cleaned up). Both prongs are readily satisfied.

*First*, the Center has demonstrated injury to its organizational interests. The Center exists "to advance taxpayer rights, promote trust

18

in the tax system, and increase access to justice in the tax system," particularly for "the most vulnerable populations, including immigrants, people whose first language is not English, low-income people, and domestic violence survivors." A168. To do so, it runs a low-income taxpayer clinic, operates a nationwide network for other low-income taxpayer clinics, and regularly holds educational events on issues relating to taxpayer rights. A168. The clinic provides free or nominal fee representation to low-income taxpayers in disputes with the IRS. A168. By law, the clinic is specifically required to work with "'individuals for whom English is a second language'" and inform them "'about their rights and responsibilities' under the Internal Revenue Code." A169 (quoting 26 U.S.C. § 7526(b)(1)(A)(ii)(II)).

The Address-Sharing Policy directly harms the Center's interest in providing those services. The policy undermines the confidence that taxpayers—particularly those who do not speak English as a first language or are immigrants—have that their data will be protected. A178. That makes them less willing to engage with the Center and its low-income taxpayer clinic. A178-179, A183. The Center has been able to provide far fewer services for taxpayers without social security numbers, and it has seen a "dramatic decline in interest and

19

engagement with the Center's programming." A179. That impedes the Center's mission of serving these vulnerable communities, and it threatens the long-term viability of its ability to further its mission through its provision of services. A182. The fact that the IRS has adopted an unlawful data-sharing policy also impedes the Center's ability to provide advice and guidance to other clinics in its nationwide network. A186. This "inhibition of [the organization's] daily operations" demonstrates an Article III injury. *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986); *see People for the Ethical Treatment of Animals v. Dep't of Agric.*, 797 F.3d 1087, 1095 (D.C. Cir. 2015) (holding that organization had standing when agency action impaired its mission to "continue to educate the public").

*Second*, the Center has used its resources to counteract those harms. It has reallocated significant portions of its budget, increased staff, and paid existing staff more to conduct additional education and outreach. A179-180. These activities are necessary to offset the diminished trust and engagement the Center has experienced as a result of the Address-Sharing Policy. Those expenditures are of a piece with ones this Court has previously held demonstrate Article III standing. *See Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020)

(holding than an increased expenditures on educational materials supported standing); *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011) (observing that "diversion of resources to programs designed to counteract the injury to [the organization's] interest in promoting fair housing could constitute such an injury").

The IRS's contrary arguments are unavailing. It submits that the Center has not been deprived of "clientele to which it was legally entitled." Blue Br. 25. That is a red herring: the question is not whether the Center is legally entitled to particular clientele (whatever that would mean), and instead whether the policy harms the Center's interest in achieving its mission of serving its client population. Relatedly, the IRS suggests (at 26) that the Center's injuries are attributable to third-party decisions by those clients, not to the IRS. But that simply ignores the district court's well-supported findings regarding "the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019); *see* A1849 (crediting Plaintiffs' undisputed evidence about client behavior). It requires no speculation to conclude that the Address-Sharing Policy has caused vulnerable taxpayers to become less willing to engage with the Center.

This case is unlike *Alliance for Hippocratic Medicine*, where the Supreme Court rejected an effort by an organization to "spend its way into standing simply by expending money to gather information and advocate against the defendant's action." 602 U.S. at 394; *accord Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 314-15 (D.C. Cir. 2025) ("[E]xpenditure of resources on advocacy is not a cognizable Article III injury."). Here, the IRS's actions "directly affected and interfered with" the Center's "core business activities"—its provision of educational and clinical services to vulnerable taxpayers. *Alliance*, 602 U.S. at 395. Under this Court's precedent, that injury to the Center's "non-advocacy operations" confers Article III standing. *Ctr. for Biological Diversity*, 144 F.4th at 315.

The IRS also misunderstands the relevance of the federal funding received by the Center to operate its low-income taxpayer clinic. *See* 26 U.S.C. § 7526. As part of that program, the Center must periodically report on its activities serving people for whom English is a second language. A316-317. Despite "dedicating more resources towards the priorities identified," the Center has seen decreased engagement across these metrics, which threatens its ability to stay in compliance with the program goals and risks its continued ability to obtain grant funding.

22

A318, A320. At a minimum, the Center has undertaken reasonable expenditures to mitigate the "substantial risk" of harm here, which the Supreme Court has held is an Article III injury. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153-54 (2010).

The IRS contends that the risk of harm is too remote to demonstrate standing. Blue Br. 27-28. That ignores that the Center must undertake expenditures now to meet its goals and mitigate the risk of loss, just like the farmers in *Monsanto* did. The IRS places great weight on the fact that the Center's next competitive grant cycle is in 2027. Blue Br. 28. But the Center must submit an application for continued funding each year, and the Center's performance must be deemed "satisfactory" to ensure its funding is continued. A319. That aside, the Center's next competitive application is due later this year, A316, and will be based on metrics that reflect the decrease in engagement that is currently happening. The Center's injuries are therefore based on current realities, not merely speculation about contingent future events.

Finally, the IRS picks out a handful of sentences from the Center's declarations that, in its view, do not convey adequate certainty about the loss of funding. Blue Br. 28-29. Clairvoyance is not required to establish standing. The Center "established a 'reasonable probability'"

of harm, *Monsanto*, 561 U.S. at 153, and has undertaken reasonable efforts to mitigate that harm. Nothing more is required. And in any event, the Center has been clear that whether or not it continues to receive federal funding, the Address-Sharing Policy is imposing severe, ongoing harms to its mission, the Center is expending resources to counteract that harm, and the district court's order will redress such harms. A320. Because the challenged policy "unquestionably make it more difficult for the [Center] to accomplish [its] primary mission," it has demonstrated Article III standing. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

### 2.   *Associational standing.*

The remaining Plaintiffs have associational standing.[4] This form of standing requires the plaintiff to show "(a) its members would

---

[4] The IRS wrongly suggests that the district court concluded that the Center cannot assert associational standing. Blue Br. 29. In fact, the district court stated that, "[o]n the present record, it is not clear that the Center has 'members' in the relevant sense," but declined to reach the issue. A1853 n.8. The district court also declined to pass on the Center's third-party standing. *Id.* If this Court concluded that Plaintiffs had not established standing, the Center would demonstrate on remand those additional standing theories. *See, e.g.*, *Flyers Rts. Educ. Fund, Inc. v. Dep't of Transp.*, 957 F.3d 1359, 1361 (D.C. Cir. 2020) (describing the associational standing test for a non-traditional membership organization).

24

otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (citation omitted). The only issue in dispute concerns the first criterion.

As the district court concluded, A1852-1856, the associational Plaintiffs' members would have Article III standing in their own right based on an increased risk that their information will be shared. The IRS takes issue with two aspects of the district court's decision. First, the agency contends that the associational Plaintiffs have not sufficiently identified particular members. Blue Br. 30-32. Second, the IRS argues that the injury is not concrete. Blue Br. 33-36. Neither contention withstands scrutiny.

The IRS's first argument fails to account for the procedural posture of this case. At this stage, Plaintiffs need only show that it is likely they will be able to demonstrate standing at summary judgment, including identifying a particular member with standing at that stage. *See Centro de Trabajadores Unidos*, 167 F.4th at 1230. As the district court

explained, "Plaintiffs have shown a substantial likelihood that their members belong to identifiable groups that have been the focus of ICE's information requests from the IRS." A1864. Main Street Alliance's members, for example, include taxpayers who file using individual taxpayer identification numbers. A196. ICE's data-sharing requests have focused on taxpayers who use these individual taxpayer identification numbers, and the record makes plain that ICE does not intend to forebear from additional requests in the future. A1864. Given that, Plaintiffs' members face an imminent risk of having their data shared under the Address-Sharing Policy.

The IRS misses the mark by focusing solely on ICE's most recent data-sharing request. *See* Blue Br. 31-32. The Address-Sharing Policy is far broader than that request, and Plaintiffs' members risk having their data shared under the Policy whether or not ICE sought information about them in that particular request. Recognizing that distinction, the district court explained that ICE is likely to make additional requests— particularly given that its prior request for information about 7 million individuals had never been processed. A1864-1865. Moreover, processing such mass requests will implicate the privacy interests of even more taxpayers than those listed. As the district court explained,

26

Plaintiffs face an additional threat of misidentification, including some who "live in communities with immigrants," are from a heritage with naming conventions that would lead to misidentification, or "have similar or identical names to other people who live near them," or family members who live with them. A1915. At a minimum, Plaintiffs' members face an imminent risk of having their information shared under future requests should the Policy remain in effect.

As to the second argument, the harm is concrete because it has "a close historical or common-law analogue." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). The Supreme Court has recognized that "disclosure of private information" and "intrusion upon seclusion" are examples of "harms traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425. The district court applied that teaching here to conclude that the harms inflicted on Plaintiffs' members are closely analogous to the torts of intrusion upon seclusion and breach of confidence. A1855-1862.

The IRS disputes the intrusion-upon-seclusion analogy, insisting that its Address-Sharing Policy does not involve any intrusion into a private sphere. Blue Br. 34. But in enacting § 6103, Congress identified tax information held by the IRS as a private area analogous to other

27

secluded areas recognized at common law, such as one's home, wallet, bank account, or personal documents. Restatement (Second) of Torts § 652B cmt. b (1977). And the fact that the information sharing occurred "between two government agencies" adds nothing to the IRS's argument, as intra-governmental data sharing is itself a harm identified by Congress through § 6103's prohibitions. The statute thus treats data-sharing with a different government agency as a disclosure to a third party, which is analogous to the common-law injury.

At bottom, the IRS's argument fails to "afford due respect to Congress's decision" regarding taxpayers' privacy rights. *TransUnion*, 594 U.S. at 425; *accord Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) ("[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important."). The particular context of § 6103 also distinguishes *Am. Fed'n of Tchrs. v. Bessent*, 152 F.4th 162, 172 (4th Cir. 2025), even assuming that decision is correct (notwithstanding the issues raised in the pending petition for rehearing en banc). Section 6103 creates a zone of seclusion around a particular set of information held by a particular agency. *See* J. Comm. on Tax'n, *supra*, at 323 ("Congress believes" that a taxpayer's information held by the IRS "is entitled to essentially the

28

same degree of privacy as those private papers maintained in his home."). The statute confirms that the tort of seclusion upon intrusion is closely analogous.

The tort of breach of confidence offers another relevant analogue. "This tort 'is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved.'" *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (quoting *Young v. U.S. Dep't of Just.*, 882 F.2d 633, 640 (2d Cir. 1989)). The essence of the harm recognized by the tort is the "unauthorized disclosure of privileged information to a third party." *Id.* at 1065.

The IRS offers only conclusory assertions why this tort is not analogous. It suggests that taxpayers do not provide information to the IRS based on a "confidential relationship." Blue Br. 35-36. Again, this elides congressional judgment, which deemed tax information "confidential," 26 U.S.C. § 6103(a). Congress therefore secured special protections for information furnished to the IRS. The record is replete with evidence substantiating the importance taxpayers place on this confidentiality. *See, e.g.*, A180-181, A186-192, A195-197, A215. That Congress has required some taxpayers to file tax returns, 26 U.S.C.

29

§ 6011, in no way conflicts with its judgment that the "assurance of privacy secured by § 6103 is fundamental to a tax system that relies upon self-reporting." *Nat'l Treasury Emps. Union v. Fed. Lab. Rels. Auth.*, 791 F.2d 183, 184 (D.C. Cir. 1986).

The IRS repeats its argument that intra-governmental disclosure is different than third-party disclosure. Blue Br. 36. But again, the relevant harm here occurs when taxpayer information is shared with other governmental entities. That is why Congress carefully enacted elaborate restrictions on intra-governmental disclosures following the Watergate scandal, where tax information was improperly shared within the federal government. The IRS offers no basis for ignoring that congressional judgment.

### B.   The APA provides for judicial review.

As the district court concluded, the APA provides the appropriate mechanism for judicial review of the IRS's Address-Sharing Policy, which is a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704.

### 1.   *Plaintiffs' claims challenge final agency action.*

The Address-Sharing Policy adopted by the IRS in 2025 is a final agency action. The government starts things off on the wrong foot by

contending (at 38) there is no agency action at issue because the Address-Sharing Policy "does not exist." Though the government denies the Policy's existence, evidence of it abounds. A policy need not be formally announced to be final agency action. *See Her Majesty the Queen in Right of Ont. v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990). It is of no matter that the government contends the IRS did not announce the policy (at 38). Where there is "evidence of" the agency's "actual practice," an agency's policy is reviewable under the APA. *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018). In this case, "the record leaves no doubt the [IRS] has a policy of disclosing confidential information" to ICE in a manner that it has not previously been disclosed before. *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 929-30 (D.C. Cir. 2008).

As the district court determined, the Address-Sharing Policy is reflected through numerous "factually uncontested allegations" showing that "the IRS spent an unknown amount of money developing the capability to conduct mass transfers of taxpayer information; entered into an agreement with ICE to conduct mass transfers of confidential taxpayer address information; and then completed a mass transfer of

31

confidential taxpayer address information to ICE pursuant to this agreement, all while removing high-level individuals who disagreed about the disclosure process." A1870. The administrative record reveals that numerous written processes were put in place that reflect the bounds of Address-Sharing Policy, including the "DHS-ICE Data Exchange Overview," which governed the automated process the IRS used to return results. A462; *see also* A466-67, A473-77. And the IRS revised its Internal Revenue Manual, a reflection of the policy change, removing privacy safeguards and procedural barriers to effectuating the Address-Sharing Policy.[5] The record is replete with evidence of the policy.

The IRS also suggests (at 38) that the Address-Sharing Policy does not qualify as "agency action" at all, because it is neither a rule nor an order. *See* 5 U.S.C. § 551(13). That is untenable. The phrase agency action "is meant to cover comprehensively every manner in which an

---

[5] *See* Internal Revenue Manual § 11.3.28.2 (setting forth detailed processes that previously applied to disclosures under Section 6103(i)(2)); *id.* Exhibit 11.3.28-2 (setting forth a detailed checklist of steps to take prior to disclosures under Section 6103(i)(2)), both available at https://web.archive.org/web/20250403125859/https://www.irs.gov/irm/part11/irm_11-003-028 (as archived Apr. 3, 2025). The Manual, as revised on April 17, 2025, is available at https://perma.cc/4T8Q-H5U9.

agency may exercise its power." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 478 (2001). Specifically, the Address-Sharing Policy is a "rule" because it is a "statement of general . . . applicability and future effect designed to implement . . . or prescribe law or policy": how the IRS will share address information with ICE. 5 U.S.C. § 551(4). Even if the agency did not write it down in a single document, that does not negate its status as a rule. Courts have consistently held that such unwritten policies are final agency action. *See Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting cases demonstrating that "[a]gency action generally need not be committed to writing to be final and judicially reviewable").

Second, the government is incorrect in asserting (at 38) that there is no agency action because the IRS simply complies with the relevant statutory and MOU requirements upon receipt of a compliant request. In fact, the IRS complied with neither the statute nor the MOU.

The agency action is also final. There is no question that the Address-Sharing Policy marks the "consummation" of the IRS's decision-making process; it represents a final decision to implement a policy of permitting mass disclosures of address information to ICE,

purportedly under Section 6103(i)(2). It is in no way "tentative"; agency leadership at IRS and Treasury have approved of the adoption of the policy, *see* A1838, a "signpost[] of authoritative determination, finality[,] and ripeness." *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971). And any officials that stood in the way of its implementation were removed or pushed out of their positions. A1870. This Court has previously determined that a policy of allowing disclosure of an individual's confidential information is "surely a consummation of the agency's decisionmaking process;" such is the case here. *See Venetian Casino*, 530 F.3d at 931 (quotation marks omitted).

The policy is also an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (quotation marks omitted). The Address-Sharing Policy has affected the rights of the individuals and entities with privacy interests in that data, resulting in significant legal consequence. These rights are impacted at the time taxpayers share their confidential data with the IRS and it becomes subject to the Address-Sharing Policy, not, as the government argues (at 40) only

34

after "subsequent actions." Further, the Address-Sharing Policy has dictated the obligations of the IRS and its employees in disclosing data to ICE. That, too, is a legal consequence. *Cf. Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 320 (D.C. Cir. 2011) (guidance document "b[ound] EPA regional directors and thus qualifie[d] as final agency action"). Unlike the challenged actions in the cases on which the government relies (at 40), the Policy is definitive and imposes legal consequences now; it is not contingent on future administrative action.

The IRS relies on *Valero Energy Corp. v. EPA*, 927 F.3d 532 (D.C. Cir. 2019) to argue the Address-Sharing Policy does not "produce the 'practical effects' needed" to establish finality. The *Valero* court only looked to practical effects after establishing "the document binds no one and results in no discernible legal consequences." *Id.* at 537. In any event, the disclosure of confidential information pursuant to the Address-Sharing Policy does have those practical consequences because, as a matter of law, information sharing under Section 6103(i)(2) "*must be accompanied by [] the threat that it will be used in a criminal investigation or prosecution.*" A1871.

35

The Address-Sharing Policy stands in stark contrast to the MOU alone, which this Court recently determined did not qualify as final agency action. *Centro de Trabajadores Unidos*, 167 F.4th at 1235-36. There, the Court determined that the MOU on its face did not impose binding duties on the parties, and instead merely clarified existing duties under a statute. *Id.* By contrast, the Address-Sharing Policy goes well beyond that, for the reasons stated above. It is a final policy with significant legal effect, and the agency itself has treated it as binding. *Centro* did not address the broader Address-Sharing Policy and its application, *see id.* at 1228, so it does not support the IRS's argument here.

### 2. *Plaintiffs lack an adequate alternative remedy.*

Plaintiffs are also entitled to APA review of the Address-Sharing Policy because there is no applicable "special statutory review proceeding," and they lack another "adequate remedy" for their harms. 5 U.S.C. §§ 703, 704. The "adequate remedy doctrine" exists "to avoid duplication of 'special statutory procedures for review of agency actions.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Hum. Servs.*, 396 F.3d 1265, 1275 (D.C. Cir. 2005) (quoting *Darby v. Cisneros,* 509 U.S. 137, 146 (1993)). The Supreme

Court has thus rejected a "restrictive interpretation" of that phrase, which would "run counter" to the APA's goal of "remov[ing] obstacles to judicial review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 904 (1988). Section 704 only forecloses an APA claim where there is "'clear and convincing evidence' from which to conclude that Congress intended to bar APA review." *El Rio Santa Cruz*, 396 F.3d at 1275 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).

The IRS's argument falls far short of meeting that demanding standard. It points to two sets of statutes as putative alternative remedies—one providing for civil damages, and one authorizing criminal penalties—for certain disclosures of information that violate § 6103. Blue Br. 43-44 (citing 26 U.S.C. § 7431 (damages); *id.* §§ 7213, 7213A (criminal penalties)). But "[n]either of those remedies would provide plaintiffs anything like the relief they seek," so they do not foreclose APA review. *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 11 (D.C. Cir. 2015).

As it did before the district court, the IRS fails to explain how the civil-damages statute is an adequate alternative. *See* A1873. The Supreme Court has made clear that a reviewing court must not "assume, categorically, that a naked money judgment against the

37

United States will always be an adequate substitute for prospective relief." *Bowen*, 487 U.S. at 905. But that is precisely what the IRS asks the Court to do. The IRS does not contend that the civil-damages provision authorizes prospective remedies. And it may not even provide for retrospective review of an IRS policy, as a court need not decide whether a disclosure was erroneous if it resulted from a "good faith . . . interpretation of section 6103." 26 U.S.C. § 7431(b)(1). At bottom, the two forms of relief are complementary, not in tension. *See, e.g.*, *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988) (approving prospective relief under the APA, notwithstanding the damages remedy provided by the Privacy Act).

The criminal statutes are even further afield. Criminal prohibitions do not create any "remedy" at all for Plaintiffs, as criminal laws must be enforced by the Executive Branch. It is particularly implausible to rely on those provisions given the Executive Branch's stated view that its own policy is lawful. Such proceedings are plainly "not of the same genre as a special statutory procedure for review of agency action." *El Rio Santa Cruz*, 396 F.3d at 1275 (quotation marks omitted). They therefore do not bar judicial review under the APA.

38

The government mistakenly suggests that a contrary holding would create a circuit split. *See* Blue Br. 44. But none of the cited cases concerns the availability of APA review. Instead, each addressed whether a violation of § 6103 would trigger the exclusion of evidence in a judicial proceeding if the statute were violated. *See United States v. Orlando*, 281 F.3d 586, 595 (6th Cir. 2002) (concluding that "suppression of the evidence is not the appropriate remedy" even if the statute were violated); *Nowicki v. Comm'r*, 262 F.3d 1162, 1163 (11th Cir. 2001) ("[I]mposition of the exclusionary rule is not warranted for a disclosure of return information which violates § 6103."); *United States v. Michaelian*, 803 F.2d 1042, 1049-50 (9th Cir. 1986) (rejecting the argument that "dismissal [of a criminal indictment] or suppression [of evidence] is an appropriate remedy for § 6103 violation"). Holding that the APA authorizes judicial review of a policy such as the one under review here would not conflict with any of those decisions.

Finally, the IRS adverts to a different statutory procedure under which, in limited circumstances, a taxpayer may petition the Tax Court to prevent the IRS from publicly disclosing identifying information in connection with a written determination regarding her tax situation. Blue Br. 44-45 (citing 26 U.S.C. § 6110(f)(3)(A)). That simply has

39

nothing to do with the type of policy at issue here. Because that statute concerns an entirely separate kind of agency action, "there is little basis for inferring anything from it concerning the reviewability of such distinct final agency action" as is challenged here. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 601 (2016).

## C.    The Address-Sharing Policy is likely unlawful.

As the district court held, the Address-Sharing Policy likely violates the APA in at least two ways. First, it flouts the statutory limits of § 6103(i)(2) by authorizing sharing in circumstances where disclosure is forbidden. Remarkably, it is *undisputed* that portions of the data-sharing that occurred prior to the district court's stay violated the law. Dkt. No. 66-1, ¶ 18. But even those disclosures that IRS maintains were lawful in fact violated the plain statutory text. Second, the policy was adopted without reasoned decisionmaking. Each reason is independently sufficient to support the district court's order.

### 1.    *The Address-Sharing Policy is likely contrary to law.*

Agency action is contrary to law if it violates a federal statute or regulation. *See, e.g.*, *Reuters Ltd. v. FCC*, 781 F.2d 946, 950 (D.C. Cir. 1986) ("[I]t is elementary that an agency must adhere to its own rules and regulations."). The Address-Sharing Policy fails that standard

because it permits the automated sharing of confidential taxpayer data *en masse* and without any necessary processes or safeguards to ensure that IRS data is not disclosed unless and until a request meets the requirements set forth in Section 6103(i)(2). For many of the required pieces of information a request must contain, the Address-Sharing Policy put in place nothing more than a computerized rule that required that a corresponding field "must not be empty." A462. It included no process to confirm the information entered was meaningful or met the statutory requirements. A462. This clearly fails to ensure that "[r]eturns and return information shall be confidential" except in limited circumstances, as the law requires. 26 U.S.C. § 6103(a). Information may only be disclosed under Section 6103(i)(2) "upon receipt of a valid request," *Centro de Trabajadores Unidos*, 167 F.4th at 1224, but the IRS failed to ensure the requests it received *en masse* were valid. A reading of Section 6103 that permits such disclosures under the Address-Sharing Policy would render the statute effectively meaningless and allow for troves of data to be disclosed with almost no limiting principles. As the district court concluded, the Address-Sharing

41

Policy violates multiple provisions of Section 6103(i)(2), and Defendants

arguments to the contrary all fail.

### a)    A request must include an address of the taxpayer

Section 6103(i)(2) requires that any request must be in writing

and set forth, in part, "the name and address of the taxpayer with

respect to whom the requested return information relates." 26 U.S.C.

§ 6103(i)(2)(B)(i). As the district court correctly noted, this requirement

is "more than just a box to be checked." A1884. Yet the Address-Sharing

Policy fails even that standard; the Romo Declaration made clear the

Policy required nothing more than a "proxy" zip code, which violates the

statute. The district court explained:

> A zip code is not an address, and a zip code proxy, as the IRS would define it, might as well be a set of random numbers. For instance, ICE could have submitted a request with an "address" like, "Don't Care 12345," or, "00000," and still received a taxpayer's address through the IRS's TIN Matching process.

Dkt. No. 74, at 7.

Defendants spend much time (at 46-50) arguing that the statute

does not require address matching between the address submitted by

ICE and those in IRS records. But that argument misses the point,

because it is incontrovertible that the statute *does* require that the

requesting agency provide the "IRS with the taxpayer's name and address." *Centro de Trabajadores Unidos*, 167 F.4th at 1231; 26 U.S.C. § 6103(i)(2)(B)(i). Defendants themselves repeatedly concede that disclosure of address information is only permitted upon receipt of a "compliant" request.[6] *See, e.g.*, Blue Br. at 4. And the IRS, consistent with its obligation to keep taxpayer information confidential unless it receives a valid request, must confirm that the address it receives is that of the taxpayer. The IRS ought to comply by confirming that addresses match to ensure that the information disclosed relates to the correct taxpayer, but at a minimum, it must actually verify that the statutory requirement is met. The Address-Sharing Policy does not require such verification and thus is contrary to law.

### b) A request must include the relevant taxable period

The Address-Sharing Policy also violates Section 6103 because it does not require that the IRS verify that each request includes the

---

[6] Defendants also imply (at 49) that because they matched individuals by taxpayer identification number, inclusion of an address of the taxpayer is not a requirement for a valid request. This clearly belies the statutory text which straightforwardly requires "the name and address of the taxpayer." 26 U.S.C. § 6103(i)(2)(B)(i).

taxable period or periods to which such return information relates. ICE's mass request was not valid because it did not include, for each request, the specific "taxable period or periods to which [the] return information relates." 26 U.S.C. § 6103(i)(2)(B)(ii). ICE submitted, for all 1.28 million requests, a range of years—"January 2022 to present." Blue Br. at 50.

The taxable period must be relevant *for that specific request.* A blanket entry of "2022 to present" for more than one million requests fails that test. Take for example, an individual who was issued a final order of removal in January 2025. That person's address in 2022 is in no way related to that request, and thus, a request for return information for that taxable period is not valid.

Further, the IRS processed this request without taking any steps to verify that the request included valid taxable periods at all. Instead, the Policy merely required that for every request, the "Taxable Period" column of a spreadsheet "[m]ust not be empty," A462. A474. Given the stringent confidentiality requirements set forth in the Internal Revenue Code, and the inability of the IRS to disclose information unless it has

44

confirmed receipt of a compliant request, this process is not in accordance with the law.

### c) A request must include the specific reason why such disclosure is, or may be, relevant to a criminal proceeding or investigation

The statute also requires that a compliant request must set forth "the specific reason" why the disclosure "is, or may be, relevant" to a proceeding or investigation. 26 U.S.C. § 6103(i)(2)(B)(iv). In a letter accompanying the request, ICE indicated that for each of the 1.28 million requests, "the requested information may contain address information which is potentially at issue with respect to investigating or proving a violation under 8 U.S.C. § 1253(a)(1)." A449. An accompanying spreadsheet indicated that the information was necessary "[t]o verify presence within the United States of America." A434. The Address-Sharing Policy permitted and would permit disclosures for these purposes, but such disclosures are violative of the statute for two reasons.

First, the statute requires that ICE submit, for each request, a "specific reason" the return information is relevant to the investigation. 26 U.S.C. § 6103(i)(2)(B)(iv). As the district court explained, "[i]f

45

Congress thought any reason could be provided, then it would have omitted the term 'specific,' as it did elsewhere in 6103." A1890. It thus requires by the IRS "more than a cursory consideration of the reasons provided by the agency." A1891. But the IRS's policy fails to honor that requirement. It allowed ICE to provide circular reasoning, essentially representing "to the IRS that the 'specific reason' why confidential taxpayer information was relevant to an investigation or proceeding under a criminal statute was because the agency was conducting an investigation or proceeding under that criminal statute." *Id.* Further, the "specific reason" offered by the government is not relevant to the investigations it purports to conduct. The government argues the information "could show that aliens had not departed the United States as required by the applicable statute," but an address unlinked to a taxable period does no such thing.

The disconnect between what ICE requested and what would be relevant to its purported investigation highlights the second way in which the Address-Sharing Policy fails to require that an agency offer a "specific reason" to the IRS. The IRS had significant reason to believe that the reason for the request was pretext, and the Address-Sharing

46

Policy failed to require the IRS to take reasonable steps to confirm it was legitimate, in order to fulfill its statutory duty to keep return information confidential. As the district court pointed out, where the IRS disclosed address information to ICE, it provided the "last known address" only—not the taxable period to which the address relates. A1891-1892; *see also* A464; A474-475. Absent any date associated with an address, that information would not aid ICE, in any meaningful way, in investigating a potential violation of 8 U.S.C. § 1253(a)(1). After all, an address alone cannot show whether a person overstayed an order of removal if there is no date associated with it. But a bare address would be relevant to efforts to locate and deport individuals—a civil, not criminal investigation, and one for which disclosures of information by the IRS is not permitted. 26 U.S.C. § 6103(i)(1)(A)(i) (allowing disclosures related to a "specifically designated Federal *criminal* statute") (emphasis added).

> **d)     Information may only be disclosed to an individual "personally and directly engaged" in a related criminal proceeding or investigation**

Return information may only be disclosed to individuals personally and directly engaged in a criminal investigation or

proceeding. 26 U.S.C. § 6103(i)(2)(A). ICE identified one individual, who it represented was "personally and directly engaged" in 1.28 million criminal investigations.

As an initial matter, the IRS argues that this requirement governs only to whom information is disclosed—not whether such a disclosure is permissible. Blue Br. at 54. That reading of the statute is beyond the pale. Under the relevant provision, a request for return information may be made by the "head of any Federal agency" or other specified individual, but the IRS may disclose responsive information only to individuals "personally and directly engaged" in the criminal investigation or proceeding. That structure requires the requestor to identify, as part of the request, the person "personally and directly engaged" in the investigation or proceeding to whom any disclosure should be made. And the information must be specifically relevant for use in a criminal proceeding, or an investigation likely to lead to one, conducted by the "personally and directly engaged" individual. 26 U.S.C. § 6103(i)(2)(A).

The request the IRS processed flouted those requirements. Put simply: ICE had no intention of conducting, and did not conduct, 1.28

48

million criminal investigations, and it tacitly concedes as much. Defendants explain that ICE can conduct a "single, broad-scale investigation that begins with a high-level review of address information." Blue Br. 55 (emphasis omitted). Putting aside that the address information requested will, in most cases, not support such a criminal investigation (*see supra* pp. 44-47), that kind of "high-level review" is data mining—not individual criminal investigations. This is how the statute must be read for it to have any meaningful limitation. ICE itself conceded that no individual criminal investigations existed at the time of the request, explaining that *after* reviewing mass databases of information, ICE would "have discretion" as to "whether to open … separate investigations that focus on specific individuals." Blue Br. at 56. In the absence of that kind of individual investigation, the review of data is not "an investigation which may result in" a criminal proceeding. Any other interpretation of the provision would render it meaningless, as any law-enforcement agency could request troves of information that could conceivably be used in some future investigation.

Further, one person cannot be "personally and directly engaged" in 1.28 million concurrent criminal investigations. As the district court

49

found, ICE had identified Assistant Director "J.W." as personally and directly engaged in 7.6 million investigations under a different statutory provision; it is "unreasonable to think that, in one month, the same Assistant Director could be 'personally and directly' engaged in 7.6 million criminal matters under one statute and 1.2 million criminal matters under another." A1913.

In addition, as the district court found, ICE's representations to the IRS "raise[] an inference that ICE's representation that it is conducting criminal investigations under 8 U.S.C. § 1253(a)(1) was pretext." A1913. The record contains significant evidence that ICE sought information not for any bona fide criminal investigation, but rather for locating and deporting immigrants—both of which are civil immigration matters, not criminal. *See, e.g.,* A1913 ("White House spokesperson Abigail Jackson said the information sharing was 'part of President Trump's promise to carry out the mass deportation of criminal illegal aliens'"); A423 (ICE requesting data for "the full alien population" so ICE can "make it available for targeting"). The district court found that the "factually uncontested allegations" support the claim that "address information will be impermissibly used for civil

50

immigration enforcement." A1914. Disclosures under (i)(2) for such purposes are prohibited, so the Address-Sharing Policy violates the statute by permitting the IRS to fulfill such requests.

### 2.    *The Address-Sharing Policy is likely arbitrary and capricious.*

"[A]n agency acts arbitrarily and capriciously when it abruptly departs from a position it previously held without satisfactorily explaining its reason for doing so." *Wis. Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001). To do so is to "entirely fail to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009); *see Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30-31 (2020).

The district court concluded that the Address-Sharing Policy is likely arbitrary and capricious because "the IRS failed to present a reasoned basis for the Policy, failed to consider key issues implicated by

51

the Policy, and failed to consider the reliance interests engendered by the IRS's prior policy regarding disclosure of confidential taxpayer information." A1894. Defendants fail to address any of these conclusions. Instead, the government argued that the Address-Sharing Policy is not arbitrary and capricious for two reasons. First, that no policy exists. As discussed, *supra* pp. 31-32, evidence of the policy abounds, and the district court correctly found that the IRS adopted such a policy. Second, that the disclosures were legally required, and thus, could not be arbitrary and capricious. This argument also fails. Even if the IRS determines that Section 6103(i)(2) requires disclosure of address information upon receipt of a "valid request," *Centro de Trabajadores Unidos*, 167 F.4th at 1224, it does not follow that any method the agency adopts to facilitate those disclosures is therefore permissible. The APA requires that when making a policy change, the IRS must consider any "alternatives that are within the ambit of the existing policy." *Regents*, 591 U.S. at 30 (cleaned up). In adopting the Address-Sharing Policy without considering whether it could make any legally required disclosures under the prior policy, the IRS acted in an arbitrary and capricious manner.

52

As the district court determined, the prior policy relating to disclosures under Section 6103(i)(2) was "rooted in individualized review, segmentation, and limited, last-resort disclosure." A1895. The Address-Sharing Policy replaced a policy that took painstaking care to comply with Section 6103(i)(2) and sought to minimize the unlawful and unnecessary disclosure of return information.

As the district court indicated, the government did not contest the claim that in "the same month the IRS entered into the MOU with ICE, the IRS amended its procedures [set forth in the Internal Revenue Manual] for reviewing Section 6103(i)(2) requests for taxpayer information … These amendments converted a process through which Section 6103(i)(2) requests were 'undertaken carefully' and 'handled on a case-by-case basis strictly in accordance with the law' into a process through which massive requests for confidential taxpayer information could be processed quickly in bulk without much human interaction." A1896.[7]

---

[7] The IRS argues that the Internal Revenue Manual does not have the force of law and thus cannot be considered. That misunderstands the Manual's relevance. As in *Venetian Casino,* Plaintiffs do "not contend the Manual itself is a final agency action." 530 F.3d at 931. Instead, "the Manual is relevant insofar as it illuminates the nature of

Even if Section 6103(i)(2) required disclosures by the IRS in response to ICE's request, as the government argues, it does not follow that the Address-Sharing Policy is the *only* way to comply with the statute's requirements. For example, the IRS could have continued to require that ICE submit case-by-case requests, and carefully scrutinize them on an individualized basis before responding. It could have required, as did the prior policy, that each request cover only the taxable periods relevant to the investigation. For example, if an individual was issued a removal order in 2024, address data from 2022 or 2023 would not be relevant. Under the prior policy, the request would have been limited to both meet the statutory requirements and safeguard the data. The Address-Sharing Policy takes a different approach. It treats each of the 1.28 million requests identically and in bulk, automating their processing.

The government has, at no point, addressed the removal of these requirements to individually assess each request—removals that were necessary in order to effectuate a process that can now allow disclosures

the policy." *Id.* And the Manual (in addition to the agency's actions) makes clear that the IRS has *changed* its policy, without acknowledging or explaining that change. This is arbitrary and capricious.

54

of data, *en masse*, through automated systems. As the district court noted, "Defendants' attempt at characterizing the IRS's information sharing with ICE as business-as-usual is undermined by Plaintiffs' showings regarding the IRS's overhaul of its technical infrastructure and belied by the administrative record." A1896. The IRS did not consider any obvious alternatives "within the ambit of the existing policy" before adopting the Address-Sharing Policy, and thus, it is arbitrary and capricious. *See Regents*, 591 U.S. at 30 (cleaned up).

Further, the IRS failed to consider key issues in adopting the Address-Sharing Policy, including (1) the need to protect taxpayers' privacy, (2) the impact on participation and trust in the tax system, and (3) the harm that could result from disclosures, and in particular mistaken disclosures. As the district court concluded, "there is no question that the IRS failed to consider these issues when adopting the Address-Sharing Policy, as the record before the Court indicates that the IRS failed to consider any countervailing issues at all when adopting the new Policy." A1897. The Romo Declaration further underscores the consequences that result from these failures, *supra* pp. 11-13.

In particular, the IRS's prior policy engendered significant reliance interests. Organizations, including the Center, have, for years, assured clients worried about confidentiality of the "stringent protection in place at the IRS with respect to the protection of information" A177. These organizations have encouraged immigrants to obtain ITINs and file their taxes. Small businesses have done the same. And Defendants do not—and cannot—respond to Plaintiffs' identification of the many representations the government has made, including during President Trump's first term, when the IRS stated clearly that "[t]here is no authorization under this provision to share tax data with ICE." For years, noncitizens have relied on those representations, and similar ones made by the agency regarding the confidentiality of taxpayer information, in their interactions with the tax system. But the IRS failed completely to consider reliance interests in adopting the Address-Sharing Policy, and their brief on appeal does not contend otherwise. That alone is grounds for a stay.

## II.    The district court correctly balanced the equitable factors in granting preliminary relief.

Having concluded that Plaintiffs are likely to succeed on the merits, the district court carefully weighed the equitable factors before entering

preliminary relief. In no respect did the court abuse its discretion in fashioning relief tailored to prevent irreparable harm to Plaintiffs while respecting legitimate law-enforcement interests.

### A.    The district court's order is necessary to prevent irreparable harm.

The district court correctly determined that preliminary relief was necessary to prevent irreparable harm to Plaintiffs and their members. A1899-1915. It was therefore proper to enter a stay "to preserve status or rights pending conclusion of the review proceedings," 5 U.S.C. § 705, and a preliminary injunction to prevent irreparable injury during the case, *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

**1. The Center.** The IRS largely glosses over the specific harms that the district court found, as a factual matter, the Center was likely to endure. Diminished trust in the tax system will "create[e] insurmountable obstacles to the Center's work" and "threaten[] the existence of the Center's *pro bono* legal services program." A1900. That such harms are irreparable is beyond cavil. *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) ("A business's destruction in its current form commonly qualifies as irreparable harm." (cleaned up)).

To the extent it does engage with the harms found by the district court, the IRS largely rehashes its arguments regarding the Center's standing. Blue Br. 60-61. Those arguments remain unavailing. As we have explained, the threatened loss of federal funding is neither speculative nor in the distant future. *See supra* pp. 22-24.

And the IRS cannot meaningfully contest that the policy "threatens to erode the goodwill that the Center has cultivated with taxpayers in a way that cannot be adequately measured at a later date." A1901. That, too, is irreparable. *See, e.g., Stuller, Inc. v. Steak N Shake Enters., Inc.,* 695 F.3d 676, 680 (7th Cir. 2012) (holding that plaintiff demonstrated irreparable harm where "it would be difficult to reestablish its previous business model without a loss of goodwill and reputation"). The IRS suggests (at 60) that such harm is speculative only because it ignores the ample record evidence supporting the district court's factual findings. Again, the fact that some taxpayers are required by law to file tax returns in no way diminishes the importance of trust in our tax system, which relies on voluntary reporting. *See supra* pp. 4, 29-30.

**2. The associational plaintiffs.** The district court also concluded that the associational plaintiffs' members face irreparable harm from the risk that their "confidential address information will be

impermissibly used by ICE for civil immigration enforcement." A1903.

That concern was well founded. The impetus for the data-sharing

arrangement is an executive order focused on civil immigration

enforcement. A1908-1909. And public statements by the White House

confirm that civil immigration enforcement is the true focus of the data-

sharing effort. A1913-1914. The district court rightly considered those

circumstances in evaluating the true purpose of the data-sharing. *See*

*Dep't of Com.*, 588 U.S. at 785 (observing that courts "are not required

to exhibit a naiveté from which ordinary citizens are free" (quotation

marks omitted)).

Against that backdrop, it is no surprise that the events leading up to

the August data sharing were fraught with irregularities. ICE made

repeated requests that flagrantly and transparently disregarded § 6103.

A1910-1913. IRS officials that raised legitimate questions about ICE's

efforts were sidelined. A1913. The request that IRS eventually

processed in August 2025 disregarded the safeguards enshrined in

§ 6103 and repeated in the MOU, as evidenced by the repeated legal

violations Plaintiffs established. *See supra* pp. 40-51.[8] And ICE's failure

---

[8] The Romo Declaration further underscore this disregard and therefore supports affirmance. *See supra* pp. 11-13.

to provide any meaningful reason it needed addresses as part of its purported criminal investigations further indicates that the stated need for address information is pretextual. A1907-1908. Considering the totality of the circumstances, the district court did not err in concluding that ICE was likely to use shared data impermissibly.

The government strains mightily to cast these events in a more favorable light, citing the presumption of regularity. Blue Br. 62-63. The district court acknowledged that presumption, and it rightly concluded that it had been overcome. A1906. For example, the government does not deny that the cited Executive Order and the White House's statement both referred to civil immigration enforcement. Blue Br. 63-64. Instead, it points to another provision of the MOU that referenced criminal enforcement efforts. Blue Br. 64. That discrepancy confirms, rather than refutes, that the stated reasons were pretext. And the government paints the back-and-forth between the IRS and ICE as merely a good-faith process for resolving concerns. Blue Br. 64-65. But the district court drew the better inference here, particularly given that the IRS makes no effort to explain the procedural inconsistencies described in the court's opinion.

At bottom, "the evidence tells a story that does not match the explanation" given. *Dep't of Com.*, 588 U.S. at 784. The district court acted well within its discretion to conclude that the associational plaintiffs' members face irreparable harm given the pretextual nature of the data-sharing arrangement.

The risk of harm is particularly "heightened by the additional threat of misidentification." A1915. Many taxpayers have the same or similar names to people who live near or with them, and government databases may not accurately record the names of individuals who do not follow Anglo naming conventions. A1915; *see* A187, A197. As a result, there is a material risk that the IRS will misidentify and improperly share the addresses even of members who do not have a final order of removal. The government does not even acknowledge the district court's findings regarding irreparable harm based on the threat of misidentification, let alone attempt to demonstrate they are clearly erroneous.

### B.    The balance of the equities clearly favors Plaintiffs.

The district court also properly balanced the equities before entering preliminary relief. The order bears little resemblance to the IRS's caricature. *See* Blue Br. 66 (calling it "far-reaching and extreme"). In fact, the district court carefully tailored its order to honor the balance

61

Congress struck between taxpayer privacy and legitimate law-enforcement interests. *See* A1921 (explaining that the court fashioned relief "tailored to addressing the precise illegalities and irreparable injuries that Plaintiffs have established"). Specifically, the district court declined to "enjoin *all* data transfers from the IRS to" the Department of Homeland Security and instead enjoined "only *unlawful* transfers." A1922. And to aid in monitoring compliance, the court modestly required the IRS to file under seal notices regarding future data-sharing requests from the Department of Homeland Security. *See id.*

The government fails to show that the district court abused its discretion in entering this relief. As an initial matter, the IRS has no legitimate interest "in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. After all, our constitutional "system does not permit agencies to act unlawfully even in pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 766 (2021). For the reasons set forth above, the IRS's Address-Sharing Policy does not comply with § 6103 and the APA. That alone refutes any argument that the district court's order inflicts irreparable harm on the IRS.

62

In any event, the government's argument fails on its own terms. The IRS first suggests that it is harmed because the order prevents it from "effectuating statutes enacted by representatives of its people." Blue Br. 66 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). That assertion is immediately belied by the IRS's complaint that "the order is essentially a 'follow-the-law' injunction" that merely requires compliance with what the statute commands. The government makes no effort to reconcile these inconsistent positions. And, as the district court's thorough analysis makes clear, the IRS "is *not*, in fact, 'effectuating the statute enacted by representatives of its people' because it is not giving effect to the statute's" limitations on data-sharing. *Make the Rd. N.Y. v. Noem*, No. 25-5320, 2025 WL 3563313, at *32 (D.C. Cir. Nov. 22, 2025) (statement of Millett and Childs, JJ.) (cleaned up).

The IRS also mischaracterizes the order as establishing a "pre-clearance regime" for future data-sharing requests. Blue Br. 66. It does no such thing. Rather, the order requires the IRS to file, under seal, a notice apprising the court and Plaintiffs about any future data-sharing requests from the Department of Homeland Security. A1828-1829. The district court crafted this relief to avoid "unduly burden[ing]" the

63

government's "interest in vigorous enforcement of criminal statutes." A1920. Such narrowly tailored relief guarantees that the Department of Homeland Security "will retain the ability to request information from the IRS in strict compliance with the [law]," while simultaneously ensuring that the court can monitor compliance with its order. *Id.* Nothing in the order obligates the government to seek the district court's pre-approval of data-sharing requests.

Since the district court entered its order four months ago, IRS has filed two notices regarding data-sharing requests. *See* Dkt. Nos. 67, 71. Neither notice contains any confidential information, and the government itself disclaimed any need to keep them under seal. *Id.* at n.1. Given that position, it is difficult to understand how filing such notices harms legitimate criminal investigations or constitutes an unwarranted invasion into agency operations. The government fails to substantiate any irreparable harm to its legitimate interests, which is no surprise given its failure to object to this relief before the district court. *See* Hr'g Tr. 104, Dkt. No. 38.

## C.    The district court's order is not overbroad.

There was no error in the scope of relief the district court ordered, which properly focused on the agency action at issue, rather than on

64

specific plaintiffs. That framing was consistent with longstanding APA principles. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring) (explaining that, regardless of whether universal relief is available under other statutes, "in the APA, Congress did in fact . . . authorize vacatur"). The district court also appropriately exercised its discretion given the nature of Defendants' actions and the irreparable harm those actions caused. The government's contrary arguments are meritless.

The government primarily argues that the district court's order conflicts with *Trump v. CASA*, 606 U.S. 831 (2025), and that relief under section 705 should be limited to Plaintiffs. Blue Br. 67-68. But *CASA* explicitly declined to address the scope of relief under the APA. *See Trump,* 606 U.S. at 847 n.10; *id.* at 869 (Kavanaugh, J., concurring). As a result, a panel of this Court recently explained that "*CASA* does not control the scope of relief available under Section 705." *Make the Rd. N.Y.*, 2025 WL 3563313, at *33-36 (statement of Millett and Childs, JJ.). Section 705 stays, by their very nature, are not party-specific remedies. Rather, they "operate on the legal source of authority," and thus are not party-limited. *Id.* at *35–36.

65

## CONCLUSION

For the foregoing reasons, the district court's order should be affirmed.

Respectfully submitted,

*/s/ Madeline H. Gitomer*
Madeline H. Gitomer
Simon C. Brewer
Daniel A. McGrath
Steven Y. Bressler
Robin F. Thurston
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 448-9090

*Counsel for Appellees*
Democracy Forward Foundation
P.O. Box 34556
Washington, D.C. 20043
(202) 448-9090

*Counsel for Appellees*

March 19, 2026

66

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and D.C. Circuit Rule 32(e)(1), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) and D.C. Circuit Rule 32(e)(1) because it contains 12,988 words including footnotes and excluding the parts of the brief exempted by Rule 32(f) and D.C. Circuit Rule 32(e)(1); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in 14-point Century Schoolbook font.

/s/ *Madeline H. Gitomer*

## CERTIFICATE OF SERVICE

I certify that on March 19, 2026, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ *Madeline H. Gitomer*

**ADDENDUM**

**26 U.S.C. § 6103 (excerpts)**

**(a)** General rule.--Returns and return information shall be confidential, and except as authorized by this title--

(1) no officer or employee of the United States,

(2) no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(1)(C) or (7)(A), any tribal or local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section or section 6104(c), and

(3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (c), subsection (e)(1)(D)(iii), paragraph (10), (13), (14), or (15) of subsection (k), paragraph (6), (8), (10), (12), (13) (other than subparagraphs (D)(v) and (D)(vi) thereof), (16), (19), (20), or (21) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

**(b)** Definitions.--For purposes of this section—

(1) Return.--The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

Add. 1

(2) Return information.--The term "return information" means—

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

. . .

but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer. Nothing in the preceding sentence, or in any other provision of law, shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws.

(3) Taxpayer return information.--The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

. . .

(7) Inspection.--The terms "inspected" and "inspection" mean any examination of a return or return information.

(8) Disclosure.--The term "disclosure" means the making known to any person in any manner whatever a return or return information.

Add. 2

. . .

. . .

**(i)** Disclosure to Federal officers or employees for administration of Federal laws not relating to tax administration.--

(1) Disclosure of returns and return information for use in criminal investigations.--

(A) In general.--Except as provided in paragraph (6), any return or return information with respect to any specified taxable period or periods shall, pursuant to and upon the grant of an ex parte order by a Federal district court judge or magistrate judge under subparagraph (B), be open (but only to the extent necessary as provided in such order) to inspection by, or disclosure to, officers and employees of any Federal agency who are personally and directly engaged in--

(i) preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party, or pertaining to the case of a missing or exploited child,

(ii) any investigation which may result in such a proceeding, or

(iii) any Federal grand jury proceeding pertaining to enforcement of such a criminal statute to which the United States or such agency is or may be a party, or to such a case of a missing or exploited child,

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

. . .

(2) Disclosure of return information other than taxpayer return information for use in criminal investigations.—

Add. 3

(A) In general.--Except as provided in paragraph (6), upon receipt by the Secretary of a request which meets the requirements of subparagraph (B) from the head of any Federal agency or the Inspector General thereof, or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, any United States attorney, any special prosecutor appointed under section 593 of title 28, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to section 510 of title 28, United States Code, the Secretary shall disclose return information (other than taxpayer return information) to officers and employees of such agency who are personally and directly engaged in--

  (i) preparation for any judicial or administrative proceeding described in paragraph (1)(A)(i),

  (ii) any investigation which may result in such a proceeding, or

  (iii) any grand jury proceeding described in paragraph (1)(A)(iii),

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

(B) Requirements.--A request meets the requirements of this subparagraph if the request is in writing and sets forth—

  (i) the name and address of the taxpayer with respect to whom the requested return information relates;

  (ii) the taxable period or periods to which such return information relates;

Add. 4

(iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and

(iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

(C) Taxpayer identity.--For purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information.

. . .

. . .

**(p)** Procedure and recordkeeping.—

. . .

(4) Safeguards.--Any Federal agency described in subsection . . . (i)(1), (2), (3), (5), or (7) . . . shall, as a condition for receiving returns or return information—

(A) establish and maintain, to the satisfaction of the Secretary, a permanent system of standardized records with respect to any request, the reason for such request, and the date of such request made by or of it and any disclosure of return or return information made by or to it;
(B) establish and maintain, to the satisfaction of the Secretary, a secure area or place in which such returns or return information shall be stored;

(C) restrict, to the satisfaction of the Secretary, access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title;

(D) provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be

Add. 5

necessary or appropriate to protect the confidentiality of the returns or return information;

. . .

. . .

. . .