# No. 26-5006

## UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

### CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs-Appellees,*

v.

### INTERNAL REVENUE SERVICE et al.,

*Defendants-Appellants*

On Appeal from the United States District Court for the District of Columbia
No. 25-cv-0457-CKK, Hon. Colleen Kollar-Kotelly

### BRIEF OF 115 MEMBERS OF CONGRESS AS *AMICI CURIAE* IN SUPPORT OF APPELLEES

Laura MacCleery
UNIDOSUS
1126 16th Street NW #600
Washington, D.C. 20036
Phone: (202) 489-7147
lmaccleery@unidosus.org

Andrew Weiner
*Counsel of Record*
Robert McLeod
KOSTELANETZ LLP
601 New Jersey Avenue, NW
Suite 260
Washington, D.C. 20001
Phone: (202) 790-6999
aweiner@kostelanetz.com

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE*.................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT....................................3

ARGUMENT....................................................................................................6

I.  Through Section 6103, Congress Sought to Protect Confidentiality
    and Promote Voluntary Compliance of All Taxpayers ................................6

II.  Disclosures of Taxpayer Information for Immigration Enforcement
     Defy the Plain Language of I.R.C. § 6103(i)(2) .........................................17

III.  The IRS's Policy and Practice of Sharing Address Information With
      ICE Is Arbitrary and Capricious and Violates the Administrative
      Procedure Act.........................................................................................21

CONCLUSION..............................................................................................25

ADDENDUM

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

CASES

*Addison v. Holly Hill Fruit Prods.*,
 322 U.S. 607 (1944) .................................................................................... 17

*Centro de Trabajadores Unidos v. Bessent*,
 167 F.4th 1218 (D.C. Cir. 2026) ........................................................... 17, 18

*Commissioner v. Clark*,
 489 U.S. 726 (1989) .................................................................................... 17

*Ctr. for Taxpayer Rights v. Internal Revenue Serv.*,
 ___ F. Supp. 3d ___, 2025 WL 3251044 (D.D.C. Nov. 21, 2025) ............. 20, 21, 22

*Ctr. for Taxpayer Rights v. Internal Revenue Serv.*,
 No. 25-457, 2026 WL 551105 (D.D.C. Feb 26, 2026) ................................ 19

*Dep't of Commerce v. New York*,
 588 U.S. 752 (2019) .................................................................................... 24

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
 591 U.S. 1 (2020) ........................................................................................ 23

*Encino Motorcars, LLC v. Navarro*,
 579 U.S. 211 (2016) .................................................................................... 22

*FCC v. Fox Television Stations, Inc.*,
 556 U.S. 502 (2009) .................................................................................... 22

*Hibbs v. Winn*,
 542 U.S. 88 (2004) ...................................................................................... 20

*Judulang v. Holder*,
 565 U.S. 42 (2011) ...................................................................................... 23

*Lake v. Rubin*,
 162 F.3d 113 (D.C. Cir. 1998) ...................................................................... 6

*Maracich v. Spears*,
 570 U.S. 48 (2013) ...................................................................................... 17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983) ...................................................................................... 21

*Nat'l Treasury Emps. Union v. FLRA*,
 791 F.2d 183 (D.C. Cir. 1986) ...................................................................... 6

ii

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ........................................................................ 24

*Tax Analysts v. IRS*,
  117 F.3d 607 (D.C. Cir. 1997) ....................................................... 7

**STATUTES**

Administrative Procedure Act (5 U.S.C.):

  § 551 ............................................................................................ 4

  § 706(2)(A) ................................................................................. 21

8 U.S.C. § 1253(a)(1) ..................................................................... 24

Internal Revenue Code (26 U.S.C.):

  § 1 ............................................................................................... 13

  § 871 ........................................................................................... 13

  § 6103 ...................................... 1-7, 10-12, 14-17, 20, 23, 25

  § 6103(i) ....................................................................................... 7

  § 6103(i)(1) ............................................................................. 8, 17

  § 6103(i)(2) ....................... 1, 3-5, 7-10, 12-14, 17-19, 22

  § 6103(i)(2)(A) ....................................................................... 9, 20

  § 6103(i)(2)(B) ............................................................................. 9

  § 6103(i)(2)(B)(i) ....................................................................... 18

  § 6103(i)(2)(B)(iv) ................................................................ 19, 20

  § 6103(k)(12) .............................................................................. 20

  § 6103(l) ...................................................................................... 11

  § 6103(l)(13) .......................................................................... 10, 11

  § 6103(l)(21) ............................................................................... 10

  § 6109(a)(1) ................................................................................. 13

  § 7526(a) ..................................................................................... 15

  § 7526(b)(1)(A)(ii)(II) ................................................................ 15

  § 7526A(a) ................................................................................... 15

  § 7526A(e)(2)(4) ......................................................................... 15

  § 7701(b) ..................................................................................... 13

iii

Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, § 203, 129 Stat. 2242 ...................................................................................... 15

Revenue Act of 1978, Pub. L. No. 95-600, § 701(bb)(1), 92 Stat. 2763 ..................... 7

Tax Equity and Fiscal Responsibility Act, Pub. L. No. 97-248, § 356, 96 Stat. 324 ......................................................................................... 7, 8

Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 90 Stat. 1520 (1976)................................................................................................ 6

**OTHER AUTHORITIES**

122 Cong. Rec. 24013 (1976) (statement of Sen. Lowell Weicker) ........................... 6

127 Cong. Rec. H4366–67 (1981)............................................................ 10

152 Cong. Rec. S4953 (daily ed. May 23, 2006) (statement of Sen. Chuck Grassley)................................................................................ 12

*2024 Annual Report to Congress, Research Report: IRS Processing of Individual Taxpayer Identification Numbers* (2025).............................. 15

Amendment to S. 2454, S. Amdt. 3267 to S. Amdt. 3192, 109th Cong., 152 Cong. Rec. 2814 (Apr. 4, 2006) ................................................... 12

Amendment to S. 2611, S. Amdt. 4177, 109th Cong., 152 Cong. Rec. 5013 (May 23, 2006) ................................................................... 12

Comprehensive Immigration Reform Act of 2006, S.2611, 109th Cong. § 301 (2006)............................................................................... 11

H.R. 3519, 97th Cong. (1981) ................................................................. 9

I.R.M. § 11.3.28.4(5) ......................................................................... 14

IRS, *Disclosure and Privacy Law Reference Guide*, Pub. 4639 (rev. Oct. 2012) .............................................................................. 14

IRS, *Topic No. 857—Individual Taxpayer Identification Number ("ITIN")*, https://www.irs.gov/taxtopics/tc857 (Nov. 7, 2024) ...................... 14

Staff of J. Comm. on Tax'n, Present Law And Background Relating To Tax Issues Associated With Immigration Reform, JCX-32-06 (July 25, 2006) ................................................................................ 13

Kevin G. Andrade, *Many immigrants have stopped filing taxes out of fear,* THE NEW BEDFORD LIGHT (Feb. 24, 2026), https://newbedfordlight.org/many-immigrants-have-stopped-filing-taxes-out-of-fear/ .................................................................. 16

Maria Sacchetti*, Undocumented and Paying Taxes, They Seek a*

*Foothold in the American Dream*, WASH. POST (Mar. 11, 2017) .......................... 22

Memorandum from Edwin Meese III, Counsellor to the President, to Richard S. Schweiker, Sec'y of Health & Human Servs. (June 3, 1982)................. 9

Memorandum from Joel Gerber, Deputy Chief Counsel, IRS, to Commissioner Roscoe L. Egger Jr. (Apr. 2, 1982) .................................................. 10

Memorandum from Peter J. Wallison, General Counsel of the Treasury (May 17, 1982) ..................................................................................................... 10

Pamela J. Gardiner, TIGTA, IRS Memorandum No. 94505 (1999) .......................... 22

Privacy Act of 1974; System of Records, 82 Fed. Reg. 43556 (Dep't Homeland Sec. Sept. 18, 2017) .............................................................................. 21

S. Rep. No. 94-938 (1976)......................................................................................... 6, 7

S. Rep. No. 95-745 (1978).............................................................................................. 8

*Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways & Means*, 108th Cong. 12 (2004) (statement of Mark W. Everson, Commissioner of Internal Revenue) ........................................................................................ 16

T.D. 8671, 61 Fed. Reg. 26788 (May 29, 1996) .................................................. 13, 14

T.D. 10013, 89 Fed. Reg. 93172 (Nov. 26, 2024)................................................. 14, 22

The Budget Lab at Yale, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* (2025) .................................................................................... 15

U.S. Census Bureau, *What's in a Name* (Dec. 15, 2016)........................................... 19

U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, vol. I*, (2000) ......................................................................................................... 11

U.S. Gov't Accountability Off., GAO-03-821, *Taxpayer Information: Increased Sharing and Verifying of Information Could Improve Education's Award Decisions* (2003) ............................................................... 11

v

## INTERESTS OF *AMICI CURIAE*

*Amici* are 115 Members of Congress listed on the attached Addendum. *Amici* submit this brief because Congress has an acute interest in ensuring that section 6103 of the Internal Revenue Code (26 U.S.C.) ("I.R.C."),[1] which protects the privacy of taxpayers, and Congressional intent behind the statutory scheme are followed.[2] We are alarmed that this Administration is seeking to rewrite section 6103 or to disregard its requirements. The data sharing at issue in this case between the Internal Revenue Service ("IRS") and the Department of Homeland Security ("DHS"), in reliance on section 6103(i)(2), violates the express terms of the statute and its history. Congress rejected several proposals to use return information for immigration enforcement purposes to section 6103. Instead, Congress and the IRS, acting on delegated

---

[1] Unless otherwise stated, all "section" references are to the Internal Revenue Code of 1986, as amended, in effect at the relevant time.

[2] Counsel for *amici* certify pursuant to Rule 29(a)(4)(E) of the Federal Rules of Appellate Procedure that (i) no party's counsel authored this brief in whole or in part, (ii) no party or party's counsel contributed money that was intended to fund preparing or submitting this brief, and (iii) no other person besides the amici and their counsel contributed money that was intended to fund preparing or submitting the brief. Counsel for *amici* also submit pursuant to Circuit Rule 29(d) that a separate brief from Members of Congress as *amici curiae* is necessary because of their unique interests in defending the legislative powers reserved by the Constitution for Congress and in representing their constituents and taxpayers who are harmed by the data sharing at issue in this case. *Amici* also bring a unique perspective regarding Congress's intent and the balancing of interests behind section 6103. For all these reasons, *amici* believe that this brief will aid the Court in resolving the issues presented in this case. All parties consent to the *amici's* participation.

1

authority, promoted voluntary compliance by immigrant taxpayers by protecting their information.

The confidentiality protections established by section 6103 apply to all taxpayers, regardless of immigration status. *Amici* submit this brief to make clear how the Administration's actions and change in policy encroach upon powers reserved by the Constitution for Congress and contravenes Congress's longstanding prerogative to prioritize collection of federal tax revenues by preserving the confidentiality of return information. The IRS adhered to and promoted this policy of confidentiality to millions of taxpayers for decades.

The data sharing here was illegal and threatens federal government revenues, adversely affecting all taxpayers. It would also compromise taxpayer privacy and raise the possibility of grave consequences for individuals misidentified by U.S. Immigration and Customs Enforcement ("ICE"), chilling participation in the tax system, impacting our constituents, and destroying public trust.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Every year, millions of Americans entrust their most sensitive personal and financial information to the IRS by filing tax returns that Congress requires by law. Congress enacted section 6103 to assure taxpayers that their information will not be disclosed except for statutorily identified and compelling reasons that Congress specifically authorized. To safeguard the boundaries of these enumerated exceptions, Congress has backed its statutory command to preserve the privacy of returns with civil and criminal penalties.

Section 6103's statutory framework barring disclosure with detailed, narrow exceptions reflects Congress's careful judgment, maintained and refined over fifty years, in support of a tax system built on voluntary compliance. The specific exception at issue, section 6103(i)(2), illustrates the care with which Congress has approached this subject.

Section 6103(i)(2) provides a limited authority to receive certain tax information in an investigation of a non-tax criminal matter. When Congress first authorized nontax criminal disclosures in 1976, it required judicial approval through an *ex parte* order. In 1982, Congress created an alternative for written agency requests by adding section 6103(i)(2), it included four enumerated requirements designed to substitute for the protection of judicial oversight. The head of a requesting agency or other designated officials must: identify the taxpayer by name and address, specify the taxable period, identify the criminal statute under which the investigation is proceeding, and state the

3

specific reason why disclosure is relevant. Return information must be disclosed only to officials who are "personally and directly engaged" in the investigation and must be used "solely for" that purpose.

The district court in this case correctly concluded that the IRS's address sharing with ICE under section 6103(i)(2) likely violated the statute and the Administrative Procedure Act (5 U.S.C. §§ 551 *et seq.*) ("APA"). Requests omitted "the name and address of the taxpayer," as required by the statute, and the IRS did not as a general matter match provided addressed against its own records. The requests also referenced a single, identical explanation of the relevance of every address requested, even though the statute requires a "specific reason" connecting disclosure to a particular proceeding or investigation. Further, DHS represented that a single government official was "personally and directly engaged" in criminal matters involving millions of taxpayers, a construction of the statute that would effectively eliminate the limitations on recipients of return information as circumscribed by Congress.

The confidentiality protections of section 6103 are foundational to a strategy carried out over decades by Congress and the IRS to promote voluntary compliance with our tax laws and increase federal revenue. Congress authorized and made permanent the Individual Taxpayer Identification Number program so that individuals ineligible for a Social Security Number could meet their tax obligations. Congress also funded taxpayer-assistance and return-preparation grants designated for underserved and limited-English-proficient communities, while, at the same time, repeatedly

4

declined to enact amendments that would have permitted disclosures for immigration enforcement. The IRS, in turn, supported these efforts with public statements clarifying that section 6103 does not authorize disclosure of tax information for immigration purposes.

Millions of taxpayers relied on these assurances by filing returns and contributing billions of dollars to the federal treasury. The IRS, by sharing the return information of immigrant taxpayers, departed from these longstanding positions without acknowledging its policy reversal, without offering a reasoned explanation, and without assessing the foreseeable consequences for voluntary compliance and federal revenue. This is precisely the kind of arbitrary and capricious decision making that Congress enacted the APA to prevent.

The consequences of IRS's data-sharing policy are far-reaching. Immigrant taxpayers face a high risk of misidentification based on the IRS's disregard of requirements in section 6103(i)(2). Taxpayers lose faith in the statutory protections intended to safeguard their return information, which harms our tax system by undermining voluntary compliance and the collection of revenue to fund the federal government. Unilateral changes to laws and established policy by the Executive branch shakes public confidence in government and the rule of law.

*Amici* request that this Court affirm the district court's order to stay the IRS's data sharing with ICE.

## ARGUMENT

I.  **Through Section 6103, Congress Sought to Protect Confidentiality and Promote Voluntary Compliance of All Taxpayers**

Nearly fifty years ago, Congress mandated that "[r]eturns and return information shall be confidential" except as expressly authorized for a specific, compelling purpose. Tax Reform Act of 1976, Pub. L. No. 94-455, § 1202, 90 Stat. 1520, 1667–97 (1976), *codified at* I.R.C. § 6103(a); *see* S. Rep. No. 94-938, Part I, at 328 (1976) (anchoring section 6103 in the principle that "the information that the American citizen is compelled by our tax laws to disclose . . . was entitled to essentially the same degree of privacy as those private papers maintained in his home."); *id.* at 318 ("[R]eturns and return information should generally be treated as confidential, and not subject to disclosure, except in those limited situations delineated in the newly amended Section 6103."). Section 6103 reflects a considered judgment that "the assurance of privacy . . . is fundamental to a tax system that relies upon self-reporting." *Nat'l Treasury Emps. Union v. FLRA*, 791 F.2d 183, 184 (D.C. Cir. 1986); *see also Lake v. Rubin*, 162 F.3d 113, 116 (D.C. Cir. 1998) (stating that section 6103 was enacted "to protect the privacy of tax return information and to regulate in minute detail the disclosure of this material").

Before 1976, the IRS operated, according to one Senator, as a "lending library" for the rest of the federal government, 122 Cong. Rec. 24013 (1976) (statement of Sen. Lowell Weicker), and shared roughly 80 million transcripts per year with other

6

agencies. S. Rep. No. 94-938, at 316–18 (1976). Congress recognized that "the IRS probably has more information about people than any other agency in the country," and "consequently, almost every other agency that has a need for information about U.S. citizens, therefore, logically seeks it from the IRS." *Id.* at 316–17. Watergate laid bare the danger of that arrangement: the same information that taxpayers had disclosed in good faith was weaponized by the Executive branch. *See Tax Analysts v. IRS*, 117 F.3d 607, 611 (D.C. Cir. 1997) (noting that section 6103 was enacted "in the wake of Watergate and White House efforts to harass those on its 'enemies list'").

Congress responded by imposing a statutory scheme that denies the Executive branch discretion over disclosures of return information, even to other federal agencies. The exceptions to the general rule of confidentiality in section 6103 (subsections (c) through (o)) reflect Congress's painstaking and ongoing effort "to balance the particular office or agency's need for the information involved with the citizen's right to privacy and the related impact of disclosure upon the continuation of compliance with our country's voluntary assessment system." S. Rep. No. 94-938, at 318.

In 1982, Congress amended section 6103(i) in the Tax Equity and Fiscal Responsibility Act ("TEFRA"), Pub. L. No. 97-248, § 356, 96 Stat. 324, 641, by creating the law-enforcement disclosure provision at subsection (i)(2) now in dispute.[3]

---

[3] The Revenue Act of 1978, Pub. L. No. 95-600, § 701(bb)(1), 92 Stat. 2763, 2922, added subsection (i)(2)(C), providing that "a taxpayer's identity shall not be treated as taxpayer return information" for purposes of (i)(2). Before the amendment, ambiguity in the statute threatened to prevent the IRS from even identifying the taxpayer whose

Before TEFRA, *every* disclosure of return information for nontax criminal purposes required an *ex parte* court order, *viz.,* authorization by a federal judge. I.R.C. § 6103(i)(1) (1976). Recognizing that this requirement was too cumbersome, Congress created an exception for written requests from agencies regarding a non-tax criminal investigation or proceeding that includes alternative protections of taxpayer privacy. Under section 6103(i)(2), a written request must come from the head of a federal agency or a high-ranking, criminal justice official and include:

> (i) the name and address of the taxpayer with respect to whom the requested return information relates;
>
> (ii) the taxable period or periods to which such return information relates;
>
> (iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and
>
> (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

---

information it was disclosing in connection with an ongoing criminal investigation. The legislative history explained:

> In order for the IRS to transmit this information . . . it is necessary, of course, to provide the name and address of the taxpayer. Because the taxpayer furnishes his name and address on his return, it is arguable that the IRS would not be able to provide this information to the Justice Department or other Federal agency, thus completely negating the purpose and operation of these provisions.

S. Rep. No. 95-745, at 61 (1978). The amendment resolved that ambiguity by permitting that identification data could accompany the substantive return information the IRS was already disclosing about a specific suspect.

I.R.C. § 6103(i)(2)(B). In short, a written request must be approved at the highest levels and be individually tailored to a particular taxpayer, specific tax years, and an identified criminal proceeding or investigation, and must include the specific reason why the tax information is relevant to the criminal proceeding or investigation. Section 6103(i)(2) further limits the disclosure of return information to "officers and employees" who are "personally and directly engaged in" the criminal proceeding or investigation, and limits use of such return information "solely for" the criminal proceeding or investigation. I.R.C. § 6103(i)(2)(A).

From the outset, the IRS interpreted section 6103(i)(2)(B) as incompatible with bulk data sharing. Shortly after section 6103(i)(2) became law, the Reagan Administration sought to identify men who failed to register for the Selective Service, requesting from the Social Security Administration and the IRS address information for roughly 500,000 suspected individuals. *See* Memorandum from Edwin Meese III, Counsellor to the President, to Richard S. Schweiker, Sec'y of Health & Human Servs. (June 3, 1982) (requesting that the Secretary furnish to the Selective Service System the names, dates of birth, social security numbers, and addresses of individuals required to register under the Military Selective Service Act). Months earlier, Congress had considered—and rejected—a provision that would have authorized exactly this kind of address sharing by the IRS. Specifically, H.R. 3519, 97th Cong. (1981), proposed adding a new subsection to the Military Selective Service Act that would have

9

empowered the President to require the Secretary of the Treasury to disclose the address of any individual listed in the Selective Service System. The House struck that provision on the floor. 127 Cong. Rec. H4366–67 (1981). In response to the White House's request of 500,000 individuals' address information, the Treasury General Counsel concluded that disclosing such information under section 6103(i)(2) "would likely be viewed as a challenge to Congressional prerogatives" and observed that "[t]here would appear to be no reason to seek such an amendment if Justice could, under current law (section 6103(i)(2)), simply write to the IRS and request the current addresses[.]" Memorandum from Peter J. Wallison, General Counsel of the Treasury (May 17, 1982); *see* Memorandum from Joel Gerber, Deputy Chief Counsel, IRS, to Commissioner Roscoe L. Egger Jr. (Apr. 2, 1982) (stating, based on "an overall reading of section 6103 and its legislative history," that the "more defensible legal position is that the disclosures cannot be made").

When Congress intends disclosure of bulk return information, the exception in section 6103 lacks the type of requirements in subsection (i)(2) that constrain and particularize proper requests. For example, section 6103(l)(21) permits disclosure of return information to the Department of Health and Human Services to determine eligibility for federal health insurance programs, and section 6103(l)(13) permits disclosure of return information to the Department of Education for student financial-aid purposes.

10

Notably, when the Department of Education initially sought data to assist parents in applying for student aid based on tax records, the Treasury Department responded that it needed Congressional authorization, resulting in the exception under subsection (l)(13). *See* U.S. Dep't of the Treasury, Off. of Tax Pol'y, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, vol. I*, at 90–93 (2000) (recommending that Congress amend section 6103 to authorize disclosure of return information to the Department of Education for student financial-aid verification); *see also* U.S. Gov't Accountability Off., GAO-03-821, *Taxpayer Information: Increased Sharing and Verifying of Information Could Improve Education's Award Decisions* 13–16 (2003) (documenting that Treasury, OMB, and the Department of Education jointly proposed a legislative amendment to section 6103 in August 2002).

Furthermore, Congress has repeatedly and deliberately chosen not to allow the IRS to share information related to immigration enforcement. Most significantly, in 2006, Congress considered the Comprehensive Immigration Reform Act of 2006, S.2611, 109th Cong. § 301 (2006), which proposed allowing limited disclosure of return information to DHS to facilitate implementation of the Electronic Employee Verification System now known as E-Verify. Senator Chuck Grassley proposed an amendment to section 6103(l) to allow DHS to obtain taxpayer information of certain employers with more than 100 employees whose names and taxpayer identifying numbers "did not match the records maintained by the Commissioner of Social

11

Security" or with more than ten employees "with the same taxpayer identifying number." Amendment to S. 2611, S. Amdt. 4177, 109th Cong., 152 Cong. Rec. 5013, 5018–19 (May 23, 2006). In remarks on the Senate floor, Senator Grassley explained:

> The protection of taxpayer information is a cornerstone of our voluntary tax system . . . . We identified the specific information that would be needed to identify potentially illegal workers and crafted an amendment to 6103 that permits such use while maintaining all of the privacy protections afforded by 6103.

152 Cong. Rec. S4953 (daily ed. May 23, 2006) (statement of Sen. Chuck Grassley). Additionally, Senator Ben Nelson proposed broadly amending section 6103(i) to authorize disclosure of return information to DHS for use in "any judicial or administrative civil or criminal enforcement proceeding against an alien under the Immigration and Nationality Act," or "any investigation which may result in [such] proceedings." Amendment to S. 2454, S. Amdt. 3267 to S. Amdt. 3192, 109th Cong., 152 Cong. Rec. 2814, 2825 (Apr. 4, 2006).

Both proposed amendments operated on the premise that section 6103(i)(2) did not already authorize the disclosure of return information for immigration enforcement, or the amendments would have been superfluous. Congress understood that using return information for immigration enforcement was beyond the scope of the statute and that the proposed amendments were asking Congress to evaluate "whether the potential benefits to Department of Homeland Security workplace enforcement outweigh the adverse effects on taxpayer compliance and privacy that would result from the

12

disclosures of return information." Staff of J. Comm. on Tax'n, Present Law And Background Relating To Tax Issues Associated With Immigration Reform, JCX-32-06, at 1 (July 25, 2006). Both proposed amendments failed.

Congress has consistently prioritized revenue collection over the competing goal of using taxpayer information for immigration enforcement not only by safeguarding the confidentiality of return information but also by encouraging voluntary compliance on the part of *all* taxpayers, including those who lack authorization to work in the United States. Immigration status has no relevance in our tax system, which instead applies a substantial presence test and imposes tax on "resident aliens." *See* I.R.C. §§ 1, 871, 7701(b). For millions of individuals obligated to pay federal taxes, their ineligibility for a Social Security Number ("SSN") presented a significant problem reporting income properly and filing returns. Upon receipt of immigrant taxpayers' returns, the IRS lacked a reliable means to track taxpayers' information from one year to the next. Congress and the IRS addressed these problems by creating the Individual Taxpayer Identification Number ("ITIN") program. T.D. 8671, 61 Fed. Reg. 26788 (May 29, 1996); *see* I.R.C. § 6109(a)(1) (authorizing the Secretary to require for tax purposes an "identifying number as may be prescribed for securing proper identification of such person").

The history of the ITIN program is instructive. The IRS worked with the Immigration and Naturalization Service ("INS") (the predecessor to the current immigration agencies) to design a system to track tax payments from an individual over

13

time. Over a period of years, the agencies considered the parameters and workability of a new identification system in full view of the potentially competing interests related to immigration enforcement. 61 Fed. Reg. at 26789. Consistent with section 6103 and Congressional intent, the agencies prioritized tax privacy to facilitate voluntary compliance and reduce the risk of public concern stemming from that compliance.

The IRS emphasized that the ITIN is "intended for tax use only" and "creates no inference" about the individual's immigration status or right to work. 61 Fed. Reg. at 26789. The IRS has since consistently reinforced that assurance. *See, e.g.,* T.D. 10013, 89 Fed. Reg. 93172, 93174 (Nov. 26, 2024) ("There is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws."); IRS, *Topic No. 857—Individual Taxpayer Identification Number ("ITIN")*, https://www.irs.gov/taxtopics/tc857 (last updated Nov. 7, 2024) ("An ITIN is issued for federal tax filing purposes only and . . . creates no inference concerning your immigration status or your right to work in the United States."); *see also* I.R.M. § 11.3.28.4(5) (Apr. 17, 2025) ("Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address."); IRS, *Disclosure and Privacy Law Reference Guide*, Pub. 4639 (rev. Oct. 2012) ("Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with this section. The section contemplates requests for return information in addition to taxpayers' addresses.").

14

Millions of taxpayers, including many economic contributors residing and working in our districts and states, took the IRS at its word and applied for an ITIN, resulting in billions of dollars in payroll-tax contributions from workers who are unlikely ever to claim Social Security benefits and whose contributions help to maintain the solvency of the Social Security Trust Fund. *See* Nat'l Taxpayer Advocate, *2024 Annual Report to Congress, Research Report: IRS Processing of Individual Taxpayer Identification Numbers*, at 230 fig. 5.3.3 (2025) (reporting that approximately 3.8 million returns were filed with ITINs in tax year 2022, generating $17.3 billion in total tax paid); The Budget Lab at Yale, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* (2025) (estimating that undermining Section 6103 confidentiality protections could reduce federal revenue by $313 billion over a decade as ITIN filers exit the tax system). The program has also been an essential facilitator of billions of dollars tax payments to state governments, as ITIN holders use the same identifier to meet their obligations under state tax laws. Our constituents benefit significantly from the substantial tax payments of individuals who are ineligible for an SSN.

Congress also repeatedly authorized and invested in return-preparation and taxpayer assistance grants that support underserved and limited-English-proficient communities, including immigrant taxpayers, to ensure that everyone with an obligation to pay federal taxes has the information and assurances necessary to do so. I.R.C. §§ 7526(a) & (b)(1)(A)(ii)(II), 7526A(a) & (e)(2)(4). Congress also enacted ITIN expiration and renewal rules in 2015, further codifying ITINs as a fixture of our tax

15

system. *See* Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, div. Q, § 203, 129 Stat. 2242, 3078.

The high rate of voluntary compliance involving millions of taxpayers is an achievement of Congressional and IRS efforts aimed at maintaining tax revenues consistent with economic activity that is taxable under federal law. Commissioner of Internal Revenue Mark W. Everson, who had also served as the Deputy Commissioner of INS, testified in 2004 that "any sharing of confidential taxpayer information, directly or indirectly, with immigration authorities would have a chilling effect on efforts to bring ITIN holders, and potential ITIN holders, into the U.S. tax system" and "would deprive the Federal Government of tax revenue[.]" *Social Security Number and Individual Taxpayer Identification Number Mismatches and Misuse: Hearing Before the Subcomm. on Oversight & the Subcomm. on Soc. Sec. of the H. Comm. on Ways & Means*, 108th Cong. 12 (2004) (statement of Mark W. Everson, Commissioner of Internal Revenue). In the same hearing, the Government Accountability Office confirmed that "Section 6103 does not currently authorize data sharing between IRS and DHS specifically for immigration enforcement." *Id.* at 48 n.20. The IRS's current data-sharing policy and actions contradict these longstanding assurances without any assessment of the foreseeable harm to voluntary compliance and the public fisc, or to public trust in the tax system and its decades of promises to taxpayers. *See, e.g.,* Kevin G. Andrade, *Many immigrants have stopped filing taxes out of fear,* THE NEW BEDFORD

16

LIGHT (Feb. 24, 2026), https://newbedfordlight.org/many-immigrants-have-stopped-filing-taxes-out-of-fear/.

## II. Disclosures of Taxpayer Information for Immigration Enforcement Defy the Plain Language of I.R.C. § 6103(i)(2)

The requirements of section 6103(i)(2) are the means by which Congress sought to ensure that disclosures without an *ex parte* hearing and judicial oversight, as required by section 6103(i)(1), would remain individualized, targeted, and bounded. Where "a general statement of policy is qualified by an exception," courts generally "read the exception narrowly in order to preserve the primary operation of the provision." *Commissioner v. Clark*, 489 U.S. 726, 739 (1989). This approach guards against "eviscerat[ing] [the] legislative judgment through an expansive reading of a somewhat ambiguous exception." *Id.* In addition, the "detail and . . . particularity" of the exceptions in section 6103 "preclude their enlargement by implication." *Addison v. Holly Hill Fruit Prods.*, 322 U.S. 607, 617 (1944); *see also Maracich v. Spears*, 570 U.S. 48, 60 (2013) (exceptions "ought not operate to the farthest reach of their linguistic possibilities if that result would contravene the statutory design").

As this Court recognized in *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), section 6103(i)(2) "does not contemplate or authorize freewheeling disclosure of sensitive information" and instead "imposes specific requirements for requesting information from IRS, strictly delineating who can make a request, how, and why." *Id.* at 1230–31. The Court further held that the disclosure duty

17

is triggered "[o]nly if every requirement is satisfied." *Id*. at 1231. In *Centro*, the Court considered only a challenge to the Memorandum of Understanding ("MOU") between IRS and DHS regarding the disclosure of return information to ICE. *Id.* at 1223; *see also* Dist. Ct. Doc. 30-6 (MOU). As the record in this case demonstrates, the implementation of the MOU and actual data sharing that has taken place fall short of what section 6103(i)(2) demands.

First, without accurate address information, ICE's requests necessarily fail the requirement to provide "*the* name and address of the taxpayer." I.R.C. § 6103(i)(2)(B)(i) (emphasis added). In *Centro*, this Court held that the statute does not require a current address and that the provision does not bar requests that seek address information alone. 167 F.4th at 1231. The Court observed, however, that the address must be one "known by the requesting agency to be that 'of the taxpayer,'" and, as the government acknowledged, the statute requires that the requesting agency make "a good-faith effort to provide the last-known address reflected in its files for the specific individual whose tax information is requested." *Id.* (quoting I.R.C. § 6103(i)(2)(B)(i)).

The IRS's data sharing with ICE violates the statute by both measures. ICE's written requests for tax information in many cases lacked *any* address for the taxpayer. ICE's data file included in the address field entries such as "Failed to Provide," "Unknown Address," and "NA NA," along with references to jails, detention facilities, and prisons without street addresses. Dist. Ct. Doc. 66-1, Declaration of Dottie A. Romo ¶¶ 13–14 ("Romo Decl."). The IRS treated any five-digit number for a zip code

18

as sufficient to satisfy the address field. *Id.* ¶ 6. The disclosure of return information based on these requests violates the address requirement of section 6103(i)(2) as well as exhibits a lack of good faith.

Regarding the vast majority of disclosures (90.3%), the IRS matched requests solely by taxpayer identification number and name, without any verification of address information. *Id.* ¶¶ 8(a), 10. As the district court found, the IRS "violated the IRC approximately 42,695 times by disclosing last known taxpayer addresses to ICE through TIN Matching without confirming that ICE's request set forth the 'address of the taxpayer.'" *Ctr. for Taxpayer Rights v. Internal Revenue Serv.*, No. 25-457, 2026 WL 551105, at *3 (D.D.C. Feb. 26, 2026). The IRS effectively substituted an ITIN for the address requirement in further violation of the statute.

Congress requires both the address of the taxpayer and that the address provided match the requested records for obvious reasons: to confirm the identity of the taxpayer whose return information is requested and to ensure that the disclosure is legally authorized. Accuracy is particularly important here because ICE is using return information to conduct deportations, and because the risk of misidentification is high. Among Hispanic populations, for example, 26 surnames cover a quarter of the population, and similar concentration exists for Asian Americans. U.S. Census Bureau, *What's in a Name* (Dec. 15, 2016).

Second, sweeping requests for address information violate the statute's requirement that a request set forth "the specific reason or reasons why such disclosure

is, or may be, relevant to such [criminal] proceeding or investigation." I.R.C. § 6103(i)(2)(B)(iv). Every word of this provision serves a function. The definite article "the" demands a particularized showing. The modifier "specific" requires more than a generic assertion applicable to all 1.28 million individuals. And the requirement that the reason relate to "such proceeding or investigation" links each disclosure to an identified criminal matter.

If Congress had thought that any reason for a request would suffice, it would have omitted the term "specific"—as it did elsewhere in Section 6103. *See Ctr. for Taxpayer Rights v. Internal Revenue Serv.*,___ F. Supp. 3d ___, 2025 WL 3251044, at *28 (D.D.C. Nov. 21, 2025) (contrasting Section 6103(i)(2)(B)(iv) with provisions like Section 6103(k)(12), which uses "reason" without the modifier "specific"); *see also Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("'A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'") (quoting 2A N. Singer, *Statutes and Statutory Construction* § 46.06, pp.181–186 (rev. 6th ed. 2000)). The district court correctly held that this requirement "confers a responsibility on the IRS to engage in some level of individualized, non-automated review when evaluating agency requests for disclosure of taxpayer information." *Ctr. for Taxpayer Rights*, 2025 WL 3251044, at *27.

Third, the IRS's disclosures also violate the limitations on recipients and use. Section 6103(i)(2)(A) requires that disclosed return information go only to "officers and employees of such agency who are *personally* and *directly* engaged in" the criminal

20

proceeding or investigation, "*solely* for" that use. (Emphasis added). These limitations protect sensitive taxpayer data from unauthorized disclosure and ensure that an authorized disclosure for a criminal proceeding or investigation is not a pretense or prelude to use the data for other purposes.

The district court found it "unlikely that a single individual could be 'personally and directly engaged' in approximately 47,000 criminal matters, let alone 1.28 million of them." *Ctr. for Taxpayer Rights*, 2025 WL 3251044, at *24. The government's theory that a single senior ICE official can be "personally and directly engaged" in over a million investigations simultaneously reduces this statutory safeguard to a nullity in contravention of the Congressional designs.

Moreover, the Implementing Agreement confirms that ICE will maintain information from the IRS on, among other places, the "Alien File, Index, and National File Tracking System of Records," which contains "the official record of an individual's immigration history." Dist. Ct. Doc. 48-3, at 54 (Implementing Agreement); Privacy Act of 1974; System of Records, 82 Fed. Reg. 43556, 43557 (Dep't Homeland Sec. Sept. 18, 2017). This is the antithesis of the targeted, limited disclosure that Congress envisioned.

### III. The IRS's Policy and Practice of Sharing Address Information With ICE Is Arbitrary and Capricious and Violates the Administrative Procedure Act

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action . . . ."); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–23 (2016) ("[T]he agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy[,]" taking into account "that longstanding policies may have 'engendered serious reliance interests . . . .'") (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). As demonstrated above, sharing taxpayer data for immigration enforcement conflicts with section 6103(i)(2) and is invalid for that reason alone. The practice is also arbitrary and capricious, as the district court found, because the IRS "failed to acknowledge and explain its departure from its prior policy of strict confidentiality, failed to consider the reliance interests that were engendered by its prior policy of strict confidentiality, and failed to provide a reasoned explanation for implementing the new Address-Sharing Policy." *Ctr. for Taxpayer Rights*, 2025 WL 3251044, at *2.

For decades, the IRS maintained that "[t]here is no provision in the United States Code that authorizes the disclosure or redisclosure of returns or return information for enforcement of immigration laws." T.D. 10013, 89 Fed. Reg. 93172, 93174 (Nov. 26, 2024); *see* Pamela J. Gardiner, TIGTA, IRS Memorandum No. 94505, at 5 (1999) (stating that "the IRS intentionally will not provide information

to" immigration enforcement authorities and that, before doing so, the "the IRS requires that IRC Section 6103 be changed"); Maria Sacchetti, *Undocumented and Paying Taxes, They Seek a Foothold in the American Dream*, WASH. POST (Mar. 11, 2017) (including the IRS statement: "The IRS has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs . . . ."). The IRS's practice of sharing data for immigration enforcement repudiates these longstanding positions without demonstrating awareness or providing a public rationale consistent with the law and its purpose.

The IRS also has not considered, or even publicly acknowledged, the profound reliance interests at stake. When the government reverses a policy that has induced widespread reliance, it must confront both the reliance itself and the scope of the consequences. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 22–26 (2020). The IRS spent nearly three decades assuring taxpayers that return information was for tax purposes only and promoting voluntary compliance among immigrant taxpayers, for example, through the ITIN program. Those assurances induced millions of individuals to enter the federal tax system, generating billions in revenue. The IRS also has not provided an assessment of the likely and foreseeable harm to voluntary compliance and the public fisc, which is the cornerstone and primary objective of the tax system the IRS is charged by Congress to administer. *See Judulang v. Holder*, 565 U.S. 42, 55–56, 64 (2011) (agency action "unmoored from

23

the purposes and concerns" of the underlying statute is arbitrary and capricious).

Congress has a direct and vested interest in ensuring that the IRS complies with both substantive law and the APA's procedural safeguards, particularly given the consequences of the IRS's arbitrary and capricious decision for our country's finances, tax system, and taxpayer privacy. To determine IRS's compliance with these standards, this Court must base its assessment on the grounds upon which the IRS *actually* acted, not on *post hoc* rationalizations developed for litigation. *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943). And where, as here, the administrative record shows that the IRS's stated rationale (facilitating criminal investigations under 8 U.S.C. § 1253(a)(1)) is belied by the scale of the requested data and the references to civil removal objectives in the agreement related to those disclosures, the Court need not accept a "contrived" explanation at face value. *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). The Supreme Court in *New York* rejected the pretextual reasons given for including a citizenship question on the Census. *Id.* at 784–85. The stated criminal-investigation purpose of the IRS's address sharing would similarly undermine the "reasoned explanation requirement of administrative law . . . meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Id.* at 785.

The IRS's address sharing improperly challenges Congress's legislative authority and its exercise of that authority to protect taxpayer information under section 6103 and to hold agencies accountability under the APA.

## CONCLUSION

For the foregoing reasons, the Court should affirm the stay order and preliminary injunction entered by the district court.

Respectfully submitted,


/s/ Andrew Weiner
Andrew Weiner
Robert McLeod
KOSTELANETZ LLP
601 New Jersey Avenue NW
Suite 260
Washington, DC 20001
Phone: 202-790-6999
Fax: 212-808-8108
aweiner@kostelanetz.com

Laura MacCleery
UNIDOSUS
1126 16th Street NW #600
Washington, DC 20036
Phone: 202-489-7147
lmaccleery@unidosus.org

*Counsel for Amici Curiae*

# ADDENDUM: AMICI CURIAE

## LEADING AMICI (5)

**Adriano Espaillat**
Representative of New York

**Linda T. Sánchez**
Representative of California

**Catherine Cortez Masto**
Senator from Nevada

**Jimmy Gomez**
Representative of California

**Alex Padilla**
Senator from California

## MEMBERS OF THE U.S. SENATE (9)

**Cory A. Booker**
Senator from New Jersey

**Adam Schiff**
Senator from California

**Tammy Duckworth**
Senator from Illinois

**Jeanne Shaheen**
Senator from New Hampshire

**Ben Ray Luján**
Senator from New Mexico

**Chris Van Hollen**
Senator from Maryland

**Gary C. Peters**
Senator from Michigan

**Sheldon Whitehouse**
Senator from Rhode Island

**Jacky Rosen**
Senator from Nevada

## MEMBERS OF THE U.S. HOUSE OF REPRESENTATIVES (101)

**Katherine M. Clark**
Representative of Massachusetts

**Gabe Amo**
Representative of Rhode Island

**Ted W. Lieu**
Representative of California

**Yassamin Ansari**
Representative of Arizona

**Nancy Pelosi**
Representative of California

**Becca Balint**
Representative of Vermont

**Nanette Barragán**
Representative of California

**Donald S. Beyer**
Representative of Virginia

**Suzanne Bonamici**
Representative of Oregon

**Brendan F. Boyle**
Representative of Pennsylvania

**Salud O. Carbajal**
Representative of California

**André Carson**
Representative of Indiana

**Greg Casar**
Representative of Texas

**Sean Casten**
Representative of Illinois

**Joaquin Castro**
Representative of Texas

**Judy May Chu**
Representative of California

**Gilbert Cisneros**
Representative of California

**Yvette D. Clarke**
Representative of New York

**J. Luis Correa**
Representative of California

**Jim Costa**
Representative of California

**Joe Courtney**
Representative of Connecticut

**Angie Craig**
Representative of Minnesota

**Danny K. Davis**
Representative of Illinois

**Madeleine Dean**
Representative of Pennsylvania

**Diana DeGette**
Representative of Colorado

**Rosa L. Delauro**
Representative of Connecticut

**Suzan K. DelBene**
Representative of Washington

**Maxine Dexter**
Representative of Oregon

**Lloyd Doggett**
Representative of Texas

**Veronica Escobar**
Representative of Texas

| | |
|---|---|
| **Lizzie Fletcher**<br>Representative of Texas | **Sara Jacobs**<br>Representative of California |
| **Bill Foster**<br>Representative of Illinois | **Pramila Jayapal**<br>Representative of Washington |
| **Maxwell Alejandro Frost**<br>Representative of Florida | **Henry C. ("Hank") Johnson, Jr.**<br>Representative of Georgia |
| **John Garamendi**<br>Representative of California | **Timothy Martin Kennedy**<br>Representative of New York |
| **Sylvia Garcia**<br>Representative of Texas | **Ro Khanna**<br>Representative of California |
| **Robert R. Garcia**<br>Representative of California | **John B. Larson**<br>Representative of Connecticut |
| **Jesús G. "Chuy" García**<br>Representative of Illinois | **George Latimer**<br>Representative of New York |
| **Adelita S. Grijalva**<br>Representative of Arizona | **Teresa Leger Fernandez**<br>Representative of New Mexico |
| **Pablo Jose Hernandez**<br>Representative of Puerto Rico | **Mike Levin**<br>Representative of California |
| **Steven Horsford**<br>Representative of Nevada | **Sam Liccardo**<br>Representative of California |
| **Jared Huffman**<br>Representative of California | **Stephen F. Lynch**<br>Representative of Massachusetts |
| **Glenn F. Ivey**<br>Representative of Maryland | **John Mannion**<br>Representative of New York |

**April McClain Delaney**
Representative of Maryland

**Alexandria Ocasio-Cortez**
Representative of New York

**Jennifer McClellan**
Representative of Virginia

**Jimmy Panetta**
Representative of California

**Betty McCollum**
Representative of Minnesota

**Chellie Pingree**
Representative of Maine

**James P. McGovern**
Representative of Massachusetts

**Mark W. Pocan**
Representative of Wisconsin

**LaMonica R. McIver**
Representative of New Jersey

**Nellie Avila Pou**
Representative of New Jersey

**Gregory W. Meeks**
Representative of New York

**Mike Bruce Quigley**
Representative of Illinois

**Rob Menendez**
Representative of New Jersey

**Delia C. Ramirez**
Representative of Illinois

**Dave Min**
Representative of California

**Emily Randall**
Representative of Washington

**Gwen Moore**
Representative of Wisconsin

**Jamie Raskin**
Representative of Maryland

**Seth Wilbur Moulton**
Representative of Massachusetts

**Luz Rivas**
Representative of California

**Jerrold Nadler**
Representative of New York

**Raul Ruiz**
Representative of California

**Eleanor Holmes Norton**
Representative of the District of Columbia

**Andrea Salinas**
Representative of Oregon

**Mary Gay Scanlon**
Representative of Pennsylvania

**Norma J. Torres**
Representative of California

**Jan Schakowsky**
Representative of Illinois

**Lori Trahan**
Representative of Massachusetts

**Lateefah Simon**
Representative of California

**Lauren Underwood**
Representative of Illinois

**Adam Smith**
Representative of Washington

**Juan Vargas**
Representative of California

**Darren Soto**
Representative of Florida

**Nydia M. Velázquez**
Representative of New York

**Gregory John Stanton**
Representative of Arizona

**James R. Walkinshaw**
Representative of Virginia

**Haley Stevens**
Representative of Michigan

**Debbie Wasserman Schultz**
Representative of Florida

**Eric Michael Swalwell**
Representative of California

**Maxine Waters**
Representative of California

**Mike Thompson**
Representative of California

**Bonnie Watson Coleman**
Representative of New Jersey

**Rashida Tlaib**
Representative of Michigan

**Frederica S. Wilson**
Representative of Florida

**Paul D. Tonko**
Representative of New York

**Ritchie John Torres**
Representative of New York

# CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limit of Circuit Rule 29(a)(5), because, excluding the parts of the brief listed in Fed. R. App. P. 32(f), this brief contains 5,944 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in size 14, Times New Roman font.


March 26, 2026                                    /s/ Andrew Weiner
                                                 *Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

This is to certify that on this 26th day of March 2026 the forgoing brief was electronically filed with the Clerk of the Court using the Court's CM/ECF system and was served on the parties by CM/ECF.

/s/ Andrew Weiner