**[SCHEDULED FOR ORAL ARGUMENT ON MAY 12, 2026]**

**No. 26-5006**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CENTER FOR TAXPAYER RIGHTS, et al.,

Plaintiffs-Appellees,

v.

INTERNAL REVENUE SERVICE, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

**REPLY BRIEF FOR APPELLANTS**

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

AUGUST FLENTJE
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 307-0878*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................... vi

GLOSSARY ............................................................................................... xi

ARGUMENT .............................................................................................. 1

I.  Plaintiffs have no likelihood of success on the merits ..................... 1

    A.  Plaintiffs lack Article III standing ........................................... 1

        1.  The Center lacks organizational standing ...................... 1

        2.  Plaintiffs lack associational standing ............................ 7

    B.  Plaintiffs do not challenge a final agency action
        reviewable under the APA ...................................................... 16

    C.  Plaintiffs' APA claim is foreclosed by the Internal
        Revenue Code's exclusive remedy for § 6103 violations ....... 20

    D.  Plaintiffs' APA claim fails on the merits ............................... 21

        1.  Section 6103 ................................................................... 21

        2.  Arbitrary and capricious ............................................... 31

II.  Plaintiffs failed to establish the remaining preliminary
    injunction factors ............................................................................ 33

CONCLUSION ......................................................................................... 34

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Aetna Health, Inc. v. Davila,*
542 U.S. 200 (2004) ................................................................ 21

*American Fed'n of Gov't Emps. v. Reagan,*
870 F.2d 723 (D.C. Cir. 1989) ............................................... 13

*American Fed'n of Teachers v. Bessent,*
152 F.4th 162 (4th Cir. 2025) ............................................... 15

*Biden v. Texas,*
597 U.S. 785 (2022) ............................................................... 17

*Centro de Trabajadores Unidos v. Bessent,*
167 F.4th 1218 (D.C. Cir. 2026) ..................... 9, 10, 11, 16, 19, 20, 22,
................................................................. 23, 27, 28, 31, 32

*Chamber of Com. v. EPA,*
642 F.3d 192 (D.C. Cir. 2011) ................................................. 9

*Clapper v. Amnesty Int'l USA,* 568 U.S. 398,
568 U.S. 398 (2013) ............................................................ 6, 7

*Department of Commerce v. New York,*
588 U.S. 752 (2019) ............................................................ 4, 5

*Electronic Privacy Info. Ctr. v. U.S. Dep't of Com.,*
928 F.3d 95 (D.C. Cir. 2019) ............................................ 10, 11

*Food & Drug Admin. v. Alliance for Hippocratic Med.,*
602 U.S. 367 (2024) ............................................ 1, 2, 3, 4, 5, 6, 7

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) ........................................... 11, 13

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
460 F.3d 13 (D.C. Cir. 2006) ................................................. 32

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982) ........................................................ 1, 2, 3, 4, 5

*Kamal v. J. Crew Grp., Inc.,*
  918 F.3d 102 (3d Cir. 2019) .............................................. 15

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) .......................................................... 31

*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990) ...................................................... 25, 32

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ............................................................ 7

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ............................................................ 9

*TransUnion LLC v. Ramirez,*
  594 U.S. 413. (2021) ......................................................... 14

**Statutes:**

5 U.S.C. § 551(4) ............................................................ 17, 18

5 U.S.C. § 704 ..................................................................... 31

8 U.S.C. § 1253(a)(1) .................................................... 27-28, 30

8 U.S.C. § 1305(a) ............................................................... 15

26 U.S.C. § 441 ................................................................... 26

26 U.S.C. § 6103 ............................................................. 14, 20

26 U.S.C. § 6103(i)(2) ...................................... 16, 18, 20, 21-22, 23, 24,
  .................................................... 25, 27, 28, 29, 31, 32, 33

26 U.S.C. § 6103(i)(2)(A)(ii) ................................................ 29

26 U.S.C. § 6103(i)(2)(B)(i) ............................................. 22, 24

iii

26 U.S.C. § 6103(i)(2)(B)(ii) ..................................................................... 26

26 U.S.C. § 6103(i)(2)(B)(iv) ............................................................... 27, 28

26 U.S.C. § 6110(f)(3)(A) ......................................................................... 21

26 U.S.C. § 7431 ...................................................................................... 20

26 U.S.C. § 7431(a) .................................................................................. 20

26 U.S.C. § 7431(b) .................................................................................. 21

26 U.S.C. § 7431(c) .................................................................................. 21

26 U.S.C. § 7431(d) .................................................................................. 21

**Regulations:**

26 C.F.R. § 301.6103(i)-1(b) ................................................................... 30

26 C.F.R. § 301.6212-2(a) ...................................................................... 27

## GLOSSARY

| | |
|---|---|
| A | Appendix |
| APA | Administrative Procedure Act |
| DHS | U.S. Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| IRS | Internal Revenue Service |
| ITIN | Individual Taxpayer Identification Number |
| MOU | Memorandum of Understanding |

## ARGUMENT

The government's opening brief demonstrates the errors in the district court's order, and plaintiffs' brief repeats those errors. For the reasons below and in our opening brief, the court's order should be vacated.

## I.    Plaintiffs have no likelihood of success on the merits

### A.    Plaintiffs lack Article III standing

#### 1.    The Center lacks organizational standing

Plaintiffs' claim IRS has adopted an unlawful "policy" of sharing taxpayers' address information, which may cause some taxpayers to be less willing to engage the Center's services and has thus injured, indirectly, the Center. (Br. 19-20.) As demonstrated in our opening brief (at 22-29), the Center's theory of indirect injury, causation, and redressability fails to establish standing under Article III.

In its effort to show injury-in-fact, the Center relies (Br. 18, 20-21) on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and subsequent decisions of this Court applying *Havens* that predate *Food & Drug Admin. v. Alliance for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367 (2024), for the broad proposition that it may demonstrate injury merely by showing IRS's action indirectly "impedes the Center's

mission" to serve taxpayers and "the Center has used its resources to counteract" that alleged harm.  (Br. 20.)  *Alliance* makes clear, however, that this is the wrong standard and that an organization is not injured simply because the action makes implementing its mission more challenging such that the organization diverts resources to counteract the action.  602 U.S. at 394.  Under *Alliance*, a plaintiff organization alleging standing under *Havens* must show that the challenged action "directly affect[s] and interfere[s]" with its "core business activities."  *Id.* at 395.

The Center has not and cannot make that showing.  As the Center's own theory of injury confirms (Br. 19-20), no "direct[] ... interfere[nce]" has occurred here.  *Alliance*, 602 at 395.  IRS's alleged policy of sharing address information with ICE places no restraints or prohibitions on the Center's provision of services to taxpayers, nor does it require the Center (or taxpayers, for that matter) to do or to refrain from doing anything.  Instead, according to the Center, IRS's alleged policy has a remote impact on the Center because it "undermines the confidence that taxpayers ... have that their data will be protected"; and that, in turn, "makes them less willing to engage with the Center and

2

its low-income taxpayer clinic"; and that, in turn, has resulted in the Center "provid[ing] far fewer services for taxpayers without social security numbers"; and that, ultimately, "impedes the Center's mission of serving" these taxpayers. (Br. 19-21.) But that kind of indirect injury, far removed from IRS's action and turning on the unfettered choices of third parties not before the Court, is not the sort of "impediment" *Alliance* requires, even if it "makes it more difficult" for the Center to achieve its mission. 602 U.S. at 395.

The Center's alleged injury differs significantly from the kind of injury recognized in *Havens*, on which the Center relies. In *Havens*, an organization providing housing counseling services was deprived of information to which it had a statutory right, and on which it relied to provide those services, when the owner of apartment complexes provided false information about housing availability to the organization's employee. 455 U.S. at 368, 373. The apartment owner's act of giving false housing information to the organization, on which the organization relied to provide its services, "directly affected and interfered with [the organization's] core business activities—not dissimilar to a retailer who sues a manufacturer for selling defective

3

goods to the retailer." *Alliance*, 602 U.S. at 395; *see Havens*, 455 U.S. at 379. To apply *Havens*' holding to the Center's theory of injury here, in the absence of any "direct[] ... interfere[nce]," would impermissibly "extend the *Havens* holding beyond its context." *Alliance*, 602 U.S. at 395.

The Center acknowledges (Br. 21) that IRS's action does not directly interfere with its activities because any injury to the Center is "attributable to third-party decisions by [its] clients, not to the IRS." Unable to avoid that reality, the Center asks this Court to replace *Alliance*'s direct-interference standard for injury-in-fact with a different principle, one that relates to the separate requirement of causation for Article III standing—*i.e.*, the principle regarding "the predictable effect of Government action on the decisions of third parties." (Br. 21 (quoting *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019)).) That response is a red herring.

First, it conflates the injury-in-fact and causation requirements for Article III standing. In requiring that a defendant's action must "directly affect[] and interfere[]" with the organization's "core business activities," *Alliance*, 602 U.S. at 395, the Supreme Court was

4

describing—as it said in the very next sentence—"the kind of injury" required to show organizational standing. The principle on which the Center relies, on the other hand, relates to the separate requirement of causation. *See Department of Commerce*, 588 U.S. at 768. The Center must demonstrate *both* injury-in-fact *and* causation to establish standing, so even if the Center could show causation based on "the predictable effect of Government action on the decisions of third parties," it must still show the kind of injury required under *Alliance*'s direct-interference standard for injury-in-fact—a showing the Center cannot make here. Indeed, any other analysis would be an end run around the key standing principles of *Alliance* and *Havens*.

Second, the Center's theory of causation is speculative in any event. "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Alliance*, 602 U.S. at 383. Here, it is not at all predictable that a purportedly unlawful IRS policy to share taxpayer address information with ICE would result in a *decrease* in interest for "free or nominal fee" (Br. 19) services provided by *the Center*—an organization that is purportedly

5

"dedicated to furthering taxpayers' awareness of and access to taxpayer rights" (A168).  Indeed, one would expect the exact opposite to occur—that is, an *increase* in interest for the Center's services.  A reasonable taxpayer cognizant of his legal duty to file and pay taxes, but fearing that IRS might unlawfully disclose his address information to ICE, would naturally want to be informed about his "rights and responsibilities under the Internal Revenue Code"—a service the Center says it provides for "free" or a "nominal fee."  (Br. 19.)  Only an irrational taxpayer would intentionally fail to fulfill his legal tax filing obligations without seeking free or low-cost tax advice and services such as those the Center purports to offer.  The Center's assertion that IRS's alleged policy has *caused* taxpayers to lose interest in the Center's services defies common sense and rests on pure "speculation about the unfettered choices made by independent actors not before the courts." *Alliance*, 602 U.S. at 383 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)).  Therefore, the Center also fails the causation requirement for Article III standing.

The Center's only other argument for standing is that it has "undertaken reasonable expenditures to mitigate the substantial risk"

of losing federal funding for its low-income taxpayer clinic.  (Br. 23.)
But the Center cannot manufacture standing by expending resources in
response to its fear of future harm that is not "certainly impending."
*Clapper*, 568 U.S. at 416.  Plaintiffs cite *Monsanto Co. v. Geertson Seed
Farms*, 561 U.S. 139 (2010), but that case does not support any contrary
rule.  And unlike the showing made by the plaintiffs in *Monsanto*, the
Center has not shown a "substantial risk" of loss of federal funding in
the future—let alone that this alleged future injury is "certainly
impending" as *Clapper* requires—for the reasons explained in our
opening brief (at 26-29).  Plaintiffs' brief (at 22-24) serves only to
confirm and underscore those reasons without offering anything new on
that score.

### 2.    Plaintiffs lack associational standing

The membership organization plaintiffs also lack associational
standing.[1]  (*See* Gov. Br. 30-36.)

---

[1] The Center has no members and, therefore, cannot show
associational standing (A1853 n.8), nor can it show third-party standing
because it lacks standing itself, *Alliance*, 602 U.S. at 393 n.5.

### a.    Plaintiffs have failed to show an imminent injury in fact

First, plaintiffs have failed to show that even a single identified member is likely to suffer an imminent injury in fact from IRS's alleged address-sharing policy.  The district court found (A1865) that IRS will disclose address information to ICE only for individuals who have an outstanding order of removal.  In our opening brief, we emphasized (at 31-32) that plaintiffs have failed to demonstrate that even a single member of any of the plaintiff membership organizations is subject to an outstanding order of removal and whose information is, therefore, potentially at risk of being disclosed to ICE.  In their brief, plaintiffs do not dispute that significant shortcoming of their pleadings and declarations (*see* Br. 24-27), and it is fatal to plaintiffs' Article III standing here.

Contrary to plaintiffs' mischaracterization of the government's argument, it's not just that plaintiffs "have not sufficiently *identified* particular members." (Br. 25 (emphasis added).)  More than that, plaintiffs have failed to demonstrate—or even *allege*—that *any* member is in fact subject to a removal order so that there might be at least *some* risk that IRS could disclose his or her address information to ICE.  In

the absence of plaintiffs identifying at least one member who is likely to suffer an imminent injury in fact from IRS's alleged policy, they cannot establish associational standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) ("[O]ur prior cases ... have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm."); *accord Chamber of Com. v. EPA*, 642 F.3d 192, 199-200 (D.C. Cir. 2011).

Plaintiffs respond that the government's argument does not "account for the procedural posture of this case" and that they can wait until "summary judgment [to] identify[] a particular member with standing *at that stage.*" (Br. 25 (emphasis added).) Not so. *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218 (D.C. Cir. 2026), which plaintiffs cite in support, does not stand for that proposition. In *Centro*, this Court rejected an APA challenge similar to the one here that sought to enjoin IRS's disclosure of taxpayer address information to ICE. As a threshold question, the Court concluded that one of the plaintiff organizations had demonstrated a likelihood of associational standing. 167 F.4th at 1228-30. Unlike this case, however, the organization in *Centro* had submitted a declaration by its executive

9

director attesting that some of its members were subject to "outstanding orders of deportation" and, for that reason, were "in immediate danger of having information in their tax filings used against them by immigration enforcement." *Id.* at 1229. By contrast, plaintiffs here have not even alleged, let alone submitted a declaration attesting, that any of their members is subject to an outstanding removal order. Therefore, plaintiffs have failed to show that even a single member is at imminent risk of having his or her address information shared with ICE. *Centro*'s ruling on standing is distinguishable on that basis alone.

Because plaintiffs sought and obtained a preliminary injunction, they also cannot wait until a later stage in the litigation to make the required showing. Plaintiffs' argument in this regard misconstrues *Centro*'s statement that "on a motion for a preliminary injunction, a plaintiff need only be 'likely to be able to demonstrate standing at the summary judgment stage.'" 167 F.4th at 1224 (quoting *Electronic Privacy Info. Ctr. ("EPIC") v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019)). *EPIC* makes clear that this quoted language means that "standing must be evaluated 'under the heightened standard for evaluating a motion for summary judgment' in 'determining whether or

10

not to grant the motion for preliminary injunction.'" 928 F.3d at 104 (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)). In *Food & Water Watch*, this Court expressly held that the "appropriate standard" for evaluating a plaintiff's standing to seek a preliminary injunction is "the heightened standard for evaluating a motion for summary judgment." 808 F.3d at 912. That standard "was correct," *id.*, even though the plaintiffs in that case had moved for a preliminary injunction "contemporaneously" with the filing of their complaint and "the litigation had not proceeded past the pleadings stage." *Id.* at 913. Therefore, just as a plaintiff "must set forth by affidavit or other evidence specific facts to survive a motion for summary judgment," *EPIC*, 928 F.3d at 104, plaintiffs here were required to set forth by affidavit or other evidence specific facts demonstrating their standing to obtain a preliminary injunction. They cannot wait until some later stage in the litigation to satisfy their burden to show a "substantial likelihood of standing." *Id.*

In sum, unlike *Centro*, where the plaintiff "provided detailed information about multiple members who would have standing to sue," 167 F.4th at 1229, plaintiffs here have failed to demonstrate that even a

11

single member is at risk of having his or her address information shared with ICE because of an outstanding removal order.

Plaintiffs counter that ICE requests have focused not on individuals with an outstanding removal order but instead on taxpayers who use an Individual Taxpayer Identification Number ("ITIN"), as some of their members do.[2] (Br. 26.) But there is no evidence of that in the record. To the contrary, the administrative record shows that IRS will process a request from ICE only as to individuals with a final removal order that has been outstanding for at least 90 days, and the district court so found (A1865). The administrative record includes a document titled "DHS-ICE Data Exchange Overview" that sets forth IRS's computerized process for validating ICE requests, which includes the requirement that the "final order date" supplied by ICE "must be [a] valid date and over 90 days from the current date." (A462.) Internal communications confirm that IRS followed that process when responding to ICE's request in August 2025. (A482.) Plaintiffs suggest

---

[2] An ITIN is a 9-digit number issued by IRS for federal taxpayer identification purposes to individuals who are not eligible for a Social Security number. *See* https://www.irs.gov/tin/itin/individual-taxpayer-identification-number-itin.

that the government errs by "focusing solely on ICE's most recent data-sharing request" instead of IRS's "broader" policy. (Br. 26.) Yet plaintiffs themselves describe this same "DHS-ICE Data Exchange Overview" document—which requires an outstanding removal order for IRS to process a request (A462)—as "reflect[ing] the bounds of [IRS's] address-sharing policy" they challenge. (Br. 32.)

Unable to show that any of their members faces an imminent threat because of an outstanding removal order, plaintiffs, in a last-ditch effort, raise the specter of "misidentification." (Br. 27.) But that theory requires the Court to assume, in the absence of any evidence and contrary to the presumption of regularity, *American Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989), that ICE will use the information to mistakenly prosecute the wrong person or illegally use the information for civil enforcement and deport the wrong person. That theory is implausible (*see* Gov. Br. 61-65), and such a speculative threat falls far short of this Court's "very strict understanding of what increases in risk and overall risk levels can count" to demonstrate a sufficiently "imminent" injury in fact. *Food & Water Watch*, 808 F.3d at 915.

### b.    The alleged injury is not "concrete"

Plaintiffs' asserted injury—namely, that IRS's disclosure of taxpayer address information to another government agency violates their members' privacy interests (A1853, A97)—is also not "concrete" for Article III standing purposes because it does not have a "close relationship" to a common-law analog.  *TransUnion LLC v. Ramirez,* 594 U.S. 413, 417, 424-25. (2021).

Plaintiffs maintain (Br. 27-28) that intrusion upon seclusion provides the necessary analog because "Congress identified tax information held by the IRS as a private area analogous to other secluded areas recognized at common law" by enacting 26 U.S.C. § 6103.  That argument does not work because Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 594 U.S. at 426.  Therefore, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III." *Id.*  Here, plaintiffs' asserted injury involving data-sharing between two government

14

agencies about an alien's address in the United States is nothing like the intrusion into a person's private space recognized by the common-law tort. *See American Fed'n of Teachers v. Bessent*, 152 F.4th 162, 171-74 (4th Cir. 2025); Gov. Br. 33-35. In fact, federal law requires aliens in the United States to provide DHS with address information and to promptly update it when they move, 8 U.S.C. § 1305(a); *a fortiori* there is no "intrusion upon seclusion" when government agencies share that same information.

Nor may plaintiffs rely on the tort breach of confidence because the Internal Revenue Code does not create between IRS and taxpayers the sort of "confidential relationship" recognized by that tort. *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019). Further, that plaintiffs' alleged harm here only "occurs when taxpayer information is shared with other government entities" (Br. 30) does not make it analogous to a "third party" disclosure recognized by the tort, *Kamal*, 918 F.3d at 114; rather, it underscores the distinction between the injury recognized by the tort and the one plaintiffs allege here.

**B.    Plaintiffs do not challenge a final agency action reviewable under the APA**

In *Centro*, this Court held (after the government filed its opening brief in this case) that the MOU between IRS and ICE for sharing taxpayer address information was *not* a "final agency action" reviewable under the APA.  167 F.4th at 1235-36.  Here, plaintiffs contend (Br. 30-36) that IRS has adopted, apart from the MOU, some *other* abstract "address-sharing policy" that, unlike the MOU, *does* constitute final agency action.  That argument is weaker than the one rejected in *Centro*, and it fails for all the same reasons, plus some.

To begin, plaintiffs do not challenge any "agency action" that exists separate and apart from the MOU itself.  (Gov. Br. 38-39.)  As we said in our opening brief (at 38), IRS's only address-sharing policy, "consistent with the MOU, is to comply with 26 U.S.C. § 6103(i)(2)'s disclosure requirements upon receipt of a compliant request, as the statute requires IRS to do."  Plaintiffs and the district court, however, have imagined another "address-sharing policy"—wholly apart from the MOU—that plaintiffs contend is a final agency action.  But the only "agency action" here is the *MOU itself*.

16

In *Biden v. Texas*, the Supreme Court reversed the court of appeals for "postulating the existence of" a "termination decision" purportedly made by the agency and treating that decision as the "agency action" in question, even though there was no "'agency statement of general or particular applicability ... designed to implement' that decision." 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)). Rather, the "operative agency actions," the Court said, were other memoranda prepared by the agency in that case, *id.* at 810, and "to the extent that the Court of Appeals understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA, that was error," *id.* at 809.

So too here. The only address-sharing policy in this case—*i.e.*, the "operative agency action," *Biden*, 597 U.S. at 810—is the MOU, and the district court erred "by postulating the existence of" some other alleged address-sharing policy "wholly apart from any 'agency statement of general or particular applicability ... designed to implement' that [policy]." *Id.* at 809 (quoting 5 U.S.C. § 551(4)). In reality, the "address-sharing policy" found and articulated by the district court (A1868-1869) is nothing more than a gloss on the MOU, which allows for exactly the

17

same sharing of information under 26 U.S.C. § 6103(i)(2).[3]  But to the

extent it might be construed otherwise, neither plaintiffs nor the

district court have pointed to an "agency statement," 5 U.S.C. § 551(4),

by IRS adopting or implementing that separate policy.

Plaintiffs say that "evidence" of the alleged address-sharing policy

"abounds," including "factually uncontested allegations" that IRS has

"entered into an agreement with ICE to" share "taxpayer address

information," has "completed a mass transfer ... pursuant to this

agreement," and has "revised its Internal Revenue Manual."[4]  (Br. 31-

32.)  But the evidence plaintiffs cite merely evidences IRS's policy

reflected in the MOU, not some *other* address-sharing policy that

constitutes separate "agency action."  The government does not dispute

---

[3] The district court held IRS has adopted "a policy of disclosing the confidential address information of tens of thousands of taxpayers to ICE under Section 6103(i)(2) of the Internal Revenue Code, in reliance on representations from ICE that the addresses are relevant to and will be used for immigration-related criminal investigations and proceedings, even when ICE identifies only a single ICE employee (or a small number of ICE employees) as the employee(s) 'personally and directly engaged' in each of the tens of thousands of relevant criminal investigations or proceedings."  (A1868-1869.)

[4] Plaintiffs refer repeatedly (Br. 7, 32, 53) to supposed changes to the Internal Revenue Manual, but they never identify what those changes were or how they support their claims.

the MOU's existence or that it reflects a "policy statement" that "outlines the process through which ICE can request addresses from IRS." *Centro*, 167 F.4th at 1236. But as *Centro* said, *id.*, it is the MOU, not some other non-existent policy alleged by plaintiffs, that sets forth "how the IRS will share address information with ICE" (Br. 33). Therefore, plaintiffs' challenge to an alleged address-sharing policy separate and apart from the MOU does not challenge any "agency action."

Further, the alleged policy (even if it existed) would not be "final" agency action at all events for the same reasons *Centro* held the MOU is not final agency action—it would be at most a "nonbinding, nonfinal policy statement that is not reviewable under the APA." 167 F.4th at 1236; *see* Gov. Br. 39-42. "Policy statements generally do not qualify for judicial review." *Centro*, 167 F.4th at 1235. As with the MOU, the alleged policy here, which IRS denies even exists, "was not the product of notice-and-comment rulemaking," "IRS has never characterized it as a 'rule,'" and IRS has not "relie[d] on [it] to justify its actions." *Id.* at 1236. The alleged policy thus lacks "actual legal effect," and IRS has never "characteriz[ed]" or "applied" it "as if it were binding on" any

19

party—all factors to be considered when evaluating a policy statement's finality. *Id.*

Plaintiffs nonetheless maintain that the alleged policy affects taxpayers' "privacy interests" and the "obligations of the IRS and its employees in disclosing data to ICE." (Br. 34-35.) But this Court rejected similar arguments against the MOU in *Centro*, 167 F.4th at 1236. As in that case, the alleged policy here, at most, "merely reflects IRS's views on what § 6103(i)(2) allows it to do." *Id.* (cleaned up). "This does not change the character of the [alleged policy] from a policy statement to a binding rule" because "an agency's statement that merely expresses its view of what the law requires is not final, and not reviewable." *Id.*

## C. Plaintiffs' APA claim is foreclosed by the Internal Revenue Code's exclusive remedy for § 6103 violations

Congress enacted a comprehensive and carefully delineated remedial scheme for violations of 26 U.S.C. § 6103. Section 7431 is broad in scope; it includes any violation of § 6103 by any person, whether or not employed by the United States, and whether the violation was knowing or merely negligent. 26 U.S.C. § 7431(a).

20

Congress provided a civil action for damages in any such case, and it crafted specific exceptions to liability, including for a "good faith, but erroneous" interpretation, while also limiting the period for bringing action. *Id.* § 7431(b), (c), (d). But Congress excluded injunctive relief, and that choice must be taken as deliberate, especially given the provision for limited injunctive relief elsewhere pertaining to the disclosure of taxpayer information. *See* 26 U.S.C. § 6110(f)(3)(A). To be sure, that means plaintiffs cannot obtain the relief they seek here, but a remedial scheme does not displace the APA only when it contains each and every conceivable remedy; to the contrary, the exclusion of certain remedies is as much a policy decision as their inclusion. *See, e.g.*, *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 208-09 (2004). A contrary decision would depart from the cases holding that § 7431's remedy is exclusive. *See* cases cited Gov. Br. 44.

### D.   Plaintiffs' APA claim fails on the merits

#### 1.   Section 6103

The district court erred on multiple fronts in concluding that IRS's alleged policy violates 26 U.S.C. § 6103(i)(2). Since the government filed its brief, this Court has confirmed that "Section

21

6103(i)(2)'s text unambiguously authorizes IRS to disclose taxpayer address information when certain requirements are met."  *Centro*, 167 F.4th at 1231.  IRS's alleged policy meets those requirements for the reasons we explained.  (Gov. Br. 46-58.)

### a.    The "address of the taxpayer"

A request meets the requirements under § 6103(i)(2) if it sets forth, among other things, "the name and address of the taxpayer with respect to whom the requested return information relates."  26 U.S.C. § 6103(i)(2)(B)(i).  But the district court read into the statute an additional requirement, found nowhere in the statute's text, that IRS must "confirm[]" that the address provided by ICE "matche[s] an address the IRS ha[s] in its system" (A1887) even if IRS relies on the taxpayer's unique identification number to confirm a positive match. The district court's imposition of that atextual requirement was wrong for reasons we explained.  (Gov. Br. 46-50.)

On appeal, plaintiffs do not defend the district court's reasoning (Br. 42-43)—and rightly so because *Centro* forecloses it.  *Centro* rejected the contention that § 6103(i)(2)(B)(i) requires a requesting agency to provide the taxpayer's *current* address because courts "do not read into

statutes words that aren't there to impose additional requirements or qualifications that Congress declined to enact," and "§ 6103(i)(2) does not specify what address must be included in a written request." 167 F.4th at 1231. Similarly, IRS is not statutorily required to confirm a match between the address submitted and an address in its system. As *Centro* explained, "Section 6103(i)(2) allows agencies to submit a taxpayer's name and address and request the taxpayer's current mailing address in return. These submitted and requested addresses may be the same, which could be useful in confirming information the requestor already has, but they may also be different, which could be useful in giving the requestor new information." *Id.* All the statute requires is that "the address provided must ... be an address known by the requesting agency to be that 'of the taxpayer.'" *Id.*

Rather than defend the district court, plaintiffs assert (Br. 42-43) that IRS's alleged policy does not require ICE requests to provide any address at all. That baseless contention has no support in the record. The district court never made any such finding, and IRS has never adopted any policy that does *not* require a request under § 6103(i)(2) to include the taxpayer's address. Plaintiffs' argument improperly

23

conflates IRS's August 2025 disclosure with the alleged *policy* they challenge in this case. Importantly, IRS's August 2025 disclosure, where IRS has acknowledged an error in applying the MOU's criteria for a small percentage of individuals (*see* Gov. Br. 10, 46), is *not* the "final agency action" plaintiffs challenge here. Rather, the district court found that IRS has adopted an address-sharing *policy* (apart from the MOU and before the August 2025 disclosure) that it held is a final agency action reviewable under the APA. But even assuming *arguendo* IRS has adopted such a policy, the administrative record is crystal clear that IRS's policy is to disclose information under § 6103(i)(2) only if, among other things, the request sets forth the taxpayer's name and address as § 6103(i)(2)(B)(i) and the MOU require. Specifically, the MOU expressly states that "each request will contain … the name and address of the taxpayer." (A374; *see also* A390 (implementing agreement requiring ICE to provide an address).) In addition, IRS and Treasury Department officials have adamantly and repeatedly conveyed that ICE requests must provide the taxpayer's name and address and that responses would not be forthcoming if there is no name or address. (A350, A420-422.) That such policy might have been inadvertently

24

misapplied for a small percentage of individuals in August 2025 because of an unintended flaw in the computerized validation process is not evidence that IRS has taken "final agency action" to adopt a policy of processing noncompliant requests that would be directly contrary to the MOU. IRS's intent in designing its review process under the MOU was to require an address, and it has requested that ICE take appropriate remedial steps for any data based on incomplete or insufficient address information. *See* Romo Declaration, Dkt. No. 66-1 (filed Feb. 11, 2026).

Plaintiffs also contend (Br. 41) that IRS's use of "automated" computer assistance to process requests under § 6103(i)(2) is itself somehow unlawful, as is responding to such requests "*en masse.*" But § 6103(i)(2) does not proscribe or regulate how IRS must process valid requests under the statute. Indeed, those are the very sort of "day-to-day operations" of a federal agency that courts may not superintend under the APA, *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990), and the district court rightly rejected these arguments (A1888-1889).

### b.    The "taxable period or periods"

Nor has IRS adopted any policy that does not require ICE requests to set forth "the taxable period or periods to which such return information relates."  26 U.S.C. § 6103(i)(2)(B)(ii); *see* Gov. Br. 50-51. The data file submitted as part of ICE's June 2025 request included, under a column labeled "taxable period," a separate row for *each* individual that specified "January 2022 to present" as the taxable periods for that individual.  (A437-439 (redacted excerpt of ICE data file received on June 25, 2025 (A335)).)  Plaintiffs' assertion (Br. 44) that ICE supplied a single "blanket entry" "for more than one million requests" is plainly inaccurate.  Plaintiffs also suggest (Br. 44) that the statute's term "taxable period or periods" cannot include "a range of years," but that, too, is obviously incorrect.  The statute's use of the plural noun "taxable ... periods" contemplates that a request for information may cover more than a single taxable period, which is generally a calendar year for individual taxpayers, *see* 26 U.S.C. § 441. ICE's request identified "January 2022 to present" as the relevant tax periods, which included tax years 2022-2025.  That is a legally permissible and perfectly logical way for ICE to obtain the "last known

address" (A449)—*i.e.*, the most *current* address on IRS records, 26

C.F.R. § 301.6212-2(a)—of the listed individuals.  The inclusion of tax

periods back to 2022 was obviously intended to capture information of

any individual who may not have filed more recent tax returns.

"Section 6103(i)(2) allows agencies to submit a taxpayer's name and

address and request the taxpayer's current mailing address in return."

*Centro*, 167 F.4th at 1231.

### c.    The "specific reason" why disclosure "is, or may be, relevant"

ICE's request also easily satisfied the statute's requirement that it

set forth the "specific reason" why the information "is, or may be,

relevant" to an investigation under 8 U.S.C. § 1253(a)(1).  26 U.S.C.

§ 6103(i)(2)(B)(iv); *see* Gov. Br. 51-53.  ICE explained that it was

requesting the "last known address" (A449), which is the most current

address, for each individual "to verify [that person's] presence within

the United States of America" (A434-436).  ICE also supplied the date of

final removal orders for the listed individuals, which had to be a "valid

date and over 90 days from the current date" to be processed by IRS.

(A462.)  The current address of a person with a final removal order that

is 90 days or older is highly relevant to an investigation under 8 U.S.C.

§ 1253(a)(1) because it may indicate that an "alien against whom a final order of removal is outstanding" has "fail[ed] or refuse[d] to depart from the United States within a period of 90 days from the date of the final order of removal." 8 U.S.C. § 1253(a)(1). ICE's explanation was "specific" enough for IRS to determine that the requested address information "is, or may be, relevant" to ICE's criminal investigation, and that is all § 6103(i)(2)(B)(iv) requires.

Plaintiffs' argument (Br. 46-47) rests on the false premise that the address information ICE requested was "unlinked to a taxable period" and thus had no "date associated with" it. That is factually incorrect as explained above. ICE's request sought current addresses of the listed individuals from IRS by identifying relevant taxable periods, and *Centro* held that § 6103(i)(2) authorizes ICE to do exactly that. 167 F.4th at 1231.

### d.    "Personally and directly engaged"

Plaintiffs defend (Br. 47-51) the district court's untenable interpretation of § 6103(i)(2) as dictating to other federal agencies how they must conduct their criminal investigations in order to receive taxpayer information from IRS under the statute. Disclosure under

28

§ 6103(i)(2) is mandatory once IRS receives a valid request, and the statute's "personally and directly engaged" requirement merely tells IRS *to whom* the mandatory disclosure must be made.  So the parties' dispute on this point is solely about whether IRS made the mandatory disclosure to the right person or persons.

Under plaintiffs' flawed view of the statute, ironically, IRS should have disclosed the information to more than 47,000 officers and employees at ICE instead of just one whom ICE identified as being "personally and directly engaged in the criminal proceeding or criminal investigation."  (A449, A437-439.)  As plaintiffs interpret the statute, ICE could receive information from IRS only if ICE had first initiated and staffed "individual criminal investigations" (Br. 49)—that is, a *separate* investigation for each listed individual.  But the statute uses very broad terms in authorizing disclosure of taxpayer information for use by another federal agency in "***any*** investigation which may result in" a criminal proceeding.  26 U.S.C. § 6103(i)(2)(A)(ii) (emphasis added).  As explained in our opening brief (at 55-58), ICE had discretion to initiate a *single*, broad-scale investigation that begins with a high-level review of many individuals' address information to determine, at

the outset, how many of them were still present in the United States after receiving a final removal order. That is not "data-mining" (Br. 49); that is a responsible way for an agency with limited resources to carry out its criminal enforcement obligations, and it is the sort of task that is suitable for a single high-level ICE officer charged with enforcing 8 U.S.C. § 1253(a)(1), with the aid of modern technology and help, as needed, from his information technology support staff or others. *See* 26 C.F.R. § 301.6103(i)-1(b) (permitting officers and employees to whom disclosure is authorized under the statute to further disclose return information to clerical or other personnel with specialized knowledge or technical skills needed for the criminal investigation or proceeding).

Plaintiffs' remaining contention on this point (Br. 50-51) is that ICE was really using criminal investigation under § 1253(a)(1) as a "pretext" to obtain information for civil immigration enforcement, and IRS should have known that and refused to process ICE's request. That baseless argument fails for the reasons explained in our opening brief (at 61-65).

In sum, plaintiffs have failed to show that IRS has adopted any address-sharing policy in violation of § 6103(i)(2).

### 2.     Arbitrary and capricious

Plaintiffs' claim (Br. 51-56) that IRS's alleged policy is arbitrary and capricious fails for the reasons we explained (Gov. Br. 58-59), and *Centro* further confirms those reasons.

First, the alleged policy does not even exist apart from the MOU and, in any event, is not "final agency action," 5 U.S.C. § 704, for the same reasons *Centro* held the MOU is not final agency action, 167 F.4th at 1235-36.

Second, plaintiffs' change-of-position challenge is not viable under *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), and *Centro*, 167 F.4th at 1236-39, rejecting a similar change-of-position challenge to the MOU. In short, IRS's compliance with a valid request under § 6103(i)(2) is mandatory, not discretionary, so any alleged policy to process valid requests from ICE cannot be arbitrary and capricious. *Centro* leaves no room for doubt that § 6103(i)(2) does not "delegate[] discretionary authority" to IRS and, therefore, is "not one of those cases, in which the question is whether the agency has reasonably exercised its discretion." 167 F.4th at 1237, 1238. "[Section] 6103(i)(2) requires IRS to disclose address information in response to a valid request

31

regardless of what happens to the MOU" or the policy plaintiffs allege IRS has adopted here. *Id.* Plaintiffs' arbitrary-and-capricious claim thus "rises and falls with their contrary-to-law claim." *Id.* at 1235.

Plaintiffs nonetheless argue (Br. 52-54) that IRS has discretion over the "method" of processing "valid requests" and suggest that "IRS could have continued to require that ICE submit case-by-case requests." But § 6103(i)(2) makes disclosure mandatory upon receipt of a compliant request that satisfies the statutory requirements, none of which entails that the request must be made "case-by-case." IRS thus has no discretion to deny a "bulk" (Br. 54) request that meets the statutory requirements. And to the extent plaintiffs seek to challenge IRS's use of "automat[ed]" (Br. 54) computer systems to process requests, the APA does not permit judicial review of such decisions regarding the "day-to-day operations," *Lujan*, 497 U.S. at 899, of a federal agency in carrying out "the common business of managing government programs," *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).

## II.    Plaintiffs failed to establish the remaining preliminary injunction factors

Plaintiffs have not shown irreparable harm, and the remaining preliminary injunction factors weigh heavily in the government's favor. (*See* Gov. Br. 59-67.)  One aspect of plaintiffs' response warrants further reply.  Plaintiffs dispute (Br. 63) that the district court's order establishes a "pre-clearance regime" for processing requests under § 6103(i)(2).  But they ignore its requirement that IRS must provide the court and plaintiffs with detailed information about any request it receives "if Defendant IRS determines that disclosure ... would be lawful."  (A1829.)  The court and plaintiffs can thus prevent IRS from responding to any request that does not satisfy their erroneous interpretation of § 6103(i)(2).  That the order enjoins IRS from responding to requests "except in strict compliance" with § 6103(i)(2) does not mitigate its harm to federal law enforcement because, as we have demonstrated, the court badly misinterprets the statute and will bar ICE's access to information to which it is legally entitled for use in criminal investigations under a correct interpretation of the statute.

## CONCLUSION

The Court should vacate the district court's order.

Respectfully submitted,

BRETT A. SHUMATE
   *Assistant Attorney General*

ERIC D. MCARTHUR
   *Deputy Assistant Attorney General*

AUGUST FLENTJE

*/s/ Jacob Christensen*

JACOB CHRISTENSEN
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7525*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 307-0878*
   *jacob.christensen@usdoj.gov*

April 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains <u>6,482</u> words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jacob Christensen*
Jacob Christensen