# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CENTER FOR TAXPAYER RIGHTS, et al.,

Plaintiffs-Appellees,

v.

INTERNAL REVENUE SERVICE, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the District of Columbia

## BRIEF FOR APPELLANTS

BRETT A. SHUMATE
  *Assistant Attorney General*
ERIC D. McARTHUR
  *Deputy Assistant Attorney General*
AUGUST FLENTJE
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

<u>Plaintiffs-Appellees</u>.  Plaintiffs in the district court and appellees in this appeal are Center for Taxpayer Rights; Main Street Alliance; National Federation of Federal Employees, IAM AFL-CIO; and Communications Workers of America, AFL-CIO.

<u>Defendants-Appellants</u>.  Defendants in the district court and appellants in this appeal are the Internal Revenue Service; Scott Bessent, in his official capacity as Acting Commissioner, Internal Revenue Service; U.S. Department of the Treasury; Scott Bessent, in his official capacity as Secretary of the Treasury; U.S. Digital Service; U.S. DOGE Service Temporary Organization; Amy Gleason, in her official capacity as Acting Administrator of the U.S. DOGE Service and U.S. DOGE Service Temporary Organization; Elon Musk, in his official capacity as the leader of DOGE; Steve Davis, in his official capacity as Chief Operating Officer of DOGE; U.S. Department of the Treasury DOGE Team; U.S. Office of Personnel Management; Charles Ezell, in

his official capacity as Acting Director of the Office of Personnel Management; General Services Administration; Stephen Ehikian, in his official capacity as Acting Administrator of the General Services Administration.

Additional defendants in the district court, who were replaced by substitution under Federal Rule of Civil Procedure 25(d), were Douglas O'Donnell, in his official capacity as Acting Commissioner, Internal Revenue Service; and Michael Faulkender, in his official capacity as Acting Commissioner, Internal Revenue Service.

Amici.  Appearing as amici in the district court were Members of the Congressional Hispanic Caucus Leadership:  Representative Adriano Espaillat of New York, Representative Joaquin Castro of Texas, Representative Gil Cisneros of California, Representative Sylvia Garcia of Texas, Representative Rob Menendez of New Jersey, Representative Andrea Salinas of Oregon, and Representative Norma Torres of California.

Lawyers Defending American Democracy, Inc., has provided notice of its intention to participate as amicus for appellees in this appeal.

<u>Intervenors</u>.  No intervenor has appeared in the district court or in this appeal.

## B.     Rulings Under Review

Appellants appeal from the order of the U.S. District Court for the District of Columbia, Judge Colleen Kollar-Kotelly, dated November 21, 2025 (D.D.C. Civil No. 25-cv-00457, Dkt. 53).  (A1827-1830.)  The order is accompanied by a memorandum opinion.  (A1831-1924.)  The opinion of the district court is not published in the Federal Supplement but is available at 2025 WL 3251044.

## C.     Related Cases

This case has not previously been before this Court or any other court aside from the district court from which this appeal was taken.  Counsel are not aware of any related cases that involve substantially the same parties and the same or similar issues.  *Centro de Trabajadores Unidos v. Bessent*, No. 25-5181 (D.C. Cir.) (argued Oct. 3, 2025), an appeal currently pending before this Court, and *CEDC v. Bessent*, No. 25-cv-12822 (D. Mass.), both involve the same or similar issues but were filed by different plaintiffs against IRS and other government defendants.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... vi

GLOSSARY ............................................................................................ xi

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES ............................................................. 1

PERTINENT STATUTES AND REGULATIONS .................................... 3

STATEMENT OF THE CASE ................................................................. 3

    A.    Statutory background ............................................................ 3

        1.    Section 6103 ................................................................ 3

        2.    ICE criminal enforcement ......................................... 6

    B.    Factual background ............................................................... 6

    C.    Prior Proceedings ................................................................ 11

        1.    The complaint ............................................................ 11

        2.    The preliminary injunction ....................................... 12

    D.    Related Cases ........................................................................ 13

SUMMARY OF ARGUMENT ............................................................... 14

STANDARD OF REVIEW ................................................................... 19

ARGUMENT ........................................................................................ 20

I.    Plaintiffs have no likelihood of success on the merits ................... 20

    A.    Plaintiffs lack Article III standing ....................................... 21

        1.     The Center lacks organizational standing...................22

        2.     Plaintiffs lack associational standing ...........................29

   B.     Plaintiffs do not challenge a final agency action reviewable under the APA.......................................................36

   C.     Plaintiffs' APA claim is foreclosed by the Internal Revenue Code's exclusive remedy for § 6103 violations.......42

   D.     Plaintiffs' APA claim fails on the merits.............................45

        1.     Section 6103 .................................................................46

        2.     Arbitrary and capricious..............................................58

II.   Plaintiffs failed to establish the remaining preliminary injunction factors........................................................................59

   A.     Irreparable harm.................................................................59

   B.     Balance of equities and public interest ................................66

III.  The district court improperly granted relief to nonparties ...........67

CONCLUSION ........................................................................................69

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                    **Page(s)**

*Agbanc Ltd. v. Berry,*
   678 F. Supp. 804 (D. Ariz. 1988) ........................................ 45

*Allen v. Wright,*
   468 U.S. 737 (1984) ............................................................. 21

*American Chemistry Council v. Department of Transp.,*
   468 F.3d 810 (D.C. Cir. 2006) ................................... 30-31, 32

*American Fed'n of Gov't Emps. v. Reagan,*
   870 F.2d 723 (D.C. Cir. 1989) ........................................... 62

*American Fed'n of Teachers v. Bessent,*
   152 F.4th 162 (4th Cir. 2025) ................................. 34, 35, 41

*AT & T Co. v. EEOC,*
   270 F.3d 973 (D.C. Cir. 2001) ........................................... 40

*Bates v. United States,*
   522 U.S. 23 (1997) ............................................................. 47

*Biden v. Texas,*
   597 U.S. 785 (2022) ........................................................... 39

*Block v. Cmty. Nutrition Inst.,*
   467 U.S. 340 (1984) ........................................................... 45

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988) ........................................................... 42

*CEDC v. Bessent,*
   No. 25-cv-12822, 2026 WL 309281 (D. Mass. Feb. 5, 2026) ............ 14

*Center for Biological Diversity v. U.S. Dep't of the Interior,*
   144 F.4th 296 (D.C. Cir. 2025) ......................................... 23

*Centro de Trabajadores Unidos v. Bessent,*
   No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025) ... 14, 48, 62

*Chamber of Com. v. EPA,*

642 F.3d 192 (D.C. Cir. 2011) .................................. 26, 27, 29, 30, 32

*Chaplaincy of Full Gospel Churches v. England,*
454 F.3d 290 (D.C. Cir. 2006) .................................. 59, 60

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ........................................... 29

*Deep S. Ctr. for Env't Just. v. EPA,*
138 F.4th 310 (5th Cir. 2025) ................................. 23, 25

*DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.,*
76 F.3d 1212 (D.C. Cir. 1996) ................................. 40

*Food & Drug Administration v. Alliance for Hippocratic Medicine,*
602 U.S. 367 (2024) ................................ 15, 21-22, 22, 23, 24, 25, 26

*Food & Water Watch, Inc. v. Vilsack,*
808 F.3d 905 (D.C. Cir. 2015) ................................. 22

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ........................................... 40

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.,*
460 F.3d 13 (D.C. Cir. 2006) .................................. 37

*Grosdidier v. Chairman,*
560 F.3d 495 (D.C. Cir. 2009) ................................. 45

*Hanson v. District of Columbia,*
120 F.4th 223 (D.C. Cir. 2024) ................................ 19

*Havens Realty Corp. v. Coleman,*
455 U.S. 363 (1982) ........................................... 22, 25

*Immigration & Naturalization Serv. v. Legalization Assistance Project,*
510 U.S. 1301 (1993) .......................................... 67

*Jeffries v. Volume Servs. Am., Inc.,*
928 F.3d 1059 (D.C. Cir. 2019) ................................ 35

*Kamal v. J. Crew Grp., Inc.,*
918 F.3d 102 (3d Cir. 2019) ................................... 35

vii

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) .......................................................... 24

*Lujan v. National Wildlife Fed'n,*
   497 U.S. 871 (1990) .......................................................... 37

*Maryland v. King,*
   567 U.S. 1301 (2012) ........................................................ 66

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) .......................................................... 19

*Muransky v. Godiva Chocolatier, Inc.,*
   979 F.3d 917 (11th Cir. 2020) ........................................ 35

*Nken v. Holder,*
   556 U.S. 418 (2009) .......................................................... 66

*Nowicki v. Commissioner,*
   262 F.3d 1162 (11th Cir. 2001) ...................................... 44

*Pennsylvania v. DeVos,*
   480 F. Supp. 3d 47 (D.D.C. 2020) .................................. 20

*Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n,*
   324 F.3d 726 (D.C. Cir. 2003) ........................................ 40

*Sierra Club v. EPA,*
   955 F.3d 56 (D.C. Cir. 2020) .......................................... 39

*Summer v. Earth Island Inst.,*
   555 U.S. 488 (2009) .................................................... 30, 32

*Swanson Grp. Mfg. LLC v. Jewell,*
   790 F.3d 235 (D.C. Cir. 2015) ........................................ 29

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) .................................................... 21, 33

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ............................................... 18-19, 67

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
   578 U.S. 590 (2016) .......................................................... 39

*United Atates v. Michaelian,*
   803 F.2d 1042 (9th Cir. 1986) ........................................... 44

*United States v. Orlando,*
   281 F.3d 586 (6th Cir. 2002) ............................................. 44

*Valero Energy Corp. v. EPA,*
   927 F.3d 532 (D.C. Cir. 2019) ..................................... 40, 42

*Venetian Casino Resort, LLC v. EEOC*
   530 F.3d 925 (D.C. Cir. 2008) ..................................... 40, 41

*Winter v. Natural Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ........................................................ 19, 21

## Statutes:

5 U.S.C. § 551 ............................................................... 38, 39

5 U.S.C. § 702 ..................................................................... 68

5 U.S.C. § 703 ............................................................... 42, 45

5 U.S.C. § 704 ............................................................... 36, 42

5 U.S.C. § 705 ......................................... 1, 2, 11, 13, 14, 20, 68

8 U.S.C. § 1101 ....................................................................... 6

8 U.S.C. § 1103 ....................................................................... 6

8 U.S.C. § 1253 ................... 2, 6, 7, 8, 9, 10, 40, 51, 53, 54, 55, 57, 62, 65

8 U.S.C. § 1357 ....................................................................... 6

26 U.S.C. § 6103 ........................................................... *passim*

26 U.S.C. § 6110 ................................................................... 44

26 U.S.C. § 7213 ............................................................... 6, 43

26 U.S.C. § 7213A ............................................................ 6, 43

26 U.S.C. § 7431 ............................................................... 5, 43

26 U.S.C. § 7431 ........................................................ 42-43, 43

26 U.S.C. § 7526 ............................................................ 27

26 U.S.C. § 6011, 6651 ................................................. 36

26 U.S.C. § 6651 ........................................................... 36

28 U.S.C. § 1292 ............................................................. 1

28 U.S.C. § 1331 ............................................................. 1

28 U.S.C. § 2107 ............................................................. 1

**Other Authorities:**

8 C.F.R. § 1.2 ................................................................. 6

26 C.F.R. § 301.6103 ............................................ 57, 63, 1, 8

26 C.F.R. § 301.6212-2 ................................................. 52

Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025) .................... 64

Restatement (Second) of Torts § 652B ............................... 33, 34

# GLOSSARY

| | |
|---|---|
| A | Appendix |
| APA | Administrative Procedure Act |
| DHS | U.S. Department of Homeland Security |
| ICE | U.S. Immigration and Customs Enforcement |
| IRS | Internal Revenue Service |
| MOU | Memorandum of Understanding |

# STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. § 1331, but the government contests jurisdiction. The district court granted plaintiffs' motion to stay agency action under 5 U.S.C. § 705 or, alternatively, for a preliminary injunction, on November 21, 2025. (A1827-1830.) The government timely appealed on January 5, 2026, and filed an amended notice of appeal on January 6, 2026. (A1931, A1932.) *See* 28 U.S.C. § 2107(b). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

# STATEMENT OF THE ISSUES

Section 6103 of the Internal Revenue Code, 26 U.S.C., provides generally that tax returns and return information collected by the Internal Revenue Service (IRS) are confidential and shall not be disclosed. But the statute makes numerous exceptions that permit, and sometimes require, the IRS to disclose taxpayer information. At issue here, § 6103(i)(2) requires the IRS, upon receipt of a compliant request, to disclose return information for use by another federal agency in nontax criminal investigations.

This case concerns IRS's disclosure of taxpayer address information to U.S. Immigration and Customs Enforcement (ICE) for use in criminal investigations under 8 U.S.C. § 1253(a)(1), which criminalizes the failure of aliens to depart from the United States when under a final order of removal. Plaintiffs filed this suit alleging that IRS has adopted an unlawful "policy" of sharing taxpayer information with ICE under § 6103(i)(2), in violation of the Administrative Procedure Act (APA) and contrary to the provisions of § 6103(i)(2). The district court granted plaintiffs' motion for a stay of that alleged policy under 5 U.S.C. § 705 and issued a preliminary injunction.

The issues presented are:

(1)    Whether plaintiffs have Article III standing to assert their APA claim;

(2)    Whether the IRS's alleged policy that plaintiffs challenge constitutes a final agency action reviewable under the APA;

(3)    Whether APA review is precluded by the Internal Revenue Code's exclusive remedy for violations of 26 U.S.C. § 6103;

(4)    Whether the IRS's alleged policy violates 26 U.S.C. § 6103 or the APA;

(5)     Whether plaintiffs faced irreparable harm and satisfied the remaining factors for a preliminary injunction or stay of agency action; and

(6)     Whether the district court granted overbroad relief.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.     Statutory background

#### 1.     Section 6103

Section 6103(a) of the Internal Revenue Code provides a general rule that tax "returns" and "return information" shall be confidential and shall not be disclosed except as authorized by the Code.  When enacting § 6103, however, Congress sought to balance taxpayers' interest in confidentiality with governmental agencies' legitimate need for taxpayer information in some circumstances.  S. Rep. No. 94-938, pt. I, at 318 (1976).  The statute thus makes numerous exceptions to the general rule of confidentiality that authorize, and sometimes require, IRS to disclose taxpayer information under a variety of circumstances. *See* 26 U.S.C. § 6103(c)–(o).

At issue here, § 6103(i)(2) *requires* IRS, upon receipt of a compliant request, to disclose return information to other federal agencies for their use in nontax criminal investigations. Specifically, upon receipt of a compliant request, IRS "shall disclose return information (other than taxpayer return information) to officers and employees" of the requesting agency "who are personally and directly engaged in … any investigation which may result in" a "judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party." 26 U.S.C. § 6103(i)(2)(A) (cross referencing § 6103(i)(1)(A)(i)). Return information disclosed under this provision must be "solely for the use of such officers and employees in such … investigation." *Id.* § 6103(i)(2)(A).

A request for information under § 6103(i)(2) must be made by "the head of any Federal agency" (or another position specified in the statute); must be "in writing"; and must set forth "(i) the name and address of the taxpayer with respect to whom the requested return information relates; (ii) the taxable period or periods to which such

return information relates; (iii) the statutory authority under which the proceeding or investigation … is being conducted; and (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation." 26 U.S.C. § 6103(i)(2)(A), (B). When properly requested, "return information" that IRS must disclose under § 6103(i)(2) includes a "taxpayer's identity," consisting of the taxpayer's name, mailing address, taxpayer identification number, or a combination thereof. *Id.* § 6103(b)(2)(A), (b)(6), (i)(2)(C).

Federal agencies that receive returns or return information from IRS are required to safeguard that information and to restrict access to "persons whose duties or responsibilities require access" and to whom disclosure is authorized. 26 U.S.C. § 6103(p)(4). When an agency that has received information under § 6103(i)(2) is finished using the information, it must return the information, make it "undisclosable," or continue to maintain the required safeguards to protect its confidentiality. *Id.* § 6103(p)(4)(F). Unauthorized inspection or disclosure of any return or return information by a government officer or employee may subject the government to civil damages in certain circumstances, *id.* § 7431, and willful, unauthorized inspection or

disclosure may result in disciplinary action, *id.* § 7213A, and is a felony, *id.* § 7213.

## 2. ICE criminal enforcement

The Secretary of the Department of Homeland Security is charged with enforcement of the nation's immigration laws. 8 U.S.C. § 1103(a). Under her direction, ICE officers are "immigration officers," *see* 8 U.S.C. § 1101(a)(18); 8 C.F.R. § 1.2, empowered with law enforcement authority as set forth in 8 U.S.C. § 1357, including the authority to arrest aliens for felonies and other offenses against the United States. Relevant here, ICE is charged with the enforcement of 8 U.S.C. § 1253(a), which imposes criminal penalties on any alien against whom a final order of removal is outstanding who willfully fails or refuses to depart from the United States within 90 days of the order.

## B. Factual background

In February 2025, an ICE official contacted IRS-CI (Criminal Investigation) for assistance in an "ICE led effort to locate approximately 700,000 individuals who are all under Final Orders of Removal." (A338.) ICE's Acting Director followed up a few days later requesting that IRS provide information, including known home

addresses, for "approximately 700 thousand criminal illegal aliens who have standing deportation orders." (A346-347.) Internally, IRS identified 26 U.S.C. § 6103(i)(2) as authorizing disclosure of taxpayer information to ICE for use in criminal enforcement, but it determined that ICE's request did not satisfy some of § 6103(i)(2)'s requirements, so IRS did not fulfill the request. (*See* A349-351.)

Soon after, in April 2025, the Department of the Treasury and the Department of Homeland Security (DHS) executed a "Memorandum of Understanding" (MOU) to facilitate IRS's disclosure of taxpayer address information to ICE in compliance with § 6103(i)(2) for use in criminal enforcement. (A371-385.) The MOU "sets forth the agreement of the parties with respect to ICE's use of the authority in IRC § 6103(i)(2) for the submission of requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or another specifically designated Federal criminal statute." (A372.)

The MOU specifies that all ICE requests for disclosure must comply with § 6103(i)(2) and that IRS will not process noncompliant requests. (A373.) ICE represents in the MOU that information received from IRS "will only be used by officers and employees of ICE

solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1)" or another federal criminal statute. (A374.) ICE also represents that it will follow detailed protocols to safeguard the information it receives from IRS as required by applicable law, including by restricting access solely to authorized persons, and will return or destroy the information in accordance with applicable record retention schedules when it is no longer needed. (A376-380.)

In June 2025, after the MOU was signed, ICE sent multiple data files to IRS seeking the last known address of individuals identified in the files. (A423, A428, A430.) IRS reviewed each file for sufficiency under the MOU and § 6103(i)(2) and informed ICE regarding deficiencies. (A420-422, A428.) IRS and Treasury determined that files seeking address information for the "full alien population" and files that lacked address and taxable period information did not comply with the MOU or statutory requirements and could not be processed. (A420-423.)

ICE subsequently submitted a data file to IRS on June 25, 2025, supplemented by a letter dated June 27, 2025, signed by ICE's Acting Director (together, the "request"). (A449-450.) This request sought the "last known address" of approximately 1.28 million individuals identified in the data file. (A449, A258.) The request designated 8 U.S.C. § 1253(a)(1) as the relevant criminal statute and explained that the requested information is or may be relevant to an investigation under § 1253(a)(1) because it "may contain address information which is potentially at issue with respect to investigating or proving a violation under" that provision (A449) and would be used "to verify presence within the United States of America" (A434-436 (redacted excerpt of the data file)). In other words, the IRS address data could show that aliens had not departed the United States as required by the applicable criminal statute. ICE's request identified January 2022 to present as the "taxable period" (A437-439 (redacted excerpt of the data file)) and "Jesse Williams," the Assistant Director of the ICE Enforcement and Removal Operations, Field Operations, as the officer or employee "personally and directly engaged in the criminal proceeding or criminal investigation" (A437-439, A449, A322-323). ICE attested in its request

that "the information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1)." (A449.)

IRS determined that ICE's request (the June 27 letter coupled with the data file submitted on June 25) satisfied the requirements for disclosure under § 6103(i)(2) for a portion of the individuals.[1] (A444, A445, A440.) In August 2025, IRS provided ICE with the last known address of 47,289 individual taxpayers whom IRS was able to match with the identifying information provided by ICE.[2] (A480-481, A482,

---

[1] The district court said (A1838) that Treasury officials sought to "bypass" a specific IRS employee for "legal approval" of ICE's request, but the administrative record shows there was unanimous agreement among IRS's "6103 experts" that the request complied with § 6103(i)(2) (A444, A445, A440, A451), and "approval" for IRS's disclosure was given by the IRS Commissioner (A483). In fact, Treasury officials insisted throughout the process that taxpayer information be disclosed to ICE only if § 6103(i)(2)'s requirements were satisfied. (*See, e.g.*, A420-422, A428, A444.)

[2] IRS identified a positive match for most of these individuals based on their name and taxpayer identification number supplied by ICE. IRS has since discovered that ICE supplied potentially incomplete or potentially insufficient address information for a small portion of these individuals whom IRS matched based on their taxpayer identification number. (See Declaration of Dottie A. Romo filed in the District Court on February 11, 2026, Docket Entry No. 66-1.)

A258.)  But IRS was unable to match the remaining individuals in ICE's request with a known taxpayer in its records; therefore, IRS did not disclose any information for most of the individuals in ICE's request.  (A258.)

## C.  Prior Proceedings

### 1.  The complaint

Plaintiffs are a nonprofit organization that advocates for taxpayer rights and gives tax advice to low-income taxpayers (the Center), an association of small businesses, and two labor unions.  They sued on the theory that IRS has adopted a new address-sharing "policy" for disclosing confidential tax return information to ICE, in violation of 26 U.S.C. § 6103 and the APA.  (A72-73.)  Plaintiffs subsequently moved for a stay under 5 U.S.C. § 705 or, alternatively, for a preliminary injunction to enjoin IRS's alleged policy that "permits disclosures of IRS data to ICE under § 6103(i)(2)."[3]  (A77.)

---

[3] The amended complaint also asserted a nonstatutory *ultra vires* claim against the U.S. DOGE Service, the Treasury DOGE Team, and individuals associated with DOGE.  The district court's order dismissed that claim.  (A1827.)

## 2.    The preliminary injunction

The district court granted plaintiffs' motion.  It held the Center had organizational standing to sue in its own right and that the other plaintiffs had associational standing to sue on behalf of their members. (A1845-1866.)  The court further held that plaintiffs were likely to succeed on the merits of their APA claim.  In that regard, the court concluded that IRS had adopted an "address-sharing policy" with ICE (A1867-1870), that this policy was reviewable under the APA as a "final agency action" for which there was no other adequate remedy in a court (A1867-1875), that this policy likely violated § 6103 (A1876-1893), and that it was arbitrary and capricious (1893-1898).

More specifically as to § 6103, the district court concluded that the IRS's alleged address-sharing policy and its August 2025 disclosure to ICE likely violated § 6103(i)(2) in several respects:  (1) the court read into the statute a nontextual requirement that IRS must confirm that the address provided by ICE matches an address in its system for the taxpayer, and IRS did not do this; (2) the court found that ICE's request failed to provide the taxable period; (3) the court concluded that ICE's request did not provide a "specific" enough reason for needing address

information; and (4) the court found it unlikely that one ICE officer could be "personally and directly engaged" in so many criminal investigations. (A1876-1893.)

Finally, the court held that plaintiffs would suffer irreparable harm absent a stay and that the balance of the equities and the public interested favored injunctive relief. (A1899-1920.)

Accordingly, the district court entered an order staying IRS's alleged address-sharing policy under 5 U.S.C. § 705 pending further review. (A1827-1830.) The order also enjoins IRS from disclosing any return information to ICE "except in strict compliance with" § 6103(i)(2). (A1828.) And it requires IRS to notify the court and plaintiffs within 48 hours of receiving any request from ICE (or any component of DHS) pursuant to § 6103(i)(2) and to provide 72 hours advance notice to the court and plaintiffs if IRS determines that disclosure in response to any such request would be lawful. (A1828-1829.)

## D. Related Cases

After the district court issued its order, another district court issued a preliminary injunction that (*inter alia*) enjoins ICE from using

taxpayer addresses provided by IRS pursuant to the MOU. *CEDC v. Bessent*, No. 25-cv-12822, 2026 WL 309281 (D. Mass. Feb. 5, 2026). Both that order and the order here are at odds with the decision in *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025) (rejecting similar arguments and refusing to enjoin IRS's implementation of the MOU), *appeal pending* No. 25-5181 (D.C. Cir.) (argued Oct. 3, 2025).

## SUMMARY OF ARGUMENT

The district court's order was an abuse of discretion and should be vacated.

I.      To be entitled to a preliminary injunction or stay under 5 U.S.C. § 705, plaintiffs had to clearly show that they have Article III standing, that IRS's alleged address-sharing policy is final agency action for which there is no other adequate remedy, that APA review is not precluded by the Internal Revenue Code's exclusive remedial scheme for violations of 26 U.S.C. § 6103, and that IRS's alleged policy violates § 6103 or is arbitrary and capricious under the APA. Plaintiffs are not likely to prevail on *any* of these issues, let alone *all* of them.

A.     At the threshold, plaintiffs lack Article III standing.  The

Center lacks organizational standing because it failed to establish that

the IRS's challenged action directly affects and interferes with its core

business activities.  The Center's alleged injury—*i.e.*, that the IRS's

action caused taxpayers to be less willing to engage with the Center,

which, in turn, forced the Center to expend more resources in taxpayer

outreach—is materially indistinguishable from the downstream,

resource-diversion theory of injury that the Supreme Court rejected in

*Food & Drug Administration v. Alliance for Hippocratic Medicine*, 602

U.S. 367 (2024).  The Center's additional assertion that the IRS's action

puts it at imminent risk of losing federal funding in the future is

speculative at best, given that the Center's funding is renewable on a

*noncompetitive* basis until 2027, and is also based on equivocal

allegations that are insufficient to show standing.

As for the other plaintiffs, they lack associational standing

because they failed to specifically identify a single member likely to

suffer an "injury in fact."  The record shows, and the district court

found, that IRS will share address information with ICE only for

individuals who have an outstanding removal order, and plaintiffs have

not identified a single member with a removal order.  Therefore,

plaintiffs have failed to identify a single member at "imminent" risk of

having his or her information shared with ICE.  Further, the purported

intangible injury from IRS's inter-agency sharing of information is not

"concrete" because it lacks a common-law analog.

B.     Plaintiffs also do not challenge a "final agency action"

reviewable under the APA.  To start, the alleged IRS "address-sharing

policy" does not qualify as "agency action," which requires at minimum

some agency statement designed to implement the alleged policy.  But

even if such a policy did exist, it would not be "final" agency action

because IRS's sharing of address information with another federal

agency does not have any direct and appreciable legal consequences for

plaintiffs or their members, whose rights or obligations are not affected

by IRS's action.  Any practical effect on plaintiffs' members is

contingent on future action that may or may not be taken by ICE.

C.     APA review is precluded for the additional reason that the

Internal Revenue Code provides the exclusive remedy for violations of

26 U.S.C. § 6103, as well as disciplinary and criminal penalties for

willful violations.  The Code's remedy is limited to civil damages and

does not include injunctive relief that plaintiffs seek here, and plaintiffs cannot circumvent that remedial scheme through an APA action.

D.      Even if plaintiffs could overcome these threshold barriers to the adjudication of their claim, they are not likely to prevail on the merits. The district court misinterpreted and misapplied 26 U.S.C. § 6103(i)(2) in several respects. First, nothing in the statute's text requires IRS to confirm that the address provided by the requesting agency matches an address in IRS's system. And the matching IRS did—based on taxpayer identification number—is indisputably reliable. Second, the court's finding that ICE's request did not provide the taxable period or periods is clearly erroneous; the record establishes that ICE's request included the taxable period. Third, ICE's explanation of need for address information was "specific" enough for IRS to determine whether the requested information is, or may be, relevant to ICE's criminal investigation, which is all the statute requires. And fourth, ICE's designation of one high-level ICE officer to receive IRS's disclosure is fully compatible with § 6103(i)(2).

Nor can plaintiffs show IRS's action is arbitrary and capricious. Any action by IRS to disclose return information in compliance with 26

17

U.S.C. § 6103(i)(2) cannot be arbitrary and capricious because disclosure is mandatory under the statute upon receipt of a compliant request.

II.  The district court also misjudged the remaining preliminary injunction factors.  Plaintiffs cannot show injury for Article III standing purposes, let alone irreparable injury required for injunctive relief. Moreover, plaintiffs' assertion that ICE will illegally use the taxpayer information for civil, rather than criminal, enforcement is baseless, has no support in the record, and contravenes the presumption of regularity that should have governed the outcome here.  On the other hand, the order significantly harms the government, impeding federal law enforcement by restricting ICE's ability to obtain relevant information under § 6103(i)(2) for use in criminal investigations, and it establishes a pre-clearance regime whereby the court is improperly micromanaging executive agencies charged with enforcing federal law.  The balance of the equities and the public interest thus weigh strongly against the court's order.

III.  Further, by combining marginal theories of standing with universal relief, the district court's order cannot be squared with *Trump*

*v. CASA, Inc.*, 606 U.S. 831 (2025), but should have been carefully limited to address only the parties' irreparable harm.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.") (cleaned up). To be entitled to a preliminary injunction, plaintiffs had to clearly show "that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. This Court reviews the district court's decision whether to grant a preliminary injunction for abuse of discretion, its legal conclusions de novo, and its findings of fact for clear error. *See Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024), *cert. denied*, 145 S. Ct. 2778 (2025).

Under 5 U.S.C. § 705, "to prevent irreparable injury," a district court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." A stay under 5 U.S.C. § 705 is governed by essentially the same standard of review that applies to preliminary injunctions. *See, e.g.*, *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020).

## ARGUMENT

The district court abused its discretion in granting plaintiffs' motion for a stay under 5 U.S.C. § 705 or, alternatively, for a preliminary injunction, and its order should be vacated.

## I. Plaintiffs have no likelihood of success on the merits

Plaintiffs failed to demonstrate that they are likely to succeed on the merits of their APA claim—their only surviving claim—for multiple reasons. As a threshold matter, each plaintiff lacks Article III standing. Further, plaintiffs do not challenge a final agency action reviewable under the APA, and the Internal Revenue Code's exclusive remedy for violations of 26 U.S.C. § 6103 likewise precludes APA review. Even if this case were justiciable, plaintiffs failed to establish a violation of

§ 6103 or that IRS's alleged address-sharing policy is arbitrary and capricious under the APA.

Each issue above is independently fatal to plaintiffs' claim, and in the absence of a "clear showing" by plaintiffs that they are "likely to succeed" on *all* of them, *Winter*, 555 U.S. at 20, 22, the district court's order was an abuse of discretion and must be vacated.

## A. Plaintiffs lack Article III standing

Article III of the Constitution gives federal courts power to decide only genuine "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The standing requirement ensures federal courts do not become "a vehicle for the vindication of the value interests of concerned bystanders," *Allen v. Wright*, 468 U.S. 737, 756 (1984), and it guards against those who wish to use the courts for "general complaints about the way in which government goes about its business," *id.* at 760. "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief

Executive." *Food & Drug Admin. v. Alliance for Hippocratic Med.* ("*Alliance*"), 602 U.S. 367, 382 (2024).

Article III standing thus requires the plaintiff to show an injury in fact that is attributable to the defendant's conduct and redressable by the requested relief. *Alliance*, 602 U.S. at 380. Because each element of standing must be established with the manner and degree of evidence required at the successive stages of the litigation, plaintiffs seeking a preliminary injunction must show a "substantial likelihood" of standing. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912-13 (D.C. Cir. 2015). Plaintiffs have not, and cannot, make that showing here.

### 1. The Center lacks organizational standing

An organization asserting standing to sue on its own behalf "must satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals." *Alliance*, 602 U.S. at 393-94. To demonstrate injury in fact, an organization must allege a "concrete and demonstrable injury to the organization's activities" that is "far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The organization must establish that the defendant's challenged action

"directly affected and interfered with [the organization's] core business activities." *Alliance*, 602 U.S. at 395; *see also Center for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 314 (D.C. Cir. 2025).

The district court held (A1848-1849) that the Center established a "substantial likelihood" of standing because, according to the court, IRS's decision to share information with ICE caused certain taxpayers to be "less willing" to "engage with the Center" and, in turn, the Center was "forced to expend resources beyond what it typically expects to expend" to counteract this decline in interest for its services. But that sort of downstream, resource-diversion theory of standing is materially indistinguishable from the one the Supreme Court rejected in *Alliance*, 602 U.S. at 393-96.

"*Alliance* significantly clarified the doctrine of organizational standing." *Deep S. Ctr. for Env't Just. v. EPA*, 138 F.4th 310, 317 (5th Cir. 2025). In *Alliance*, pro-life medical associations challenged actions by the Food and Drug Administration that facilitated access to mifepristone, an abortion drug. Though the medical associations (like the Center here) were not themselves "the object of the challenged

23

government action," *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992), they claimed standing under *Havens* because they had "incurr[ed] costs to oppose FDA's actions" and were "forced" to expend "considerable resources to the detriment of other spending priorities," *Alliance*, 602 U.S. at 394-95. The Court unanimously found that injury insufficient: an organization cannot "spend its way into standing" by "divert[ing] its resources in response to a defendant's actions." *Id*. That theory "would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike," provided they expend resources opposing those policies, but "*Havens* does not support such an expansive theory of standing." *Id.* at 395.

So too here. Tax-advice organizations may often need to adjust their budgets following changes in tax law or policy. But that common business reality does not give rise to Article III standing, lest organizations gain universal standing to "challenge almost every federal policy that they dislike." *Id.*

The district court analogized (A1850-1851) to *Havens* and reasoned that the interference with housing counseling services in that case was akin to the interference with the Center's tax advice services.

But "*Havens* was an unusual case" and cannot be extended "beyond its

context." *Alliance*, 602 U.S. at 396. The organization in *Havens*

operated a housing counseling service and had a statutory right to

certain housing information on which it relied to provide that service.

455 U.S. at 373-74. The organization was deprived of that information

when the owner of apartment complexes gave the organization's

employees false information about apartment availability. As the Court

clarified in *Alliance*, the organization had standing because the

apartment owner's provision of false housing information to the

organization's employees "directly affected and interfered with [the

organization's] core business activities." 602 U.S. at 395.

That is not the kind of injury the Center alleges here. IRS's

sharing of information with ICE does not "directly interfere" with the

Center's tax advice service. *Alliance*, 602 U.S. at 395; *Deep S. Ctr.*, 138

F.4th at 319 ("Article III requires 'direct interference.'"). Unlike

*Havens*, the Center has not been deprived of information or, as

analogous here, clientele to which it was legally entitled. Further,

unlike *Havens*, the Center's alleged injury is not direct but is

downstream from how the IRS's actions have allegedly affected third-

party behavior.  Because of the IRS's actions, certain taxpayers have allegedly chosen to engage less with the Center, which in turn has allegedly made it more difficult for the Center to provide services for those taxpayers.  (A1849.)  So any potential injury to the Center depends upon the independent choices of third parties, who may or may not behave in a way that affects the Center.  Indeed, a policy regarding intra-governmental information sharing like the one here is hardly even tangentially connected to the Center's core business activities.  No similar circumstances were present in *Havens*, and the district court erred by extending the *Havens* holding "beyond its context" to support standing here.  *Alliance*, 602 U.S. at 396.

The district court also said (A1849) the Center was "forced" to expend resources on education and outreach or else "risk losing federal funding" for its low-income taxpayer clinic.  But this concern relates to a potential *future* injury, creating for the Center "a significantly more rigorous burden to establish standing."  *Chamber of Com. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011).  "To qualify for standing" in these circumstances, the Center "must demonstrate that the alleged future injury is 'imminent.'  And to shift injury from 'conjectural' to

'imminent,' the [Center] must show that there is a 'substantial probability' of injury." *Id.* (cleaned up). The Center has come nowhere close to showing an actual or imminent threat to its federal funding in consequence of the IRS's actions.

The Center receives federal grants under 26 U.S.C. § 7526. (A168.) Criteria considered in selecting grant recipients include the number of taxpayers who will be served and the clinic's record in providing service to "low-income taxpayers." 26 U.S.C. § 7526(c)(4). The district court based its finding on the Center's allegations that the number of its cases "involving taxpayers with ITINs [individual taxpayer identification number]" and its outreach activities "related to ESL [English as a second language] taxpayers" has declined in 2025. (A1848-1849, A179.) But that is not a proxy for the individuals implicated here—illegal aliens ordered removed and violating criminal law by remaining in the United States. Moreover, the Center has not alleged that any government official has threatened its funding, and its allegations relate only to specific subcategories of low-income taxpayers, without addressing whether there has been an overall decline in its services provided to all low-income taxpayers. As to that broader

category, the Center reports robust activity in 2025, including 22 active cases currently being handled by the Center, with 41 more pending assignments, 49 taxpayer consultations, and at least one international conference.  (A170, A174-175.)  Regardless, the Center's current grant is renewable on a *non-competitive* basis through the *end of 2026*; the Center's next *competitive* grant cycle is not until the year 2027.  (A315-316 (¶ 6).)  So the Center has no actual risk of losing funding until 2027 in any event, and that remote risk—by definition—is not "imminent."

Moreover, the Center's allegations regarding possible loss of funding are equivocal at best:

- "I am worried that our *potential* inability to meet these goals will impact our ability to continue our grant or obtain additional funding when we apply for another competitive grant."  (A318 (emphasis added).)

- "I am concerned that Defendant's actions *may* jeopardize our ability to meet these levels."  (A319 (emphasis added).)

- "Our [performance] *may* be viewed unfavorably as the IRS evaluates our grant application."  (A320 (emphasis added).)

- "In my experience, the failure to meet stated goals *could be* a basis for reducing funding." (A320 (emphasis added).)

This Court has consistently rejected similar allegations as insufficient to demonstrate a "substantial probability" of future injury. *See, e.g.*, *Chamber of Com.*, 642 F.3d at 202; *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015); *see also Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("allegations of *possible* future injury are not sufficient"). And the Center cannot manufacture standing by expending resources in response to a speculative threat that is not "certainly impending." *Clapper*, 568 U.S. at 416. The district court erred in concluding otherwise.

## 2. Plaintiffs lack associational standing

An organization claiming associational standing to seek injunctive relief must show, among other requirements, that at least one of its members would have standing to sue in his own right. *Chamber of Com.*, 642 F.3d at 199. This includes a showing that the member is under threat of suffering an "injury in fact" that is both "concrete" and "imminent." *Id.* at 200. The Center has no members and, therefore, cannot establish associational standing. (A1853 n.8.) But the district

court held that the other plaintiffs demonstrated a substantial

likelihood of associational standing on behalf of their members, yet it

erred in doing so because plaintiffs failed to identify any member who is

likely to suffer the requisite "injury in fact."

### a. The alleged injury is not "imminent" as to any identified member

First, plaintiffs failed to show an "imminent" injury in fact to any

of its members. The district court found (A1866) an "imminent" risk of

injury based on its conclusion that there was a "high likelihood that the

IRS [had] disclosed [plaintiffs'] members' confidential address

information to ICE" and "an imminent risk" that it would do so again in

the future. But the record does not support these conclusions.

"When a petitioner claims associational standing, it is not enough

to aver that unidentified members have been injured." *Chamber of

Com.*, 642 F.3d at 199. "Rather, the petitioner must specifically

'identify members who have suffered the requisite harm.'" *Id.* (quoting

*Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)); *see also

American Chemistry Council v. Department of Transp.*, 468 F.3d 810,

820 (D.C. Cir. 2006) (holding that "an organization bringing a claim

based on associational standing must show that at least one

specifically-identified member has suffered an injury-in-fact.…  At the very least, the identity of the party suffering an injury in fact must be firmly established.").

Here, the pleadings and declarations submitted by plaintiffs only partially identify a single member of plaintiff National Federation of Federal Employees (*see* A209-210) and a single member of plaintiff Main Street Alliance (*see* A199-203), while retaining those members' anonymity.  Plaintiffs have not identified even one member of plaintiff Communications Workers of America, AFL-CIO.  The anonymous member of the National Federation of Federal Employees states that he is a citizen (A210), and, though not stated expressly, it is easily inferred from the anonymous Main Street Alliance member's declaration that she likewise has legal status in the United States (*see* A199-203).  Yet the record shows (A462, A482), and the district court found (A1865), that IRS will disclose address information to ICE only for individuals who have an outstanding order of removal.  Significantly, neither of the anonymous members has alleged that he or she is subject to an order of removal, which, given their legal status, is extremely unlikely. Plaintiffs, moreover, have failed altogether to specifically identify any

other members in their pleadings or declarations, much less any member whose confidential address information has been or is likely to be disclosed to ICE because of an outstanding removal order.  (*See* A67-71, A194-197, A205-207.)  Plaintiffs have thus failed to "specifically identify," *Chamber of Com.*, 642 F.3d at 199, even a single member at imminent risk of having his or her information shared with ICE.

In fact, the IRS's August 2025 disclosure included address information for only a small percentage of the individuals contained in ICE's request (A258), so it is entirely speculative that any of plaintiffs' members' information has been disclosed to ICE.  But even if there were a "statistical probability" that some of plaintiffs' unidentified members have had or will have their information disclosed to ICE, that would not suffice to show injury in fact.  *Summers*, 555 U.S. at 497-99; *see also American Chemistry Council*, 468 F.3d at 820 ("It is not enough to show … that there is a substantial likelihood that at least one member may have suffered an injury-in-fact.").  Because plaintiffs failed to specifically identify a single member at imminent risk of having his or her address information disclosed to ICE, they have failed to show an injury in fact, and associational standing is precluded.

## b. The alleged injury is not "concrete"

In addition, the alleged injury to plaintiffs' members is not "concrete," which independently precludes standing. *TransUnion*, 594 U.S. at 424. "Article III standing requires a concrete injury even in the context of a statutory violation" *id.* at 426, because "an injury in law is not an injury in fact," *id.* at 427. Therefore, plaintiffs must allege a concrete injury, defined as an injury with a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417, *see also id.* at 424-25. Neither the common-law tort of intrusion upon seclusion nor breach of confidence supplies the necessary common-law analog here.

First, plaintiffs' asserted injury—namely, that IRS's alleged unlawful disclosure of their members' address information to another governmental agency violates their members' privacy interests (A1853, A97)—bears no resemblance to the common-law tort of intrusion upon seclusion. That tort is marked by the "intentional interference with [an individual's] interest in solitude or seclusion." Restatement (Second) of Torts § 652B cmt. a. Accordingly, liability for the tort arises only where a defendant "has intruded into a private place or has otherwise invaded

33

a private seclusion that the plaintiff has thrown about his person or affairs," *id.* cmt. c, and only if such intrusion is "substantial" and "of a kind that would be highly offensive" to a reasonable person, *id.* cmt. d. For example, the tort's harm is felt "when a reporter accosts a convalescing patient in the hospital, when a private detective peers through a bedroom window for weeks, and when a photographer snaps an opportunistic photo of a woman's underwear." *American Fed'n of Teachers v. Bessent*, 152 F.4th 162, 172 (4th Cir. 2025) (citing Restatement (Second) of Torts § 652B cmt. b, illus. 1, 2; cmt. c, illus. 7). This is different in kind from the harm plaintiffs allege here of unauthorized sharing of address information between two government agencies, which does not involve an intrusion or interference into anyone's private space or seclusion.[4] The Fourth Circuit recently rejected an attempt to analogize a nearly identical theory of injury— involving information sharing within a government agency—to the

---

[4] The district court said (A1857) that plaintiffs' alleged intrusion includes other sensitive taxpayer information, including Social Security numbers, but that is incorrect because plaintiffs' motion sought injunctive relief only with respect to IRS's alleged policy of sharing address information with ICE (A1841, A85).

common-law tort of intrusion upon seclusion, *id.* at 171-74, and plaintiffs' attempt here fails for the same reasons.

Second, plaintiffs' reliance on the tort of breach of confidence is also misplaced. A breach of confidence involves "the unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102, 114 (3d Cir. 2019). It "is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved." *Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019). Based on that understanding, "breach of confidence claims traditionally arise in the context of close professional relationships—those involving physicians, therapists, financial institutions, and the like." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc).

Plaintiffs' alleged injury here does not have the requisite "close relationship" with this tort because the Internal Revenue Code does not create a "confidential relationship" between the IRS and taxpayers. Taxpayers do not offer their private information to the IRS in confidence based on an established relationship of trust between them.

Rather, taxpayers file tax returns and provide the required information to the IRS because *Congress requires* them to do so and penalizes them if they fail to comply. 26 U.S.C. §§ 6011, 6651. And the fact that Congress has also placed restrictions on the disclosure of taxpayer information does not create a "confidential relationship" between taxpayers and the IRS, and certainly not anything like that traditionally recognized by the tort. Furthermore, the inter-agency sharing of address information within the federal government that is alleged here is also not analogous to disclosure to a "third party" that is recognized by the tort.

Because plaintiffs cannot identify a common-law analog with a close relationship to the harm they allege, they have failed to establish an injury in fact that is concrete and, therefore, lack standing for this additional reason.

## B. Plaintiffs do not challenge a final agency action reviewable under the APA

The district court additionally lacked authority to adjudicate plaintiffs' APA claim because only "final agency action" is reviewable under the APA, 5 U.S.C. § 704, and IRS's alleged "policy" of sharing taxpayer address information with ICE does not qualify.

It is well settled that not all agency conduct is subject to review under the APA.  As the Supreme Court has explained, the APA does not permit "general judicial review of [an agency's] day-to-day operations." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 899 (1990).  Nor does the APA authorize courts to oversee "the common business of managing government programs." *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 20 (D.C. Cir. 2006).  Here, plaintiffs do not assert that IRS's August 2025 disclosure to ICE is a final agency action (presumably because they seek *prospective* injunctive relief, and that disclosure already occurred), nor do they assert that the MOU is a final agency action (it is not).  Instead, they maintain, and the district court agreed (A1868-1869), that IRS has adopted an abstract "address-sharing policy" for the large-scale sharing of taxpayer address information with ICE; and the district court held that this purported policy constitutes "final agency action" under the APA.  The court was undeterred (A1869) by the fact that IRS has never "publicly announced" such a policy, that "the details … are still unclear," or that there are no direct legal consequences for individuals (much less the organizational

plaintiffs) from IRS's mere inter-agency sharing of address information with ICE.

The district court erred on multiple fronts. To start, the alleged "address-sharing policy" does not qualify as "agency action" because it does not exist; IRS's only practice in this respect, consistent with the MOU, is to comply with § 6103(i)(2)'s disclosure requirements upon receipt of a compliant request, as the statute requires IRS to do. "Agency action" is defined as an agency "rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). But if the court thought the IRS's alleged address-sharing policy qualified as an agency "rule," it never said so, nor could it have. That is because an agency "rule" requires some "agency statement … designed to implement, interpret, or prescribe law or policy," *id.* § 551(4), and the administrative record in this case includes no such agency statement pertaining to the alleged policy articulated by the court. Specifically, nowhere is there any agency statement that IRS has a policy to disclose "the confidential address information of tens of thousands of taxpayers … in reliance on representations from ICE … even when ICE identifies only a single ICE employee … as the

employee[] 'personally and directly engaged' in each of the tens of thousands of relevant criminal investigations or proceedings." (A1868-1869.) Neither plaintiffs nor the court pointed to any such statement by the agency, formal or informal, written or oral. The court thus erred "by postulating the existence of an agency [policy] wholly apart from any 'agency statement of general or particular applicability ... designed to implement' that [policy]." *Biden v. Texas*, 597 U.S. 785, 809 (2022) (quoting 5 U.S.C. § 551(4)).[5] Accordingly, plaintiffs do not challenge an "agency action" to begin with.

In addition, the alleged IRS policy is not "final" agency action in any event because it does not have "direct and appreciable legal consequences" for plaintiffs or their members. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *Sierra Club v. EPA*, 955 F.3d 56, 62 (D.C. Cir. 2020). The IRS's alleged policy of sharing taxpayer address information with ICE does not create any new rights or impose obligations for plaintiffs or their members. And there are no

---

[5] The alleged policy is also nothing like an "order, license, sanction, [or] relief." 5 U.S.C. § 551(13). These, too, are defined terms, *see id.* § 551(6), (8), (10), (11), and the alleged policy would not satisfy any of the definitions.

standalone practical consequences for them from the mere sharing of information from one executive agency to another. To be sure, in investigations under 8 U.S.C. § 1253(a)(1), ICE might *use* the address information it receives from IRS in a way that later affects individuals whose information is shared. But it would be *those* subsequent actions by ICE that produce the "practical effects" needed, *see Valero Energy Corp. v. EPA*, 927 F.3d 532, 537 (D.C. Cir. 2019), not the upstream disclosure of information by IRS that (along with much else) shapes whatever enforcement decision ICE ultimately makes. An agency action that affects the challenger's rights only "on the contingency of future administrative action" is not final. *DRG Funding Corp. v. Secretary of Hous. & Urb. Dev.*, 76 F.3d 1212, 1214 (D.C. Cir. 1996) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)); *see also Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (action must "directly affect the parties"); *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 731-33 (D.C. Cir. 2003); *AT & T Co. v. EEOC*, 270 F.3d 973, 975-76 (D.C. Cir. 2001).

The district court relied (A1870-1871) on *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), but that case is readily

distinguishable. In *Venetian*, a casino sued the Equal Employment Opportunity Commission over its policy of disclosing an employer's confidential information containing trade secrets to third parties without notifying the employer. *Id.* at 929. This Court accepted the policy as a final agency action under the APA. *Id.* at 931. Unlike this case, the Commission's policy in *Venetian* was memorialized in multiple versions of the agency's compliance manual, its existence was undisputed, and disclosure of the employer's confidential trade secrets to its competitors and other third parties would have immediate material consequences for the employer, whose rights in the trade secrets would be directly affected. *See id.* at 927-31. Thus, the policy in *Venetian* was "one by which [the employer's] rights … ha[d] been determined." *Id.* at 931. By contrast, the IRS's alleged address-sharing policy does not determine anyone's rights or obligations and does not involve sharing information with non-governmental third parties. *Cf. American Fed'n of Teachers*, 152 F.4th at 175 (distinguishing *Venetian* on similar grounds). And, contrary to the district court's view (A1871), *Venetian* does not support the proposition that agency action is final if it can lead to a "threat [of] civil litigation" or "the possibility of civil

liability," which the court analogized to possible future criminal prosecution in this case. A final agency action must, at the very least, impose an "immediate and significant practical burden on" the regulated party. *Valero Energy Corp.*, 927 F.3d at 537.

The district court erred in concluding that IRS's alleged address-sharing policy is final agency action subject to APA review.

## C. Plaintiffs' APA claim is foreclosed by the Internal Revenue Code's exclusive remedy for § 6103 violations

Further, the APA provides a vehicle for review only if "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action"). And where a "special statutory review proceeding" exists and is adequate, that proceeding governs. 5 U.S.C. § 703. Here, the Internal Revenue Code provides a comprehensive remedial scheme for violations of 26 U.S.C. § 6103 that precludes APA review.

Congress created a waiver of sovereign immunity for violations of § 6103 by authorizing civil damages against the United States in 26

U.S.C. § 7431. Section 7431 authorizes a right of action against the United States if "any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information … in violation of … section 6103." 26 U.S.C. § 7431(a)(1). Damages are authorized in the sum of "the greater of" (a) $1,000 for each unauthorized disclosure of a return or return information, or (b) the actual damages sustained by the plaintiff plus punitive damages for willful disclosures or disclosures that result from gross negligence. *Id.* § 7431(c). But the statute does not authorize injunctive relief.

In addition to § 7431, 26 U.S.C. § 7213 makes the unauthorized, willful disclosure, solicitation, or redisclosure of return information a felony that is punishable by a fine, imprisonment, or both, and dismissal for federal government officers and employees. Similarly, 26 U.S.C. § 7213A makes the unauthorized, willful inspection of return information punishable by a fine, imprisonment, or both, and dismissal for federal government officers and employees.

Considering this highly reticulated scheme, courts have held that the civil and criminal remedies discussed above represent the exclusive

recourse for taxpayers aggrieved by the unlawful inspection or disclosure of their return information, and this Court would create a circuit split by ruling otherwise. *See United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002) ("Congress has provided civil and criminal remedies for violations of § 6103, but no statutory provision requires the exclusion of evidence so obtained."); *Nowicki v. Commissioner*, 262 F.3d 1162, 1164 (11th Cir. 2001) ("Congress saw fit to provide only certain remedies for violations of § 6103."); *see also United Atates v. Michaelian*, 803 F.2d 1042, 1049-50 (9th Cir. 1986) (upholding district court's "refus[al] to fashion a dismissal or suppression remedy for a violation of § 6103," given other "legislatively created remedies"). Additional equitable relief is, therefore, unavailable.

Indeed, when Congress wanted to afford taxpayers the ability to bring a preemptive suit to prevent the disclosure of their tax information, it did so expressly. Section 6110 provides that a taxpayer who has obtained a written determination concerning his tax situation may petition the Tax Court to prevent IRS from disclosing information contained therein. 26 U.S.C. § 6110(f)(3)(A). Congress's provision of

such a remedy in this limited context confirms that its omission in other contexts should be respected.

In the face of a comprehensive statute, litigants are not permitted to "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman*, 560 F.3d 495, 497 (D.C. Cir. 2009); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984). Given the remedies available to individuals whose return information is disclosed in violation of § 6103—which is part of the complex statutory scheme Congress created in the Internal Revenue Code—a non-APA "special statutory review proceeding," 5 U.S.C. § 703, exists and is adequate. Therefore, plaintiffs are not entitled to injunctive relief through the APA. *Cf. Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 807 (D. Ariz. 1988) (concluding that § 7431 provides an adequate remedy at law that precludes equity jurisdiction).

### D.    Plaintiffs' APA claim fails on the merits

Even if plaintiffs' APA claim were justiciable, it would fail on the merits. The district court concluded that the IRS's alleged address-sharing policy is contrary to law, on the ground that it violates 26

U.S.C. § 6103, and is also arbitrary and capricious. These related holdings are both erroneous.

## 1. Section 6103

The district court concluded (A1876-1893) that IRS's disclosure of address information in response to ICE's request, and IRS's alleged policy to grant similar requests, violated § 6103(i)(2) in several respects. The court erred at each turn.

## a. The "address of the taxpayer"

A request under § 6103(i)(2) must set forth "the name and address of the taxpayer with respect to whom the requested information relates." 26 U.S.C. § 6103(i)(2)(B)(i). ICE supplied name and address information for the 47,289 individuals at issue.[6] Nevertheless, the district court found (A1886-1887) this inadequate under the statute because IRS did not "confirm" that the address provided by ICE "matched an address the IRS had in its system," relying instead on the taxpayer's identification number to confirm a match. But the statute's text does not impose any matching requirement, and the court erred by

---

[6] As noted *supra* p. 10 n.2, ICE provided potentially incomplete or potentially insufficient address information for a small portion of these individuals and is remediating that error.

reading into the statute a condition that Congress saw fit not to impose. *Bates v. United States*, 522 U.S. 23, 29 (1997) ("[W]e ordinarily resist reading words or elements into a statute that do not appear on its face.").

As demonstrated below, the structure of the statute shows that address matching is not required and that Congress intended that a taxpayer's identity—including his name and address—be made available to other federal agencies for their use in nontax criminal investigations.  If, as the district court held, the requesting agency's lack of identical address information were fatal to its request (because IRS could not "match" the address supplied with an address in its system), then the statute would be rather self-defeating with respect to this key type of information that Congress specially made disclosable in the statute.

Under the statute, "return information (other than taxpayer return information)" must be disclosed upon receipt of a compliant request.[7]  26 U.S.C. § 6103(i)(2)(A).  Notably, although "taxpayer return

---

[7] "Return information" and "taxpayer return information" are defined in § 6103(b)(2) and (3), respectively.

information" is generally not disclosable under this provision, Congress was careful to carve out from that nondisclosable category "a taxpayer's identity," which is therefore included in the broad category of disclosable "return information" under § 6103(i)(2). *Id.* § 6103(i)(2)(C), 6103(b)(2)(A) (defining "return information" to include "a taxpayer's identity"). A "taxpayer's identity" is "the name of a person with respect to whom a return is filed, *his mailing address*, his taxpayer identifying number …, *or a combination thereof.*" *Id.* § 6103(b)(6) (emphases added). The statute's plain text thus entitles a requesting agency to the disclosure of a taxpayer's mailing address regardless of whether that information is sought by itself "or" in "combination" with other return information. *Id.*; *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420, at *5-7 (D.D.C. May 12, 2025) (rejecting argument that requests seeking *only* address information are unlawful), *appeal pending* No. 25-5181 (D.C. Cir.) (argued Oct. 3, 2025).

Moreover, the statute's specific carve out for a taxpayer's identity (including address)—making disclosure of that information mandatory when properly requested—strongly indicates that Congress believed a

taxpayer's identity, including his name and address, may be relevant and needed by other agencies for use in nontax criminal investigations (and did not raise the same sort of sensitivities as other tax return information). The statute thus enables an agency like ICE with potentially outdated address information to obtain a current address from IRS for use in a nontax criminal investigation. Under the district court's reading, however, a requesting agency would not be able to obtain this key type of information unless IRS were able to find an exact matching address in its system, thus defeating the plain effect of the statute's operative text that makes a taxpayer's identity disclosable.

After all, the purpose of the "name and address" requirement in § 6103(i)(2)(B)(i) is to enable IRS to identify "the taxpayer with respect to whom the requested return information relates." 26 U.S.C. § 6103(i)(2)(B)(i). Here, IRS used the best possible matching method by utilizing unique taxpayer identification numbers—which could not mistakenly confuse two different taxpayers—where they were supplied by ICE. (*See* A351 ("As a practical matter, the IRS typically needs … a name and [taxpayer identification number] to identify a taxpayer with certainty.").) Under these circumstances, nothing in the statute's text

requires IRS to also confirm that the (potentially outdated) address supplied by ICE matches an address in IRS's records. The district court erred by imposing this additional requirement found nowhere in the statute's text.

### b. The "taxable period or periods"

In addition, the district court's finding (A1892) that ICE's request did not set forth "the taxable period or periods to which such return information relates," 26 U.S.C. § 6103(i)(2)(B)(ii), is factually incorrect and clearly erroneous. ICE's request was formalized in a letter and data file that ICE submitted electronically to IRS. (A449-450.) The administrative record includes a redacted excerpt of the data file provided by ICE (A434-439), which consists of a spreadsheet that includes a column labeled "Taxable Period" and rows underneath that identify the taxable period or periods for each individual as January 2022 to present (A437-439). A document titled DHS-ICE Data Exchange Overview confirms that IRS would not process ICE's request unless it included (*inter alia*) the taxable period, which was "required for processing." (A462.)

The district court apparently confused ICE's June 27 request, which specified the taxable period in the accompanying data file (A437-439), with ICE's earlier efforts to obtain information, which did not (A421). Treasury officials notified ICE of the deficiencies in these earlier efforts (A420), however, and ICE corrected them in its June 27 request, as demonstrated above and as plaintiffs appear to concede (A1928 n.6). This holding was therefore incorrect.

### c. The "specific reason" why disclosure "is, or may be, relevant"

Contrary to the district court's decision (A1890-1891), ICE's request also satisfied the requirement that it set forth "the specific reason or reasons why such disclosure is, or may be, relevant to such [nontax criminal] proceeding or investigation." 26 U.S.C. § 6103(i)(2)(B)(iv). ICE's request sought the last known address of individuals with an outstanding removal order, and it identified 8 U.S.C. § 1253(a)(1) as the statutory authority under which it was conducting an investigation. (A449.) That statute makes it a crime (*inter alia*) for an alien to willfully fail or refuse to depart from the United States within a period of 90 days from the date of a final order of removal. ICE explained that the requested information "is, or may be,

relevant to" its investigation under § 1253(a)(1) because it "may contain address information which is potentially at issue with respect to investigating or proving a violation under" the statute (A449) and may assist "to verify presence within the United States of America" (A434-436). The district court thought (A1891) ICE's explanation was "generalized" and "circular," rather than "specific," and therefore concluded that it did not comply with § 6103(i)(2)(B)(iv).

Nonsense. By its terms, the statute merely requires that a requesting agency's explanation be "specific" enough to enable IRS to make a reasonable judgment as to whether the requested information "is, or may be, relevant to" the specified criminal proceeding or investigation. 26 U.S.C. § 6103(i)(2)(B)(iv). ICE's request easily satisfied that standard.

A person's "last known address" is the most current address for the person in the IRS's files. *See* 26 C.F.R. § 301.6212-2(a). Here, ICE sought the last known address for individuals with an outstanding removal order. (A449, A482, A462 (final order date supplied by ICE must be "over 90 days from the current date").) Information about the most current address of a person with an outstanding removal order is

52

inherently relevant to a potential infraction of 8 U.S.C. § 1253(a)(1)

because it goes to proving that the person has remained within the

United States beyond his final order of removal.  If a person's last

known address on file with IRS is outside the United States, that

information is likewise highly relevant to an investigation under

§ 1253(a)(1).  ICE's explanation sufficed to demonstrate the potential

relevance of the information it sought—"To verify presence within the

United States of America."  (A434-436.)  Presence in the United States

is one of the elements of an infraction under § 1253(a)(1) and is,

therefore, extremely relevant to an investigation under this provision.

Ultimately, what matters is that ICE's explanation was "specific"

enough to enable IRS to determine that the requested information "is,

or may be, relevant to" ICE's criminal investigation, § 6103(i)(2)(B)(iv),

and that is all the statute requires.

### d.    **"Personally and directly engaged"**

Finally, the district court concluded (A1879-1884) that IRS's

disclosure to ICE—and IRS's alleged "policy" to make such

disclosures—likely violated § 6103(i)(2)'s requirement that any

disclosure under this provision be made "to officers and employees of

[the requesting] agency who are personally and directly engaged in" the criminal investigation. 26 U.S.C. § 6103(i)(2)(A). The IRS's August 2025 disclosure was made to Jesse Williams, whose position at the time was Assistant Director of the ICE Enforcement and Removal Operations, Field Operations (A322-323), and the court found it "unlikely that a single individual could be 'personally and directly engaged' in approximately 47,000 criminal matters, let alone 1.28 million of them, as ICE represented to the IRS" (A1882). But that conclusion rests on unsupported notions about how the district court thinks ICE must conduct a criminal investigation under 8 U.S.C. § 1253(a)(1).

Before addressing that issue, however, we pause to clarify a significant aspect of the statute—namely, the "personally and directly engaged" requirement in § 6103(i)(2)(A) is *not* about *whether* disclosure is required; rather, it governs only *to whom* disclosure—which at this point is *mandatory*—must be made. In other words, § 6103(i)(2) mandates disclosure of return information upon receipt of a compliant request, and the "personally and directly engaged" requirement merely tells IRS to whom the required disclosure must be made. So the district

court's focus on this requirement boils down to whether IRS made the required disclosure to the right person or persons. Ironically, under the court's (flawed) rationale, IRS should have disclosed the material to 47,000 or more officers and employees at ICE instead of just one.

That aside, the district court fundamentally misconceived how ICE may conduct a criminal investigation under 8 U.S.C. § 1253(a)(1). ICE's request sought the last known address of approximately 1.28 million individuals with final removal orders. In carrying out its criminal enforcement obligations under § 1253(a)(1) with respect to these individuals, ICE has discretion to initiate a *single*, broad-scale investigation that *begins* with a high-level review of address information that is directly relevant to determining, at the outset of the investigation, whether and how many of these individuals are present in the United States at times after issuance of the removal order in violation of the criminal statute. ICE's request indicates that it sought address information for these individuals for that very purpose: "To verify presence within the United States of America." (A434-436.) With the assistance of computers and modern technology, that is precisely the sort of task that is suitable for one high-level ICE officer who is

charged with enforcing § 1253(a)(1), and it is one that he can readily perform. Then, after ICE has gained a better understanding of the scope of potential violations of § 1253(a)(1) based on the results of that initial review of the data, ICE would have discretion whether and how to investigate further, including whether to open and assign additional staff to separate investigations that focus on specific individuals.

Properly viewed this way, ICE's designation of the Assistant Director as the "officer" who is "personally and directly engaged" in the criminal investigation, 26 U.S.C. § 6103(i)(2)(A), is perfectly compatible with the statute and satisfies even the district court's interpretation of that statutory phrase—that is, as referring to "someone working on the substance of the relevant criminal matter who will be able to apply to the criminal matter the information obtained through the IRS's disclosure." (A1881.) If, after performing an initial high-level review of the data, ICE were to proceed with individualized investigations that require additional staffing, § 6103 would permit ICE to further disclose the pertinent return information it received from IRS to other ICE officers and employees who might later be assigned to particular

criminal matters.  26 C.F.R. § 301.6103(i)-1; *see also* 26 U.S.C.

§ 6103(q), (p)(4)(C).

The district court's decision, by contrast, improperly constrains

ICE's discretion how to enforce and carry out investigations under 8

U.S.C. § 1253(a)(1).  Under the district court's faulty view, ICE was

required to initiate and fully staff 1.28 million *separate* investigations—

one for each individual—*before* it could receive any return information

from IRS.  The statute requires nothing of the sort.  And obviously, that

may not be the best use of ICE resources, especially not before ICE can

confirm whether and how many of the 1.28 million individuals are even

present in the United States—which is one of the reasons ICE

requested address information from IRS to begin with, to assist ICE in

making those determinations.  And looking at the bigger picture, it is

implausible that Congress would have limited the ability to investigate

and enforce federal criminal law in this manner.  The statute broadly

requires IRS to disclose return information for use in "*any*

investigation," 26 U.S.C. § 6103(i)(2)(A)(ii) (emphasis added), and

neither the district court nor IRS should be in the business of dictating

how ICE must conduct its criminal investigations, or else lose access to

relevant return information that Congress made disclosable for its use under § 6103(i)(2). But that is the absurd effect of the district court's decision.

IRS's August 2025 disclosure to the Assistant Director as the officer personally and directly engaged in a criminal investigation under § 1253(a)(1)—and its alleged policy to make similar disclosures—complied with § 6103(i)(2), and the district court erred in concluding otherwise.

## 2. Arbitrary and capricious

The district court's ruling that IRS's alleged address-sharing policy is arbitrary and capricious fails for the simple reason, demonstrated above, that no such policy exists that qualifies as "agency action" under the APA. *See supra* pp. 37-39. Instead, IRS responded to a specific information-sharing request pursuant to statutory authority. The court faulted (A1895-1898) IRS for failing to justify (or even acknowledge) that the alleged policy was a departure from past practice. But because IRS has not adopted a new policy, let alone one that departs from a previous policy maintained by the agency, no explanation or justification was required under the APA.

More fundamental, any action by IRS to disclose return information that complies with 26 U.S.C. § 6103(i)(2) cannot be arbitrary and capricious because such disclosure is mandatory under the statute.

## II. Plaintiffs failed to establish the remaining preliminary injunction factors

The remaining preliminary injunction factors—irreparable harm, the balance of equities, and the public interest—likewise favor the government and cannot justify the district court's vastly overbroad injunction.

### A. Irreparable harm

"This court has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To meet that standard, plaintiffs must demonstrate injury that is "both certain and great," "actual and not theoretical," "beyond remediation," and "of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* The failure to show irreparable harm is grounds by itself for refusing to issue a preliminary injunction. *Id.* This Court reviews de novo the district court's legal conclusion as to irreparable harm. *Id.*

Here, plaintiffs cannot establish a cognizable injury for Article III standing purposes, let alone the kind of irreparable harm necessary to support a preliminary injunction. As we demonstrated *supra* pp. 22-29, the Center's alleged diversion of resources in response to the IRS's actions, in an effort to increase taxpayer engagement with its services and to avoid the loss of federal funding, is not a cognizable Article III injury. Yet the district court focused (A1900) on these purported injuries, and in particular the alleged threat to the Center's federal funding, to find irreparable harm. But the supposed threat to the Center's federal funding is purely speculative and rests on equivocal allegations of the sort that this Court has consistently rejected as insufficient to show a probability of future injury even for standing purposes, *see supra* pp. 26-29, let alone to show irreparable injury that is "both certain and great." *Chaplaincy*, 454 F.3d at 297. The district court also insisted (A1900-1901) that IRS's alleged address-sharing policy is destroying "trust in the tax system" and eroding the Center's "goodwill" with taxpayers. But that sort of amorphous harm is far too speculative to satisfy the "high standard" of irreparable injury that this Court demands, *Chaplaincy*, 454 F.3d at 297, especially given that all

individuals must file and pay taxes as required by law regardless of how much they "trust in the tax system."

As for the other plaintiffs, the district court (A1902-1916) rested its irreparable-harm finding on the baseless assertion that ICE is really planning to *illegally* use the address information it received from IRS for large-scale (and imminent) *civil* immigration enforcement, rather than "solely" for use in an investigation or proceeding "pertaining to the enforcement of a … *criminal* statute," 26 U.S.C. § 6103(i)(2)(A) (emphasis added), as the statute requires.  As we demonstrated *supra* pp. 30-32, plaintiffs have failed to identify a single member whose address information has been or is likely to be disclosed to ICE because of an outstanding removal order.  Consequently, plaintiffs cannot show irreparable harm to their members caused by the IRS's actions even if their implausible assertion about how ICE will use the information could be believed.

Yet the district court piled speculation upon speculation to conclude not only that ICE has already or will imminently obtain plaintiffs' members' address information but that it also has imminent plans to use that information illegally in violation of 26 U.S.C. § 6103.

This is the same implausible assertion rejected by the court in *Centro*, 2025 WL 1380420, at *4. As in that case, plaintiffs here put forth no evidence that ICE *has in fact* used the information it obtained for unlawful purposes, and courts must presume that public officers have properly discharged their official duties "in the absence of clear evidence to the contrary." *American Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989).

The record reinforces the presumption of regularity that should have governed the outcome here. For one, plaintiffs' theory, which the district court accepted, requires an implausible assumption that government officials would open themselves up to potential disciplinary proceedings, dismissal, and criminal penalties by violating § 6103, as well as subject the government to potential civil damages. 26 U.S.C. §§ 7213, 7213A, 7431. In addition, the MOU executed between Treasury and DHS also includes strict limitations on the use of information provided under § 6103(i)(2), including that the requested taxpayer information will "only be used by officers and employees of ICE *solely*" for proceedings and investigations "pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), or other specifically designated

Federal criminal statutes, or any subsequent criminal proceedings."
(A374 (emphasis added).)  The MOU further specifies that "ICE will use
and redisclose the address information only as specifically authorized
by IRC § 6103(i)(2) as implemented in 26 C.F.R. § 301.6103(i)-1."
(A374.)  And, in ICE's request for information, ICE's Acting Director
reiterated and attested that ICE would abide by these restrictions.
(A449-450.)

The district court's contrary conclusion is largely derivative of its
mistaken view that IRS's disclosure to ICE "violated many of the
safeguards contained in [§] 6103(i)(2)."  (A1907.)  The court reiterated
its view, for instance, that one ICE officer could not be "personally and
directly engaged" at the outset of a broad criminal investigation to
verify the presence of 1.28 million individuals in the United States and
that ICE was not "specific" enough in explaining its need for address
information.  As demonstrated above, the court misinterpreted and
misapplied § 6103(i)(2).

The district court also stressed (A1908-1910) that the MOU's
introduction references one of the President's executive orders on border
security, which broadly instructs agencies to double-down on "removal"

efforts.  But that introduction also referenced, in a more specific

paragraph, criminal enforcement of § 1253(a)(1).  It was error for the

court to disregard the specific purpose of this MOU and its *express text*

limiting the permissible use of taxpayer information to criminal

enforcement.  And to boot, the executive order directs agencies to

pursue "additional actions to protect the American people" and directs

that its provisions "shall be implemented consistent with applicable

law," which of course includes the strictures of the Internal Revenue

Code.  *See* Exec. Order No. 14161, § 4(b), 90 Fed. Reg. 8451, 8452 (Jan.

20, 2025).

Finally, the district court inferred (A1912-1913) from the "history

of ICE's requests" that ICE is "wholly uninterested" in abiding by the

Internal Revenue Code and that ICE's attestations in the MOU and in

its June 27 letter—which were signed by the Secretary of the

Department of Homeland Security and by ICE's Acting Director,

respectively—were mere "pretext."  But the record simply does not

support these outlandish inferences or the court's reasons for them.

First, while an IRS employee was under the impression that ICE

initially (before the MOU was signed) sought information for civil

removal proceedings, the record includes no statements from ICE to that effect, and the IRS employee acknowledged at the time that this assumption might be "incorrect." (A341.) Second, the fact that ICE's subsequent efforts to obtain information included some deficiencies that Treasury officials relayed to ICE (A420), and which ICE officials were attempting in good faith to resolve (*see* A421), is way too thin a reed to infer that ICE was "wholly uninterested in abiding by the requirements of the Internal Revenue Code" (A1912). And last, contrary to the court's view (A1913), ICE's designation of one high-level officer to receive the IRS's disclosure is fully compatible with § 6103(i)(2), as we demonstrated above, and that is true whether ICE is investigating potential criminal violations of 8 U.S.C. § 1253(a)(1) or another specified criminal statute. None of this supports the court's conclusion that ICE was using § 6103(i)(2) as a pretext for civil immigration enforcement.

For the reasons above, plaintiffs have failed to demonstrate irreparable harm, which by itself precludes injunctive relief.

## B. Balance of equities and public interest

As for the remaining factors, allowing the injunction to stand threatens irreparable injuries to the government and the public, whose interests "merge" in this context. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court's order is far-reaching and extreme. Based on the court's misinterpretation of § 6103(i)(2)'s requirements, the order impedes and delays federal law enforcement by improperly restricting the information that ICE is entitled to receive from IRS under § 6103(i)(2) for use in criminal investigations. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.").

Not only that, the order is essentially a "follow-the-law" injunction that establishes a pre-clearance regime, where IRS is required to notify the district court and plaintiffs of any future requests it receives from ICE—or any component of DHS—under § 6103(i)(2) and to provide the court and plaintiffs with advance notice of any IRS determination to disclose information in response to such requests. Requiring prior notice of criminal investigatory activity is highly unusual and harmful

to that process, and the district court's ongoing micromanagement of the operations of executive agencies charged with enforcing federal law is "an improper intrusion by a federal court into the workings of a coordinate branch of the Government." *Immigration & Naturalization Serv. v. Legalization Assistance Project*, 510 U.S. 1301, 1306 (1993) (O'Connor, J., in chambers). These harms to the government and the public far outweigh any asserted injury to plaintiffs.

## III. The district court improperly granted relief to nonparties

Even if it were not otherwise an abuse of discretion, the district court's order improperly stays the IRS's alleged policy for everyone instead of granting party-specific relief as *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), requires. *CASA* makes clear that Congress "has granted federal courts no" power to issue "universal injunction[s]." *Id.* at 841. Consistent with the longstanding limits on equitable power that cabin the authority provided to federal courts in the Judiciary Act of 1789, federal courts sitting in equity may provide—at most—"complete relief between the parties." *Id.* at 851. That principle required the district court to limit relief to the plaintiffs in this case.

5 U.S.C. § 705 provides no avenue around the equitable limitations on non-party relief identified in *CASA*. That provision permits a court to stay agency action only "to the extent necessary to prevent irreparable injury," which incorporates constitutional and equitable limitations on non-party relief. Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.* More generally, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1). Thus, consistent with the equitable principles articulated in CASA, the APA requires courts to decline to enter universal relief, however styled, where other remedies would fully redress plaintiffs' injuries.

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's November 21, 2025, order.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. MCARTHUR
*Deputy Assistant Attorney General*

AUGUST FLENTJE

*/s/ Jacob Christensen*
JACOB CHRISTENSEN
*Attorneys, Appellate Staff*
*Civil Division, Room 7525*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-5048*
*jacob.christensen@usdoj.gov*

February 2026

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains <u>12,987</u> words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Jacob Christensen*
Jacob Christensen

# ADDENDUM

## TABLE OF CONTENTS

8 U.S.C. § 1253 ................................................................. A1

26 U.S.C. § 6103................................................................ A1

26 C.F.R. § 301.6103(i)-1 .................................................. A8

**8 U.S.C. § 1253.  Penalties related to removal**

(a) Penalty for failure to depart

    (1) In general

        Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 1227(a) of this title, who—

        (A) willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

        (B) willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

        (C) connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

        (D) willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under Title 18, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 1227(a) of this title), or both.

\*   \*   \*   \*   \*

**26 U.S.C. § 6103.  Confidentiality and disclosure of returns and return information**

(a) General rule

Returns and return information shall be confidential, and except as authorized by this title—

    (1) no officer or employee of the United States,

    (2) no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(1)(C) or (7)(A), any

tribal or local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section or section 6104(c), and

(3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (c), subsection (e)(1)(D)(iii), paragraph (10), (13), (14), or (15) of subsection (k), paragraph (6), (8), (10), (12), (13) (other than subparagraphs (D)(v) and (D)(vi) thereof), (16), (19), (20), or (21) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

(b) Definitions

For purposes of this section—

(1) Return

The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

(2) Return information

The term "return information" means—

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data,

received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

\* \* \* \* \*

### (3) Taxpayer return information

The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

\* \* \* \* \*

### (6) Taxpayer identity

The term "taxpayer identity" means the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in section 6109), or a combination thereof.

\* \* \* \* \*

### (i) Disclosure to Federal officers or employees for administration of Federal laws not relating to tax administration

#### (1) Disclosure of returns and return information for use in criminal investigations

##### (A) In general

Except as provided in paragraph (6), any return or return information with respect to any specified taxable period or periods shall, pursuant to and upon the grant of an ex parte order by a Federal district court judge or magistrate judge under subparagraph (B), be open (but only to the extent necessary as provided in such order) to inspection by, or disclosure to, officers and employees of any Federal agency who are personally and directly engaged in--

(i) preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party, or pertaining to the case of a missing or exploited child,

(ii) any investigation which may result in such a proceeding, or

(iii) any Federal grand jury proceeding pertaining to enforcement of such a criminal statute to which the United States or such agency is or may be a party, or to such a case of a missing or exploited child,

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

\* \* \* \* \*

(2) Disclosure of return information other than taxpayer return information for use in criminal investigations

(A) In general

Except as provided in paragraph (6), upon receipt by the Secretary of a request which meets the requirements of subparagraph (B) from the head of any Federal agency or the Inspector General thereof, or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, any United States attorney, any special prosecutor appointed under section 593 of title 28, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to section 510 of title 28, United States Code, the Secretary shall disclose return information (other than taxpayer return information) to officers and employees of such agency who are personally and directly engaged in--

(i) preparation for any judicial or administrative proceeding described in paragraph (1)(A)(i),

(ii) any investigation which may result in such a proceeding, or

(iii) any grand jury proceeding described in paragraph (1)(A)(iii),

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

(B) Requirements.--A request meets the requirements of this subparagraph if the request is in writing and sets forth--

(i) the name and address of the taxpayer with respect to whom the requested return information relates;

(ii) the taxable period or periods to which such return information relates;

(iii) the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and

(iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

(C) Taxpayer identity.--For purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information.

\* \* \* \* \*

(p) Procedure and recordkeeping

\* \* \* \* \*

(4) Safeguards

Any Federal agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5), or (7), (j)(1), (2), or (5), (k)(8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (17), or (22), (o)(1)(A), or (o)(3), the Government Accountability Office, the Congressional Budget Office, or any agency, body, or commission described in subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), or (k)(10), (l)(6), (7), (8), (9), (12), (15), or (16), any appropriate State officer (as defined in section 6104(c)), or any

other person described in subsection (k)(10) or (15), subsection (l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20), or any Indian tribe or tribal organization receiving a grant under section 455(f) of the Social Security Act, or any entity described in subsection (l)(21), shall, as a condition for receiving returns or return information—

 (A) establish and maintain, to the satisfaction of the Secretary, a permanent system of standardized records with respect to any request, the reason for such request, and the date of such request made by or of it and any disclosure of return or return information made by or to it;

 (B) establish and maintain, to the satisfaction of the Secretary, a secure area or place in which such returns or return information shall be stored;

 (C) restrict, to the satisfaction of the Secretary, access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title;

 (D) provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the returns or return information;

 (E) furnish a report to the Secretary, at such time and containing such information as the Secretary may prescribe, which describes the procedures established and utilized by such agency, body, or commission, the Government Accountability Office, or the Congressional Budget Office for ensuring the confidentiality of returns and return information required by this paragraph; and

 (F) upon completion of use of such returns or return information

  (i) in the case of an agency, body, or commission described in subsection (d), (i)(3)(B)(i), (k)(10), or (l)(6), (7), (8), (9), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or (15) or subsection

(l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) return to the Secretary such returns or return information (along with any copies made therefrom) or make such returns or return information undisclosable in any manner and furnish a written report to the Secretary describing such manner,

(ii) in the case of an agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5) or (7), (j)(1), (2), or (5), (k)(8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (15), (17), or (22),,3 (o)(1)(A), or (o)(3) or any entity described in subsection (l)(21), the Government Accountability Office, or the Congressional Budget Office, either--

(I) return to the Secretary such returns or return information (along with any copies made therefrom),

(II) otherwise make such returns or return information undisclosable, or

(III) to the extent not so returned or made undisclosable, ensure that the conditions of subparagraphs (A), (B), (C), (D), and (E) of this paragraph continue to be met with respect to such returns or return information, and

\* \* \* \* \*

(q) Regulations

The Secretary is authorized to prescribe such other regulations as are necessary to carry out the provisions of this section.

**26 C.F.R. § 301.6103(i)-1. Disclosure of returns and return information (including taxpayer return information) to and by officers and employees of the Department of Justice or another Federal agency for use in Federal grand jury proceeding, or preparation for proceeding or investigation, involving enforcement of Federal criminal statute not involving tax administration**

(a) Disclosure of returns and return information (including taxpayer return information) to officers and employees of the Department of Justice or another Federal agency

Returns and return information (including taxpayer return information), as defined in section 6103(b)(1), (2), and (3) of the Internal Revenue Code, shall, to the extent provided by section 6103(i)(1), (2), and (3) and subject to the requirements of section 6103(i)(1) and (2), be open to inspection by or disclosure to officers and employees of the Department of Justice (including United States attorneys) or of another Federal agency (as defined in section 6103(b)(9)) personally and directly engaged in, and for their necessary use in, any Federal grand jury proceeding, or preparation for any administration or judicial proceeding (or their necessary use in an investigation which may result in such a proceeding), pertaining to enforcement of a specifically designated Federal criminal statute not involving or related to tax administration to which the United States or such agency is or may be a party.

(b) Disclosure of returns and return information (including taxpayer return information) by officers and employees of the Department of Justice or another Federal agency

(1) Returns and return information (including taxpayer return information), as defined in section 6103(b)(1), (2), and (3) of the Code, disclosed to officers and employees of the Department of Justice or other Federal agency (as defined in section 6103(b)(9)) as provided by paragraph (a) of this section may be disclosed by such officers and employees to other persons, including, but not limited to, persons described in subparagraph (2) of this paragraph, but only to the extent necessary in connection with a Federal grand jury proceeding, or the proper preparation for a

A8

proceeding (or in connection with an investigation which may result in such a proceeding), described in paragraph (a). Such disclosures may include, but are not limited to, disclosures where necessary—

> (i) To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);

> (ii) To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or

> (iii) To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

Disclosure of a return or return information to a person other than the taxpayer to whom such return or return information relates or such taxpayer's legal representative to properly accomplish any purpose or activity described in this subparagraph should be made, however, only if such purpose or activity cannot otherwise properly be accomplished without making such disclosures.

(2) Among those persons to whom returns and return information may be disclosed by officers and employees of the Department of Justice or other Federal agency as provided by subparagraph (1) of this paragraph are—

> (i) Other officers and employees of the Department of Justice (including an office, board, division, or bureau of such department, such as the Federal Bureau of Investigation or the Drug Enforcement Administration) or other Federal agency described in subparagraph (1), such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel (for example, in the case of the

Department of Justice, Section Chiefs, Deputy Assistant Attorneys General, Assistant Attorneys General, the Deputy Attorney General, the Attorney General, and supervisory personnel of the Federal Bureau of Investigation or the Drug Enforcement Administration);

(ii) Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such officers and employees of the Department of Justice or other Federal agency described in subparagraph (1); and

(iii) Court reporters.