**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-5006**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

CENTER FOR TAXPAYER RIGHTS, et al.,

Plaintiffs-Appellees,

v.

INTERNAL REVENUE SERVICE, et al.,

Defendants-Appellants.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**APPENDIX**
**Vol. 1, pp. 1–385**

———————————

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MCARTHUR
  *Deputy Assistant Attorney General*

AUGUST FLENTJE
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
  *Attorneys for Appellants*

# TABLE OF CONTENTS

## VOLUME 1

Docket Seet ................................................................................................ A1

Amended Complaint (Dkt. 20) ............................................................... A19

Plaintiffs' Motion for Stay under 5 U.S.C. § 705 or, in the
    Alternative, for Preliminary Injunction (with exhibits)
    (Dkt. 30) ............................................................................................ A77

Defendants' Opposition (with exhibits) (Dkt. 31) ............................. A217

Plaintiffs' Reply (with exhibits) (Dkt. 34) ......................................... A277

Plaintiffs' Response to Court Order (Dkt. 39) ................................... A311

Defendants' Response to Court Order (Dkt. 40) ............................... A322

Defendants' Notice of Submission of Administrative Record
    (Dkt. 48) ........................................................................................... A331

Certification of Administrative Record (Dkt. 48-1) .......................... A333

Administrative Record Index (Dkt. 48-2) ........................................... A335

Administrative Record (Dkt. 48-3) ...................................................... A338

## VOLUME 2

Administrative Record (continued) (Dkt. 48-3 through 48-9) ........... A386

## VOLUME 3

Administrative Record (continued) (Dkt. 48-9 through 48-11) ......... A771

## VOLUME 4

Administrative Record (continued) (Dkt. 48-11 through 48-13) ..... A1156

# VOLUME 5

Administrative Record (continued) (Dkt. 48-13 through 48-15) ..... A1541

Plaintiffs' Notice Regarding Objections to Defendant's Designation
    of the Administrative Record (Dkt. 49) ................................... A1794

Plaintiffs' Motion for Leave to File Supplement (Dkt. 50) ............. A1802

Defendants' Response to Plaintiffs' Notice (Dkt. 51) ...................... A1811

Defendants' Opposition to Plaintiffs' Motion for Leave (Dkt. 52) ... A1819

Order (Dkt. 53) ................................................................................ A1827

Memorandum Opinion (Dkt. 54) ..................................................... A1831

Plaintiffs' Supplement (Dkt. 54) ..................................................... A1925

Notice of Appeal (Dkt. 59) .............................................................. A1931

Corrected Notice of Appeal (Dkt. 61) .............................................. A1932

APPEAL,JURY,STAYED,TYPE–E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25–cv–00457–CKK

CENTER FOR TAXPAYER RIGHTS et al v. INTERNAL
REVENUE SERVICE et al
Assigned to: Judge Colleen Kollar–Kotelly
Case in other court:  USCA, 26–05006
Cause: 05:702 Administrative Procedure Act

Date Filed: 02/17/2025
Jury Demand: Plaintiff
Nature of Suit: 899 Administrative
Procedure Act/Review or Appeal of
Agency Decision
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**CENTER FOR TAXPAYER RIGHTS**          represented by

**Johanna M. Hickman**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Email: hhickman@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Karianne Melissa Jones**
EVERGREEN LEGAL STRATEGIES
LLP
1763 Columbia Rd NW
Washington, DC 20009
202–875–2234
Email: kjones@evergreenlegalstrategies.com
*TERMINATED: 03/26/2025*
*ATTORNEY TO BE NOTICED*

**Madeline Gitomer**
DEMOCRACY FORWARD
P.O. Box 34553
Washington
Washington, DC 20043
202–448–9090
Email: mgitomer@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–455–9060
Email: rthurston@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Simon Christopher Brewer**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–448–9090
Fax: 202–796–4426
Email: sbrewer@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
DEMOCRACY FORWARD

FOUNDATION
P.O. Box 34553
Washington, DC 20043
254–722–5745
Email: sperryman@democracyforward.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–982–1569
Email: sbressler@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
DEMOCRACY FORWARD
FOUNDATION
P.O. Box 34553
Washington, DC 20043
202–812–7824
Email: dmcgrath@democracyforward.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**MAIN STREET ALLIANCE**      represented by   **Johanna M. Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karianne Melissa Jones**
(See above for address)
*TERMINATED: 03/26/2025*
*ATTORNEY TO BE NOTICED*

**Madeline Gitomer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Simon Christopher Brewer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**                          represented by

A2

**NATIONAL FEDERATION OF
FEDERAL EMPLOYEES, IAM
AFL–CIO**

**Johanna M. Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karianne Melissa Jones**
(See above for address)
*TERMINATED: 03/26/2025*
*ATTORNEY TO BE NOTICED*

**Madeline Gitomer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Simon Christopher Brewer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**COMMUNICATIONS WORKERS OF
AMERICA, AFL–CIO**

represented by **Johanna M. Hickman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Karianne Melissa Jones**
(See above for address)
*TERMINATED: 03/26/2025*
*ATTORNEY TO BE NOTICED*

**Madeline Gitomer**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Robin F. Thurston**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Simon Christopher Brewer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Skye Perryman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Y. Bressler**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Alexander McGrath**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**INTERNAL REVENUE SERVICE**    represented by    **Bradley P. Humphreys**
KING STREET LEGAL, PLLC
800 Connecticut Ave NW
Suite 300
Washington, DC 20006
276–696–1981
Email: brad@kingstlegal.com
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
DOJ–Civ
1100 L St. NW
Washington, DC 20005
202–305–5486
Email: stephen.tagert@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**DOUGLAS O'DONNELL**    represented by    **Bradley P. Humphreys**
*in his official capacity as Acting*    (See above for address)
*Commissioner, Internal Revenue Service*    *TERMINATED: 09/29/2025*
*TERMINATED: 05/16/2025*    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE**    represented by    **Bradley P. Humphreys**
**TREASURY**    (See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**SCOTT BESSENT**    represented by    **Bradley P. Humphreys**
*in his official capacity as Secretary of the*    (See above for address)
*Treasury*    *TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DIGITAL SERVICE (U.S. DOGE SERVICE)**

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DOGE SERVICE TEMPORARY ORGANIZATION**

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**AMY GLEASON**
*in her purported official capacity as Acting Administrator of the U.S. DOGE Service and U.S. DOGE*

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ELON MUSK**
*in his official capacity as the leader of DOGE*

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEVE DAVIS**
*in his official capacity as Chief Operating Officer of DOGE*

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Defendant**

**U.S. DEPARTMENT OF THE TREASURY DOGE TEAM**

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**OFFICE OF PERSONNEL MANAGEMENT**

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHARLES EZELL**
*in his official capacity as Acting Director of the Office of Personnel Management*

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**GENERAL SERVICES ADMINISTRATION**

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**STEPHEN EHIKIAN**
*in his official capacity as Acting Administrator of the General Services Administration*

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MICHAEL FAULKENDER**
*in his official capacity as Acting*
*Commissioner, Internal Revenue Service*

represented by **Bradley P. Humphreys**
(See above for address)
*TERMINATED: 09/29/2025*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John Stephen Tagert**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Amicus**

**MEMBERS OF CONGRESS AS**
**AMICI CURIAE**

represented by **Andrew Weiner**
KOSTELANETZ LLP
601 New Jersey Ave. NW
Suite 260
Washington, DC 20001
202–875–8000
Fax: 202–808–8108
Email: aweiner@kostelanetz.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nicholas Scott Bahnsen**
KOSTELANETZ LLP
620 New Jersey Avenue NW
Suite 260
20001
Washington, DC 20001
202–790–6990
Email: nbahnsen@kostelanetz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/17/2025 | 1 | COMPLAINT against SCOTT BESSENT, INTERNAL REVENUE SERVICE, DOUGLAS O'DONNELL, U.S. DEPARTMENT OF THE TREASURY, U.S. DOGE SERVICE, U.S. DOGE SERVICE TEMPORARY ORGANIZATION with Jury Demand ( Filing fee $ 405 receipt number ADCDC–11484198) filed by MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Cov Sheet Attachment, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons)(McGrath, Daniel) (Attachment 1 replaced on 2/18/2025) (zmtm). (Entered: 02/17/2025) |
| 02/17/2025 | 2 | NOTICE OF RELATED CASE by COMMUNICATIONS WORKERS OF AMERICA, CENTER FOR TAXPAYER RIGHTS, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, MAIN STREET ALLIANCE. Case related to Case No. 25–313. (McGrath, Daniel) (Entered: 02/17/2025) |
| 02/18/2025 | | Case Assigned to Judge Colleen Kollar–Kotelly. (zmtm) (Entered: 02/18/2025) |
| 02/18/2025 | 3 | SUMMONS (8) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (zmtm) (Additional attachment(s) added on 2/18/2025: # 1 Notice and Consent) (zmtm). Modified on 2/18/2025 to add docket number (zmtm). (Entered: 02/18/2025) |
| 02/18/2025 | 4 | NOTICE of Appearance by Daniel Alexander McGrath on behalf of COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR |

| | | TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (McGrath, Daniel) (Entered: 02/18/2025) |
|---|---|---|
| 02/18/2025 | 5 | NOTICE of Appearance by Robin F. Thurston on behalf of COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (Thurston, Robin) (Entered: 02/18/2025) |
| 02/18/2025 | 6 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Karianne M. Jones, Filing fee $ 100, receipt number ADCDC–11485947. Fee Status: Fee Paid. by COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Declaration, # 2 Supplement Declaration, # 3 Certificate of Good Standing)(McGrath, Daniel) (Entered: 02/18/2025) |
| 02/18/2025 | 7 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Madeline H. Gitomer, Filing fee $ 100, receipt number ADCDC–11485966. Fee Status: Fee Paid. by COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(McGrath, Daniel) (Entered: 02/18/2025) |
| 02/18/2025 | 8 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Skye L. Perryman, Filing fee $ 100, receipt number ADCDC–11485977. Fee Status: Fee Paid. by COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(McGrath, Daniel) (Entered: 02/18/2025) |
| 02/18/2025 | 9 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (McGrath, Daniel) (Entered: 02/18/2025) |
| 02/18/2025 | 10 | ORDER ESTABLISHING PROCEDURES FOR CIVIL CASES ASSIGNED TO JUDGE COLLEEN KOLLAR–KOTELLY. Signed by Judge Colleen Kollar–Kotelly on 02/18/2025. (lcckk1) (Entered: 02/18/2025) |
| 02/19/2025 | | MINUTE ORDER: For good cause shown, the 6 , 7 , and 8 Motions for Leave to Appear *Pro Hac Vice* filed on behalf of Attorneys Karianne M. Jones, Madeline H. Gitomer, and Skye L. Perryman, are GRANTED, CONTINGENT ON Attorneys Jones, Gitomer, and Perryman filing declarations certifying their familiarity with the Local Rules of this Court on or before **February 26, 2025**. Because Attorney Jones is an active member of the District of Columbia Bar practicing on behalf of an organization with an office in this District and has not yet applied for admission to this Court's Bar, Attorney Jones's admission *pro hac vice* is also CONTINGENT on Attorney Jones submitting an application for admission to this Court's Bar pursuant to Local Rule of Civil Procedure 83.8 on or before **February 26, 2025**. **Counsel shall promptly register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Colleen Kollar–Kotelly on 02/19/2025. (lcckk1) (Entered: 02/19/2025) |
| 02/24/2025 | 11 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. SCOTT BESSENT served on 2/20/2025; INTERNAL REVENUE SERVICE served on 2/20/2025; DOUGLAS O'DONNELL served on 2/20/2025; U.S. DEPARTMENT OF THE TREASURY served on 2/20/2025; U.S. DIGITAL SERVICE (U.S. DOGE SERVICE) served on 2/20/2025; U.S. DOGE SERVICE TEMPORARY ORGANIZATION served on 2/19/2025, RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/20/2025. ( Answer due for ALL FEDERAL DEFENDANTS by 4/21/2025.), RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 02/20/2025. (McGrath, Daniel) (Entered: 02/24/2025) |

| 02/25/2025 | 12 | NOTICE of Appearance by Madeline Gitomer on behalf of COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (Attachments: # 1 Declaration)(Gitomer, Madeline) (Entered: 02/25/2025) |
|---|---|---|
| 02/25/2025 | 13 | NOTICE of Appearance by Skye Perryman on behalf of COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (Attachments: # 1 Declaration)(Perryman, Skye) (Entered: 02/25/2025) |
| 02/25/2025 | 14 | NOTICE of Appearance by Karianne Melissa Jones on behalf of COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (Attachments: # 1 Declaration, # 2 Certificate of Good Standing)(Jones, Karianne) (Entered: 02/25/2025) |
| 03/26/2025 | 15 | NOTICE OF WITHDRAWAL OF APPEARANCE as to COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. Attorney Karianne Melissa Jones terminated. (Jones, Karianne) (Entered: 03/26/2025) |
| 03/28/2025 | 16 | NOTICE of Appearance by Bradley P. Humphreys on behalf of All Defendants (Humphreys, Bradley) (Entered: 03/28/2025) |
| 04/16/2025 | 17 | Consent MOTION for Extension of Time to File Answer re 1 Complaint,, *or Otherwise Respond* by SCOTT BESSENT, INTERNAL REVENUE SERVICE, DOUGLAS O'DONNELL, U.S. DEPARTMENT OF THE TREASURY, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 04/16/2025) |
| 04/17/2025 | | MINUTE ORDER: The Defendants' 17 Consent Motion for Extension of Time is GRANTED. The Defendants shall file their Answer or other response to the Plaintiffs' 1 Complaint on or before **April 25, 2025**. Signed by Judge Colleen Kollar–Kotelly on 04/17/2025. (lcckk1) (Entered: 04/17/2025) |
| 04/17/2025 | | Set/Reset Deadlines: The Defendants shall file their Answer or other response to the Plaintiffs' 1 Complaint on or before 4/25/2025. (dot) (Entered: 04/18/2025) |
| 04/25/2025 | 18 | MOTION to Dismiss by SCOTT BESSENT, INTERNAL REVENUE SERVICE, DOUGLAS O'DONNELL, U.S. DEPARTMENT OF THE TREASURY, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Humphreys, Bradley) (Entered: 04/25/2025) |
| 05/05/2025 | 19 | Consent MOTION for Extension of Time to *Respond to Motion to Dismiss* by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Text of Proposed Order)(McGrath, Daniel) (Entered: 05/05/2025) |
| 05/05/2025 | | MINUTE ORDER: For good cause shown, the Plaintiffs' 19 Consent Motion for Extension of Time is GRANTED. The Plaintiffs shall file their response to the Defendants' 18 Motion to Dismiss on or before **May 16, 2025**. The Defendants shall file any reply on or before **May 23, 2025**. Signed by Judge Colleen Kollar–Kotelly on 05/05/2025. (lcckk1) (Entered: 05/05/2025) |
| 05/05/2025 | | Set/Reset Deadlines: Response to Dispositive Motions due by 5/16/2025; Reply to Dispositive Motions due by 5/23/2025. (mhp) (Entered: 05/05/2025) |
| 05/16/2025 | 20 | AMENDED COMPLAINT against SCOTT BESSENT, INTERNAL REVENUE SERVICE, U.S. DEPARTMENT OF THE TREASURY, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION, AMY GLEASON, ELON MUSK, STEVE DAVIS, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, OFFICE OF PERSONNEL MANAGEMENT, |

| | | |
|---|---|---|
| | | CHARLES EZELL, GENERAL SERVICES ADMINISTRATION, STEPHEN EHIKIAN, MICHAEL FAULKENDER with Jury Demand filed by NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO, MAIN STREET ALLIANCE, CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO. (Attachments: # 1 Summons, # 2 Summons, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons)(McGrath, Daniel) (Entered: 05/16/2025) |
| 05/20/2025 | 21 | NOTICE of Appearance by Johanna M. Hickman on behalf of CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (Hickman, Johanna) (Entered: 05/20/2025) |
| 05/22/2025 | | MINUTE ORDER: Upon consideration of the Plaintiffs' 20 Amended Complaint, it is ORDERED that the Defendants' 18 Motion to Dismiss is DENIED WITHOUT PREJUDICE and the briefing schedule on that Motion is VACATED so that the Defendants may revise and refile their Motion or otherwise respond to the amended pleading. *See Ellipso, Inc. v. Mann*, 460 F. Supp. 2d 99, 103 (D.D.C. 2006) (RCL). The Defendants shall Answer or otherwise respond to the 20 Amended Complaint in accordance with Federal Rule of Civil Procedure 12. Signed by Judge Colleen Kollar–Kotelly on 05/22/2025. (lcckk1) (Entered: 05/22/2025) |
| 05/23/2025 | 22 | SUMMONS (8) Issued Electronically as to STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM. (Attachment: # 1 Notice and Consent)(zjm) (Entered: 05/23/2025) |
| 05/30/2025 | 23 | Joint MOTION for Briefing Schedule *for Defendants' Motion to Dismiss Plaintiffs' Amended Complaint* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 05/30/2025) |
| 05/30/2025 | 24 | ORDER granting 23 Motion for Briefing Schedule. Signed by Judge Colleen Kollar–Kotelly on 5/30/2025. (lcckk3) (Entered: 05/30/2025) |
| 05/30/2025 | | Set/Reset Deadlines/Hearings: Defendant's Motion to Dismiss due by 7/3/2025. Plaintiff's Response to Motion to Dismiss due by 7/25/2025. Defendant's Reply to Dispositive Motions due by 8/4/2025. (zakb) (Entered: 05/30/2025) |
| 06/30/2025 | 25 | Unopposed MOTION to Modify *Briefing Schedule* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 06/30/2025) |
| 07/02/2025 | | MINUTE ORDER: For good cause shown, Defendants' 25 Unopposed Motion to Modify Briefing Schedule is GRANTED. Defendants shall file their motion to dismiss on or before **July 10, 2025**. Plaintiffs shall file their response to Defendants' motion to dismiss on or before **August 1, 2025**. Defendants shall file any reply in support of their motion to dismiss on or before **August 11, 2025**. Signed by Judge Colleen Kollar–Kotelly on 07/02/2025. (lcckk1) (Entered: 07/02/2025) |
| 07/02/2025 | | Set/Reset Deadlines: Defendants' Motion to Dismiss due by 7/10/2025. Response due by 8/1/2025. Reply due by 8/11/2025. (dot) (Entered: 07/02/2025) |
| 07/10/2025 | 26 | MOTION to Dismiss *Plaintiffs' Amended Complaint* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, |

| | | |
|---|---|---|
| | | GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Humphreys, Bradley) (Entered: 07/10/2025) |
| 08/01/2025 | 27 | Memorandum in opposition to re 26 MOTION to Dismiss *Plaintiffs' Amended Complaint* filed by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Declaration of Nina E. Olson)(McGrath, Daniel) (Entered: 08/01/2025) |
| 08/06/2025 | 28 | Unopposed MOTION for Extension of Time to File Response/Reply as to 26 MOTION to Dismiss *Plaintiffs' Amended Complaint* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Humphreys, Bradley) (Entered: 08/06/2025) |
| 08/11/2025 | | MINUTE ORDER granting 28 Motion for Extension of Time to File Response/Reply re 26 MOTION to Dismiss *Plaintiffs' Amended Complaint*. Reply due by 8/15/2025. Signed by Judge Colleen Kollar–Kotelly on 8/11/2025. (lcckk3) Modified event title on 8/11/2025 (hmc). (Entered: 08/11/2025) |
| 08/11/2025 | | Set/Reset Deadlines: Reply due by 8/15/2025. (hmc) (Entered: 08/11/2025) |
| 08/15/2025 | 29 | REPLY to opposition to motion re 26 Motion to Dismiss,, filed by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Humphreys, Bradley) (Entered: 08/15/2025) |
| 08/20/2025 | 30 | MOTION for Preliminary Injunction *(Stay Under 5 U.S.C. 705, 706, or in the alternative for Preliminary Injunction)* by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6 – Declaration of Nina E. Olson, # 9 Exhibit 7 – Declaration of Shawn Phetteplace, # 10 Exhibit 8 – Declaration of Jane Doe, # 11 Exhibit 9 – Declaration of Yvette Piacsek, # 12 Exhibit 10 – Declaration of John Doe, # 13 Exhibit 11 – Declaration of John Koskinen)(Hickman, Johanna). Added MOTION to Stay on 8/24/2025 (zjm). (Entered: 08/20/2025) |
| 08/20/2025 | | MINUTE ORDER: The Court is in receipt of the Plaintiffs' 30 Motion for Stay Under 5 U.S.C. § 705 or, in the Alternative, for a Preliminary Injunction. The Defendants shall respond to the Plaintiffs' 30 Motion on or before **August 28, 2025**. The Plaintiffs shall file any reply on or before **September 3, 2025**. The parties shall be prepared for a hearing on the Plaintiffs' Motion on either September 4 or September 5. Signed by Judge Colleen Kollar–Kotelly on 08/20/2025. (lcckk1) (Entered: 08/20/2025) |
| 08/20/2025 | | Set/Reset Deadlines: Defendants' Response to 30 due by 8/28/2025; Plaintiffs' Replies due by 9/3/2025. (dot) (Entered: 08/21/2025) |
| 08/28/2025 | 31 | Memorandum in opposition to re 30 MOTION for Preliminary Injunction *(Stay Under 5 U.S.C. 705, 706, or in the alternative for Preliminary Injunction)* MOTION to Stay filed by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF |

| | | |
|---|---|---|
| | | PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Affidavit A – Declaration of John J. Walker, # 2 Text of Proposed Order)(Humphreys, Bradley) (Entered: 08/28/2025) |
| 08/29/2025 | | MINUTE ORDER: Upon consideration of the Plaintiffs' 30 Motion for Stay Under 5 U.S.C. § 705 or, in the Alternative, for Preliminary Injunction, and the Defendants' 31 Opposition thereto, it is ORDERED that counsel shall appear for a hearing on the Plaintiffs' 30 Motion at **1:00 p.m. ET on September 5, 2025**, in Courtroom 28–A. On or before September 3, 2025, the Court will issue a further order identifying specific legal and factual issues that counsel should be prepared to address at this hearing. Signed by Judge Colleen Kollar–Kotelly on 08/29/2025. (lcckk1) (Entered: 08/29/2025) |
| 08/29/2025 | | Set/Reset Hearings: Motion Hearing set for 9/5/2025 at 1:00 PM in Courtroom 28A– In Person before Judge Colleen Kollar–Kotelly. (dot) (Entered: 09/04/2025) |
| 09/03/2025 | 32 | ORDER identifying specific legal and factual issues that counsel should be prepared to address at the hearing on Plaintiffs' 30 Motion on September 5, 2025. Signed by Judge Colleen Kollar–Kotelly on 9/3/2025. (lcckk3) (Entered: 09/03/2025) |
| 09/03/2025 | 33 | MOTION for Leave to Appear Pro Hac Vice :Attorney Name– Andrew Weiner, Filing fee $ 100, receipt number ADCDC–11931098. Fee Status: Fee Paid. by Members of Congress as Amici Curiae. (Attachments: # 1 Affidavit)(Bahnsen, Nicholas) (Entered: 09/03/2025) |
| 09/03/2025 | 34 | REPLY to opposition to motion re 30 Motion for Preliminary Injunction,,,, Motion to Stay,,, filed by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Exhibit 12, # 2 Exhibit 13)(McGrath, Daniel) (Entered: 09/03/2025) |
| 09/03/2025 | | MINUTE ORDER: For good cause shown, the 33 Motion for Leave to Appear *Pro Hac Vice* filed on behalf of Attorney Andrew Weiner is GRANTED, CONTINGENT ON Attorney Weiner filing a declaration certifying his familiarity with the Local Rules of this Court on or before **September 10, 2025**. Because Attorney Weiner is an active member of the District of Columbia Bar practicing on behalf of an organization with an office in this District, Attorney Weiner's admission *pro hac vice* is also CONTINGENT ON him applying for admission to become a full member of this Court's Bar no later than **October 3, 2025.** **Counsel shall promptly register for e–filing via PACER and file a notice of appearance pursuant to LCvR 83.6(a)** Click for instructions. Signed by Judge Colleen Kollar–Kotelly on 9/3/2025. (lcckk3) (Entered: 09/03/2025) |
| 09/04/2025 | | MINUTE ORDER: The Court will provide access for the public to telephonically attend the hearing on Plaintiffs' 30 Motion for Stay Under 5 U.S.C. § 705 or, in the Alternative, for Preliminary Injunction that is set for September 5, 2025, at 1:00 p.m. ET. The hearing can be accessed by dialing the toll–free number: (833) 990–9400 (Meeting ID: 585620654). Attendees using the public access telephone line can listen to proceedings but will not be audible to other participants during the hearing. Attendees are also reminded of the general prohibition against photographing, recording, or rebroadcasting any court proceedings (including those held by telephone or videoconference). Violation of these prohibitions may result in sanctions, including removal of court–issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Signed by Judge Colleen Kollar–Kotelly on 9/4/2025. (lcckk3) (Entered: 09/04/2025) |
| 09/05/2025 | 35 | NOTICE of Appearance by Andrew Weiner on behalf of Members of Congress as Amici Curiae (Weiner, Andrew) (Entered: 09/05/2025) |
| 09/05/2025 | 36 | Unopposed MOTION for Leave to File Amicus Brief*in support of Plaintiffs* by Members of Congress as Amici Curiae. (Attachments: # 1 Exhibit Brief of Amici Curiae)(Weiner, Andrew) (Entered: 09/05/2025) |
| 09/05/2025 | | MINUTE ORDER: For good cause shown, the 36 Unopposed Motion for Leave to File Brief of Amici Curiae Members of the Congressional Hispanic Caucus Leadership |

| | | |
|---|---|---|
| | | in Support of Plaintiffs' <u>30</u> Motion for Stay or Preliminary Injunction is GRANTED. Signed by Judge Colleen Kollar–Kotelly on 09/05/2025. (lcckk1) (Entered: 09/05/2025) |
| 09/05/2025 | | MINUTE ORDER: The Court held a hearing on Plaintiffs' <u>30</u> Motion for a Preliminary Injunction on September 5, 2025. The Court took the Motion under advisement and expresses no view at this time on its ultimate disposition. At the hearing, the parties represented that they would provide the Court with certain information. Based on those representations and the surrounding discussion, the Court **ORDERS** the Plaintiffs to provide the Court with details of the effect that the IRS's actions may have on federal funding received by the Center for Taxpayer Rights, including details regarding any federal reporting requirements associated with the funding. The Court further **ORDERS** the Defendants to provide (i) the name and title of the individual at the IRS who received ICE's June 27 data request, (ii) the name and title of the individual whom ICE identified as the "officer[] or employee[]... personally and directly engaged in" the relevant criminal investigations or proceedings at issue in its June 27 request to the IRS, and (iii) the name and title of the individual who received the IRS's August 7 disclosure on behalf of ICE. Counsel for Defendants committed to notifying the Court within 24 hours if, while the Plaintiffs' motion is pending, the IRS either receives another request for information from DHS/ICE or makes plans to share additional information with DHS/ICE. Accordingly, Defendants are **ORDERED** to make such notification if the obligation arises. Finally, the Court discussed the possibility of ordering the administrative record. Counsel for Defendants requested 45 days to produce the record if the Court make such order. If the Court requires the administrative record to resolve Plaintiffs' Motion, it will order for it at a future date. Signed by Judge Colleen Kollar–Kotelly on 9/5/2025. (lcckk3) (Entered: 09/05/2025) |
| 09/05/2025 | <u>37</u> | AMICUS BRIEF by MEMBERS OF CONGRESS AS AMICI CURIAE. (zjm) (Entered: 09/06/2025) |
| 09/05/2025 | | Minute Entry for proceedings held before Judge Colleen Kollar–Kotelly: Motion Hearing held on 9/5/2025 re <u>30</u> MOTION for Preliminary Injunction *(Stay Under 5 U.S.C. 705, 706, or in the alternative for Preliminary Injunction)* MOTION to Stay filed by NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO, MAIN STREET ALLIANCE, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, CENTER FOR TAXPAYER RIGHTS. Motion heard and taken under advisement. (Court Reporter Sonja Reeves.) (dot) (Entered: 09/08/2025) |
| 09/09/2025 | <u>38</u> | TRANSCRIPT OF MOTION HEARING before Judge Colleen Kollar–Kotelly held on September 5, 2025; Page Numbers: 1–133. Date of Issuance: September 9, 2025. Court Reporter/Transcriber Sonja L. Reeves, RDR, CRR, Telephone number (202) 354–3246, Transcripts may be ordered by submitting the <u>Transcript Order Form</u><br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 9/30/2025. Redacted Transcript Deadline set for 10/10/2025. Release of Transcript Restriction set for 12/8/2025.(Reeves, Sonja) (Entered: 09/09/2025) |
| 09/09/2025 | | MINUTE ORDER: The Court held a hearing on Plaintiffs' <u>30</u> Motion for Preliminary Injunction on September 5, 2025. At the hearing, the Court informed the parties that it may require the administrative record to resolve Plaintiffs' Motion. Counsel for the Defendants requested 45 days to produce the administrative record in the event the Court ordered such production.The Court has determined that it requires the administrative record to resolve Plaintiffs' Motion. As the Court will more fully |

explain in its written ruling on Plaintiffs' Motion, Plaintiffs have shown a substantial likelihood that at least one Plaintiff, the Center for Taxpayer Rights, has Article III standing based on the harms to its core activities that are described in paragraphs 40 through 54 of the [30–8] Declaration of Nina E. Olson. Furthermore, Plaintiffs have shown a substantial likelihood that the IRS has taken final agency action by adopting and implementing a policy of disclosing the addresses of tens of thousands of taxpayers to Immigration and Customs Enforcement ("ICE") based on a representation from ICE that a single ICE employee is (or a small number of ICE employees are) "personally and directly engaged" in investigating each of those taxpayers for committing a criminal offense under 8 U.S.C. § 1253(a)(1). Because resolving the balance of Plaintiffs' Motion will require the Court to assess Plaintiffs' likelihood of success on the merits of their arbitrary–and–capricious claims under the Administrative Procedure Act, binding precedent compels the Court to call for the administrative record. *See Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (directing that "before assessing... probability of success on the merits" in a case challenging agency action as arbitrary and capricious, district courts should "require[] the [agency] to file the administrative record" and "determine[] the grounds on which" the agency acted).Accordingly, it is hereby ORDERED that Defendants shall file the administrative record underlying the decisions challenged in this case on or before **October 24, 2025**. If Defendants take the position that any document that would otherwise be part of the administrative record is subject to a privilege other than the deliberative process privilege, Defendants shall promptly file a motion for exemption from disclosure, which the Court shall resolve in due course. *See In re United States*, 583 U.S. at 32 ("[T]he District Court may not compel the Government to disclose any document that the Government believes is privileged without first providing the Government with the opportunity to argue the issue."). Plaintiffs shall file any objections to Defendants' designation of the administrative record, including objections that Defendants omitted information that should have been included, on or before **October 27, 2025**. Signed by Judge Colleen Kollar–Kotelly on 9/9/2025. (lcckk3) (Entered: 09/09/2025)

| | | |
|---|---|---|
| 09/09/2025 | | Set/Reset Deadlines: Defendants' Administrative Record due by 10/24/2025. Plaintiffs' Objections due by 10/27/2025. (dot) (Entered: 09/09/2025) |
| 09/17/2025 | 39 | RESPONSE TO ORDER OF THE COURT re Order,,,,,,, *to Provide Additional Information* filed by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Declaration)(McGrath, Daniel) (Entered: 09/17/2025) |
| 09/18/2025 | 40 | RESPONSE TO ORDER OF THE COURT re Order,,,,,,, *Requiring Defendants to Provide Additional Information* filed by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Exhibit, # 2 Exhibit)(Humphreys, Bradley) (Entered: 09/18/2025) |
| 09/29/2025 | 41 | NOTICE OF SUBSTITUTION OF COUNSEL by John Stephen Tagert on behalf of All Defendants Substituting for attorney Bradley P. Humphreys (Tagert, John) (Entered: 09/29/2025) |
| 10/01/2025 | 42 | MOTION to Stay re Order,,,,,,,,,,, by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Tagert, John) (Entered: 10/01/2025) |
| 10/01/2025 | 43 | ORDER denying 42 Motion to Stay. Signed by Judge Colleen Kollar–Kotelly on 10/1/2025. (lcckk3) (Entered: 10/01/2025) |

| | | |
|---|---|---|
| 10/10/2025 | 44 | NOTICE of Appearance by Steven Y. Bressler on behalf of CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO (Bressler, Steven) (Entered: 10/10/2025) |
| 10/22/2025 | 45 | Unopposed MOTION for Extension of Time to File *the Administrative Record* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Tagert, John) (Entered: 10/22/2025) |
| 10/22/2025 | 46 | ORDER granting 45 Motion for Extension of Time to File. It is ORDERED that Defendants' deadline to file the administrative record and to file a motion (if any) for exemption from disclosure of any document that would otherwise be part of the administrative record subject to a privilege other than the deliberative process privilege is hereby extended from **October 24, 2025, to October 29, 2025**. It is FURTHER ORDERED that, if Defendants file a motion with the administrative record to exempt certain documents from disclosure, Defendants shall first confer with Plaintiffs and attempt to reach a resolution regarding such documents before filing such motion, and inform the Court, in writing, of the outcome of this conference.ORDERED that Plaintiffs' deadline to file any objections to Defendants' designation of the administrative record is extended until **November 3, 2025**.Signed by Judge Colleen Kollar–Kotelly on 10/22/2025. (lcckk3) (Entered: 10/22/2025) |
| 10/22/2025 | | Set/Reset Deadlines: Defendants' Administrative Record and Motion due by 10/29/2025. Plaintiffs' objections due by 11/3/2025 (dot) (Entered: 10/23/2025) |
| 10/23/2025 | 47 | NOTICE *Regarding the Court's September 5 Minute Order* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION re Order,,,,,,, (Tagert, John) (Entered: 10/23/2025) |
| 10/23/2025 | | MINUTE ORDER: The Court is in receipt of the Defendants' 47 Notice Regarding the Court's September 5 Minute Order. The Court commends the Defendants for their transparency.The conduct at issue in Defendants' Notice does not appear to implicate the issues before the Court in this matter. Defendants' Notice details a disclosure request the IRS received from U.S. Customs and Border Protection ("CBP") on September 11. CBP is a different subcomponent of DHS from ICE. Furthermore, CBP's request was made under a different provision of 26 U.S.C. § 6103 than the request at issue in this matter. Finally, Defendants represent that CBP did not request any individual return information and has no authority to redisclose the information they may obtain from their request.If Plaintiffs believe CBP's September 11 request to the IRS implicates the issues before the Court in this matter, then they shall file something on the record to that effect. The Plaintiffs need not file anything if they agree with the Court's assessment. Signed by Judge Colleen Kollar–Kotelly on 10/23/2025. (lcckk3) (Entered: 10/23/2025) |
| 10/29/2025 | 48 | ADMINISTRATIVE RECORD *Notice of Submission of Administrative Record* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION re Order,,,,,,,,,,, (Attachments: # 1 Exhibit Certification, # 2 Exhibit Index, # 3 Exhibit Administrative Record (Part 1), # 4 Exhibit Administrative Record (Part 2), # 5 Exhibit Administrative Record (Part 3), # 6 Exhibit Administrative Record (Part 4), # 7 Exhibit Administrative Record (Part 5), # 8 Exhibit Administrative Record (Part 6), |

| | | |
|---|---|---|
| | | # 9 Exhibit Administrative Record (Part 7), # 10 Exhibit Administrative Record (Part 8), # 11 Exhibit Administrative Record (Part 9), # 12 Exhibit Administrative Record (Part 10), # 13 Exhibit Administrative Record (Part 11), # 14 Exhibit Administrative Record (Part 12), # 15 Exhibit Administrative Record (Part 13))(Tagert, John) Modified event title on 10/31/2025 (znmw). (Entered: 10/29/2025) |
| 11/03/2025 | 49 | NOTICE *of Objections to Defendants' Administrative Record* by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO re 48 Notice (Other),,,, (McGrath, Daniel) (Entered: 11/03/2025) |
| 11/03/2025 | 50 | MOTION for Leave to File *Supplement Concerning the Administrative Record* by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION OF FEDERAL EMPLOYEES, IAM AFL–CIO. (Attachments: # 1 Proposed Supplement, # 2 Text of Proposed Order)(McGrath, Daniel) (Entered: 11/03/2025) |
| 11/04/2025 | | MINUTE ORDER: The Court is in receipt of Plaintiffs' 49 Notice of Objections to the Administrative Record and Plaintiffs' 50 Motion to File Supplement Concerning the Administrative Record.With respect to Plaintiffs' 49 Notice of Objections, Plaintiffs object to the exclusion of two documents from the administrative record. Counsel for Plaintiffs represent that they conferred with counsel for Defendants regarding both of these documents before Defendants filed the administrative record, and that counsel for Defendants confirmed the existence of both records. Accordingly, if counsel for Defendants wants to file an opposition to Plaintiffs' 49 Notice of Objection, they must do so **on or before November 10, 2025.** If none is filed, the Court shall assume that Defendants do not consent to the inclusion of these documents in the administrative record, according to Plaintiffs' representations.Turning to Plaintiffs' 50 Motion to File Supplement, Plaintiffs seek to file a motion that highlights portions of the administrative record that Plaintiffs consider relevant to their claims against Defendants. In their motion, Plaintiffs represent that Defendants do not consent to Plaintiffs filing their supplement. Accordingly, if counsel for Defendants wants to file an opposition to Plaintiffs' 50 Motion to File Supplement, they must do so **on or before November 10, 2025.** If none is filed, the Court shall assume that Defendants do not consent to Plaintiffs' proposed supplement, according to Plaintiffs' representations. Signed by Judge Colleen Kollar–Kotelly on 11/4/2025. (lcckk3) (Entered: 11/04/2025) |
| 11/04/2025 | | Set/Reset Deadlines: Defendants' oppositions to 49 and 50 due by 11/10/2025. (dot) (Entered: 11/04/2025) |
| 11/10/2025 | 51 | RESPONSE re 49 Notice (Other), filed by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Tagert, John) (Entered: 11/10/2025) |
| 11/10/2025 | 52 | RESPONSE re 50 MOTION for Leave to File *Supplement Concerning the Administrative Record* filed by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Tagert, John) (Entered: 11/10/2025) |
| 11/13/2025 | | MINUTE ORDER: The Court GRANTS Plaintiffs' 50 Motion for Leave to File. Both Plaintiffs' 50 Motion and Defendants' 52 Response shall be considered filed. Signed by Judge Colleen Kollar–Kotelly on 11/12/2025. (lcckk3) (Entered: 11/13/2025) |
| 11/13/2025 | 58 | SUPPLEMENTAL MEMORANDUM to re 48 ADMINISTRATIVE RECORD, filed by CENTER FOR TAXPAYER RIGHTS, COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, MAIN STREET ALLIANCE, NATIONAL FEDERATION |

| | | OF FEDERAL EMPLOYEES, IAM AFL–CIO. (zjm) (Entered: 12/09/2025) |
|---|---|---|
| 11/21/2025 | 53 | ORDER granting Plaintiffs' 30 Motion for Stay, or in the alternative for Preliminary Injunction, granting in part and denying in part Defendants' 26 Motion to Dismiss Plaintiffs' Amended Complaint, and dismissing without prejudice Count One of Plaintiffs' 20 Amended Complaint. See Order for further details. Signed by Judge Colleen Kollar–Kotelly on 11/21/2025. (lcckk3) (Entered: 11/21/2025) |
| 11/21/2025 | 54 | MEMORANDUM OPINION accompanying 53 Order. Signed by Judge Colleen Kollar–Kotelly on 11/21/2025. (lcckk3) (Entered: 11/21/2025) |
| 11/24/2025 | 55 | NOTICE *Relating to the Court's Order (ECF No. 53)* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION re 53 Order on Motion to Dismiss,, Order on Motion for Preliminary Injunction,, Order on Motion to Stay, (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Tagert, John) (Entered: 11/24/2025) |
| 12/04/2025 | 56 | Consent MOTION for Extension of Time to File Answer re 20 Amended Complaint,, 53 Order on Motion to Dismiss,, Order on Motion for Preliminary Injunction,, Order on Motion to Stay, by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Tagert, John) (Entered: 12/04/2025) |
| 12/04/2025 | 57 | ORDER GRANTING Defendants' 56 Motion for Extension of Time to Answer. Defendants' deadline to respond to Plaintiffs' Amended Complaint is now **January 9, 2026**. Signed by Judge Colleen Kollar–Kotelly on 12/4/2025. (lcckk3) (Entered: 12/04/2025) |
| 12/04/2025 | | Set/Reset Deadlines: Answer to the Amended Complaint due by 1/9/2026. (dot) (Entered: 12/05/2025) |
| 01/05/2026 | 59 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 53 Order on Motion to Dismiss,, Order on Motion for Preliminary Injunction,, Order on Motion to Stay, by SCOTT BESSENT, STEPHEN EHIKIAN, OFFICE OF PERSONNEL MANAGEMENT, ELON MUSK, CHARLES EZELL, U.S. DEPARTMENT OF THE TREASURY, AMY GLEASON, STEVE DAVIS, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), INTERNAL REVENUE SERVICE, MICHAEL FAULKENDER, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, GENERAL SERVICES ADMINISTRATION, DOUGLAS O'DONNELL. Fee Status: No Fee Paid. Parties have been notified. (Tagert, John) (Entered: 01/05/2026) |
| 01/06/2026 | 60 | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 59 Notice of Appeal to DC Circuit Court.(zjm) (Entered: 01/06/2026) |
| 01/06/2026 | 61 | Amended NOTICE OF APPEAL re appeal 59 by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Tagert, John) (Entered: 01/06/2026) |
| 01/07/2026 | 62 | Consent MOTION for Extension of Time to File Answer by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, |

| | | INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Tagert, John) (Entered: 01/07/2026) |
|---|---|---|
| 01/07/2026 | 63 | Supplemental Record on Appeal transmitted to US Court of Appeals re 61 Amended Notice of Appeal, 59 Notice of Appeal to DC Circuit Court,, ; (zjm) (Entered: 01/07/2026) |
| 01/08/2026 | | ORDER granting 62 Motion for Extension of Time to Answer. Defendants' response now due on or before January 28, 2026. Signed by Judge Colleen Kollar–Kotelly on 1/8/2026. (lcckk3) (Entered: 01/08/2026) |
| 01/13/2026 | | USCA Case Number 26–5006 for 59 Notice of Appeal to DC Circuit Court,, filed by MICHAEL FAULKENDER, ELON MUSK, AMY GLEASON, CHARLES EZELL, DOUGLAS O'DONNELL, U.S. DOGE SERVICE TEMPORARY ORGANIZATION, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, STEPHEN EHIKIAN, INTERNAL REVENUE SERVICE, OFFICE OF PERSONNEL MANAGEMENT, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), STEVE DAVIS, GENERAL SERVICES ADMINISTRATION, SCOTT BESSENT. (zjm) (Entered: 01/13/2026) |
| 01/20/2026 | 64 | Consent MOTION to Stay *All District Court Proceedings Pending the Appeal of the Court's November 21, 2025 Order* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, DOUGLAS O'DONNELL, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION. (Attachments: # 1 Text of Proposed Order)(Tagert, John) (Entered: 01/20/2026) |
| 01/21/2026 | 65 | ORDER granting 64 Motion to Stay. Signed by Judge Colleen Kollar–Kotelly on 1/21/2026. (lcckk3) (Entered: 01/21/2026) |
| 02/11/2026 | 66 | NOTICE *of Supplemental Declaration* by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION (Attachments: # 1 Declaration of Dottie A. Romo)(Tagert, John) (Entered: 02/11/2026) |
| 02/12/2026 | 67 | SEALED DOCUMENT filed by SCOTT BESSENT, STEVE DAVIS, STEPHEN EHIKIAN, CHARLES EZELL, MICHAEL FAULKENDER, GENERAL SERVICES ADMINISTRATION, AMY GLEASON, INTERNAL REVENUE SERVICE, ELON MUSK, OFFICE OF PERSONNEL MANAGEMENT, U.S. DEPARTMENT OF THE TREASURY, U.S. DEPARTMENT OF THE TREASURY DOGE TEAM, U.S. DIGITAL SERVICE (U.S. DOGE SERVICE), U.S. DOGE SERVICE TEMPORARY ORGANIZATION re 53 Order on Motion to Dismiss,, Order on Motion for Preliminary Injunction,, Order on Motion to Stay, (This document is SEALED and only available to authorized persons.)(Tagert, John) (Entered: 02/12/2026) |
| 02/13/2026 | 68 | NOTICE of Appearance by Simon Christopher Brewer on behalf of All Plaintiffs (Brewer, Simon) (Entered: 02/13/2026) |

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS,
P.O. Box 71278 Washington DC 20024

MAIN STREET ALLIANCE,
909 Rose Ave, Suite 400
North Bethesda, MD 20852

NATIONAL FEDERATION OF
FEDERAL EMPLOYEES, IAM AFL-CIO
1225 New York Avenue, NW
Suite 450
Washington, DC 20005

COMMUNICATIONS WORKERS OF
AMERICA, AFL-CIO
501 3rd Street, NW
Washington, DC 20001,

*Plaintiffs*,

*vs.*

INTERNAL REVENUE SERVICE
1111 Constitution Ave., NW,
Washington, DC 20224

MICHAEL FAULKENDER, in his official
capacity as Acting Commissioner, Internal
Revenue Service,
1111 Constitution Ave., NW,
Washington, DC 20224

U.S. DEPARTMENT OF THE
TREASURY,
1500 Pennsylvania Avenue, NW,
Washington, DC 20220

SCOTT BESSENT, in his official capacity
as Secretary of the Treasury,
1500 Pennsylvania Avenue, NW,
Washington, DC 20220

U.S. DIGITAL SERVICE (U.S. DOGE

Case No. 25-cv-457 (CKK)
**Jury Trial Requested**

SERVICE)
736 Jackson Pl NW
Washington, DC 20503

U.S. DOGE SERVICE TEMPORARY
ORGANIZATION
736 Jackson Pl NW
Washington, DC 20503

AMY GLEASON, in her purported official
capacity as Acting Administrator of the
U.S. DOGE Service and U.S. DOGE
Service Temporary Organization,
736 Jackson Place NW
Washington, DC 20503

ELON MUSK, in his official capacity as
the leader of DOGE
1650 17th Street NW
Washington, DC 20006

STEVE DAVIS, in his official capacity as
Chief Operating Officer of DOGE
736 Jackson Place NW
Washington, DC 20503

U.S. DEPARTMENT OF THE
TREASURY DOGE TEAM,
1500 Pennsylvania Avenue NW
Washington, DC 20220

U.S. OFFICE OF PERSONNEL
MANAGEMENT,
1900 E Street NW
Washington, DC 20415

CHARLES EZELL, in his official capacity
as Acting Director of the Office of
Personnel Management
1900 E Street NW
Washington, DC 20415

GENERAL SERVICES
ADMINISTRATION,
1800 F Street NW
Washington, DC 20405

STEPHEN EHIKIAN, in his official
capacity as Acting Administrator of the
General Services Administration,
1800 F Street NW
Washington, DC 20405

*Defendants.*

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

1.      The Internal Revenue Service ("IRS") houses some of the nation's most sensitive

information systems. Recognizing the sensitivity of confidential taxpayer information, Congress

has enacted specific protections governing access to the information well beyond those that apply

to other personal information held by the government. The security of that sensitive, protected

taxpayer information is now in grave jeopardy as the so-called Department of Government

Efficiency, or "DOGE" and its affiliated personnel move to access and share broad swaths of IRS

data in an unprecedented manner.

2.      Since President Trump's inauguration on January 20, DOGE, apparently led by

White House official Elon Musk, has launched a sweeping campaign to access highly sensitive

information systems and dismantle and restructure multiple federal agencies unilaterally.

3.      The speed of these efforts is core to the project. At every step, DOGE has violated

multiple laws, from constitutional limits on executive power, to laws protecting civil servants from

arbitrary threats and adverse action, to crucial protections for data held by the government

collected on hundreds of millions of Americans.

4.      The results have been catastrophic. DOGE has seized control of some of the most

carefully protected information systems housed at numerous agencies, including the Treasury

Department, the Social Security Administration, the Department of Labor, the Department of Health and Human Services, and the Consumer Financial Protection Bureau, and taken hold of all sensitive personnel information at the Office of Personnel Management. While some of this control has been limited through litigation, DOGE's efforts continue apace.

5.      DOGE's spread through the government includes the IRS. This case seeks to protect the privacy and legal rights of millions of Americans and thousands of small business owners who depend upon the IRS to take care that the sensitive data they provide to it will be protected.

6.      While the DOGE playbook at the IRS appears to mirror every other agency it has entered, the systems at issue, and the laws that govern access to them, are not.

7.      This nation already once experienced a President who sought to collect tax information on his political allies and enemies in the White House for use for favor and punishment and, following the Watergate era, Congress clearly and unequivocally acted to protect the American people from these intrusions.

8.      Recognizing the sensitivity of confidential taxpayer information, Congress has enacted specific protections governing access to the information well beyond those that apply to other personal information held by the government.

9.      Despite these significant protections, DOGE Affiliates continue to seek unfettered and unlawful access to the information. And since the original Complaint in this action was filed, DOGE has effected a dramatic shift in IRS policy towards consolidation and inter-agency sharing of taxpayer data, upending long-standing policies and practices intended to both ensure compliance with the law and protect the integrity and security of this highly sensitive data.

10.    DOGE claims power and authority that Congress has never granted it, and that it may not legally exercise.

11.    As detailed below, DOGE's sweeping efforts to upend the protections Congress has put in place and create a unified, inter-agency collection of personal data from sensitive information systems—including IRS systems—lacks statutory authority and violates the Tax Reform Act, the Privacy Act, and the Administrative Procedure Act.

12.    Absent this Court's intervention, this sensitive data will be broadly shared with agencies across the federal government, in a manner that violates the stringent protections Congress has put in place to restrict the use and disclosure of taxpayers' information, upending taxpayers' reliance on previously longstanding IRS policies and practices.

13.    The sensitive taxpayer data that DOGE seeks to share and use includes highly sensitive data that taxpayers submit with their legally mandated tax returns, including addresses; Social Security numbers; information about individuals' income and net worth; bank account information; tax liability; and sensitive information regarding deductions, such as charitable donations, dependents, and medical expenses; as well as whether an individual's tax return has been or is being investigated.

14.    Defendants have already taken action to make this happen, creating a "mega" application programming interface ("API") that will facilitate unprecedented cross-agency sharing of sensitive taxpayer data, and they have executed at least one agreement to share data with another agency—DHS—to support unspecified criminal investigations in connection with immigration enforcement.

15.    As Congress recognized nearly a half-century ago and codified in the Tax Reform Act, the privacy and confidentiality of tax filings are essential to a tax system that depends on

4

voluntary compliance. Defendants' actions both lack Congressional authorization and violate longstanding law and IRS practice. A DOGE-led, rushed effort to share that sensitive information freely across the federal government, without needed protections and controls, violates the law.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the Tax Reform Act, 26 U.S.C. §§ 6103, 7213A, the Privacy Act, 5 U.S.C. § 552a, and the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.*

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are (or purport to exercise the authority of) agencies of the United States and officers or employees of those federal agencies who are sued in their official capacity. Further, Defendants are headquartered in the District of Columbia, where a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

18.     Defendant Internal Revenue Service is a federal agency headquartered in Washington, DC, and established to help America's taxpayers understand and meet their tax responsibilities and to enforce the Internal Revenue Code and other tax laws.

19.     Defendant Michael Faulkender is the Acting Commissioner for the IRS and is sued in his official capacity.

20.     Defendant U.S. Department of the Treasury ("Treasury") is a federal Department headquartered in Washington, DC, and the IRS is a component bureau of Treasury.

21.     Defendant Scott Bessent is the Secretary of the Treasury and is sued in his official capacity.

22.     Together, Defendants IRS, Treasury, Acting Commissioner Faulkender, and Secretary Bessent will be referred to as the "Treasury-IRS Defendants."

23.     Defendant U.S. DOGE Service (previously the U.S. Digital Service) was established by Executive Order 14158, reorganizing and renaming the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President. Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 20, 2025).

24.     Defendant U.S. DOGE Service Temporary Organization is a temporary organization also created by Executive Order 14158 and headed by the U.S. DOGE Service Administrator. *Id.*

25.     Defendant Amy Gleason is purported to be the Acting U.S. Digital Service Administrator (for both U.S. DOGE Service and U.S. DOGE Service Temporary Organization).

26.     Defendant Elon Musk is putatively a Special Government Employee, serving as Senior Advisor to the President in the Executive Office of the President, and is the *de facto* head of DOGE.

27.     Defendant Steve Davis is a Senior Advisor in the United States Digital Service and is the *de facto* Chief Operating Officer and second-in-command of DOGE.

28.     Defendant Treasury DOGE Team is the group of employees identified by Defendant Bessent pursuant to Executive Order 14158 § 3(c). They are sued as an entity.

29.     Defendant U.S. Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, DC. It serves as the "home" agency for a number of DOGE Affiliates and regularly details these individuals to other federal agencies to carry out the DOGE agenda.

30.     Defendant Charles Ezell is the Acting Director of OPM and is sued in his official capacity.

31.     Defendant General Services Administration ("GSA") is a federal agency headquartered in Washington, DC. It serves as the "home" agency for a number of DOGE Affiliates and regularly details those individuals to other federal agencies in order to carry out the DOGE Agenda.

32.     Defendant Stephen Ehikian is the Acting Administrator of the GSA and is sued in his official capacity.

33.     Together, Defendants U.S. DOGE Service, U.S. DOGE Service Temporary Organization, Musk, Davis, Treasury DOGE Team, OPM, Ezell, GSA, and Ehikian will be referred to as the "DOGE Defendants."

34.     All Defendants together will be referred to as "Defendants."

35.     Plaintiff Center for Taxpayer Rights (the "Center" or "CTR") is a 501(c)(3) not-for-profit organization, incorporated under the laws of Virginia and headquartered in Washington, DC, that focuses its work on advancing taxpayer rights, promoting trust in systems of taxation, and increasing access to justice in the tax system, particularly for the most vulnerable populations.

36.     In addition, the Center runs a federally-funded Low Income Taxpayer Clinic ("LITC").

37.     The Center's LITC provides free representation to low-income taxpayers who have tax disputes with federal, state, or local tax agencies.

38.     The close attorney-client relationship between the LITC's legal staff and their low-income clients allows the CTR to advocate for their clients' interests, which would be difficult for them to assert themselves. Many of these clients are involved in disputes with the IRS and fear

retribution, while others may not have the resources to protect these privacy interests or fear reputational harm for being identified as low-income filers that qualify for the Earned Income Tax Credit ("ETIC").

39.    The LITC's clients include individuals whose taxpayer information is especially sensitive.

40.    For example, the LITC represents domestic violence survivors. These individuals are often caught up in the IRS audit and dispute process, because the victims' abusers have often claimed their survivors or their dependents on their tax forms.

41.    The LITC also represents a high percentage of "EITC" and Child Tax Credit ("CTC") filers.  EITC claimants are audited at a rate approximately four times the rate of the rest of the population and the President's statements suggest they may be a focal point of DOGE's scrutiny.[1]

42.    The LITC also represents immigrants. Many of these clients want to pay their taxes but are fearful that submitting personal information to the government may lead to harm, despite the protections in place to safeguard the confidentiality of this information.

43.    Plaintiff Main Street Alliance ("MSA"), headquartered in Maryland and incorporated in Washington, DC, is a nationwide network of small businesses with members across the country.

44.    MSA works to help small businesses navigate challenges, strengthen their operations, and contribute to vibrant local communities.

---

[1]    How do IRS audits affect low-income families?, Tax Policy Center, https://taxpolicycenter.org/briefing-book/how-do-irs-audits-affect-low-income-families (last updated Jan. 2024).

8

45. MSA has small business members that are sole proprietors, partnerships, family-run enterprises, or expanding local companies, with a resultant need to file various forms of individual and business tax returns. The IRS therefore houses their confidential information.

46. MSA's small business members, especially when launching their sole proprietorship businesses, file individual tax returns with incomes low enough to qualify for and claim the EITC, CTC, and other refundable credits. MSA also has members that have suffered identity theft who are particularly distressed by broad-ranging, unlawful access to and overbroad sharing of their tax information.

47. Plaintiff National Federation of Federal Employees ("NFFE"), IAM, AFL-CIO, is an unincorporated association with its principal place of business in Washington, DC, and is a national labor union representing approximately 110,000 professional and non-professional federal government workers across the United States.

48. NFFE members file tax returns with the IRS, and the IRS therefore houses their confidential taxpayer return information.

49. NFFE's ranks include federal government employees paid at the lower grades of the General Schedule Pay Table and Wage Scale.

50. Some of NFFE's lower-income members have been eligible for, claimed, and will claim the EITC. Some of NFFE's members have been eligible for, claimed, and will claim the CTC.

51. Plaintiff Communications Workers of America, AFL-CIO ("CWA") is a union of hundreds of thousands of public and private sector workers in communities across the United States, Canada, Puerto Rico, and other U.S. territories. Its members work in telecommunications and IT, the airline industry, manufacturing, federal service contracts, news media, broadcast and

cable television, education, health care, public service, and other fields. It is headquartered in Washington, DC.

52.    CWA members file tax returns with the IRS, and the IRS therefore houses their confidential taxpayer return information.

53.    Some CWA members have been eligible for, claimed, and will claim the ETIC. Some CWA members have been eligible for, claimed, and will claim the CTC.

### LEGAL FRAMEWORK

54.    Government information systems are subject to comprehensive privacy and information security protections.

55.    Information systems at the IRS are subject to even more stringent privacy protections given the breadth and sensitivity of the confidential information regarding individual Americans that they contain.

56.    Following the Watergate scandal and the public disclosure of widespread misuse of citizens' tax information for improper purposes, Congress enacted a comprehensive scheme for the control of tax return information collected by the IRS in the Tax Reform Act of 1976. Codified at 26 U.S.C. § 6103, the Act replaced the prior regime in which return information could be inspected "upon order of the President" and under regulations promulgated by the Secretary of the Treasury and approved by the President.[2]

57.    Section 6103 requires that tax information, including returns and return information, be treated as confidential and may be subject to inspection or disclosure only when expressly authorized by statute.

---

[2] Mark Berggren, *I.R.C. 6103: Let's Get to the Source of the Problem*, 74 Chi-Kent L. Rev. 825, 825 (1999).

58.    Even Treasury Department officers and employees are only granted access to inspect or disclose tax information where their "official duties require such inspection or disclosure for tax administration purposes." 26 U.S.C. § 6103(h)(1).

59.    Indeed, the IRS has made the right of confidentiality core to its "The Taxpayer Bill of Rights." This

> general ban on disclosure provides essential protection for the taxpayer; it guarantees that the sometimes sensitive or otherwise personal information in a return will be guarded from persons not directly engaged in processing or inspecting the return for tax administration purposes. The assurance of privacy secured by § 6103 is fundamental to a tax system that relies upon self-reporting.

*Gardner v. United States*, 213 F.3d 735, 738 (D.C. Cir. 2000) (internal citation omitted).

60.    In the later Taxpayer Browsing Protection Act, Congress acted to make it unlawful even to inspect return information without proper authorization. 26 U.S.C. § 7213A. This further stressed Congress's intent to protect taxpayer data from even being shared with IRS employees who did not have an authorized need to access the data.

61.    Taxpayers are also protected explicitly against political interference. Top officials within the Executive Branch, including the President, are prohibited by law from requesting an audit or investigation of a particular taxpayer or from interfering with an ongoing audit or investigation. 26 U.S.C. § 7217. Violation of this statutory provision is a crime punishable by fine or imprisonment.

62.    For a White House employee to obtain access to return information, the President must personally sign such a request identifying the specific taxpayer whose return information is sought and stating "the specific reason why the inspection or disclosure is requested." 26 U.S.C. § 6103(g).

63.    These legal protections against disclosure of taxpayer return information extend explicitly to inter-agency sharing. While this data can be shared with other agencies, sharing can only occur in narrowly-prescribed circumstances.

64.    Taxpayers have a statutory right to seek damages under 26 U.S.C. § 7431 for the knowing or negligent unauthorized inspection or disclosure of returns or return information in violation of 26 U.S.C. § 6103, but that statutory right does provide a remedy to prevent ongoing unlawful inspection or disclosure.

65.    The term "disclosure" means "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8).

66.    The terms "inspected" and "inspection" mean any examination of a return or return information. 26 U.S.C. § 6103(b)(7).

67.    The term "return" is broadly defined to include "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed. 26 U.S.C. § 6103(b)(1).

68.    The term "return information" encompasses nearly all the information that IRS may possess on individual taxpayers, including

> a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense.

26 U.S.C. § 6103(b)(2)(A).

69.    Records of tax payments and tax deposits are tax return information under 26 U.S.C. § 6103.

70.    The Privacy Act of 1974, 5 U.S.C. § 552a, prohibits disclosure of information from systems of records except in enumerated circumstances.

71.    The Privacy Act further requires that, when an agency establishes or revises a system of records, it must issue a System of Records Notice ("SORN"), which discloses information about the records in the system, the manners in which those records may be used, and storage and access policies. 5 U.S.C. § 552a(e)(4).

72.    The E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899, requires that agencies conduct a Privacy Impact Assessment ("PIA") for new or substantially changed information technology which contains records. PIAs are intended to "demonstrate that system owners and developers have incorporated privacy protections throughout the entire life cycle of a system." *E-Government Act of 2002*, Department of Justice, Office of Privacy and Civil Liberties, https://www.justice.gov/opcl/e-government-act-2002 (updated Feb. 13, 2019).

73.    Federal agencies are also subject to standards and guidance developed by the National Institute of Standards and Technology ("NIST"). NIST develops and implements "standards to be used by all agencies to categorize all information and information systems" in order to provide appropriate levels of information security according to a range of risk levels and "minimum information security requirements for information and information systems." 15 U.S.C. § 278g-3(b)(1). The Secretary of Commerce is further empowered to make those standards "compulsory and binding to the extent determined necessary by the Secretary to improve the efficiency of operation or security of Federal information systems." 40 U.S.C. § 11331.

74.    Those mandatory standards for Federal information systems can be found in NIST Special Publication 800-53.[3] The standards require that when federal agencies process personally identifiable information ("PII"), they must design and adopt information security and privacy programs to manage the security risks for the PII in the system.[4]

## FACTUAL ALLEGATIONS

**I.    Taxpayer Data is Uniquely Sensitive, as Congress and the IRS Have Long Recognized**

75.    As the nation's tax collector, the IRS collects and maintains sensitive and confidential data about over 150 million individual taxpayers and millions more businesses, including data such as SSNs or individual taxpayer identification numbers, addresses, marital status, employment information, income, bank and brokerage account information, information regarding eligibility for deductions and tax credits, medical expenses, and confidential business information like profits and losses.

76.    Because this data is so sensitive, both Congress and the agency itself have put in place heightened protections against its improper access, use, and disclosure.

### A.    Historical Abuses Prompted Stringent Protection of Return Information

77.    In the 1970s, the Watergate hearings revealed that the Nixon White House had sought to access IRS return information concerning both supporters under audit and individuals on its "enemies" list.

78.    But that was not the only use of private tax information at IRS that prompted an

---

[3] *NIST SP-800-53, Security and Privacy Controls for Information Systems and Organization, Rev. 5*, U.S. Dep't of Commerce: National Institute of Standards and Technology (Sept. 2020), https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-53r5.pdf.

[4] *Id*. at 13.

outcry. Even the Nixon Administration's authorization for the U.S. Department of Agriculture to access names and addresses drawn from farmers' tax returns for a statistical assessment regarding the scope and scale of American farming resulted in a public outcry, with commentators decrying the privacy risks and "big brother" surveillance that would result from this type of inter-agency sharing of tax information.

79.     Congress responded. One member of Congress observed the perils of an arrangement in which "sensitive tax information—which is supposed to be confidential—is given to the Department of Agriculture, an agency which has so much control over the destinies of farmers." Another argued that "American citizens expect and have a right to expect in our free society the confidentiality of their tax returns to be honored. This massive invasion of privacy of such a sizable segment of our country's population is deplorable."[5] Thereafter, Congress conducted detailed hearings on the need, or lack thereof, for federal agencies to have access to IRS-protected tax return information.[6]

80.     Shortly thereafter, Congress enacted the Tax Reform Act of 1976, reinforcing the confidentiality of return information in the IRS's control.

81.     Reflecting the outcry over both inter-agency sharing of tax information and

---

[5]     Nat'l Taxpayer Advocate, *Annual Report to Congress* 241 (2003), https://www.taxpayeradvocate.irs.gov/wp-content/uploads/2020/08/nta_2003_annual_update_mcw_1-15-042.pdf. Joseph J. Thorndike, *How a Dispute Over Counting Farms Shaped Taxpayer Privacy Protections*, Tax Notes (Apr. 21, 2025), https://www.taxnotes.com/tax-history-project/how-dispute-over-counting-farms-shaped-taxpayer-privacy-protections/2025/04/18/7s0ly; Joseph J. Thorndike, *Nixon Gave USDA Access to Tax Returns; Farmers Decried 'Snooping'*, Tax Notes (Apr. 28, 2025), https://www.taxnotes.com/tax-history-project/nixon-gave-usda-access-tax-returns-farmers-decried-snooping/2025/04/25/7s16t.

[6] Joseph J. Thorndike, *The 1973 Congressional Hearings That Reshaped Tax Privacy Protections*, Tax Notes (May 5, 2025), https://www.taxnotes.com/featured-analysis/1973-congressional-hearings-reshaped-tax-privacy-protections/2025/05/02/7s4fb.

President Nixon's abuses, the Act strictly controls sharing of IRS tax information *within* the federal government.

82.    The importance of these protections remains clear today, as President Trump's former chief of staff has stated that the president expressed a desire in his first term to have the IRS investigate or audit his perceived political enemies.[7] In recent weeks, the President has repeatedly threatened to use the tax system to punish Harvard University for its perceived "political" sympathies.[8]

### B. Historically, the IRS Has Tightly Controlled Return Information, Even as to its Own Employees

83.    The IRS has longstanding, detailed privacy protocols limiting IRS employee access to return information to tax administration purposes only.[9]

84.    IRS employees may access return information only according to standard operating procedures and within the bounds of privacy protection plans.[10]

85.    For example, as set out by the Internal Revenue Manual (an authoritative manual for IRS staff regarding agency policies and procedures that is also publicly available), return information must only be placed in shared locations with "strong access controls" based on "need-to-know principles."[11] The Internal Revenue Manual is "the single, official compilation of IRS

---

[7] Michael S. Schmidt, *Trump Wanted I.R.S. Investigations of Foes, Top Aide Says*, N.Y. Times (Nov. 13, 2022), https://www.nytimes.com/2022/11/13/us/politics/trump-irs-investigations.html.

[8] Elissa Nadworny, *Trump again threatens Harvard's tax-exempt status, saying, 'It's what they deserve!,'* NPR (May 2, 2025), https://www.npr.org/2025/05/02/nx-s1-5384897/trump-harvard-tax-irs-antisemitism.

[9] Internal Revenue Manual 10.5 (IRS 2020), https://www.irs.gov/irm/part10/irm_10-005-002 [hereinafter "IRM"].

[10] IRM 10.5.2.1.1, 10.5.2.1.3 (IRS 2020), https://www.irs.gov/irm/part10/irm_10-005-002#idm140196468618800.

[11] IRM10.5.2.2.5.2 (IRS 2020), https://www.irs.gov/irm/part10/irm_10-005-002#idm140196468618800.

16

policies, procedures, and guidelines" and " the primary source of instructions to staff."[12]

86.     "IRS employees may access returns and return information only when there is a 'need to know' the information for their tax administration duties." That "need to know" must "be established on a *case by case basis*."[13]

87.     IRS employees are directed to consult with their supervisors or other IRS authorities when there is any uncertainty about whether access to return information is authorized.[14]

88.     If an IRS employee accesses return information that is even questionably in violation of the law—including inadvertently, in error, or because such information was merely *related* to the employee's assigned case—they are directed to complete and sign a specific IRS form for tracking such access (Form 11377)—and send it to their manager, documenting their access to return information that was not required for their duties.[15]

89.     The IRS regularly investigates cases of unauthorized access of return information by its own employees, has implemented technological controls to prevent unauthorized access, tracks the access of its personnel, and requires extensive training to protect return information.[16]

90.     The Treasury Inspector General for Tax Administration is the component of the Treasury Department charged with conducting audits and investigations of IRS operations,

---

[12] IRM 1.11.1 (IRS 2022), https://www.irs.gov/irm/part1/irm_01-011-001.
[13] IRM11.3.22.2.1 (IRS 2024), https://www.irs.gov/irm/part11/irm_11-003-022 (emphasis added).

[14] IRM10.5.5.3.5 (IRS 2023), https://www.irs.gov/irm/part10/irm_10-005-005.

[15] *Id.*

[16] U.S. Gov't Accountability Off., *Taxpayer Information Keeps Ending Up In the Wrong Hands. What Can IRS Do To Better Protect It?* (Sept. 26, 2023), https://www.gao.gov/blog/taxpayer-information-keeps-ending-wrong-hands.-what-can-irs-do-better-protect-it.

including reporting on IRS employee misconduct allegations.[17] In carrying out its responsibilities, the Inspector General for Tax Administration regularly investigates, identifies, and refers for criminal prosecution instances of fraud and issues reports on systemic fraud and waste.[18]

91.    Taxpayer data is stored across multiple different databases and systems across the IRS, accessed and used for specific purposes. In addition to supporting legal compliance, these measures—including the separation and segmentation of sensitive data—are important to cybersecurity. The consolidation of data in a single location, with a single point of access, makes that data more vulnerable to cyberattacks.

92.    The sharing of taxpayer data across agencies is also tightly restricted, by law and as a matter of well-established historical practice at the IRS.

93.    As a historical practice, IRS has tightly controlled its sharing of taxpayer data with other agencies, including with Treasury, to ensure that the data was only shared when lawfully permissible and in a manner that protected the sensitive information being shared. These controls on access implement the restrictions on IRS and other federal agency use found within the Taxpayer Protection Act and the Taxpayer Browsing Protection Act and have been implemented in IRS policy. *See, e.g.*, IRM 10.5.5.1.1, https://www.irs.gov/irm/part10/irm_10-005-005 ("Since the inception of the Integrated Data Retrieval System (IDRS) in 1972, IRS has worked continuously to prevent and detect unauthorized access, attempted access and inspection of taxpayer records.").

---

[17] Pub. L. No. 105-206, 112 Stat. 685 (1998).

[18] *See* Treasury Inspector Gen. for Tax Admin., *Recent Investigative Activities*, https://www.tigta.gov/recent-investigative-activities (last visited Feb. 16, 2025); Press Release, Treasury Inspector Gen. for Tax Admin., *TIGTA Identifies Fraud Scheme, Alerts IRS to Prevent $3.5 Billion in Potentially Improper Pandemic Tax Credits* (Apr. 24, 2024), https://www.tigta.gov/articles/press-releases/tigta-identifies-fraud-scheme-alerts-irs-prevent-35-billion-potentially.

## II. The "Department of Government Efficiency."

94.    On November 12, 2024, then President-Elect Trump announced his intent to create the "Department of Government Efficiency" ("DOGE") to "provide advice and guidance from outside of Government" to "the White House and Office of Management & Budget," to help "pave the way" for the Trump-Vance Administration to "dismantle," "slash," and "restructure" federal programs and services.[19] Congress has neither established nor appropriated money for DOGE. It appears to be operating at the direction of the President and his White House advisor, Elon Musk.

95.    On the day of his inauguration, January 20, 2025, President Trump signed Executive Order 14158, Establishing and Implementing the President's "Department of Government Efficiency," ("the E.O."), reorganizing and renaming the United States Digital Service as the United States DOGE Service, established in the Executive Office of the President.[20]

96.    The E.O. established the role of U.S. DOGE Service Administrator in the Executive Office of the President, reporting to the White House Chief of Staff.[21]

97.    The E.O. further established within U.S. DOGE Service a temporary organization known as "the U.S. DOGE Service Temporary Organization." The U.S. DOGE Service Temporary Organization is headed by the U.S. DOGE Service Administrator and is tasked with advancing "the President's 18-month DOGE agenda."[22]

98.    The E.O. also requires each Agency Head to establish a "DOGE Team" comprised of at least four employees within their respective agencies. DOGE Teams are required to

---

[19] *See* Donald J. Trump (@realDonaldTrump), Truth Social (Nov. 12, 2024, 7:46 PM ET), https://truthsocial.com/@realDonaldTrump/posts/113472884874740859.

[20] Exec. Order No. 14158, 90 Fed. Reg. 8441 (Jan. 29, 2025).

[21] *Id.* § 3(b).

[22] *Id.*

"coordinate their work with [U.S. DOGE Service] and advise their respective Agency Heads on implementing the President's DOGE Agenda."[23]

99.     The E.O. directs Agency Heads to take all necessary steps "to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems."[24] The E.O. nominally directs the U.S. DOGE Service to adhere to "rigorous data protection standards."[25]

100.     The E.O. does not and cannot vest any statutory authority in DOGE.

101.     Multiple DOGE officials have asserted that U.S. DOGE Service was reorganized to "fall[] under the Executive Office of the President [EOP]" and is now "subject to [the] Presidential Records [Act],"[26] which applies to, in relevant part, individuals and components in EOP who are close to the President: "a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201.

102.     DOGE's structure has evolved over time and currently includes a network of individuals who are located at, and often detailed to, agencies across the federal government. Many of these DOGE staffers and affiliates have the Office of Personnel Management ("OPM"), the General Services Administration ("GSA"), or the Executive Office of the President ("EOP")

---

[23] *Id.* § 3(c).

[24] *Id.* at 4(b).

[25] *Id.*

[26] Minho Kim, *Trump's Declaration Allows Musk's Efficiency Team to Skirt Open Records Laws*, N.Y. Times (Feb. 10, 2025), https://www.nytimes.com/2025/02/10/us/politics/trump-musk-doge-foia-public-records.html?smid=url-share; *see also* Katie Miller (@katierosemiller), X (Feb. 5, 2025, 5:26 PM), https://x.com/katierosemiller/status/1887311943062499425 (contending that the E.O. made DOGE "subject to Presidential Records [Act]").

DOGE component as their initial or home agency, but they have been detailed or otherwise dispatched to multiple agencies, where they appear to hold positions concurrently across agencies.

103.    This network of personnel tasked with carrying out the President's DOGE Agenda—with partially overlapping employment across multiple agencies including the U.S. Digital Service Temporary Organization, OPM, GSA, and other host agencies—can collectively be referred to as "DOGE" or "DOGE Affiliates." They are responsible for, *inter alia*, unlawful access, use, and disclosure of data at and across agencies of the U.S. government. On information and belief, all DOGE Affiliates take instruction from and coordinate their work through central DOGE leadership.

104.    Regardless of their formal employer, these DOGE Affiliates are generally identified as representatives of DOGE by agency employees and publicly, and they are empowered to implement DOGE's agenda and directives.

105.    On information and belief, Gavin Kliger, Todd Newnam, and Sam Corcos have been the most prominent DOGE Affiliates located at and directing priorities and policies of the IRS since the Trump Administration took power.

### III. DOGE'S Pattern of Rapidly Entering Agencies, Seizing Critical Systems, and Unilaterally Dismantling and Restructuring Them

106.    Since Inauguration Day, DOGE Affiliates have sought and obtained, at least until stopped by court orders, unprecedented access to information systems across numerous federal agencies, including the United States Agency for International Development, the Department of Treasury, the Social Security Administration, the Department of Labor, the Department of Health and Human Services, the Consumer Financial Protection Bureau, the National Oceanic and

21

Atmospheric Administration, the Office of Personnel Management, and the Department of Education.

107.    Based on the pattern of conduct in subsequent months, DOGE personnel are seeking to develop the ability to facilitate large-scale transfers of data across agencies, rather than merely obtaining access for purposes of intra-agency review and analysis in support of their purported goal of stopping 'fraud, waste, and abuse.' One former DOGE Affiliate has said DOGE was collecting data for the sake of having it, describing DOGE Affiliates triumphantly returning to a DOGE 'war room' set up at the Eisenhower Executive Office Building with access to databases and laptops containing data; the purported need for or value of the data was beside the point.[27]

108.    DOGE Affiliates also played critical roles in the dismantling of the U.S. Agency for International Development and ongoing efforts to largely eviscerate agencies including the Department of Education, Consumer Financial Protection Bureau, U.S. Institute of Peace, and the Institute of Museum and Library Services.

109.    DOGE's behavior repeats itself across virtually every agency it enters: swooping in with new DOGE Affiliates, demanding sweeping access to sensitive systems and turning off key cybersecurity monitoring and protection measures, taking employment action against employees who resist their unlawful commands, and then giving themselves the ability and tools to carry out large-scale combination and exfiltration of data apparently unrelated to the efficiency of agency operations, for unknown purposes. At several agencies, DOGE Affiliates have simultaneously sought this data access while shutting down the agency. This process can move

---

[27] Hannah Natanson et al., *DOGE Aims to Pool Federal Data, Putting Personal Information at Risk*, Wash. Post (May 7, 2025), https://www.washingtonpost.com/business/2025/05/07/doge-government-data-immigration-social-security/.

incredibly quickly, with agencies transformed roughly overnight, or fully dismantled within a week.

110.    Many DOGE Affiliates are working across multiple agencies concurrently,[28] potentially collecting sensitive information from multiple databases across agencies and providing opportunities to combine and cross-reference data in ways that were never contemplated by the security plans for those systems.

111.    DOGE is reportedly working on building a "chatbot and other AI tools to analyze huge swaths of contract and procurement data" within the General Services Administration, and DOGE "moved swiftly" in the early days of the administration, "to bring aboard more AI tools" into the federal government.[29]

112.    DOGE is also reportedly using large-scale collection and analysis of data to surveil

---

[28] *See, e.g.*, Tim Marchman & Matt Giles, *This DOGE Engineer Has Access to the National Oceanic and Atmospheric Administration*, Wired (Feb. 5, 2025), https://www.wired.com/story/doge-engineer-noaa-data-google-musk-climate-project-2025/; Vittoria Elliott et al., *The US Treasury Claimed DOGE Technologist Didn't Have 'Write Access' When He Actually Did*, Wired (Feb. 6, 2026), https://www.wired.com/story/treasury-department-doge-marko-elez-access/; Avi Asher-Schapiro et al., *Elon Musk's Demolition Crew*, ProPublica (Feb. 6, 2025), https://projects.propublica.org/elon-musk-doge-tracker/ (DOGE staffer Nikhil Rajpal working at NOAA, CFPB, and OPM); Ella Nilsen & Sean Lyngaas, *Trump Energy Secretary Allowed 23-Year-Old Doge Rep To Access It Systems Over Objections From General Counsel*, CNN (Feb. 7, 2025), https://www.cnn.com/2025/02/06/climate/doge-energy-department-trump/index.html (DOGE staffer Luke Farritor working at HHS and Department of Energy); Evan Weinberger, *Musk's DOGE Descends on CFPB With Eyes on Shutting It Down*, Bloomberg Law (Feb. 7, 2025), https://news.bloomberglaw.com/banking-law/musks-doge-descends-on-consumer-financial-protection-bureau; Asher-Schapiro et al., *supra* (DOGE staffer Gavin Kliger working at CFPB, OPM, and USAID); Makena Kelly & Zoe Schiffer, *Elon Musk's Friends Have Infiltrated Another Government Agency*, Wired (Jan. 31, 2025), https://www.wired.com/story/elon-musk-lackeys-general-services-administration/; Laura Barrón-López (@lbarronlopez), X (Feb. 3, 2025, 2:05 PM), https://x.com/lbarronlopez/status/1886491276729544809 (DOGE staffer Edward Coristine working at OPM, Small Business Administration, and General Services Administration).

[29] Paresh Dave et al., *Elon Musk's DOGE is Working on a Custom Chatbot Called GSAi*, Wired (Feb. 6, 2025), https://www.wired.com/story/doge-chatbot-ai-first-agenda/.

federal workers, monitoring electronic employee communications, including emails, at the agencies it engaged with[30] and using AI to analyze those communications for hostility to President Trump and his agenda.[31]

113.    DOGE leader and Defendant Elon Musk confirmed in a March 2025 interview that DOGE's efforts to obtain access to data at agencies were part of a broader attempt at

> reconciling all of the government databases to eliminate the waste and fraud. . . These databases don't talk to each other. And that's really the source of, that's the biggest vulnerability for fraud, is the fact that these databases don't talk to each other. So we need to reconcile the databases. It's a, frankly, painful homework, but it has to be done, and will greatly improve the efficiency of the government systems.[32]

DOGE's careless and unlawful behavior has not ended in merely accessing sensitive and protected information. On February 12, 2025, DOGE reportedly posted classified information, including classified personnel information, from the National Reconnaissance Office on its website.[33] In

---

[30] Jenna McLaughlin & Shannon Bond, *GSA Staff Facing Massive Cuts and Fears Of 'nonstop' Surveillance*, NPR (Feb. 12, 2025), https://www.npr.org/2025/02/11/nx-s1-5293258/trump-gsa-budget-cuts-doge ("Some employees were told that this would include monitoring of when employees logged in and out of their devices, when employees swipe in and out of their workspaces and monitoring of all their work chats. They were also told that 'keylogger' software that would keep track of everything the employees typed on their work machines would be installed on their work computers, the GSA officials said.")

[31] Alexandra Ulmer et al., *Exclusive: Musk's DOGE using AI to Snoop on U.S. Federal Workers, Sources Say*, Reuters (Apr. 8, 2025), https://www.reuters.com/technology/artificial-intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-08/.

[32] Coral Davenport, *DOGE Accesses Federal Payroll System Over Objections of Career Staff*, N.Y. Times (Mar. 31, 2025),https://www.nytimes.com/2025/03/31/us/politics/doge-musk-federal-payroll.html.

[33] Jennifer Bendery, *Elon Musk's DOGE Posts Classified Data On Its New Website*, HuffPost (Feb 14, 2025), https://www.huffpost.com/entry/elon-musk-doge-posts-classified-data_n_67ae646de4b0513a8d767112; Will Steakin et al., *DOGE Data Release Criticized By Intel Community; Trump Admin Says It's Public Data*, ABC News (Feb. 16, 2025), https://abcnews.go.com/US/agency-data-shared-doge-online-sparks-concern-intelligence/story?id=118858837.

March 2025, Treasury admitted that a DOGE Affiliate improperly emailed unencrypted personal information within a spreadsheet to another agency.[34]

114.    A senior DOGE Affiliate was placed in the State Department in a role with potential access to sensitive and protected data despite recent allegations that he was terminated for disclosing his prior employer's sensitive, protected commercial information.[35]

115.    DOGE's pattern of entering agencies, obtaining access to data, and pushing out career IT staff who raise objections has unfolded at agencies across the government, including the following:

**Treasury**

116.    Shortly before President Trump's inauguration, DOGE Affiliates demanded access to sensitive Treasury systems, including the system used by the Bureau of the Fiscal Service ("BFS"), to control the vast majority of federal payments.[36]

117.    The career official serving as Acting Secretary of the Treasury prior to Secretary Bessent's confirmation denied DOGE operatives' request for access to the BFS payment system and was subsequently placed on administrative leave.[37]

---

[34] Wes Davis, *A DOGE Staffer Broke Treasury Policy by Emailing Unencrypted Personal Data*, The Verge (Mar. 15, 2025), https://www.theverge.com/news/630894/doge-treasury-lawsuit-marko-elez-unencrypted-emails.

[35] Marco Quiroz-Gutierrez, *A 19-Year-Old Who Was Reportedly Fired From an Internship for Leaking Internal Information to Competitors Is Now a DOGE 'Senior Advisor' in the State Department*, Yahoo News (Mar. 13, 2025), https://www.yahoo.com/news/19-old-reportedly-fired-internship-134320960.html.

[36] Katelyn Polantz et al., *How an Arcane Treasury Department Office Became Ground Zero in the War Over Federal Spending*, CNN (Feb. 1, 2025), https://www.cnn.com/2025/01/31/politics/doge-treasury-department-federal-spending/index.htm.

[37] Jeff Stein et al., *Senior U.S. Official Exits After Rift with Musk Allies over Payment System*, Wash. Post (Jan. 31, 2025), https://www.washingtonpost.com/business/2025/01/31/elon-musk-treasury-department-payment-systems/.

118.    Following his confirmation, Secretary Bessent granted DOGE operatives access to BFS, though the precise identities of DOGE Affiliates with access, and their level of access, are not reliably known by the public.[38]

119.    According to some reporting, DOGE personnel had the ability to stop individual payments from the BFS system, to change data in the system, or to alter system code.[39]

120.    On February 8, a judge in the Southern District of New York issued a Temporary Restraining Order halting DOGE's access to Treasury systems, finding that granting DOGE access to those systems "presents the risk of disclosure and confidential information and [a] heightened risk that the systems in question will be more vulnerable than before to hacking." *Order Granting Temporary Restraining Order*, *New York v. Trump*, No. 25 Civ. 1144, slip op. at 2 (S.D.N.Y. Feb. 8, 2025). That Court subsequently entered a Preliminary Injunction.

121.    In the wake of that decision, a decision which Defendant Musk suggested in posts on his social media website X was issued by a "corrupt" judge who "needs to be impeached" and should be ignored,[40] Mr. Musk for the first time described at least some of DOGE's work at Treasury as seeking to ensure that payment categorization codes in outgoing government payments are no longer left blank, requiring every payment to "include a rationale for the payment," and

---

[38] Andrew Duehren et al., *Elon Musk's Team Now Has Access to Treasury's Payment System*, N.Y. Times (Feb. 1, 2025), https://www.nytimes.com/2025/02/01/us/politics/elon-musk-doge-federal-payments-system.html.

[39] Vittoria Elliott et al., *A 25-Year-Old With Elon Musk Ties Has Direct Access to the Federal Payment System*, Wired (Feb. 4, 2025), https://www.wired.com/story/elon-musk-associate-bfs-federal-payment-system/.

[40] Alexandra Marquez, *Legal Experts Warn of 'Constitutional Crisis' as JD Vance and Elon Musk Question Judges' Authority Over Trump*, NBC News (Feb. 9, 2025), https://www.nbcnews.com/politics/white-house/legal-experts-constitutional-crisis-vance-musk-judicial-rulings-trump-rcna191387.

require more frequent updating of Treasury's "DO-NOT-PAY" list.[41] According to Mr. Musk, career Treasury employees rather than DOGE staff will be implementing these changes.[42]

122.    Defendant Musk said the DOGE team and Treasury had jointly agreed to this work, although he did not indicate whether it was the full extent of DOGE's work and plans in Treasury's sensitive systems.[43]

### **NLRB**

123.    In early March 2025, DOGE Affiliates arrived at the headquarters of the National Labor Relations Board, a federal agency responsible for investigating and adjudicating complaints about unfair labor practices, which maintains sensitive data about workers and unions as well as proprietary business information. The DOGE Affiliates gained access to NLRB's internal systems, with the stated goal of reviewing it for compliance with administration priorities and to look for cost savings.

124.    NLRB's case management system contains sensitive information about workers, whistleblowers, union activists, and businesses, rather than any operational data that would be relevant to evaluating potential agency cost savings.

125.    DOGE Affiliates reportedly accessed this information and deliberately evaded common cybersecurity measures, including demanding that their actions on these systems not be logged, turning off monitoring tools, deleting records of their access after the fact, and engaging in other strategies more typically used by threat actors to conceal cyberattacks. Even more

---

[41]    Elon    Musk    (@elonmusk),    X    (Feb.    8,    2025,    2:51    PM    ET), https://x.com/elonmusk/status/1888314848477376744.

[42] *Id.*

[43] *See id.*

troublingly, after they were provided access to the systems, NLRB staff also detected several suspicious log-in attempts from an IP address in Russia.[44]

**Labor**

126.    At the Department of Labor, agency leadership told employees in early February 2025 to do whatever DOGE Affiliates asked and provide access to any DOL system they requested access to.[45] As revealed in other litigation, DOGE Affiliates have been provided with access to eight systems containing sensitive information, justified on the basis of the Executive Order that created DOGE, Exec. Order No. 14,158, 90 Fed. Reg. 8,441 (Jan. 20, 2025), rather than any particularized need for access.

127.    DOGE Affiliates purport to have accessed and analyzed data from state unemployment insurance programs, which states originally had provided to DOL's Office of the Inspector General for narrow specified purposes, but which President Trump ordered the Inspector General to turn over to the Secretary of Labor in a March 20, 2025 Executive Order.[46]

128.    In April 2025, media reported that DOGE Affiliates at DOL had obtained access to systems housing sensitive data pertaining to immigrants. DOGE Affiliate Miles Collins was given access to DOL's National Farmworker Jobs Program, which provides funding to organizations

---

[44] Jenna McLaughlin, *A whistleblower's disclosure details how DOGE may have taken sensitive labor data*, NPR (Apr. 15, 2025), https://www.npr.org/2025/04/15/nx-s1-5355896/doge-nlrb-elon-musk-spacex-security.

[45] These facts are alleged in *AFL-CIO v. Department of Labor* and are discussed in the Court's ruling on the Motion to Dismiss, 25-cv-00339 (D.D.C. Feb. 5, 2025), ECF No. 78.

[46] Rebecca Rainey, *DOGE Overhypes Unemployment Audit Result, Ex-Labor Officials Say*, Bloomberg Law (Apr. 18, 2025), https://news.bgov.com/daily-labor-report/doge-overhypes-unemployment-audit-result-ex-labor-officials-say.

that work with migrant and seasonal farmworkers—individuals who are authorized to work in the United States.[47]

## SSA

129.    At the end of January 2025, two DOGE Affiliates—Michael Russo and Scott Coulter—arrived at SSA. The Acting Chief of Staff for the agency at the time was informed of their arrival by a mid-level employee, Leland Dudek; she directed him to stand down and not have further contact with DOGE and stated that the Commissioner's Office would handle it.[48]

130.    Mr. Russo was onboarded as Chief Information Officer on February 3, 2025 but introduced himself as a DOGE representative.[49] It is unclear who appointed him to the CIO role. He was shortly joined by DOGE Affiliate Akash Bobba—a 21-year-old software engineer and former Palantir intern, also associated with OPM and the Department of Education[50] —and the Commissioner's Office soon after began receiving demands from Mr. Russo, Defendant Steve Davis, and other White House-affiliated personnel to provide Mr. Bobba with extensive access to SSA data and systems before midnight on February 10. The DOGE Affiliates did not explain why such extensive data access was needed, and the Acting Chief of Staff for the agency has explained that this request was highly unusual—the agency would not generally provide full access to all

---

[47] Leah Feiger and Vittoria Eliott, DOGE Has Access to Sensitive Labor Department Data on Immigrants and Farm Workers, Wired (Apr. 18, 2025), https://www.wired.com/story/doge-access-immigration-data-department-of-labor/.

[48] Decl. of Tiffany Flick, *AFSCME v. SSA*, No. 25-cv-00596 (D. Md. Mar. 7, 2025), ECF No. 22-10,        https://www.documentcloud.org/documents/25557185-tiffany-flick-lawsuit-v-ssa/ [hereinafter "Flick Decl."].

[49] *Id.* ¶ 11.

[50] Asher-Schapiro et al., *Elon Musk's Demolition Crew*, *supra* note 28.

data systems even to the agency's most skilled and highly trained experts because access is provided only as needed for an individual's position. [51]

131. Following these events, President Trump named Mr. Dudek—who was, at the time, on administrative leave pending an investigation of his improper contacts with DOGE personnel—to the role of Acting Commissioner, prompting the departure of then-Acting Commissioner Michelle King, a thirty-year veteran of the agency, who had resisted the DOGE team's data access requests.[52]

132. Subsequently, Acting Commissioner Dudek provided Mr. Bobba and other members of the DOGE team with access to at least one major data warehouse[53] and authorized an unprecedented agreement to share the last known addresses of 98,000 people with ICE.[54]

133. Since at least mid-March 2025, DOGE reportedly has been uploading data from SSA to an existing U.S. Citizenship and Immigration Service ("USCIS") 'data lake,' or centralized repository of data, at DHS, which also reportedly contains data from the IRS and voting data from at least two states.[55] DOGE Affiliate Antonio Gracias has described at least some of the work

---

[51] Flick Decl., *supra* note 48.

[52] Associated Press, *Social Security head steps down over DOGE access of recipient information, sources say*, CNN (Feb. 18, 2025), https://www.cnn.com/2025/02/17/politics/social-security-head-steps-down-doge-access/index.html; Flick Decl., *supra* note 48.

[53] Flick Decl. ¶ 47, *supra* note 48.

[54] Alexandra Berzon et al., *Social Security Lists Thousands of Migrants as Dead to Prompt Them to 'Self-Deport'*, N.Y. Times (Apr. 10, 2025), https://www.nytimes.com/2025/04/10/us/politics/migrants-deport-social-security-doge.html.

[55] Makena Kelly & Vittoria Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants*, Wired (Apr 18, 2025), https://www.wired.com/story/doge-collecting-immigrant-data-surveil-track/.

DOGE is doing with this data, explaining that they looked for instances of noncitizens voting.[56]

134.    In late March 2025, another DOGE Affiliate—Scott Coulter, who was also a member of the on-site DOGE team at NASA, where he obtained wide access to internal databases—was appointed to replace Mr. Russo as Chief Information Officer of SSA.[57]

135.    In April 2025, Ranking Member Gerry Connolly, of the House Committee on Oversight and Government Reform, disclosed that credible whistleblower information had been provided to the Committee that DOGE was building a "massive database of SSA data and data from across the federal government, including the Internal Revenue Service (IRS), Department of Health and Human Services (HHS), and other agencies" and that DOGE was conducting its work "in a manner that disregards important cybersecurity and privacy considerations, potentially in violation of the law."[58]

136.    Defendant Davis has reportedly told SSA staffers that they would soon begin work to link various sources of SSA data with the goal of "joining all data across government."[59]

**Federal Payroll Data (Multiple Agencies)**

137.    Over the final weekend of March 2025, DOGE personnel gained access to the Federal Personnel and Payroll System, housed at the Department of the Interior, which processes

---

[56]  Stephen Fowler and Jude Joffe-Block, *How DOGE may have improperly used Social Security data to push voter fraud narratives*, NPR (Apr. 11, 2025), https://www.npr.org/2025/04/11/nx-s1-5352470/doge-musk-social-security-voting.

[57] Matt Bracken, *Social Security Administration Swaps Out One DOGE Staffer at CIO for Another*, FedScoop (Mar. 27, 2025), https://fedscoop.com/social-security-administration-swaps-out-one-doge-staffer-at-cio-for-another/.

[58]  Press Release, Rep. Gerry Connolly, Disturbing Whistleblower Information Obtained by Committee Democrats Leads Ranking Member Connolly to Demand Investigation into DOGE's Disruption of Social Security Operations, Collection of Americans' Sensitive Data (Apr. 17, 2025), https://connolly.house.gov/news/documentsingle.aspx?DocumentID=6404.

[59] Natanson et al., *DOGE Aims to Pool Federal Data*, *supra* note 27.

payroll for around 276,000 federal employees across dozens of agencies, including the Departments of Justice, Treasury, and Homeland Security. This system contains highly sensitive government personnel information, including the PII of government workers.[60]

138.    Leading up to this point, the DOGE Affiliates had tried for two weeks to obtain administrative access to this system but faced objections from senior IT staff who were concerned this access could compromise highly sensitive data, including by making it more vulnerable to cyberattacks, and flagging the irregularity of the request. On Friday, March 28, 2025, Tyler Hassan—a DOGE Affiliate who had recently been named acting assistant secretary of policy, management and budget for the agency—placed the agency's Chief Information Officer and Chief Information Security Officer on administrative leave and under investigation for their "workplace behavior." On Saturday, March 29, 2025, the DOGE Affiliates obtained the access they were seeking.[61]

### IV. DOGE's Access to and Control Over Protected Information at IRS

139.    DOGE and its game of governmental whack-a-mole has wreaked havoc on the American system of government (perhaps a feature, not a bug, of its aims) and caused incredible concern for the privacy of the American public.

140.    Working through DOGE Affiliates embedded at IRS, DOGE has also effected a dramatic shift in IRS policy regarding access to and control over protected taxpayer data. As a result, IRS has already decided to begin large-scale data sharing with other government agencies, which it is poised to dramatically expand, within weeks or months, via a new centralized

---

[60] Davenport, *DOGE Accesses Federal Payroll System Over Objections of Career Staff*, *supra* note 32.

[61] *Id.*

technological platform.

141.    The nation has, once before, experienced an Executive Branch that sought to obtain information regarding individual American taxpayers, and Congress put an unambiguous barrier in its way. Those protections, enshrined in federal law for decades, mandate that DOGE and the other Defendants be restrained here.

### A. DOGE-Affiliated Personnel Have Obtained Access to and Control over Sensitive and Personal Information About Taxpayers, Including Social Security Numbers, Banking Information, and Tax Returns.

142.    On February 13, DOGE Affiliate Gavin Kliger reportedly arrived at the IRS to "examine the agency's operations."[62]

143.    In first few weeks of the Trump Administration, Kliger identified himself as being employed by at least CFPB, OPM, and USAID.[63] On February 3, Kliger sent an email from a USAID mail address announcing that agency's headquarters was closed for business.[64] On February 6, CFPB staff were told that Kliger would require access to CFPB data and systems, and he was added to the CFPB staff directory on February 7.[65] Ultimately Kliger has reportedly been

---

[62] Nathan Layne, *Exclusive: Top Elon Musk Aide Arrives at IRS to Scrutinize Operations, Sources Say*, Reuters (Feb. 13, 2025), https://www.reuters.com/world/us/top-musk-staffer-goes-irs-examine-operations-sources-say-2025-02-13/.

[63] Asher-Schapiro, *supra* note 28 (DOGE staffer Gavin Kliger working at CFPB, OPM, and USAID); Kelly & Schiffer, *supra* note 28.

[64] Edward Wong et al, *Top Security Officials at Aid Agency Put on Leave After Denying Access to Musk Team*, N.Y. Times (Feb. 3, 2025), https://www.nytimes.com/2025/02/02/us/politics/usaid-official-leave-musk.html.

[65] J. David, *DOGE is Now Inside the Consumer Financial Protection Bureau*, Wired ( Feb. 7, 2025), https://www.wired.com/story/doge-access-consumer-financial-protection-bureau-data/; Bobby Allen et al., *Musk's Team Takes Control of Key Systems at Consumer Financial Protection Bureau*, N.P.R. (Feb. 7, 2025), https://www.npr.org/2025/02/07/g-s1-47322/musks-team-takes-control-of-key-systems-at-consumer-financial-protection-bureau.

placed at eight different agencies in the early months of the Trump Administration.[66] Around the time Kliger arrived at IRS, he listed his job on LinkedIn as Special Advisor to the Director at OPM.[67]

144.    Upon arriving at the IRS in February, Kliger attended meetings with as many as five different phones.[68]

145.    DOGE Affiliates also reportedly requested to review IRS systems used for internal accounting operations, such as payroll and purchasing.[69]

146.    On February 16, it was reported that DOGE Affiliates were also seeking broad access to IRS tax systems and datasets including the Integrated Data Retrieval System ("IDRS"), and "[u]nder pressure from the White House," the IRS was considering granting such access with a Memorandum already drafted to facilitate such access.[70]

147.    The IDRS enables "instantaneous visual access" to return information across an extraordinarily broad swath of IRS files including the Taxpayer Information File, which integrates

---

[66] Asher-Schapiro et al., *Elon Musk's Demolition Crew*, *supra* note 28 (showing Kliger as connected to IRS, USAID, OPM, CFPB, the National Institutes of Health, the Federal Trade Commission, the Department of Agriculture, and the Voice of America).

[67] Julianne Mcshanne, *DOGE Worker Says He Was Radicalized by Reading Writer Who Later Denied Holocaust*, Mother Jones (Feb. 16, 2025), https://www.motherjones.com/politics/2025/02/doge-elon-musk-ron-unz-holocaust-substack-post-sailer-vdare-trump/; Gavin Kliger, LinkedIn, https://www.linkedin.com/in/gavin-kliger-5a339b157/ (last visited May 15, 2025).

[68] Hunter Walker, *Inside The 'Bizarre' Meeting Where DOGE Requested 'Extensive System Access' At IRS*, Talking Points Memo (Feb. 14, 2025), https://talkingpointsmemo.com/news/doge-irs-extensive-system-access.

[69] *Id.*

[70] Jacob Bogage & Jeff Stein, *Musk's DOGE Seeks Access to Personal Taxpayer Data, Raising Alarm at IRS*, Wash. Post (Feb. 16, 2025), https://www.washingtonpost.com/business/2025/02/16/doge-irs-access-taxpayer-data.

(Page 56 of Total)

return information from individual and organizational taxpayers.[71]

148.    The IDRS includes the personal identification numbers and bank information of taxpayers in the United States – individuals, businesses, and nonprofits.

149.    Specifically, the IDRS includes:

a.    Information about taxpayer returns subject to examination;

b.    Application information about pending adoptions, such that adoptive parents can claim the dependency exemption and child care credit;

c.    Details about the authorization taxpayers have provided to representatives for purposes of sending tax refunds;

d.    Bank information for any check for tax refunds returned to the IRS;

e.    Taxpayer Identification Numbers and Individual Taxpayer Identification Numbers; and

f.    Preparer Tax Identification Numbers.

150.    The administration has offered varying reasons for why such access is necessary, ranging from working on fraud related to Earned Income Tax Credits or the child tax credit payment system,[72] to identifying targeting of audits, [73] to apparently snooping around tax

---

[71]    IRS, *2023 Document 6209 - ADP and IDRS Information*, § 14 (2023), https://www.irs.gov/privacy-disclosure/2023-document-6209-adp-and-idrs-information.

[72]    Alexander Rifaat, *Musk's Team Enters IRS; Trump Vows Scrutiny of Improper Payments*, TaxNotes (Feb. 14, 2025), https://www.taxnotes.com/featured-news/musks-team-enters-irs-trump-vows-scrutiny-improper-payments/2025/02/14/7r3s6; Elon Musk (@elonmusk), X (Feb. 15, 2025, 9:36 PM), https://x.com/elonmusk/status/1890953327069782337; Aimee Picchi, *Elon Musk's DOGE Presence at the IRS Raises Concerns About Taxpayer Data Security, Refund Delays*, CBS News (Feb. 17, 2025), https://www.cbsnews.com/news/musk-doge-trump-irs-taxpayer-data-idrs-wyden-warren-letter/

[73]    Lauren Irwin, *Stephen Miller: DOGE Will Restore 'Faith and Confidence' in IRS,* Hill (Feb. 17, 2025), https://thehill.com/policy/technology/5149835-stephen-miller-doge-irs/.

information of senators critical of the administration.[74]

151.    It is highly unusual—and perhaps unprecedented in the contemporary era—to grant political appointees access to personal taxpayer data, and particularly to the IDRS.[75] Even IRS commissioners do not typically have access to all taxpayer data systems.[76]

152.    On February 19, following public reports of the anticipated data-sharing and the initial filing of this suit, OPM and Treasury entered into a Memorandum of Understanding regarding Mr. Kliger's detail to the IRS. It specified that Mr. Kliger's assignment was not intended to involve access to returns or return information, including taxpayer PII and that, if such access became necessary to his duties, he would only be provided with access to anonymized data.[77]

153.    The February 19 Memorandum of Understanding also specified that Mr. Kliger would report to and work under the supervision of John York, a Counselor to Secretary Bessent.

154.    Also on February 19, Mr. York provided a declaration in another case informing the Court that Treasury would soon be onboarding two new DOGE Affiliates to be principally assigned to the IRS.[78]

155.    Sam Corcos was appointed as a Consultant for Treasury on February 28, 2025, and

---

[74]    Elon    Musk    (@elonmusk),    X    (Feb.    17,    2025,    6:09    PM), https://x.com/elonmusk/status/1891625938108002407.

[75]    Lily    Batchelder    (@lilybatch),    X    (Feb.    17,    2025,    12:47    PM), https://x.com/lilybatch/status/1891544934265630939.

[76] Bogage & Stein, *supra* note 70.

[77] Memorandum of Understanding from Jonathan Blum, Principal Deputy Assistant Sec'y, Dep't of Treasury, to Mike Crapo, Chairman of Comm. on Fin., U.S. Senate (Feb. 27, 2025) (on file with TaxNotes, *see* https://www.taxnotes.com/research/federal/legislative-documents/congressional-tax-correspondence/treasury-official-sends-memo-doge-detail-crapo/7rl0x).

[78] Decl. of John York, *All. For Retired Ams. v. Bessent*, No. 25-cv-00313 (D.D.C. Feb. 20, 2025), ECF    No.    30-1, https://storage.courtlistener.com/recap/gov.uscourts.dcd.277055/gov.uscourts.dcd.277055.30.1.pdf.

was designated as a Special Government Employee ("SGE") as defined by 18 U.S.C. §202.[79] Due

to unspecified "timing constraints," Treasury's Office of Security Programs—which conducts

background vetting for Treasury employees and contractors—expedited the security clearance

process.[80] As recently as April 22, 2025, OSP had still not completed his background check.[81] Mr.

Corcos's principal professional experience appears to be as a founder and the CEO of Levels, a

holistic health-focused start-up company, which he co-founded in 2019 with a former SpaceX

engineer, using seed and Series A funding from Andreessen Horowitz, a venture capital firm led

by Marc Andreessen,[82] an ally of and major donor to President Trump,[83] who played a key role in

recruiting DOGE personnel in collaboration with Defendant Musk.[84]

156.    On Friday, February 28, Mr. Corcos—who an IRS Human Capital Officer

described as a political advisor to Tom Krause, another member of the Treasury DOGE Team—

arrived at the IRS, accompanied by Mr. Kliger. They demanded that Mr. Corcos be issued IT

---

[79] Defs.' Rep. in Supp. Anticipated Mot. to Dissolve Prelim. Inj., *State of New York v. U.S. Dep't of the Treasury*, No. 25-cv-01144 (S.D.N.Y. Mar. 5, 2025), ECF No. 98, https://storage.courtlistener.com/recap/gov.uscourts.nysd.636609/gov.uscourts.nysd.636609.98.0.pdf.

[80] Decl. of Kari Mencl, *State of New York v. U.S. Dep't of the Treasury*, No. 25-cv-01144 (S.D.N.Y. May 1, 2025), ECF No. 145, https://storage.courtlistener.com/recap/gov.uscourts.nysd.636609/gov.uscourts.nysd.636609.145.0.pdf [hereinafter "Mencl Decl."].

[81] *Id.*

[82] Jacqueline Sweet, *New DOGE Staffer Has Ties to a Sanctioned Russian Oligarch*, Rolling Stone (Mar. 7, 2025), https://www.rollingstone.com/politics/politics-features/doge-staffer-corcos-wife-ties-russian-oligarch-1235291673/.

[83] Raphael Hernandes et al., *Revealed: The Tech Bosses Who Poured $394.1m Into US Election - and How They Compared to Elon Musk*, The Guardian (Dec. 7, 2024), https://www.theguardian.com/us-news/2024/dec/07/campaign-spending-crypto-tech-influence.

[84] Elizabeth Dwoskin et al., *Musk and Ramaswamy Race to Build a 'DOGE' Team for War with Washington*, Wash. Post (Nov. 24, 2024), https://www.washingtonpost.com/business/2024/11/24/musk-ramaswamy-doge-trump/.

equipment and an identity card immediately, although no advance notice had been provided, no onboarding paperwork had been prepared, and the tax check required for all IRS employees had not yet been completed. A Human Capital Officer scheduled the onboarding as soon as possible, for the next business day. On Saturday, March 1, then-Acting Commissioner Krause called the Human Capital Officer and directed her to complete the tax check (a tax compliance check conducted for employment suitability[85]) that day; when the Human Capital Officer referenced above stated that this was not possible before the next business day, Acting Commissioner Krause said she was being uncooperative and was expected to "jump if DOGE told [her] to jump." The following Monday, Acting Commissioner Krause placed the Human Capital Officer on administrative leave with the intention of terminating her employment, stating—among other reasons—that she was being insubordinate and uncooperative with the DOGE Affiliates.[86]

157.    On information and belief, Treasury did not enter into a Memorandum of Understanding or other agreement regarding Mr. Corcos's work at IRS or restricting the data he would be permitted to access or control, either at the time he was onboarded or since.[87]

158.    Treasury also onboarded a second new Treasury DOGE Team member at some point after March 4, 2025—Mr. Todd Newnam—who has been described as "the Treasury DOGE

---

[85] IRM 11.3.31.1, https://www.irs.gov/irm/part11/irm_11-003-031#idm140030602046896.

[86] Decl. of Traci DiMartini ¶ 20, *State of Maryland v. USDA*, No. 25-cv-00748 (D. Md. Mar. 7, 2025), ECF No. 4-37.

[87] A status report the government filed in another case states that there is no MOU between Treasury and USDS regarding the Treasury DOGE team and that they are Treasury employees who report to Treasury leadership. Defs.' Rep. in Supp. Anticipated Mot. to Dissolve Prelim. Inj., *State of New York*, *supra* note 79.

Team Lead" for all Treasury components other than the Bureau of the Fiscal Service, including the IRS. As of at least April 24, 2025, Treasury claimed that Mr. Corcos reported to Mr. Newnam.[88]

159.    By mid-March 2025, Mr. Corcos ordered that nearly all of the IRS's congressionally funded programs and initiatives planned for the fiscal year and calendar year 2025 be halted (or, in DOGE parlance, "deleted"). An IRS employee said that employees were scrambling to figure out whether Mr. Corcos had the authority to direct these actions and, if so, where his authority came from.

160.    One IRS employee described how Mr. Corcos and the DOGE Affiliates operated: "They just randomly drop by people's offices, demanding access to systems; they're bullying us and there's no discipline in what they are doing, which really worries me."[89]

161.    In late March 2025, Mr. Corcos and Mr. Kliger put into motion plans to hold a 'hackathon' at the IRS's DC headquarters for the purpose of building an application programming interface ("API") that would allow control of and access to all data across IRS systems in one interface.[90]

---

[88] Decl. of Daniel Katz, *State of New York v. U.S. Dep't of the Treasury*, No. 25-cv-01144 (S.D.N.Y.    May    1,    2025),    ECF    No.    143, https://storage.courtlistener.com/recap/gov.uscourts.nysd.636609/gov.uscourts.nysd.636609.143.0.pdf.

[89] Rene Marsh, *''Delete' Is One of Their Favorite Terms': Inside DOGE's IRS Takeover Ahead of Tax Season*, CNN (Mar. 15, 2025), https://www.cnn.com/2025/03/15/politics/doge-irs-takeover-irs-tax-season.

[90] Makenna Kelly, *DOGE Is Planning a Hackathon at the IRS. It Wants Easier Access to Taxpayer Data*, Wired (Apr. 5, 2025), https://www.wired.com/story/doge-hackathon-irs-data-palantir/; Rebecca Heilweil, *DOGE Rep Sam Corcos is Treasury's New Chief Information Officer, Source Says*, FedScoop (May 6, 2025), https://fedscoop.com/doge-sam-corcos-treasury-chief-information-officer/.

162.    On Friday, March 28, 2025, IRS placed on administrative leave around fifty senior executive service IT staff, at the direction of DOGE;[91] this action, on information and belief, followed pushback and anticipated resistance regarding the DOGE-directed plans to create the API and allow large-scale transfers of IRS data outside the agency.

163.    Shortly after the senior IT leaders were placed on administrative leave *en masse*, it was reported that the Acting IRS Commissioner for the previous month, Melanie Krause, was leaving the agency, along with Chief Risk Officer Mike Wetklow, Chief Privacy Officer Kathleen Walters, and Chief Financial Officer Teresa Hunter.[92]

164.    Around the same time, it was reported that the Chief Information Officer for Treasury, Tony Arcadi, had resigned from his position.[93]

165.    Approximately two weeks later, on April 14, 2025, the IRS's Chief Information Officer, Rajiv Uppal, announced he was also leaving the agency.[94]

166.    Approximately two weeks after that, it was reported that Treasury's acting Chief Information Officer, Jeff King—who had only assumed the post in late March, after Mr. Arcadi's departure—would also be leaving the IRS. During his time at the agency, Mr. King reportedly played an instrumental role in IRS's cybersecurity and modernization efforts in the previous

---

[91] Matt Bracken, *IRS Cuts About 50 IT Executives, Sources Say*, FedScoop (Mar. 29, 2025), https://fedscoop.com/irs-it-layoffs-tax-agency-doge/.

[92] Nathan Layne & Kanishka Singh, *Top IRS Officials Join Chief in Quitting Following Immigration Data Deal*, Reuters (Apr. 9, 2025), https://www.reuters.com/world/us/us-irs-chief-quit-over-deal-share-data-with-immigration-officials-report-says-2025-04-08/; Erin Slowey, *IRS Head, Privacy Chief to Quit After Immigration Data Deal (1)*, Bloomberg Tax (Apr. 8, 2025), https://news.bloombergtax.com/daily-tax-report/irs-head-privacy-chief-to-quit-following-immigration-data-deal.

[93] Rebecca Heilweil, *Treasury Department Elevates Jeffrey King from Deputy CIO to the Top IT Spot*, FedScoop (Mar. 29, 2025), https://fedscoop.com/treasury-department-cio-jeffrey-king/.

[94] Matt Bracken, *IRS's Top IT Official Leaving the Tax Agency This Month*, FedScoop (Apr. 15, 2025),https://fedscoop.com/irs-top-it-official-rajiv-uppal-leaving/.

administration.[95] Treasury's Chief Technology Officer and Chief Information Security Officer also announced their departures.[96]

167.    Shortly thereafter, Mr. Corcos was named as the new Chief Information Officer of Treasury.[97]

### B. At the Direction of DOGE Personnel, IRS Has Adopted a Policy of Large-Scale Data-Sharing with Other Agencies, Unrelated to Tax Administration

168.    Upon arriving at the IRS, DOGE Affiliates quickly set to work pressing the IRS to engage in unprecedented consolidation and sharing of sensitive, protected taxpayer return information. The IRS has done so, adopting unprecedented changes to its data management and sharing practices. And since the filing of the original Complaint in this matter, these changes have escalated and revealed DOGE's ultimate objective: large-scale consolidation and sharing of taxpayer data with other agencies, for purposes having nothing to do with tax administration.

169.    On February 28, 2025—the day Mr. Corcos arrived at the IRS—he and Mr. Kliger began pressing agency officials to create an "omnibus" agreement that would allow other federal agencies broad access to taxpayer information for the purported purpose of cross-referencing with other government benefits and identifying fraud.[98]

170.    The agency programs with which DOGE seeks to allow cross-referencing IRS taxpayer information are sweeping and implicate critical benefits for tens, if not hundreds, of

---

[95] Rebecca Heilweil, *Jeff King, Acting CIO of Treasury Department, Is Leaving*, FedScoop (Mar. 29, 2025),https://fedscoop.com/jeff-king-acting-cio-of-treasury-department-is-leaving/.

[96] Rebecca Heilweil, *Two Top Tech Officials Are Out at Treasury, Sources Say*, Fedscoop (May 1, 2025), https://fedscoop.com/two-top-tech-officials-are-out-at-treasury-sources-say/.

[97] Heilweil, *DOGE Rep Sam Corcos is Treasury's New Chief Information Officer, Source Says*, *supra* note 90.

[98] Jacob Bogage & Jeff Stein, *DOGE Presses to Check Federal Benefits Payments Against IRS Tax Records*, Wash. Post (Mar. 1, 2025), https://www.washingtonpost.com/business/2025/03/01/doge-irs-tax-records-benefits/.

millions of people. This includes, at a minimum, the Supplemental Nutrition Assistance Program ("SNAP") and student loan and aid programs. DOGE has also, through the Department of Agriculture, demanded that states turn over personally identifiable data about SNAP recipients.[99]

171.    Indeed, with DOGE influencing IRS decision-making, the agency reached an unprecedented agreement to share broad swaths of taxpayer data with another agency—the Department of Homeland Security—for use in immigration enforcement. The agency entered into this agreement over the apparent objections of career leaders and the individuals with formal control over IRS policy.[100] It has been reported that this data-sharing prompted, in part, the departures of the then Acting Commissioner Krause, Chief Risk Officer Wetklow, and Chief Privacy Officer Hunter.

172.    Since mid-March 2025, DHS reportedly has been uploading IRS data to a 'data lake,' or centralized repository of data, housed within USCIS. A DHS employee told a reporter: "They are trying to amass a huge amount of data. It has nothing to do with finding fraud or wasteful spending . . . They are already cross-referencing immigration with SSA and IRS as well as voter data."[101]

173.    Pursuant to the Homeland Security Act, USCIS focuses exclusively on the administration of immigration benefit applications; it has no immigration enforcement or criminal

---

[99] Jude Joffe-Block and Stephen Fowler, *USDA, DOGE demand states hand over personal data about food stamp recipients*, NPR (May 9, 2025), https://www.npr.org/2025/05/09/nx-s1-5389952/usda-snap-doge-data-immigration.

[100] Jacob Bogage & Shannon Najmabadi, *Acting IRS Chief to Quit Over Deal to Share Data with Immigration Authorities*, Wash. Post (Apr. 8, 2025), https://www.washingtonpost.com/business/2025/04/08/irs-dhs-tax-data-immigrants/.

[101] Kelly & Elliott, *DOGE Is Building a Master Database to Surveil and Track Immigrants*, *supra* note 55.

investigation function.[102] USCIS also has no exception under 26 U.S.C. § 6103 for receipt of taxpayer data from IRS.

174.    As of March 28, 2025, DOGE Affiliates Kyle Schutt, Edward Coristine, Aram Moghaddassi and Payton Rehling had been granted access to the USCIS 'data lake.'[103]

175.    Schutt is a software engineer formally employed by the GSA but who has reportedly performed work at the Cybersecurity and Infrastructure Security Agency ("CISA"), Department of Health and Human Services ("HHS"), and DHS. Schutt has also been detailed to U.S. DOGE Service Temporary Organization.

176.    Coristine—a 19-year-old undergraduate student—is a GSA employee, also listed as an "expert" at OPM in internal records, and has reportedly performed work at CISA, the Department of State, DHS, the Federal Emergency Management Agency, GSA, HHS, U.S. Agency for International Development, and Department of Education. Coristine has also been detailed to the U.S. DOGE Service Temporary Organization.

177.    Moghaddassi, a 26-year-old software engineer who previously worked at Elon Musk-owned companies Neuralink and X and appeared with Defendant Musk and other DOGE members in a Fox News special that aired March 27, 2025,[104] is formally employed by DOL and has reportedly performed work at Treasury, SSA, HHS, DOL, and DHS.

---

[102] U.S. Customs and Immigr. Servs., Policy Manual, ch. 1, https://www.uscis.gov/policy-manual/volume-1-part-a-chapter-1 (last updated May 13, 2025).

[103] Rebecca Heilweil, *DOGE Granted Access to Naturalization-Related IT Systems, Memo Shows*, FedScoop (Apr. 2, 2025), https://fedscoop.com/doge-granted-access-to-naturalization-immigration-it-systems/.

[104] Sarah D. Wire, *Meet the Actual DOGE Staff: Musk Aides Give New Details in Fox Interview*, USA Today (Mar. 28, 2025),https://www.usatoday.com/story/news/politics/2025/03/28/department-government-efficiency-aides-musk-trump/82703804007/.

178.    Rehling is a 27-year-old data engineer who has reportedly performed work at SSA and USCIS, which has referred questions about Rehling to DOGE. He is also among a group of DOGE workers who were in April 2025 granted access to the Justice Department's Executive Office for Immigration Review's Courts and Appeals System, which contains highly sensitive information regarding the addresses and case histories of millions of immigrants.[105]

### C. At the Direction of DOGE Personnel, IRS Has Expanded its Implementation of its New Data Sharing Policy Through the Creation of a "Mega API"

179.    Beginning in late March 2025, Mr. Corcos directed IRS to undertake a new effort to create a system for sharing protected taxpayer data broadly across the federal government.

180.    DOGE engaged federal contractor Palantir, in a highly irregular procurement process, to transform a project originally intended to improve IRS customer service into one focused on creating a "mega API" that would allow access to broad swaths of IRS taxpayer data, including names, addresses, social security numbers, tax returns, and employment information. Engineers working on the project intend to complete it within a thirty-day period.[106]

181.    While Palantir had been working on a contract to aid the IRS is making it more efficient for customer service representatives to access basic information concerning taxpayers that contacted the agency with questions and concerns, DOGE shifted Palantir's work to creating an application programming interface ("API") that will allow broad access to data across IRS

---

[105] Hannah Natanson et al., *Justice Dept. Agrees to Let DOGE Access Sensitive Immigration Data,* Wash. Post (Apr. 21, 2025), https://www.washingtonpost.com/immigration/2025/04/21/doge-ecas-justice-immigration-courts-trump/.

[106] Makenna Kelly, *Palantir Is Helping DOGE With a Massive IRS Data Project* (Apr. 11, 2025), https://www.wired.com/story/palantir-doge-irs-mega-api-data/.

systems. This required a modified scope of work for Palantir on existing contracts and new task orders.[107]

182.    DOGE reportedly intends for this work to facilitate use of Palantir's Foundry platform as a central access point for all IRS systems.[108] A person with access could view and potentially alter any records in any of those systems,[109] and other Palantir tools, such as its Artificial Intelligence Platform, could be applied to the data.[110]

183.    Despite the serious privacy interests at stake with the sensitive taxpayer data if hundreds of millions of Americans implicated, DOGE rushed this project with cursory engagement from senior privacy and risk officials in the agency, aiming to transform access to taxpayer data within a short period of time.[111]

184.    This mechanism for wide-ranging access to taxpayer information across systems—and across agencies—runs counter to IRS's historical and considered practice of carefully circumscribing access to taxpayer data to prevent risks of gravely harmful disclosures and to ensure data is only accessed for lawful and appropriate purposes.

185.    On information and belief, the primary goal of creating this "mega API" is to facilitate further rapid, large-scale IRS data-sharing with other agencies in the federal government.

---

[107] *See Blanket Purchase Agreement (BPA) Call (PIID 205AE925F00117)*, USA Spending, https://www.usaspending.gov/award/CONT_AWD_205AE925F00117_2050_2032H518A00029_2050 [https://perma.cc/69UC-BPMY] (last visited May 15, 2025).

[108] Kelly, *Palantir Is Helping DOGE With a Massive IRS Data Project*, *supra* note 106.

[109] *Id.*

[110] *Palantir Foundry: The Ontology-Powered Operating System for the Modern Enterprise*, Palantir, https://www.palantir.com/platforms/foundry/ (last visited May 15, 2025).

[111] Kelly, *Palantir Is Helping DOGE With a Massive IRS Data Project*, *supra* note 106.

186.    On information and belief, this type of data-sharing could be achieved through either mass transfers of data out of the agency or by creating a network of interoperable data sources among different agencies with a centralized access point.

187.    On information and belief, DOGE is also seeking to create a system for quick, template agreements to enable sharing IRS data with other agencies in unprecedented and expedited ways. This approach gravely risks the security and privacy of IRS data systems.

188.    There are also parallels between this work and Defendant Musk's private business interests. In February 2025, Palantir announced that it had integrated Grok—a large language model developed by Mr. Musk's artificial intelligence start-up company, xAI—into its Artificial Intelligence Platform .[112] In April 2025, DOGE recruiter Anthony Jancso[113] posted in an online forum of Palantir alumni that he was hiring for a "DOGE orthogonal project to design benchmarks and deploy AI agents across live workflows in federal agencies."[114] And in May 2025, Palantir and xAI announced they were partnering, along with an investment firm, to design and deploy AI-powered tools in the financial services and insurance sectors.[115]

---

[112] Harrison Brooks, *Palantir Enhances AIP with Elon Musk's AI Chatbot Grok*, AInvest (Feb. 6, 2025), https://www.ainvest.com/news/palantir-enhances-aip-with-elon-musk-s-ai-chatbot-grok-25021010bafa2d3a7bff8514/.

[113] Asher-Schapiro et al., *Elon Musk's Demolition Crew*, *supra* note 28.

[114] Caroline Haskins & Vittoria Elliott, *A DOGE Recruiter Is Staffing a Project to Deploy AI Agents Across the US Government*, Wired (May 2, 2025), https://www.wired.com/story/doge-recruiter-ai-agents-palantir-clown-emoji/.

[115] *Musk's xAI joins TWG Global, Palantir for AI push in Financial Sector*, Reuters (May 6, 2025), https://www.reuters.com/business/musks-xai-joins-twg-global-palantir-ai-push-financial-sector-2025-05-06/.

## HARMS TO PLAINTIFFS

189.    Plaintiff Center for Taxpayer Rights focuses its work on advancing taxpayer rights, promoting trust in systems of taxation, and increasing access to justice in the tax system, particularly for the most vulnerable populations.

190.    The Center will be harmed by the shift in IRS data management and sharing practices to facilitate large-scale inter-agency transfers of sensitive taxpayer return information and consolidation of that data with other sensitive data sources from across the federal government, as well as by the DOGE Defendants' actions to gather data from or facilitate transfers of data between agencies across the U.S. government. These actions will harm the Center's ability to encourage trust in the taxpayer process. For example, undocumented immigrants have often been fearful of filing taxes. The Center encourages them to do so, relying on the protections that numerous statutes and IRS policies afford to taxpayer information.

191.    Public reports of DOGE access to taxpayer information, and the access to such information itself, will result in taxpayer distrust of the confidentiality of the information they submit to the IRS—particularly among vulnerable populations.

192.    This will result in the Center needing to dedicate more resources to facilitating trust in the taxpayer system and to reach low-income or other vulnerable taxpayers and away from other mission-crucial activities. Without assurances that such protections—including protections against large-scale inter-agency data sharing—will be respected by DOGE and the agency employees that grant them access to taxpayer information, the Center will be unable to assure vulnerable populations that their information will be appropriately safeguarded.

193.    This will impede the Center's core activities of reaching taxpayers and furthering the rights of taxpayers.

194.    In addition, the Center runs a Low Income Tax Clinic (LITC). The Center's LITC represents clients who are low-income taxpayers in their tax disputes with federal, state, or local tax agencies.

195.    Further, the Center operates LITC Connect, a nationwide network of LITCs and attorneys, accountants, and enrolled agents, that promotes access to justice for low-income taxpayers and ensures a fair and just tax system for all. The Center holds weekly calls for LITC Connect members, matches LITCs with tax professionals, provides training and support, and carries professional liability insurance for the professional serving the LITCs that are members. LITC Connect members represent about 20,000 taxpayers nationwide and have educated many more taxpayers and service providers about their rights and responsibilities before the IRS.

196.    The Center's and the LITC Connect members' clients are all low-income taxpayers, many of whom have filed for tax credits, including the CTC and EITC, and who are eligible to receive other public benefits like SNAP. Many of these clients are also survivors of domestic violence or victims of identity theft who have particular distress surrounding the disclosure of their sensitive tax information.

197.    Plaintiff Main Street Alliance ("MSA") works to help its small business owner members navigate challenges and thrive, as they work toward long-term prosperity. This includes helping small businesses navigate challenges with taxes, tariffs, access to capital, and other matters that affect their members' financial health.

198.    IRS has collected and stored extensive confidential business information regarding MSA's members, including business income, profits and losses, and other information that would reflect operational details.

199.   MSA's members have understood the information they submit to IRS to be private, barring a discrete list of specific exceptions. Their trust in IRS is engendered by their understanding of the privacy laws the agency is subject to and the agency's own public commitments to data privacy.

200.   Treasury-IRS Defendants are required by law to protect the sensitive personal, business, and financial information that they collect and maintain about MSA's members from unnecessary and unlawful disclosure.

201.   Defendants' actions have thus harmed MSA's members by depriving them of privacy protections guaranteed by federal law, invading their privacy, and breaching the confidence of private information they provided to the IRS.

202.   Supporting small businesses as they seek to succeed financially is a key part of MSA's mission, and its members' interests are also harmed by DOGE's wide-ranging access to and/or control over its members' sensitive financial information contained in IRS tax return information databases, including the IDRS, and Defendants' management of that data in a manner that increases the risk of its improper disclosure.

203.   Additionally, as MSA represents small businesses and sole proprietorships, it has members with incomes low enough to qualify for the EITC, and these members have and will file for that credit. To the extent DOGE focuses its inspection on EITC recipients, as President Trump and Defendant Musk have suggested they might, MSA's members are even more likely to suffer harm.

204.   Plaintiff National Federation of Federal Employees ("NFFE") represents 110,000 professional and non-professional federal workers, some of whom are paid on the lower end of the

General Schedule and Wage Grade pay systems, and its mission is to, among other things, promote its members' "economic welfare."[116]

205.    IRS has collected and stored extensive personal and financial information about NFFE's members, including their Social Security or taxpayer identification numbers, names and addresses, taxable income, marital status, and information, such as medical expenses, relating to eligibility for tax deductions and credits.

206.    NFFE's members have understood the information they submit to IRS to be private, barring a discrete list of specific exceptions. Their trust in IRS is engendered by their understanding of the privacy laws the agency is subject to and the agency's own public commitments to data privacy.

207.    Treasury-IRS Defendants are required by law to protect the sensitive personal, business, and financial information that they collect and maintain about NFFE's members from unnecessary and unlawful disclosure.

208.    Defendants' actions have thus harmed NFFE's members by depriving them of privacy protections guaranteed by federal law, invading their privacy, and breaching the confidence of private information they provided to the IRS.

209.    NFFE and its members will be harmed by DOGE's broad access to and/or control over its members' sensitive financial information contained in its members' tax return information, Defendants' transfer of such information to other agencies in violation of the law, and Defendants' management of such information in a manner that increases the risk of its improper disclosure. In particular, NFFE represents some lower-income federal workers who qualify for the EITC and CTC, and these members have and will file for those credits. To the extent DOGE focuses its

---

[116] Nat'l Fed'n of Fed. Empls., *About Us*, https://nffe.org/about/ (last visited Feb. 17, 2025).

inspection on EITC recipients, as President Trump and Defendant Musk have suggested they might, NFFE's members are even more likely to suffer harm.

210.    CWA's members include hundreds of thousands of public and private sector workers.

211.    IRS has collected and stored extensive personal and financial information about CWA's members, including their Social Security or taxpayer identification numbers, names and addresses, taxable income, marital status, and information, such as medical expenses, relating to eligibility for tax deductions and credits.

212.    CWA's members have understood the information they submit to IRS to be private, barring a discrete list of specific exceptions. Their trust in IRS is engendered by their understanding of the privacy laws the agency is subject to and the agency's own public commitments to data privacy.

213.    Treasury-IRS Defendants are required by law to protect the sensitive personal, business, and financial information that they collect and maintain about CWA's members from unnecessary and unlawful disclosure.

214.    Defendants' actions have thus harmed CWA's members by depriving them of privacy protections guaranteed by federal law, invading their privacy, and breaching the confidence of private information they provided to the IRS.

215.    CWA and its members will be harmed by DOGE's broad access to and/or control over its members' sensitive financial information contained in its members' tax return information, Defendants' transfer of such information to other agencies in violation of the law, and Defendants' management of such information in a manner that increases the risk of its improper disclosure. In particular, CWA represents some lower-income workers who qualify for the EITC and CTC, and

51

these members have and will file for those credits. To the extent DOGE focuses its inspection on EITC recipients, as President Trump and Defendant Musk have suggested they might, CWA's members are even more likely to suffer harm.

### CLAIMS FOR RELIEF

### Count I
### Actions *Ultra Vires*
*DOGE Defendants*

216.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

217.    In directing and controlling the use and administration of Defendant IRS' systems, DOGE Defendants have breached secure government systems and caused the unlawful disclosure of sensitive taxpayer return information.

218.    DOGE Defendants have also effected a shift in IRS data management and sharing practices to facilitate large-scale inter-agency transfers of sensitive taxpayer return information and consolidation of that data with other sensitive data sources from across the federal government, for unknown purposes.

219.    DOGE Defendants are also gathering data from or facilitating transfers of data between agencies across the U.S. government, with the objective of creating either a centralized database containing significant amounts of cross-agency data about individuals and businesses or an interoperable network of systems, across multiple agencies, that would allow for centralized queries or examinations of data.

220.    DOGE Defendants may not take actions which are not authorized by law.

221.    No law or other authority authorizes or permits DOGE defendants to access or administer these systems, nor to fundamentally shift long-standing U.S. policy to segregate highly

sensitive taxpayer return information and restrict its use—on the agency- and even individual employee-level—to only those who need to know the information for a specific, legally authorized purpose.

222.    No law or other authority authorizes or permits DOGE defendants to create a single, unified database or inter-agency network consolidating information about citizens and residents from across the federal government—including sensitive taxpayer return information from the IRS, which individuals and businesses are required by law to submit—for either all or a significant subset of U.S. citizens and residents.

223.    Through such conduct, Defendants have engaged (and continue to engage) in *ultra vires* actions which injure plaintiffs by exposing their protected private information and increasing the risk of further disclosure of their information.

<u>**Count II**</u>
**Violation of the APA: Arbitrary and Capricious, Contrary to Law, 5 U.S.C. § 706**
*Treasury-IRS Defendants*

224.    Plaintiffs assert and incorporate by reference the foregoing paragraphs.

225.    Treasury-IRS Defendants have made the decision and acted to disclose and continue disclosing highly sensitive, legally protected taxpayer data to at least one other agency—with imminent plans to expand the scope of this data-sharing to other agencies—without acknowledging that IRS was changing its policies with respect to inter-agency data sharing, identifying the source of its authority to do so, or providing any reasoning whatsoever for its decision, and without considering the consequences, including to the reliance interests of Plaintiffs and their members.

226.    Treasury-IRS Defendants have also made a decision and acted to consolidate taxpayer data contained across multiple databases and systems into a single point of access, without acknowledging that IRS was changing its policies with respect to inter-agency data sharing, identifying the source of its authority to do so, or providing any analysis whatsoever for why its decision is not arbitrary and capricious, and without considering the consequences, including the legal or security implications of this decision.

227.    Treasury-IRS Defendants have made the decision and acted to allow access to taxpayer data through a consolidated mechanism in a manner that facilitates and allows IRS and other federal employees to access and inspect personal data, including return information and other taxpayer data, without a need for the information in the performance of their duties or for tax administration purposes, or within other unlawful exceptions for inspection, access, or disclosure in violation of 5 U.S. Code § 552a(b), 26 U.S.C. § 6103, and 26 U.S.C § 7213A.

228.    The Treasury-IRS Defendants' conduct constitutes final agency action under 5 U.S.C. § 706.

229.    Treasury-IRS Defendants have thereby engaged in conduct that is contrary to law, in excess of statutory authority, and arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 5 U.S.C. § 706(2).

### **Requested Relief**

WHEREFORE, Plaintiffs request that this Court:

1.    Enjoin Defendants' wrongful provision of access, inspection, and disclosure of return information and other personal information in the IRS system to members of DOGE

or other federal agencies or employees without lawful means of access, inspection, or disclosure;

2.      Enjoin Defendants from using the recently created mega API, or any other similar platform, to share IRS return information or other sensitive data outside of IRS, and within IRS to employees without a need for and tax administration purpose for the access;

3.      Declare unlawful and halt DOGE Defendants' access to, inspection, or disclosure of personal or other protected information;

4.      Declare unlawful and halt Defendants' use of IRS systems for purposes in excess of System of Records Notices (SORNs) and Privacy Impact Assessments (PIAs;

5.      Declare unlawful and halt DOGE Defendants' direction, control, or use of IRS systems;

6.      Declare unlawful Defendants' policy and actions to share IRS taxpayer data broadly with other federal agencies through the recently created mega API and through template agreements that do not conform to the specific, lawful reasons for inter-agency sharing of taxpayer data;

7.      Order Treasury-IRS Defendants to establish and maintain security protections that prevent the unauthorized access of return information or other personal information;

8.     Order Treasury-IRS Defendants to revoke access to return information or other personal information by DOGE Defendants and any other unauthorized entity or individual;

9.     Prohibit DOGE Defendants from collecting, accessing, disclosing, or retaining return information or other personal information in IRS systems;

10.     Award costs and reasonable attorneys' fees incurred in this action; and

11.     Grant such other relief as the Court may deem just and proper.

Dated: May 16, 2025                              Respectfully Submitted,

                                        */s/ Daniel A. McGrath*
                                        Daniel A. McGrath (Bar No. 1531723)
                                        Madeline H. Gitomer (Bar No. 1023447)
                                        Robin F. Thurston (Bar No. 7268942)
                                        Skye L. Perryman (Bar No. 984573)
                                        Democracy Forward Foundation
                                        P.O. Box 34553
                                        Washington, DC 20043
                                        Tel.: (202) 448-9090
                                        dmcgrath@democracyforward.org
                                        mgitomer@democracyforward.org
                                        sperryman@democracyforward.org
                                        rthurston@democracyforward.org

                                        *Counsel for Plaintiffs*

                                        Yvette M. Piacsek (Bar No. 980302)
                                        General Counsel
                                        National Federation of Federal Employees, IAM, AFL-CIO

1225 New York Ave. N.W., Suite 450
Washington, D.C. 20005
Tel.: (202) 216-4428
ypiacsek@nffe.org

*Counsel for Plaintiff NFFE*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs*,

v.

INTERNAL REVENUE SERVICE et al.,

*Defendants*.

Civil Action No. 25-cv-457-CKK

**PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE
ALTERNATIVE, FOR PRELIMINARY INJUNCTION**

Plaintiffs respectfully move this Court for relief under 5 U.S.C. §§ 705, 706, and, in the

alternative, for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65. For the

reasons described in Plaintiffs' accompanying memorandum of law, declarations, exhibits, and

Amended Complaint, Plaintiffs request that this Court enter relief under 5 U.S.C. §§ 705, 706,

staying and preliminarily setting aside the Defendants' Data Policy, as defined in Plaintiffs'

accompanying memorandum in support of this Motion, that permits disclosures of IRS data to

ICE under Sec. 6103(i)(2) of the Internal Revenue Code, during the pendency of this action.

Plaintiffs also request that the Court order:

     (1) that Defendants, and their officers, agents, servants, employees, attorneys, and all

          acting in concert with them, shall not effectuate the transfer of any IRS data, to

          include taxpayer information, return information, and taxpayer identity, including

1

address information, (as defined under Sec. 6103(b)(2), (3), (6) of the Internal

Revenue Code), pursuant to Sec. 6103(i)(2) of the Internal Revenue Code, in

response to requests from the Department of Homeland Security and its component

agencies for the disclosure, verification, or confirmation of taxpayer address

information, or taxpayer identity information that includes address information, and

information regarding the receipt of tax credits or refunds;

(2) that Defendants shall inform ICE that any disclosures of address information under

the Data Policy, by the IRS to ICE and pursuant to Sec. 6103(i)(2), have been deemed

unlawful and thus Defendants must destroy, or seek and facilitate the destruction of

such data;

(3) that the IRS shall submit to the Court within three days a sworn declaration attesting

that the information disclosed has been destroyed or returned and detailing its actions

to otherwise comply with the Court's Order; and

(4) that Defendants shall not effectuate any similar policy under a different name.

Plaintiffs have met and conferred with counsel for Defendants concerning this Motion.

Defendants oppose.

Plaintiffs respectfully request a hearing on this Motion, pursuant to Local Rule 65.1(d).

August 20, 2025                              Respectfully submitted,

/s/ Johanna M. Hickman
Daniel A. McGrath (D.C. Bar No. 1531723)
Johanna M. Hickman (D.C. Bar No. 981770)
Madeline H. Gitomer (D.C. Bar No 1023447)
Steven Y. Bressler (D.C. Bar No. 482492)
Robin Thurston (D.C. Bar No. 1531399)
Democracy Forward Foundation
P.O. Box 34553

2

Washington, DC 20043
202-448-9090
dmcgrath@democracyforward.org
hhickman@democracyforward.org
mgitomer@democracyforward.org
rthurston@democracyforward.org
sbressler@democracyforward.org

*Counsel for Plaintiffs*

3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs*,

v.

Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

*Defendants*.

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

BACKGROUND ................................................................................................................. 3

I.    The IRS Has Long Stringently Protected Taxpayer Information, As a Matter of Law and Policy ..................................................................................................................................... 5

    A.    Section 6103 Explicitly Limits Sharing of Taxpayer Data Within the Federal Government, Including When Requested for Purported Criminal Investigations. ........ 6

    B.    IRS Policy has Long Stringently Protected Taxpayer Data ........................................... 7

    C.    The IRS's Longstanding Privacy Policy Extended to Requests for Return Information for Use in Criminal Investigations. ................................................................................... 8

II.    Defendants Have Radically Shifted the IRS's Data Policy, and are Rapidly Implementing it Through Sharing Data with DHS. .......................................................................................... 9

    A.    Defendants Have Effectuated the Data Policy to Widely Share Taxpayer Data Throughout the Federal Government. ............................................................................. 10

    B.    Defendants Are Now Implementing the Data Policy at Scale, Responding to Mass ICE Requests for IRS Data. ................................................................................................... 12

III.    The Implementation of the Data Policy Harms Plaintiffs, Their Clients, and Their Members. ................................................................................................................................. 14

LEGAL STANDARDS ..................................................................................................... 19

ARGUMENT ..................................................................................................................... 20

I.    Plaintiffs are Likely to Succeed on the Merits of Their Claims Because the Data Policy Violates the APA. ................................................................................................................... 20

    A.    The Data Policy is Final Agency Action and There Is No Adequate Remedy Other Than APA Review ................................................................................................................... 20

    B.    The Data Policy Violates the Internal Revenue Code ................................................. 23

    C.    The Data Policy is Arbitrary and Capricious ............................................................... 28

        1.    The Defendant Agencies Have Not Acknowledged or Justified Their Change in Policy .............................................................................................................................. 29

        2.    Defendants Failed to Consider Key Issues in Adopting the Data Policy ................. 30

        3.    The Data Policy Failed to Consider Reliance Interests ............................................ 33

i

II.    Plaintiffs Face Irreparable Injury from the Continued Effect of the IRS Data Policy ...... 35

   A.    The Center Faces Irreparable Harm to its Organizational Interests ............................ 35

   B.    The Center's LITC Clients and Plaintiffs' Members also face imminent, irreparable
         injury, in the absence of a stay ..................................................................................... 39

III.   Balance of the Equities ............................................................................... 44

IV.    The Court Should Stay the Data Policy under Section 705 .......................................... 45

**CONCLUSION** ............................................................................................... 45

ii

The IRS holds taxpayer information on virtually every American. It is among the most sensitive and confidential personal information in government systems. As a result, and in response to Nixon-era abuses, Congress enacted stringent privacy protections in the Tax Reform Act of 1976, and for decades IRS policy has been to carefully guard the confidentiality of taxpayer data. Now, however, the IRS has adopted a new policy ("the Data Policy") to widely share taxpayers' sensitive data. Defendants' new, unannounced, and unexplained Data Policy is unlawful and is already causing irreparable harm to Plaintiffs and others. Plaintiffs ask the Court to stop it.

In recent days, Defendants have begun executing this Data Policy at mass scale. During the week of August 4, 2025, the IRS shared tens of thousands of taxpayers' data within days of receiving an Immigration and Customs Enforcement ("ICE") request for the addresses of more than 1 million taxpayers, purportedly under a narrow exception to taxpayer confidentiality laws. But that exception, which allows the IRS to provide information for specific criminal investigations and proceedings, does not apply to the IRS's bulk disclosure of sensitive information, and ICE's request failed on its face to comply with the laws protecting taxpayer confidentiality. It is entirely implausible that ICE is conducting *bona fide* criminal investigations of over 1 million people or that it seeks home addresses for use in preparation for judicial or administrative proceedings or investigation that may lead to such proceedings, as the law requires. Rather, as the White House said in July, this data sharing is "part of President Trump's promise to carry out the mass deportation of criminal illegal aliens"—a *civil* immigration enforcement effort that is not a legal basis for ICE to request or receive confidential taxpayer information from the IRS.

1

Nonetheless, the IRS disregarded its statutory obligations to protect the confidentiality of taxpayer information and responded with home addresses for the taxpayers it was able to locate in its system. Thus, in just one week, the IRS disseminated as much taxpayer data under this inapposite criminal proceeding provision to ICE as it had previously shared in a single year with *all* federal law enforcement agencies, which have never before included ICE. And yet, because the IRS was able to find matches in its system for less than 5% of the names ICE requested, this unprecedented and unlawful disclosure of taxpayer data was apparently not enough for this Administration. The new IRS Commissioner was consequently fired, to join the ranks of the five Acting Commissioners and dozens of senior privacy, legal, and IT leaders pushed out of the agency in the last 7 months after raising objections to the Administration's reckless handling and unlawful disclosures of confidential taxpayer data.

The IRS's recent implementation of the Data Policy at mass scale to share unprecedented quantities of taxpayer data with ICE at breakneck speed illustrates the unlawful and arbitrary nature of the Data Policy. In section 6103(i)(2) of the Internal Revenue Code, Congress provided a host of specific requirements to govern requests for information relevant to criminal matters—which the IRS has long interpreted *not* to permit disclosures for purposes of obtaining address information—and the IRS has historically carefully responded to these requests on a case-by-case basis. But in a reversal of that policy and practice, the IRS has now responded to at least one *en masse* request from ICE seeking the data of as many as 1.23 million people, on a turnaround time of just days. It is neither plausible nor possible that the IRS is ensuring that this data will be shared only with specific law enforcement officers "directly and personally engaged" in specific investigations of specific non-tax criminal statutes, as required by the law, or that the IRS is carefully evaluating each request. And the IRS has provided no explanation, let alone the

2

reasoned explanation required by the Administrative Procedure Act, for its abrupt reversal of privacy protections to allow this to happen.

While the Data Policy challenged in this action is not limited to the IRS's data sharing with ICE, this emergency Motion seeks relief with respect to this narrower implementation of the Policy, which is confirmed to be already occurring. Defendants' initiation of mass data sharing with ICE under the Data Policy is causing and threatens irreparable harm to Plaintiffs and their members and clients. This sharing is irreversibly harming Plaintiff Center for Taxpayer Rights' ("CTR" or "the Center") ability to provide the education and representation services for immigrants who speak English as a second language, as well as its efforts to promote trust and engagement in the tax system, obstructing the organization from fulfilling its core mission and statutory responsibilities as a Low Income Taxpayer Clinic. CTR's clients and Plaintiff Main Street Alliance's ("MSA") members also include immigrants and taxpayers with immigrant family members, whose data may already have been unlawfully shared with ICE or who are at imminent risk of having their data unlawfully shared with ICE, and who are already suffering concrete and irreparable injuries as a result. Members of Plaintiffs National Federation of Federal Employees, IAM AFL-CIO ("NFFE") and Communication Workers of America, AFL-CIO ("CWA") similarly face heightened risks that their data will be disclosed. Plaintiffs respectfully request that this Court stay or preliminarily set aside Defendants' sharing of address information with ICE under the Data Policy and return or destroy any such information already disclosed to prevent further irreparable harm before the Court can resolve this action on the merits.

## BACKGROUND

Longstanding IRS policy strictly controlled the dissemination of taxpayer information within the federal government, in conformance with protections codified in 26 U.S.C. § 6103. In

3

an unannounced reversal of this policy, Defendants have now effected a new IRS Data Policy that prioritizes consolidation of protected data and free sharing across the federal government. The Administration has pressed forward with this change over the objections of IRS leadership and long-serving senior executive service IT staff, such that scores of senior IRS officials have been fired, put on administrative leave, or quit.

Defendants are now implementing data sharing under the new Data Policy at scale. In recent years, the IRS has shared between 40,000 to 70,000 individuals' tax information with law enforcement each year for non-tax criminal matters. That reflects the total number of disclosures across all federal law enforcement agencies, none of which were to ICE. Under the new Data Policy, in the first week of August alone, the IRS reportedly shared approximately 60,000 individuals' return information with ICE, within days of receiving an *en masse* request,[1] despite a stated requirement that the IRS "review each request for completeness and validity."[2] This sharing was purportedly authorized under Section 6103's provisions for the sharing of information with law enforcement officers who "are personally and directly engaged" in a criminal investigation or proceeding under a specifically identified criminal statute. 26 U.S.C. § 6103(i)(1, 2). In light of the irreparable harms caused and threatened by this mass sharing, Plaintiffs filed this motion for emergency relief.

---

[1] Rene Marsh, *IRS begins sharing sensitive taxpayer data with immigration authorities to find undocumented migrants*, CNN (Aug. 8, 2025), https://perma.cc/24KK-QZMB (Ex. 1).
[2] *Mem. of Understanding Between IRS and ICE*, at 5.B https://perma.cc/BHH8-ZQXM (Ex. 4).

4

I.  **The IRS Has Long Stringently Protected Taxpayer Information, As a Matter of Law and Policy.**

The IRS collects and maintains the sensitive and confidential data of more than 150 million individual taxpayers and millions more businesses.[3] This data includes social security numbers ("SSNs"), individual taxpayer identification numbers ("ITINs"), addresses, bank account and employment information, medical expense information, and confidential business information. *See* 26 U.S.C. § 6103(b)(2). In the wake of abuses by the Nixon Administration, including efforts to use confidential information to target political enemies, Congress passed the Tax Reform Act of 1976 (codified in the Internal Revenue Code of Title 26), which implemented significantly more protective controls and limitations on the sharing of IRS tax information within the federal government.[4] The IRS policy manual implements these statutory requirements with detailed requirements and limitations on how taxpayer information may be accessed and disclosed.[5] Pursuant to these laws and policies, the IRS has stringently protected taxpayer information, even from sharing within the federal government, for decades.

---

[3] *See* IRS, *2024 Internal Revenue Service Data Book*, https://perma.cc/XG7C-RKZ5.

[4] Taxpayer Advoc. Serv., *National Taxpayer Advocate: 2003 Annual Report to Congress* at 245 (Dec. 31, 2003), https://perma.cc/T6ZD-Q6VL ("Taxpayer Advocate Report") (explaining that the Act significantly limited "the rules governing the availability of tax information to Federal agencies for purposes of nontax criminal cases," and that the Senate Finance Committee determined that an individual's tax information is "entitled to essentially the same degree of privacy as those private papers maintained in his home").

[5] *See* Internal Revenue Manual § 10.5.2, *Privacy Compliance and Assurance (PCA) Program*, IRS (Jan. 27, 2020), https://perma.cc/JP7T-9WEX ("IRM"); IRM § 9.3.1, *Disclosure*, IRS (Dec. 19, 2024), https://perma.cc/4VL8-75KK. The Privacy Act was enacted two years earlier to protect sensitive personal data held by all federal agencies across the federal government. 5 U.S.C. § 552a; Sam Berger & Alex Tausanovitch, *Lessons From Watergate*, Ctr. for Am. Progress (July 30, 2018), https://perma.cc/M8XB-NDF8. Plaintiffs have pled that the Data Policy is contrary to both the Privacy Act and the Internal Revenue Code, but here move for relief solely on the basis of their APA contrary to law claim concerning the Internal Revenue Code as well as APA arbitrary and capricious claims.

5

A.    **Section 6103 Explicitly Limits Sharing of Taxpayer Data Within the Federal Government, Including When Requested for Purported Criminal Investigations.**

Section 6103 of the Internal Revenue Code requires that Plaintiffs' members' "[r]eturns and return information shall be confidential." 26 U.S.C. § 6103(a). It prohibits any inspection or disclosure of that information unless the requirements for one of the listed exceptions are met. *Id*. And its exceptions are either connected with tax administration or permit disclosure to other federal agencies only for specific, limited purposes. *See id.* §§ 6103(i), (j), and (l). Treasury Department officers and employees can only be granted access to inspect or disclose tax information where their "official duties require such inspection or disclosure for tax administration purposes." *Id*. § 6103(h)(1). And 26 U.S.C. § 7213A prohibits IRS employees and officers from inspecting returns or return information without authorization.

Section 6103 contains specific requirements for the sharing of taxpayer data when requested for criminal investigations conducted by other agencies. Section 6103(i)(2) provides that "return information" may be disclosed to "officers and employees of [a requesting federal] agency who are *personally and directly* engaged in" an investigation or proceeding "of a specifically designated criminal statute." *Id*. § 6103(i)(2)(A); (i)(1)(A) (emphasis added). To meet the requirements for sharing return information in response to a request under this provision, the requesting agency must provide the taxpayer's name and address, the taxable periods to which the requested return information relates, the specific criminal statutory authority under which the investigation or proceeding is being conducted, and the "specific reason or reasons" why disclosure of return information is relevant to the criminal investigation or proceeding. *Id*. § 6103(i)(2)(B). Further, certain disclosures require a court order, including disclosures made for the purpose of locating an individual. *See id.* § 6103(i)(1)(A), (i)(4), (i)(5).

6

**B.      IRS Policy has Long Stringently Protected Taxpayer Data.**

In conformance with Section 6103, the IRS has long restricted how personal and business information can be shared within and outside of the agency.[6] *See* Declaration of John Koskinen, Ex. 11 ("Koskinen Decl.") ¶ 8–12. For example, interagency sharing or combining of taxpayer information has been permitted "only where the agency can demonstrate, using established criteria, a need for the information that clearly outweighs taxpayer privacy interests and concerns about the effect on voluntary tax compliance."[7] Therefore, "if IRS [taxpayer] data is to be provided at all, the IRS should be the last stop—not the first—for information for purposes unrelated to tax administration."[8] The IRS's Internal Revenue Manual, therefore, requires employees to complete rigorous steps prior to disclosing any tax information under each provision of Sec. 6103.[9]

The combination of the IRS's adherence to statutory requirements, compliance with the IRS policy manual, and prioritization and implementation of privacy-protective practices has established a longstanding policy (the "Privacy Policy") that has spanned decades. The Privacy Policy was grounded in key principles, integrated into data-sharing and data-access decisions made by IRS leadership, based on statutory requirements and longstanding agency judgment.

---

[6] *See* IRM §§ 10.5.2.1.1, *Background, & 10.5.2.1.3, Responsibilities,* IRS (Jan. 27, 2020)*, https://perma.cc/JP7T-9WEX*; IRM §§ 11.3.28.1.1, *Background*, https://perma.cc/HY8W-QPJG, IRS (April 17, 2025) ("Congress decided that federal law enforcement officials should not have easier access to information about a taxpayer maintained by the IRS than they would have if they sought to compel the production of that information from the taxpayer themselves").

[7] Dep't of Treasury, *Report to the Congress on Scope and Use of Taxpayer Confidentiality and Disclosure Provisions, Vol. I: Study of General Provisions* at 9 (Oct. 2000), https://perma.cc/2LC2-M9F5.

[8] *Id*. at 34.

[9] *See generally* IRM § 11.3.28, *Disclosure to Federal Agencies for Administration of Non-Tax Criminal Laws*, IRS (Apr. 21, 2025), https://perma.cc/J7Z3-8FVS.

7

These included: prioritizing public trust;[10] protecting taxpayer information within the IRS *and* at agencies that receive taxpayer information, including by segregating taxpayer information across databases;[11] evaluating disclosures of taxpayer information on a case-by-case basis;[12] and disclosing IRS data only when other data cannot suffice.[13] This Privacy Policy has been well understood by the IRS and the public alike. For decades, the IRS has assured the American public that their data in its possession is confidential. As a 2013 publication for government employees put it: "The General Rule - Tax Information Is Confidential!"[14]

### C. The IRS's Longstanding Privacy Policy Extended to Requests for Return Information for Use in Criminal Investigations.

As the IRS itself states in its Manual, in enacting 6103(i), "Congress determined that federal law enforcement officials should not have easier access to information about a taxpayer maintained by the IRS than they would have if they sought to compel the production of that

---

[10] *See, e.g.*, IRS, Tax Information Security Guidelines at 23, https://perma.cc/9EEP-KZ6D ("The IRS must administer the disclosure provisions of the Internal Revenue Code (IRC) according to the spirit and intent of these laws, ever mindful of the public trust."); *Gardner v. United States*, 213 F.3d 735, 738 (D.C. Cir. 2000) ("This general ban on disclosure provides essential protection for the taxpayer…The assurance of privacy secured by § 6103 is fundamental to a tax system that relies upon self-reporting."); *see also* Jacob Bogage & Shannon Najmabadi, *Acting IRS chief to quit over deal to share data with immigration authorities*, Wash. Post (Apr. 9, 2025), https://perma.cc/D7XE-7FDD (explaining "the tax agency's longtime guarantee that taxpayers suspected of being in the country illegally wouldn't have their information turned over to immigration enforcement").

[11] Hannah Natanson, *et al.*, *DOGE aims to pool federal data, putting personal information at risk*, Wash. Post (May 7, 2025), https://perma.cc/9JCK-9K4W ("Separation and segmentation is one of the core principles in sound cybersecurity.'"); *see, e.g.*, IRS, *Tax Information Security Guidelines*, https://perma.cc/9EEP-KZ6D.

[12] *See, e.g.*, IRM § 11.3.22.2, *Disclosure to certain Federal Officers and Employees for Tax Administration Purposes under IRC 6103(h)*, IRS (Aug. 9, 2024), https://perma.cc/5ZN4-NM4E.

[13] *See, supra,* n.7, at 34.

[14] IRS, *Protecting Federal Tax Information for Government Employees*, Publication 4761 (Rev. 9-2013), https://perma.cc/5KYH-MNYB.

8

information from the taxpayer themselves."[15] The agency has judged that 6103(i) "establishes the general rule that a federal agency enforcing a non-tax criminal law must obtain court approval to obtain a return or return information."[16] Under the sub-provision 6103(i)(2), which creates a limited exception for which court approval is not required, Congress and the IRS have imposed numerous other safeguards, permitting disclosures of only very limited pieces of information and requiring the requesting agency to include a specific justifications for the information. For example, prior to April 17, 2025—when the Manual was updated—it directed IRS employees processing a Section 6103(i)(2) request to, *inter alia*, "analyze [the] request," "discuss" with the requesting law enforcement officer the "time frames and specific information requested," and "analyze" the requested return information "for potential redactions."[17]

## II.    Defendants Have Radically Shifted the IRS's Data Policy and are Rapidly Implementing it Through Sharing Data with DHS.

In this Administration, Defendants abruptly changed the IRS's longstanding Privacy Policy and implemented a permissive data-sharing policy that prioritizes the consolidation and inter-agency sharing of sensitive taxpayer information in the IRS's custody.  Under this new Data Policy, earlier this month Defendants began sharing IRS data *en masse,* through automated means, with ICE pursuant to an agreement with DHS, quickly responding to ICE requests for taxpayer information concerning more than a million individuals in one fell swoop.

---

[15] IRM § 11.3.28.1.1, *supra* n.6.

[16] *Id*.

[17] IRM § 11.3.28, Exhibit 11.3.28-2 *Processing IRC 6103(i)(2) Requests*, IRS (Aug. 11, 2023), https://web.archive.org/web/20250403125859/https://www.irs.gov/irm/part11/irm_11-003-028#idm139635074069120 (capture date April 3, 2025). These processing instructions were materially changed in the April 2025 updates, removing many of these cautions and safeguards. *Compare with* IRM § 11.3.41, Exhibit 11.3.41-6 *IRC 6103(i)(2) Case Processing Checklist*, IRS (April 18, 2025), https://www.irs.gov/irm/part11/irm_11-003-041#idm140113567748240.

9

A.    **Defendants Have Effectuated the Data Policy to Widely Share Taxpayer Data Throughout the Federal Government.**

Defendants have directed adoption of the new IRS Data Policy that abandoned the agency's prior promise that taxpayer information be kept confidential, including within the government, and that access and disclosures be strictly minimized.[18] The Data Policy (1) greatly expands access to and use of taxpayer information within the IRS; (2) consolidates data systems to facilitate broad, not segregated access within the agency; and (3) permits large-scale data-sharing with other agencies, unrelated to tax administration.[19]

Although the IRS has not announced the Policy publicly, it is apparent from recent IRS actions. For example, DOGE Affiliates at the IRS are building a single, unified database of taxpayer information within the IRS including through the use of a software tool—known as an application programming interface ("API")—that will permit automated access to all IRS taxpayer information by IRS employees in one interface.[20]

The new Data Policy is also revealed by, and led to significant changes in, how the IRS shares taxpayer information with other federal agencies for non-tax purposes. IRS DOGE Affiliates have worked to create an "omnibus" agreement, to allow federal agencies broad access to taxpayer information.[21] The IRS also finalized a broad agreement to share IRS data with ICE. *See* Ex. 4. Reflective of the policy, a whistleblower disclosed to Congress in April that DOGE

---

[18] *See* Makena Kelly, *Palantir Is Helping DOGE With a Massive IRS Data Project*, WIRED (Apr. 11, 2025),  https://perma.cc/AF3S-6QP7.

[19] *Id.*; Ex. 4; Ex. 1.

[20] Makena Kelly, *DOGE Is Planning a Hackathon at the IRS. It Wants Easier Access to Taxpayer Data*, WIRED (Apr. 5, 2025), https://perma.cc/3LRJ-FUAX; Rebecca Heilweil, *DOGE Rep Sam Corcos is Treasury's New Chief Information Officer, Source Says*, FedScoop (May 6, 2025), https://perma.cc/R34N-D8SB.

[21] Jacob Bogage & Jeff Stein, *DOGE Presses to Check Federal Benefits Payments Against IRS Tax Records*, Wash. Post (Mar. 1, 2025), https://perma.cc/EDZ5-53FK.

10

was building a "massive database of SSA data and data from across the federal government, including the [IRS], Department of Health and Human Services (HHS), and other agencies" and doing so "in a manner that disregards important cybersecurity and privacy considerations, potentially in violation of the law."[22] The Administration also intends to cross-reference and "reconcile" databases at different agencies for the purpose of "eliminat[ing] the waste and fraud,"[23] and, also has moved to gather information on SNAP recipients into a federal database that can be cross-referenced with other data,[24] like IRS taxpayer data.[25]

Some members of senior leadership at the IRS have resisted the new Data Policy, including on the basis that it violates the law, and have then been pushed out of the agency.[26] These leaders include multiple Acting IRS Commissioners, the Chief Risk Officer, the Chief Privacy Officer, the Chief Financial Officer, the Chief Information Officer, the subsequent Chief Information Officer, and approximately 50 senior IRS IT executives.[27]

---

[22] H. Comm. on Oversight & Gov't Reform Democrats, Press Release, *Disturbing Whistleblower Information Obtained by Committee Democrats Leads Ranking Member Connolly to Demand Investigation into DOGE's Disruption of Social Security Operations, Collection of Americans' Sensitive Data* (Apr. 17, 2025), https://perma.cc/24PE-7T6Z.

[23] Coral Davenport, *DOGE Accesses Federal Payroll System Over Objections of Career Staff*, N.Y. Times (Mar. 31, 2025), https://perma.cc/L6L3-7REC.

[24] 90 Fed. Reg. 26521 (June 23, 2025).

[25] Jude Joffe-Block & Stephen Fowler, *USDA, DOGE demand states hand over personal data about food stamp recipients*, NPR (May 9, 2025), https://perma.cc/5LJP-2SZH.

[26] Nathan Layne & Kanishka Singh, *Top IRS Officials Join Chief in Quitting Following Immigration Data Deal*, Reuters (Apr. 9, 2025), https://perma.cc/X3JX-G5ZF; Erin Slowey, *IRS Head, Privacy Chief to Quit After Immigration Data Deal (1)*, Bloomberg Tax (Apr. 8, 2025), https://perma.cc/HMF6-FYLL; Matt Bracken, *IRS Cuts About 50 IT Executives, Sources Say*, FedScoop (Mar. 29, 2025), https://perma.cc/J8DT-MGYW.

[27] *See also* Natanson, *et al.*, *DOGE aims to pool federal data, putting personal information at risk*, Wash. Post (May 7, 2025), https://perma.cc/9JCK-9K4W/ (losing even "three agency leaders in three months is 'unprecedented'").

11

**B.    Defendants Are Now Implementing the Data Policy at Scale, Responding to Mass ICE Requests for IRS Data.**

Defendants are now implementing the Data Policy, sharing sensitive taxpayer data at enormous scale. The IRS has acknowledged that information sharing with ICE has begun and that is being carried out pursuant to the Memorandum of Understanding ("MOU") it executed with ICE in April 2025 and pursuant to Section 6103(i)(2).[28] The MOU authorizes ICE to request "address information," specifically "the last known address for each individual in each request." *See* Ex. 4, at 2. The MOU incorporates the requirements in Section 6103(i)(2) of the Internal Revenue Code and requires ICE to provide in its request the taxpayer's name and address, the relevant tax year, the criminal statutory provision under which the taxpayer is facing an investigation, and the identity of "the ICE officers and employees personally and directly engaged in the nontax criminal investigation." *See* Ex. 4, at 3. Given that the stated purpose of the MOU is to obtain accurate, current addresses, the "address" that it says ICE will include in requests is presumably one known to be out of date or inaccurate. The agreement also restates the Section 6103(i)(2) requirement that information is only to be used "by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings" under the criminal statute specified in their request. *Id.*

Despite the statutory and MOU requirements that limit the IRS to sharing data only when specific requirements met, including identification of law enforcement officers "personally and directly engaged" in the relevant criminal investigation, the scale of recent data sharing is massive and rapid. In the week of August 4, 2025, ICE requested that the IRS provide the personal information for 1.23 *million* individuals in a mass request for data on individuals that

---

[28] Defs.' Notice in Status of Requests for Return Information, *Centro de Trabajadores Unidos v. Bessent*, No. 1:25-cv-00677 (D.D.C. Aug. 12, 2025), ECF No. 72 (Ex. 5).

12

ICE believes are in the country without valid immigration status. *See* Ex. 1. The IRS processed this request within days and provided home addresses from the tax return information of tens of thousands of individuals before the end of the week, *id.*, despite statutory bars and long-standing policies against such disclosures. White House officials pushed the IRS to release even more information, including whether the individuals the IRS identified had claimed the Earned Income Tax Credit.[29] Shortly after the IRS refused that request, the President removed the recently confirmed IRS Commissioner and replaced him with Defendant Treasury Secretary Bessent in an acting capacity.

This mass sharing of data under the Data Policy follows the then-acting general counsel of the IRS Andew De Mello's refusal "to turn over the addresses of 7.3 million taxpayers sought by ICE" after identifying numerous legal deficiencies in the agency's request.[30] Two days later, he was forced out of his job.[31] Another former senior IRS official stated that demands for this amount of data, for these purposes, was "unprecedented" and amounted to "a big data dump."[32] This request was also under the MOU between the IRS and ICE.[33]

The disclosures now occurring from the IRS to ICE within a single week under the Data Policy are unprecedented. In 2023, the IRS reported no disclosures to DHS. In total the agency reported 75,647 disclosures to the Department of Justice, U.S. Attorneys, and other federal law

---

[29] Jacob Bogage & Kadia Goba, *IRS, White House clashed over immigrants' data before tax chief was ousted*, Wash. Post (Aug. 9, 2025), https://perma.cc/K2PN-WEKR (Ex. 2).
[30] William Turton, *et al.*, *The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE*, ProPublica (July 15, 2025), https://perma.cc/6XGQ-KX6T (Ex. 3).
[31] *Id.*
[32] *Id.*
[33] Aravind Vodupalli, *The New ICE-IRS Data Sharing Agreement Has Three Problems*, Tax Pol'y Ctr. (Apr. 21, 2025), https://perma.cc/FY7J-VTL8 (citing Ex. 4).

13

enforcement agencies.[34] The year before, it reported 43,141 disclosures to those agencies, and none to DHS.[35] The recent disclosures made in a matter of days rival the total annual IRS disclosures under 6103(i)(2) to *all* law enforcement agencies, and the IRS has never made such disclosures to ICE.

The IRS has represented in court that "IRS cannot share information under Section 6103(i)(2) for civil immigration enforcement."[36] However, the Administration has clearly stated that the purpose of the IRS's data sharing *is* to support civil enforcement of immigration laws,[37] rather than to conduct *bona fide* investigations of non-tax criminal laws. In response to investigative reporting by ProPublica in July 2025, detailing the mechanics of the IRS's data sharing process with ICE, a White House spokesperson said:

> ProPublica . . . suggests we should turn a blind eye to criminal illegal aliens present in the United States for the sake of trying to collect tax payments from them. . . . This isn't a surveillance system. . . . It's part of President Trump's promise to carry out the mass deportation of criminal illegal aliens. . . ."

*See* Ex. 3.

### III. The Implementation of the Data Policy Harms Plaintiffs, Their Clients, and Their Members.

The impact of the IRS's effectuation and implementation of the Data Policy through its mass data sharing with ICE has been swift and significant, including harms to (1) the Center's

---

[34] IRS, Joint Comm. on Tax'n, *Disclosure Report For Public Inspection Pursuant To Internal Revenue Code Section 6103(P)(3)(C) For Calendar Year 2023 (JCX-14-24)* (Apr. 25, 2025), https://perma.cc/5A86-ZSJN.

[35] IRS, Joint Comm. on Tax'n, *Disclosure Report For Public Inspection Pursuant To Internal Revenue Code Section 6103(p)(3)(C) For Calendar Year 2022 (JCX-6-23)* (Apr. 18, 2023), https://perma.cc/GM8S-R5KU.

[36] Defs.' Resp. to Amicus Brs., *Centro de Trabajadores v. Bessent*, Case No. 25-677-DLF (D.D.C. May 7, 2025), ECF No. 66.

[37] A deportation (i.e., removal) proceeding is a "a purely civil action." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984).

14

clients and Plaintiffs' taxpaying members, whose data has already been disclosed or is at imminent risk of disclosure for purposes of immigration enforcement and in violation of the law and their privacy interests, (2) the Center's ability to provide services, advise its clients, and further its mission, and (3) the Center's clients and MSA's members' ability to interact with the tax system to receive benefits to which they are entitled.

The IRS has, to date, disclosed to ICE the confidential information of tens of thousands of taxpayers. Immigrant taxpayers, including the Center's clients and MSA's members, have either been included in these disclosures or face an imminent risk that their data will be disclosed. ICE has asked IRS to provide data about as many as 7.3 million taxpayers, *see* Ex. 3—a number that likely exceeds the total number of active ITIN holders, *see* Declaration of Nina Olson, Ex. 6 ("Olson Decl.") ¶ 74, suggesting all ITIN holders will likely be swept up in this data transfer. ITIN tax filers number among the Center's clients and MSA's members. Olson Decl. ¶ 17, 42; Declaration of Shawn Phetteplace, Ex. 7 ("Phetteplace Decl.") at ¶ 9.

Immigrant taxpayers whose data is disclosed are also placed at heightened risk of having that data used illegally for immigration enforcement, exposing them to ICE raids, detention, and even removal from the country. Given the risks of misidentification posed by this process, *see* Olson Decl. ¶ 75-78; Phetteplace Decl. ¶ 15; Declaration of Jane Doe, Ex. 8 ("Jane Doe Decl.") ¶ 23-24, all taxpayers whose data is shared face this risk, regardless of whether they have pending orders of removal or are otherwise subject to immigration enforcement. The IRS's data-sharing practices have consequently instilled deep and legitimate fear in immigrant communities. *See* Olson Decl. ¶ 50, 62-63, 72-75; Phetteplace Decl. ¶ 7-8, 12-14. And these risks, caused by the IRS's data-sharing, are standing in the way of people—including the Center's clients and MSA's members, on whose behalf they sued—engaging with the tax system by applying for

15

ITINs, filing tax returns, or otherwise engaging in IRS processes, losing time-sensitive opportunities to preserve their rights, including to benefits to which they are entitled. *See* Olson Decl. ¶ 79-90); Phetteplace Decl. ¶ 14. For example, at least one of the Center's Low Income Taxpayer Clinic ("LITC") clients is choosing to forgo a $500 credit to which they are entitled, to avoid providing further information to the IRS in fear of its being shared (Olson Decl. ¶ 48); at least one client is entitled to a refund of excess tax withholdings, but is electing not to file a tax return for the same reason (*Id*. ¶ 49). In these and other cases, the pecuniary losses will become irrevocable if the taxpayer cannot safely file a return by the relevant IRS deadline. (*Id*. ¶ 89)

Members of Plaintiff MSA—including small business owners who are immigrants and who employ immigrants and ITIN filers (Phetteplace Decl. ¶ 6; Jane Doe Decl. ¶ 26), as well as include low-income sole proprietors eligible for the EITC, CTC, and other refundable credits (MSA Decl. ¶ 4, 12; Jane Doe Decl., ¶ 10, 23), face similar harms in connection with their personal and business-related tax returns. Some MSA members are themselves or have spouses or family members in the category of taxpayers targeted for this unlawful data sharing. Phetteplace Decl. ¶ 8. Others face challenges to their businesses because their employees are harmed. Phetteplace Decl. ¶ 6, 8, 10; Jane Doe Decl. ¶ 26-28.

The Center itself is also suffering organizational harm from Defendants' actions. It faces significant hurdles to fulfil its mission and to provide the services and programming on which its clients, members, and communities rely. Its mission is to advance taxpayer rights, promote trust in the tax system, and increase access to justice in the tax system. Olson Decl. ¶ 3-6. Its work focuses on the most vulnerable populations, including immigrants, people whose first language is not English, low-income people, and domestic violence survivors. *Id*. ¶ 3. Plaintiffs pursue this mission by, *e.g.*: (1) running a LITC, *id*. ¶ 4, 7-18; (2) conducting education and outreach on the

16

role taxpayer rights play in promoting "trust in systems of taxation," *id*. ¶ 6, 21-27; and (3) running LITC Connect, a nationwide network of other LITCs, attorneys, accounts, and enrolled agents, id. ¶ 19-20. The trust and confidentiality protections afforded by the law—and, historically, by the IRS—are foundational to the Center's work, and the Center relies upon them. *Id*. ¶ 28-39. Since its founding, the Center has advised and encouraged its clients and target populations to file their taxes, because their information is adequately protected by the IRS and will not be used for immigration enforcement purposes. *Id*. ¶ 34, 47. The Data Policy has made that almost impossible, despite dedication of more time, money, and resources to these efforts.

Because of the IRS's data sharing with ICE, taxpayers and prospective taxpayers "have become less willing to come to the Center's events, seek its guidance, or engage with the Center's education and outreach," and—for example—the Center has held only a tenth of the events it did compared to last year. *Id*. ¶ 41-44. These obstacles materially limit the Center's ability to further its mission of promoting trust in the tax system or its funding-related obligations to educate these taxpayer populations about their rights and responsibilities. *Id*. ¶ 40-46. Although the Center has dedicated increased resources to these efforts, it still faces a significant frustration of its mission. *Id*. ¶ 45-46, 52-53. Once these taxpayers' trust in the tax system is lost, it will be very difficult—and, for some taxpayers, impossible—to restore. *Id*. ¶ 53.

The Data Policy has also created significant obstacles to the Center serving its clients. Id. ¶ 47-51. The Center's LITC can also no longer responsibly provide substantive advice to its immigrant clients about whether they can safely—or should—engage with the IRS by applying for ITINs, filing tax returns, or otherwise participating in IRS processes. *Id*. ¶ 47. Although the law provides strong privacy protections, the Center's attorneys cannot reconcile the IRS's current conduct with the law. *Id*.

17

LITC Connect members are suffering similar harms. *Id.* ¶ 55-68. They "are also experiencing a significant drop-off in the willingness of taxpayers to attend and engage with their education and outreach efforts, particularly among those who do not speak English as a first language and who are more likely to be immigrants." *Id.* ¶ 55. The volume of calls from Hispanic taxpayers has noticeably decreased and is nearing a standstill. *Id.* ¶ 56. The Center's LITC Connect is designed to support these member clinics and practitioners. The Center is unable to navigate this drastic and unlawful change, and it has harmed its ability to provide advice, outreach, and support to the network. *Id.* ¶ 69-70.

The members of Plaintiffs National Federation of Federal Employees ("NFFE") and Communications Workers of America ("CWA") are also harmed by the Data Policy and its implementation to permit mass disclosures of sensitive taxpayer information to ICE. Plaintiff unions NFFE and CWA have hundreds of thousands of public and private sector members and employees whose sensitive information—including their Social Security or taxpayer identification numbers; names and addresses; taxable income; marital status; and information, such as medical expenses, relating to eligibility for tax deductions and credits—is held by the IRS. Am. Compl. ¶ 47–53; Declaration of Yvette Piacsek, Ex. 9 ("Piacsek Decl.) ¶ 3; Declaration of John Doe, Ex. 10 ("John Doe Decl.") ¶ 3-4. They each have members who are low-income workers eligible for the Earned Income Tax Credit ("EITC") and the Child Tax Credit ("CTC"). Am. Compl. ¶ 49–50, 53; Piacsek Decl. ¶ 5. Many NFFE members are citizens who immigrated to the United States and have family members and loved ones that they worry will be harmed by the Data Policy. Piacsek Decl. ¶ 6-9; John Doe Decl. ¶ 5-6.

18

### LEGAL STANDARDS

The Administrative Procedure Act ("APA") permits plaintiffs to seek judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Reviewable "agency action" "includes the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). A reviewing court shall "hold unlawful and set aside" agency actions found to be "arbitrary, capricious," or "otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Section 705 of the APA authorizes a court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The court may do so "[o]n such conditions as may be required and to the extent necessary to prevent irreparable injury." *Id*. "The factors governing issuance of a section 705 stay are the same as those that govern the grant of a preliminary injunction." *Coal. for Humane Immigrant Rts. v. Noem*, No. 25-872-JMC, 2025 WL 2192986, at *12 (D.D.C. Aug. 1, 2025). To obtain this preliminary relief, "the moving party must show: (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the [preliminary relief motion] were not granted, (3) that [such an order] would not substantially injure other interested parties, and (4) that the public interest would be furthered" by the order. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "In a case like this one, where the Government is the non-movant, the third and fourth factors merge." *Coal. for Humane Immigr. Rts.*, 2025 WL 2192986, at *12.

19

## ARGUMENT

**I.    Plaintiffs are Likely to Succeed on the Merits of Their Claims Because the Data Policy Violates the APA.**

**A.    The Data Policy is Final Agency Action and There Is No Adequate Remedy Other Than APA Review**

The Data Policy—described above, *see, supra,* Background § II— (1) greatly expands access to and use of taxpayer information within the IRS; (2) consolidates data systems to facilitate broad, not segregated access within the agency; and (3) permits large-scale data-sharing with other agencies, unrelated to tax administration, amounts to a wholesale rewrite of the IRS's data privacy policy. The Data Policy constitutes final agency action and is subject to the APA's provisions for judicial review.

Final agency actions are those (1) which "mark the consummation of the agency's decisionmaking process," as opposed to decisions of a "merely tentative or interlocutory nature;" and (2) "by which rights or obligations have been determined, or from which legal consequences will flow." *Army Corps of Eng'rs v. Hawkes Co*, 578 U.S. 590, 597 (2016). Consummation means that the agency has reached a decision on the issue before it and effectuated it in some manner; it need not be reduced to a written statement. *See, e.g., Her Majesty the Queen*, 912 F.2d at 1531 ("[T]he absence of a formal statement of the agency's position, as here, is not dispositive[.]"); *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) ("Agency action . . . need not be in writing to be final and judicially reviewable.").

D.C. Circuit precedent leaves no doubt that a policy permitting disclosure of information is final agency action. In *Venetian Casino Resort v. EEOC*, 530 F.3d 925, 931 (D.C. Cir. 2008), the court of appeals held that the EEOC's adoption of a policy allowing disclosure of an employer's confidential information without notice to that employer constituted final agency

20

action reviewable under the APA. The D.C. Circuit viewed this as so self-evident that the sum of its discussion of the issue is that the policy "is surely a 'consummation of the agency's decisionmaking process,' and 'one by which . . . rights [and] obligations have been determined.'" *Id*. (quoting *Bennett*, 520 U.S. at 177–78); *see also Chrysler Corp. v. Brown*, 441 U.S. 281, 318-19 (1979) (holding that a "decision to disclose [reports under FOIA] is reviewable agency action" under the APA).

Defendants' action constitutes final agency action. In evaluating the first *Bennett* prong, the D.C. Circuit considers "whether the action is 'informal, or only the ruling of a subordinate official, or tentative.'" *Soundboard Ass'n v. F.T.C.*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 151 (1967)). The decision to disclose extraordinarily sensitive government information and data protected by law to other agencies, and to do so without a permissible purpose is not tentative or informal; rather, it is a final determination of agency policy and practice. Further, agency leadership approval of an agency action is a "signpost[] of authoritative determination, finality[,] and ripeness." *Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C. Cir. 1971). As discussed *supra*, any leadership that has disagreed with the implementation of Defendants' new policy has been quickly removed from their position or pushed out of the IRS.

Defendants' action also recognizes that this action is not informal; the Data Policy has been implemented in several concrete ways, including through the data-sharing agreement with ICE that far exceeds what had previously been permissible under IRS policy and the development of the technical infrastructure necessary for mass data sharing. *See*, *supra*,

21

Background § II(A).[38] Now, Defendants have actually shared unprecedented swaths of taxpayers' data with ICE under this new Data Policy, establishing its finality. *See*, *supra*, Background § II(B). This action is not tentative; the policy has been implemented, and disclosure of sensitive information, pursuant to the Data Policy, has begun. Analysis of the second *Bennett* prong is equally clear: Defendants' decision has determined their obligations to disclose data and information within their control and the right of DOGE Affiliates, IRS employees, and other agencies to access it. It has also affected the rights of the individuals and entities with privacy interests in that data and created significant legal consequences via unlawfully expanding access to and disclosure of taxpayer information in violation of those individuals' statutory rights to have that data protected under the Internal Revenue Code. As in *Venetian Casino*, such actions determine rights and obligations. 530 F.3d at 931.

Further, there is no other adequate remedy available that would preclude the court's review of this action under the APA. In assessing whether such an alternative "adequate remedy" exists, there is a strong presumption that agency actions are reviewable under the APA. *Abbott Labs* 387 U.S. at 140. Here, the only other plausible remedies to the Data Policy are discrete damages provisions for unlawful access or disclosure under the Internal Revenue Code. *See* 26 U.S.C. § 7431. Backward-looking damages for discrete instances of unlawful access are inadequate to address a policy of ongoing data sharing at mass scale. Other courts in this circuit have repeatedly held that similar provisions within the Privacy Act do not provide an adequate remedy precluding APA review. The same logic applies here. *See Doe v. Stephens*, 851 F.2d 1457, 1460–61, 1463 (D.C. Cir. 1988); *Radack v. DOJ*, 402 F. Supp. 2d 99, 104 (D.D.C. 2005);

---

[38] As noted *supra* note 17, Defendants have also revised the IRS Manual to remove privacy safeguards and procedural barriers to effectuating the MOU.

*AFL-CIO v. DOL*, No. 25-339, 2025 WL 1129227, at *16 (D.D.C. Apr. 16, 2025) (citing *Doe v. Chao*, 540 U.S. 614, 619 n.1 (2004)). The Data Policy is reviewable final agency action.

### B.    The Data Policy Violates the Internal Revenue Code

Under the APA, a reviewing court shall "set aside agency action . . . found to be . . . not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). An "agency action is 'not in accordance with law' if it violates some extant federal statute or regulation." *Ovintiv USA, Inc. v. Haaland*, 665 F. Supp. 3d 59, 72 (D.D.C. 2023). The Data Policy is contrary to law because it authorizes widespread sharing of protected taxpayer data across the federal government, without necessary safeguards, that necessarily violates Section 6103. The Data Policy also exceeds statutory authority, as nothing permits the disclosures made and imminently planned by the IRS. *See* 5 U.S.C. § 706(2)(A), (C). The IRS's MOU with ICE and its recent sharing of return information *en masse*—both carried out under the Data Policy—demonstrate the Policy's unlawfulness because they violate the stringent requirements of Section 6103(i)(2).

Sec. 6103(i)—the only exception to the confidentiality of taxpayer information that the IRS or ICE has invoked in connection with these data transfers—permits disclosures to federal officers or employees for administration of federal laws not relating to tax administration. See 26 U.S.C. § 6103(i). Subpart (1) allows disclosures only pursuant to a court order. *Id*. at § 6103(i)(1). Subpart (2) allows for the disclosure of a narrower category of information— "return information other than taxpayer return information," for use in criminal investigations, without requiring a court order. *Id*. at § 6103(ii). The requesting agency must provide: (i) the *name and address* of the taxpayer with respect to whom the requested return information relates; (ii) the taxable period or periods to which such return information relates; (iii) the statutory

23

authority under which the proceeding or investigation is being conducted; and (iv) the *specific reason* or reasons why such disclosure is, or may be, relevant to such proceeding or investigation. *Id*. The limited category of information that may be disclosed under (i)(2) excludes any information provided to the IRS by or on behalf of the taxpayer themselves. *Id*. As the Internal Revenue Manual explains, 6103(i)(2) requests are typically made by U.S. Attorney's Offices requesting such things as "fact of filing information" (i.e. whether an individual has filed a tax return).[39]

Sec. 6103(i)(2) requires guardrails for disclosing this limited subset of return information, but the IRS's recent transfer of data to ICE breached them all. First, the IRS may only disclose data after receiving a request "which meets the requirements of subparagraph (B)." 26 U.S.C. § 6103(i)(2)(A). However, the IRS cannot have undertaken any meaningful review of the *en masse* request it received from ICE to ensure compliance, given the speed with which it was processed. Rather than requiring a careful review by IRS employees, the IRS developed an automated process that simply processes searches and returns results as long as ICE filled in all the columns in a spreadsheet. *See* Ex. 3. Thus, the IRS was able to process as many as 1.23 million requests for information, within days of receipt of the requests. *See* Ex. 1. In making these automated disclosures, the IRS cannot be complying with its obligations to confirm compliance with Section 6103(i)(2) before transferring data.

*Second,* Section 6103(i)(2) requires that the request include "the name and address of the taxpayer." Under the plain text of the statute, the requests fail to meet this requirement. Yet ICE is *seeking* addresses for these individuals. *See* Ex. 1. While DHS may have former or inaccurate

---

[39] IRM § 11.3.28.4, *Disclosure of Return Information (Other Than Taxpayer Return Information) Pursuant to IRC 6103(i)(2),* IRS (April 17, 2025), https://perma.cc/AN57-7XR8 at (4).

24

addresses, the statute is straightforward—it requires that the requester include the "name and address," not name and a *former* address, or a *suspected* address. There are good reasons for this requirement, including ensuring that the IRS provides information on the correct taxpayer in response to a request.

It is also why for over 40 years the IRS has interpreted the law to prohibit disclosures under Section 6103(i)(2) for requests seeking address information. This question has been assessed by numerous administrations. In 1982, the IRS determined addresses should not be disclosed under 6103(i)(2). *See* Olson Decl. ¶ 31; *Wayte v. United States*, 470 U.S. 598, 613 (1985) (noting that the Secret Service had attempted to obtain address information from the IRS, but could "gain no useful access" to the data under the 26 U.S.C. § 6013). This position has remained consistent since 1982.[40] Indeed, he IRS Manual is clear: "Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address."[41] The Court's "respect" is "especially warranted" for this "Executive Branch interpretation [that] was issued roughly contemporaneously with enactment of the statute and remained consistent over time." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024). The Data Policy is contrary to law.

Reading Section 6103(i)(2) in the "context of the statute as a whole" reinforces the conclusion that it does not permit sharing taxpayers' addresses to allow ICE to locate individuals for immigration enforcement or because of a suspicion of criminal conduct. *See Robinson v.*

---

[40] *E.g.*, GAO, *Internal Revenue Service: Individual Taxpayer Identification Numbers Can Be Improperly Obtained and Used* (Mar 10, 2004), https://perma.cc/AK35-2P6V ("Section 6103 ... allows IRS to disclose taxpayer information to federal agencies and authorized employees of those agencies, but only under specific conditions. Section 6103 does not currently authorize data sharing between IRS and DHS specifically for immigration enforcement.")
[41] IRM § 11.3.28.4, *supra* n.39, at (5); *see also* IRS Pub. 4639, *Disclosure & Privacy Law Reference Guide*, 5–4 (rev. 2012), https://perma.cc/3GQR-TPWT ("Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section.")

25

*Shell Oil Co.*, 519 U.S. 337, 341 (1997). There is a separate provision of 6103(i) designed for these purposes: 6103(i)(5) explicitly pertains to disclosures to "locate fugitives from justice." Statements by the Administration, as well as the MOU between ICE and the IRS, make clear that locating individuals suspected of violating immigration law, not prosecuting them criminally, is the intent of the disclosures at issue here. *See* Ex. 3; Ex. 4. But disclosures under 6103(i)(5), for "use in locating [an] individual," require a court order; Defendants do not have one.

*Third*, the IRS is authorized to provide the requested information *only* to specific officers and employees of the requesting agency who are "personally and directly engaged" in preparation for a criminal judicial or administrative proceeding, an investigation which may result in such a proceeding, or certain grand jury proceedings. 26 U.S.C. § 6103(i)(2). It does not permit the IRS to disclose information to a receiving agency liaison or data analyst, to be further passed along at the receiving agency's discretion. Rather, Section 6103(i)(2) specifies that the information may be used by *only* those officers and employees personally and directly engaged in that preparation, as identified in the request, and *solely* for that preparation. *Id*. This requirement is an important safeguard against broad dissemination of confidential information, after it leaves the IRS's control. ICE—an agency of around 21,000 employees, across all functions[42]—cannot have identified enough employees to competently attest they are "personally and directly engaged" in criminal investigations of 1.23 million people, or even 40,000.

*Fourth*, whether a taxpayer qualifies for the Earned Income Tax Credit ("EITC") is "taxpayer return information" and cannot be disclosed in response to a Section 6103(i)(2) request. Yet when the White House contacted the IRS on August 8 to follow up on ICE's

---

[42]DHS, U.S. Immigration and Customs Enforcement, Budget Overview (Fiscal Year 2024), https://perma.cc/F23X-EU4J, at 7.

requests, officials requested additional information on the taxpayers the IRS identified—specifically, whether any had claimed the EITC. *See* Ex. 1; Ex. 2. This too violated the statute.[43]

*Fifth,* taxpayer information may only be disclosed based on—and must be used *solely* for purposes of preparation for—a criminal judicial or administrative proceeding, an investigation which may result in such a proceeding, or certain grand jury proceedings. 26 U.S.C. § 6103(i)(2). While the information ICE seeks here may *relate* to individuals facing deportation and who could theoretically be subject to federal criminal investigation, it is *sought* to confirm their home addresses so they can be located. *See* Ex. 1. And exclusion and removal of non-citizens in the United States is a matter of *civil* immigration law, not federal criminal law. ICE intends to use the information for removal or deportation purposes, as the Administration has stated both publicly and in the MOU;[44] the disclosures are therefore unlawful.

This requirement is set forth twice in (i)(2). It states that recipients of the information may only use the information for the preparation for a proceeding or an investigation that may result in such a proceeding, and that any requests for disclosure must set forth the "*specific* reason or reasons why such a disclosure is, or may be, relevant to such proceeding or investigation." *Id.* ICE's requests for information on tens or hundreds of thousands of taxpayers cannot set forth a *specific* reason for each disclosure. A boilerplate reason for all individuals

---

[43] The White House, incidentally, is not entitled to request taxpayer information from the IRS under Section 6103(i)(2); it may only do so under a different provision—Section 6103(g)—and there is no indication that such a request was properly made here.

[44] The MOU Introduction (Ex. 4, p. 1) emphasizes the impetus for the agreement as Exec. Order No. 14161, which directs certain agencies to "take immediate steps to identify, exclude, or remove aliens illegally present in the United States." Exec. Order No. 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, 90 Fed Reg. 8451 (Jan. 30, 2025). *See also* Ex. 3 ("It's part of President Trump's promise to carry out the mass deportation of criminal illegal aliens.")

27

would not be "specific," or that word would have no meaning in the statute. These disclosures under the Data Policy are therefore also violative of Section 6103(i)(2).

That the IRS did not locate matches for and disclose data about all of the people identified in ICE's request provides Plaintiffs with little relief; the IRS disclosed information about tens of thousands of taxpayers already, and the same day that the IRS said it could not satisfy the balance of the request, Commissioner Long was "ousted" by the Administration. *See* Ex. 2. Such an act makes clear: wide disclosure of data under the Data Policy is required, and anyone who opposes or expresses concerns with its legality and implementation, particularly with respect to disclosures to DHS, will be removed.

Courts must exercise their "independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*. In this instance, Defendants have not. Thus, the Data Policy is unlawful and must be stayed with respect to these disclosures to ICE.

### C.     The Data Policy is Arbitrary and Capricious

Defendants' Data Policy is also arbitrary and capricious. The APA "requires agencies to engage in "reasoned decisionmaking." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)). That requires the agency to "articulate a satisfactory explanation for its action," which includes "display[ing] awareness that it is changing position" and "that there are good reasons for the new policy." *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 513, 515 (2009). Agency actions "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks and citation omitted). "Normally, an agency [action] would be arbitrary and capricious if the agency . . . entirely failed to consider an

28

important aspect of the problem . . . or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* And finally, an agency must provide "a more detailed justification than what would suffice for a new policy created on a blank slate" when "its prior policy has engendered serious reliance interests that must be taken into account." *Id.* at 515; *see also Am. Bar Ass'n v. Dep't of Educ.*, 370 F. Supp. 3d 1, 33 (D.D.C. 2019).

### 1. The Defendant Agencies Have Not Acknowledged or Justified Their Change in Policy

Defendants' Data Policy has led to the disclosure of sensitive data regarding thousands of individuals, with potentially tens of thousands to millions more imminent, with no meaningful acknowledgement or justification from the Defendants regarding this significant change in position. "'[A]n '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice.'" *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016). "An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books," and it must "show that there are good reasons for the new policy." *State Farm*, 556 U.S. at 515. While an agency need not "demonstrate . . . that the reasons for the new policy are *better* than the reasons for the old one" or "provide a more detailed justification than what would suffice for a new policy created on a blank slate," it must at least "display awareness that it *is* changing position." *Id.*

In 2017, the IRS in the first Trump Administration made clear that it "has strong processes in place to protect the confidentiality of taxpayer information, and this includes information related to tax returns filed using ITINs."[45] The agency was clear that "[t]here is no

---

[45] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://perma.cc/8JVS-K4KR.

29

authorization under this provision to share tax data with ICE."[46] That position did not change during the following administration. "Requests for addresses only are invalid" under Section(i)(2) according to the IRS Manual.[47] But the recent mass disclosures of data from IRS to ICE, as well as the imminent additional disclosures, make plain: this policy has been reversed, without explanation. The Data Policy is unacknowledged and unexplained.

Defendants have failed to even attempt to present a reasoned basis for the wholesale changes they have made.[48] The Data Policy is, therefore, arbitrary and capricious. *E.g., Fox*, 556 U.S. at 513; *Encino Motorcars*, 579 U.S. at 222.

## 2.    Defendants Failed to Consider Key Issues in Adopting the Data Policy

An agency action is arbitrary and capricious if the agency "failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. In the scramble to consolidate internal access to and share with other agencies sensitive taxpayer information, Defendants lost sight of all other considerations—(1) the need to protect taxpayers' privacy, (2) the impact on participation and trust in the tax system, and (3) the harm that could result from disclosures, and in particular mistaken disclosures. Because Defendants did not consider these important factors, the policy is arbitrary and capricious.

*First,* the Internal Revenue Code and IRS's own regulations make clear it was important to consider taxpayers' privacy. The Taxpayer Bill of Rights gives individuals the right to privacy and the right to confidentiality. 26 U.S.C. § 7803(a)(3). Section 6103 makes clear that "returns and return information shall be confidential," with limited exceptions, and imposes criminal

---

[46] *Id*.

[47] IRM § 11.3.28.4, *supra* n.39, at (5).

[48] Defendants have not acknowledged or explained, for example, the changes it has made to the IRS Manual, *supra* note 17.

penalties for violations. IRS websites tell taxpayers that their information will be protected, and any examination by the IRS will be "no more intrusive than necessary."[49] Taxpayer data "is among the most confidential in the federal government."[50] Ex. 3; *see also* Koskinen Decl. ¶ 4-7. And rightfully so—the IRS holds incredibly sensitive information on millions of individuals and businesses.[51] Yet Defendants have provided no explanation to indicate they considered this critical factor.

*Second*, Defendants failed to evaluate the impact of the Data Policy, and the disclosures to ICE pursuant to it, on participation and trust in the tax system and, consequently, on tax revenue, which the Supreme Court has described as "the lifeblood of government." *Bull v. United States*, 295 U.S. 247, 259 (1935). Since 1985, the Internal Revenue Code has taxed "resident aliens"—including anyone who satisfies the "substantial presence" test defined in 26 U.S.C. § 7701(b)(3), regardless of immigration status—along with U.S. citizens, consciously sweeping in more taxpayers than have documented immigration status. Olson Decl. ¶ 14. And the IRS has "long assessed that it is critical to assure taxpayers that their sensitive information is protected and secure to support the integrity of the tax system and to encourage taxpayers to file returns and pay their taxes." Koskinen Decl. ¶ 7. For one, undocumented immigrants contribute significant revenue to the federal tax system—$59.4 billion in 2022 alone.[52] The IRS is expected to lose $12 billion in revenue this year, and more than $313 billion over the next decade, "as

---

[49] IRS, *Taxpayer Privacy Isn't Just a Right – It's the Law*, https://perma.cc/EP3T-HKRL (last visited Aug. 18, 2025).

[50] William Turton, *et al.*, *The IRS is Building a Vast System to Share Millions of Taxpayers' Data with ICE*, ProPublica (July 15, 2025), https://perma.cc/F87T-GUHB; *see also* Koskinen Decl.

[51] *See, e.g.*, Kris Cox, *IRS-ICE Agreement Weakening Privacy Protections Poses Risks for All Taxpayers*, Ctr. on Budget & Pol'y Priorities (Apr. 21, 2025), https://perma.cc/9D7T-MPXK.

[52] Carl Davis, et al., *Tax Payments by Undocumented Immigrants*, Inst. on Tax'n & Econ. Pol'y (July, 30, 2024), https://perma.cc/HV9A-TLAK; *see also* Liana Wang, *The IRS-ICE Deal Threatens All Workers*, OnLabor (May 26, 2025), https://perma.cc/CK3M-CG5U.

31

undocumented workers are poised to pay fewer taxes after the agency struck a deal to share data with U.S. immigration authorities."[53]

Further, trust and participation in the tax system facilitates the public benefit of individuals getting access to tax credits and refunds that Congress has determined they should have as a matter of public policy.[54] These include credits and deductions Congress has enacted to benefit people with children, with low incomes, paying for college, and others.[55]

*Third*, Defendants failed to consider the harm that could result from large-scale disclosures of taxpayer information under the Data Policy. Koskinen Decl ¶ 7 ("the confidentiality and limited sharing of taxpayer data is critical to preventing tax filing fraud by criminal actors using taxpayer information"). In particular, Defendants' automated haste under the Data Policy can reasonably be expected to "ramp up the risk of exposing data to hackers and other adversaries."[56] Searches run on name and (potentially out-of-date) address alone, as ICE seeks under the Data Policy, are likely to result in false positives and disclosure of the wrong individual's information to ICE. Olson Decl. ¶ 75-78. Tax and privacy experts reasonably "worry about how such a powerful yet crude platform could make dangerous mistakes":

---

[53] Augusta Saraiva, *IRS to Lose Billions in Revenue if Migrants Stop Filing Taxes*, Fortune (Apr. 9, 2025), https://perma.cc/Y6QV-7NQF; *see also* Julian Aguilar, *Tax-sharing Agreement Between ICE, IRS Could Cost Texas Billions in Tax Revenue, Experts Warn,* Houston Chronicle (Aug. 6, 2025), https://perma.cc/K5B9-P7WB.

[54] *See, e.g.*, Conor F. Boyle, et al., Cong. Rsch. Serv., R43805, The Earned Income Tax Credit (EITC): How It Works and Who Receives It (2023), https://perma.cc/T4TZ-DPSN; Nathan Anderson, *et al.*, *Why Are Millions of Dollars in Tax Refunds Going Unclaimed*, No. 1 ProfitWise News & Views (Mar. 2022), https://perma.cc/LF6W-F3GM.

[55] Cong. Rsch. Serv., R44825, The Earned Income Tax Credit (EITC): A Brief Legislative History (Apr. 26, 2017), https://perma.cc/9QV6-QCYL (The EITC "is now one of the federal government's largest antipoverty programs.")

[56] Hannah Natanson, *et al.*, *DOGE Aims to Pool Federal Data, Putting Personal Information at Risk*, Wash. Post (May 7, 2025), https://perma.cc/9JCK-9K4W.

32

> Because the search starts with a name instead of a taxpayer identification number, it risks returning the address of an innocent person with the same name as or a similar address to that of one of ICE's targets. The proposed system assumes the data provided by DHS is accurate and that each targeted individual is the subject of a valid criminal investigation. In effect, the IRS has no way to independently check the bases of these requests.

Ex. 3. Plaintiffs and their members fear that their taxpayer information will become wrapped up in this hasty, inaccurate process. Piacsek Decl. ¶ 9 (members "fear that the IRS's mass sharing of data with ICE will subject them to mistaken immigration enforcement actions based on misidentification"); Jane Doe Decl. ¶ 14 ("I have been a victim of identity theft in the past and therefore know all too well what it is like to have my information disclosed to someone else").

Defendants failed to consider any of these important issues prior to effectuating the Data Policy and disclosing data on a mass scale. Their decision to rush disclosure of sensitive data, without the normal guardrails that have long applied, was not "the product of reasoned decisionmaking." *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52.

### 3.    The Data Policy Failed to Consider Reliance Interests

Defendants failed to account for the significant reliance interests of people who submit personally identifying information to the federal government on the understanding that such information shall be confidential and protected from disclosure, as articulated in the numerous declarations submitted in support of this filing. Piacsek Decl. ¶ 3; Phetteplace Decl. ¶ 16 ("For decades, MSA small business owners and their leaders have relied on reassurances by public officials, and the Tax Code itself to protect their sensitive information"); Jane Doe Decl. ¶ 13; Olson Decl. ¶ 32 ("These protections have been a cornerstone of the Center's ability to (1) effectively counsel our clients, and (2) provide education and outreach that encourages participation in the tax system").

33

The Data Policy also failed to consider immigrant taxpayers' reliance on prior public statements by the IRS and its officials that the agency "has no authorization under [the relevant] provision to share tax data with ICE."[57] *See also* Koskien Decl, ¶ 11 ("The IRS has historically… not shared taxpayers' information with immigration authorities for the purpose of locating individuals suspected to be present in the country illegally"). This has engendered significant reliance from immigrants, including MSA members and the Center's clients. MSA Decl. ¶ 6 ("MSA small business members include many immigrant-owned businesses. These, and other MSA small business members employ significant numbers of immigrants. They have trusted in the assurances of the IRS that their data would be kept confidential"); Olson Decl. ¶ 33 ("For example, we have, for years, assured our clients who are worried about confidentiality of the stringent protection in place at the IRS with respect to the protection of information").

The Center has also relied on these protections regarding the tax information of immigrants in offering services and programming to advance its mission. Olson Decl ¶ 35 ("We have, for example, encouraged undocumented immigrants to file for an Individual Tax Identification Number (ITIN) in order to participate in our tax system"). None of these interests were considered when Defendants began sharing significant amounts of sensitive data pursuant to the Data Policy. "When an agency changes course, as [Defendants] did here, it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Regents of the Univ. of Cal.*, 591 U.S. at 30 (internal quotation marks and citations omitted). Because Defendants were not, the Data Policy is arbitrary and capricious and thus unlawful under the APA.

---

[57] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://perma.cc/X4ZL-2CMT.

34

## II.    Plaintiffs Face Irreparable Injury from the Continued Effect of the IRS Data Policy

Plaintiffs and their clients and members face irreparable harm if the Court does not act to stay the Data Policy pending resolution of this case. "An irreparable harm is an imminent injury that is both great and certain to occur, and for which legal remedies are inadequate." *Beattie v. Barnhart*, 663 F. Supp. 2d 5, 9 (D.D.C. 2009). Here, the harms suffered by both organizational Plaintiffs CTR and MSA and their clients and members satisfy this standard.

### A.    The Center Faces Irreparable Harm to its Organizational Interests

The D.C. Circuit has held that "organizational plaintiffs establish irreparable harm where defendants' actions 'perceptibly impair[] the organization's programs' and 'directly conflict with the organization's mission.'" *Cath. Legal Immig. Network, Inc. v. Exec. Off. for Immigr. Rev.*, No. 21-00094, 2021 WL 3609986, at *3 (D.D.C. Apr. 4, 2021) (cleaned up); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (looking to whether "a defendant's conduct has made the organization's activities more difficult" or "conflict[s] with the organization's mission"); *League of Women Voters of United States v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (accord). Plaintiff CTR satisfies this test, which is sufficient to establish both irreparable injury to support entry of a preliminary injunction and standing. *See League of Women Voters*, 838 F.3d at 9 (holding that frustration of organization's mission demonstrates injury for purposes of both standing and irreparable harm).[58]

CTR faces irreparable harm to its ability to conduct effective education and outreach programs, its ability to counsel its LITC clients, and its facilitation of the LITC Connect network of LITCs, in direct conflict with and obstructing its ability to achieve its mission of promoting

---

[58] The Center also asserts third-party standing in this case to assert the interests of its clients. *See* Plaintiffs' Mem. in Opp'n to Defs' Mot. to Dismiss, ECF No. 27 (August 1, 2025), at 30-32.

trust in the tax system and advancing taxpayer rights. Each of these three categories of services and programs are "perceptibly impaired" by the Data Policy, which directly conflicts with CTR's mission. *Fair Emp. Council of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

"As the D.C. Circuit has confirmed, '[o]bstacles' that 'unquestionably make it more difficult for [an organization] to accomplish [its] primary mission ... provide injury for purposes both of standing and irreparable harm.'" *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 130–31 (D.D.C. 2020) (quoting *Whitman-Walker Clinic, Inc.*, 2020 WL 5232076, at *38 (alterations in original) (quoting *League of Women Voters*, 838 F.3d at 9). Where an organization can explain "how the agency action 'forced it to divert or modify its activities in any meaningful way from its standard programmatic efforts,'" it can show a diversion of resources in support of a showing of irreparable harm. *Nat'l Ass'n for Advancement of Colored People v. United States Postal Serv.*, 496 F. Supp. 3d 1, 11–12 (D.D.C. 2020) (quoting *Int'l Acad. Of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243 (D.D.C. 2016)).

Such is the case here. Particularly for the populations the Center serves, the Data Policy and current and ongoing transfers of home address information to ICE have significantly eroded trust in the tax system and made it materially more difficult for the Center to pursue its mission. Because of Defendants' conduct, these taxpayers can no longer rely on the confidentiality protections that have been in place for decades. Olson Decl. ¶ 39, 47. And the Center cannot accomplish its mission if taxpayers cannot safely engage in the tax system. When taxpayers are fearful and unwilling to engage, they do not attend the Center's education and outreach events, and the Center has already seen a significant drop-off in attendance, forcing the Center to devote and divert more resources to these efforts to fulfil its mission. *Id*. ¶ 41-46. These taxpayers

36

include ESL taxpayers who speak English as a second language ("ESL taxpayers"), to whom the Center is required to conduct specialized outreach as a condition of funding for its LITC. *Id.* ¶ 41. These taxpayers are also less willing to retain the LITC and engage with IRS processes, including to preserve their rights and obtain benefits to which they are entitled *Id.* ¶ 42, thereby frustrating the Center's delivery of client services and pursuit of its mission to advance taxpayer rights. The Center's LITC is also hampered in its ability to advise its clients by the double bind that the Internal Revenue Code and Data Policy create—an "intolerable situation that undermines [the Center's] ability to develop trusting relationship with [its] clients and to effectively represent them." *Id.* ¶ 47. Organizations have standing to challenge and are irreparably harmed by rules that interfere with counsel's ability to provide services to their clients–including immigrant clients. *See Cath. Legal Immigr. Network, Inc. v. EOIR*, 2021 WL 184359, at *175 (D.D.C. 2021) (finding that a rule that would "interfere with the[ir] ability … to provide essential services to their clients and/or members—in some cases irretrievably so," constituted irreparable harm); *see also, e.g.*, *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 38-9 (D.D.C. 2020) (finding standing and enjoining rule that "will frustrate [plaintiff legal services organizations'] ability to provide legal services directly to asylum applicants, a core component of their respective missions"). Similar obstacles face the Center's LITC Connect members. Olson Decl. ¶ 55-68.

These harms to the Center's ability to engage these populations through its counseling and educational efforts are time sensitive. The tax system operates under strict deadlines for taxpayers, including to file returns and to engage with audits and other requests for information from the IRS, and once a taxpayer misses these deadlines, they lose rights and potentially incur penalties. Olson Decl. ¶ 81-89. This frustration of mission in a time-bound context is similar to

37

other instances in which courts have found irreparable harm to organizations. *See League of United Latin Am. Citizens v. Exec. Off. of the President*, No. 25-0946, 2025 WL 1187730, at *41 (D.D.C. Apr. 24, 2025); *League of Women Voters*, 838 F.3d at 9; *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("once the election occurs, there can be no do-over and no redress"). As with voter registration efforts at issue in those cases, frustration of the Center's efforts to reach, educate, and support taxpayers in applying for ITINs, filing their tax returns, and otherwise engaging with IRS processes to protect their rights and interests, before the relevant deadlines pass, cannot be restored later by Court order.

Second, a sudden and significant erosion of trust in the tax system, based on implementation of the Data Policy, and resulting harm to CTR's mission is irreparable. Olson Decl. ¶ 52-53 ("it is very difficult to restore that trust"). The IRS has acknowledged this, noting that "[i]f the IRS abused [taxpayers'] reasonable expectation of privacy, the resulting loss of public confidence could seriously impair the tax system."[59] This erosion of trust will frustrate the Center's efforts to advance its mission. Olson Decl. ¶ 53 ("[I]f these disclosures continue to go through, trust in the system will further plummet, creating almost insurmountable obstacles to our mission of promoting trust in the system and encouraging participation.").

---

[59] IRS, Chief Counsel of Procedure & Administration, IRS Pub. 4369, Disclosure & Privacy Law Reference Guide, at 1-9, https://perma.cc/K2JX-89TR. *See also* Bernie Becker & Myah Ward, *IRS Upheaval Cracks Agency Resistance to Data Sharing with Immigration Officials,* Politico (Mar. 31, 2025), https://perma.cc/NQ6Y-ZXPB (noting view of former IRS commissioner under President George W. Bush that disclosures of this type are "a bad trade in the long run," and would result in a "longer-term decline in tax compliance from immigrant communities, and perhaps others who depend on keeping their information filed with the IRS private.").

38

**B.    The Center's LITC Clients and Plaintiffs' Members also face imminent, irreparable injury, in the absence of a stay**

Taxpayers at imminent risk of having their return information indiscriminately shared with ICE also face irreparable injury. These individuals include clients of the Center's LITC and members of MSA, whose interests these Plaintiffs represent in this action. First, the disclosure of confidential information outside the IRS—in violation of the statutory protections designed to prevent it and without adequate safeguards against further illegal sharing or use—is itself an irreparable injury. Unlawful disclosures of confidential information warrant entry of a preliminary injunction where there is an imminent risk of public disclosure or impermissible use. *See AFL-CIO. v. Dep't of Lab.*, 2025 WL 1783899, at *12 (D.D.C. June 27, 2025) (collecting cases). This is because "the disclosure of private, confidential information 'is the quintessential type of irreparable harm that cannot be compensated or undone by money damages.'" *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 499 (S.D.N.Y. 2019). "Obviously, once … highly personal information is disclosed …, the revelation cannot be undone." *NTEU v. Dep't of Treasury*, 838 F. Supp. 631, 640 (D.D.C. 1993); *see also Hosp. Staffing Sols. v. Reyes*, 736 F. Supp. 2d 192, 200 (D.D.C. 2010) ("the disclosure of confidential information can constitute an irreparable harm because such information, once disclosed, loses its confidential nature."). As addressed in Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 27), such injuries are also concrete enough to satisfy the requirements of Article III standing because they have "a close historical or common-law analogue," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021): the torts of intrusion upon seclusion, see *All. for Retired Ams. v. Bessent*, 770 F. Supp. 3d 79, 102 (D.D.C. 2025), and breach of confidence, *see Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019).

39

Further, where such disclosures violate statutorily guaranteed privacy protections for the purpose of supporting criminal investigations or immigration enforcement activity, the violation is more analogous to a deprivation of Fourth Amendment rights than to a violation of an individual's personal privacy. "It has long been established that the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Mills v. D.C.*, 571 F.3d 1304, 1312 (D.C. Cir. 2009). For example, in *Klayman v. Obama*, the court found irreparable injury and issued a preliminary injunction where the government was conducting bulk collection of metadata associated with phone calls, allegedly in violation of the Fourth Amendment. 142 F. Supp. 3d 172 (D.D.C. 2015). The court reasoned that where the government violated rights guaranteed to the plaintiffs by the Fourth Amendment, even for a finite time, "the loss of constitutional freedoms is an 'irreparable injury' of the highest order. *Id.* at 181. Such harm likewise occurs when people are forced to provide the information to the government themselves, as taxpayers are required to do under the Internal Revenue Code. *See NTEU*, 838 F. Supp. at 640 (finding irreparable injury "when plaintiffs are forced to choose between revealing constitutionally protected information . . . at the cost of possible further discipline or discharge").

Here, Plaintiffs demonstrate an imminent risk that their members' and clients' data will be broadly disclosed and impermissibly used as a result of the IRS's disclosures. As detailed in, *supra*, Section V.B., ICE's *en masse* data requests are facially noncompliant with the requirements of Section 6103, and the Administration has clearly stated its intention that ICE use the data for an impermissible purpose: to implement "President Trump's promise to carry out the mass deportation of criminal illegal aliens." Ex. 3.  Once the IRS shares the data outside the agency, there are no adequate safeguards against subsequent unlawful use or disclosure of the

40

confidential information. This is not a situation where, for example, data is only being shared among employees within an agency who are obligated to keep it confidential (*All. for Retired Americans v. Bessent*, 770 F. Supp. 3d 79 (D.D.C. 2025); *Univ. of Cal. Student Ass'n v. Carter*, No. 25-cv-0354, 766 F. Supp. 3d 114, 121 (D.D.C. Feb. 17, 2025)) or where there is no evidence that the recipient of the shared data will misuse it or disclose it without authorization (*Baker DC v. Nat'l Lab. Rels. Bd.*, 102 F. Supp. 3d 194, 203 (D.D.C. 2015). Here, the IRS is sharing data with an unknown number of personnel at another agency, and there is significant evidence to support an inference of current and future misuse of the data.

Although there are some safeguards set forth on the face of the MOU and in Section 6103 itself, ICE's and the White House's recent conduct demonstrate material noncompliance with those safeguards. ICE sent a mass request, during the first week of August 2025, seeking personal information for as many as 1.23 million people. As discussed above, given the scale of this request, ICE could not have identified in its request the specific personnel who are "personally and directly engaged in" each one of this many purported investigations, meaning that subsequent disclosure of this confidential information to *other* individuals who will actually carry out any actions ICE plans to take is all but certain. Such subsequent disclosure of the data violates Section 6103(i)(2) (authorizing disclosure of information "solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding"). And ICE's subsequent misuse of the confidential information seems imminent, given the Administration's stated intention to use the data to support "mass deportation," a civil immigration enforcement function that is not permitted under either the MOU or Section 6103(i)(2).

The White House's conduct further illustrates the risk of noncompliance with the safeguards set forth in the MOU and under Sec. 6103 and the imminence of additional data

41

sharing. As discussed above, when ICE received less information than expected, in response their mass request, the White House intervened with the IRS directly and asked for more information about these taxpayers, beyond even what was authorized in the MOU and by law.[60] After the IRS declined this request, citing taxpayer privacy rights, then-Commissioner Long was removed.

In addition to the irreparable harm inherent in the disclosures of this confidential information, there are additional imminent, foreseeable consequences to the IRS's indiscriminate data sharing with ICE that cannot be remedied later, if it is allowed to proceed.

Defendants' conduct—handing over confidential home addresses of taxpayers to ICE, in violation of law—places those taxpayers and their family members at imminent risk of the kinds of immigration detention- and removal-related harm that other courts have found warranted preliminary injunctions to prevent, including risk of removal to a third country (*Doe v. Noem*, No. 3:25-cv-00023, 2025 WL 1399216, at *11 (W.D. Va. May 14, 2025)) and risk of summary removal without due process (*D.B.U. v. Trump*, No. 1:25-cv-01163-CNS, 2025 WL 1304288, at *9 (D. Colo. May 6, 2025)), as evidenced by the actual summary removal of an immigrant—*in error*, and contrary to an Immigration Court order forbidding removal—to a notorious prison in a foreign country (*Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101 (April 10, 2025)). Plaintiffs' immigrant clients are rightfully frightened of the very real and irreparable harms they face, if the IRS provides their home addresses to ICE.

But taxpayers have more to contend with, under the Data Policy, than "mere fear." *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 21, 43 (D.D.C. 2017). The risks caused by the IRS's radical policy shift and unlawful data sharing with ICE also impede taxpayers' ability to

---

[60] Jacob Bogage & Kadia Goba, *IRS, White House Clashed Over Immigrants' Data Before Tax Chief Was Ousted*, Wash. Po. (Aug. 9, 2025), https://perma.cc/8SWF-54XS.

safely participate in the tax system—as they are required to do by law and as is necessary to obtain certain benefits to which they are entitled, such as to receive a refund of excess tax withholdings or a credit on behalf of a U.S. citizen child—and to participate in other parts of the formal economy, such as by opening a bank account or borrowing money. Olson Decl. ¶ 73.[61] These rights and obligations are time sensitive; if taxpayers do not timely file their returns or respond to IRS audits and inquiries, they forfeit rights or money to which they would otherwise have been entitled. Olson Decl. ¶ 81-89. Here, as in *Kirwa*, the IRS unlawfully changed a policy and reneged on a promise, putting people who relied on that promise at risk of deportation and in a position where they cannot receive benefits to which they would have otherwise been entitled, demonstrating irreparable harm. *Id*. at 42-43.

Together, the violation of taxpayers' statutory privacy rights and its real-world consequences demonstrate concrete, imminent irreparable harm. The White House and DHS demanded in June 2025 that the IRS assist ICE in locating as many as 7.3 million immigrants, *see* Ex. 3—more than the total number of active U.S. ITIN holders (immigrant taxpayers).[62] This request led to the ouster of the Acting IRS Chief Counsel when he refused, and the IRS and ICE subsequently developed an automated process for receiving and responding to bulk-requests. See Ex. 3. The IRS has now reportedly shared home address information in bulk for tens of thousands of people. And—when asked about the White House's reported displeasure that more data was not disclosed and the ouster of the IRS Commissioner—a the White House stated that Administration officials were "aligned on the mission" to "eliminate[ ] information silos." Ex. 1.

---

[61] *See also* Lauren Kaori Gurley & Jacob Bogage, *Deportation Fears Trigger Decline in Tax Filings in Immigrant Communities,* Wash. Po. (May 19, 2025), https://perma.cc/49WU-FQ86.

[62] Treasury Inspector Gen. for Tax Admin., Administration of the Individual Taxpayer Identification of Number Program (2023), at 1, https://perma.cc/H52Q-7ZU5 (5.8 million active ITIN numbers as of Dec. 31, 2022).

43

The irreparable harm of the privacy violation has already arrived, for the tens of thousands of taxpayers whose data has already reportedly been disclosed, and these harms are plainly imminent for the remaining ITIN holders, who are among the LITC's clients, Olson Decl. ¶ 13, 17, 42, and MSA's members, Phetteplace Decl. ¶ 9. Moreover, the fear of detention- and removal-related harms and the associated impediments to safely engaging with the IRS and the tax system cause irreparable harms to taxpayers who are themselves at risk of ICE enforcement or share a household with those who are, including those among the LITC's clients, *see*, *e.g.*, Olson Decl. ¶ 48-49, and MSA's members, Phetteplace Decl. ¶ 6-8, 12-14.

## III.    Balance of the Equities

"It is well established that the Government cannot suffer harm from [relief] that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (internal quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (citing *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA. . .—that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity requires relief.

But even if this Court were to balance Defendants' interests as if it were a private party, the balance of equities and public interest would still overwhelmingly favor Plaintiffs. Neither Defendants, nor any non-defendant component of the Government, have any lawful or legitimate need to unlawfully share the personal data of millions of taxpayers from one of the government's most sensitive systems.

## IV.    The Court Should Stay the Data Policy under Section 705

A stay of Defendants' Data Policy is the appropriate preliminary relief to preserve the status quo ante while this case proceeds. Section 705 of the APA allows a court to "postpone the effective date of an agency action or . . . preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. "Courts—including the Supreme Court—routinely stay already effective agency action." *Texas v. Biden*, 646 F. Supp. 3d 753, 770 (N.D. Tex. 2022) (citing, e.g., *W. Virginia v. EPA*, 577 U.S. 1126 (2016)); *accord Kingdom v. Trump*, No. 25-cv-691, 2025 WL 1568238, at *5 (D.D.C. June 3, 2025) (observing that "various courts have interpreted § 705 to permit a 'stay'— which may be more aptly described as a temporary rollback—even of already-consummated agency action"); *see also Trump v. CASA*, 2025 WL 1773631, at *2567 (2025) (Kavanaugh J., concurring) ("in cases under the Administrative Procedure Act," courts may "preliminarily 'set aside'" an agency action). Accordingly, the fact that the policy is "already in effect does not bar this Court from staying [it]—and returning things to the status quo ante while this case proceeds—under section 705." *Coal. for Humane Immigr. Rts.*, 2025 WL 2192986, at *15.[63]

## CONCLUSION

For all these reasons, the Court should grant Plaintiffs' motion and enter a stay under section 705, preliminary set aside the agency action under section 706, or preliminarily enjoin Defendants actions.

Dated: August 20, 2025

Respectfully submitted,

*/s/ Johanna M. Hickman*

---

[63] In the alternative, the Court should issue a preliminary injunction. Plaintiffs respectfully request that it either waive or set only a nominal bond requirement under Fed. R. Civ. P. 65(c).

Daniel A. McGrath (D.C. Bar No. 1531723)
Johanna M. Hickman (D.C. Bar No. 981770)
Madeline H. Gitomer (D.C. Bar No 1023447)
Robin Thurston (D.C. Bar No. 1531399)
Steven Y. Bressler (D.C. Bar No. 482492)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
202-448-9090
dmcgrath@democracyforward.org
hhickman@democracyforward.org
mgitomer@democracyforward.org
rthurston@democracyforward.org
sbressler@democracyforward.org

*Counsel for Plaintiffs*

46

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS et al.,

          *Plaintiffs*,

v.                                                    Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

          *Defendants*.

### [PROPOSED] ORDER

Upon consideration of Plaintiffs' motion for stay under 5 U.S.C. § 705, to preliminarily

set aside agency action under 5 U.S.C. § 706, and, in the alternative, for preliminary injunction,

it is hereby

ORDERED that Plaintiffs' motion is GRANTED, and it is further

ORDERED that Defendants' data policy that permits disclosures of IRS data to ICE

under Sec. 6103(i)(2) is STAYED and preliminarily SET ASIDE; and it is further

ORDERED that Defendants, and their officers, agents, servants, employees, attorneys,

and all acting in concert with them, shall not effectuate the transfer of any IRS data, to include

taxpayer information, return information, and taxpayer identity, including address information,

(as defined under Sec. 6103(b)(2), (3), (6) of the Internal Revenue Code), pursuant to Sec.

6103(i)(2) of the Internal Revenue Code, in response to requests from the Department of

Homeland Security and its component agencies for the disclosure, verification, or confirmation

of taxpayer address information, or taxpayer identity information that includes address

information, and information regarding the receipt of tax credits or refunds; it is further

ORDERED that Defendants shall inform ICE that any disclosures of address information

under the Data Policy, by the IRS to ICE and pursuant to Sec. 6103(i)(2), have been deemed

unlawful and thus Defendants must destroy, or seek and facilitate the destruction of such data; it

is further

ORDERED that the IRS shall submit to the Court within three days a sworn declaration

attesting that the information disclosed has been destroyed or returned and detailing its actions to

otherwise comply with this Order; and it is further

ORDERED that Defendants shall not effectuate any similar policy under a different

name.


DATED this ____ day of _____, 2025.


_____
Hon. Colleen Kollar-Kotelly
United States District Judge

# Exhibit 1

8/14/25, 11:09 PM
Case 1:25-cv-00457-CKK Document 30-2 Filed 08/20/25 Page 2 of 6
IRS begins sharing sensitive taxpayer data with immigration authorities to find undocumented migrants | CNN Politics
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 135 of 388

POLITICS • 3 MIN READ

# IRS begins sharing sensitive taxpayer data with immigration authorities to find undocumented migrants

**AUG 8, 2025**

By **Rene Marsh**







A sign displaying the name of the International Revenue Service Building is seen in Washington, ...

8/14/25, 11:09 PM
Case 1:25-cv-00457-CKK   Document 30-2   Filed 08/20/25   Page 3 of 6
IRS began sharing sensitive taxpayer data with immigration authorities to find undocumented migrants | CNN Politics
USCA Case #26-5006      Document #2159317      Filed: 02/17/2026      Page 136 of 388

✉   🔗   ✖   f

The Internal Revenue Service began sharing sensitive taxpayer data this week with immigration authorities searching for undocumented migrants, according to two sources familiar with the matter.

As part of President Donald Trump's massive deportation push, the Treasury Department and the Department of Homeland Security signed an agreement in April to turn over information about undocumented immigrants who DHS says are already facing deportation orders and are under federal criminal investigation.

While the IRS has disclosed sensitive tax data previously for specific reasons allowable under privacy law, the agency has never shared such large volumes of data with any agency for the sole purpose of large-scale immigration enforcement.

The records include personal information like names, addresses and tax data of immigrants, which will enable DHS to confirm the home addresses and location for individuals it says are facing final orders of removal or who are the subjects of federal criminal investigations.

Advertisement

IRS begins sharing sensitive taxpayer data with immigration authorities to find undocumented migrants | CNN Politics

The data sharing started this week after a "push" from the Trump administration to get it underway, one of the sources said.

It comes after months of tension within IRS over the plans and internal concerns from career officials about the legality of the collaboration. The chaos led to the resignation or impending departure of several senior IRS officials earlier this year, CNN previously reported.

The start of the data sharing also comes as Trump is ousting **Billy Long** from his role as IRS commissioner, CNN reported earlier Friday.

One of the sources told CNN that Immigration and Customs Enforcement asked for personal information for 1.23 million people it suspects are in the country illegally but only a small fraction, less than 5%, was shared because the data ICE sent IRS did not have exact matching data to confirm the individuals they were looking for.

Advertisement

"Less than 5% isn't what they were hoping for," the source said.

The White House was not happy with the number of records shared and called about the lack of data first thing Friday morning, the second source added.

In response to CNN's reporting, a White House spokeswoman said, "The Trump Administration is working together to implement President Trump's executive order to stop waste, fraud, and abuse by eliminating information silos and to prevent illegal aliens from taking advantage of benefits meant for hardworking American taxpayers. Any absurd assertion other than everyone being aligned on the mission is simply false and total fake news."

CNN has reached out to DHS and Treasury for comment.

Advertisement

**CNN previously reported** in April, DHS officials told the IRS they need access to its data to help them locate up to 7 million suspected undocumented immigrants – an eye-popping figure that "shocked" IRS employees.

The IRS has addresses for undocumented immigrants because many register with the agency and pay billions of dollars in taxes each year – in exchange for their data staying confidential in most circumstances.

Tax information has generally been closely held within the IRS, but strict privacy laws outline some exceptions – for example, the data may be shared with law enforcement agencies for investigation and prosecution of non-tax criminal laws. However, it's unclear if DHS has provided the IRS with

evidence that all 7 million individuals they are hoping to locate using IRS data are under investigation or face prosecution for non-tax criminal laws.

Undocumented immigrants are often **urged to register** with the IRS and pay their federal taxes because it makes them look like law-abiding residents and could aid their immigration case.

Lawyers who represent immigrant groups have argued that the IRS/DHS data sharing deal means the IRS has gone back on its duty to protect taxpayer information from improper disclosure and will open the door for federal law enforcement to gain access to confidential taxpayer information without obtaining a court order as required by law.



## Up next



DC police to share information with federal immigration officers

3 MIN READ



On social media, the Department of Homeland Security appeals to nostalgia — with motifs of White identity

7 MIN READ



Mexico says 26 alleged cartel figures sent to US were requested by Trump administration, not part of tariff talks

3 MIN READ



FBI agents are again pulled from their day jobs to address a Trump priority

6 MIN READ

## Most read

1   New blood pressure guidelines recommend an earlier start to treatment and skipping alcohol

Exhibit 2

*Democracy Dies in Darkness*

# IRS, White House clashed over immigrants' data before tax chief was ousted

The Trump administration's move to push out IRS Commissioner Billy Long came after the agency said it couldn't release some information on taxpayers suspected of being here illegally.

Updated August 9, 2025

By <u>Jacob Bogage</u> and <u>Kadia Goba</u>

The Internal Revenue Service clashed with the White House over using tax data to help locate suspected undocumented immigrants hours before Trump administration officials forced IRS Commissioner Billy Long from his post Friday, according to two people familiar with the situation.

The Department of Homeland Security sent the IRS a list Thursday of 40,000 names of people DHS officials thought were in the country illegally and asked the IRS to use confidential taxpayer data to verify their addresses, said the people, who spoke on the condition of anonymity for fear of reprisals.

The Treasury Department, the parent agency of the IRS, and DHS agreed to an arrangement in April to facilitate such data sharing — over the objections of the tax service's privacy lawyers.

DHS officials have suggested they would eventually ask the IRS for <u>help locating 7 million people</u>. There are about 11 million undocumented immigrants in the United States, according to federal estimates.

On Friday, though, the IRS responded that it was able to verify fewer than 3 percent of the names immigration enforcement officials submitted, the people said.

The names the agency could match were mainly the individuals for whom DHS provided an individual taxpayer identification number. An ITIN is an IRS-specific ID that immigrants often use in place of a Social Security number on a tax filing. Undocumented immigrants pay tens of billions of dollars in taxes each year, which the ITINs help facilitate.

White House officials requested additional information on the taxpayers the IRS identified, the people said — specifically, if any of them had claimed the earned income tax credit, which can reduce the tax bill for some low-income filers. The IRS declined to provide that information, citing taxpayer privacy rights.

## Trump presidency

Follow live updates on the Trump administration. We're tracking Trump's progress on campaign promises and legal challenges to his executive orders and actions.

Long had previously told agency executives that his agency would not furnish confidential taxpayer information outside of the confines of the IRS's agreement with DHS, the people said.

Still, the people did not know if tension over the IRS's role in President Donald Trump's mass deportation drive contributed to Long's departure from the IRS.

"The Trump administration is working in lockstep to eliminate information silos and to prevent illegal aliens from taking advantage of benefits meant for hardworking American taxpayers," White House spokeswoman Abigail Jackson said in a statement.

"Any absurd assertion other than everyone being aligned on the mission is simply false and totally fake news," she added after this story was published.

DHS said in a statement that the agreement with the IRS "outlines a process to ensure that sensitive taxpayer information is protected, while allowing law enforcement to effectively pursue criminal violations."

"After four years of Joe Biden flooding the nation with illegal aliens, these processes streamline pursuit of violent criminals, scrub these individuals from voter rolls, identify what public benefits these aliens are using at taxpayer expense, all while protecting American citizens' safety and data," the statement said.

Treasury Department officials did not immediately return a request for comment.

Long on Friday said Trump intended to nominate him as the U.S. ambassador to Iceland after less than two months in the IRS job. Treasury Secretary Scott Bessent will serve as the interim IRS commissioner. Trump administration officials confirmed both moves.

Long jokingly posted on social media Friday that he'd called Trump and asked to join ICE, or U.S. Immigration and Customs Enforcement.

"I guess he thought I said Iceland?" Long wrote. "Oh well."

CNN reported Friday night about the DHS request for information and that the White House was displeased with the number of records the IRS shared.

Long had previously sparred with Treasury officials over plans to start tax filing season around Presidents' Day in February — about a month behind schedule — and also preemptively announced plans to eliminate the IRS's Direct File program, even though Treasury officials had not decided to do so, according to four people familiar with the events, who similarly spoke on the condition of anonymity.

"Billy Long did a great job while at the IRS, and his promotion to ambassador was previously slated to happen," a White House official said Saturday, speaking on the condition of anonymity to discuss personnel matters.

Long, a former six-term Republican congressman from Missouri, was confirmed to the position in mid-June. Trump broke tradition by not allowing the former Biden-appointed IRS commissioner, Danny Werfel, to serve out his full five-year term.

He was the sixth IRS leader since the start of the year. One early acting commissioner left amid churn at the agency due to the administration's cost-cutting campaign led by Elon Musk's U.S. DOGE Service, while another left after the agency agreed to the DHS data-sharing arrangement. A third acting commissioner was pushed out after only two days because of an internal conflict between Musk and Bessent.

*Riley Beggin contributed to this report.*

## What readers are saying

The comments reflect a strong disapproval of the Trump administration's attempts to access confidential taxpayer information, with many praising IRS Commissioner Billy Long for standing up to these demands. Commenters express concerns about privacy rights and the misuse of... Show more

This summary is AI-generated. AI can make mistakes and this summary is not a replacement for reading the comments.

# Exhibit 3

Case 1:25-cv-00457-CKK   Document 30-5   Filed 08/20/25   Page 2 of 6
USCA Case #26-5006      Document #2159317      Filed: 02/17/2026      Page 145 of 388

## ProPublica



Ricardo Tomás for ProPublica

**Trump Administration**

# The IRS Is Building a Vast System to Share Millions of Taxpayers' Data With ICE

ProPublica has obtained the blueprint for the Trump administration's unprecedented plan to turn over IRS records to Homeland Security in order to speed up the agency's mass deportation efforts.

by **William Turton**, **Christopher Bing** and **Avi Asher-Schapiro**

July 15, 2025, 11:45 a.m. EDT

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive our biggest stories as soon as they're published.*

The Internal Revenue Service is building a computer program that would give deportation officers unprecedented access to confidential tax data.

ProPublica has obtained a blueprint of the system, which would create an "on demand" process allowing Immigration and Customs Enforcement to obtain the home addresses of people it's seeking to deport.

Last month, in a previously undisclosed dispute, the acting general counsel at the IRS, Andrew De Mello, refused to turn over the addresses of 7.3 million taxpayers sought by ICE. In an email obtained by ProPublica, De Mello said he had identified multiple legal "deficiencies" in the agency's request.

Two days later, on June 27, De Mello was forced out of his job, people familiar with the dispute said. The addresses have not yet been released to ICE. De Mello did not respond to requests for comment, and the administration did not address questions sent by ProPublica about his departure.

The Department of Government Efficiency began pushing the IRS to provide taxpayer data to immigration agents soon after President Donald Trump took office. The tax agency's acting general counsel refused and was replaced by De Mello, who Trump administration officials viewed as more willing to carry out the

8/14/25, 11:08 PM    The IRS Is Building a Vast System to Share Tax Data With ICE - ProPublica

Case 1:25-cv-00457-CKK   Document 30-5   Filed 08/20/25   Page 2 of 6
USCA Case #26-5006   Document #2159317   Filed: 02/17/2026   Page 146 of 388

president's agenda. Soon after, the Department of Homeland Security, ICE's parent agency, and the IRS negotiated a "memorandum of understanding" that included specific legal guardrails to safeguard taxpayers' private information.

In his email, De Mello said ICE's request for millions of records did not meet those requirements, which include having a written assurance that each taxpayer whose address is being sought was under active criminal investigation.

"There's just no way ICE has 7 million real criminal investigations, that's a fantasy," said a former senior IRS official who had been advising the agency on this issue. The demands from the DHS were "unprecedented," the official added, saying the agency was pressing the IRS to do what amounted to "a big data dump."

In the past, when law enforcement sought IRS data to support its investigations, agencies would give the IRS the full legal name of the target, an address on file and an explanation of why the information was relevant to a criminal inquiry. Such requests rarely involved more than a dozen people at a time, former IRS officials said.

Danny Werfel, IRS commissioner during the Biden administration, said the privacy laws allowing federal investigators to obtain taxpayer data have never "been read to open the door to the sharing of thousands, tens of thousands, or hundreds of thousands of tax records for a broad-based enforcement initiative."

A spokesperson for the White House said the planned use of IRS data was legal and a means of fulfilling Trump's campaign pledge to carry out mass deportations of "illegal criminal aliens."

Taxpayer data is among the most confidential in the federal government and is protected by strict privacy laws, which have historically limited its transfer to law enforcement and other government agencies. Unauthorized disclosure of taxpayer return information is a felony that can carry a penalty of up to five years in prison.

The system that the IRS is now creating would give ICE automated access to home addresses en masse, limiting the ability of IRS officials to consider the legality of transfers. IRS insiders who reviewed a copy of the blueprint said it could result in immigration agents raiding wrong or outdated addresses.

"If this program is implemented in its current form, it's extremely likely that incorrect addresses will be given to DHS and individuals will be wrongly targeted," said an IRS engineer who examined the blueprints and who, like other officials, spoke on condition of anonymity for fear of retribution.

The dispute that ended in De Mello's ouster was the culmination of months of pressure on the IRS to turn over massive amounts of data in ways that would redefine the relationship between the agency and law enforcement and reduce taxpayers' privacy, records and interviews show.

In one meeting in late March between senior IRS and DHS officials, a top ICE official made a suggestion: Why doesn't Homeland Security simply provide the name and state of its targets and have the IRS return the addresses of everyone who matches that criteria?

The IRS lawyers were stunned. They feared they could face criminal liability if they handed over the addresses of individuals who were not under a criminal investigation. The conversation and news of deeper collaboration with ICE so disturbed career staff that it led to a series of departures in late March and early April across the IRS' legal, IT and privacy offices.

They were "pushing the boundaries of the law," one official said. "Everyone at IRS felt the same way."

## The Blueprint

The technical blueprint obtained by ProPublica shows that engineers at the agency are preparing to give DHS what it wants: a system that enables massive automated data sharing. The goal is to launch the new

system before the end of July, two people familiar with the matter said.

The DHS effort to obtain IRS data comes as top immigration enforcement leaders face escalating White House pressure to deport some 3,000 people per day, according to reports.

One federal agent tasked with assisting ICE on deportations said recent operations have been hamstrung by outdated addresses. Better information could dramatically speed up arrests. "Some of the leads that they were giving us were old," said the agent, who spoke on condition of anonymity because he was not authorized to speak with the press. "They're like from two administrations ago."

In early March, immigrants rights groups sued the IRS hoping to block the plan, arguing that the memorandum of understanding between DHS and the IRS is illegal. But a judge in early May ruled against them, saying the broader agreement complied with Section 6103, the existing law regulating IRS data sharing. That opened the door for engineers to begin building the system.

The judge did not address the technical blueprint, which didn't exist at the time of the ruling. But the case is pending, which means the new system could still come under legal review.

Until now, little was known about the push and pull between the two agencies or the exact technical mechanics behind the arrangement.

The plan has been shrouded in secrecy even within the IRS, with details of its development withheld from regular communications. Several IRS engineers and lawyers have avoided working on the project out of concerns about personal legal risk.

Asked about the new system, a spokesperson for IRS parent agency the Treasury Department said the memorandum of understanding, often called an MOU, "has been litigated and determined to be a lawful application of Section 6103, which provides for information sharing by the IRS in precise circumstances associated with law enforcement requests."

At a time when Trump is making threats to deport not only undocumented immigrants but also U.S. citizens, the scope of information-sharing with the IRS could continue to grow, according to documents reviewed by ProPublica and sources familiar with the matter: DHS has been looking for ways to expand the agreement that could allow Homeland Security officials to seek IRS data on Americans being investigated for various crimes.

Last month, an ICE attorney proposed updating the MOU to authorize new data requests on people "associated with criminal activities which may include United States citizens or lawful permanent residents," according to a document seen by ProPublica. The status of this proposal is unclear. De Mello, at the time, rejected it and called for senior Treasury Department leadership to personally sign off on such a significant change.

The White House described DHS' work with the IRS as a good-faith effort to identify and deport those who are living in the country illegally.

"ProPublica continues to degrade their already terrible reputation by suggesting we should turn a blind eye to criminal illegal aliens present in the United States for the sake of trying to collect tax payments from them," White House spokesperson Abigail Jackson said in a statement after receiving questions about the blueprint from ProPublica.

She pointed to the April MOU as giving the government the authority to create the new system and added, "This isn't a surveillance system. ... It's part of President Trump's promise to carry out the mass deportation of criminal illegal aliens — the promise that the American people elected him on and he is committed to fulfilling."

In a separate statement, a senior DHS official also cited the court's approval of the MOU, saying that it "outlines a process to ensure that sensitive taxpayer information is protected while allowing law enforcement to effectively pursue criminal violations."

8/14/25, 11:08 PM   Case 1:25-cv-00457-CKK   Document 30-5   Filed 08/20/25   Page 1 of 6
The IRS Is Building a Vast System to Share Tax Records With ICE — ProPublica
USCA Case #26-5006      Document #2159317      Filed: 02/17/2026      Page 148 of 388

# How the System Works

The new system would represent a sea change, allowing law enforcement to request enormous swaths of confidential data in bulk through an automated, computerized process.

The system, according to the blueprint and interviews with IRS engineers, would work like this:

First, DHS would send the IRS a spreadsheet containing the names and previous addresses of the people it's targeting. The request would include the date of a final removal order, a relevant criminal statute ICE is using to investigate the individual, and the tax period for which information is sought. If DHS fails to include any of this information, the system would reject the request.

The system then attempts to match the information provided by the DHS to a specific taxpayer identification number, which is the primary method by which the IRS identifies an individual in its databases.

If the system makes a match, it accesses the individual's associated tax file and pulls the address listed during the most recent tax period. Then the system would produce a new spreadsheet enriched with taxpayer data that contains DHS' targets' last known addresses. The spreadsheet would include a record of names rejected for lack of required information and names for which it could not make a match.

Tax and privacy experts say they worry about how such a powerful yet crude platform could make dangerous mistakes. Because the search starts with a name instead of a taxpayer identification number, it risks returning the address of an innocent person with the same name as or a similar address to that of one of ICE's targets. The proposed system assumes the data provided by DHS is accurate and that each targeted individual is the subject of a valid criminal investigation. In effect, the IRS has no way to independently check the bases of these requests, experts told ProPublica.

In addition, the blueprint does not limit the amount of data that can be transferred or how often DHS can request it. The system could easily be expanded to acquire all the information the IRS holds on taxpayers, said technical experts and IRS engineers who reviewed the documents. By shifting a single parameter, the program could return more information than just a target's address, said an engineer familiar with the plan, including employer and familial relationships.

Engineers based at IRS offices in Lanham, Maryland, and Dallas are developing the blueprint.

# "Gone Back on Its Word"

For decades, the American government has encouraged everyone who makes an income in the U.S. to pay taxes — regardless of immigration status — with an implicit promise that their information would be protected. Now that same data may be used to locate and deport noncitizens.

"For years, the IRS has told immigrants that it only cares that they pay their taxes," said Nandan Joshi, an attorney with the Public Citizen Litigation Group, which is seeking to block the data-sharing agreement in federal court. "By agreeing to share taxpayer data with ICE on a mass basis, the IRS has gone back on its word."

The push to share IRS data with DHS emerged while Elon Musk's DOGE reshaped the engineering staff of the IRS. Sam Corcos, a Silicon Valley startup founder with no government experience, pushed out more than 50 IRS engineers and restructured the agency's engineering priorities while he was the senior DOGE official at the agency. He later became chief information officer at Treasury. He has also led a separate IRS effort to create a master database using products from Silicon Valley giant Palantir Technologies, enabling the government to link and search large swaths of data.

Corcos didn't respond to a request for comment. The White House said DOGE is not part of the DHS-IRS pact.

Sen. Ron Wyden, the ranking Democrat on the Senate Committee on Finance, which oversees the IRS, told ProPublica the system being built was ripe for abuse. It "would allow an outside agency unprecedented access to IRS records for reasons that have nothing to do with tax administration, opening the door to endless fishing expeditions," he said.

The Treasury Inspector General for Tax Administration, the department's internal watchdog, is already probing efforts by Trump and DOGE to obtain private taxpayer data and other sensitive information, ProPublica reported in April.

The Trump administration continues to add government agencies to its deportation drive.

DOGE and DHS are also working to build a national citizenship database, NPR reported last month. The database links information from the Social Security Administration and the DHS, ostensibly for the purpose of allowing state and local election officials to verify U.S. citizenship.

And in May, a senior Treasury Department official directed 250 IRS criminal investigative agents to help deportation operations, a significant shift for two agencies that historically have had separate missions.

McKenzie Funk contributed reporting, and Kirsten Berg and Alex Mierjeski contributed research.

---

**William Turton**
I am an investigative reporter focusing on the Department of Government Efficiency.



MORE STORIES    NEED TO GET IN TOUCH?

---

**Christopher Bing**   X   @   🦋   in
I cover the rapid intersection between technology and national security.

MORE STORIES    NEED TO GET IN TOUCH?

If you have a tip that warrants public scrutiny, heard an intriguing rumor or simply have advice about what I should be looking out for, I'd love to hear from you. I have significant experience unraveling complex and sensitive stories.

---

**Avi Asher-Schapiro**   X   in
I cover the Trump administration and Big Tech in Washington, D.C.



MORE STORIES    NEED TO GET IN TOUCH?

If you have tips about Big Tech and the Trump administration, please get in touch.

## What We're Watching

During Donald Trump's second presidency, ProPublica will focus on the areas most in need of scrutiny. Here are some of the issues our reporters will be watching — and how to get in touch with them securely.

# Exhibit 4



Department of the Treasury
Internal Revenue Service

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

# MEMORANDUM OF UNDERSTANDING

BETWEEN

THE U.S. DEPARTMENT OF THE TREASURY,
INTERNAL REVENUE SERVICE

AND

THE U.S. DEPARTMENT OF HOMELAND SECURITY,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

FOR THE EXCHANGE OF INFORMATION FOR NONTAX
CRIMINAL ENFORCEMENT

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN**
**U.S. TREASURY DEPARTMENT on behalf of the INTERNAL REVENUE SERVICE**
**AND**
**U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the U.S.**
**IMMIGRATION AND CUSTOMS ENFORCEMENT,**

**FOR THE EXCHANGE OF INFORMATION FOR NONTAX CRIMINAL**
**ENFORCEMENT**

1. **INTRODUCTION:**

   a. WHEREAS by Executive Order (EO) No. 14161, <u>Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats</u>, 90 Fed. Reg. 8451 (Jan. 20, 2025), the President directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to take immediate steps to identify, exclude, or remove aliens illegally present in the United States; and

   b. WHEREAS the Department of Homeland Security has identified numerous aliens illegally present in the United States whom they have represented are under final orders to remove them from the United States; and

   c. WHEREAS the Department of Homeland Security has represented that each of the above-referenced individuals is under criminal investigation for violations of one or more specifically designated Federal criminal statutes (not involving tax administration), including 8 U.S.C. § 1253(a)(1); and

   d. WHEREAS the parties wish to enter into an agreement setting forth the procedures, processes, and safeguards to be followed upon the receipt of a request for the disclosure of information subject to the confidentiality requirements of Internal Revenue Code (IRC) § 6103;

   e. NOW THEREFORE, this Memorandum of Understanding (MOU) between the U.S. Treasury Department / Internal Revenue Service (IRS), and the U.S. Department of Homeland Security / U.S. Immigration and Customs Enforcement (ICE), sets forth the agreement of the parties with respect to ICE's use of the authority in IRC § 6103(i)(2) for the submission of requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or another specifically designated Federal criminal statute.

2. **AUTHORITY:**

The IRS enters into this MOU pursuant to IRC § 7803(a)(2), delegating to the IRS the authority to administer the Internal Revenue Code, and IRC § 6103(i)(2), authorizing the disclosure of return information other than taxpayer return information for purposes of the enforcement of a specified

nontax Federal criminal statute.  ICE enters into this MOU pursuant to 8 U.S.C. § 1253(a)(1), 8 U.S.C. § 1103, and 6 U.S.C. § 112(b)(2).

## 3.  PURPOSE:

(U//LES) The purpose of this MOU is to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes.  The specifications and details regarding the IRS's and ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

## 4.  CONTACTS:

A.  Contacts for this MOU are the IRS designee(s) and the ICE designee(s). Refer to Exhibit A.

B.  Succession of Authority.  The IRS and ICE anticipate there may be changes to the titles and\or responsibilities of officers and employees designated within this MOU. In the event of such changes, any actions that may be taken under this MOU by said officers or employees, may be taken by any officer(s) or employee(s) the IRS and ICE determine to have succeeded to the relevant portions of said officers' or employees' authorities or responsibilities.  Each party shall be responsible for ensuring the points of contact are current by providing a revised Exhibit A to all parties within 30 days of any change.

## 5.  DUTIES AND RESPONSIBILITIES OF THE IRS:

The IRS will:

A.  Receive requests for address information from ICE.

B.  Review each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2). The IRS will provide explanations and/or reasons the request cannot be processed.

C.  (U//LES) Search for the last known address for each individual in each request.

D.  (U//LES) For each individual the IRS is able to identify from the information provided by ICE, provide the IRS last known address for that individual.  For each individual the IRS cannot identify from the information provided by ICE, indicate "no match" in the response.

E.  Send responses to ICE in the manner set forth herein.

F.  Account for disclosures made under this MOU as required pursuant to IRC § 6103(p)(3)(A).

2
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

G. (U//LES) Specifications and details regarding the IRS's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

## 6. DUTIES AND RESPONSIBILITIES OF ICE:

ICE will:

A. (U//LES) Send requests for address information for specifically identified individuals pursuant to the specifications contained in a separate implementation agreement between ICE and IRS.

B. Each request must be made consistent with IRC § 6103(i)(2)(A).

C. (U//LES) Each request will contain the following information with respect to each individual identified in the request:

   1. (U//LES) The name and address of the taxpayer.
   2. (U//LES) The taxable period or periods as to which the return information (address) they are seeking relates.
   3. (U//LES) The specifically designated nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding regarding the individual is being conducted.
   4. (U//LES) The date of the final order of removal and the related case number assigned to each such order.
   5. (U//LES) The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding.  Any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.
   6. (U//LES) Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified.

D. (U//LES) Each request will attest that the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings.

E. ICE will use and redisclose the address information only as specifically authorized by IRC § 6103(i)(2) as implemented in 26 C.F.R § 301.6103(i)-1.  Specifically, the regulations provide:
   1. (U//LES) Return information disclosed under IRC § 6103(i)(2) shall be open to inspection by or disclosure to ICE officers and employees personally and directly engaged in, and for their necessary use in, proceedings and investigations that may result in such proceedings, pertaining to the enforcement of a specifically designated nontax Federal criminal statute.

   2. (U//LES) Return information disclosed under IRC § 6103(i)(2) may be disclosed by such

3

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

ICE officers and employees to other persons only to the extent necessary to the enforcement of the specifically designated nontax Federal criminal statute, including:

   a. (U//LES) To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);
   b. (U//LES) To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or
   c. (U//LES) To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

3. (U//LES) Among those persons to whom returns and return information may be disclosed by officers and employees of ICE on a need-to-know basis as provided are:

   a. (U//LES) Other ICE officers and employees such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel;
   b. (U//LES) Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such ICE officers and employees; and
   c. (U//LES) Court reporters.

F. (U//LES) ICE will ensure the proper handling, transmission, safeguarding, and security of the address information as contained in Sections 8 and 9 of this MOU.

G. Specifications and details regarding ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

4
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**7.   DESCRIPTION OF THE RECORDS:**

A.  Systems of Records Notices

    1.  The IRS will
        a.  (U//LES) disclose address information from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

    2.  ICE will
        a.  (U//LES) disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Address Information; Date of Birth; Country of Citizenship; FBI Numbers; and Fingerprint Identification Number (FINS), from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE; and

        b.  (U//LES) maintain the address information provided by the IRS in the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

**8.   INFORMATION SECURITY:**

The IRS and ICE will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, Subchapter II, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283); related Office of Management and Budget (OMB) circulars and memoranda, such as Circular A-130, Managing Information as a Strategic Resource (July 28, 2016), and Memorandum M-17-12, Preparing for and Responding to a Breach of Personally Identifiable Information (PII) (Jan. 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including amendments published after the effective date of this MOU. These laws, directives, and regulations include requirements for safeguarding Federal information systems and Personally Identifiable Information used in Federal agency business processes, as well as related reporting requirements. Both agencies recognize, and will implement, the laws, regulations, NIST standards, and OMB directives, including those published subsequent to the effective date of this MOU.

The FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Both agencies are responsible for oversight and compliance of their contractors and agents.

5
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

A153

A. Incident Reporting

If the IRS or ICE experiences an incident involving the loss or breach of PII provided by IRS under the terms of this MOU, they will follow the incident reporting guidelines issued by OMB. In the event of a reportable incident under OMB guidance involving PII, the agency experiencing the incident is responsible for following its established procedures, including notification to proper organizations (i.e., Cybersecurity & Infrastructure Security Agency (CISA) and the agency's privacy office). Immediately upon discovery of a potential cybersecurity incident involving IRS-provided PII, ICE will contact the IRS Computer Security Incident Response Center (CSIRC) at 240-613-3606.

B. Breach Notification

The IRS and ICE will follow PII data breach notification policies and related procedures as required by OMB Memorandum M-17-12 (Jan. 3, 2017). If the agency that experienced the data breach, after conducting a risk assessment, determines notification to the potentially impacted individuals and an offer of an identity protection/identity monitoring service, and/or other remedies is required, that agency will carry out the remedies without cost to the other agency.

**9. DISCLOSURE, SAFEGUARDS, AND RECORD KEEPING REQUIREMENTS:**

A. ICE will maintain all Federal tax returns and return information sourced from the IRS in accordance with IRC § 6103(p)(4) and comply with the safeguards requirements set forth in Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies*. Publication 1075 is the IRS-published guidance for security guidelines and other safeguards for protecting returns and return information, pursuant to 26 C.F.R. § 301.6103(p)(4).

The IRS safeguarding requirements include:

1. ICE will establish a central point of control for all requests for and receipt of Federal tax returns and return information and maintain a log to account for all subsequent disclosures and products made with/from that information, and movement of the information until destroyed, in accordance with Publication 1075.

2. ICE will establish procedures for secure storage of Federal tax returns and return information consistently maintaining two barriers of protection to prevent unauthorized access to the information, including when in transit, in accordance with Publication 1075.

3. ICE will consistently label Federal tax returns and return information obtained under this MOU to make it clearly identifiable and to restrict access by unauthorized individuals. Any duplication or transcription of Federal tax returns and return information creates new records which must also be properly accounted for and safeguarded. Federal tax returns and return information should not be commingled with other ICE records unless the entire file is safeguarded in the same manner as required for Federal tax returns and return

6
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

information and the Federal tax information (FTI) within is clearly labeled in accordance with Publication 1075.

4.  ICE will restrict access to Federal tax returns and return information solely to officers and employees of ICE as described in this MOU for the purposes of carrying out this MOU. Prior to access ICE must evaluate which employees require such access. Authorized individuals may only access Federal tax returns and return information to the extent necessary to perform services related to, and as authorized by, this MOU, in accordance with Publication 1075.

5.  Prior to initial access to FTI and annually thereafter, ICE will ensure that employees and officers that will have access to Federal tax returns and return information receive awareness training regarding the confidentiality restrictions applicable to the Federal tax returns and return information and certify acknowledgement in writing that they are informed of the criminal penalties and civil liability provided by IRC §§ 7213, 7213A, and 7431 for any willful disclosure or inspection of Federal tax returns and return information that is not authorized by the IRC, in accordance with Publication 1075.

6.  ICE will submit an annual Safeguard Security Report (SSR) to the Office of Safeguards by the submission deadline specified in Publication 1075 to provide an update on safeguarding activities during the reporting period.  The SSR will also provide Head of Agency certification that the SSR addresses all Outstanding Actions identified by the IRS Office of Safeguards from the agency's prior year SSR; accurately and completely reflects ICE's current environment for the receipt, storage, processing, and transmission of FTI; accurately reflects the security controls in place to protect the FTI in accordance with Publication 1075 and of ICE's commitment to assist the Office of Safeguards in the joint effort of protecting the confidentiality of FTI; support the Office of Safeguards on-site review to assess ICE's compliance with Publication 1075 requirements by means of manual and automated compliance and vulnerability assessment testing, including coordination with information technology (IT) divisions to secure pre-approval, if needed, for automated system scanning and to support timely mitigation of identified risk to FTI in ICE's Corrective Action Plan (CAP) for as long as ICE maintains Federal tax returns and return information.  Required reports will be transmitted in electronic format and on the template provided by IRS Office of Safeguards using an IRS-approved encryption method in accordance with Publication 1075.

7.  ICE will timely report all data incidents involving FTI to the Office of Safeguards and cooperate with Office of Safeguards investigators, providing data and access as needed to determine the facts and circumstances of the incident.

8.  When a data incident results in ICE taking adverse or disciplinary action against an employee based on an unauthorized inspection or disclosure of FTI in violation of ICE's procedures ICE must notify each impacted taxpayer in writing. The notification letter must include the date of the unauthorized inspection or disclosure and the rights of the taxpayer

7
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

under IRC § 7431. ICE must report to IRS Safeguards when taxpayer notification letters are issued, in accordance with Publication 1075.

9. ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with Publication 1075.

10. ICE will conduct periodic internal inspections of facilities where Federal tax returns and return information is maintained to ensure IRS safeguarding requirements are met and will permit the IRS access to such facilities as needed to review the extent to which ICE is complying with the IRC § 6103(p)(4) requirements of this section.

11. IRC § 6103(p)(9) requires ICE to conduct on-site assessments of each contractor's compliance with safeguarding requirements. ICE must submit findings of the most recent review as part of the annual SSR submission. ICE must certify to the IRS that each contractor is in compliance with safeguarding standards in accordance with Pub 1075. ICE must ensure that contracts with contractors and subcontractors performing work involving returns or return information contain specific language requiring compliance with IRC § 6103(p)(4) and Publication 1075 standards. Contract language must enforce ICE's right to access contractor and subcontractor facilities in order to comply with IRC § 6103(p)(9) to ensure IRS safeguarding requirements are met.

12. Usage of FTI for Artificial Intelligence (AI) purposes must be disclosed to the Office of Safeguards for assessment of compliance with safeguard requirements.

B. Generally, this MOU covers secure electronic transmission of Federal tax returns and return information to ICE, provided ICE computer systems are compliant with National Institute of Standards and Technology (NIST) Special Publication 800-53 standards and guidance for security of data at the moderate impact level. ICE's SSR must fully describe the computer system and security controls implemented for the receipt, processing, storage, and transmission of electronic Federal tax returns and return information. Required security controls for systems that receive, process, store, and transmit electronic Federal tax returns and return information are specified in Publication 1075.

C. Any creation or receipt of Federal tax returns and return information in paper format must also be fully disclosed in ICE's SSR. Required security controls associated with the receipt, processing, and storage of any Federal tax returns and return information received in paper format are specified in Publication 1075.

D. ICE must report suspected unauthorized inspection or disclosure of Federal tax returns and return information within 24 hours of discovery to the IRS Office of Safeguards in accordance with Publication 1075.

E. IRS will conduct periodic safeguard reviews of ICE to assess whether security and confidentiality of Federal tax returns and return information is maintained consistent with the

8
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

safeguarding protocols described in Publication 1075, ICE's SSR, and in accordance with the terms of this MOU. Periodic safeguard reviews will involve the inspection of ICE's facilities where FTI is maintained; the testing of technical controls for computer systems storing, processing, or transmitting FTI; review of ICE's recordkeeping and policies; and interviews of ICE's employees to verify the use of FTI and to assess the adequacy of procedures established to protect FTI.

F.  ICE recognizes and will reflect in its actions and procedures that all Safeguards documents and related communications are IRS official records; that they are property of the IRS; that IRS records are subject to disclosure restrictions under Federal law and IRS rules and regulations and may not be released publicly under state Sunshine or Information Sharing/Open Records provisions and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. If ICE determines that it is appropriate to share Safeguards documents and related communications with another governmental function/branch for the purposes of operational accountability or to further facilitate protection of FTI, the recipient governmental function/branch must be made aware, in unambiguous terms, that Safeguards documents and related communications are property of the IRS; that they constitute IRS official records; that any request for the release of IRS records is subject to disclosure restrictions under Federal law and IRS rules and regulations and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. Federal agencies in receipt of FOIA requests for Safeguards documents must forward them to IRS for reply.

G.  All information received from ICE under this MOU becomes return information as defined in IRC § 6103(b)(2) and will not be further disclosed or disseminated except as authorized by IRC § 6103.

## 10.  TRANSMITTAL PROCEDURES:

Transmittal procedures and transmittal security requirements will be included in a separate implementation agreement entered into between IRS and ICE.

9
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**11. LIABILITY:**

A. Each party to this MOU shall be liable for the acts and omissions of its own employees.

B. The IRS shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under the Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority. Similarly, ICE shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under applicable Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority.

C. This MOU is not an obligation or commitment of funds, nor a basis for transfer of funds, but rather is a basic statement of the understanding between the parties. Unless otherwise agreed in writing, each party shall bear its own costs in relation to this MOU. Expenditures by each party will be subject to its budgetary processes and to the availability of funds and resources pursuant to applicable laws, regulations, and policies.

**12. THIRD PARTY RIGHTS:**

This MOU does not confer any rights or benefits on any third party.

**13. PRIVACY:**

The IRS and ICE will ensure the integrity and accuracy of personal and financial data. The IRS and ICE will perform their duties in a manner that recognizes and enhances individuals' right of privacy and will ensure their activities are consistent with laws, regulations, and good administrative practices.

**14. EFFECTIVE DATE:**

The effective date of this MOU is the date it has been signed by all parties to the Agreement. The information exchange contained in this agreement will not commence until a separate implementation agreement between the IRS and ICE has been signed and implemented.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**15.  AMENDMENT OF MOU:**

This MOU may be amended by deletion or modification of any provisions, provided that such amendment is in writing and is signed by all parties to the MOU.

**16. TERMINATION OF MOU:**

(U//LES) This MOU will remain in effect as necessary for the IRS to provide address information in response to ICE requests satisfying the requirements contained in this MOU.  This MOU may be terminated upon ninety  (90) days written notice by either the IRS or ICE, which shall describe the rationale for the termination and be publicly posted on the respective party's website 90 days prior to termination.

**17. LIMITATIONS:**

Any provision of this MOU which conflicts with Federal law will be null and void. The provisions of paragraph 11, *Liability*, will continue until all potential liabilities have lapsed.

11
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**APPROVALS**:

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

_Scott K. W. Bessent_

Secretary Scott Bessent

Date: April 07, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

_____

Secretary Kristi Noem

Date: April ___, 2025

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Page 163 of 388

Filed: 02/17/2026

Document #2159317

USCA Case #26-5006

(Page 163 of Total)

**APPROVALS**:


U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE


_____
Secretary Scott Bessent

Date: April ___, 2025




U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT


_____
Secretary Kristi Noem

Date: April 7, 2025




12
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**EXHIBIT A – POINTS OF CONTACT**

**INTERNAL REVENUE SERVICE:**

Name:
Title:
Phone:
Email:

Name:
Title:
Phone:
Email:

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT:**

Name:
Title:
Phone:
Email:

Name:
Title:
Phone:
Email:

13
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Page 165 of 388

Filed: 02/17/2026

Document #2159317

USCA Case #26-5006

(Page 165 of Total)

Exhibit 5

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTRO DE TRABAJADORES UNIDOS, et al.,<br><br>　　　　Plaintiffs,<br><br>　　　　v.<br><br>SCOTT BESSENT, in his official capacity as Secretary of the Treasury, et al.,<br><br>　　　　Defendants. | Civil Action No. 25-677 (DLF) |

## **DEFENDANTS' NOTICE ON STATUS OF REQUESTS FOR RETURN INFORMATION**

In previous filings and hearings on this matter, the United States informed this Court that the IRS had neither received any request nor released any information to ICE under the terms of the MOU between DHS and Treasury dated April 7, 2025. Since then, the IRS responded to requests for return information made by ICE pursuant to the MOU. The IRS did so only as consistent with the MOU and 26 U.S.C. § 6103(i)(2).

Date: August 12, 2025

　　　　　　　　　　　　　　　　　*/s/ Andrew J. Weisberg*
　　　　　　　　　　　　　　　　　Joseph A. Sergi (D.C. Bar No. 480837)
　　　　　　　　　　　　　　　　　Senior Litigation Counsel

　　　　　　　　　　　　　　　　　Andrew J. Weisberg (N.Y. Bar No. 5616321)
　　　　　　　　　　　　　　　　　Trial Attorney
　　　　　　　　　　　　　　　　　Tax Division
　　　　　　　　　　　　　　　　　U.S. Department of Justice
　　　　　　　　　　　　　　　　　P.O. Box 14198
　　　　　　　　　　　　　　　　　Washington, DC 20044
　　　　　　　　　　　　　　　　　Telephone: (202) 305-0868
　　　　　　　　　　　　　　　　　Joseph.A.Sergi@usdoj.gov
　　　　　　　　　　　　　　　　　*Counsel for Defendants*

1

## <u>CERTIFICATE OF SERVICE</u>

I certify that on August 12, 2025, I filed the foregoing Notice on Status of Requests for

Return Information with the Clerk of Court using the CM/ECF system, which will serve counsel

for the plaintiffs and all other parties to this action.

<div align="right">

*/s/ Andrew J. Weisberg*
Andrew J. Weisberg
Trial Attorney
Tax Division
U.S. Department of Justice

</div>

2

# Exhibit 6

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs*,

v.                                           Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

*Defendants*.

## DECLARATION OF NINA E. OLSON

I, Nina E. Olson, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.      I am over eighteen years old and of sound mind, and I am fully competent to make this declaration.

2.      I serve as the Executive Director and Founder of the Center for Taxpayer Rights ("the Center" or "CTR"). I am personally knowledgeable about the organization's mission and operations. I previously served as the Internal Revenue Service ("IRS") National Taxpayer Advocate from 2001 to 2019, and earlier represented taxpayers in disputes with the IRS in private practice and at The Community Tax Law Project, the nation's first independent low-income taxpayer clinic. I've also testified before Congress relating to taxpayer rights and tax administration on more than 70 occasions.

1

<u>Center for Taxpayer Rights Mission, Activities, and Services</u>

3.      The Center's mission is dedicated to furthering taxpayers' awareness of and access to taxpayer rights, and deepening their understanding of the role taxation plays in achieving the common good.  We focus on (1) advancing taxpayer rights, (2) promoting trust in the tax system, and (3) increasing access to justice in the tax system, particularly for the most vulnerable populations, including immigrants, people whose first language is not English, low-income people, and domestic violence survivors.

4.      As a part of this work, the Center runs a Low-Income Taxpayer Clinic ("LITC"), which receives federal funds under the authorization provided by statute for such clinics in 26 U.S.C. § 7526.

5.      This Center also operates a nationwide network—LITC Connect—of other LITCs, as well as attorneys, accountants, and enrolled agents. LITC Connect has approximately 160 individual members and 90 LITC members.

6.      The Center also holds conferences, workshops, webinars, and other events to educate individuals on issues related to taxpayer rights, including privacy rights, and promoting trust in the tax system.  The Center also engages with the media and publishes written materials on these same issues.

<u>LITCs</u>

7.      Low Income Taxpayer Clinics, or LITCs, are organizations that provide *pro bono* (free) or nominal fee representation to low-income taxpayers who have tax disputes with the IRS, or related state or local tax disputes.  The disputes can involve audits, administrative appeals, collection, account adjustments, or litigation.  LITCs also provide outreach and education for low-

2

income taxpayers and taxpayers who speak English as a Second Language (ESL) about taxpayer rights and responsibilities.

8.  LITCs are required to "ensure the fairness and integrity of the tax system for taxpayers who are low-income or speak English as a second language."[1] This includes working to "inform individuals for whom English is a second language about their rights and responsibilities" under the Internal Revenue Code. 26 U.S.C. § 7526 (b)(1)(A)(ii)(II).  LITCs must also, in order to receive federal funding, identify and advocate for issues that impact these taxpayers.[2]

9.  Without LITCs, taxpayers who cannot afford representation in tax disputes with the tax agency are likely to get the wrong result, simply because they do not understand the tax law, or they do not understand what they need to provide the agency to support their case, or they simply give up because they are afraid or intimidated by the tax agency.

10.  Low income and other vulnerable taxpayer populations may not know they have the general right to challenge the tax agency and be heard, or that they have specific protections under the law.  LITCs ensure that low-income taxpayers are afforded the same rights and protections — due process — as taxpayers who can pay for counsel.

<u>The Center's Legal Services</u>

11.  At the Center, we integrate research and systemic advocacy with direct representation, litigation, and services through our own LITC.

12.  CTR's LITC provides free representation to low-income taxpayers who have tax disputes with federal, state, or local tax agencies.  Our LITC also provides outreach and

---

[1] Internal Revenue Service, National Taxpayer Advocate, Annual Report to Congress, 2024, at 197, https://www.taxpayeradvocate.irs.gov/reports/2024-annual-report-to-congress/full-report/.
[2] *Id.*

education for low-income taxpayers, and taxpayers who speak English as a second language, about taxpayer rights and responsibilities, consistent with our obligations under 26 U.S.C. § 7526 (b)(1)(A)(ii)(II) as a condition of our federal funding.

13.    The Center currently has 22 active cases in-house; there are another 41 cases pending assignment to volunteers through LITC Connect.  The Center has also conducted 49 consultations with taxpayers in 2025 thus far, providing guidance and advice where the taxpayer did not require direct representation.; 18 of these consultations were with *pro se* taxpayers during 4 virtual trial sessions at the United States Tax Court.  The Center receives its cases from a variety of sources, including direct referrals from the IRS and from taxpayers finding the Center's LITC listing on the IRS website.  In addition to cases we receive as a result of our outreach and education events, the Center also has referral arrangements with a network of Volunteer Income Tax Assistance (VITA) sites serving the District of Columbia, and a network of Domestic Violence shelters and other organizations serving this population in the District of Columbia.  None of our clients would be able to afford paid representation in their cases; the tax issues they are dealing with range from denial of credits relating to children, including the Earned Income Tax Credit and the Child Tax Credit; worker classification issues; other types of audits; and collection issues, including wage garnishments that cause our clients to be unable to pay their basic living expenses.

14.    Since 1985, the Internal Revenue Code has taxed U.S. citizens and "resident aliens" on their worldwide income, unless treaty provisions provide otherwise.  26 U.S.C.

4

§ 7701(b)(1), enacted by the Tax Reform Act of 1984, Pub. Law 98-369, Section 138.[3]  An

individual is considered a resident alien for federal tax purposes if they have the requisite

immigration status or they satisfy the substantial presence test defined in 26 U.S.C. § 7701(b)(3).

Thus, taxpayers who are unlawfully present in the United States and meet the substantial

presence test are required to file federal tax returns reporting their income.

15.    The United States Supreme Court has held that "taxes are the lifeblood of

government and their prompt and certain availability an imperious need." *Bull v. United States*,

295 U.S. 247, 259 (1935). Accordingly, the tax code has distinguished itself from immigration

enforcement in defining resident aliens differently and more expansively than under immigration

law.  The law, policies, and practice pertaining to tax return and return information

confidentiality under 26 U.S.C. § 6103 have followed that distinction by ensuring the tax

agency—which collects the lifeblood of government—is not drawn into immigration

enforcement.  Section 6103 has walked a fine line by carving out extremely narrow exceptions to

tax return confidentiality such that voluntary tax compliance is not eroded by the IRS's

complicity in the use of tax return information to enforce laws unrelated to tax administration,

which would fatally impair the IRS's ability to collect the revenue that is government's

lifeblood.

16.    The IRS created Individual Taxpayer Identification Numbers (ITINs) in 1996 as a

way for individuals who do not qualify for a Social Security Number, including resident aliens,

to file federal tax returns.  To obtain an ITIN, one must complete Form W-7, Application for an

---

[3] Prior to 1985, "[t]he question of residency [was] one of fact which must be determined based upon the circumstances of each individual case." *Hoskins v. Comm'r*, 46 T.C.M. (CCH) 1172 (T.C. 1983).

Individual Taxpayer Identification Number; the applicant must provide their name and address and other identifying information and submit original identity documents. In most instances, the Form W-7 cannot be processed on its own; it must be submitted along with the taxpayer's Individual Income Tax Return. Once an ITIN is assigned, the taxpayer must use that number for all subsequent returns, on which they must include their current address (which may be different from the address used to obtain the ITIN), as well as information regarding their dependents, marital status, and sources of income.

17.    Last year, in 2024, the Center handled 16 cases involving ESL taxpayers, including 14 cases involving taxpayers with ITINs, of which 8 involved ITIN processing or assignment issues.

18.    We have, until recently, counseled our clients and community members without Social Security Numbers (SSNs) to strongly consider obtaining an ITIN, so that they can participate in our country's tax system. We have advised our clients, in alignment with our mission and consistent with our experience and professional judgment, that they have taxpayer rights, guaranteed by law, that protect the confidentiality of their information. We have advised them that the law requires them to pay federal taxes, and that future hopes of an adjustment of status may benefit from consistent participation in the tax system. This advice is aligned with the Center's mission and consistent with its obligations to receive federal funding under 26 U.S.C. § 7526 (b)(1)(A)(ii)(II).

<u>LITC Connect</u>

19.    The Center also runs LITC Connect. Among other services, LITC Connect holds weekly calls with several dozen representatives of its member LITCs, provides training and

6

support, and carries professional liability insurance for the network of professionals that serve LITC members.

20.    LITC Connect also offers training in relevant tax issues to volunteers and LITCs, and developing resources for educating taxpayers about their rights and responsibilities, we ensure the protection of taxpayer rights. For example, we have conducted trainings on litigating refund claims in federal district courts and the Court of Federal Claims; on representing survivors of domestic violence; and on representing incarcerated or formerly incarcerated persons in tax disputes. We have also created a 10-week video series on the "Roadmap to a Tax Controversy" that is watched by new LITC staff and student interns. We host weekly strategy calls, where we help LITCs identify issues impacting low income and other vulnerable population.  We discuss approaches to legal issues, share advice, discuss litigation strategy, and provide guidance to other practitioners on the issues we are facing.

<u>The Center's Education and Outreach</u>

21.    CTR puts enormous effort into getting information about taxpayer rights and responsibilities to low-income taxpayers and their advocates.

22.    On a regular basis, we hold outreach and education events and activities for smaller groups of taxpayers, and we dedicate resources to targeting vulnerable populations. In 2024, we conducted five ESL outreach activities and five outreach activities to organizations that serve ESL or low-income taxpayers; during these sessions we discussed taxpayers' rights and responsibilities, including the responsibility of persons present in the US for a certain number of days (i.e. resident aliens) to file returns and the confidentiality protections for return information.

23.     During these events, we generally make a presentation targeted to the taxpayer population attending—for example, survivors of domestic violence or newcomers to the United

<div align="center">7</div>

States.  When the events are held in-person, we set aside time for questions from the attendees but also for individual, anonymous consultations with attendees if they wish to discuss their issues in greater detail or are anxious about asking questions in public.  When the events are held virtually, we answer questions from the chat function and we also offer an opportunity to meet a lawyer in a private online breakout room to discuss specific case issues.  Another form of outreach event is appearing on podcasts that reach the populations we serve in the LITC.  Attendance at events can range from 5 people to 300,000, depending on the audience and mode of presentation.  All three CTR attorneys, including myself, conduct outreach and education, and the LITC has one staff position dedicated to outreach and education, and is about to hire another person who will assist in this work.

24.     The Center also conducts public education campaigns to educate taxpayers about their rights and obligations. For example, during the 2025 filing season, the Center, in partnership with the District of Columbia Office of Tax and Revenue, conducted a Metro poster campaign placed in stations serving low-income communities with a concentration of EITC filers.  These posters alerted taxpayers, including ESL taxpayers, to be alert to schemes, scams, and incompetent return preparers, and to take steps to protect their identities during the filing season.

25.     We also hold larger convenings to discuss these issues, such as conferences and webinars.  This year, we held our 10th International Conference on Taxpayer Rights, from June 4 to 6, 2025, focused on "Trust, Taxpayer Rights, & the Rule of Law."  We discussed issues related to specific groups of taxpayers and the challenges they may face in attempting to comply with tax laws in their country; we discussed trust in tax systems in the digital age of tax administration, and how automated tools can breed distrust; and we discussed how once trust in a tax system is lost, it is difficult to regain.  The conference is held in-person and live-streamed, and the US and

8

international audiences include LITC staff, tax practitioners and policymakers, academics, and tax agency officials.

26.    In 2024, the International Conference on Taxpayer Rights was entitled "Toward a Digital Taxpayer Bill of Rights" and focused on the implications of a digitalized tax system on under- and unrepresented taxpayers.  In 2023, we held a conference on moving towards an effective, trusted, and inclusive IRS, focused on ensuring the most vulnerable populations were protected by the tax system, including EITC recipients and ITIN filers.

27.    We also advocate for systemic change by connecting with national and international policymakers, advocates, and academics on issues impacting taxation and taxpayer rights; filing amicus briefs and participating in high-impact litigation in important tax cases; and promoting transparency through Freedom of Information Act requests and other research. We also file comments on regulations and procedures and amicus briefs in cases related to taxpayer rights.  This work is done in service of our mission to support the rights of low-income taxpayers in particular.

<u>The Center's Reliance on IRS Data Protections to Fulfil Its Mission and Provide Services</u>

28.    Section 6103 of the tax code provides that the information taxpayers provide to the IRS shall remain confidential, with limited exceptions.  An essential feature of Section 6103's exceptions is that information may be disclosed only for a designated purpose and pursuant to the exact procedures provided for each exception.

29.    The IRS also administratively adopted the Taxpayer Bill of Rights (TBOR) in the summer of 2014. Congress codified the TBOR in 2015. *See* Protecting Americans from Tax Hikes Act of 2015 (PATH Act), Pub. L. No. 114-113 § 401, 129 Stat. 3117 (2015) (codified at 26 U.S.C. § 7803). The TBOR's sixth enumerated right is the "Right to Confidentiality," now found at 26 U.S.C. § 7803(a)(3)(D), which provides that taxpayers have the right to expect that

9

"any information they provide to the IRS will not be disclosed unless authorized by the taxpayer or by law." That right reflects nearly fifty years of congressional intent, beginning with the 1976 Tax Reform Act, to limit disclosure of tax data to narrow, carefully delineated exceptions in 26 U.S.C. § 6103.

30.     These confidentiality protections serve not only taxpayers' interests; they also strengthen the system of tax administration, which necessarily relies on voluntary compliance. By promising to safeguard taxpayers' privacy, the IRS encourages taxpayers to share wide-ranging information about their lives, sometimes including sensitive matters of family life, health status, and even behavior that may be contrary to other laws. All of this information is necessary to comprehensive and successful tax administration. As former IRS Commissioner Mark Everson testified to Congress in 2004: "We are broadly restricted under Section 6103 of the Code from sharing taxpayer information with third parties, including other government agencies, except in very limited circumstances."

31.     In fact, as early as 1982, six years after the enactment of 26 U.S.C. § 6103, the IRS vigorously defended the confidentiality of tax returns and return information against expansive interpretations of information sharing in the interests of maintaining voluntary tax compliance:

> The costs of IRS disclosure also seem high. Congress is likely to raise strong institutional objections, and will be strongly supported by various civil libertarian groups. A potentially costly and burdensome class action law suit is likely to be filed on behalf of those whose addresses were disclosed, and the publicity generated by the event will inevitably have some effect on the public's willingness to disclose information voluntarily to the IRS.

Memorandum from Peter J. Wallison, General Counsel, Department of the Treasury, to Secretary Regan, Disclosure to the Selective Service System (May 17, 1982) at 2.

10

32.     These protections have been a cornerstone of the Center's ability to (1) effectively counsel our clients, and (2) provide education and outreach that encourages participation in the tax system.

33.     For example, we have, for years, assured our clients who are worried about confidentiality of the stringent protection in place at the IRS with respect to the protection of information.

34.     Undocumented immigrants working in the United States are required by law to pay and file taxes.  Thus, we must advise our clients, and educate community members, of this legal responsibility.  In the past, we would do so while also assuring them of the confidentiality of their information.

35.     We have, for example, encouraged undocumented immigrants to file for an ITIN in order to participate in our tax system.  We have advised our clients and community members that filing allows certain ITIN holders to obtain dependent credits, like the Child Tax Credit, for their children who have a valid Social Security Number (SSN).

36.     We also advise our clients and community members that an ITIN can be used to open an interest-bearing checking or savings account or obtain a mortgage.

37.     Further, filing taxes as an ITIN holder or undocumented immigrant allow people without Social Security Numbers (SSNs) to pay taxes and contribute to essential programs, even though they cannot receive the benefits attached to them.  It benefits the entire tax system and country to have these individuals participate.

38.     Immigrants have also been led to believe that paying their taxes, even while without legal status in the United States, can lead towards a path to citizenship.  Legislative proposals for immigration reform often include, for example, language that payment of back

11

taxes can be used as evidence of good moral character in qualifying for a path towards citizenship. And USCIS explicitly requires proof of tax compliance to establish eligibility for naturalization.[4]

39.    We have, in our legal work and outreach efforts, advised clients and community members of all of this, for years.  That is no longer possible.

<u>The Data Sharing Policy Has Harmed and Continues to Harm the Center's Work</u>

40.    The Center's work, particularly through its operation of the Center's LITC, has become much more difficult in recent months as a result of the policy change at the IRS that has changed how the IRS accesses and shares data, and thus reduced confidence in the protection of taxpayer data.

41.    The reporting on the IRS's new policy to share taxpayer data much more broadly with other agencies, including ICE, has made it significantly more difficult for the Center to accomplish this mission. Taxpayers, particularly those who do not speak English as a first language and are more likely to be immigrants—to whom the Center is required to conduct outreach and education, as a statutory condition of its LITC's federal funding—have become less willing to come to the Center's events, to seek its guidance, or to engage with the Center's education and outreach.  This has also been the Center's recent experience interacting with other populations particularly concerned about the security of personal information, including the domestic violence survivors the Center serves—many of whom interact with the IRS regarding Earned Income Tax Credit and/or Child Tax Credit payment issues.

---

[4] USCIS, Form G-1151: Thinking About Applying for Naturalization? Use this List to Help You Get Ready!" (rev. Feb. 2024), https://www.uscis.gov/sites/default/files/document/guides/G-1151.pdf

42.     Potential LITC clients are also less willing to engage with the Center's services. The comparison from last year to this year makes clear the drastic impact this policy has had. Last year the Center handled 14 cases involving taxpayers with ITINs. To date in 2025, the Center has received only one new case involving an ITIN taxpayer.

43.     Last year, we conducted ten outreach and education activities related to ESL taxpayers; this year, the Center has only been able to conduct one virtual outreach/educational activity to ESL taxpayers and has been unable to host any in-person events, which are the most effective.

44.     The dramatic decline in interest and engagement with the Center's programming is due to taxpayers' reluctance to engage with the IRS for fear of drawing attention to themselves or having their current status or location shared with DHS/ICE.

45.     To attempt to adapt to this difficulty in carrying out the educational component of its mission, the Center has had to expend significant resources in recent months. First, the Center assigned additional education and outreach duties to an existing staff member and increased that staffer's pay as a result of the additional workload and responsibility. In the last two weeks, the Center hired an additional staffer to focus on education and outreach in light of the reduced trust in the tax system engendered by the IRS's policy change to share taxpayer data more freely across the federal government. This need to expend additional resources is reflected in a FY 2026 grant application the Center submitted to the IRS on or around July 11, 2025.

46.     The Center has had to allocate approximately $75,000 to $100,000 on an annual basis out of its LITC's operating budget to education and outreach as a result of the reduction in trust and chilling effects of the IRS's policy change. This includes an allocation of approximately

13

$35,000 for the last quarter of 2025 and a planned allocation of $75,000 to $100,000 for 2026. This represents nearly 10 percent of the Center's LITC's operating expenses.

47.    When responding to questions or concerns from ITIN taxpayers about the privacy of the information they submit to the IRS, the LITC can no longer provide substantive advice about whether or not the taxpayers should or can safely submit information to the IRS. We can only lay out their legal obligation to file and the consequences of failing to file. And we can inform them that although the law provides certain privacy protections that should prevent this, the IRS has an information-sharing agreement with ICE, and that ICE may be able to obtain their address information from the IRS, which could put the taxpayer or members of their household/family at risk of detention and removal. Before the IRS's new data-sharing policy, we were in a position to offer reliable advice about the risks and privacy protections associated with tax filings for this population. Now, under the new data-sharing policy, the Center is not in a position to provide reliable advice, consistent with our professional obligations, because we cannot reconcile the IRS's reported data-sharing conduct with our understanding of the laws that should constrain it. Instead, the Center can only lay out the relevant facts, and the taxpayer has to make the decision on whether to file, without the benefit of our advice. This is an intolerable situation the undermines our ability to develop trusting relationships with our clients and to effectively represent them.

48.    This has resulted in immediate impairment to our ability to counsel our clients. For example, we have represented clients in cases where, due to an IRS processing error, clients faced issues in obtaining an ITIN for their children, which prevented them from claiming their children as dependents and receiving a $500 credit to which they were entitled. These clients had, prior to 2025, sought assistance from the LITC to rectify this error with the IRS. In at least one instance,

14

because they feared interaction with ICE, they walked away from the tax credit they were eligible for, scared of providing information to or engaging further with the agency.

49.     In other cases, LITC clients have U.S. citizen children and adult dependents who would qualify for the Other Dependent Credit (ODC). These clients are also entitled to a refund of excess tax withholdings. In at least one instance, a client declined to file a return claiming the ODC or refund of withholdings, for fear of their information being disclosed to ICE and subjecting them to ICE raids or deportation, potentially preventing this client from ever obtaining the refund to which they are entitled.

50.     Our clients and community members without SSNs that are not already ITIN holders are much less likely to apply for an ITIN, now that their information is likely to be imminently shared, unlawfully, with ICE. I am confident that some members of the communities we serve will decide not to apply for an ITIN, or file taxes with an ITIN, because they are fearful of how their data will now be shared. This understandable change in behavior by the populations we serve directly contravenes our mission of increasing participation and trust in the tax system.

51.     The data sharing policy will drastically erode our pro bono legal services program, which is central to our mission and vision to increase access to counsel for low-income individuals, and in particular the ESL community. Our pro bono program provides representation to a significant number of clients each year. As mentioned above, the data sharing policy makes this representation drastically more complicated and burdensome.   This lack of clarity as to taxpayer rights and how data will be protected or shared will make it harder for pro bono attorneys to take cases and navigate their professional obligations in connection with those cases, and will increase the burden of mentoring these cases when we do place them, as even experienced practitioners

<div align="center">15</div>

will not be familiar with the new policy the agency has set forth, and its implications for how the Center counsels clients.

52.     Regardless of the money spent, and the resources dedicated to fulfilling the Center's mission, our activities are facing obstacles like never before.  We cannot fulfill our mission if we cannot reach the communities we serve.  We cannot fulfill our mission if we cannot effectively counsel our clients.  We cannot fulfill our mission or our obligations as counsel to LITC clients if we are unable to stand behind our representations of the rights that taxpayers are supposed to have and the trust they are supposed to be able to place in the tax system. The IRS's initiation of mass data sharing with ICE in recent weeks starkly threatens harms to the Center's ability to carry out its mission that cannot be reversed. An extended period of mass data sharing with ICE is very likely to permanently obstruct the Center's ability to accomplish its mission.

53.     The effective operation of the U.S. tax system is based on voluntary compliance; the IRS could not collect the trillions of dollars in federal revenue through enforcement actions alone.  It is an axiom of tax administration that taxpayer trust in the system is critical to maintaining and increasing voluntary compliance.[5] Taxpayer trust is generated by the tax agency both ensuring all taxpayers abide by the tax laws and its employees adhere to the taxpayer rights and protections provided for in the Internal Revenue Code, including the right to confidentiality in the Taxpayer Bill of Rights (26 U.S.C. § 7803(a)(3)(H)) and under 26 U.S.C. § 6103.  When taxpayers' trust in

---

[5] "Research shows that tax compliance is affected by (social and personal) norms such as those regarding procedural justice, trust, belief in the legitimacy of government, reciprocity, altruism, and identification with the group."  Marjorie Kornhauser, A Tax Morale Approach to Compliance: Recommendations for the IRS, 8 FLA. TAX REV. 601-602. (2006).  *See also* National Taxpayer Advocate 2007 Annual Report to Congress, Vol. 2, 1, Normative & Cognitive Aspects of Tax Compliance: Literature Review and Recommendations for the IRS Regarding Individual Taxpayers.

the tax system is eroded because their rights are not respected and the agency's promise of confidentiality is broken, they become less willing to engage with the tax agency, and it is very difficult to restore that trust. This loss of trust makes it difficult for the Center to reach its clients and convince them that they have rights and can challenge the IRS's position and be heard, resulting in a further loss of trust in the system.[6] The announcement of the policy change regarding data-sharing with ICE has already eroded our clients' trust in the system, and if these disclosures continue to go through, trust in the system will further plummet, creating almost insurmountable obstacles to our mission of promoting trust in the system and encouraging participation.

54.    Based on the Center's experience and my long personal experience working as a taxpayer advocate, including as National Taxpayer Advocate and in representing taxpayers, it is clear that the sudden difficulty the Center and other LITCs have experienced in reaching the population who we exist to serve is caused by the IRS's change in its data policy and shift to more open sharing of sensitive taxpayer information across the federal government.

<u>The Data Sharing Policy Has Harmed and Continues to Harm members of LITC Connect</u>

55.    The Center has heard repeatedly from its member LITCs across the country that they are also experiencing a significant drop-off in the willingness of taxpayers to attend and engage with their education and outreach efforts, particularly among those who do not speak English as a first language and who are more likely to be immigrants.

56.    An LITC Connect member shared that for their LITC, the volume of calls from Hispanic taxpayers has noticeably decreased and is nearing a standstill.

---

[6] "Once tax morale dips, it is hard to restore it to prior levels." *Id*. at 602.

17

57.    That member has also seen a significant decline in attendance at their education events. In the past, they were able to fill the venues where they were holding the event almost at capacity, but they are now fortunate to have ten attendees. Many individuals are no longer interested in filing taxes due to concerns that their information might be shared with ICE. While they are still reaching a small number of ESL taxpayers in the community, the overall impact of their efforts has decreased noticeably since the data sharing policy was announced.

58.    Another member shared that they are simply not hearing from their clients or the community.  Historically, for this LITC, ITIN holders had made up approximately eight percent of their client base, and in 2024, they received a larger number of calls than was typical from ITIN holders, or people who needed them to file in 2024. That changed this year, as reports of the data sharing policy were made public.

59.    That clinic has struggled with how to provide education to the community, and the ESL population in particular.  It is now difficult to do a presentation highlighting the benefits of filing a tax return without also noting the risk of alerting ICE.

60.    That clinic shared with LITC Connect that the breach of confidentiality feeds the distrust in government that many of their clients and community members already have due to culture and growing up in places where governments are more openly corrupt. It is extremely difficult to conduct their outreach related to taxpayer rights and participation in the tax system when there are such new, significant risks facing these populations as a result of the data sharing policy.

61.    LITC Connect members have also shared that their client counseling work has been significantly impacted by the Data Sharing Policy.  Their clients and community members have expressed anxiety about participating in the tax system at much higher rates this year.

18

62.    As one LITC Connect clinic member shared, in the past several months, those clients who have applied for ITINs, and those that have filed their tax returns with ITINs in the past (even earlier during this past tax season) have expressed regret of having done so because they fear that ICE is going to be knocking on their door.  Even though some of them know that there are certain requirements that ICE must fulfill to obtain information from the IRS, they do not trust ICE and have expressed how uneasy they feel.

63.    A clinic shared that clients with ITINs are experiencing anxiety and fear about law enforcement showing up at their door and breaking their family apart.

64.    Many of their clients who had previously come to them to get into filing compliance have decided to defer this pursuit for now, knowing all of the risks.

65.    Similarly, many clients who had filed jointly with US citizen spouses in the past are scared to file their 2024 taxes.

66.    One clinic shared with LITC Connect that their clients with ITINs either declined to be represented or withdrew from representation earlier this year.

67.    That clinic shared that many clients and prospective clients, after learning about the data sharing policy, have not returned to the clinic.

68.    LITC Connect member clinics are unable to provide their clients with legal advice and also serve their missions. Though they aim to meet their statutory requirements, including to inform individuals for whom English is a second language about their rights and responsibilities, they also must now underscore the risks that their clients face.  They can no longer assure clients of the confidentiality of their data or the trust they should have in the IRS and the tax system.

69.    This also harms the Center.  The Center's LITC Connect is designed to support these member clinics and practitioners.  The Center is unable to navigate this drastic and unlawful

19

change, and it has harmed its ability to provide advice, outreach, and support to the network. One of the services the LITC Connect provides is technical advice and guidance to LITC members. The Center has not been able to provide LITC Connect members with advice and guidance about how to advise their own clients in the face of this data sharing policy; members are left with many unanswered questions, undermining the very purpose for LITC Connect.

70.    The data sharing policy significantly impairs the work of LITC Connect. The Center is much less able to support the network it runs as they face these challenges.

<u>The Data Sharing Policy Harms the Center's and the LITC Connect Members' Clients</u>

71.    The harms to the Center's clients, and the clients of its network's members, are significant and irreparable.

72.    Clients, particularly those that have an ongoing immigration proceeding or that have been in front of an immigration judge before, are incredibly nervous and concerned about participating in the tax system. The IRS's new data sharing policy is heightening fear within immigrant communities and deepening the mistrust between immigrants and government institutions. Some clients have expressed that they have filed taxes in good faith with the assurance that this information would remain confidential and now they feel betrayed and scared.

73.    The clients I have experience working with do want to participate in the tax system and pay their taxes. They would like to obtain ITINs to obtain benefits for their children, to contribute to our society, or to use in establishing a bank account or taking out a loan. But they now fear immigration raids by ICE. They fear detention, even if not lawful. They ultimately fear separation from their families and loved ones. They fear deportation from the place they call home.

74.    Reports that ICE has requested 1.23 million records *in one day*, and ultimately seeks information on 7.3 million people, necessarily mean any taxpayer using an ITIN—including the

20

LITC's clients—is at imminent risk of having their data disclosed to ICE. According to published reports, there are likely fewer than 7.3 million active ITIN holders in total.[7]

75.    Even our clients not currently subject to deportation orders are incredibly fearful. The way the IRS is sharing data with ICE creates a significant risk of incorrectly linking taxpayers with different individuals who have similar names and address history. Under the terms of the MOU, and based on available reporting, ICE is not required to provide and has not provided ITINs for the majority of the taxpayers for whom it seeks information. From my time as Taxpayer Advocate, during which my office conducted many taxpayer surveys and wrestled with the IRS method of recording names in its systems, I know that government databases often fail to properly or consistently record the names of individuals whose names do not follow Anglo naming conventions. For example, many Spanish and Portuguese speaking individuals have two surnames. Likewise, individuals who speak languages that use writing systems other than the Latin alphabet, such as Chinese, Hindi, Cyrillic, or Arabic scripts, may have their names transliterated inconsistently. A recent article authored by the IRS's former Chief Data and Analytics Officer provides a description of these problems, which is consistent with my experience.[8]

---

[7] Treasury Inspector General for Tax Administration, Report No. 2024-400-012, *Administration of the Individual Taxpayer Identification Number Program* (Dec. 19, 2023), https://www.tigta.gov/sites/default/files/reports/2023-12/2024400012fr.pdf, p. 1 ("As of December 31, 2022 . . . there were more than 5.8 million active ITINs, and the IRS reported that almost 487,000 new ITINs were issued during CY 2022").

[8] *See also* Barry Johnson, Linking Tax and ICE Data May Hurt Many US Citizens and Other Legal Residents, Taxvox (May 6, 2025), https://taxpolicycenter.org/taxvox/linking-tax-and-ice-data-may-hurt-many-us-citizens-and-other-legal-residents.

76. For that reason, the training guide for volunteers in the IRS Volunteer Income Tax Assistance (VITA) and Tax Counseling for the Elderly programs dedicates two entire pages to entering Spanish, IndoChinese, and other hyphenated or dual/triple surnames. *See* Internal Revenue Serv., Pub. 4012, 2024 Returns: VITA/TCE Volunteer Resource Guide: Entering Last Name Correctly B19–B20 (rev. Oct. 2024). The guide notes that the name and taxpayer identifying number must match exactly or the e-filed return will be rejected. As the VITA guide illustrates, the IRS name control is limited to the first 4 digits of the taxpayer's last name. With the diversity of naming conventions for surnames, the name control alone is not a sufficient method for matching taxpayers. The taxpayer identifying number must also match, to ensure that the correct person is identified in the IRS system.

77. Because the IRS has agreed to run searches for ICE using only the name and former address, and because the name control in IRS databases is limited to the first 4 digits of the taxpayer's last name, there is a high probability of false positives (matching the wrong taxpayer with a name included in an ICE request) in the disclosures that have occurred, or the disclosures that will occur imminently. The consequences of these false positives for a taxpayer could be dire: exposure to ICE enforcement raids, criminal investigation and penalties, detention, or even removal.

78. This insufficiently rigorous matching protocol also virtually ensures that IRS will violate Section 6103 in at least some cases by disclosing information for taxpayers that were not included in any request and about whom ICE has made no representations supporting disclosure under one of the Section 6103 exceptions. I have been told that a number of IRS personnel have quit or retired rather than face the risk of prosecution that would accompany what they see as flagrant violations of Section 6103, which can carry criminal penalties.

22

79.    The fears of the Center's clients have concrete, immediate impacts on their ability to engage safely with the tax system, to preserve their rights and satisfy their obligations.

80.    When our clients or prospective clients choose not to obtain an ITIN, this has significant impact on their lives.  In some states, ITINs are necessary to be eligible for state tax credits.  State education benefits may also require proof of state tax filing, which can require an ITIN.  The lack of an ITIN can also foreclose the ability to open a bank account or take out a loan.  For low-income clients, the absence of the ability to obtain these financial benefits or government services can lead to extreme difficulty in their participation in society and significant financial harm.

81.    In addition, some of these rights and obligations afforded to taxpayers are time sensitive.  There are several tax deadlines that, if missed, can cause irreparable harm.

82.    For example, the Internal Revenue Code requires taxpayers to timely file tax returns and pay their taxes. Taxpayers who miss these deadlines are subject to late filing penalties, late payment penalties, and accrual of interest.

83.    There are also taxpayer rights that must be timely invoked or are forfeited. For example, 26 U.S.C. § 6212 requires the IRS to issue a notice when it determines a "deficiency" in tax.  The notice is required to inform the taxpayer of the proposed deficiency; the taxpayer has 90 days from the date of the notice to petition the United States Tax Court. 26 U.S.C. § 6213(a).[9] The Tax Court (an Article I court) is the only judicial forum in which a taxpayer can dispute the amount of the deficiency before paying the proposed tax due.  The Tax Court takes the position that the

---

[9] If the notice is addressed to a taxpayer outside of the United States, the taxpayer has 150 days to petition the Tax Court. *Id.*

23

90-day deadline is jurisdictional—if a taxpayer misses it by an hour, they have no recourse to Tax Court.  If taxpayers, especially low-income taxpayers, are afraid of engaging with the federal government and miss the 90-day deadline, they will for all intents and purposes be deprived of judicial review of the tax liability because they cannot afford to pay the tax first and sue in federal district court or the Court of Federal Claims for a refund.  They will be forced to pay a debt they do not owe, which is a violation of Internal Revenue Code Section 7803(a)(3), which provides that taxpayers have the right to pay no more than the correct amount of tax.

84.    Internal Revenue Code sections 6320 and 6330 provide taxpayers who have an outstanding tax liability and against whom the IRS is proposing to levy on property (such as a bank account or the taxpayer's wages) or file a public federal notice of tax lien, with the right to a Collection Due Process hearing.  At this hearing, the taxpayer can challenge the IRS's proposed collection action and offer alternatives to that action.  If the taxpayer disagrees with the hearing officer's conclusions, the taxpayer has the right to petition the United States Tax Court for review of the determination.

85.    The time to request a CDP hearing before the IRS is 30 days from notice of intent to levy/file a lien; and the time to petition the Tax Court is 30 days from the hearing officer's determination notice.  26 USC 6330(d)(1). If the taxpayer misses the deadline, the IRS would proceed with the collection action which, for low-income taxpayers, could result in the taxpayer experiencing irreparable harm, including being unable to obtain food, housing, or transportation.

86.    Taxpayers with a qualifying child or a dependent spouse who does not have a SSN may be eligible for the "Other Dependent Credit" under 26 U.S.C. § 24(h)(4) if the child or spouse has an ITIN.  If the child or spouse does not yet have an ITIN, the taxpayer must file their return along with the appropriate ITIN applications by the due date for the return (April 15, or October

24

15 if an extension request is timely filed). If a taxpayer is fearful of interacting with the government and misses this deadline, the ODC (in the amount of $500) is irrevocably lost. The Center has a client who faces the loss of this benefit because they do not feel safe pursuing it.

87.    For Tax Years between 2018 and 2024, ITIN holders are eligible for the Child Tax Credit (CTC) for their US citizen children. In Tax Year 2021, the maximum CTC was $3,600 per child. For subsequent years, the maximum CTC is $2,000 per child.[10] Taxpayers must file a claim for a refund within 3 years of the due date of the return. LITCs and other organizations conducted a major campaign to remind taxpayers they generally had until April 15, 2025 to claim the 2021 CTC. Taxpayers who were afraid to file a return by that date, because of fears about data being shared, will not be able to obtain a refund attributable to the CTC. The Center has a client in this situation.

88.    Where taxpayers have paid the taxes they were assessed and then filed an administrative refund claim with the IRS that was disallowed, taxpayers have 2 years to file in federal district court or the court of federal claims. If they miss that deadline, then their ability to obtain that refund is forever foreclosed. Taxpayers fearing to file in federal courts for fear of deportation will thus incur irreparable harm.

89.    Each of these time-limited benefits are lost to taxpayers if they determine they cannot safely interact with our tax system and disclose information to the IRS. Consistent with the federal grant requirements, our clients are low-income, and thus, this money is critical to their ability to survive and provide for their families. Many of our clients depend on their annual tax

---

[10] 26 U.S.C. § 24(h)(7), as enacted by Tax Cuts and Jobs Act Pub. Law 115-97; changes enacted by Pub. Law 119-21 are not effective for tax years before January 1, 2025. *Id*. section 70104(f).

refund to pay for basic living expenses including housing, utilities, food and transportation. Our clients, and the communities we seek to educate, that miss these deadlines cannot later have these harms remedied.

90.    Yet some of our clients must weigh these risks against the risk of potentially subjecting themselves and their family members to ICE raids or even deportation. It is an impossible choice for our clients, and one that they would not have to make if the IRS followed the law and afforded them the confidentiality protections to which they are entitled.

August 19, 2025

Washington, DC

Nina E. Olson

Executive Director
Center for Taxpayer Rights

26

Exhibit 7

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

CENTER FOR TAXPAYER RIGHTS et al.,

         *Plaintiffs*,

v.

         Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

         *Defendants*.

---

**<u>DECLARATION OF SHAWN PHETTEPLACE</u>**

I, Shawn Phetteplace, declare as follows:

1. I am the national campaigns director of the Main Street Alliance ("MSA"). I have held that position since 2023 and been on staff with MSA since 2020. In my role as national campaigns director, I work closely with MSA's small business members. This declaration is based on my firsthand knowledge of the facts as stated here.

2. MSA is a national network of small businesses, which represents approximately 30,000 small businesses across the United States. MSA helps small business owners realize their full potential as leaders for a just future that prioritizes good jobs, equity, and community through organizing, research, and policy advocacy on behalf of small businesses. MSA also seeks to amplify the voices of its small business membership by sharing their

experiences with the aim of creating an economy where all small business owners have an equal opportunity to succeed.

3. MSA has small business members that are sole proprietors, partnerships, family-run enterprises, or expanding local companies, with a resultant need to file various forms of individual and business tax returns. The IRS therefore houses their confidential information. This can include addresses, Social Security numbers; information about individuals' income and net worth; bank account information; tax liability; and sensitive information regarding deductions, such as charitable donations, dependents, and medical expenses.  It can also include sensitive business information.

4. MSA's small business members, especially when launching their sole proprietorship businesses, file individual tax returns with incomes low enough to qualify for and claim the Earned Income Tax Credit, the Child Tax Credit, and other refundable credits.

5. MSA also has members that have suffered identity theft who are particularly distressed by broad-ranging, unlawful access to and overbroad sharing of their tax information.

6. MSA small business members include many immigrant-owned businesses.  These, and other MSA small business members employ significant numbers of immigrants.  They have trusted in the assurances of the IRS that their data would be kept confidential. These businesses are very concerned about submitting their sensitive personal and business information to the IRS since the public reporting on the IRS's disclosures to ICE.

7. Some MSA members have spouses or other family members who are non-citizen immigrants. They fear that if the IRS discloses to ICE their home address—which is

shared by those family members—it could be used for ICE enforcement action against their family members.

8.  In addition, some MSA members have family members or employees that may be undocumented immigrants. These members are similarly very worried.

9.  Some MSA members file their tax returns using an Individual Taxpayer Identification Number (ITIN). These numbers are not just used by undocumented immigrants; they can also be used by their dependents, as well as people who are lawfully present in the U.S., such as certain survivors of domestic violence, student visa-holders, and some spouses and children of individuals with employment visas.

10. If ITIN holders cannot rely on the IRS to maintain the confidentiality of their information, it will be harder for MSA to serve immigrant business owners. If entrepreneurs without an SSN decide against obtaining an ITIN out of fear, they will be relegated to the informal economy, and our county will lose an important tax base. If immigrant entrepreneurs decide not to obtain an ITIN or disclose their ITIN status to government agencies, multiple state and local policy frameworks that accept ITINs will be severely undermined and possibly dismantled entirely, removing critical avenues for entrepreneurship and small business development.

11. The Administration has said that the IRS must help ICE locate as many as 7.3 million immigrants.

12. Disclosures at that scale instill fear that some of our members, their employees, or their families may have information disclosed to ICE and face reprisals. On top of that, many MSA members– and sole proprietors in particular– file individual tax returns with incomes low enough to qualify for and claim the EITC.

13. Given the news that ICE requested from IRS 1.23 million records just within the last few weeks, MSA members are very concerned that their information could imminently be swept up in that request or requests in the very near-term.

14. The fears instilled by public reporting on these IRS disclosures is discouraging some MSA members from interacting with the IRS or filing their taxes.

15. In addition, MSA represents numerous Hispanic business owners. Many of them are rightly concerned that they could face mistaken immigration enforcement actions based on misidentification. Many of these members live in communities with immigrants, and some of them have similar or identical names to other people who live near them. Sharing tax information with few controls to ensure correct identification is likely to result in the disclosure of incorrect information and the misidentification of individuals targeted in immigration enforcement efforts.

16. For decades, MSA small business owners and their leaders have relied on reassurances by public officials, and the Tax Code itself to protect their sensitive information. They understood that this information would not be shared with other authorities for immigration enforcement purposes.

August 19, 2025

Pontiac, Michigan

Shawn Phetteplace

4

Exhibit 8

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs,*

v.                                                    Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

*Defendants.*

### DECLARATION OF JANE DOE

I, Jane Doe, declare as follows:

1. My name is Jane. I am over 18 years old.  The information in this declaration is based on my personal knowledge.

2. I wish to submit this declaration anonymously out of fear that I or my business will be targeted for retribution.

3. I am a member of the Main Street Alliance (MSA) and have been for several years.

4. I participate in numerous MSA activities and do advocacy in connection with MSA.  For example, I have travelled to Washington D.C. to meet with legislators on the importance of adequate funding for child care and Head Start.  I have also conducted trainings and held meetings with MSA.

5. I have worked closely with MSA to advocate for increased funding for child care, and higher wages for child care workers.

6.  I co-own, a child care center that provides child care, before and after school care, and summer care for children ranging in age from infant to age 12.

7.  I have electronically filed a federal income tax return within the last six years.

8.  I have also received a federal tax refund in the last six years.

9.  My business has filed a federal partnership tax return in the last six years.

10. In past tax years, I have qualified for and claimed the child tax credit on my personal tax returns.

11. My child care center is a partnership, and we file Form 1065 every year.  This form includes sensitive information like detailed income and loss information, and information on deductions, tax liability, and payments for the business.

12. I also file Form 1040 and Schedule K-1.  This information includes my employer identification number, my Social Security Number, and my financial information.  This also includes information about my children, including their Social Security Numbers.

13. I submit all of this sensitive information with the understanding that in doing so, it will be protected by the IRS and used only for limited purposes, like assessing and processing my tax return.

14. I have been a victim of identity theft in the past and therefore know all too well what it is like to have my information disclosed to someone else, when I thought it was private and protected.

15. Approximately 25 years ago, a person stole my identity by taking my university ID, which included my Social Security Number (which was typical at the time).

16. The person, in my name, stole a car in one state, assaulted someone in another state, and then was apprehended by law enforcement in a third state.  There were warrants for my

arrest issued in three states, and my parents were notified by out-of-state police that they had me in their custody. It was, of course, not me.

17. I had to hire a lawyer and spend significant amounts of money and time to clear my name. It took more than a year and was incredibly stressful.

18. I was very worried about being apprehended by law enforcement, because even during a traffic stop, if an officer ran my name in the system, three outstanding warrants for my arrest were in the system– despite me never having been arrested or involved in any of this.

19. The consequences of this identity theft follow me to this day. I thought it was behind me, but a few years ago I was invited to the White House, but after a background check identified these past warrants, I was denied access.

20. Ever since, I have felt very nervous about disclosing my personal information. But I do so, because it is my responsibility as a taxpayer.

21. I rely on the laws passed by Congress and rules in place at the IRS to protect my personal information.

22. I am very concerned about the reports that this information may be accessed by people who intend to use it for other purposes, in ways that I believed were not permissible under the law.

23. I am concerned that it could be used improperly or disclosed to others in ways that could compromise my privacy, particularly because the government has said they want to focus on people who have filed for the Child Tax Credit.

24. In addition, the recent reports of disclosures from the IRS to ICE concern me greatly. For one, it does not sound like there are sufficient checks in place to ensure that there are not

cases of mistaken identity.  I worry that my or my family's information could be caught

up in these disclosures, given my past experience with mistaken identity.

25. In addition, my small business employs a non-citizen immigrant.  I am required to submit

to the IRS employees' quarterly wages and employee information when I file taxes. Their

work is critical to the success of my child care business.  They currently have legal status

and authorization to work, and they pay taxes, but they may lose their status in the long

term.  Now that I know that the data I submit to the IRS might be used for immigration

enforcement, I fear that I may be putting my employee at risk.

26. I had relied on the assurance from the IRS that the information I provided would not be

used for non-tax purposes. Given this new use of the information, my employee may

need to take additional steps to protect themselves.  My small business does not have the

resources to assist them, so they may need to go work elsewhere.

27. We are already short-staffed, and we have rooms that sit empty due to a lack of teachers.

To lose another teacher during this teacher shortage would be incredibly difficult

financially. In addition, this employee has been a valued member of our team for almost

two years, and she is loved by the children and families she serves. It will be devastating

for my business and for our child care team if I am forced to find a new employee or

operate my business down another teacher.

28. In addition, I am very worried that the disclosures to ICE that have been publicly reported

could involve their information.  I am worried that when I turn over information to the

IRS, as my business is required to do, the IRS will unlawfully share that information with

ICE and this employee could be subject to ICE raids and deportation, which would

impact me and my business.

29. IRS's disclosure of my sensitive personal information to other agencies, like ICE, without
satisfying the legal requirements, would also violate my privacy, and the fact that IRS is
not following the laws about data sharing causes me fear that my personal information
will be shared and misused.

Executed on August 18 2025

Wisconsin

_____

Jane Doe

Exhibit 9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs*,

v.                                                    Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

*Defendants*.

**<u>DECLARATION OF YVETTE PIACSEK</u>**

I, Yvette Piacsek, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is
true and correct:

1. I serve as general counsel for the National Federation of Federal Employees ("NFFE"). I
am personally familiar with NFFE's operations and membership and provide this
information on the basis of that knowledge.

2. NFFE is a national union represents approximately 110,000 workers across the United
States. NFFE's mission is to advance the social and economic welfare and education of
federal workers, including of its members.

3. NFFE's members are taxpayers and have submitted their sensitive personal information to
the Internal Revenue Service ("IRS") with the expectation that their data would be
protected and only disclosed or accessed when strict requirements were met under
assurances the IRS has provided for decades. The IRS consequently holds myriad forms of

sensitive personal and financial information of NFFE members including their Social Security or taxpayer identification numbers; names and addresses; taxable income; marital status; and information, such as medical expenses, relating to eligibility for tax deductions and credits.

4. NFFE's members have expressed that they have anxiety and fear that the Administration's change in policy to freely share IRS taxpayer data will lead to improper access and disclosure of their personal information.

5. Many of NFFE's members are lower income federal workers who qualify for the Earned Income Tax Credit, and certain government benefits like federal student aid and Supplemental Nutrition Assistance ("SNAP"). As a result, these members are particularly afraid that their taxpayer data will be inappropriately accessed or shared based on repeated Administration statements indicating that lower income individuals eligible for these such credits and benefits will be a target of the policy of sharing IRS data.

6. The recent large-scale sharing of IRS data with the Department of Homeland Security ("DHS") and its component Immigration and Customs Enforcement ("ICE") gives NFFE's members stark concerns about the security of their data and the government's use of that data.

7. Many NFFE members are citizens who immigrated to the United States from other countries. These members, a substantial share of whom are Hispanic, live in communities with large numbers of immigrants and have family members who are immigrants and are not citizens.

8.  These members fear that their confidential tax information, and that of their family members, will be shared with ICE improperly for the purposes of civil immigration enforcement.

9.  These members additionally fear that the IRS's mass sharing of data with ICE will subject them to mistaken immigration enforcement actions based on misidentification. As these members live in communities with many immigrants and have names similar or identical to immigrants in their communities, sharing IRS address information freely with immigration enforcement authorities is likely to result in misidentifying individuals targeted in immigration enforcement efforts. NFFE members in these communities fear that such free sharing of IRS data will result in such misidentification.


Washington, DC

Executed on August 18, 2025

Yvette M. Piacsek
General Counsel
National Federation of Federal Employees
 IAMAW, AFL-CIO
1225 New York Ave. NW, Suite 450
Washington, D.C. 20005
Ypiacsek@nffe.org

# Exhibit 10

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs*,

v.                                                    Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

*Defendants*.

### DECLARATION OF JOHN DOE

I, John Doe, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true

and correct:

1. I am a union member of the National Federation of Federal Employees ("NFFE"). I have

   been a member of NFFE since 2021.

2. I worked for the Federal Government for 15 years as a Wildland Firefighter in communities

   that serve immigrant communities and have worked alongside immigrants throughout my

   life. I am an active Union Steward that represents federal employees that are unjustly

   disciplined at a National Level. I actively work with members of Congress to represent

   federal employees while working with Agency leaders to advocate for a better work

   environment. The work I do helps enhance protections for federal employees, that will

   ultimately help the public that they serve.

3. I am a taxpayer and have submitted my personal information to the Internal Revenue Service ("IRS") with the expectation that my information data would be protected and only disclosed or accessed in limited circumstances and according to the law.

4. The information I provide to the IRS is very personal and includes sensitive information I do not want widely disclosed.

5. I have serious anxiety and fear that now, my data, and the data of my loved ones, may be accessed or disclosed for purposes I thought were impermissible.

6. The recent large-scale sharing of IRS data with ICE makes me very fearful about the security of my data and the government's use of my data.

7. Though I am a citizen, I am very worried about my family, friends, and colleagues who may be at increased risk. Practically everyone I work or have worked with has family that has immigrated to the U.S., many are undocumented, and most are Hispanic ethnicity. My family has roots of coming to this country undocumented.

8. I fear that their confidential tax information will be shared with ICE improperly for the purposes of civil immigration enforcement.

9. I also fear that the IRS's mass sharing of data with ICE will subject me to mistaken immigration enforcement actions based on misidentification.

California

Executed on August 19, 2025

*John Doe*

John Doe

Exhibit 11

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR TAXPAYER RIGHTS et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-457-CKK |
| INTERNAL REVENUE SERVICE et al., | |
| *Defendants*. | |

## <u>DECLARATION OF JOHN A. KOSKINEN</u>

I, John A. Koskinen, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.  I served as Commissioner of the Internal Revenue Service ("IRS") from December 2013 through November 2017, under the Obama and Trump Administrations.

2.  In my earlier roles in government service I also gained experience working with the agency. As the Deputy Director for Office of Management and Budget ("OMB") for management from 1994 to 1997 I worked with the IRS on the agency's implementation of information technology which involved coordination with the IRS's newly-appointed Chief Information Officer. Later, as the chairman of the President's Council on Y2K, 2000 Conversion, I continued work with the IRS relevant to Y2K's potential impacts on the agency's information technology.

3.   As Commissioner of the IRS, I was statutorily responsible for administering, managing, conducting, directing, and supervising the application of the tax code.  This included its provisions related to privacy and its provisions on taxpayer rights, including the implementation of the Taxpayer Bill of Rights. It was my statutory responsibility to ensure that employees of the IRS were familiar with taxpayer rights, including the right to privacy. *See* 26 U.S.C. § 7803.[1]

4.   The IRS has long treated sensitive taxpayer information as highly confidential and accessible and shareable only in the limited instances in which an IRS employee requires the information for tax administration purposes or another agency meets one of the specific requirements for sharing of taxpayer data.

5.   Even as the Commissioner, I was repeatedly trained in the IRS's policies concerning the treatment of sensitive taxpayer information. In these annual trainings, the agency emphasizes to every employee, from the Commissioner on down, the sanctity of the IRS's confidential treatment of taxpayer information and the agency's policy of protecting access to and limiting the sharing of taxpayer information on pain of agency discipline and criminal prosecution.

6.   The IRS has treated the confidential nature, and strictly limited sharing, of taxpayers' information as a core principle of agency policy and of compliance with the requirements of the Internal Revenue Code.

7.   In addition to the legal requirements to tightly protect taxpayer information from unnecessary sharing and disclosure, the IRS has sought to protect this data as a matter of policy for several important reasons. *First*, the agency has long assessed that it is critical

---

[1] https://www.law.cornell.edu/uscode/text/26/7803.

to assure taxpayers that their sensitive information is protected and secure to support the integrity of the tax system and to encourage taxpayers to file returns and pay their taxes. *Second*, the confidentiality and limited sharing of taxpayer data is critical to preventing tax filing fraud by criminal actors using taxpayer information. This fraudulent use of taxpayers' information in the past cost billions of dollars annually in the form of fraudulent refunds and greatly burdened affected taxpayers.

8. As a part of the IRS's confidential treatment of taxpayer information, the agency has strictly controlled its sharing of taxpayer information with other agencies and worked to share information only under circumstances where the taxpayers' data would be protected after it was shared.

9. For example, the IRS shares information with the Department of Education under a specific provision of the Internal Revenue Code for the purpose of administering federal student aid. In doing so, the IRS has historically adhered strictly to the limits on such sharing and has worked to ensure that the Department of Education has sufficient protections in place for taxpayer information once it is received from the IRS.

10. The IRS has similarly carefully shared taxpayers' information with other federal agencies for the purposes of criminal investigation in a manner that complies with the Internal Revenue Code's protections and ensures the protection of sensitive information. The IRS has, consequently, historically required the U.S. Department of Justice to request taxpayer data for its criminal matters by providing specific information about the relevant criminal matter. The IRS then has determined whether and how to share information for these criminal matters on a case-by-case basis, applying an individualized assessment of the request. Under these circumstances, there were no mass requests for sensitive

taxpayer information. Any request for the provision of such information en masse would constitute a clear break with IRS's longstanding approach to sharing information requested for the purposes of criminal law enforcement.

11. The IRS has historically, as a matter of both law and policy, not shared taxpayers' information with immigration authorities for the purpose of locating individuals suspected to be present in the country illegally. There is no provision of the Internal Revenue Code that provides for sharing taxpayers' information for the purposes of such immigration action. And, as a matter of policy, the IRS has long strictly protected the taxpayer information of immigrant tax filers as a matter of policy. Protecting immigrant taxpayers' data encourages them to file tax returns and pay taxes and bolsters the integrity of the tax system. Immigrant filers who may be concerned about the sharing of their information with immigration authorities have historically paid tens of billions of dollars annually in taxes as a result, at least in part, of the trust engendered by this policy.

12. In short, the IRS has long had a policy of strictly protecting taxpayer information both to conform with the requirements of the Internal Revenue Code and to further the policy aims of the agency to engender trust in the tax system and encourage the filing of tax returns and the paying of taxes. Under this policy, sharing with other agencies was undertaken carefully and requests for taxpayers' information related to criminal matters was handled on a case-by-case basis strictly in accordance with the law.

13. The information sharing contemplated now, from the outside, does not appear to be consistent with how the IRS approached privacy, confidentiality, and data sharing during my time as Commissioner. It raises concerns about the legality and the policy implications for the tax system to propose and effectuate such data sharing.

Washington, DC  20015

Executed on August 14, 2025

John A. Koskinen

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS, *et al.*,

       *Plaintiffs*,

v.

INTERNAL REVENUE SERVICE, *et al.*,

       *Defendants*.

Case No. 1:25-cv-00457-CKK

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A STAY UNDER 5 U.S.C. § 705 OR, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

I.     Tax Return Information and Disclosure ...................................................... 2

II.    IRS's Provision of Information to DHS under Section 6103(i)(2) of the Internal
       Revenue Code ................................................................................................. 5

III.   The *Centro* Litigation ....................................................................................... 7

IV.    This Case .......................................................................................................... 7

LEGAL STANDARD ............................................................................................ 8

ARGUMENT ........................................................................................................ 10

I.     Plaintiffs Are Unlikely to Prevail on Their Claim that IRS's Provision of Information
       to DHS Under the Terms of the MOU Violated Section 6103 of the Internal
       Revenue Code ................................................................................................. 10

       A.     Plaintiffs Fail to Establish Standing for Their Claims. ......................... 10

              1.     Plaintiffs Lack Associational Standing ...................................... 10

              2.     The Center Lacks Organizational Standing. ............................. 17

       B.     Plaintiffs Do Not Challenge Final Agency Action ................................ 20

       C.     Plaintiffs Cannot Bring Claims under Section 6103 through the APA ... 23

       D.     The IRS Has Complied Fully with Section 6103 ................................. 26

       E.     Plaintiffs Are Unlikely to Prevail on Their Arbitrary and Capricious Claim ... 31

II.    Plaintiffs Cannot Demonstrate Irreparable Harm. .................................... 32

III.   The Balance of Equities Favors Defendants ............................................. 36

IV.    Plaintiffs Should Be Ordered to Post a Substantial Security in Connection with Any
       Preliminary Injunctive Relief, and Any Preliminary Injunctive Relief Should Be
       Stayed Pending Any Appeal ......................................................................... 37

CONCLUSION .................................................................................................... 38

## INTRODUCTION

This case is now in its third iteration: it began when filed in February 2025 as a challenge to DOGE team access to Internal Revenue Service ("IRS") data systems, then morphed into a challenge to an alleged "Data Policy." And now, in their motion for a preliminary injunction, Plaintiffs attempt to shoehorn into the allegations in their Amended Complaint a challenge to the IRS's provision of information to the U.S. Department of Homeland Security ("DHS") pursuant to Internal Revenue Code Section 6103(i)(2) and a detailed and lawfully executed memorandum of understanding ("MOU").

The Court should deny Plaintiffs' motion. For one thing, it is indistinguishable from the request for preliminary injunctive relief, challenging the same MOU, that Judge Friedrich denied in *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677, 2025 WL 1380420 (D.D.C. May 12, 2025) ("*Centro*"). Judge Friedrich's decision in *Centro* is currently on appeal to the D.C. Circuit, and oral argument is scheduled for October 3, 2025. Plaintiffs' motion, remarkably, does not discuss Judge Friedrich's decision or the pending appeal. As a matter of both comity and judicial efficiency, the Court should not allow Plaintiffs to obtain an end-run around *Centro*, based on the same facts and the same legal theories that are currently on appeal to the D.C. Circuit.

More fundamentally, the Court should deny Plaintiffs' motion because it does not satisfy the demanding standard for emergency injunctive relief in this Circuit. Plaintiffs lack standing to challenge the IRS provision of information under the MOU because they cannot establish injury in fact, either on behalf of their members or clients, or for themselves.

Plaintiffs' motion also fails on the merits. While Plaintiffs frame their challenge as one to an alleged "Data Policy," there is no such policy. There is only the sharing of information pursuant to the same subpart of Section 6103 and the same MOU at issue in *Centro*. Neither the MOU nor

1

the IRS's sharing of information pursuant to that MOU is a final agency action reviewable under the Administrative Procedure Act ("APA"). Nor can Plaintiffs pursue an APA claim that the IRS's provision of information violates the Internal Revenue Code given the comprehensive remedial scheme Congress established for violations of 26 U.S.C. § 6103.

Threshold issues aside, the provision of information to DHS under the terms of the MOU is fully consistent with Section 6103. Section 6103(i)(2) *requires* the IRS to provide address information to law enforcement agencies when the statutory prerequisites are satisfied. They are here, as confirmed by both the terms of the MOU and the accompanying declaration of John J. Walker, the IRS's Chief Privacy Officer. Moreover, as to Plaintiffs' arbitrary and capricious claim, it is hardly a violation of the APA to do what Congress has mandated.

Plaintiffs are also not entitled to injunctive relief because they cannot meet the high bar for a showing of irreparable harm required in this Circuit, as demonstrated by a recent data sharing decision before this Court and other decisions in this District. Any claim of harm is further undercut by Plaintiffs' months' long delay in moving for emergency relief.

Finally, the balance of the equities and the public interest weigh heavily in the government's favor. It is in the public interest to fulfill the requirements of Section 6103(i)(2), and—if there could be any doubt—the ongoing consideration of the issues presented in this case by the D.C. Circuit cautions against granting Plaintiffs' motion.

## BACKGROUND

### I.    Tax Return Information and Disclosure

Section 6103 of the Internal Revenue Code establishes a general rule that "returns" and "return information" shall be confidential and shall not be disclosed "except as authorized by this title." 26 U.S.C. § 6103(a). The statute defines "return" to include "any tax or information return,

declaration of estimated tax, or claim for a refund . . . which is filed with the Secretary [of the Treasury . . . ." *Id.* § 6103(b)(1). The term "return information" includes, among other things, "a taxpayer's identity, the nature of his income, [and] . . . whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing." *Id.* § 6103(b)(2)(A).

Section 6103(a)'s general prohibition against disclosure is subject to a series of statutory exceptions. *Id.* § 6103(c)–(o). The relevant exception here is Section 6103(i)(2), titled "Disclosure of return information other than taxpayer return information for use in criminal investigations." Upon receipt of a valid, legally compliant request, Section 6103(i)(2) requires the IRS to disclose certain return information—including the taxpayer's name, mailing address, and taxpayer identifying number—to officers and employees of a federal agency who are personally and directly engaged in:

> (i)    preparation for any judicial or administrative proceeding pertaining to the enforcement of a non-tax federal criminal statute,
>
> (ii)   any investigation which may result in such a proceeding, or
>
> (iii)  any grand jury proceeding pertaining to enforcement of such a non-tax federal criminal statute.

*Id.* § 6103(i)(2)(A).

Section 6103(i)(2) sets out certain requirements for an agency to obtain information from the IRS. A request under Section 6103(i)(2) must generally be made by the head of an agency or the inspector general thereof. *Id.* § 6103(i)(2)(A). The request must also be made in writing; set forth the name and address of the taxpayer to whom it relates; identify the taxable period or periods to which the requested information relates; identify the statutory authority under which the criminal investigation or proceeding is being conducted; and identify the reason why disclosure of the requested return information is, or may be, relevant to the investigation or proceeding. *Id.* § 6103(i)(2)(B)(i)–(iv).

3

Section 6103(i)(2) is also specific as to what information the IRS must disclose in response to an agency request that complies with the foregoing requirements. As relevant here, Section 6103(i)(2) requires that the IRS disclose certain information, including a taxpayer's address, upon the receipt of a compliant request for such information.

Specifically, Section 6103(i)(2) authorizes the IRS to disclose return information "other than taxpayer return information." *Id*. § 6103(i)(2)(A). "Taxpayer return information" is a subcategory of "return information," defined as that return information "which is filed with, or furnished to, the Secretary *by or on behalf of the taxpayer* to whom such return information relates (as opposed to return information that the IRS has obtained from another source). *Id.* § 6103(b)(3) (emphasis added). For purposes of Section 6103(i)(2), however, "a taxpayer's identity shall not be treated as taxpayer return information." *Id.* § 6103(i)(2)(C). And the statute defines "taxpayer identity" as the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number, or any combination of that information. *Id.* § 6103(b)(6). Thus, when properly requested, the express terms of Section 6103(i)(2) compel the disclosure of any of the following information: a taxpayer's name, mailing address, and/or taxpayer identifying number, regardless of the source from which the IRS obtained that information.

In contrast to other provisions of Section 6103 that use permissive language—for example Section 6103(c), (d)(5)(A), and (e)(11)—Section 6103(i)(2) states that "upon receipt by the Secretary of a request which meets the requirements of [Section 6103(i)(2)(B)] . . . the Secretary *shall* disclose" the return information requested. *Id.* § 6103(i)(2)(A). In other words, once the IRS receives a request that meets the requirements of Section 6103(i)(2), its compliance is mandatory.[1]

---

[1] There are narrow exceptions if the Secretary determines that "such disclosure would identify confidential informant or seriously impair a civil or criminal investigation," or if the

The statute also requires that the agency receiving return information under Section 6103(i)(2) must follow stringent safeguards for protecting the information. *See* 26 U.S.C. § 6103(p)(4). And because the receiving agency is bound by Section 6103(a)'s confidentiality mandate, redisclosures of return information must also be authorized under Section 6103. *See id.* § 6103(p)(2)(B), (p)(4)(C); 26 C.F.R. § 301.6103(p)(2)(B)-1. The receiving agency must establish and maintain a system of records that tracks its requests and the return information it receives. 26 U.S.C. § 6103(p)(4)(A). The records must be securely stored and access must be restricted to agency personnel whose duties require access and to whom disclosures may be made. 26 U.S.C. § 6103(p)(4)(B), (C). And the IRS has issued detailed guidance that recipients of return information must follow. *See* 26 C.F.R. § 6103(p)(4)-1; IRS Pub. 1075, *Tax Information Security Guidelines* (Nov. 2021), *available at* https://perma.cc/WSK5-FLVH. For instance, return information must be stored in a system that prevents unauthorized access and permits regular audits to ensure unauthorized access does not occur. Pub. 1075 at 50, 104. If return information is commingled in a file with information obtained from elsewhere, the entire file must be secured. *See id.* at 55. The return information must be returned or destroyed after it is used. *See* 26 U.S.C. § 6103(p)(4)(F)(ii).

## II.    IRS's Provision of Information to DHS under Section 6103(i)(2) of the Internal Revenue Code

On April 7, 2025, the U.S. Department of the Treasury ("Treasury Department") and DHS entered into a memorandum of understanding governing the sharing of information, including address information, between their respective subcomponents, the IRS and Immigration and Customs Enforcement ("ICE"). *See* Walker Decl., attached as Exhibit A. The MOU provides that

---

requesting agency does not establish or maintain appropriate safeguards "to protect the confidentiality" of the return information received. 26 U.S.C. § 6103(i)(6), (p)(4).

all ICE requests for return information will conform to Section 6103(i)(2)'s requirements, including that each request will provide the name and address of the taxpayer about whom information is requested; the taxable period or period to which the requested information relates; the specific non-tax federal criminal statute under which ICE is conducting an investigation or proceeding; and the reason that the requested information is, or may be, relevant to the investigation or proceeding. MOU § 6(C). Under the MOU, the IRS will disclose the return information to ICE only if the requirements of Section 6103(i)(2) are satisfied. *See* MOU §§ 1(e), 6(E).

The MOU also provides that ICE will safeguard any return information that it receives from the IRS. In particular, ICE will use the information solely in connection with non-tax federal criminal investigations and proceedings. MOU § 6(D). Any further disclosure of the information within ICE will be made consistent with that purpose on a need-to-know basis. MOU § 6(E)(3). And ICE will return or destroy the information in accordance with applicable record retention schedules when it is no longer needed. MOU § 9.

The IRS received a request for information from ICE under the terms of the MOU on June 27, 2025 for the last known address of 1.28 million taxpayers. Walker Decl. ¶ 6. The IRS responded to ICE on August 7, 2025. *Id.* ¶ 7. Pursuant to the terms of the MOU, for those names with respect to which the IRS could locate an address, and for which ICE had provided all of the information required by the MOU and Section 6103(i)(2), the IRS provided a last known address. *Id.*. The IRS provided last known addresses for 3.70 percent of the individuals requested by ICE. *Id.*.

6

III.    **The *Centro* Litigation**

Another court in this District has already determined in the context of a preliminary injunction that the IRS's information sharing with DHS under the terms MOU is lawful. In *Centro de Trabajadores Unidos v. Bessent*, No. 25-cv-0677-DLF, 2025 WL 1380420 (D.D.C.), four non-profit organizations sued the Treasury Department, the IRS, DHS, and ICE. After the denial of their motion for a temporary restraining order, the plaintiffs moved for a preliminary injunction, seeking to enjoin the IRS from disclosing addresses to DHS pursuant to the MOU. *Id.* at *2.

Judge Friedrich denied that motion, concluding that the plaintiffs were unlikely to prevail on the merits. Judge Friedrich concluded that the plan language of Section 6103(i)(2) not only authorizes, but also requires, the IRS to disclose return information to an agency that requests it in connection with a non-tax federal criminal investigation or proceeding. She further concluded that the terms of the MOU reflect the IRS's and DHS's intent to fully comply with Section 6103(i)(2). Judge Friedrich also determined that, although it was not clear that the IRS had changed its views about whether address information could be provided to DHS, the IRS's previous statements were, at most, general statements of policy that do not bind the IRS. *Id.* at *8.

The *Centro* plaintiffs appealed Judge Friedrich's decision. Oral argument on the *Centro* appeal is scheduled for October 3, 2025. *See* Order, No. 25-5181 (D.C. Cir. Aug. 15, 2025).

IV.    **This Case**

Plaintiffs here are the Center for Taxpayer Rights (the "Center"), a 501(c)(3) organization focused on taxpayer rights; the Main Street Alliance, a "nationwide network of small businesses with members across the country"; and two labor unions, the National Federation of Federal Employees, IAM AFL-CIO and Communications Workers of America, AFL-CIO. Am. Compl. ¶¶ 35–53. They filed suit against the IRS, the Treasury Department, the United States Digital

<center>7</center>

<center>A225</center>

Service ("USDS"), and the USDS Temporary Organization on February 17, 2025. Their initial Complaint asserted five causes of action, all of which challenged access allegedly granted to IRS data systems to what Plaintiffs refer to as "DOGE." *See generally* Compl., ECF No. 1. Defendants moved to dismiss the initial Complaint on April 25, 2025. *See* Defs.' Mot. to Dismiss Pls.' Compl., ECF No. 18.

Plaintiffs filed an Amended Complaint on May 16, 2025 that added Amy Gleason, Elon Musk, Steve Davis, the Treasury Department DOGE Team, the Office of Personnel Management, and the General Services Administration as Defendants. Whereas Plaintiffs' initial Complaint focused on the legality of allowing Treasury DOGE Team members access to IRS data systems, the Amended Complaint changed course. The Amended Complaint challenges an alleged "dramatic shift in IRS policy toward consolidation and inter-agency sharing of taxpayer data[.]" Am. Compl. ¶ 9. Plaintiffs assert that, to facilitate alleged data-sharing, Defendants have "create[ed] a 'mega' application programming interface ('API') that will facilitate unprecedented cross-agency sharing of sensitive taxpayer data, and [ ] have executed at least one agreement to share data with another agency—DHS[.]" *Id.* ¶ 14.

Defendants moved to dismiss Plaintiffs' Amended Complaint on July 10, 2025, and Defendants' motion was fully briefed as of August 15, 2025. Now, over six months into this case, Plaintiffs move for emergency injunctive relief.

## LEGAL STANDARD

A motion to stay agency action pending review under 5 U.S.C. § 705 is governed by the same standard as a motion for preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. *Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 58 (D.D.C. 2020); *Green Oceans v. U.S. Dep't of the Interior*, No. 24-cv-141-RCL, 2024 WL 3104945, at *2 n.3 (D.D.C. June 24, 2024);

*see also Nken v. Holder*, 556 U.S. 418, 433–34 (2009). Section 705, however, can only be invoked by a party entitled to proceed under the APA. *See* 5 U.S.C. § 705.

A preliminary injunction is an "extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). It is "never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To warrant preliminary injunctive relief, the moving party must show (1) likelihood of success on the merits, (2) irreparable harm in the absence of preliminary relief, (3) that the balance of equities "tips in his favor," and (4) that an injunction is in the public interest. *Id.* at 20. Where the government is the party opposing injunctive relief, as here, the latter two factors "merge." *Nken*, 556 U.S. at 435.

"Historically, these factors have been evaluated on a sliding scale." *Giri v. Nat'l Bd. of Med. Exam'rs*, 718 F. Supp. 3d 30, 38 (D.D.C. 2024) (quoting *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009)). The D.C. Circuit has since "suggested without deciding that a movant must independently establish both likelihood of success on the merits and irreparable harm." *WhaleCo Inc. v. Shein Tech. LLC*, No. 23-cv-3706 (TJK), 2025 WL 445187, at *4 (D.D.C. Feb. 9, 2025) (*citing Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011)). But "[e]ither way, 'it is clear that failure to show a likelihood of irreparable harm remains, standing alone, sufficient to defeat the motion.'" *Id.* (quoting *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018)).

Additionally, Plaintiffs bear the burden of showing subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because "standing is not dispensed in gross," Plaintiffs must "demonstrate standing for each claim that they press and for each form of relief that they seek." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

## ARGUMENT

I.  **Plaintiffs Are Unlikely to Prevail on Their Claim that IRS's Provision of Information to DHS Under the Terms of the MOU Violated Section 6103 of the Internal Revenue Code.**

A.  **Plaintiffs Fail to Establish Standing for Their Claims.**

Standing is a central component of Article III's case-or-controversy requirement and demands that plaintiffs have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citation omitted). In cases seeking to enjoin government action, standing also serves important separation-of-powers concerns, as ensuring federal court jurisdiction prevents courts from exercising "general legal oversight of the other branches of Government." *Murthy v. Missouri*, 603 U.S. 43, 76 (2024) (cleaned up); *see also TransUnion*, 594 U.S. at 423–24.

At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent, (2) a causal connection between the injury and defendants' challenged conduct, and (3) a likelihood that the injury suffered will be redressed by a favorable decision. *Lujan*, 504 U.S. at 560. The party invoking federal court jurisdiction "bears the burden of establishing each of those elements." *Hecate Energy LLC v. FERC*, 126 F.4th 660, 665 (D.C. Cir. 2025).

Plaintiffs in this case are two not-for-profit groups and two labor unions. As such, they must demonstrate that they possess either associational standing to bring claims on behalf of their members, or organizational standing to sue in their own right. Plaintiffs fail to establish either.

1.  <u>Plaintiffs Lack Associational Standing</u>.

To demonstrate associational standing, Plaintiffs must establish that "(1) at least one of [its] members has standing to sue in her or his own right, (2) the interests the association seeks to

<center>10</center>

protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit." *Elec. Privacy Inf. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019) (citations omitted); *see also Ass'n of Flight Attendants—CWA, AFL-CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 464 (D.C. Cir. 2009). Plaintiffs fail to establish such standing.

Plaintiffs' alleged injuries fail to establish associational standing (or, indeed, any type of standing) under the standards set out in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). There, the Supreme Court explained that an intangible harm may be cognizable for standing purposes only when it "has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts." *Id.* at 417 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). Plaintiffs agree that *TransUnion*'s framework applies but seek to stretch the common law torts of "intrusion upon seclusion" and "breach of confidence" far beyond their limits. *See* Mem. in Opp'n to Defs.' Mot. to Dismiss, at 21–24, ECF No. 27; *see also* Pls.' Mem. in Supp. Of Mot. for Stay or, in the Alternative, for Prelim. Inj. at 39, ECF No. 30-1 ("Pls.' Mot.").

1. Before turning to those common law torts, however, Plaintiffs' assertion of associational standing fails at the outset because the alleged injury is far too speculative. To support standing, an alleged harm may not be premised on hypotheticals. Rather, the plaintiffs must allege "actual or imminent, not speculative" harm, "meaning that the injury must have already occurred or be likely to occur soon." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024), *on remand to*, 117 F.4th 336 (5th Cir. 2024). For injury to be imminent, it must be "*certainly impending,*" and mere "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (alteration in original) (citation omitted).

Plaintiffs fail the injury-in-fact test, because it is entirely speculative that any of Plaintiffs'

members' or the Center's clients' address information has been, or will be, transferred pursuant to

the MOU. There is simply nothing like the indiscriminate "*en masse*" disclosure of information

that Plaintiffs allege. *See* Pls.' Mot. at 9, 23. As explained in Mr. Walker's declaration, although

ICE requested address information for approximately 1.28 million names, the IRS provided 3.70

percent of the total addresses requested, either because ICE did not provide all information

required under the terms of the MOU (and therefore did not satisfy the requirements of Section

6103(i)(2)), or because the IRS was unable to match the individual to a known taxpayer. Walker

Decl. ¶ 7. Moreover, since receiving the June 27 request, the IRS has not received any further

request from ICE pursuant to the MOU. *Id.* ¶ 8. The likelihood that Plaintiffs' members' specific

address information was included in the IRS's provision of information to ICE is remote, and any

claim that Plaintiffs' members' addresses may be shared in the future is entirely speculative. *See*

*Lujan*, 504 U.S. at 560–61; *Clapper*, 568 U.S. at 409.

Furthermore, and even assuming that some members' address information has or will be

transferred to ICE, it is purely hypothetical to assume that the information will be "broadly

disclosed" or "impermissibly used," as Plaintiffs contend. Pls.' Mot. at 40; *see also id*. at 43

(speculating that address information may be used in civil removal proceedings). The MOU

executed between the Treasury Department and DHS includes strict limitations on the use of

information provided under Section 6103(i)(2), including that the requested address information

will "only be used by officers and employees of ICE *solely*" with respect to proceedings and

investigations "pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), or other specifically

designated Federal criminal statutes, or any subsequent criminal proceedings." MOU § 6(D)

(emphasis added). The MOU further specifies that "ICE will use and redisclose [ ] address

12

information only as specifically authorized by [Internal Revenue Code] § 6103(i)(2) as implemented in 26 C.F.R. § 301.6103(i)-1." MOU § 6(E).

Plaintiffs acknowledge these restrictions, as they must, but suggest that ICE or others in the Executive Branch may not abide by them. *See* Pls.' Mot. at 41–42. But the government is entitled to a presumption of regularity, and the Court should thus not accept Plaintiffs' invitation to assume government officials will violate the requirements of Section 6103 or the terms of the MOU. *See Am. Fed'n of Gov't Emps. v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989) (explaining that the presumption of regularity "supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume [those officers] have properly discharged their public duties" (citation omitted)); *see also Hines v. United States*, 658 F. Supp. 2d 139, 144 (D.D.C. 2009) ("presum[ing] the regularity of IRS documents and official actions of the IRS"). Even without the presumption of regularity, Plaintiffs' theory requires an implausible assumption that government officials would open themselves up to potential disciplinary proceedings, dismissal, and criminal penalties by violating Section 6103. Such wild speculation is not a basis for this Court's jurisdiction.

The hypothetical nature of Plaintiffs' claims—based on an alleged risk that their members' information will be further disclosed or misused—distinguishes this case from *Alliance for Retired Americans v. Bessent*, where this Court concluded in the context of a motion for a preliminary injunction that the plaintiffs likely had standing. *See* 770 F. Supp. 3d 79, 99 (D.D.C. 2025). In that case, no theorizing was required to know that the Treasury Department established a DOGE team that was granted broad access to Treasury's Bureau of the Fiscal Service ("BFS") data systems. *See id*. at 95–96. Nor did the Court need to assume that the defendants in *Alliance for Retired Americans* would carry out their duties in bad faith, as Plaintiffs ask the Court to do here. In that

13

case, it was undisputed that the defendants relied on the provision in the Privacy Act that allows an agency to access records if there is a "need" for the "record[s] in the performance of their duties." 5 U.S.C. § 552a(b)(1); *see also* Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., at 25–28, No. 1:25-cv-00313 (D.D.C.), ECF No. 61-1. There are ongoing legal disputes in *Alliance for Retired Americans*, including over whether the Treasury Department DOGE team may properly access BFS records under that provision of the Privacy Act. But the unsupported assumption that the defendants would further disseminate information without complying with the protections under federal law is missing from that case.

2. Even if the Court were to put aside the speculative nature of Plaintiffs' alleged injuries, their asserted harm is not cognizable under *TransUnion*. Beginning with intrusion upon seclusion, as Defendants have explained, "'at its core, the harm contemplated by the common-law tort of intrusion upon seclusion includes an intrusion into an individual's private space.'" Defs.' Mem. in Supp. of Mot. to Dismiss, at 12, ECF No. 26-1 (quoting *Am. Fed'n of Teachers v. Bessent*, No. 25-1282, 2025 WL 1023638, at *2 (4th Cir. Apr. 7, 2025) (Agee, J., concurring)). And as the Fourth Circuit explained in a recent published decision, "intrusion upon seclusion has long been understood to guard not against the disclosure of sensitive information as such, but against the feeling of unease when and where one should ideally be at peace." *Am. Fed'n of Teachers v. Bessent*, --- F.4th ----, 2025 WL 2313244, at *5 (4th Cir. 2025).

That type of intrusion is missing from information sharing from the IRS to ICE under the terms of the MOU and provisions of Section 6103(i)(2). An agency sharing lawfully obtained information, contained in data systems that the agency lawfully maintains, with another agency pursuant to a memorandum of understanding is in no way analogous to a "highly offensive" "intentional[] intru[sion], physical[] or otherwise, upon the solitude or seclusion of another or his

<div align="center">14</div>

private affairs or concerns." Restatement (Second) of Torts § 652B (A.L.I. 1977) ("Restatement").

In fact, Plaintiffs do not allege that their members would even know if a record containing their

personal information was shared, barring some step taken by the agency to alert the person of the

fact. *See TransUnion*, 594 U.S. at 438 (emphasizing that certain plaintiffs had not suffered an

injury sufficient to support standing where they did not "even *kn[o]w*" their files contained

inaccurate information); *Am. Fed'n of Teachers*, 2025 WL 2313244, at *5 (explaining that, for

purposes of intrusion upon seclusion, "it is not the information obtained, but the knowledge that a

third party is engaged in targeted snooping, that causes the harm" (citing Eli A. Meltz, *No Harm,

No Foul? "Attempted" Invasion of Privacy and the Tort of Intrusion Upon Seclusion*, 83 Fordham

L. Rev. 3431, 3453 (2015)).

Plaintiffs' theory of injury is also inconsistent with how courts describe the tort. Take *Wolf

v. Regardie*, 553 A.2d 1213 (D.C. 1989), which Plaintiffs cited in their opposition to Defendants'

motion to dismiss, *see* Pls.' Opp'n to Defs.' Mot. to Dismiss Pls.' Am. Compl at 22, ECF No. 27.

In that case, the court explained that:

> the types of invasion intrinsic in the tort of intrusion upon seclusion are those such
> as harassment, peeping through windows or in other locations in which a plaintiff
> has chosen to seclude himself, opening personal mail, eavesdropping on private
> conversations, entering a plaintiff's home without permission or searching his
> personal belongings, examining a plaintiff's private bank account, or other
> invasions of that nature.

*Wolf*, 553 A.2d at 1217–18. Each of those examples describes a targeted intrusion into a specific

person's *private* information—as opposed to the address where an individual receives mail. They

are nothing like the alleged conduct challenged here, where the Internal Revenue Code has long

permitted information sharing between the IRS and law enforcement when the requirements of

Section 6103(i)(2) are satisfied.

15

3. Plaintiffs' reliance on the tort of breach of confidence (Pls.' Mot. at 39) fares no better. That tort "lies where a person offers private information to a third party in confidence and the third party reveals that information to another." *Jeffries v. Volume Servs. Am. Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019) (internal quotation marks omitted). To start, it is doubtful whether this tort qualifies as a traditional cause of action. *See TransUnion*, 594 U.S. at 427 (stating that the "lawsuit may not proceed because that plaintiff has not suffered any . . . harm *traditionally* recognized as providing a basis for a lawsuit in American courts" (emphasis added)). While the D.C. Circuit in *Jeffries* invoked the tort to find standing, that decision predates *TransUnion*, does not address whether the tort has a sufficient historical origin, and relies, in part, on an Eleventh Circuit panel decision that was later overturned by the Eleventh Circuit sitting en banc. *See Jeffries*, 928 F.3d at 1064 (citing *Muransky v. Godiva Chocolatier, Inc.*, 922 F.3d 1175 (11th Cir.), *reh'g en banc granted, opinion vacated*, 939 F.3d 1278 (11th Cir. 2019), and *on reh'g en banc*, 979 F.3d 917 (11th Cir. 2020)).

In that en banc decision, which came out after *Jeffries* was decided, the Eleventh Circuit questioned—without deciding—whether breach of confidence "can fairly be said to have 'traditionally been regarded as providing a basis for a lawsuit in English or American courts'" for standing purposes. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931 (11th Cir. 2020) (en banc) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). The Eleventh Circuit found that the tort has been "emerging" only since the 1980s in a "rudimentary form after initially dying out in its infancy." *Id.* (cleaned up). The Second Circuit has described it as "a relative newcomer to the tort family" and found that the tort is usually limited to the physician-patient or bank-customer relationships. *Young v. U.S. Dep't of Just.*, 882 F.2d 633, 640 (2d Cir. 1989). The tort's nascent

16

and underdeveloped pedigree raises serious doubts about whether this tort can serve as a valid analogue under *TransUnion*'s requirement of a historically grounded cause of action.

Yet, even if the Court were to apply the elements of the tort, the analogy still falls flat. The tort "lies whe[n] a person offers private information to a third party in confidence and the third party reveals that information to another." *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 73 (D.D.C. 2025) (quoting *Jeffries*, 928 F.3d at 1064). Here, Plaintiffs do not allege that IRS will publicly disclose their information once they obtain it, and inter-agency information sharing pursuant to a lawful agreement cannot plausibly be analogized to disclosure to a "third party." Thus, Plaintiffs' reliance on the tort of breach of confidence necessarily fails.

4. Plaintiffs' remaining theories of injury likewise do not support standing. Plaintiffs' suggestion that the statutory requirements of the Internal Revenue Code somehow independently suffice for injury-in-fact (Pls.' Mot. at 40, 43) runs headlong into the Supreme Court's holding in *TransUnion*. Congress can create "a statutory prohibition or obligation and a cause of action" but may not override Article III's injury requirement. *TransUnion*, 594 U.S. at 426. Whatever Congress might have intended is irrelevant to the question of whether Plaintiffs have established constitutional standing. *See Am. Fed'n of Teachers*, 2025 WL 2313244, at *7 ("A plaintiff's theory of statutory liability and their standing should not be conflated."). And although Plaintiffs' attempt to draw an analogy to the deprivation of Fourth Amendment rights, *see* Pls.' Mot. at 40, Plaintiffs have not, in fact, alleged any constitutional violation in this case, meaning that Plaintiffs' cited cases are inapposite.

2.   The Center Lacks Organizational Standing.

The Center is the only plaintiff that articulates any alleged harm to itself as an organization. *See* Am. Compl. ¶¶ 189–215; *see also* Pls.' Mot. at 35–38. But the Center is not "the object of the

government action or inaction [it] challenge[s]," meaning that, although "standing is not precluded, . . . it is ordinarily 'substantially more difficult' to establish." *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493–94 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)). And organizations, like all plaintiffs, must prove an injury-in-fact that is fairly traceable to the challenged actions. For a plaintiff organization like the Center, that showing requires "more than simply a setback to the organization's abstract social interests." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995) (citation omitted). The organization must establish that the challenged conduct "'perceptibly impaired' the organization's *ability to provide services*." *Turlock Irrigation Dist. v. Fed. Energy Regul. Comm'n*, 786 F.3d 18, 24 (D.C. Cir. 2015) (emphasis added) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).

The foundational decision establishing the contours of organizational standing is *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). As the Supreme Court recently explained in *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), however, the Court "has been careful not to extend the *Havens* holding beyond its context." *Alliance*, 602 U.S. at 396. The *Alliance* Court explicitly rejected the organizations' assertion that "standing exists when an organization diverts its resources in response to a defendant's actions," and clarified that "*Havens* does not support such an expansive theory of standing." *Id.* at 395. In *Havens*, the realty defendant had provided false information about apartment availability that "perceptibly impaired" the organization's counseling and referral services, meaning that the realty's "actions directly affected and interfered with" the organization's "core business activities"—not dissimilar, the *Alliance* Court remarked, "to a retailer who sues a manufacturer for selling defective goods to the retailer." *Id.*

18

The facts of this case are nothing like *Havens*, and notably almost all of the cases Plaintiffs cite to argue that the Center has standing predate *Alliance*. *See* Pls.' Mot. at 35–38. There is no concrete impediment to the Center's mission akin to the false information the realty provided in *Havens*. Nothing about the MOU or IRS's information sharing under Section 6103(i)(2) "directly affects" or "interferes" with the Center's "core business activities." The Center, through its Low-Income Taxpayer Clinic ("LITC"), is free to continue to counsel taxpayers on their rights without interference. The Center's "*ability* to provide services," *Turlock Irrigation Dist.*, 786 F.3d at 24 (emphasis added), remains undisturbed.

Attempting to show some direct interference with its work, the Center submits the declaration of its Executive Director and Founder, Nina Olson. *See* Olson Decl., ECF No. 30-8. Ms. Olson states that, in recent months, "[t]axpayers, particularly those who do not speak English as a first language and are more likely to be immigrants, have become less willing to come to the Center's events, to seek its guidance, or to engage with the Center's education and outreach." *Id.* ¶ 41. Ms. Olson further states that "[t]his has also been the Center's experience with other populations particularly concerned about the security of personal information[.]" *Id.* Based on "the Center's experience and [her] long personal experience working as a taxpayer advocate," Ms. Olson posits that "it is clear that the sudden difficulty the Center and other LITCs have experienced in reaching the population who we exist to serve is caused by the IRS's change in its data policy and shift to more open sharing of sensitive taxpayer information across the federal government." *Id.* ¶ 54.

The Center's attempt to draw a direct line between the IRS's response to ICE's information request (or the broader alleged "Data Policy") and decreased use of the Center's services is speculative, to say the least. Plaintiffs cannot establish harm from the IRS's fulfillment of the

19

statutory *obligation* under Section 6103(i)(2). Nor should the Center's clients reasonably expect confidentiality in information Congress has required the IRS to turn over to law enforcement agencies when the requirements of Section 6103(i)(2) are satisfied.

Further, whether the various individuals who declined Center's services or programming in recent months did so because of the alleged increased information sharing, versus any number of other reasons (be it economic, social, or due to some other government policy, or for a different reason or a combination of reasons), is unknowable. Indeed, one might suspect that taxpayers who are worried about the use of their mailing addresses would seek more guidance, not less, from an organization whose mission is "dedicated to furthering taxpayers' awareness of and access to taxpayer rights[.]" *Id.* ¶ 3. But, either way, the Center offers no concrete reason to ascribe the decreased utilization of its services—or its increased expenditures—to Defendants' alleged conduct. *Compare League of United Latin Am. Citizens v. Exec. Off. of the President*, --- F. Supp. ---, 2025 WL 1187730, at *25, *32 (D.D.C. 2025) (concluding that a requirement of "documentary proof of United States citizenship" would be a "direct impediment" to the organization's core mission of registering eligible voters). The alleged impairment to the Center's operation, and the Center's increased expenditures in response to declining engagement, are too tenuous and require too many unsupported assumptions for a finding of jurisdiction. *See Clapper*, 568 U.S. at 416 (an organization cannot establish standing based on actions it takes "in response to a speculative threat").[2]

---

[2] In a footnote, Plaintiffs state that "[t]he Center also asserts third-party standing in this case to assert the interests of its clients." Pls.' Mot. at 35 n.58. For the reasons explained in Defendants' reply in support of their motion to dismiss, Plaintiffs have not adequately alleged third-party standing. *See* Defs.' Reply in Supp. of Mot. to Dismiss Am. Compl. at 11–12, ECF No. 29. Having relegated third-party standing to a footnote in their brief, the Court need not consider Plaintiffs' claim of third-party standing as a basis for Plaintiffs' requested injunctive relief. *See Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997).

**B.    Plaintiffs Do Not Challenge Final Agency Action.**

Plaintiffs are not entitled to relief through the APA because they do not identify any final agency action. Agency action is final—and therefore reviewable in a judicial action brought pursuant to the APA—only when it "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

Plaintiffs' frame their APA claim as challenging a so-called "Data Policy" at IRS. Plaintiffs contend that this alleged policy is "apparent from recent IRS actions," including the development of a so-called "mega-API" and the creation of an "'omnibus' agreement" to "allow federal agencies broad access to taxpayer information." Pls.' Mot. at 10; *see also, e.g.*, Am. Compl. ¶¶ 161–62, 168–72. According to Plaintiffs, the "Data Policy": "(1) greatly expands access to and use of taxpayer information within the IRS; (2) consolidates data systems to facilitate broad, not segregated access within the agency; and (3) permits large-scale data-sharing with other agencies, unrelated to tax administration." Pls.' Mot. at 10.

Yet, there is no such "Data Policy," contrary to Plaintiffs' allegations.  As the MOU at issue in Plaintiffs' motion demonstrates, the IRS's information sharing is tailored to highly specific circumstances and conforms to the requirements of the Internal Revenue Code. *See generally* MOU. To the extent Plaintiffs contend that the MOU executed between the Treasury Departement and DHS, or IRS's response to DHS's June 27 request are themselves final agency action— separate from the non-existent "Data Policy"—that argument also lacks merit. The MOU does not represent a new "policy." It is merely a mechanism to effectuate the information sharing *required* by Section 6103(i)(2), and to ensure that appropriate security measures are in place to protect

21

sensitive information. *See id.* Similarly, as to IRS's response to DHS's June 27 request, it is not a new policy to provide statutorily required information.

Put differently, Plaintiffs' assertions satisfy neither of the *Bennett v. Spear* prongs. *See Bennett*, 520 U.S. at 177–78. First, information sharing between agencies does not "consummat[e]" a decisionmaking process in any formal sense. *Hawkes*, 578 U.S. at 597. Fulfilling the IRS's obligations under Section 6103(i)(2) is one of a variety of actions that may lead to, for instance, a criminal prosecution, but it is not the "consummation" of any agency process. Second, Plaintiffs' allegations that the information sharing violates Section 6103 (which Plaintiffs' motion fails to demonstrate) does not mean that any rights or obligations have been determined as the result of that action, or that legal consequences will flow. There is no final agency action where the challenged act "impose[d] no obligations, prohibitions or restrictions on regulated entities" and "does not subject them to new penalties or enforcement risks." *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020). Plaintiffs' members and clients are not regulated by agency decisions to comply with a valid information request, nor have Plaintiffs identified any direct legal consequences that arise from the information sharing.

Even if such decisions could produce indirect, practical consequences for Plaintiffs, they would not be final agency action. Adverse effects "accompany many forms of indisputably non-final government action." *Air Brake Sys., Inc. v. Mineta*, 357 F.3d 632, 645 (6th Cir. 2004). For example, "initiating an enforcement proceeding against a company . . . may have a devastating effect on the company's business, but that does not make the agency's action final." *Id*. What matters is that the alleged information sharing decisions here have no "direct and appreciable legal consequences" for Plaintiffs. *California Cmtys. Against Toxics v. EPA*, 934 F.3d 627, 640 (D.C. Cir. 2019). That forecloses Plaintiffs' APA claim.

Plaintiffs point the Court to the D.C. Circuit's decision in *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925 (D.C. Cir. 2008), but that case is not analogous to this one. In *Venetian*, the D.C. Circuit held that the Equal Employment Opportunity Commission's policy of disclosing an employer's confidential information (possibly including trade secrets) to third parties who were potential plaintiffs with discrimination claims against the employer constituted final agency action. Unlike this case, *Venetian* did not deal with disclosure within the federal executive branch to a federal law enforcement agency with statutory rights to the information in question. Disclosure of information to law enforcement authorities, as Congress required, is far different in kind from the facts of *Venetian*.

### C.    Plaintiffs Cannot Bring Clams under Section 6103 Through the APA.

Plaintiffs are also unlikely to prevail on the merits of their claim that IRS's provision of information to DHS runs contrary to the APA because it violates Section 6103, because the Internal Revenue Code's comprehensive statutory scheme precludes APA review.

The APA provides a vehicle for review only in circumstances where "there is no other adequate remedy." 5 U.S.C. § 704; *see also Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988) (Section 704 "also makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action"). That is not the case here.

The Internal Revenue Code creates a comprehensive remedial scheme for violations of 26 U.S.C. § 6103, and it would be inappropriate to allow Plaintiffs to use the APA to create an end-run around those remedies. Congress created a waiver of sovereign immunity for violations of § 6103 by authorizing only civil damages against the United States in 26 U.S.C. § 7431. Specifically, Section 7431 authorizes a right of action against the United States if "any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information . . . in violation of . . . section 6103." 26 U.S.C. § 7431(a)(1). Damages

23

are authorized in the sum of "the greater of" (a) $1,000 for each unauthorized disclosure of a return

or return information, or (b) the actual damages sustained by the plaintiff plus punitive damages

for willful disclosures or disclosures that result from gross negligence. *Id.* § 7431(c). Civil

damages under Section 7431 is the sole remedy that Congress provided for a violation of Section

6103, and it does not authorize injunctive relief. *See generally id.*; *see also Henkell v. United

States*, No. 96-2228, 1998 WL 41565, at *5 (E.D. Cal. Jan. 9, 1998) (explaining that § 7431 does

not authorize injunctive relief).

        In addition, Section 7712A of the Internal Revenue Code provides that an officer or

employee of the United States who willfully inspects return information in violation of Section

6103 is subject to dismissal from office or discharge from employment, a fine of up to $1,000, and

imprisonment of up to one year. 26 U.S.C. § 7213A(a)(1), (b). Similarly, Section 7213 provides

that an officer or employee of the United States who willfully discloses return information in

violation of Section 6103 is subject to dismissal from office or discharge from employment, a fine

of up to $5,000, and imprisonment of up to five years. *Id.* § 7213(a)(1). And Section 7213 also

provides criminal penalties for individuals who receive return information unlawfully, but later

willfully redisclose it in an unlawful manner; receive return information unlawfully, and later

willfully print or publish it "in any manner not provided by law"; or willfully solicit return

information in exchange for an item of material value. *Id.* § 7213(a)(2)–(5).

        Considering this highly reticulated scheme, courts have held that the civil and criminal

remedies discussed above represent the exclusive recourse for taxpayers aggrieved by the unlawful

inspection or disclosure of their return information. *See United States v. Orlando*, 281 F.3d 586,

596 (6th Cir. 2002) ("Congress has provided civil and criminal remedies for violations of § 65013,

but no statutory provision requires the exclusion of evidence so obtained."); *Nowicki v. Comm'r*,

<div align="center">24</div>

262 F.3d 1162, 1164 (11th Cir. 2001) ("Congress saw fit to provide only certain remedies for violations of § 6103 . . . ."); *see also United Atates v. Michaelian*, 803 F.2d 1042, 1049–50 (9th Cir. 1986) (upholding district court's "refus[a] to fashion a dismissal or suppression remedy for a violation of § 6103," given other "legislatively created remedies"). Additional equitable relief is, therefore, unavailable, at least in the absence of a constitutional violation. *See Orlando*, 281 F.3d at 595–59; *Nowicki*, 262 F.3d at 1163–64; *Marvin*, 732 F.2d at 673.

Indeed, when Congress wanted to afford taxpayers the ability to bring a preemptive suit to prevent the disclosure of their tax information, it did so expressly. Section 6110 provides that a taxpayer who has obtained a written determination concerning his tax situation may petition the Tax Court to prevent the IRS from disclosing information contained therein. 26 U.S.C. § 6110(f)(3)(A). Congress's provision of such a remedy in this limited context confirms that its omission in other contexts should be respected.

In the face of a comprehensive statute, litigants are not permitted to "circumvent the [scheme's] requirements and limitations by resorting to the catchall APA," even when "the plaintiff cannot prevail in a claim" under the scheme. *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (discussing the CSRA); *see also Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) (addressing the Agricultural Marketing Agreement Act). Given the remedies available to individuals whose return information is disclosed in violation of Section 6103—which is part of the complex statutory scheme Congress created in the Internal Revenue Code—there is another adequate remedy available, and Plaintiffs are not entitled to injunctive relief through the APA. *Cf. Agbanc Ltd. v. Berry*, 678 F. Supp. 804, 807 (D. Ariz. 1988)

(concluding that Section 7431 provides an adequate remedy at law that precludes equity jurisdiction).[3]

### D.    The IRS Has Complied Fully with Section 6103.

Even assuming Plaintiffs could overcome the threshold issues above, Plaintiffs are not entitled to injunctive relief because they are unlikely to prevail on their claim that the IRS's sharing of information under Section 6103(i)(2) is contrary to law. As Judge Friedrich explained in *Centro*, and as is apparent from the plain language of Section 6103, "the IRS must disclose limited taxpayer identity information (*e.g.*, the taxpayer's name and address) to assist another agency in criminal proceedings, if the agency has satisfied the statutory prerequisites in its written request." 2025, WL 1380420, at *5; 26 U.S.C. § 6103(i)(2). The MOU executed between the Treasury Department and DHS expressly incorporates those statutory requirements. *See generally* MOU; *see also Centro*, 2025 WL 1380420, at *5–6. And the IRS ensured that the requirements of the statute were satisfied before providing information to ICE under Section 6103(i)(2) and the terms of the MOU. *See* Walker Decl. ¶ 7. In short, the IRS followed the law.

Plaintiffs' efforts to resist that straightforward conclusion are unpersuasive. *First*, Plaintiffs contend that "IRS cannot have undertaken any meaningful review of the *en masse* request it received from ICE to ensure compliance given the speed with which it was processed." Pls.' Mot. at 24. There are several problems with that argument. For one, the IRS did not process the information request "within days," as Plaintiffs contend. *Id.* The IRS's responded to ICE on August 7, 2025, nearly six weeks after receiving ICE's request. *See* Walker Decl. ¶ 7.

---

[3] Because the APA is unavailable to Plaintiffs, the Court cannot grant injunctive relief pursuant to 5 U.S.C. § 705, which is contained within the APA.

26

In any event, Section 6103(i)(2) does not require the type of searching review that Plaintiffs appear to suggest was necessary. The statute requires the IRS to provide certain information, including addresses, upon receipt of written request that sets forth the name and address of the taxpayer to whom it relates; identifies the taxable period or periods to which the requested information relates; identifies the statutory authority under which the criminal investigation or proceeding is being conducted; and identifies the reason why disclosure of the requested return information is, or may be, relevant to the investigation or proceeding. 26 U.S.C. § 6103(i)(2)(B)(i)–(iv). The MOU requires that requests from DHS comply with those requirements, and the IRS independently confirmed that the request satisfied them. *See* Walker Decl. ¶ 7. Where the required information was lacking as to any specific person, the IRS did not fulfill ICE's request. *Id.*. Accordingly, the IRS complied with Section 6103(i)(2).

*Second*, Plaintiffs argue that ICE's requests for addresses were invalid because Section 6103(i)(2) requires the requesting agency to provide the "name and address" of the taxpayer to whom the request relates. Plaintiffs reason that, if the agency does not already have the *current* address of the taxpayer, it cannot receive information from the IRS, and thus Plaintiffs conclude that an agency can never request only address information under Section 6103(i)(2). *See* Pls.' Mot. at 25–25.

Judge Fredrich correctly rejected a nearly identical version of this argument in *Centro*. 2025 WL 1380420, at *6. Plaintiffs' argument fails because, "[b]y its plain language, the statute mandates that the IRS share a taxpayer's name and address with another agency, so long as its request for information is complete and valid and 'meets the requirements of [§ 6103(i)(2)(B)].'" *Id.* (citing 26 U.S.C. § 6203(i)(2)(A) (alteration in original); *see also* 26 U.S.C. § 6103(i)(C) (specifying that, for the purposes of Section 6103(i), a "taxpayer's identity" shall not be treated as

taxpayer return information"). Under the structure of the statute, the question of what must be included in an agency's request for return information is distinct from the question of what can be disclosed by the IRS. Indeed, Section 6103(i)(2) requires the IRS to disclose an address to a requesting agency notwithstanding that the agency must provide the taxpayer's name and address in its request. *See id.* § 6103(i)(2). Taken to its logical conclusion, Plaintiffs' argument would improperly read out of the statute Section 6103(i)(2)(C)'s reference to a "taxpayer's identity"— which is defined to mean "the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number . . . *or* a combination thereof," *id.* § 6103(b)(6) (emphasis added). *See Corley v. United States*, 556 U.S. 303, 314 (2009) (explaining that courts should construe statutes "so that no part will be inoperative or superfluous, void or insignificant" (cleaned up)). If an agency could only request name or address information that it already has, there would have been no reason for Congress to specify that a taxpayer's name and address must be disclosed.

Plaintiffs' argument is not saved by their citation to the Internal Revenue Manual and the Disclosure & Privacy Law Reference Guide. *See* Pls.' Mot. at 25 & n.41. "It is emphatically the province and duty of the judicial department to say what the law is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385 (2024) (cleaned up). And it has long been understood that IRS publications do not bind the IRS and cannot be relied on in the face of a contrary statute. *See* Stephanie Hunter McMahon, *Classifying Tax Guidance According to End Users*, 73 Tax Law. 245, 264 (2020); *Miller v. Commissioner*, 114 T.C. 184, 195 (2000) (collecting cases). The Internal Revenue Manual is merely a complication of "[p]rocedures . . . intended to aid in the internal administration of the IRS." *Matter of Carlson*, 1265 F.3d 915, 922 (7th Cir. 1997). "It is well settled . . . that the provisions of the Manual . . . do not have the force of law." *Elec. Privacy Info. Ctr. v. IRS*, 910 F.3d 1232, 1244–45 (D.C. Cir. 2018). The Privacy Law Reference Guide, for its

part, cautions that it "was prepared for reference purposes only; it may not be used or cited as authority for setting or sustaining a legal position." IRS Pub. 4639, *Disclosure & Privacy Law Reference Guide* \*iii, https://perma.cc/3GQR-TPWT ("Reference Guide").

In any event, the statements in the Internal Revenue Manual and the Privacy Law Reference Guide do not bear the weight that Plaintiffs put on them. The Internal Revenue Manual states that "Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address." Internal Revenue Manual § 11.3.28.4(5), Disclosure of Return Information (Other Than Taxpayer Return Information) Pursuant to IRC 6103(i)(2), https://perma.cc/HY8W-QPJG. And the Privacy Law Reference Guide states that "Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section." Reference Guide at 5–4. As Judge Friedrich noted in *Centro*, it is possible to read the Manual and Reference Guide as simply reinforcing the requirement that a request for return information under Section 6103(i)(2) must include the taxpayer's address. 2025 WL 1380420, at \*6. But even if the Manual and Reference Guide are read to support the limitation Plaintiffs propose, the Court's interpretation must yield to the statutory text, which imposes no such limitation. *See id.*

Plaintiffs also attempt to bolster their argument by reference to another subsection of the statute, Section 6103(i)(5), which pertains to the "locat[ion of] fugitives from justice" and requires a court order prior to disclosure. *See* Pls.' Mot. at 26 (citing 26 U.S.C. § 6103(i)(5)). As Judge Friedrich explained, however, Section 6103(i)(5) "serves an entirely different purpose than § 6103(i)(2)." *Centro*, 2025 WL 10380420, at \*6. "That the fugitive provision authorizes the IRS to release more extensive tax return information to the Department of Justice (assuming it meets the more onerous prerequisites in § 6103(i)(5)(B))) does not preclude the IRS from releasing a

taxpayer's name and address to an agency (assuming it satisfies the much less demanding procedure set forth in § 6103(i)(2))." *Id.*

*Third*, Plaintiffs argue (Pls.' Mot. at 26) that the IRS violated the proscription in Section 6103(i)(2) that information be disclosed only to officers and employees of the requesting agency who are "personally and directly engaged" in preparation for a criminal judicial or administrative proceeding, an investigation which may result in such a proceeding, or certain grand jury proceedings. 26 U.S.C. § 6103(i)(2). Plaintiffs question whether ICE has sufficient personnel to be "personally and directly engaged" in criminal investigations of the taxpayers for whom ICE requested information. Pls.' Mot. at 26. But Plaintiffs' argument reads the requirements of Section 6103(i)(2) too broadly. A law enforcement agency officer or employee could be "personally and directly" engaged in an investigation that starts with a high-level view of agency data. As Judge Friedrich explained in *Centro*, "if DHS is investigating an immigrant for remaining 90 days past a final removal order," in violation of 8 U.S.C. § 1253(a)(1), "a recent address could confirm that the immigrant did in fact overstay the order," *Centro*, 2025 WL 1380420, at *7. In other words, address information, even at a large scale, could allow ICE to investigate which taxpayers are potentially subject to criminal proceedings. At bottom, moreover, it is ICE's responsibility under the MOU to ensure that the "personally and directly engaged" requirement is satisfied, *see* MOU § 6(E), and it is neither unreasonable nor unlawful for the IRS to rely on ICE's representations in that respect.

*Fourth*, Plaintiffs cite two news articles to suggest that "the White House contacted [an] IRS agent on August 8 to follow up on ICE's requests, officials requested additional information on the taxpayers the IRS identified—specifically, whether any had claimed the [Earned Income Tax Credit ("EITC")]." Pls.' Mot. at 26–27. Plaintiffs assert that this alleged communication

violated Section 6103(i)(2), because whether a taxpayer qualifies for the EITC is "taxpayer return information" that cannot be disclosed. *Id.* at 27. Even if Plaintiffs' account of White House communications to IRS were accurate, however, Plaintiffs provide no indication that the IRS ever unlawfully disclosed any taxpayer return information in response. Thus, there is no evidence of any violation of Section 6103.

*Finally*, Plaintiffs speculate that the information the IRS provides to ICE will not be used "solely" for purposes of potential criminal investigations or proceedings. *See* Pls.' Mot. at 27–28. Plaintiffs' argument ignores, however, that the MOU expressly requires just that. *See* MOU § 6(D). The IRS did not act contrary to law by providing address information to ICE under the explicit expectation that ICE would use the information consistent with Section 6103(i)(2).

### E.    Plaintiffs Are Unlikely to Prevail on Their Arbitrary and Capricious Claim.

Should the Court conclude it must assess the likelihood of success on Plaintiffs' arbitrary and capricious claim, despite the lack of final agency action, Defendants are highly likely to prevail. "[R]eview under [this standard] is deferential," requiring a "court simply [to] ensure[] that the agency has acted within a zone of reasonableness and … reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

Defendants' actions—entering into an MOU to ensure compliance with the provisions of Section 6103(i)(2) before transferring information as required by that statute—falls squarely within the "zone of reasonableness." Indeed, the IRS's strict compliance with Section 6103(i)(2) is confirmed by the MOU itself. *See* MOU § 6. And it cannot be unreasonable for an agency to do what is *required* by law. *See Centro*, 2025 WL 1380420, at *7.

Plaintiffs again point to statements from the Internal Revenue Manual. *See* Pls.' Mot. at 29–30. But, as discussed above, those statements do not have the force of law and, in any event

31

"do not categorically bar the IRS from sharing information with another agency so long as the agency first provides a taxpayer's name and address and satisfies the other statutory requirements" of Section 6103(i)(2). *Centro*, 2025 WL 1380420, at *7; *see also* Part I.D, *supra.* As to reliance interests, contrary to Plaintiffs' claim, there can be no expectation that the IRS will not share return information when the Internal Revenue Code explicitly authorizes—and, indeed, requires—its disclosure.

## II.     Plaintiffs Cannot Demonstrate Irreparable Harm.

"The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). To obtain such relief, the plaintiffs must establish injury that is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'" *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citing *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Although Plaintiffs' failure to demonstrate concrete injury sufficient to establish Article III standing would also mean they cannot demonstrate irreparable harm, the converse is of course not necessarily true: that a plaintiff has or will suffer an injury in fact does not mean that they have demonstrated irreparable harm for purposes of the preliminary injunction inquiry. *See, e.g.*, *All. for Retired Ams. v. Bessent*, --- F. Supp. 3d ----, 2025 WL 740401, at *20–24 (D.D.C. 2025) (finding, in denying preliminary injunction against DOGE access, that plaintiff had not demonstrated irreparable harm and thus was not entitled to preliminary injunction, despite concluding that plaintiff had Article III standing); *Comm. for a Constructive Tomorrow v. Dep't of the Interior*, No. 24-cv-774 (LLA), 2024 WL 2699895, at *4 (D.D.C. May 24, 2024) ("While Plaintiffs have shown a substantial likelihood of standing, they have not demonstrated that they

32

will suffer irreparable harm in the absence of a preliminary injunction or administrative stay. That is a sufficient basis to deny their motion.").

Critically, "[a] movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297; *Univ. of Cal. Student Ass'n*, 2025 WL 542586, at *4 (denying TRO in DOGE data access case because plaintiff failed to make a clear showing of irreparable harm and "leav[ing] for another day consideration of whether [the plaintiff] has standing to sue and has stated a claim upon which relief may be granted"); *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 398 (D.D.C. 2020) (explaining that "if a court concludes that a movant has not demonstrated irreparable harm, it need not even consider the remaining factors").

1. Plaintiffs here fail to establish irreparable harm and therefore are not entitled to injunctive relief. For all the reasons discussed above, *see* Part I.A, *supra*, Plaintiffs have not suffered an injury-in-fact, much less any harm so "certain" and "great" as to warrant a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. As detailed in Mr. Walker's declaration, the IRS has followed the requirements of Section 6103(i)(2) and provided information only as required by the statute. It is entirely speculative to assume that any of Plaintiffs' members' or the Center's clients' address information has been, or will be, disclosed to ICE, and even further hypothesizing is required to conclude that address information will be broadly disseminated or used for an unlawful purpose.

Moreover, as this Court and others in this District have recognized in analogous circumstances, there is no irreparable harm warranting injunctive relief based on allegedly unlawful intragovernmental transfer of data. *See Alliance for Retired Americans*, 770 F. Supp. 3d

at 109 ("Plaintiffs inability to show a likelihood of future wrongful dissemination of their members' private information is fatal to their Motion."); *Univ. of Cal. Student Ass'n v. Carter*, 766 F. Supp. 3d 114, 121 (D.D.C. 2025) ("[Plaintiff] . . . cites no authority for the proposition that mere "access" to personal data by government employees who are not authorized to view it, without more, creates an irreparable injury."); *AFL-CIO v. Labor*, Civ. A. No. 25-339 (JDB), 2025 WL 1783899, at \*14 (D.D.C. June 27, 2025) ("Plaintiffs' argument that private disclosure of personal information alone amounts to irreparable harm holds no water in this Circuit."). Here, as in those cases, the information at issue is subject to strict restrictions on its use and dissemination, and available only to a limited set of federal government employees. *See* 26 U.S.C. § 6103(i)(2); MOU § 6(D), (E). In addition, as detailed above, the Internal Revenue Code sets out a comprehensive set of remedies for the unlawful disclosure of return information, including damages. *See* Background, Part I, *supra*. Even the "possibility" that adequate relief will be available after a full hearing on the merits "weighs heavily against a claim of irreparable harm." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Univ. of Cal. Student Ass'n*, 766 F. Supp. 3d at 123 (finding that "the remedies provided in the . . . Internal Revenue Code confirm that [plaintiff's members are not suffering (and will not suffer) an irreparable harm").

Plaintiffs' assertion of irreparable harm to the Center's organizational interests also cannot justify injunctive relief. As discussed above, there is no direct impediment to the Center fulfilling its mission, and Plaintiffs' contrary argument is inconsistent with the Supreme Court's decision in *Alliance*. It is hardly irreparable harm for the IRS to provide information to law enforcement agency in fulfilment of a statutory obligation.

2. There are other reasons, too, that preclude a finding of irreparable harm. For one, Plaintiffs' lengthy delay in seeking injunctive relief "stands in stark contrast to the high bar they

must clear to show irreparable harm." *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014). "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.'" *Id.* (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)). Indeed, the D.C. Circuit has viewed a delay in challenging agency action to be significant to its decision denying a preliminary injunction when the delay was only 44 days. *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) ("Our conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one.").

The Treasury Department and DHS executed the MOU at issue in Plaintiffs' motion in April 2025, and Judge Friedrich issued her decision denying the *Centro* plaintiffs' motion to enjoin information sharing under the MOU on May 12. *See Centro*, 2025 WL 1380420, at *1. Moreover, Plaintiffs' Amended Complaint demonstrates that Plaintiffs were aware of the MOU by May 15, at the very latest. *See* Am. Compl. ¶ 14. Yet, Plaintiffs delayed until August 20—over three full months while the parties briefed Defendants' motion to dismiss—before seeking emergency relief from this Court. That lengthy delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotation and citation omitted).

Plaintiffs may claim that the breadth of the IRS's potential information sharing was not apparent until more recently. But that would hardly be credible, as it would be inconsistent with Plaintiffs' own theory of their case as stated in their May 2025 Amended Complaint. *See* Am. Compl. ¶¶ 140 (alleging that the "IRS has already decided to begin large-scale data sharing with other government agencies, which it is poised to dramatically expand, within weeks or months,

via a new centralized technological platform"). Having inexplicably delayed for months, Plaintiffs should not be heard now to obtain emergency relief from this Court.

Moreover, given Plaintiffs' delay, it is now far from apparent that the Court could even fashion effective relief to address Plaintiffs' alleged harm. The IRS completed its response to DHS's June 27, 2025 request on August 7, 2025. *See* Walker Decl. ¶¶ 6–7. There are no other pending requests from DHS. *Id.* ¶ 8. And to the extent Plaintiffs seek to have "Defendants [ ] destroy" information already provided, "or seek and facilitate the destruction of such data," *see* Proposed Order, ECF No. 30-2, that proposed injunctive relief ignores that neither ICE nor DHS is a party to this litigation, precluding an order directed to them. *See generally* Am. Compl.; *Trump v. CASA, Inc.*, 145 S. Ct. 2540, 2552 (2025) (explaining that "party-specific principles [ ] permeate" the Supreme Court's equity jurisprudence).

## III.    The Balance of Equities Favors Defendants.

The remaining two preliminary injunction requirements also favor the government. Initially, the purpose of a preliminary injunction is to preserve the status quo, and "courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the status quo[.]'" *Hanson v. Dist. of Columbia*, 120 F.4th 223, 247 (D.C. Cir. 2024) (quoting *Singh v. Berger*, 56 F.4th 88, 95 (D.C. Cir. 2022)). In this case, the status quo is that the IRS and DHS have a lawful MOU in place to share information under the terms of Section 6103(i)(2). Indeed, that MOU has been in place for well over four months. *See* Walker Decl. ¶ 5. It would disrupt, rather than preserve, the status quo to enjoin information sharing under the MOU.

Moreover, as discussed above, Plaintiffs' proposed injunction would prohibit information sharing that is *required* by Section 6103(i)(2). *See* Background, Part I, *supra*. Plaintiffs' proposed injunction therefore threatens significant and irreparable harm to the government and the public that greatly outweighs any claimed injury to Plaintiffs. *See Nken*, 556 U.S. at 435; *Maryland v.*

36

*King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration and citation omitted)). The harm to the government is particularly acute because the purpose of Section 6103(i)(2) is to aid in the efficient conduct of law enforcement investigations and proceedings, which may be impeded or delayed by an injunction.

Finally, principles of comity and judicial efficiency weigh against the exercise of equitable relief. The D.C. Circuit is scheduled to hear oral argument on the *Centro* court's denial of the plaintiffs' motion for a preliminary injunction on October 3, 2025. The Court should reject Plaintiffs' request that this Court duplicate the efforts of Judge Fredrich when the D.C. Circuit will soon decide the same issue. *See Am. Chemical Paint Co. v. Thompson Chemical Corp.*, 244 F.2d 64, 66–67 (9th Cir. 1957) ("Considerations of comity and judicial restraint should deter one court from thus, in effect, overruling the decisions of a court of co-ordinate jurisdiction.").

## IV.    Plaintiffs Should Be Ordered to Post a Substantial Security in Connection with Any Preliminary Injunctive Relief, and Any Preliminary Injunctive Relief Should Be Stayed Pending Any Appeal.

For the reasons stated above, the Court can and should deny Plaintiffs' motion. If the Court is inclined to order any injunctive relief, however, it should order Plaintiffs to post substantial security with any preliminary injunction, commensurate with the disruption caused by the injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). "[I]njunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). In the event the Court issues an injunction here, the Court should require Plaintiffs to post a bond commensurate with the scope of any injunction.

*See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

Finally, Defendants respectfully request that if this Court does enter injunctive relief, that relief be stayed pending appeal, if such appeal is authorized by the Solicitor General and taken by Defendants. In the alternative, Defendants ask for a stay for a period of seven days to allow the Solicitor General to determine whether to appeal and seek a stay pending appeal.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, for a preliminary injunction.

Dated: August 28, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Bradley P. Humphreys*
BRADLEY P. HUMPHREYS
Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

*Counsel for Defendants*

38

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS, et al.,

        Plaintiffs,

v.

INTERNAL REVENUE SERVICE, et al.,

        Defendants.

Civil Action No.: 25-cv-457-CKK

## DECLARATION OF JOHN J. WALKER

I, John J. Walker, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Acting Chief Privacy Officer at the Internal Revenue Service (IRS). I have been employed by the IRS since January 1995 and held the position of Acting Chief Privacy Officer since April 27, 2025.

2.      The position of Chief Privacy Officer oversees the Office of Privacy, Governmental Liaison and Disclosure (PGLD), a business unit within the IRS. I have held positions in PGLD or its predecessor, the Privacy, Identity Protection and Data Security office, since July 2009, including as an analyst, the Privacy Review Manager, the Associate Director of Incident Management, and the Acting Director of Privacy Policy and Compliance. PGLD is responsible for protecting the privacy of sensitive return information of taxpayers and employees, and it is responsible for compliance with the confidentiality provisions of 26 U.S.C. § 6103.

3.      As the Acting Chief Privacy Officer, my duties include overseeing the management of PGLD, as well as ensuring compliance with the Privacy Act, the Freedom of Information Act,

the Federal Records Act, and 26 U.S.C. § 6103. In conjunction with this work, among other things, I oversee data exchanges with federal, state, and local government agencies.

4.      This declaration is based on my personal knowledge and on information acquired in my official capacity and in the performance of my duties as the Acting Chief Privacy Officer.

5.      On April 7, 2025, the U.S. Department of the Treasury, on behalf of the IRS, and the Department of Homeland Security (DHS), on behalf of the U.S. Immigration and Customs Enforcement (ICE), executed a Memorandum of Understanding (MOU) to create a framework for the sharing of specific return information between the agencies. The MOU governs requests submitted by ICE for return information under 26 U.S.C. § 6103(i)(2). A true and complete copy of the executed MOU is attached as **Exhibit 1**. The "points of contact" on page 13 of the MOU were redacted to protect the personal privacy interests of the listed government employees.

6.      On June 27, 2025, the IRS received a letter from ICE Acting Director Todd M. Lyons. The letter requested, pursuant to the terms of the MOU, the last known address of approximately 1.28 million individuals identified by ICE.

7.      The IRS responded to ICE on August 7, 2025. It provided ICE with the last known address of an individual only if ICE provided all of the information required by the MOU for that individual and the IRS was able to match the individual to a known taxpayer. In total, the IRS provided to ICE the last known address for 3.70% of the individuals requested by ICE.

//

//

//

//

//

8.     Since the June 27 request described in paragraph 6 above, the IRS has not received

a request pursuant to the MOU from ICE.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 28, 2025

_____

John J. Walker

3

# EXHIBIT 1



Department of the Treasury
Internal Revenue Service

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

# MEMORANDUM OF UNDERSTANDING

BETWEEN

THE U.S. DEPARTMENT OF THE TREASURY,
INTERNAL REVENUE SERVICE

AND

THE U.S. DEPARTMENT OF HOMELAND SECURITY,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

FOR THE EXCHANGE OF INFORMATION FOR NONTAX
CRIMINAL ENFORCEMENT

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**MEMORANDUM OF UNDERSTANDING
BETWEEN
U.S. TREASURY DEPARTMENT on behalf of the INTERNAL REVENUE SERVICE
AND
U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the U.S.
IMMIGRATION AND CUSTOMS ENFORCEMENT,**

**FOR THE EXCHANGE OF INFORMATION FOR NONTAX CRIMINAL
ENFORCEMENT**

1. **INTRODUCTION:**

    a. WHEREAS by Executive Order (EO) No. 14161, <u>Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats</u>, 90 Fed. Reg. 8451 (Jan. 20, 2025), the President directed the Secretary of State, in coordination with the Attorney General, and the Director of National Intelligence, to take immediate steps to identify, exclude, or remove aliens illegally present in the United States; and

    b. WHEREAS the Department of Homeland Security has identified numerous aliens illegally present in the United States whom they have represented are under final orders to remove them from the United States; and

    c. WHEREAS the Department of Homeland Security has represented that each of the above-referenced individuals is under criminal investigation for violations of one or more specifically designated Federal criminal statutes (not involving tax administration), including 8 U.S.C. § 1253(a)(1); and

    d. WHEREAS the parties wish to enter into an agreement setting forth the procedures, processes, and safeguards to be followed upon the receipt of a request for the disclosure of information subject to the confidentiality requirements of Internal Revenue Code (IRC) § 6103;

    e. NOW THEREFORE, this Memorandum of Understanding (MOU) between the U.S. Treasury Department / Internal Revenue Service (IRS), and the U.S. Department of Homeland Security / U.S. Immigration and Customs Enforcement (ICE), sets forth the agreement of the parties with respect to ICE's use of the authority in IRC § 6103(i)(2) for the submission of requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or another specifically designated Federal criminal statute.

2. **AUTHORITY:**

The IRS enters into this MOU pursuant to IRC § 7803(a)(2), delegating to the IRS the authority to administer the Internal Revenue Code, and IRC § 6103(i)(2), authorizing the disclosure of return information other than taxpayer return information for purposes of the enforcement of a specified

nontax Federal criminal statute.  ICE enters into this MOU pursuant to 8 U.S.C. § 1253(a)(1), 8 U.S.C. § 1103, and 6 U.S.C. § 112(b)(2).

**3.  PURPOSE:**

(U//LES) The purpose of this MOU is to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes.  The specifications and details regarding the IRS's and ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

**4.  CONTACTS:**

A.  Contacts for this MOU are the IRS designee(s) and the ICE designee(s). Refer to Exhibit A.

B.  Succession of Authority.  The IRS and ICE anticipate there may be changes to the titles and\or responsibilities of officers and employees designated within this MOU. In the event of such changes, any actions that may be taken under this MOU by said officers or employees, may be taken by any officer(s) or employee(s) the IRS and ICE determine to have succeeded to the relevant portions of said officers' or employees' authorities or responsibilities.  Each party shall be responsible for ensuring the points of contact are current by providing a revised Exhibit A to all parties within 30 days of any change.

**5.  DUTIES AND RESPONSIBILITIES OF THE IRS:**

The IRS will:

A.  Receive requests for address information from ICE.

B.  Review each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2). The IRS will provide explanations and/or reasons the request cannot be processed.

C.  (U//LES) Search for the last known address for each individual in each request.

D.  (U//LES) For each individual the IRS is able to identify from the information provided by ICE, provide the IRS last known address for that individual.  For each individual the IRS cannot identify from the information provided by ICE, indicate "no match" in the response.

E.  Send responses to ICE in the manner set forth herein.

F.  Account for disclosures made under this MOU as required pursuant to IRC § 6103(p)(3)(A).

2
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

G. (U//LES) Specifications and details regarding the IRS's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

## 6. DUTIES AND RESPONSIBILITIES OF ICE:

ICE will:

A. (U//LES) Send requests for address information for specifically identified individuals pursuant to the specifications contained in a separate implementation agreement between ICE and IRS.

B. Each request must be made consistent with IRC § 6103(i)(2)(A).

C. (U//LES) Each request will contain the following information with respect to each individual identified in the request:

1. (U//LES) The name and address of the taxpayer.
2. (U//LES) The taxable period or periods as to which the return information (address) they are seeking relates.
3. (U//LES) The specifically designated nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding regarding the individual is being conducted.
4. (U//LES) The date of the final order of removal and the related case number assigned to each such order.
5. (U//LES) The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding. Any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.
6. (U//LES) Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified.

D. (U//LES) Each request will attest that the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings.

E. ICE will use and redisclose the address information only as specifically authorized by IRC § 6103(i)(2) as implemented in 26 C.F.R § 301.6103(i)-1. Specifically, the regulations provide:
1. (U//LES) Return information disclosed under IRC § 6103(i)(2) shall be open to inspection by or disclosure to ICE officers and employees personally and directly engaged in, and for their necessary use in, proceedings and investigations that may result in such proceedings, pertaining to the enforcement of a specifically designated nontax Federal criminal statute.

2. (U//LES) Return information disclosed under IRC § 6103(i)(2) may be disclosed by such

3

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

ICE officers and employees to other persons only to the extent necessary to the enforcement of the specifically designated nontax Federal criminal statute, including:

a. (U//LES) To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);
b. (U//LES) To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or
c. (U//LES) To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

3. (U//LES) Among those persons to whom returns and return information may be disclosed by officers and employees of ICE on a need-to-know basis as provided are:

a. (U//LES) Other ICE officers and employees such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel;
b. (U//LES) Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such ICE officers and employees; and
c. (U//LES) Court reporters.

F. (U//LES) ICE will ensure the proper handling, transmission, safeguarding, and security of the address information as contained in Sections 8 and 9 of this MOU.

G. Specifications and details regarding ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

4

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**7.  DESCRIPTION OF THE RECORDS:**

A.  Systems of Records Notices

    1.  The IRS will
        a.  (U//LES) disclose address information from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

    2.  ICE will
        a.  (U//LES) disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Address Information; Date of Birth; Country of Citizenship; FBI Numbers; and Fingerprint Identification Number (FINS), from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE; and

        b.  (U//LES) maintain the address information provided by the IRS in the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

**8.  INFORMATION SECURITY:**

The IRS and ICE will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, Subchapter II, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283); related Office of Management and Budget (OMB) circulars and memoranda, such as Circular A-130, Managing Information as a Strategic Resource (July 28, 2016), and Memorandum M-17-12, Preparing for and Responding to a Breach of Personally Identifiable Information (PII) (Jan. 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including amendments published after the effective date of this MOU. These laws, directives, and regulations include requirements for safeguarding Federal information systems and Personally Identifiable Information used in Federal agency business processes, as well as related reporting requirements. Both agencies recognize, and will implement, the laws, regulations, NIST standards, and OMB directives, including those published subsequent to the effective date of this MOU.

The FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Both agencies are responsible for oversight and compliance of their contractors and agents.

5
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

A.  Incident Reporting

If the IRS or ICE experiences an incident involving the loss or breach of PII provided by IRS under the terms of this MOU, they will follow the incident reporting guidelines issued by OMB. In the event of a reportable incident under OMB guidance involving PII, the agency experiencing the incident is responsible for following its established procedures, including notification to proper organizations (i.e., Cybersecurity & Infrastructure Security Agency (CISA) and the agency's privacy office). Immediately upon discovery of a potential cybersecurity incident involving IRS-provided PII, ICE will contact the IRS Computer Security Incident Response Center (CSIRC) at 240-613-3606.

B.  Breach Notification

The IRS and ICE will follow PII data breach notification policies and related procedures as required by OMB Memorandum M-17-12 (Jan. 3, 2017). If the agency that experienced the data breach, after conducting a risk assessment, determines notification to the potentially impacted individuals and an offer of an identity protection/identity monitoring service, and/or other remedies is required, that agency will carry out the remedies without cost to the other agency.

9.  **DISCLOSURE, SAFEGUARDS, AND RECORD KEEPING REQUIREMENTS:**

A.  ICE will maintain all Federal tax returns and return information sourced from the IRS in accordance with IRC § 6103(p)(4) and comply with the safeguards requirements set forth in Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies*. Publication 1075 is the IRS-published guidance for security guidelines and other safeguards for protecting returns and return information, pursuant to 26 C.F.R. § 301.6103(p)(4).

The IRS safeguarding requirements include:

1.  ICE will establish a central point of control for all requests for and receipt of Federal tax returns and return information and maintain a log to account for all subsequent disclosures and products made with/from that information, and movement of the information until destroyed, in accordance with Publication 1075.

2.  ICE will establish procedures for secure storage of Federal tax returns and return information consistently maintaining two barriers of protection to prevent unauthorized access to the information, including when in transit, in accordance with Publication 1075.

3.  ICE will consistently label Federal tax returns and return information obtained under this MOU to make it clearly identifiable and to restrict access by unauthorized individuals. Any duplication or transcription of Federal tax returns and return information creates new records which must also be properly accounted for and safeguarded. Federal tax returns and return information should not be commingled with other ICE records unless the entire file is safeguarded in the same manner as required for Federal tax returns and return

information and the Federal tax information (FTI) within is clearly labeled in accordance with Publication 1075.

4.  ICE will restrict access to Federal tax returns and return information solely to officers and employees of ICE as described in this MOU for the purposes of carrying out this MOU. Prior to access ICE must evaluate which employees require such access. Authorized individuals may only access Federal tax returns and return information to the extent necessary to perform services related to, and as authorized by, this MOU, in accordance with Publication 1075.

5.  Prior to initial access to FTI and annually thereafter, ICE will ensure that employees and officers that will have access to Federal tax returns and return information receive awareness training regarding the confidentiality restrictions applicable to the Federal tax returns and return information and certify acknowledgement in writing that they are informed of the criminal penalties and civil liability provided by IRC §§ 7213, 7213A, and 7431 for any willful disclosure or inspection of Federal tax returns and return information that is not authorized by the IRC, in accordance with Publication 1075.

6.  ICE will submit an annual Safeguard Security Report (SSR) to the Office of Safeguards by the submission deadline specified in Publication 1075 to provide an update on safeguarding activities during the reporting period.  The SSR will also provide Head of Agency certification that the SSR addresses all Outstanding Actions identified by the IRS Office of Safeguards from the agency's prior year SSR; accurately and completely reflects ICE's current environment for the receipt, storage, processing, and transmission of FTI; accurately reflects the security controls in place to protect the FTI in accordance with Publication 1075 and of ICE's commitment to assist the Office of Safeguards in the joint effort of protecting the confidentiality of FTI; support the Office of Safeguards on-site review to assess ICE's compliance with Publication 1075 requirements by means of manual and automated compliance and vulnerability assessment testing, including coordination with information technology (IT) divisions to secure pre-approval, if needed, for automated system scanning and to support timely mitigation of identified risk to FTI in ICE's Corrective Action Plan (CAP) for as long as ICE maintains Federal tax returns and return information.  Required reports will be transmitted in electronic format and on the template provided by IRS Office of Safeguards using an IRS-approved encryption method in accordance with Publication 1075.

7.  ICE will timely report all data incidents involving FTI to the Office of Safeguards and cooperate with Office of Safeguards investigators, providing data and access as needed to determine the facts and circumstances of the incident.

8.  When a data incident results in ICE taking adverse or disciplinary action against an employee based on an unauthorized inspection or disclosure of FTI in violation of ICE's procedures ICE must notify each impacted taxpayer in writing. The notification letter must include the date of the unauthorized inspection or disclosure and the rights of the taxpayer

7
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

under IRC § 7431. ICE must report to IRS Safeguards when taxpayer notification letters are issued, in accordance with Publication 1075.

9. ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with Publication 1075.

10. ICE will conduct periodic internal inspections of facilities where Federal tax returns and return information is maintained to ensure IRS safeguarding requirements are met and will permit the IRS access to such facilities as needed to review the extent to which ICE is complying with the IRC § 6103(p)(4) requirements of this section.

11. IRC § 6103(p)(9) requires ICE to conduct on-site assessments of each contractor's compliance with safeguarding requirements. ICE must submit findings of the most recent review as part of the annual SSR submission. ICE must certify to the IRS that each contractor is in compliance with safeguarding standards in accordance with Pub 1075. ICE must ensure that contracts with contractors and subcontractors performing work involving returns or return information contain specific language requiring compliance with IRC § 6103(p)(4) and Publication 1075 standards. Contract language must enforce ICE's right to access contractor and subcontractor facilities in order to comply with IRC § 6103(p)(9) to ensure IRS safeguarding requirements are met.

12. Usage of FTI for Artificial Intelligence (AI) purposes must be disclosed to the Office of Safeguards for assessment of compliance with safeguard requirements.

B. Generally, this MOU covers secure electronic transmission of Federal tax returns and return information to ICE, provided ICE computer systems are compliant with National Institute of Standards and Technology (NIST) Special Publication 800-53 standards and guidance for security of data at the moderate impact level. ICE's SSR must fully describe the computer system and security controls implemented for the receipt, processing, storage, and transmission of electronic Federal tax returns and return information. Required security controls for systems that receive, process, store, and transmit electronic Federal tax returns and return information are specified in Publication 1075.

C. Any creation or receipt of Federal tax returns and return information in paper format must also be fully disclosed in ICE's SSR. Required security controls associated with the receipt, processing, and storage of any Federal tax returns and return information received in paper format are specified in Publication 1075.

D. ICE must report suspected unauthorized inspection or disclosure of Federal tax returns and return information within 24 hours of discovery to the IRS Office of Safeguards in accordance with Publication 1075.

E. IRS will conduct periodic safeguard reviews of ICE to assess whether security and confidentiality of Federal tax returns and return information is maintained consistent with the

8

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

safeguarding protocols described in Publication 1075, ICE's SSR, and in accordance with the terms of this MOU. Periodic safeguard reviews will involve the inspection of ICE's facilities where FTI is maintained; the testing of technical controls for computer systems storing, processing, or transmitting FTI; review of ICE's recordkeeping and policies; and interviews of ICE's employees to verify the use of FTI and to assess the adequacy of procedures established to protect FTI.

F.  ICE recognizes and will reflect in its actions and procedures that all Safeguards documents and related communications are IRS official records; that they are property of the IRS; that IRS records are subject to disclosure restrictions under Federal law and IRS rules and regulations and may not be released publicly under state Sunshine or Information Sharing/Open Records provisions and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. If ICE determines that it is appropriate to share Safeguards documents and related communications with another governmental function/branch for the purposes of operational accountability or to further facilitate protection of FTI, the recipient governmental function/branch must be made aware, in unambiguous terms, that Safeguards documents and related communications are property of the IRS; that they constitute IRS official records; that any request for the release of IRS records is subject to disclosure restrictions under Federal law and IRS rules and regulations and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. Federal agencies in receipt of FOIA requests for Safeguards documents must forward them to IRS for reply.

G.  All information received from ICE under this MOU becomes return information as defined in IRC § 6103(b)(2) and will not be further disclosed or disseminated except as authorized by IRC § 6103.

**10.  TRANSMITTAL PROCEDURES:**

Transmittal procedures and transmittal security requirements will be included in a separate implementation agreement entered into between IRS and ICE.

9

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

## 11. LIABILITY:

A. Each party to this MOU shall be liable for the acts and omissions of its own employees.

B. The IRS shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under the Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority. Similarly, ICE shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under applicable Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority.

C. This MOU is not an obligation or commitment of funds, nor a basis for transfer of funds, but rather is a basic statement of the understanding between the parties. Unless otherwise agreed in writing, each party shall bear its own costs in relation to this MOU. Expenditures by each party will be subject to its budgetary processes and to the availability of funds and resources pursuant to applicable laws, regulations, and policies.

## 12. THIRD PARTY RIGHTS:

This MOU does not confer any rights or benefits on any third party.

## 13. PRIVACY:

The IRS and ICE will ensure the integrity and accuracy of personal and financial data. The IRS and ICE will perform their duties in a manner that recognizes and enhances individuals' right of privacy and will ensure their activities are consistent with laws, regulations, and good administrative practices.

## 14. EFFECTIVE DATE:

The effective date of this MOU is the date it has been signed by all parties to the Agreement. The information exchange contained in this agreement will not commence until a separate implementation agreement between the IRS and ICE has been signed and implemented.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**15. AMENDMENT OF MOU:**

This MOU may be amended by deletion or modification of any provisions, provided that such amendment is in writing and is signed by all parties to the MOU.

**16. TERMINATION OF MOU:**

(U//LES) This MOU will remain in effect as necessary for the IRS to provide address information in response to ICE requests satisfying the requirements contained in this MOU.  This MOU may be terminated upon ninety  (90) days written notice by either the IRS or ICE, which shall describe the rationale for the termination and be publicly posted on the respective party's website 90 days prior to termination.

**17. LIMITATIONS:**

Any provision of this MOU which conflicts with Federal law will be null and void. The provisions of paragraph 11, *Liability*, will continue until all potential liabilities have lapsed.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**APPROVALS**:

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

Secretary Scott Bessent

Date: April 07, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

Secretary Kristi Noem

Date: April ___, 2025

12
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**APPROVALS**:

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

_____
Secretary Scott Bessent

Date: April ___, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

_____
Secretary Kristi Noem

Date: April 7, 2025

12
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**EXHIBIT A – POINTS OF CONTACT**

**INTERNAL REVENUE SERVICE:**

Name: ███████████████
Title: ███████████████████
Phone: ██████████████████
Email: █████████████████

Name: ███████████████
Title: ██████████████████
Phone: ██████████████
Email: █████████████

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT:**

Name:
Title:
Phone:
Email:

Name:
Title:
Phone:
Email:

Page 278 of 388

Filed: 02/17/2026

Document #2159317

USCA Case #26-5006

(Page 278 of Total)

13
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS, *et al.*,

*Plaintiffs*,

v.

INTERNAL REVENUE SERVICE, *et al.*,

*Defendants*.

Case No. 1:25-cv-00457-CKK

### [PROPOSED] ORDER

Having considered Plaintiffs' motion for a stay under 5 U.S.C. § 705 or, in the alternative, for a preliminary injunction; Defendants' opposition, and the entire record herein, IT IS HEREBY ORDERED:

Plaintiffs' motion is DENIED.

SO ORDERED.


Dated: _____        _____
                                       Hon. Colleen Kollar-Kotelly
                                       United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CENTER FOR TAXPAYER RIGHTS et al.,

         *Plaintiffs*,

v.

         Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

         *Defendants*.

---

## REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY RELIEF

## TABLE OF CONTENTS

Factual Developments.................................................................................................. 2

Argument ...................................................................................................................... 3

   I.  **Plaintiffs Are Likely to Succeed on the Merits, As the Data Policy and Its Large Scale Implementation Are Unlawful and Harm Plaintiffs.**........................................ 3

     A.  Plaintiffs Have Standing to Challenge the Data Policy and Its Large-Scale Implementation to Share Data with ICE.................................................... 3

     B.  Plaintiffs Challenge Reviewable Final Agency Action. ............................... 10

     C.  The Data Policy's Implementation Violates 6103 ...................................... 12

     D.  Defendants' Adoption of the Data Policy is Arbitrary and Capricious. ....... 15

     E.  The Internal Revenue Code's Provisions for Individual Instances of Improper Access or Disclosure Do Not Supplant APA Review........................................ 18

  II.  **Plaintiffs Are Irreparably Harmed by Large-Scale Sharing Data With ICE Under the Data Policy.**...................................................................................... 19

 III. **The Balance of the Equities Favors Relief.**....................................................... 23

 IV. **The Court Should Not Impose a Substantial Bond or Stay Any Preliminary Relief Pending Appeal.**............................................................................................... 24

i

For 50 years, and consistent with Section 6103 of the Internal Revenue Code, the IRS has carefully guarded taxpayers' sensitive information. But Defendants' opposition confirms that IRS has now begun unprecedented, mass disclosure of taxpayer information to ICE. Defendants argue that such mass sharing is lawful under Section 6103's narrow exceptions for criminal proceedings because, they assert, law enforcement is permitted to access taxpayer data for "high-level" review to determine "which taxpayers are potentially subject to criminal proceedings." This view of Section 6103, which would permit sweeping law enforcement access to taxpayers' information to search for *potential* crimes, flatly contradicts the protective scheme Congress has enacted and the requirement that such information only be provided to law enforcement officers "personally and directly engaged" in specific criminal investigations or proceedings. Defendants' only response to many of Plaintiffs arguments is that the IRS is not only permitted but required by law to share this data with ICE. They do not address the IRS's unexplained about-face from a decadeslong policy against sharing such information with ICE for immigration enforcement purposes and requiring careful, individualized assessments before sharing information with any agency for criminal matters. Defendants' actions are contrary to law, arbitrary, and capricious.

Plaintiffs and their clients and members are suffering, and will imminently suffer, irreparable harm from this implementation of IRS's new Data Policy through mass disclosures, both through the invasion of individuals' privacy and the harms to the organizational operations and mission of Plaintiff Center for Taxpayer Rights.

The Court should halt Defendants' unlawful conduct and the resulting harms; it should therefore decline Defendants' suggestion to wait for the pending appeal of *Centro de Trabajadores Unidos v. Bessent*, No. 1:25-cv-00677, 2025 WL 1380420 (D.D.C. May 12, 2025). That decision centrally concerned the provisions of an IRS-ICE MOU as written, not the mass data sharing that

has now occurred. It did not consider, for example, whether ICE's request for more than a million

individuals' data was handled in a manner to ensure that only officers "personally and directly

engaged" in specific criminal investigations received protected information. To prevent further

irreparable harm from Defendants' unlawful policy, Plaintiffs respectfully request preliminary

relief.

## FACTUAL DEVELOPMENTS

Since the Motion was filed, there have been two key factual developments that shed

additional light on the IRS's sharing of taxpayer data *en masse* with ICE under the Data Policy.

*First*, today IRS's implementation agreement for its April 2025 Memorandum of Understanding

("MOU") with ICE was made public. Implementation Agreement (Ex. 12).[1] This agreement states

that ICE will maintain tax information received from IRS in three systems, including the "Alien

Number" or "A-file" system that is the Department of Homeland Security's ("DHS") primary

database for all of an immigrant's "immigration history" and "official immigration record" and

which is accessible by other DHS agencies as well as ICE.[2] The agreement places no restrictions

on who can access the tax information placed in these general files at DHS, nor any requirement

that the information only be accessible to officers directly engaged in a particular criminal

proceeding.

Second, Defendants' declaration of John J. Walker, ECF No. 31-1, provides new details

regarding the scope and timeline of ICE's requests but raises additional questions. Mr. Walker

---

[1] IRS & ICE, *Implementing Agreement* (Apr. 18, 2025), https://perma.cc/E8TY-SZDM
(obtained through FOIA *Immigrant Advocates Uncover Alarming IRS-ICE Implementation Plan
to Share Taxpayer Data*, Asian Law Caucus, Sept. 3, 2025,
https://www.asianlawcaucus.org/news-resources/news/alarming-irs-ice-plan-to-share-taxpayer-data).
[2] Ex. 12; Privacy Act of 1974; System of Records, 82 Fed Reg. 43556 (Sept. 18, 2017),
*available at* https://perma.cc/2PEK-C9D3 ("System of Record Notice").

2

attests that ICE sent a letter on June 27, 2025 requesting "the last known address of approximately 1.28 million individuals identified by ICE." *Id*. at ¶ 6. He does not state whether ICE included any other types of information with this June 27 letter—for example, the details about each person that the April 2025 MOU between IRS and ICE requires. *See* Ex. 1 to Walker Decl. (ECF No. 31-1) ("MOU") at § 6(C) (listing data points ICE must provide with each request). The IRS and ICE did not develop the technical system used to transmit those details about each request until July 2025, Ex. 3 to Stay Mot. (ECF No. 30-5), so the processing of the information, whenever it was sent, almost certainly began at a much later date; Mr. Walker does not say.

Mr. Walker also attests that the IRS responded on August 7, 2025, providing ICE with the last-known address for over 47,000 people in response to this single mass request. Walker Decl. at ¶ 7. He does not represent that the IRS scrutinized the request before responding; rather, he attests that IRS provided the requested last-known address where ICE's request contained all the pieces of information required by the MOU and the IRS could "match the individual to a known taxpayer." He states that the IRS has received no further requests from ICE "pursuant to the MOU," *id*. at ¶ 8, but not whether work is ongoing to identify additional matches for the other 96.3% of individuals requested, whether IRS plans to provide further responses to that request, or whether IRS has received additional requests from ICE other than "pursuant to the MOU."

## ARGUMENT

### I.  Plaintiffs Are Likely to Succeed on the Merits, As the Data Policy and Its Large Scale Implementation Are Unlawful and Harm Plaintiffs.

#### A.  Plaintiffs Have Standing to Challenge the Data Policy and Its Large-Scale Implementation to Share Data with ICE.

Plaintiffs have standing to bring this case and to seek the relief requested in this Motion, as explained in their Motion and in opposition to the pending Motion to Dismiss, *see* ECF No. 27. Here, Plaintiffs focus on the arguments Defendants raised in its Opposition.

First, Plaintiff CTR has shown it is already suffering concrete harms to its educational activities and in its representation of taxpayer clients. These injuries are squarely analogous to those in *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). In *Havens*, the Court held that an organization had standing to sue over racial steering practices that implicated its clients because the conduct impeded its ability to provide its housing counseling services and help low- and moderate-income homeseekers secure housing. *Id*. at 379. Defendants misread *Havens* to argue that the IRS's conduct must have directly stopped CTR from delivering its services to support standing. Defs.' Opp'n to Stay Mot. (ECF No. 31) ("Opp'n") at 19. The *Havens* plaintiff was not "challenging a law that prohibit[ed] its housing counseling service." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F. Supp. 3d 135, 190 (D.D.C. 2025). It challenged conduct that impacted the organization's clients in a way that made delivery of services more difficult, forcing the organization to "devote significant resources to identify and counteract" their conduct and perceptibly impairing the organization's ability to fulfil its mission. *Havens*, 455 U.S. at 379. As acknowledged in *FDA v. Alliance for Hippocratic Medicine*, such an organization is akin to a retailer, who has standing to sue the manufacturer of a defective product if it makes its business harder to run and less successful, 602 U.S. 367, 395 (2024), not just if the manufacturer directly shuts down its store. Courts have accordingly found organizational standing in cases where, as here, a defendant's action directed at third parties perceptibly impairs the organization's ability to provide services. *See*, *e.g.*, *NEA v. Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (agency action restricting DEI activities created a material obstacle to an organization's ability to provide training and legal counseling services in furtherance of its mission); *League of United Latin Am. Citizens,* 780 F. Supp. 3d at 190 (new voter identification requirements would impede effectiveness of organization's voter registration drives); *League of Women Voters of N.H.*

4

*v. Kramer*, No. 24-cv-00073, 2025 WL 919897, at *9 (D.N.H. Mar. 26, 2025) (robocalls impeded organization's efforts to counsel voters and combat voter suppression).

The cause of these harms is not speculative, as Defendants argue. Some of CTR's injuries—the drop in engagement with its services, for example—flow from the "predictable" response of the directly regulated parties (taxpayers) to the government action. *See All. for Hippocratic Med.*, 602 U.S. at 383 ("[plaintiff must show that the 'third parties will likely react in predictable ways' that in turn will likely injure the plaintiffs.") (citations omitted). Privacy protections are essential to building taxpayer trust, especially among immigrants, and the loss of that trust causes a significant drop in engagement with the tax system. ECF No. 30-8 (Declaration of Nina E. Olson) ¶¶ 15, 53-54; ECF No. 30-11 (Declaration of John Koskinen) ¶ 11. People who decide not to engage with the tax system do not seek out CTR's services, as CTR is already observing in its engagement and retention levels. Olson Decl. ¶¶ 41-44, 54.

Defendants speculate, without evidence, that "one might suspect that taxpayers who are worried" about the issues raised by Defendants' actions might "seek more guidance, not less" from the Center. Opp'n at 20. First, this unsubstantiated assertion conflicts with record evidence that the IRS's data-sharing with ICE caused the drop-off in engagement with CTR's services. Olson Decl. ¶¶ 44, 54. And second, this drop in engagement supports, rather than undermines, the conclusion that CTR is impeded in its work. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 8 (D.C. Cir. 2016) (finding standing where voter registration at the organization's drives "plummeted," despite organization's continued efforts, following defendants' new requirements). As in *Newby*, CTR has demonstrated a significant drop-off in engagement with its services, paired with a declaration from an expert with first-hand knowledge of CTR's operations explaining how and why Defendants' actions caused that result. *See* Olson Decl. ¶¶ 41-44, 54, 55-67.

<center>5</center>

The impediments to CTR's and LITC members' ability to effectively counsel their existing clients are likewise concrete, not speculative. Their attorneys can no longer effectively and responsibly advise clients given the IRS's violations of taxpayer privacy laws, Olson Decl. ¶¶ 47-49, 68, and it is now more difficult to secure pro bono representation for clients and mentor the cases, due to the complexity and burden the Data Policy adds to the cases, *id*. at ¶ 51. CTR's "ability to provide services," Opp'n at 19, has indeed been disturbed. This injury too provides a basis for organizational standing. *See, e.g., NEA v. Dep't of Educ.*, 779 F. Supp. 3d 149, 176 (D.N.H. 2025) (finding standing where government's imposition of a confusing prohibition impeded the organization's ability to provide its members representation and counseling).

Similarly, Plaintiffs have established that certain of their members and clients have suffered, or are at imminent risk of suffering, concrete harms as a result of their data being unlawfully shared.[3] Here again, Defendants argue that these harms are speculative and also that Plaintiffs cannot demonstrate that their members' and clients' data was already disclosed or is at imminent risk of being disclosed. Opp'n at 12. Defendants focus on the number of taxpayers whose data has been disclosed to date—in itself a large figure, at over 47,000 taxpayers—but ignores the full scope of ICE's requests and the White House's campaign to ensure they are fulfilled.

ICE seeks data for 7.3 million taxpayers—more than the total number of ITIN holders—and sent a mass request to that effect to the IRS on June 25. ECF No. 30-5. After the then-Acting

---

[3] Defendants argue in a footnote that Plaintiffs have not properly alleged third-party standing. As detailed in Plaintiffs' opposition to Defendants' motion to dismiss, CTR has established standing and set forth why it meets the requirements necessary to assert the rights of its clients as well. *See* Pls.' Opp. to Mot. to Dismiss Am. Compl. (ECF No. 27) at 27-32 ("Pls.' Opp'n to MTD"). The factual allegations underlying these arguments were properly pled and are cited therein. CTR also provided additional information regarding its clients' and LITC members' clients' standing and the irreparable harm they face in the Olson Declaration accompanying the Motion. *See* Olson Decl. ¶¶ 71-90.

6

Chief Counsel concluded the request was unlawful, he was fired on June 27, *id.*—the very day that the IRS sent another letter requesting 1.28 million taxpayers' data, *see* Walker Decl. ¶ 6. After IRS processed the spreadsheet listing these 1.28 million taxpayers and returned matches for approximately 47,000 on August 7, *id.* ¶ 7, the White House quickly complained that too few records were disclosed, and Commissioner Long was fired the same day.[4] The Administration continues to pursue these disclosures and has removed all independent leadership at the IRS who would object, replacing them with officials from Treasury,[5] where DOGE affiliate Sam Corcos holds a leadership role. Defendants' own arguments acknowledge the purpose of these transfers: to support a high-level analysis of data in search of "potential[ ]" criminal violations amongst immigrants—not to support existing *bona fide* investigations of specific individuals. Opp'n at 30.

There is no reason to expect the Administration's pursuit of this data will stop before they collect data on the full population that they seek—immigrant taxpayers, including Plaintiffs' clients and members. Defendants argue that any further disclosures are speculative, Opp'n at 12, but Mr. Walker's Declaration does not support such a broad conclusion. It states only that ICE has made no *new* requests, *under the MOU*, since June 27, Walker Decl. ¶ 8, and does not say whether the IRS will satisfy the balance of the existing requests. Given the Administration's pursuit of these data transfers, the removal of all IRS officials who object, and the mass transfer that has already occurred, the factual record demonstrates that such harms are imminent. *Sierra Club v.*

---

[4] Exs. 1 & 2 to Stay Mot. (ECF Nos. 30-3 & 30-4); Andrew Duehren, et al., *Trump Is Removing I.R.S. Chief 2 Months After He Was Confirmed*, Wash. Post (August 8, 2025), https://perma.cc/K8U3-UL55.
[5] The new acting Chief Counsel is Kenneth Kies, the Assistant Secretary for Tax Policy at Treasury; the new acting Commissioner is Treasury Secretary Scott Bessent. Organizational Chart (Exhibit 13).

*Jewell,* 764 F.3d 1, 7 (D.C. Cir. 2014) (plaintiff had standing where defendants had taken concrete steps to further their stated intentions, showing "'substantial probability' of injury").

Such a conclusion requires no speculation or improper inference. In June, ICE requested the taxpayer data of enough immigrants to cover every active ITIN holder in the country, ECF No. 30-5, and the Administration has since taken several steps to remove obstacles to that data transfer. Over 47,000 taxpayers' data has been disclosed, and the Administration has stated its intention to press forward. It is reasonable to infer IRS will continue transferring the same kind of data, under the agreements that remain in force, regarding the same population of people—immigrant taxpayers—who are among Plaintiff Main Street Alliance's ("MSA") members and CTR's clients. As the court found in *Klayman v. Obama,* courts are not required to "abandon all common sense," when confronted with facts such as these; an inference as to the scope of data access, once the parameters are properly demonstrated, is appropriate. 142 F. Supp. 3d 172, 188 (D.D.C. 2015).

Defendants are likewise mistaken to argue that disclosure or imminent risk of disclosure of taxpayers' data—even if it violates Section 6103—does not satisfy Article III's injury-in-fact requirement because there is no analogous tort at common law. This injury is analogous to the torts of "intrusion upon seclusion," *see All. for Retired Ams v. Bessent,* 770 F. Supp. 3d 79, 102 (Mar. 7, 2025); *AFL-CIO v. Dep't of Lab.*, 778 F. Supp. 3d 56, 72 (D.D.C. 2025), and "breach of confidence," *see Jeffries v. Volume Servs. Am., Inc.*, 928 F.3d 1059, 1064 (D.C. Cir. 2019); *AFL-CIO*, 778 F. Supp. 3d at 73.[6] Even if "intrusion upon seclusion" required—as Defendants argue— that the injured persons *know* they had been subjected to "targeted snooping" such that they would experience "unease" as a result, Plaintiffs have shown those facts here. ICE's requests are, by

---

[6] These issues are fully briefed in Pls.' Opp'n to MTD, at 21-24.

8

definition, "targeted"; they have requested data for a specific population of people and attested in their requests that they are actively investigating those people. Immigrant taxpayers therefore reasonably feel targeted and are experiencing considerably more serious emotional impact than "unease." Olson Decl. ¶ 62 (taxpayer feeling regret after filing return, fearing ICE knocking on their door); *id.* ¶ 63 (taxpayers fearing law enforcement showing up at their door and breaking their family apart); *id.* ¶ 65 (clients too afraid to file 2025 taxes); *id.* ¶ 73 (clients fearing immigration raids, detention, separation from loved ones, and deportation). Defendants are likewise mistaken in characterizing home addresses as not sensitive information; Section 6103 deems confidential every piece of information a taxpayer supplies with his return, and the taxpayer fears cited above reflect the sensitivity around giving this information to ICE. The relevant legal question is not whether Plaintiffs satisfy every element of a tort they have not pled; it is whether the injury they have suffered—here, a violation of Section 6103—has "a close historical or common-law analogue" such that the court can be confident it is a sufficiently concrete injury-in-fact under Article III. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). Tax return information is analogous to, for example, private banking records, the intrusion into which would be actionable at common law. *See Wolf v. Regardie*, 553 A. 2d 1213, 1217–18 (D.C. 1989). Violations of Section 6103's protections are analogous to the harms recognized by this tort.

"Breach of confidence" is likewise analogous to the violation of Section 6103. Defendants argue that this tort is not old enough to suffice, citing out-of-circuit authority where the Eleventh Circuit specifically declined reach this conclusion. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 931-32 (11th Cir. 2020) (en banc) (observing there was support for both sides of the debate as to "whether breach of confidence is sufficiently ancient"). In any event, in *Jeffries* the D.C. Circuit applied the common-law-analogue standard articulated in *Spokeo v Robins*, 578 U.S.

9

330, 341 (2016), which was not so altered by *TransUnion* as to render *Jeffries* unsafe. It controls here. And publication of the information outside the U.S. government is not required. *See AFL-CIO*, 778 F. Supp. 3d at 72 (citing *Jeffries*, 928 F.3d at 1064) (noting that "[n]othing beyond 'the plaintiff's trust in the breaching party [being] violated' must occur").

### B.  Plaintiffs Challenge Reviewable Final Agency Action.

Uncontroverted facts reveal that IRS has adopted a new Data Policy that permits wide consolidation and disclosure of the protected tax information of taxpayers, including Plaintiffs' members and clients. Defendants' recent initiation of *en masse* sharing with IRS, only plausibly possible through automated mechanisms, makes this policy's existence plain and is also, by itself, a final agency action affecting statutory rights to confidentiality. Such a policy—even if not reduced to a single agency writing—is final agency action subject to APA review under the law of this Circuit. Defendants fail to distinguish controlling case law or counter relevant facts, and the cases they turn to for support are inapposite.

*First*, the Data Policy is reviewable final agency action. In *Venetian Casino Resort, L.L.C. v. E.E.O.C.*, the D.C. Circuit held that a "decision of [an agency] to adopt a policy of disclosing confidential information" is reviewable final agency action even where "the details" of the "policy are still unclear" and it is reflected in disparate agency statements and actions. 530 F.3d 925, 931 (D.C. Cir. 2008). *Venetian* is on all fours with this case, and Defendants' terse argument that it is distinct is unavailing. Indeed, here there is both a disclosure policy and agency action to actually disclose protected information. Defendants primarily seek to distinguish *Venetian* by arguing that there the challenged disclosures there were to "potential plaintiffs" who were private parties, while here the disclosure is to "a law enforcement agency" with "statutory rights to the information." But, in *Venetian*, the other parties also arguably had "statutory rights" to the relevant information under FOIA. *Id.* at 929. Nor does the recipient of planned disclosures alter their finality or impact

10

on taxpayers' statutory rights. Section 6103 is *primarily* concerned with restricting the sharing of taxpayer information *within government*. *See generally* 26 U.S.C. § 6103 (d), (f), (g), (h), (i), (j) (l), (m). IRS actions that violate taxpayers' rights to protect their confidential tax information under 6103 can involve intra-governmental disclosures, as the Data Policy does. Here, as in *Venetian*, this policy is thus the "consummation of the agency's decisionmaking process," and "one by which [] rights[] obligations have been determined." 530 F.3d at 931.

     *Second*, Defendants do not meaningfully contest the facts Plaintiffs have presented to show IRS has adopted the Data Policy and it is final agency action. Instead, Defendants offer a bare assertion that the Data Policy does not exist. Opp'n at 21, but this ignores facts that they do not dispute: IRS has created an unprecedented technological infrastructure for mass data-sharing and initiated mass sharing in response to an ICE request for the taxpayer information of 1.28 million people. *See* ECF No. 30-5; Walker Decl. ¶ 7. Defendants' sparse declaration acknowledges the mass sharing with ICE and does not refute the facts—including creation of a "mega-API" and process changes—reflective of the Data Policy. *See id*. This Circuit has long held that Defendants cannot "avoid judicial review" of a policy simply by refusing to issue a "formal statement of the agency's position." *Her Majesty the Queen in Right of Ontario v. EPA,* 912 F.2d 1525, 1531 (D.C. Cir. 1990). Where there is "evidence of" the agency's "actual practice" an agency's policy is reviewable under the APA. *Hisp. Affs. Project v. Acosta*, 901 F.3d 378, 386 (D.C. Cir. 2018).

     *Third*, Defendants' reliance on case law from other contexts is unpersuasive. Defendants point principally to *California Communities Against Toxics v. EPA*, 934 F.3d 627, 638 (D.C. Cir. 2019) and *Sierra Club v. EPA*, 955 F.3d 56, 63 (D.C. Cir. 2020), to argue that the "information sharing decisions" under the Data Policy have no "direct legal consequences." Opp'n at 22. But both of those cases involved guidance that did not actually dictate agency action. Here it is

11

uncontested that IRS *is* sharing data that is protected by statute, 26 U.S.C. 6103(a), and directly impacts taxpayers' legal rights sufficient to meet *Bennett*'s second prong regardless of the consequences that "arise from the information sharing." Opp'n at 22; 26 U.S.C. § 7803(a)(3) (taxpayers' rights to privacy and to confidentiality). And the fact that IRS has initiated this mass data sharing under the Data Policy confirms the finality and reviewability of that policy, which further distinguishes this case from *California Communities* and *Sierra Club*. The D.C. Circuit has held that courts may consider "post-guidance events" to determine if agency guidance is "final" and reviewable. *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250-52 (D.C. Cir. 2014). *California Communities* and *Sierra Club* involved no subsequent implementation of the guidance documents at issue that would support the conclusion that they were final agency actions. Here, IRS's mass, automated data sharing with ICE, by contrast, further demonstrates the Data Policy's finality.

Defendants are also wrong to assert that the IRS's decision to disclose tax information to ICE is not a final agency action because it "is not a new policy to provide statutorily required information." Opp'n at 21. The IRS has not previously interpreted 6103(i)(2) to require such disclosures, and so the decision to make those disclosures, is "designed to implement" a new policy as to its interpretation of the law—namely, what 6103(i)(2) requires. *See* 5 U.S.C. § 551(4). The sharing action has been authorized by the agency and directly impacts taxpayers' statutory rights to confidentiality. This, too, satisfies the *Bennett* prongs for final agency action independently. And the APA does not bar "a plaintiff from challenging a number of discrete final agency actions all at once." *New York v. Trump*, 133 F.4th 51, 68 (1st Cir. 2025).

## C.  The Data Policy's Implementation Violates 6103

Defendants' implementation of the Data Policy through mass sharing of taxpayer data violates Section 6103's requirements in numerous ways, and Defendants' reliance on the language of the MOU over how data *should* have been shared does not change that fact.

*First*, Defendants have now confirmed that ICE sent IRS a mass request for the tax information of 1.28 million people in a single request, and the agency has already provided the information of over 47,000 individuals in response Walker Decl. ¶¶ 6-7. By Defendants' own description this was a single mass request for a "high-level view of agency data." Opp'n at 30. Under 6103(i)(2), IRS can disclose an individual's tax information only to officers "personally and directly engaged" in preparation for, or an investigation leading to, "enforcement of a specifically designated Federal criminal statute." *Id*. (cross-referencing, in part, to (i)(1)). Defendants posit that giving broad access to "high-level view of agency data" "at a large scale" to "investigate which taxpayers are potentially subject to criminal proceedings" meets the statutory bar of providing information to officers personally and directly involved in specific proceedings and investigations. Opp'n at 30. It does not. To interpret Section 6103 in this manner would read its restriction on disclosure to officers "personally and directly" involved in a specific investigation out of the statute. Under this logic, a law enforcement agency need only assert that a handful of its officers intend to mine IRS data to snoop for leads on "taxpayers potentially subject to criminal proceedings" under a criminal provision to establish an end-run around 6103(i)'s general requirement for a court order before tax information is disclosed for use in a criminal matter. Congress cannot have enacted such strict restrictions on the disclosure of tax information to federal agencies for use in criminal proceedings only to facilitate mass disclosures for "high-level" reviews to fish for leads on "potential[]" criminal infractions.

*Second*, Defendants are wrong to state that it is simply "ICE's responsibility under the MOU to ensure that the 'personally and directly engaged' requirement is satisfied." Opp'n at 30. An MOU does not alter IRS's statutory obligations, and the "General Rule" of 6103 requires the IRS to treat return information as "confidential" and only to disclose it "as authorized" by 6103's

exceptions. 26 U.S.C. § 6103(a). Section 6103(i)(2) states that the IRS shall only disclose such information to officers "personally and directly engaged" in a criminal investigation or proceeding. The statute places the responsibility on the IRS to disclose only in accordance with this exception and does not permit IRS to make disclosures that fail even to plausibly comply with the "personally and directly engaged" requirement on the basis of a requesting agency's say-so.

*Third*, Defendants essentially concede that 6103(i)(2) and their MOU with ICE require that information disclosed under this provision be used "solely" for criminal investigations or proceedings. But as Plaintiffs noted, the Administration has stated unequivocally that the IRS sharing taxpayer data with ICE is "to carry out the mass deportation" of immigrants—a civil, not criminal, enforcement matter. *See* ECF No. 30-5. Defendants' declaration and brief do not contradict their admission that this information is sought for civil immigration enforcement, not solely for criminal proceedings as required by 6103(i)(2). They cite Judge Friedrich's observation, in *Centro*, that a "recent" address could help determine whether a person had overstayed a removal order, which is a criminal violation, Opp'n at 30, but the IRS is providing a "last known" address, not an address tied to a particular time period, Walker Decl. ¶ 7. If the purpose of these requests is—as it appears—to locate and detain people, then ICE would need to satisfy the higher standards of a different provision, 6103(i)(5), which they have not.[7]

Buttressing this conclusion, the recently released implementation agreement for the IRS-ICE MOU permits ICE to maintain tax information disclosed by IRS in DHS's primary database

---

[7] Defendants argue this is permissible, in part, because 6103(i)(5)'s court order requirements for "locating" fugitives also permit broader disclosures. But (i)(5) requires a court order for disclosure of any "return information" and permits disclosure "only to the extent necessary" to locate an individual. This requirement cannot be fairly read with (i)(2) to permit disclosure of information to locate individuals without a court order simply at the agency's discretion.

14

for all of an immigrant's "immigration history" and "official immigration record," their so-called "A-file," as well as two additional records systems.[8] A-files are broadly accessible by other DHS agencies, not only ICE.[9] And the implementation agreement places no restrictions on who can access IRS information placed in these general immigration files such that the information would only be disclosed for use in purported criminal proceedings or limited to officers "directly and personally engaged" in those proceedings.[10]

### D. Defendants' Adoption of the Data Policy is Arbitrary and Capricious.

An agency cannot act in an arbitrary and capricious manner, regardless of its interpretation of legal requirements and particularly when that interpretation changes. Here, the IRS has reversed course with its decision to share taxpayer information in bulk, without explanation or justification. Defendants' argument that it cannot be unreasonable for an agency to do what is required by law is beside the point; Defendants have no answer for the numerous deficits Plaintiffs have raised.

Defendants' actions are outside the zone of reasonableness, and they have failed to consider "the relevant issues" or "reasonably explain[] the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Defendants have failed to address, let alone justify, the IRS's abrupt changes in processing requests under 6103(i)(2)—to now include responding to requests *en masse*, through use of automated systems, rather than through individualized assessments by a particular disclosure officer. Defendants provide no argument or evidence that they have (1) sufficiently justified their change in Policy, (2) considered numerous key issues related to its adoption, or (3) considered the substantial reliance interests based on decades of past practices and statements regarding the treatment of taxpayer information.

---

[8] Implementing Agreement, Ex. 12.
[9] 82 Fed. Reg. at 43556 (System of Record Notice).
[10] Implementing Agreement, Ex. 12.

15

Plaintiffs identified significant evidence, including in the Internal Revenue Manual, that demonstrates the arbitrary and capricious nature of Defendant's action.  In response, Defendants argue that the Manual does not have the force of law and thus cannot be considered by the Court. Defendants misunderstand the law. As the D.C. Circuit explained in *Venetian Casino*, Plaintiffs do "not contend the Manual itself is a final agency action." 530 F.3d at 931. Instead, "the Manual is relevant insofar as it illuminates the nature of the policy." *Id*. And the Manual (in addition to Defendants' actions) makes clear that Defendants have *changed* their position and policy, without acknowledging or explaining that change. This is arbitrary and capricious.

*First*: the Manual states that "Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address."[11] This shows that the IRS viewed such requests as impermissible under 6103(i)(2) and so it did not disclose solely address information under that provision. Defendants have not acknowledged or explained this change in position.

*Second*: the Manual, prior to April 17, 2025, set forth a detailed, individualized process by which requests under 6103(i)(2) were carried out with numerous safeguards.[12] For example, Section 11.3.28.2 of the IRS Manual previously applied to IRC 6103(i)(2)[13] and set forth a process

---

[11] Internal Revenue Manual ("IRM") § 11.3.28.4(5), *Disclosure of Return Information (Other Than Taxpayer Return Information) Pursuant to IRC 6103(i)(2),* IRS (Apr. 17, 2025), https://perma.cc/AN57-7XR8.

[12] *See* IRM § 11.3.28.2 (setting forth that the detailed process set forth in Section 11.3.28.2 previously applied to disclosures under IRC 6103(i)(2)) and § 11.3.28-2 (setting forth a detailed checklist of steps to take prior to disclosures under 6103(i)(2)), both available at https://web.archive.org/web/20250403125859/https://www.irs.gov/irm/part11/irm_11-003-028 (as archived Apr. 3, 2025).

[13] The Manual states that on April 17, the section was revised to "correspond to changes in content" and to move much of the information to another section of the Manual, IRM 11.3.41.8.1(18) and (19), Disclosure Case Processing and Inventory Management, General Case Processing for Disclosure to Department of Justice Under an Ex Parte Court Order Pursuant to

16

that involved numerous communications between the requestor and the IRS employee, and requirements regarding documentation and safeguards.[14] Each of these processes, documentation requirements, or safeguards have been stripped from the internal IRS process used to effectuate disclosures under 6103(i)(2). The IRS has not explained these changes. Similarly, the Manual previously included an exhibit of steps to take when processing 6103(i)(2) requests. It required that an IRS employee "analyze the request," "discuss" it with the requestor, prepare an "authorization memo" for approval, and maintain such documentation into a case file, and "analyze" the information for "potential redactions."[15] This entire section has been struck from the Manual.[16] Defendants have, at no point, addressed the removal of these requirements to individually assess each request—removals that were necessary in order to effectuate a process that can now allow disclosures of data, *en masse*, through automated systems. The new Policy is arbitrary and capricious, as Defendants have provided no explanation or justification for it.

---

IRC 6103(i)(1). But critically, that part of the manual applies *only* to disclosures under 6103(i)(1). Which means that Defendants have altered the employee process for disclosing data under (i)(2) substantially, without acknowledgement or explanation.

[14] The process identified "disclosure managers" as having been delegated the authority to approve disclosures under (i)(2). It also stated that the caseworker assigned to process the request would "contact the requesting official, usually the Assistant United States Attorney (AUSA) named." That contact "must be recorded in the case history of the electronic inventory management system," and the contact should "inquire whether there is an imminent court date or discovery date," "discuss alternative[s]" to producing the return information. The assigned caseworker "will review all releases of documents" pursuant to the relevant statutory provision "to ensure that only covered documents and information are released."

[15] IRM § 11.3.28, Exhibit 11.3.28-2 *Processing IRC 6103(i)(2) Requests*, IRS (Aug. 11, 2023), https://perma.cc/YF9Y-XG3X (capture date April 3, 2025).

[16] Compare *id.* with https://perma.cc/47ZW-EYTX (which no longer includes Exhibit 11.3.28-2). Regarding the removal of this exhibit, the Manual states that it has "Removed former Exhibit 11.3.28-2" because that information is "now contained in Exhibit 11.3.41-6." But Exhibit 11.3.41-6 has remained unchanged, and the information described above has not been ported over to this Exhibit. Compare current Exhibit 11.3.41-6 at https://perma.cc/4ZRL-YK7M *with* the identical Exhibit as of April 4, 2025 at https://web.archive.org/web/20250404011943/https://www.irs.gov/irm/part11/irm_11-003-041.

17

Finally, in a sentence, Defendants attempt to brush away any concern over reliance interests because, in its view, the law "authorizes" and "requires" these disclosures, so any expectation to the contrary is unfounded. But Defendants do not respond to Plaintiffs' identification of the representations the government has made, including during President Trump's first term, when the IRS stated that "[t]here is no authorization under this provision to share tax data with ICE."[17]

### E. The Internal Revenue Code's Provisions for Individual Instances of Improper Access or Disclosure Do Not Supplant APA Review.

The Internal Revenue Code's limited damages provisions and criminal sanctions for discrete instances of unlawful disclosures do not provide an adequate remedy for Plaintiffs' challenge to IRS's ongoing policy of unlawful disclosure, and the strong presumption of reviewability under the APA is not supplanted here. *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 140 (1967). Defendants fail to address applicable D.C. Circuit precedent finding that the Privacy Act's analogous damages provisions do not offer an adequate remedy precluding APA review of disclosures made under agency policy. *See* Pls.' Opp'n to MTD at 32-36 (citing *Doe v. Stephens*, 851 F.2d 1457, 1466 (D.C. Cir. 1988)).

In *Doe*, the D.C. Circuit held that review and equitable relief under the APA was appropriate where Plaintiff showed the agency's policies of disclosure violated the Privacy Act's provisions despite the Privacy Act's damages provisions. 851 F.2d at 1466. As here, that disclosure policy concerned disclosures to other federal agencies and governmental bodies. *Id. Doe* applies here, but Defendants chiefly point to four out-of-circuit criminal cases where courts found that

---

[17] Maria Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, Wash. Post (Mar. 11, 2017), https://perma.cc/X4ZL-2CMT; *see also* Taxpayer Identifying Numbers ("TINs"), 61 Fed. Reg. 26,788, 26,789 (May 29, 1996) ("[h]aving the IRS as the sole issuer of ITINs will facilitate the general public's acceptance of the fact that the assignment of an ITIN creates no inference regarding . . . immigration status").

evidence could not be suppressed under the exclusionary rule under a claim that it was improperly

disclosed under Section 6103. Opp'n at 24-25.[18] But as these cases acknowledge, the exclusionary

rule in the criminal context is a "sanction" on government conduct, and they point to alternative

criminal sanctions for unlawful disclosure of tax information as a reason this rule of criminal

procedure need not be applied in individual instances of past unlawful disclosure. *See Michaelian*,

803 F.2d at 1048–50; *Marvin*, 732 F.2d at 673. Damages and penalty provisions for individual

instances of past unlawful disclosures do not offer an adequate remedy for Plaintiffs challenging

an agency policy dictating ongoing, mass disclosures.[19]

## II.    Plaintiffs Are Irreparably Harmed by Large-Scale Sharing Data With ICE Under the Data Policy.

Plaintiffs describe in their opening brief and above, *supra* Section I.A., how both their

members and clients and CTR have suffered, or are imminently facing, concrete injuries caused

by Defendants' actions. Here, Plaintiffs respond to several specific issues Defendants raised in

their Opposition regarding the irreparability of these harms.

---

[18] Citing *United States v. Orlando*, 281 F.3d 586, 596 (6th Cir. 2002); *Nowicki v. Comm'r*, 262 F.3d 1162, 1164 (11th Cir. 2001); *United States v. Michaelian*, 803 F.2d 1042, 1049–50 (9th Cir. 1986); *Marvin v. United States*, 732 F.2d 669, 672 (8th Cir. 1984).

[19] Defendants suggest in a single sentence that the Court cannot hear this challenge here because the Internal Revenue Code's damages provisions provide the type of detailed "comprehensive" scheme is implicitly exclusive and precludes APA review. Opp'n at 25. Not so. The damages provisions included within the Internal Revenue Code for individual instances of unlawful disclosure, 26 U.S.C. § 7431, are discrete and evince none of the characteristics of the detailed administrative adjudication schemes courts have found Congress intended to be exclusive. Defendants' own authorities support this conclusion. *Id*. at 25 (citing *Grosdidier v. Chairman, Broad Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) and *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) concerning the Civil Service Employment Act and regulatory scheme for milk markets including administrative appeal procedures). The Internal Revenue Code's damages provisions are closely akin to the Privacy Act's, which this Court has found were not intended to be exclusive. *All. for Retired Ams.*, 770 F. Supp. 3d at 105.

19

*First*, Defendants argue that Plaintiffs have known about the MOU for months and improperly delayed their Motion. Delay alone is not a justification for denying preliminary relief; it is merely a factor that may tend to show no irreparable harm has occurred. *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). Here, the relevant time period is between the date that irreparable harm could be shown and the date of filing. The IRS began its mass disclosure of data to ICE on August 7, it was publicly reported on August 8, and Plaintiffs filed their Motion on August 20—Plaintiffs did *not* delay. In fact, in *Centro*, the government argued that the plaintiffs had not shown an imminent cognizable injury based solely on the execution of the MOU, without evidence that data had been or imminently would be shared for an unlawful purpose. *Centro,* 2025 WL 1380420, at *4. Imminent, irreparable injury is a higher standard than the injury required to assert standing, which Plaintiffs pled in their May 2025 Amended Complaint. It was reasonable to wait for the facts to ripen before bringing this Motion to the Court.

*Second*, Defendants are incorrect that it is now too late to remedy the irreparable harms. Opp'n at 36. Section 6103(p) requires the IRS to ensure the data it shares is properly handled and requires the receiving agency to return or destroy the data once it has completed its authorized use of it. *See* 26 U.S.C. § 6103(p)(4). Per that obligation, under the MOU, the IRS retains the right to inspect ICE recordkeeping practices and facilities to ensure the data is being appropriately safeguarded. MOU § 9(E). The IRS has the authority to "terminate or suspend disclosures of returns and return information" if an "authorized recipient does not satisfactorily maintain the safeguards prescribed in law. 26 C.F.R. § 301.6103(p)(7)-1. Acting Commissioner Bessent plainly has the authority to require return or destruction of data already shared under this MOU, where ICE is mishandling or misusing it, which is the remedy sought here. Moreover, the Court can order prospective relief to stop additional disclosures, which would substantially preserve the status quo.

20

*Third*, Defendants' only substantive response to the harms imminently faced by Plaintiffs is to argue that any risk of subsequent disclosure or misuse of these taxpayers' data is "wild speculation." Opp'n at 13. The government asserts it is entitled to a "presumption of regularity" and that the Court should presume that ICE will comply with safeguards of Section 6103 after it receives the data. *Id.*[20] As an initial matter, it belies belief that Defendants would invoke a presumption of regularity for actions that have reversed the decades-long "regular" approach by the IRS to disclosures under 6103(i)(2). Further, a presumption of regularity is rebuttable with "clear evidence" that an official or agency did not "properly discharge their official duties." *Fed. Educ. Ass'n v. Trump*, No. 25-cv-01362, 2025 WL 2355747, at *9 (D.D.C. Aug. 14, 2025). Such is the case here. Plaintiffs have demonstrated that ICE has no intention of (and is not) complying with the safeguards of Section 6103, which distinguishes this case from those that Defendants rely upon. *See* Opp'n at 33-34. First, the White House has expressed its intention to use the data for civil immigration enforcement purposes—contrary to Section 6103(i)(2)—saying the data sharing system set up under the MOU is "to carry out . . . mass deportation." ECF No. 30-5. Defendants offer no reason why the Court should not take the White House at its word; the purpose of these data requests is plainly to support civil immigration enforcement efforts, not criminal investigations as Section 6103(i)(2) requires.

The way that ICE maintains the data received by the IRS further supports the conclusion that ICE is not following Section 6103(i)(2). The Implementing Agreement states that ICE will store the data it receives in three large internal databases, including the Alien File, Index, and

---

[20] Defendants discuss this point in connection with their standing arguments. But the argument to which it responds—that the lack of adequate safeguards against subsequent re-disclosure and misuse necessitate preliminary relief—is more relevant to the element of irreparable harm. *See All. for Retired Ams.*, 770 F. Supp. 3d at 108.

21

National File Tracking system of record, Ex. 12, rather than in a controlled-access location accessible only to persons "personally and directly involved" in the investigation. These databases are broadly available for use across ICE and other DHS components, well beyond the level of access authorized in Section 6103(i)(2). *See, e.g.,* 82 Fed. Reg. at 43556 (System of Record Notice) (The Alien File (or "A-File") is a "single file for each individual containing that individual's immigration record," used widely within DHS in connection with immigration benefits and enforcement and does not have a sole or even primary criminal investigation purpose).[21] The Implementation Agreement does not call for access controls limiting individual users' access to taxpayer data within these databases. Ex. 12.[22]

Finally, as discussed *supra*, the facts support an inference that ICE's purported criminal investigations are a pretext for gathering data that will help them locate and deport people—a misuse of the data. Defendants do not even assert that the requests from ICE do pertain to specific, *bona fide* criminal investigations for each of 1.28 million taxpayers, arguing instead that a "high-level review of agency data" in search of *potential* criminal infractions would justify the data requests. *See* Opp'n at 30. Further, both the MOU and ICE's actual request directed the IRS to provide the "last-known address" for each person identified, *see* MOU at § 5(C); Walker Decl. at ¶¶ 6-7, not the person's address as of a specific date, which belies the argument that address information alone would help ICE confirm whether a person overstayed a removal order by 90

---

[21] The other two systems listed likewise have a broad set of uses, not limited to criminal investigations, including civil immigration enforcement. *See* 89 Fed. Reg. 55638 (July 5, 2024) (SORN for the CARIER System of Records); 85 Fed. Reg. 74362 (Nov. 20, 2020) (SORN for the External Investigations System of Records).

[22] *See, e.g.,* IRS, Publication 1075, *Tax Information Security Guidelines*, https://perma.cc/GR5D-6WMF ("If FTI [Federal Tax Information] is recorded on electronic media (e.g., tapes) with other data, it must be protected as if it were entirely FTI.").

22

days, as the Defendants argue. Opp'n at 30. A last-known address would, however, be helpful in locating a taxpayer for purposes of detention and deportation, as the White House has said.

This evidence is sufficient to overcome the "presumption of regularity" that Defendants invoke. In fact, as Judge Friedman recently observed, "[i]n just six months, the President of the United States may have forfeited the right to such a presumption of regularity." *Fed. Educ. Ass'n*, 2025 WL 2355747, at *11 (collecting cases).

### III.   The Balance of the Equities Favors Relief.

The balance of the equities favors granting relief to Plaintiffs to prevent unlawful sharing of protected data. Defendants' contrary arguments are meritless. *First*, their assertion that Plaintiffs' seek to alter the status quo by preventing unprecedented mass sharing *required* by 6103 can scarcely be credited. The "status quo" in considering preliminary relief is the status quo before the challenged unlawful action—and that is the status Plaintiffs seek to preserve. *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022). Moreover, the IRS has for decades maintained that it could not share data with ICE for civil immigration enforcement purposes, and Congress has rejected measures that would authorize such sharing.[23] No law has changed, but now Defendants assert that this mass sharing under the Data Policy is *required* such that the equities weigh against relief.

---

[23] In the first Trump Administration, the IRS told ITIN holders "there is no authorization under this provision to share tax data with ICE." Sacchetti, *Undocumented and paying taxes, they seek a foothold in the American Dream*, https://perma.cc/8JVS-K4KR; Amanda Frost, *Can the Government Deport Immigrants Using Information It Encouraged Them to Provide*, Administrative Law Review Accord (2017) https://perma.cc/6482-Z8T5 (citing 2006 TAX NOTES TODAY 47 (Mar. 9, 2006)) ("In 2006, Senator Jeff Sessions proposed amending § 6103 to provide for increased disclosure of tax information to immigration enforcement, which suggests [] § 6103 does not currently permit the IRS to do so.")

23

*Second*, the pending appeal in *Centro* does not suggest that this Court should decline to enter preliminary relief to prevent irreparable harm to the Plaintiffs. The *Centro* district court considered the IRS-ICE MOU *as written* and issued its decision about the legality of potential IRS sharing of tax information with ICE before such sharing had commenced. *See Centro*, 2025 WL 1380420, at *1. Plaintiffs filed the instant Motion after IRS commenced data sharing *en masse* using the automated means under the Data Policy in a manner that cannot plausibly comply with 6103. These starkly different factual circumstances, and imminent irreparable harm, weigh against declining to enter relief here merely because the *Centro* appeal may concern similar issues.

## IV.    The Court Should Not Impose a Substantial Bond or Stay Any Preliminary Relief Pending Appeal.

Plaintiffs seek a stay under the APA and "[t]he APA has no bond requirement." *Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-cv-00628, 2025 WL 1191844, at *23 n.14 (D. Md. Apr. 24, 2025); *see also Cabrera v. Dep't of Lab*, No. 25-cv-01909, 2025 WL 2092026, at *9 n.3 (D.D.C. July 25, 2025). Nor would a substantial bond be appropriate even if the Court considered Plaintiffs' motion under Federal Rule of Civil Procedure 65, as Plaintiffs are suffering irreparable harm, including the reallocation of resources, and a substantial bond would undermine the purpose of preliminary relief. For the same reason the Court should not stay the effect of any preliminary relief, as its purpose is to prevent ongoing irreparable harm.

Dated: September 3, 2025

Respectfully submitted,

/s/ Daniel A. McGrath
Daniel A. McGrath (D.C. Bar No. 1531723)
Johanna M. Hickman (D.C. Bar No. 981770)
Madeline H. Gitomer (D.C. Bar No 1023447)
Robin Thurston (D.C. Bar No. 1531399)
Steven Y. Bressler (D.C. Bar No. 482492)
Democracy Forward Foundation
P.O. Box 34553

24

Washington, DC 20043
(202) 812-7824
dmcgrath@democracyforward.org
hhickman@democracyforward.org
mgitomer@democracyforward.org
rthurston@democracyforward.org
sbressler@democracyforward.org

*Counsel for Plaintiffs*

25

Exhibit 12

UNCLASSIFIED//FOR OFFICIAL USE ONLY

# Implementing Agreement

# for the

# Memorandum of Understanding for the

# Exchange of Information for Nontax Criminal

# Enforcement

# between

# the U.S Department of Homeland Security,

# U.S. Immigration and Customs Enforcement

# and

# the U.S Department of the Treasury,

# Internal Revenue Service

UNCLASSIFIED//FOR OFFICIAL USE ONLY

**I.   Purpose**

This Agreement provides implementing procedures for the Memorandum of Understanding between the U.S. Department of the Treasury, Internal Revenue Service (IRS) and the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) for the Exchange of Information for Nontax Criminal Enforcement. (MOU), dated April 7, 2025.  ICE will send, and IRS will receive, requests for information for specifically identified individuals via transmittal procedures contained in Section II of this Agreement.

**II.   Procedures**

01.   Disclosures by ICE to the IRS will be in accordance with IRC § 6103(i)(2) and all other applicable law, regulation, and policy.  Information may be securely transmitted via Kiteworks or as otherwise agreed upon.

02.   IRS will search the Integrated Data Retrieval System (IDRS) for the information requested.

03.   Disclosures by the IRS to ICE: Information may be securely transmitted via Kiteworks or as otherwise agreed upon.

**III.   Description of the Records**

01.   The IRS will

a.   disclose requested information from the following System(s) of Records:

1.   Treasury/IRS 22.060 Automated Non-Master File, 80 FR 54064 (Sept. 8, 2015)
2.   Treasury/IRS 34.037 IRS Audit Trail and Security Records System, 80 FR 54064 (Sept. 8, 2015)
3.   Treasury/IRS 24.030 Customer Account Data Engine Individual Master File, 80 FR 54064 (Sept. 8, 2015)
4.   Treasury/IRS 24.046 Customer Account Data Engine Business Master File, 80 FR 54064 (Sept. 8, 2015)
5.   Treasury/IRS 22.061 Individual Return Master File, 80 FR 54064 (Sept. 8, 2015)
6.   Treasury/IRS 42.008 Audit Information Management System, 80 FR 54064 (Sept. 8, 2015)

b.   treat the incoming data from ICE as transient data and destroy the data when no longer needed for business use, in accordance with General Record Schedule 5.2, item 010.

02.   ICE will

a.   disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Date of Birth; Address Information; Country of Citizenship; FBI

2 UNCLASSIFIED//FOR OFFICIAL USE ONLY

Numbers; and Fingerprint Identification Number (FINS), from the following System(s) of Records:

1. Alien File, Index, and National File Tracking, 82 F.R. 43556 (Sep. 18, 2017).
2. External Investigations, 85 F.R. 74362 (Nov. 20, 2020).
3. Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 F.R. 55638 (Jul. 5, 2024).

b. maintain the information provided by IRS in the following Systems of Records:

1. Alien File, Index, and National File Tracking, 82 F.R. 43556, (Sep. 18, 2017).
2. External Investigations, 85 F.R. 74362 (Nov. 20, 2020).
3. Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 F.R. 55638 (Jul. 5, 2024)

c. ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with IRS Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies*.

The information in these systems of records notices may be updated during the effective period of this MOU as required by the Privacy Act.

**IV.**  <u>Reproduction Costs</u>

It is mutually agreed that the parties signing this Agreement will not charge one another for costs incurred in production or reproduction of information provided under this Agreement.

Nothing in this MOU is intended or shall be construed to require the obligation, appropriation, or expenditure of funds from the U.S. Treasury in violation of the Anti-Deficiency Act, 31 U.S.C. §§ 1341-1519.

**V.**  <u>Approval Signatures</u>

TODD M LYONS
Digitally signed by TODD M LYONS
DN: cn=TODD M LYONS, o=U.S. Government, ou=People, email=Todd.M.Lyons@ice.dhs.gov, c=US
Date: 2025-04-18T16:50:24-0400

_____          _____
Signature                                                              Date

Todd Lyons
Director (Acting)
Immigration and Customs Enforcement
500 12th St SW
Washington, DC 20536

3 UNCLASSIFIED//FOR OFFICIAL USE ONLY

Dottie A. Romo

Digitally signed by
Dottie A. Romo
Date: 2025.04.18
13:52:42 -04'00'

_____          _____
Signature                                 Date

Dottie Romo
Chief Operating Officer (Acting)
Internal Revenue Service
1111 Constitution Ave NW
Washington DC 20224

# Exhibit 13

**Scott Bessent**
Acting Commissioner

**VACANT**
Chief, Direct File

**Erin Collins**
National Taxpayer Advocate

**John Hinding (Acting)**
Chief, Independent Office of Appeals

**Carolin Singh (Acting)**
Chief of Staff

**Kenneth Kies (Acting)**
Chief Counsel

**Amy Klonsky (Acting)**
Chief, Communications and Liaison

**Fumi Tamaki**
Chief Taxpayer Experience Officer

**VACANT**
Deputy Commissioner

**Edward Killen (Acting)**
Chief Tax Compliance Officer

**Kenneth Corbin**
Chief, Taxpayer Services

**Kaschit Pandya**
Chief Information Officer

**Dottie Romo**
Chief Operating Officer

**Amalia (Lia) Colbert**
Commissioner, SB/SE

**VACANT**
Director, Online Services

**Troy Rosenlieb (Acting)**
Chief Procurement Officer

**Guy Ficco**
Chief Criminal Investigation

**David Traynor (Acting)**
IRS Human Capital Officer

**VACANT**
Director, Office of Professional Responsibility

**John (Jack) Walker (Acting)**
Chief Privacy Officer

**Erick Martinez (Acting)**
Director, Whistleblower Office

**Anthony Chavez**
Chief Financial Officer

**VACANT**
Director, Enterprise Case Mgmt.

**Reza Rashidi**
Chief Data & Analytics

**VACANT**
Commissioner, Tax Exempt & Government Entities

**John Pekarik (Acting)**
Chief Facilities Management & Security Services

**VACANT**
Commissioner, LBI

**Thomas Hybertson (Acting)**
Chief Risk Officer

**Kimberly Rogers**
Director, Return Preparer

A310

Updated 8/27/2025

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

CENTER FOR TAXPAYER RIGHTS et al.,

*Plaintiffs*,

v.                                                    Civil Action No. 25-cv-457-CKK

INTERNAL REVENUE SERVICE et al.,

*Defendants*.

---

**PLAINTIFF'S RESPONSE TO COURT ORDER**

In response to the Court's Minute Order dated September 5, 2025, requesting that Plaintiffs provide the Court with details of the effect that the IRS's actions may have on federal funding received by the Center for Taxpayer Rights, including details regarding any federal reporting requirements associated with the funding, Plaintiffs submit the following information:

The Defendants' actions, challenged by Plaintiffs, perceptibly impair Plaintiff Center for Taxpayer Rights' ability to provide services to its clients in ways that jeopardize its federal funding under the Low-Income Taxpayer Clinic (LITC) Grant Program. *See generally* Third Decl. of Nina Olson, Exhibit 14. Plaintiff reiterates that, irrespective of the continued flow of federal funds, this obstruction of the Center's ability to provide services impairs its fulfillment of a core part of the Center's mission.

Respectfully submitted,

*/s/ Daniel A. McGrath*
Daniel A. McGrath (D.C. Bar No. 1531723)

Johanna M. Hickman (D.C. Bar No. 981770)
Madeline H. Gitomer (D.C. Bar No 1023447)
Robin Thurston (D.C. Bar No. 1531399)
Steven Y. Bressler (D.C. Bar No. 482492)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 812-7824
dmcgrath@democracyforward.org
hhickman@democracyforward.org
mgitomer@democracyforward.org
rthurston@democracyforward.org
sbressler@democracyforward.org


*Counsel for Plaintiffs*

# Exhibit 14

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CENTER FOR TAXPAYER RIGHTS et al., | |
| *Plaintiffs*, | |
| v. | Civil Action No. 25-cv-457-CKK |
| INTERNAL REVENUE SERVICE et al., | |
| *Defendants*. | |

## THIRD DECLARATION OF NINA E. OLSON

I, Nina E. Olson, declare under penalty of perjury, under 28 U.S.C. § 1746, that the following is true and correct:

1.     I am over eighteen years old and of sound mind, and I am fully competent to make this declaration.

2.     I serve as the Executive Director and Founder of the Center for Taxpayer Rights ("the Center" or "CTR"). I am personally knowledgeable about the organization's mission and operations. I previously served as the Internal Revenue Service ("IRS") National Taxpayer Advocate from 2001 to 2019, and earlier represented taxpayers in disputes with the IRS in private practice and at The Community Tax Law Project, the nation's first independent low-income taxpayer clinic. I've also testified before Congress on topics relating to taxpayer rights and tax administration on more than 70 occasions.

1

3.      The Low Income Taxpayer Clinic ("LITC") Grant Program was established by Congress in 1998. *See* 26 U.S.C. § 7526. The authorizing statute defines a "qualified low-income taxpayer clinic" as one that "represents low-income taxpayers in controversies with the Internal Revenue Service" or "operates programs to inform individuals for whom English is a second language about their rights and responsibilities under [the Internal Revenue Code]." *Id.* Congress directed the Secretary to consider several factors in evaluating grant recipients, including "the number of taxpayers who will be served by the clinic, including the number of taxpayers in the geographical area for whom English is a second language." *Id.*

4.      Consistent with these statutory requirements, the grant program requirements (discussed below), and our mission, the Center for Taxpayer Rights has dedicated significant resources to providing programming and services to taxpayers for whom English is a second language ("ESL taxpayers"). Since 2023, the Center has applied for and received an annual LITC Grant. As we stated in our 2025 continuation grant application, "the LITC Support Center operates nationwide" and "will serve all cities, counties, and states."

5.      Importantly, this grant program requires a one-to-one match by the recipient organization, which means that the Center is dedicating substantial non-federal resources to meeting these statutory requirements as well; it is not the case that the Center simply dedicates the federal funding it receives to these efforts. Reaching, educating, and counseling ESL taxpayers, many of whom are immigrants, are core parts of the services provided by the Center.

6.      The Center currently has a grant that runs from 2024 to 2026. Each year, the Center must submit an updated application for the continuation of the grant, which is a non-competitive continuation. Application deadlines for the following year are typically in the summer of the year

2

prior, so the Center must submit a new application for a competitive grant cycle next year, likely by July 2026, to continue receiving a grant for future years.

7.    Each year, the Center also is required to submit information to the LITC Program Office. It must submit annual goals, in particular numerical goals as to consultations with low-income and ESL taxpayers, number of education activities targeted to low-income and ESL taxpayers, and the number of low-income and ESL taxpayers reached by the educational activities.

8.    The Center must also submit two reports each grant year—an Interim Report and a Year-End Report. The LITC Program Office "uses the reports to assess the grant recipient's progress in meeting its stated goals and objectives and to measure the quality of clinic operations, including the services provided to low-income and ESL taxpayers."[1] This information is submitted through Form 13424-R, a new form approved in August 2025. It requires that the grant recipient include the following information:

- Number of cases involving a dispute with the ITIN Unit

- Number of cases involving representation of ESL taxpayers

- Number of consultations conducted with ESL taxpayers

- Number tax returns prepared ancillary to ESL activities

- Number of ITIN applications prepared ancillary to ESL activities

- Number of educational activities whose primary audience is ESL taxpayers

- Number of events targeted to ESL taxpayers

- Number of events targeted to ESL service providers

- Number of ESL taxpayer attendees

---

[1] Low Income Taxpayer Clinics, 2026 Grant Application Package and Guidelines (May 2025), https://perma.cc/33UY-5CKE.

3

- Number of staff of ESL service provider attendees

9.    Each of these reporting requirements (among other less-directly-related requirements) is directly tied to the Center's work with immigrant taxpayers. This year, as a result of publication of plans for potential data sharing between ICE and the IRS, and particularly since the Memorandum of Understanding between the IRS and ICE was made public in April, the Center's work in each of these areas has been impacted negatively by Defendants' actions.

10.    The Center has experienced a drop in almost all of the data points listed above, compared to 2023 and 2024. It is quite simply the case that the Center's efforts to effectively counsel immigrant clients, represent immigrant clients in disputes before the IRS, and offer educational services and programming to ESL taxpayers and those that serve them, are impaired by Defendants' actions. In particular, while the Center is still dedicating significant resources towards broad outreach to ESL taxpayers, there is significant hesitance for these taxpayers to engage with the Center on an individualized basis. There is much less demand for interaction or consultation with the Center, given the concerns with engaging with the IRS. In addition, we have had to revise our outreach strategy to account for these obstacles.

11.    As stated in my prior declaration, ECF 31-8, last year the Center held 10 ESL-focused events; this year, the Center has been able to hold only one, due to fear in the immigrant community to engage with the IRS as a result of data sharing with ICE. Last year, the Center represented 14 taxpayers with ITINs. This year, it is only 1 thus far. Similarly, the Center's number of consultations and representations of ESL taxpayers has dropped dramatically. Some of our immigrant clients have also determined that they no longer want to obtain the benefits to which they are legally entitled, choosing to forgo needed funds to avoid interacting with the IRS, given its about-face on data-sharing with ICE. See ECF 31-8, ¶¶ 48-50, 61-67, 89-90.

4

12.    Defendants' actions not only significantly impair our ability to provide services in furtherance of our mission, but also jeopardize our funding under the LITC Grant Program. This competitive grant program requires that we set annual goals regarding our services to ESL taxpayers, many of whom are immigrants, and that we report how many ESL taxpayers we serve each year. If we do not meet the goals we set, or if our reporting indicates that we are providing less services than prior years—we are at risk of losing our federal funding. The LITC Grant Program office assesses an applicant's ability to meet its goals that further the statutory mission of the program, which include providing *pro bono* representation and ESL outreach and education. I am very concerned that despite dedicating more resources towards the priorities identified by this federal program, based on the trends since the IRS-ICE data sharing became public, we will likely not meet the goals we set forth. The goals we set were based on our past work, the resources we are able to dedicate to these priorities, and our expectations regarding the Center's projected impact. However, it was impossible to plan for the huge impact that IRS-ICE data sharing would have on our work. I am worried that our potential inability to meet these goals will impact our ability to continue our grant or obtain additional funding when we apply for another competitive grant as part of the LITC Grant Program.

13.    As the Center's director, I am deeply concerned that because our ability to provide services and representation to immigrant taxpayers has been impaired this year, our continued funding, particularly when we are required to apply for a new competitive grant next year—is in jeopardy.

5

14.    For example, the IRS requires that all recipients "apply annually to renew the grant." 2026 LITC Notice of Funding Opportunity.[2] Though the application for second- and third-year grants is abbreviated, an applicant must "meet satisfactory performance levels" to receive continued funding. *Id*. As discussed below, I am concerned that Defendants' actions may jeopardize our ability to meet these levels, despite meeting them in years prior, and dedicating additional resources to doing so this year.

15.    Further, for each new grant cycle, each grant application undergoes a technical evaluation by a Ranking Panel of Taxpayer Advocate Service Staff. Each application is scored, and applicants that obtain a certain score, or higher, will advance to the next level of review. The IRS will consider a "variety of factors" in awarding grants, including "the number of taxpayers who will be assisted by the organization," and "the quality of the program offered by the organization including… its record in providing services to low-income and ESL taxpayers." *Id.*

16.    The Center is a relatively new LITC grantee, receiving its first grant for the last six months of calendar year 2023. During 2024 we made significant progress in establishing relationships with ESL taxpayers and groups serving those individuals. I am proud of our record of providing services and representation to ESL taxpayers and we looked forward to building upon and expanding those client representations and organizational relationships in 2025. But this year, our efforts to do so have been significantly hampered by the IRS's data sharing with ICE. Despite continued and increased outreach efforts, it has been exceedingly difficult to reach ESL taxpayers as a result of the Defendants' actions. In addition, it has been difficult to represent our existing

---

[2] 2026 LITC Notice of Funding Opportunity, https://perma.cc/LE5U-JJ9R (archived Sept. 17, 2025); *see also* Low Income Taxpayer Clinic Grant Program; Availability of 2026 Grant Application Package, 90 Fed. Reg. 19594 (May 8, 2025), *available at* https://perma.cc/6AQG-VWHC.

6

ESL taxpayer clients in their current disputes or filings with the IRS, as I described in my prior declaration. *See* ECF 30-8, ¶¶ 40-54. It has also been more difficult to provide support and guidance to our network, LITC Connect, which also advises ESL taxpayer clients. *See* ECF 30-8, ¶¶ 55-70. I worry that these impairments will jeopardize our continued funding, especially when we re-enter the competitive grant cycle next year. Our significant drop in the amount of programing and number of representations for ESL taxpayers may be viewed unfavorably as the IRS evaluates our grant application.

17.    In my experience, the failure to meet stated goals could be a basis for reducing funding for an LITC; the program office wants to see progress and an increase over time, especially from relatively newer grantees, like the Center. Much of our building up of a network of referrals and relationships, particularly among the ESL taxpayer community, has been derailed by the policy change. This has harmed our ability to continue to grow our representation, outreach, and education.

18.    And regardless of whether the Center continues to receive federal funding, our mission to advance taxpayer rights, promote trust in the tax system, and increase access to justice in the tax system, particularly for the most vulnerable populations, including immigrants, has been and continues to be severely impaired by this new policy of data sharing with ICE. A loss of federal funding would further frustrate our efforts to fulfil our mission.

19.    In addition, the Court's order requiring 24-hour notice prior to any further data sharing may help protect against further disclosures, but the Center's ability to advise its clients on how their data will be protected by the IRS, and to provide services and programming to ESL taxpayers, continues to be impaired absent longer-term relief that clarifies the agency's legal obligations with respect to taxpayer data.

7

Washington, D.C.

September 17, 2025

Nina E. Olson

8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS, *et al.*,

        *Plaintiffs*,

    v.

INTERNAL REVENUE SERVICE, *et al.*,

        *Defendants*.

Case No. 1:25-cv-00457-CKK

## DEFENDANTS' RESPONSE TO COURT ORDER

Defendants submit this filing to provide the information requested by the Court in its September 5, 2025 Minute Order.

1.      The Court ordered Defendants to provide "the name and title of the individual at IRS who received ICE's June 27, 2025 data request." The IRS received the data request in the form of a letter dated June 27, 2025 from ICE Acting Director Todd M. Lyons, addressed to then–IRS Commissioner Billy Long. A copy of that letter is attached to this filing as Exhibit 1. The Treasury Department received the letter in the first instance and provided it to the IRS. The request also consisted of a datafile, referenced in the letter, that ICE provided to the IRS two days earlier, on June 25, 2025, via a secure dropbox system commonly referred to as Kiteworks. Kiteworks is the digital equivalent of a secure mailroom.

2.      The Court also ordered Defendants to provide "the name and title of the individual whom ICE identified as the 'officer[] or employee[] . . . personally and directly engaged in' the relevant criminal investigations at issue in its June 27 request to the IRS." The datafile that ICE provided on June 25, 2025 listed Jesse J. Williams as the "IRS-POC" for each request. The June

27 letter from Acting Director Lyons confirmed that Mr. Williams was the person personally and directly engaged in the preparation for any criminal proceeding or criminal investigation. Mr. Williams is the Assistant Director of the ICE Enforcement and Removal Operations ("ERO") Field Operations.

3.      Finally, the Court ordered Defendants to provide "the name and title of the individual who received the IRS's August 7 disclosure on behalf of ICE." The IRS responded to ICE's request with the understanding that it would be delivered to Assistant Director Williams. The IRS responded to ICE's request on August 7, 2025 by providing a datafile via a digital folder provided in Kiteworks. The IRS understands that four ICE employees possessed the necessary permissions to retrieve the Kiteworks folder on Assistant Director Williams's behalf: two ICE Government Contractor Systems Architects; the ICE Homeland Security Investigations ("HSI") Acting Special Assistant to Assistant Director Williams; and an ICE HSI Criminal Analyst.[1] The IRS further responded through a letter to ICE Acting Director Lyons. A copy of that letter is attached as Exhibit 2.

Dated: September 18, 2025                    Respectfully submitted,

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            ELIZABETH J. SHAPIRO
                                            Deputy Director, Federal Programs Branch

---

[1] Defendants understood from the Court's statements at the September 5, 2025 hearing that names of specific individuals may not be necessary in responding to the Court's questions. Given the high-profile nature of this proceeding, and to protect government employees from potential harassment, Defendants have not included in this filing the names of the ICE employees with permissions to retrieve the digital folder in Kiteworks. If the Court requires the names of those employees, Defendants will provide them, but Defendants would respectfully request the Court's permission to file that information under seal.

2

_/s/ Bradley P. Humphreys_
BRADLEY P. HUMPHREYS
Senior Trial Counsel
Federal Programs Branch
Civil Division, Department of Justice
1100 L Street NW
Washington, DC 20005
Telephone: (202) 305-0878
Bradley.Humphreys@usdoj.gov

_Counsel for Defendants_

# EXHIBIT 1

*Office of the Director*



**U.S. Department of Homeland Security**
500 12th Street, NW
Washington, DC 20536

June 27, 2025

Dear Commissioner Long,

In accordance with the Memorandum of Understanding (MOU) signed between the U.S. Department of the Treasury, Internal Revenue Service (IRS) and the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) for the Exchange of Information for Nontax Criminal Enforcement, signed on or about April 7, 2025, this letter serves as ICE's written request for the last known address of the individuals listed in the information request sent to the IRS by ICE via Kiteworks, the IRS' preferred file sharing platform, on June 25, 2025 (the "Information Request").

The Information Request was electronically submitted to the IRS by ICE and contained a data file titled EARM_Full_Delta_Schema_v2.zip (the "Data File"). As set forth in Section 6 of the MOU and as required by IRC § 6103(i)(2)(A) & (B), each line of the Data File is hereby modified to include the following information:

- the designated nontax Federal criminal statute is 8 U.S.C. § 1253(a)(1)); and

- the reason for this request is to permit the U.S. Department of Homeland Security to conduct its mission in furtherance of its statutory mandate, and in preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings; and

- the reason why each requested disclosure is, or may be, relevant to such proceeding or investigation is that the requested information may contain address information which is potentially at issue with respect to investigating or proving a violation under 8 U.S.C. § 1253(a)(1); and

- the point of contact field in the Data File is the identity of the officer(s) and/or employe(es) who are personally and directly engaged in the criminal proceeding or criminal investigation; and

- ICE attests that the information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1),

**FOR OFFICIAL USE ONLY**

other specifically designated Federal criminal statute, or any subsequent criminal proceedings.

Thank you for your immediate attention to this matter.

Sincerely,

Todd M. Lyons
Acting Director

FOR OFFICIAL USE ONLY

# EXHIBIT 3



**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

**INFORMATION TECHNOLOGY**

Date: August 7, 2025

Todd M. Lyons
Acting Director
United States Immigration and Customs Enforcement (ICE)
Department of Homeland Security (DHS)
Washington, DC 20536

Subject:  IRS-DHS Memorandum of Understanding – Production of Address
Information

Dear Acting Director Lyons:

We are writing in response to your letter dated June 27, 2025, in which you requested, pursuant to the IRS-DHS Memorandum of Understanding dated April 7, 2025, and the IRS-DHS Implementing Agreement dated April 18, 2025 (collectively, the "MOU"), the last known addresses of individuals listed in a data file you transmitted separately to the IRS via Kiteworks on June 25, 2025.

The IRS has processed your request and is providing the last known addresses of identifiable individuals in a datafile titled earm_full_delta_schema_v2_irsoutput_20250806.csv (the "Data File") and transmitted to ICE via Kiteworks on August 6, 2025.   Pursuant to the MOU, the Data File also indicates a "no match" for the individuals whose addresses the IRS was unable to identify from the information you provided.  Please note that the addresses being provided in the datafile are the last known addresses of the identifiable individuals as of August 6, 2025, the date we completed processing your request.  Address information in IRS records may change thereafter if IRS receives change of address information from individuals or from the U.S. Postal Service.

You are provided this information with the understanding that it will be used strictly in accordance with, and subject to the limitations and disclosure provisions of, section 6103(i)(2) of the Internal Revenue Code (IRC) (26 U.S.C. § 6103(i)(2)) and the MOU. As provided therein, the information can only be disclosed to the persons and only for the purposes described in section 6103(i)(2).  Information disclosed or used contrary to these provisions may subject the agency to civil damages under IRC Section 7431, and its employees (including contractors) to criminal liability under IRC Sections 7213 or 7213A, as well as Section 1905 of Title 18 of the United States Code.

If you have any questions, please contact me.

Very truly yours,

James D. Keith Jr.

Digitally signed by James D.
Keith Jr.
Date: 2025.08.07 14:47:55
-04'00'

James Keith
Coordinating Director,
Taxpayer Services and Experience,
Information Technology
Internal Revenue Service

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR TAXPAYER RIGHTS, *et al.*,

                         *Plaintiffs*,

*v.*

INTERNAL REVENUE SERVICE, *et al.*,

                         *Defendants*.

Civil Action No. 1:25-cv-457-CKK

## DEFENDANTS' NOTICE OF SUBMISSION OF ADMINISTRATIVE RECORD

Defendants respectfully submit the administrative record for this case. The administrative record is accompanied by a certification from an official from the Department of Treasury. An index of the record also accompanies Defendants' submission.

Plaintiffs have conditionally consented to Defendants' assertions of privilege to withhold certain information from the administrative record based on information provided by Defendants in conferral. Plaintiffs represent that their consent is a good faith attempt to avoid raising disputes to the Court, but the consent is conditional because Plaintiffs have not yet viewed the proposed redactions for privilege in the context in which they appear in the record.

Dated: October 29, 2025                Respectfully submitted,

                                       BRETT A. SHUMATE
                                       Assistant Attorney General

                                       ELIZABETH J. SHAPIRO
                                       Deputy Director, Federal Programs Branch

                                       */s/ J. Stephen Tagert*
                                       J. Stephen Tagert
                                       Trial Attorney
                                       United States Department of Justice
                                       Civil Division, Federal Programs Branch
                                       1100 L ST. N.W.
                                       Washington, DC 20005
                                       Tel:  (202) 305-5486
                                       stephen.tagert@usdoj.gov

                                       *Counsel for Defendants*

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CENTER FOR TAXPAYER RIGHTS, et al.,

        Plaintiffs,

v.

INTERNAL REVENUE SERVICE, et al.,

        Defendants.

Civil Action No.: 25-cv-457-CKK

**CERTIFICATION OF ADMINISTRATIVE RECORD**

       I, Dottie A. Romo, am currently employed as the Chief Operating Officer of the Internal Revenue Service (IRS).  I have been employed by the IRS since March 2020, and I have held the position of Chief Operating Officer since July 2025.  I am familiar with the claims asserted by the plaintiffs in the above-captioned action against the IRS and the U.S. Department of the Treasury (Treasury).

       I hereby certify, to the best of my knowledge, that the accompanying administrative record (AR) is complete and contains all non-deliberative documents and materials directly or indirectly considered regarding the agency action set forth in the Court's Minute Order dated September 9, 2025 (September 9 Order), as follows:

> Plaintiffs have shown a substantial likelihood that the IRS has taken final agency action by adopting and implementing a policy of disclosing the addresses of tens of thousands of taxpayers to Immigration and Customs Enforcement ("ICE") based on a representation from ICE that a single ICE employee is (or a small number of ICE employees are) "personally and directly engaged" in investigating each of those taxpayers for committing a criminal offense under 8 U.S.C. § 1253(a)(1).

September 9 Order.[1]

---

[1] Notwithstanding the Court's order to file an administrative record in this case, Defendants maintain that neither the Amended Complaint nor the Motion for Preliminary Injunction challenge any final agency action.  Defendants previously argued in their pending Motion to Dismiss, ECF 26, that the Administrative Procedure Act does not provide for review and reserve their right to make this argument in further proceedings in this case, including in any subsequent appeal.

As reflected in the AR, and in accordance with the September 9 Order and the Court's further Order dated October 22, 2025, ECF 46, certain portions of records that are subject to a privilege other than the deliberative process privilege have been withheld. The IRS and Treasury have waived the deliberative process privilege with respect to the documents in the record except where indicated.

In accordance with 28 U.S.C. § 1746, I hereby certify and declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on October 29, 2025

Dottie A. Romo
Digitally signed by Dottie A. Romo
Date: 2025.10.29 16:33:45 -04'00'

Dottie A. Romo
Chief Operating Officer
Internal Revenue Service

2

| Document Number | Begin Bates | End Bates | Title |
|---|---|---|---|
|  | | | **Memorandum of Understanding** |
| 1 | TD_0000001 | TD_0000002 | Email: RE: As discussed |
| 2 | TD_0000003 | TD_0000005 | Email: FW: ICE Request for Taxpayer Addresses |
| 3 | TD_0000006 | TD_0000008 | Attachment to email FW: ICE Request for Taxpayer Addresses: 6103 - statutory excerpts |
| 4 | TD_0000009 | TD_0000010 | Email: FW: DOGE ICE Information Request |
| 5 | TD_0000011 | TD_0000011 | Email: FW: Follow Up |
| 6 | TD_0000012 | TD_0000015 | Attachment to email FW: Follow Up: IRS ICE Follow Up Questions |
| 7 | TD_0000016 | TD_0000016 | Email: Notice of SB Action |
| 8 | TD_0000017 | TD_0000033 | Action Memorandum: DHS-IRS Information Sharing MOU |
| 9 | TD_0000034 | TD_0000048 | MOU |
| | | | **Implementation Agreement** |
| 10 | TD_0000049 | TD_0000050 | Email: RE: Counsel contacts |
| 11 | TD_0000051 | TD_0000051 | Meeting/Teleconference Invitation: Implementation MOU Discussion |
| 12 | TD_0000052 | TD_0000055 | Implementation Agreement for MOU |
| | | | **Data Exchange Request** |
| 13 | TD_0000056 | TD_0000071 | *Centro de Trabajadores Unidos et al. v. Bessent,* 25-cv-677-DLF (D.D.C.) - Order on Preliminary Injunction Motion |
| 14 | TD_0000072 | TD_0000078 | Email: RE: [EXT] IRS - ICE data exchange |
| 15 | TD_0000079 | TD_0000082 | Attachment to email RE: [EXT] IRS - ICE data exchange: SLFT Adhoc - User Guide for SFTP Connection Setup |
| 16 | TD_0000083 | TD_0000089 | Email: RE: Update |
| 17 | TD_0000090 | TD_0000090 | Meeting/Teleconference Invitation: Telcon w DHSA |
| 18 | TD_0000091 | TD_0000092 | Email: RE: Telcon w DHSA (follow-up from yesterday) |
| 19 | TD_0000093 | TD_0000093 | Email: DHS Update |
| 20 | TD_0000094 | TD_0000094 | Meeting/Teleconference Invitation: Telcon w DHSA (follow-up from yesterday) |
| 21 | TD_0000095 | TD_0000095 | Meeting/Teleconference Invitation: Discussion |
| 22 | TD_0000096 | TD_0000096 | Meeting/Teleconference Invitation: Telcon w DHSA (follow-up from Tuesday & Wednesday) |
| 23 | TD_0000097 | TD_0000102 | Portion of ICE datafile received on June 25, 2025: earm_full_delta_schema_v2_irsoutput_20250806.csv |
| 24 | TD_0000103 | TD_0000107 | Email: FW: Letter from ICE |
| 25 | TD_0000108 | TD_0000111 | Email: FW: Letter from ICE |
| 26 | TD_0000112 | TD_0000113 | Attachment to email FW: Letter from ICE: AD1 Memo to IRS Commission Request for Information, dated June 27, 2025 |

| 27 | TD_0000114 | TD_0000118 | Email: RE: Letter from ICE |
|----|------------|------------|----------------------------|
| 28 | TD_0000119 | TD_0000119 | Email: DHS Data Analysis |
| 29 | TD_0000120 | TD_0000121 | Meeting/Teleconference Invitation: Data Exchange |
| 30 | TD_0000122 | TD_0000122 | Meeting/Teleconference Invitation: DHS MOU Implementation |
| 31 | TD_0000123 | TD_0000124 | Meeting/Teleconference Invitation: DHS MOU |
| 32 | TD_0000125 | TD_0000128 | DHS-ICE Data Exchange Overview |
| 33 | TD_0000129 | TD_0000130 | DHS-ICE Data Exchange Draft QC |
| 34 | TD_0000131 | TD_0000131 | Email: IRS-DHS ICE Update (Information only) |
| 35 | TD_0000132 | TD_0000134 | Email: REQUEST: Meeting to update and request approval for the DHS/IRS data sharing |
| 36 | TD_0000135 | TD_0000135 | Email: DHS Notes for Briefing |
| 37 | TD_0000136 | TD_0000140 | Attachment to email DHS Notes for Briefing : DHS-ICE Data Exchange Overview |
| 38 | TD_0000141 | TD_0000142 | Meeting/Teleconference Invitation: URGENT: DHS x IRS Data Sharing Approval |
| 39 | TD_0000143 | TD_0000144 | Letter from IRS to DHS re: IRS-DHS Memorandum of Understanding - Production of Address Information, dated August 7, 2025 |
| 40 | TD_0000145 | TD_0000147 | Email: RE: Next Steps: MOU |
| **Authorities** | | | |
| 41 | TD_0000148 | TD_0000202 | 26 U.S.C. § 6103 Confidentiality and disclosure of returns and return information |
| 42 | TD_0000203 | TD_0000205 | 8 U.S.C. § 1253 Penalties related to removal |
| 43 | TD_0000206 | TD_0000207 | 26 U.S.C. § 7213A Unauthorized inspection of returns or return information |
| 44 | TD_0000208 | TD_0000210 | 26 U.S.C. § 7213 Unauthorized disclosure of information |
| 45 | TD_0000211 | TD_0000213 | 26 U.S.C. § 7431 Civil damages for unauthorized inspection or disclosure of returns and return information |
| 46 | TD_0000214 | TD_0000227 | 26 U.S.C. § 7803 Commissioner of Internal Revenue; other officials |
| 47 | TD_0000228 | TD_0000232 | 26 C.F.R. § 301.6103(i)-1 Disclosure of returns and return information (including taxpayer return information) to and by officers and employees of DOJ or another Federal agency for use in Federal grandy jury proceeding, or preparation for proceeding or investigation, involving enforcement of Federal criminal statute not involving tax administration |
| 48 | TD_0000233 | TD_0000448 | IRS Publication 1075 - Tax Information Security Guidelines |
| 49 | TD_0000449 | TD_0000452 | 6 U.S.C. § 112 Secretary; functions |
| 50 | TD_0000453 | TD_0000463 | 8 U.S.C. § 1103 Powers and duties of the Secretary, the Under Secretary, and the Attorney General |
| 51 | TD_0000464 | TD_0000503 | 44 U.S.C. § 3551, Subchapter II (the Federal Information Security Management Act), Purposes |
| 52 | TD_0000504 | TD_0000505 | 28 U.S.C. § 1346 United States as defendant |

| 53 | TD_0000506 | TD_0000508 | Executive Order 14161, January 20, 2025 |
|---|---|---|---|
| 54 | TD_0000509 | TD_0000527 | Federal Information Security Modernization Act of 2014 |
| 55 | TD_0000528 | TD_0001019 | NIST Special Publication 800-53 - Security and Privacy Controls for Information Systems and Organizations |
| 56 | TD_0001020 | TD_0001066 | OMB M-17-12 Memorandum for Heads of Executive Departments and Agencies |
| 57 | TD_0001067 | TD_0001076 | 82 FR 43556 |
| 58 | TD_0001077 | TD_0001156 | 80 FR 54064 |
| 59 | TD_0001157 | TD_0001162 | 85 FR 74362 |
| 60 | TD_0001163 | TD_0001170 | 89 FR 55638 |
| 61 | TD_0001171 | TD_0001218 | Anti Deficiency Act, 31 U.S.C. §§ 1341-1519 |
| 62 | TD_0001219 | TD_0001222 | 26 C.F.R. § 301.6103(p)(4)-1 Procedures relating to safeguards for returns or return information |
| 63 | TD_0001223 | TD_0001226 | 26 C.F.R. § 301.6103(p)(7)-1 Procedures for administrative review of a determination that an authorized recipient has failed to safeguard returns or return information |
| 64 | TD_0001227 | TD_0001311 | Circular No. A-130 - Managing Information as a Strategic Resource |
| 65 | TD_0001312 | TD_0001456 | IRS The General Records Schedules |

From:        O'Donnell Douglas W [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
             (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2A262DB7C3EF4169B5D60E5C005E882F-`PII`]
Sent:        2/18/2025 9:17:03 PM
To:          Maloy Heather C [heather.c.maloy@irs.gov]; Paul William M [william.m.paul@irscounsel.treas.gov]       `PII`
             `PII`             @irscounsel.treas.gov]
Subject:     RE: As discussed


I alerted Dan Katz.  His response is that we will follow the law and he would like to understand the
view of Treasury OGC and IRS CC regarding the question below.


Douglas W. O'Donnell
Deputy Commissioner


---

**From:** Maloy Heather C <Heather.C.Maloy@irs.gov>
**Sent:** Tuesday, February 18, 2025  3:41 PM
**To:** Paul William M <William.M.Paul@IRSCOUNSEL.TREAS.GOV>;     `PII`
`PII`            @irscounsel.treas.gov>
**Cc:** O'Donnell Douglas W <Douglas.W.ODonnell@irs.gov>
**Subject:** RE: As discussed

Teams message from Guy Ficco below.


`PII` had a further conversation in which we were specifically  asked for Tax information. After `PII` told him
that we would very likely not be able to share it, `PII` was told that it would be elevated to the National Security
Council (which I believe the Treasury Secretary sits on).


---

**From:** Maloy Heather C <Heather.C.Maloy@irs.gov>
**Sent:** Tuesday, February 18, 2025  3:36 PM
**To:** Paul William M <William.M.Paul@IRSCOUNSEL.TREAS.GOV>     `PII`
`PII`            @irscounsel.treas.gov>
**Subject:** Fw: As discussed


---

**From:** Ficco Guy A (CI) <Guy.Ficco@ci.irs.gov>
**Sent:** Tuesday, February  18, 2025 1:18 PM
**To:** Maloy Heather C <Heather.C.Maloy@irs.gov>
**Subject:** As discussed

Heather- About an hour ago my Chief of Staff (`PII`)got contacted by and ICE
Assistant Director (`PII`) regarding IRS CI assisting in an ICE led effort to locate
approximately 700,000 individuals who are all under Final Orders of Removal. This effort is
being called a Lead Targeting Cell and is being run out of ICE Headquarters in DC, and will
be supported by numerous law enforcement agencies. They are also asking for a Sr Manager
from CI to help coordinate CIs role in the joint effort.

When [PII] asked about what systems ICE had access to, he was left with the impression that the ICE was seeking information related to tax filings or Title 26 information.

I believe in this situation, we are not permitted to share Title 26 information and would only be able to if we were jointly working under the purview of a grand jury (in which case we could make investigative disclosures to DOJ). After speaking with CT Counsel, we are going to reach out to P&A for further legal guidance.

Guy



**Guy Ficco**
**Chief, IRS-Criminal Investigation**
[PII] **office**
**cellular**

TD_0000002

| From: | O'Donnell Douglas W[/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=2A262DB7C3EF4169B5D60E5C0 05E882F-[ PII ] |
|---|---|
| Sent: | Fri 2/21/2025 4:47:28 PM (UTC) |
| To: | Daniel.Katz@treasury.gov[Daniel.Katz@treasury.gov] |
| Cc: | brian.sonfield[brian.sonfield@treasury.gov]; Shelley.Leonard2@treasury.gov[Shelley.Leonard2@treasury.gov] |
| Subject: | FW: ICE Request for Taxpayer Addresses |
| Attachment: | 6103 - statutory excerpts.docx |

Good Morning Dan,

I am reverting to you regarding an inbound request we received from ICE that I verbally related to you; specifically, that IRS provide information to ICE to assist with orders of removal of ~ 700,000 individuals.  IRS Chief Counsel coordinated with Treasury's Office of General Counsel on the effort.

Attached and below represent the legal analysis resulting in the conclusion that we cannot provide information responsive to the request made.

We are available to provide any additional information you may find useful.

Best,

Doug

Douglas W. O'Donnell
Deputy Commissioner

---

**From:** Paul William M <William.M.Paul@IRSCOUNSEL.TREAS.GOV>
**Sent:** Friday, February 21, 2025 11:14 AM
**To:** O'Donnell Douglas W <Douglas.W.ODonnell@irs.gov>
**Subject:** ICE Request for Taxpayer Addresses

Doug,

Below is Chief Counsel's and OGC's analysis of the 6103 issue raised by the ICE request for taxpayer addresses. For reference, I've attached the relevant statutory excerpts from section 6103.

Bill

**Background**

CI contacted P&A about a request received from[ PII ], Acting Deputy Assistant Director of the Department of Homeland Security Office of Intelligence, relaying a request

TD_0000003

that U.S. Immigration and Customs Enforcement (ICE) seeks access to return information for purposes of carrying out the President's Executive Orders on immigration enforcement. In particular, ICE seeks current address information from tax returns collected by IRS to supplement enforcement packages being prepared for approximately 700,000 individuals subject to orders of removal.

Section 6103 of the Internal Revenue Code (Code) protects the confidentiality of returns and return information and authorizes the disclosure of return information only under the circumstances and subject to the conditions prescribed therein. Unauthorized access or disclosure in violation of section 6103 is punishable by civil and criminal penalties.

Address information collected from returns received by the IRS is return information protected by Code section 6103; accordingly, IRS may not disclose this information to ICE absent a specific authorization in section 6103. No such authorization appears to permit the IRS to provide ICE with the return information it seeks.

Subsection (i) of section 6103 authorizes the disclosure of return information to Federal agencies under certain circumstances and for certain purposes. However, for the reasons explained below, and based on our understanding of the facts, these provisions do not authorize the disclosures requested here.

### Section 6103(i)(1)

Section 6103(i)(1)(A) authorizes disclosure, pursuant to an ex parte order by a Federal district court judge or magistrate, to officers and employees of a Federal agency who are personally and directly engaged in preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party, or any investigation which may result in such a proceeding. Section 6103(i)(1)(B) specifies the personnel at the Department of Justice that may authorize an application to a Federal district court for the order referred to in subparagraph (A), and the factual determinations the court must make to grant such an order.

Our current understanding is that ICE's request does not relate to a criminal investigation, because removal proceedings are generally civil in nature. If that is incorrect, then it might be possible (depending on the facts) for ICE to seek permission from the appropriate Department of Justice official to apply to a Federal district court judge or magistrate under section 6103(i)(1)(B) for an order that would authorize disclosure under section 6103(i)(1)(A). However, no disclosure could occur pursuant to 6103(i)(1)(A) until such court order is obtained.

### Section 6103(i)(2)

Section 6103(i)(2) authorizes disclosure of certain information (other than "taxpayer return information") in response to a request from a Federal agency head, for purposes similar to those in section 6103(i)(1), but without the need for a court order. However, the information sought by ICE would likely be "taxpayer return information," in which case it could not be disclosed under section 6103(i)(2) under any circumstances. "Taxpayer return information" is defined in section 6103(b)(3) as return information which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates. Thus, if the IRS has a taxpayer's address because the taxpayer included it on a tax return, then that

TD_0000004

information would be "taxpayer return information" that is not disclosable under section 6103(i)(2).

Even if the address information sought were the type of information that could be disclosed pursuant to (i)(2), the ICE request would not meet the other prerequisites of (i)(2). First, such disclosure must also be for the purposes of a criminal investigation or proceeding, which we do not understand to be the case here.  Second, the request must contain specific information concerning the identity of the taxpayer, the taxable periods to which the information relates, the statutory authority for the proceeding or investigation, and the specific reason why such disclosure is or may be relevant to the proceeding or investigation.  Of note, section 6103(i)(2)(B)(i) requires the request from an agency head to set forth, among other things, "the name and address of the taxpayer with respect to whom the requested return information relates."  Accordingly, if ICE lacks address information for the individuals at issue, it may be unable to make a valid request under section 6103(i)(2)(B).

In short, based on our current understanding of the facts, section 6103 would not permit IRS to disclose the address information sought by ICE to supplement its removal enforcement packages.

TD_0000005

**relevant excerpts from sections 6103(b)(1)-(3) and 6103(i)(1)-(2)**

**6103(b)** Definitions.--For purposes of this section—

> **(1)** Return.--The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

> **(2)** Return information.--The term "return information" means—

>> **(A)** a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,
>> . . .

> **(3)** Taxpayer return information.--The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

. . .

**6103(i)** Disclosure to Federal officers or employees for administration of Federal laws not relating to tax administration.—

**(1)** Disclosure of returns and return information for use in criminal investigations.--

> **(A)** In general.--Except as provided in paragraph (6), any return or return information with respect to any specified taxable period or periods shall, pursuant to and upon the grant of an ex parte order by a Federal district court judge or magistrate judge under subparagraph (B), be open (but only to the extent necessary as provided in such order) to inspection by, or disclosure to, officers and employees of any Federal agency who are personally and directly engaged in--

>> **(i)** preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party, or pertaining to the case of a missing or exploited child,

**(ii)** any investigation which may result in such a proceeding, or

**(iii)** any Federal grand jury proceeding pertaining to enforcement of such a criminal statute to which the United States or such agency is or may be a party, or to such a case of a missing or exploited child,

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

**(B)** Application for order.--The Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, any United States attorney, any special prosecutor appointed under section 593 of title 28, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to section 510 of title 28, United States Code, may authorize an application to a Federal district court judge or magistrate judge for the order referred to in subparagraph (A). Upon such application, such judge or magistrate judge may grant such order if he determines on the basis of the facts submitted by the applicant that--

**(i)** there is reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed,

**(ii)** there is reasonable cause to believe that the return or return information is or may be relevant to a matter relating to the commission of such act, and

**(iii)** the return or return information is sought exclusively for use in a Federal criminal investigation or proceeding concerning such act (or any criminal investigation or proceeding, in the case of a matter relating to a missing or exploited child), and the information sought to be disclosed cannot reasonably be obtained, under the circumstances, from another source.

. . .

**(2)** Disclosure of return information other than taxpayer return information for use in criminal investigations.--

**(A)** In general.--Except as provided in paragraph (6), upon receipt by the Secretary of a request which meets the requirements of subparagraph (B) from the head of any Federal agency or the Inspector General thereof, or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, any United States attorney, any special prosecutor appointed under section 593 of title 28, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to section 510

2

TD_0000007

of title 28, United States Code, the    Secretary shall disclose return information (other than taxpayer return information) to officers and employees of such agency who are personally and directly engaged in--

> **(i)** preparation for any judicial or administrative proceeding described in paragraph (1)(A)(i),
>
> **(ii)** any investigation which may result in such a proceeding, or
>
> **(iii)** any grand jury proceeding described in paragraph (1)(A)(iii),

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

**(B)** Requirements.--A request meets the requirements of this subparagraph if the request is in writing and sets forth--

> **(i)** the name and address of the taxpayer with respect to whom the requested return information relates;
>
> **(ii)** the taxable period or periods to which such return information relates;
>
> **(iii)** the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and
>
> **(iv)** the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

**(C)** Taxpayer identity.--For purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information.

3

TD_0000008

| From: | York, John |
|---|---|
| To: | Katz, Daniel; Pilkerton, Christopher; Krause, Tom |
| Subject: | Fw: DOGE ICE Information Request |
| Date: | Saturday, February 22, 2025 5:36:05 PM |

Hi Dan and Chris,

I just got this request in from ICE. Please let me know who we should suggest as an individual directly responsible for this matter and, as the email states, if this request is acceptable.

Respectfully,
John W. York

**From:** Vitello, Caleb <[ PII ]@ice.dhs.gov>
**Sent:** Saturday, February 22, 2025 5:06 PM
**To:** Krause, Tom <Thomas.Krause@treasury.gov>; Gavin.Kliger@irs.gov <Gavin.Kliger@irs.gov>; York, John <John.York@treasury.gov>
**Cc:** Moghaddassi.Aram.M@dol.gov <Moghaddassi.Aram.M@dol.gov>; Luke.Farritor@hhs.gov <Luke.Farritor@hhs.gov>
**Subject:** DOGE ICE Information Request

**\*\* Caution:** External email from: [[ PII ]@ice.dhs.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov \*\*

---

This email is from a US Government agency.

---

Hello,

The Department of Homeland Security a list of approximately 700 thousand criminal illegal aliens who have standing deportation orders. For each alien, we have a name, as well as other identifying information such as SSN, alien number, date of birth, and in some cases, address.

For each alien in our list, we would like the IRS to provide all possible information, and the date that information was collected, including but not limited to:
1. Known aliases
2. Known home addresses
3. Known employers' information
4. Known phone numbers
5. Known relatives
6. Known emails
7. Know Bank Name
8. Known IP information
9. SSN or TIN

Please confirm that this is acceptable and provide the name of the Directly Responsible Individual in the IRS or Treasury we can collaborate with to retrieve this data. We would like to have this data within two weeks.

Thank you for your cooperation,

*Caleb Vitello*

Acting Director
U.S. Immigration and Customs Enforcement
500 12th Street SW
Washington, D.C.  20536
PII        |@ice.dhs.gov
PII        (cell)

NOTICE: This communication may contain privileged or otherwise confidential information. If you are not an intended recipient or believe you have received this communication in error, please do not print, copy, retransmit, disseminate, or otherwise use this information.  Please inform the sender that you received this message in error and delete the message.

| | |
|---|---|
| **From:** | Christopher.Pilkerton@treasury.gov [Christopher.Pilkerton@treasury.gov] |
| **Sent:** | 3/7/2025 8:08:22 PM |
| **To:** | Paul William M [william.m.paul@irscounsel.treas.gov]; ⟨PII⟩@irscounsel.treas.gov]; Butler Paul T [paul.t.butler@irscounsel.treas.gov]; ⟨PII⟩@irscounsel.treas.gov]; Morris Audrey M [audrey.m.morris@irscounsel.treas.gov] |
| **Subject:** | FW: Follow Up |
| **Attachments:** | IRS ICE Follow Up Questions (OPLA 3.6.2025).docx |

DRAFT, DELIBERATIVE AND PREDECISIONAL
PRIV AND CONF

FYSA- just received back from DHS for our call today. Thanks

---

**From:** Mazzara, Joseph <⟨PII⟩@hq.dhs.gov>
**Sent:** Friday, March 7, 2025 2:02 PM
**To:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>
**Subject:** Fw: Follow Up

** **Caution:** External email from: [⟨PII⟩**@hq.dhs.gov**] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

<div style="background-color:green;color:white;text-align:center;">This email is from a US Government agency.</div>

See attached.

Privileged & confidential
DRAFT 3/2/25 1:30pm

Follow-Up Questions Relating to ICE's Address Information Request

Legal Considerations under Section 6103(i)(2) (federal agency request)

1. Disclosure is authorized only to officers and employees of a Federal agency who are personally and directly engaged in:

> (i) preparation for any judicial or administrative proceeding pertaining to enforcement of a specifically designated nontax Federal criminal statute,

> (ii) An investigation that may result in such a proceeding, or

> (iii) A Federal grand jury proceeding pertaining to such nontax Federal criminal statute.

In addition, section 6103(i)(2) permits disclosure "solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding."



1

Privileged & confidential
DRAFT 3/2/25 1:30pm



2.   The written request must provide:

(a) The name and address of the taxpayer;

(b) The taxable period(s) for which the information is sought;

2

TD_0000013

Privileged & confidential
DRAFT 3/2/25 1:30pm

(c) The statutory authority under which the criminal investigation or proceeding is being conducted;

(d) The specific reason or reasons why such disclosure is, or may be, relevant to the investigation or proceeding.



Practical Considerations

As a practical matter, the IRS typically needs at least a name and TIN (SSN, ITIN) to identify a taxpayer with certainty and match information in its systems. If the IRS cannot identify a unique taxpayer as a match, section 6103 does not permit the IRS to disclose any taxpayer information. In addition, in the IRS's experience, the TIN provided to employers by persons not authorized to work in the US often may not match the name of the individual in IRS records, which would result in a "no match" response.

Thus, even if the legal requirements under section 6103(i)(2) are satisfied, practical considerations may preclude the IRS from being able to match addresses with the specific individuals with respect to whom such information is requested. The more information that could be provided to help identify the specific individual, the more likely it would be that the IRS could find a true match.



3

TD_0000014

Privileged & confidential
DRAFT 3/2/25 1:30pm



4

| | |
|---|---|
| **From:** | ExecSecProcessUnit |
| **To:** | Badgley, Tyler; Pilkerton, Christopher; Miller, Rachel; De Mello, Andrew A.; McMaster, Hunter; Katz, Daniel; Alvi, Cora; Schwab, Samantha |
| **Cc:** | ExecSecStaff; ESCUStaff |
| **Subject:** | Notice of SB Action |
| **Date:** | Monday, April 7, 2025 3:13:38 PM |
| **Attachments:** | DHS-IRS Information Sharing MOU_APPROVED.pdf |

Good afternoon:

Secretary Bessent has approved the following action memo, "DHS-IRS Information Sharing MOU".

Please see the attached final PDF.

Thank you,
Exec Sec

<u>Exec Sec Resources</u>:
- Start a CT Case
- Document Templates (NEW)
- Paper Process Memo

Email:  ExecSecStaff@treasury.gov

**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C.

April 7, 2025

## ACTION MEMORANDUM

**TO:**          Secretary Bessent

**FROM:**        Tyler Badgley, Deputy General Counsel

**THROUGH:**     Chris Pilkerton, Acting General Counsel

**SUBJECT:**     **DHS-IRS Information Sharing MOU**

This memo requests your approval to sign an information sharing agreement between the Department of Homeland Security (DHS) and the Internal Revenue Service (IRS) concerning aliens under criminal investigation. The attached memorandum of understanding (MOU) lays out the process, types of requests, and handling of the requests by both DHS and IRS. A second MOU will be executed below the Secretary level concerning the operationalization and administration of these requests.

### DECISION DEADLINE

**Date:**        04/07/2025

**Rationale:**    In litigation challenging future information sharing between the IRS and DHS, there is a filing deadline today for Defendants, including Treasury. This signed memorandum will be a part of that filing.

### RECOMMENDATION

That you approve for signature the attached information sharing memorandum of understanding between the Department of Homeland Security and the Internal Revenue Service.

_____ Approve          _____ Disapprove          _____ Let's Discuss

### BACKGROUND

In support of the Administration's broader immigration enforcement efforts, DHS has requested that IRS enter into an information sharing arrangement via a memorandum of understanding (MOU). The purpose of the agreement is to aid in the identification and location of certain aliens under criminal investigation. Ordinarily the IRS is unable to provide taxpayer information or tax return information under Internal Revenue Code § 6103. One exception to § 6103 is to aid another agency in a criminal investigation § 6103(i)(2). In this case, the predominant criminal investigation provision relied upon is for aliens who have overstayed a final deportation order by 90 days and are therefore subject to criminal investigation under 8 U.S.C. § 1253(a)(1).

**Final Document**

Digitally signed by Final Document
Date: 2025.04.07
15:10:48 -04'00'

This MOU would allow Immigrations and Customs Enforcement (ICE) to send requests for address information for specifically identified individuals consistent with IRC § 6103(i)(2)(A). IRS will review each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2). For complete and valid requests, IRS will search for the last known address for each individual in each request and provide it where available or indicate no match if not. The MOU also lays out the process by which ICE will continue to comply with limitations on sharing taxpayer or tax return information.

The MOU does not lay out a set number of requests for information we expect to come from ICE, nor does it have a defined end date.

**ATTACHMENT**

1. Memorandum of Understanding between IRS and ICE

2

TD_0000018

**CLEARANCE SHEET**

| | | | |
|---|---|---|---|
| **Subject:** | **DHS-IRS Information Sharing MOU** | | |
| **Drafted by:** | GCFO | Tyler Badgley | PII |
| **Approved by:** | GCFO | Chris Pilkerton | 04/07/2025 |
| **Cleared by:** | Exec Sec | Rachel Miller | 04/07/2025 |
| | IRS | Andrew De Mello | 04/07/2025 |
| | COS | Hunter McMaster | 04/07/2025 |
| **FYI** | COS | Dan Katz | |

3

Department of the Treasury

Internal Revenue Service

**IRS**

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

# MEMORANDUM OF UNDERSTANDING

BETWEEN

THE U.S. DEPARTMENT OF THE TREASURY,
INTERNAL REVENUE SERVICE

AND

THE U.S. DEPARTMENT OF HOMELAND SECURITY,
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

FOR THE EXCHANGE OF INFORMATION FOR NONTAX
CRIMINAL ENFORCEMENT

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**MEMORANDUM OF UNDERSTANDING
BETWEEN
U.S. TREASURY DEPARTMENT on behalf of the INTERNAL REVENUE SERVICE
AND
U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the U.S.
IMMIGRATION AND CUSTOMS ENFORCEMENT,**

**FOR THE EXCHANGE OF INFORMATION FOR NONTAX CRIMINAL
ENFORCEMENT**

## 1. INTRODUCTION:

a. WHEREAS by Executive Order (EO) No. 14161, <u>Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats</u>, 90 Fed. Reg. 8451 (Jan. 20, 2025), the President directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to take immediate steps to identify, exclude, or remove aliens illegally present in the United States; and

b. WHEREAS the Department of Homeland Security has identified numerous aliens illegally present in the United States whom they have represented are under final orders to remove them from the United States; and

c. WHEREAS the Department of Homeland Security has represented that each of the above-referenced individuals is under criminal investigation for violations of one or more specifically designated Federal criminal statutes (not involving tax administration), including 8 U.S.C. § 1253(a)(1); and

d. WHEREAS the parties wish to enter into an agreement setting forth the procedures, processes, and safeguards to be followed upon the receipt of a request for the disclosure of information subject to the confidentiality requirements of Internal Revenue Code (IRC) § 6103;

e. NOW THEREFORE, this Memorandum of Understanding (MOU) between the U.S. Treasury Department / Internal Revenue Service (IRS), and the U.S. Department of Homeland Security / U.S. Immigration and Customs Enforcement (ICE), sets forth the agreement of the parties with respect to ICE's use of the authority in IRC § 6103(i)(2) for the submission of requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or another specifically designated Federal criminal statute.

## 2. AUTHORITY:

The IRS enters into this MOU pursuant to IRC § 7803(a)(2), delegating to the IRS the authority to administer the Internal Revenue Code, and IRC § 6103(i)(2), authorizing the disclosure of return information other than taxpayer return information for purposes of the enforcement of a specified

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

nontax Federal criminal statute. ICE enters into this MOU pursuant to 8 U.S.C. § 1253(a)(1), 8 U.S.C. § 1103, and 6 U.S.C. § 112(b)(2).

**3. PURPOSE:**

(U//LES) The purpose of this MOU is to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes. The specifications and details regarding the IRS's and ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

**4. CONTACTS:**

A. Contacts for this MOU are the IRS designee(s) and the ICE designee(s). Refer to Exhibit A.

B. Succession of Authority. The IRS and ICE anticipate there may be changes to the titles and\or responsibilities of officers and employees designated within this MOU. In the event of such changes, any actions that may be taken under this MOU by said officers or employees, may be taken by any officer(s) or employee(s) the IRS and ICE determine to have succeeded to the relevant portions of said officers' or employees' authorities or responsibilities. Each party shall be responsible for ensuring the points of contact are current by providing a revised Exhibit A to all parties within 30 days of any change.

**5. DUTIES AND RESPONSIBILITIES OF THE IRS:**

The IRS will:

A. Receive requests for address information from ICE.

B. Review each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2). The IRS will provide explanations and/or reasons the request cannot be processed.

C. (U//LES) Search for the last known address for each individual in each request.

D. (U//LES) For each individual the IRS is able to identify from the information provided by ICE, provide the IRS last known address for that individual. For each individual the IRS cannot identify from the information provided by ICE, indicate "no match" in the response.

E. Send responses to ICE in the manner set forth herein.

F. Account for disclosures made under this MOU as required pursuant to IRC § 6103(p)(3)(A).

2
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

TD_0000022

G. (U//LES) Specifications and details regarding the IRS's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

## 6. DUTIES AND RESPONSIBILITIES OF ICE:

ICE will:

A. (U//LES) Send requests for address information for specifically identified individuals pursuant to the specifications contained in a separate implementation agreement between ICE and IRS.

B. Each request must be made consistent with IRC § 6103(i)(2)(A).

C. (U//LES) Each request will contain the following information with respect to each individual identified in the request:

1. (U//LES) The name and address of the taxpayer.
2. (U//LES) The taxable period or periods as to which the return information (address) they are seeking relates.
3. (U//LES) The specifically designated nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding regarding the individual is being conducted.
4. (U//LES) The date of the final order of removal and the related case number assigned to each such order.
5. (U//LES) The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding. Any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.
6. (U//LES) Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified.

D. (U//LES) Each request will attest that the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings.

E. ICE will use and redisclose the address information only as specifically authorized by IRC § 6103(i)(2) as implemented in 26 C.F.R § 301.6103(i)-1. Specifically, the regulations provide:
1. (U//LES) Return information disclosed under IRC § 6103(i)(2) shall be open to inspection by or disclosure to ICE officers and employees personally and directly engaged in, and for their necessary use in, proceedings and investigations that may result in such proceedings, pertaining to the enforcement of a specifically designated nontax Federal criminal statute.

2. (U//LES) Return information disclosed under IRC § 6103(i)(2) may be disclosed by such

3

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

ICE officers and employees to other persons only to the extent necessary to the enforcement of the specifically designated nontax Federal criminal statute, including:

    a. (U//LES) To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);

    b. (U//LES) To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or

    c. (U//LES) To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

3. (U//LES) Among those persons to whom returns and return information may be disclosed by officers and employees of ICE on a need-to-know basis as provided are:

    a. (U//LES) Other ICE officers and employees such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel;

    b. (U//LES) Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such ICE officers and employees; and

    c. (U//LES) Court reporters.

F. (U//LES) ICE will ensure the proper handling, transmission, safeguarding, and security of the address information as contained in Sections 8 and 9 of this MOU.

G. Specifications and details regarding ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

4

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**7. DESCRIPTION OF THE RECORDS:**

A.  Systems of Records Notices

    1.  The IRS will
        a.  (U//LES) disclose address information from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

    2.  ICE will
        a.  (U//LES) disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Address Information; Date of Birth; Country of Citizenship; FBI Numbers; and Fingerprint Identification Number (FINS), from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE; and

        b.  (U//LES) maintain the address information provided by the IRS in the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

**8. INFORMATION SECURITY:**

The IRS and ICE will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, Subchapter II, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283); related Office of Management and Budget (OMB) circulars and memoranda, such as Circular A-130, Managing Information as a Strategic Resource (July 28, 2016), and Memorandum M-17-12, Preparing for and Responding to a Breach of Personally Identifiable Information (PII) (Jan. 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including amendments published after the effective date of this MOU. These laws, directives, and regulations include requirements for safeguarding Federal information systems and Personally Identifiable Information used in Federal agency business processes, as well as related reporting requirements. Both agencies recognize, and will implement, the laws, regulations, NIST standards, and OMB directives, including those published subsequent to the effective date of this MOU.

The FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Both agencies are responsible for oversight and compliance of their contractors and agents.

<div align="center">

5
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

</div>

A. Incident Reporting

If the IRS or ICE experiences an incident involving the loss or breach of PII provided by IRS under the terms of this MOU, they will follow the incident reporting guidelines issued by OMB. In the event of a reportable incident under OMB guidance involving PII, the agency experiencing the incident is responsible for following its established procedures, including notification to proper organizations (i.e., Cybersecurity & Infrastructure Security Agency (CISA) and the agency's privacy office). Immediately upon discovery of a potential cybersecurity incident involving IRS-provided PII, ICE will contact the IRS Computer Security Incident Response Center (CSIRC) at 240-613-3606.

B. Breach Notification

The IRS and ICE will follow PII data breach notification policies and related procedures as required by OMB Memorandum M-17-12 (Jan. 3, 2017). If the agency that experienced the data breach, after conducting a risk assessment, determines notification to the potentially impacted individuals and an offer of an identity protection/identity monitoring service, and/or other remedies is required, that agency will carry out the remedies without cost to the other agency.

## 9. DISCLOSURE, SAFEGUARDS, AND RECORD KEEPING REQUIREMENTS:

A. ICE will maintain all Federal tax returns and return information sourced from the IRS in accordance with IRC § 6103(p)(4) and comply with the safeguards requirements set forth in Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies*. Publication 1075 is the IRS-published guidance for security guidelines and other safeguards for protecting returns and return information, pursuant to 26 C.F.R. § 301.6103(p)(4).

The IRS safeguarding requirements include:

1. ICE will establish a central point of control for all requests for and receipt of Federal tax returns and return information and maintain a log to account for all subsequent disclosures and products made with/from that information, and movement of the information until destroyed, in accordance with Publication 1075.

2. ICE will establish procedures for secure storage of Federal tax returns and return information consistently maintaining two barriers of protection to prevent unauthorized access to the information, including when in transit, in accordance with Publication 1075.

3. ICE will consistently label Federal tax returns and return information obtained under this MOU to make it clearly identifiable and to restrict access by unauthorized individuals. Any duplication or transcription of Federal tax returns and return information creates new records which must also be properly accounted for and safeguarded. Federal tax returns and return information should not be commingled with other ICE records unless the entire file is safeguarded in the same manner as required for Federal tax returns and return

6
## UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

information and the Federal tax information (FTI) within is clearly labeled in accordance with Publication 1075.

4. ICE will restrict access to Federal tax returns and return information solely to officers and employees of ICE as described in this MOU for the purposes of carrying out this MOU. Prior to access ICE must evaluate which employees require such access. Authorized individuals may only access Federal tax returns and return information to the extent necessary to perform services related to, and as authorized by, this MOU, in accordance with Publication 1075.

5. Prior to initial access to FTI and annually thereafter, ICE will ensure that employees and officers that will have access to Federal tax returns and return information receive awareness training regarding the confidentiality restrictions applicable to the Federal tax returns and return information and certify acknowledgement in writing that they are informed of the criminal penalties and civil liability provided by IRC §§ 7213, 7213A, and 7431 for any willful disclosure or inspection of Federal tax returns and return information that is not authorized by the IRC, in accordance with Publication 1075.

6. ICE will submit an annual Safeguard Security Report (SSR) to the Office of Safeguards by the submission deadline specified in Publication 1075 to provide an update on safeguarding activities during the reporting period.  The SSR will also provide Head of Agency certification that the SSR addresses all Outstanding Actions identified by the IRS Office of Safeguards from the agency's prior year SSR; accurately and completely reflects ICE's current environment for the receipt, storage, processing, and transmission of FTI; accurately reflects the security controls in place to protect the FTI in accordance with Publication 1075 and of ICE's commitment to assist the Office of Safeguards in the joint effort of protecting the confidentiality of FTI; support the Office of Safeguards on-site review to assess ICE's compliance with Publication 1075 requirements by means of manual and automated compliance and vulnerability assessment testing, including coordination with information technology (IT) divisions to secure pre-approval, if needed, for automated system scanning and to support timely mitigation of identified risk to FTI in ICE's Corrective Action Plan (CAP) for as long as ICE maintains Federal tax returns and return information.  Required reports will be transmitted in electronic format and on the template provided by IRS Office of Safeguards using an IRS-approved encryption method in accordance with Publication 1075.

7. ICE will timely report all data incidents involving FTI to the Office of Safeguards and cooperate with Office of Safeguards investigators, providing data and access as needed to determine the facts and circumstances of the incident.

8. When a data incident results in ICE taking adverse or disciplinary action against an employee based on an unauthorized inspection or disclosure of FTI in violation of ICE's procedures ICE must notify each impacted taxpayer in writing. The notification letter must include the date of the unauthorized inspection or disclosure and the rights of the taxpayer

7
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

TD_0000027

under IRC § 7431. ICE must report to IRS Safeguards when taxpayer notification letters are issued, in accordance with Publication 1075.

9. ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with Publication 1075.

10. ICE will conduct periodic internal inspections of facilities where Federal tax returns and return information is maintained to ensure IRS safeguarding requirements are met and will permit the IRS access to such facilities as needed to review the extent to which ICE is complying with the IRC § 6103(p)(4) requirements of this section.

11. IRC § 6103(p)(9) requires ICE to conduct on-site assessments of each contractor's compliance with safeguarding requirements. ICE must submit findings of the most recent review as part of the annual SSR submission. ICE must certify to the IRS that each contractor is in compliance with safeguarding standards in accordance with Pub 1075. ICE must ensure that contracts with contractors and subcontractors performing work involving returns or return information contain specific language requiring compliance with IRC § 6103(p)(4) and Publication 1075 standards. Contract language must enforce ICE's right to access contractor and subcontractor facilities in order to comply with IRC § 6103(p)(9) to ensure IRS safeguarding requirements are met.

12. Usage of FTI for Artificial Intelligence (AI) purposes must be disclosed to the Office of Safeguards for assessment of compliance with safeguard requirements.

B. Generally, this MOU covers secure electronic transmission of Federal tax returns and return information to ICE, provided ICE computer systems are compliant with National Institute of Standards and Technology (NIST) Special Publication 800-53 standards and guidance for security of data at the moderate impact level. ICE's SSR must fully describe the computer system and security controls implemented for the receipt, processing, storage, and transmission of electronic Federal tax returns and return information. Required security controls for systems that receive, process, store, and transmit electronic Federal tax returns and return information are specified in Publication 1075.

C. Any creation or receipt of Federal tax returns and return information in paper format must also be fully disclosed in ICE's SSR. Required security controls associated with the receipt, processing, and storage of any Federal tax returns and return information received in paper format are specified in Publication 1075.

D. ICE must report suspected unauthorized inspection or disclosure of Federal tax returns and return information within 24 hours of discovery to the IRS Office of Safeguards in accordance with Publication 1075.

E. IRS will conduct periodic safeguard reviews of ICE to assess whether security and confidentiality of Federal tax returns and return information is maintained consistent with the

8
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

safeguarding protocols described in Publication 1075, ICE's SSR, and in accordance with the terms of this MOU. Periodic safeguard reviews will involve the inspection of ICE's facilities where FTI is maintained; the testing of technical controls for computer systems storing, processing, or transmitting FTI; review of ICE's recordkeeping and policies; and interviews of ICE's employees to verify the use of FTI and to assess the adequacy of procedures established to protect FTI.

F.  ICE recognizes and will reflect in its actions and procedures that all Safeguards documents and related communications are IRS official records; that they are property of the IRS; that IRS records are subject to disclosure restrictions under Federal law and IRS rules and regulations and may not be released publicly under state Sunshine or Information Sharing/Open Records provisions and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. If ICE determines that it is appropriate to share Safeguards documents and related communications with another governmental function/branch for the purposes of operational accountability or to further facilitate protection of FTI, the recipient governmental function/branch must be made aware, in unambiguous terms, that Safeguards documents and related communications are property of the IRS; that they constitute IRS official records; that any request for the release of IRS records is subject to disclosure restrictions under Federal law and IRS rules and regulations and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. Federal agencies in receipt of FOIA requests for Safeguards documents must forward them to IRS for reply.

G.  All information received from ICE under this MOU becomes return information as defined in IRC § 6103(b)(2) and will not be further disclosed or disseminated except as authorized by IRC § 6103.

**10. TRANSMITTAL PROCEDURES:**

Transmittal procedures and transmittal security requirements will be included in a separate implementation agreement entered into between IRS and ICE.

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

TD_0000029

**11. LIABILITY:**

A.  Each party to this MOU shall be liable for the acts and omissions of its own employees.

B.  The IRS shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under the Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority. Similarly, ICE shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under applicable Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority.

C.  This MOU is not an obligation or commitment of funds, nor a basis for transfer of funds, but rather is a basic statement of the understanding between the parties. Unless otherwise agreed in writing, each party shall bear its own costs in relation to this MOU. Expenditures by each party will be subject to its budgetary processes and to the availability of funds and resources pursuant to applicable laws, regulations, and policies.

**12. THIRD PARTY RIGHTS:**

This MOU does not confer any rights or benefits on any third party.

**13. PRIVACY:**

The IRS and ICE will ensure the integrity and accuracy of personal and financial data. The IRS and ICE will perform their duties in a manner that recognizes and enhances individuals' right of privacy and will ensure their activities are consistent with laws, regulations, and good administrative practices.

**14. EFFECTIVE DATE:**

The effective date of this MOU is the date it has been signed by all parties to the Agreement.  The information exchange contained in this agreement will not commence until a separate implementation agreement between the IRS and ICE has been signed and implemented.

10
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

TD_0000030

## 15.  AMENDMENT OF MOU:

This MOU may be amended by deletion or modification of any provisions, provided that such amendment is in writing and is signed by all parties to the MOU.

## 16. TERMINATION OF MOU:

(U//LES) This MOU will remain in effect as necessary for the IRS to provide address information in response to ICE requests satisfying the requirements contained in this MOU.  This MOU may be terminated upon ninety  (90) days written notice by either the IRS or ICE, which shall describe the rationale for the termination and be publicly posted on the respective party's website 90 days prior to termination.

## 17. LIMITATIONS:

Any provision of this MOU which conflicts with Federal law will be null and void. The provisions of paragraph 11, *Liability*, will continue until all potential liabilities have lapsed.

11

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**APPROVALS**:

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

_____

Secretary Scott Bessent

Date: April 07, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

_____

Secretary Kristi Noem

Date: April ___, 2025

12

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**EXHIBIT A – POINTS OF CONTACT**

**INTERNAL REVENUE SERVICE:**

> Name:
> Title:
> Phone:
> Email:

> Name:
> Title:
> Phone:
> Email:

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT:**

> Name:
> Title:
> Phone:
> Email:

> Name:
> Title:
> Phone:
> Email:

13

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

Department of the Treasury
IRS
Internal Revenue Service

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

# MEMORANDUM OF UNDERSTANDING

BETWEEN

## THE U.S. DEPARTMENT OF THE TREASURY, INTERNAL REVENUE SERVICE

AND

## THE U.S. DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

FOR THE EXCHANGE OF INFORMATION FOR NONTAX CRIMINAL ENFORCEMENT

UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE

A371

TD_0000034

## MEMORANDUM OF UNDERSTANDING
### BETWEEN
### U.S. TREASURY DEPARTMENT on behalf of the INTERNAL REVENUE SERVICE
### AND
### U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT,

### FOR THE EXCHANGE OF INFORMATION FOR NONTAX CRIMINAL ENFORCEMENT

1. **INTRODUCTION:**

   a. WHEREAS by Executive Order (EO) No. 14161, <u>Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats</u>, 90 Fed. Reg. 8451 (Jan. 20, 2025), the President directed the Secretary of State, in coordination with the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to take immediate steps to identify, exclude, or remove aliens illegally present in the United States; and

   b. WHEREAS the Department of Homeland Security has identified numerous aliens illegally present in the United States whom they have represented are under final orders to remove them from the United States; and

   c. WHEREAS the Department of Homeland Security has represented that each of the above-referenced individuals is under criminal investigation for violations of one or more specifically designated Federal criminal statutes (not involving tax administration), including 8 U.S.C. § 1253(a)(1); and

   d. WHEREAS the parties wish to enter into an agreement setting forth the procedures, processes, and safeguards to be followed upon the receipt of a request for the disclosure of information subject to the confidentiality requirements of Internal Revenue Code (IRC) § 6103;

   e. NOW THEREFORE, this Memorandum of Understanding (MOU) between the U.S. Treasury Department / Internal Revenue Service (IRS), and the U.S. Department of Homeland Security / U.S. Immigration and Customs Enforcement (ICE), sets forth the agreement of the parties with respect to ICE's use of the authority in IRC § 6103(i)(2) for the submission of requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or another specifically designated Federal criminal statute.

2. **AUTHORITY:**

The IRS enters into this MOU pursuant to IRC § 7803(a)(2), delegating to the IRS the authority to administer the Internal Revenue Code, and IRC § 6103(i)(2), authorizing the disclosure of return information other than taxpayer return information for purposes of the enforcement of a specified

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

TD_0000035

nontax Federal criminal statute.  ICE enters into this MOU pursuant to 8 U.S.C. § 1253(a)(1), 8 U.S.C. § 1103, and 6 U.S.C. § 112(b)(2).

## 3.  PURPOSE:

(U//LES) The purpose of this MOU is to establish the procedures and requirements for ICE's submission of valid IRC § 6103(i)(2) requests for addresses of persons subject to criminal investigation under 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statutes.  The specifications and details regarding the IRS's and ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

## 4.  CONTACTS:

A.  Contacts for this MOU are the IRS designee(s) and the ICE designee(s). Refer to Exhibit A.

B.  Succession of Authority.  The IRS and ICE anticipate there may be changes to the titles and\or responsibilities of officers and employees designated within this MOU. In the event of such changes, any actions that may be taken under this MOU by said officers or employees, may be taken by any officer(s) or employee(s) the IRS and ICE determine to have succeeded to the relevant portions of said officers' or employees' authorities or responsibilities.  Each party shall be responsible for ensuring the points of contact are current by providing a revised Exhibit A to all parties within 30 days of any change.

## 5.  DUTIES AND RESPONSIBILITIES OF THE IRS:

The IRS will:

A.  Receive requests for address information from ICE.

B.  Review each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2). The IRS will provide explanations and/or reasons the request cannot be processed.

C.  (U//LES) Search for the last known address for each individual in each request.

D.  (U//LES) For each individual the IRS is able to identify from the information provided by ICE, provide the IRS last known address for that individual.  For each individual the IRS cannot identify from the information provided by ICE, indicate "no match" in the response.

E.  Send responses to ICE in the manner set forth herein.

F.  Account for disclosures made under this MOU as required pursuant to IRC § 6103(p)(3)(A).

2
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

TD_0000036

G. (U//LES) Specifications and details regarding the IRS's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

## 6. DUTIES AND RESPONSIBILITIES OF ICE:

ICE will:

A. (U//LES) Send requests for address information for specifically identified individuals pursuant to the specifications contained in a separate implementation agreement between ICE and IRS.

B. Each request must be made consistent with IRC § 6103(i)(2)(A).

C. (U//LES) Each request will contain the following information with respect to each individual identified in the request:

   1. (U//LES) The name and address of the taxpayer.
   2. (U//LES) The taxable period or periods as to which the return information (address) they are seeking relates.
   3. (U//LES) The specifically designated nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding regarding the individual is being conducted.
   4. (U//LES) The date of the final order of removal and the related case number assigned to each such order.
   5. (U//LES) The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding. Any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.
   6. (U//LES) Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified.

D. (U//LES) Each request will attest that the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings.

E. ICE will use and redisclose the address information only as specifically authorized by IRC § 6103(i)(2) as implemented in 26 C.F.R § 301.6103(i)-1. Specifically, the regulations provide:
   1. (U//LES) Return information disclosed under IRC § 6103(i)(2) shall be open to inspection by or disclosure to ICE officers and employees personally and directly engaged in, and for their necessary use in, proceedings and investigations that may result in such proceedings, pertaining to the enforcement of a specifically designated nontax Federal criminal statute.

   2. (U//LES) Return information disclosed under IRC § 6103(i)(2) may be disclosed by such

3

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

ICE officers and employees to other persons only to the extent necessary to the enforcement of the specifically designated nontax Federal criminal statute, including:

    a. (U//LES) To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);

    b. (U//LES) To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or

    c. (U//LES) To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

3. (U//LES) Among those persons to whom returns and return information may be disclosed by officers and employees of ICE on a need-to-know basis as provided are:

    a. (U//LES) Other ICE officers and employees such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel;

    b. (U//LES) Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such ICE officers and employees; and

    c. (U//LES) Court reporters.

F. (U//LES) ICE will ensure the proper handling, transmission, safeguarding, and security of the address information as contained in Sections 8 and 9 of this MOU.

G. Specifications and details regarding ICE's procedural obligations and requirements concerning the information exchange will be included in a separate implementation agreement entered into between IRS and ICE.

4

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**7.  DESCRIPTION OF THE RECORDS:**

A.  Systems of Records Notices

    1.  The IRS will
        a.  (U//LES) disclose address information from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

    2.  ICE will
        a.  (U//LES) disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Address Information; Date of Birth; Country of Citizenship; FBI Numbers; and Fingerprint Identification Number (FINS), from the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE; and

        b.  (U//LES) maintain the address information provided by the IRS in the System(s) of Records described in a separate implementation agreement entered into between the IRS and ICE.

**8.  INFORMATION SECURITY:**

The IRS and ICE will comply with the requirements of the Federal Information Security Management Act (FISMA), 44 U.S.C. Chapter 35, Subchapter II, as amended by the Federal Information Security Modernization Act of 2014 (Pub. L. No. 113-283); related Office of Management and Budget (OMB) circulars and memoranda, such as Circular A-130, Managing Information as a Strategic Resource (July 28, 2016), and Memorandum M-17-12, Preparing for and Responding to a Breach of Personally Identifiable Information (PII) (Jan. 3, 2017); National Institute of Standards and Technology (NIST) directives; and the Federal Acquisition Regulations, including amendments published after the effective date of this MOU. These laws, directives, and regulations include requirements for safeguarding Federal information systems and Personally Identifiable Information used in Federal agency business processes, as well as related reporting requirements. Both agencies recognize, and will implement, the laws, regulations, NIST standards, and OMB directives, including those published subsequent to the effective date of this MOU.

The FISMA requirements apply to all Federal contractors, organizations, or entities that possess or use Federal information, or that operate, use, or have access to Federal information systems on behalf of an agency. Both agencies are responsible for oversight and compliance of their contractors and agents.

5
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

A. Incident Reporting

If the IRS or ICE experiences an incident involving the loss or breach of PII provided by IRS under the terms of this MOU, they will follow the incident reporting guidelines issued by OMB. In the event of a reportable incident under OMB guidance involving PII, the agency experiencing the incident is responsible for following its established procedures, including notification to proper organizations (i.e., Cybersecurity & Infrastructure Security Agency (CISA) and the agency's privacy office). Immediately upon discovery of a potential cybersecurity incident involving IRS-provided PII, ICE will contact the IRS Computer Security Incident Response Center (CSIRC) at 240-613-3606.

B. Breach Notification

The IRS and ICE will follow PII data breach notification policies and related procedures as required by OMB Memorandum M-17-12 (Jan. 3, 2017). If the agency that experienced the data breach, after conducting a risk assessment, determines notification to the potentially impacted individuals and an offer of an identity protection/identity monitoring service, and/or other remedies is required, that agency will carry out the remedies without cost to the other agency.

9. **DISCLOSURE, SAFEGUARDS, AND RECORD KEEPING REQUIREMENTS:**

A. ICE will maintain all Federal tax returns and return information sourced from the IRS in accordance with IRC § 6103(p)(4) and comply with the safeguards requirements set forth in Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies*. Publication 1075 is the IRS-published guidance for security guidelines and other safeguards for protecting returns and return information, pursuant to 26 C.F.R. § 301.6103(p)(4).

The IRS safeguarding requirements include:

1. ICE will establish a central point of control for all requests for and receipt of Federal tax returns and return information and maintain a log to account for all subsequent disclosures and products made with/from that information, and movement of the information until destroyed, in accordance with Publication 1075.

2. ICE will establish procedures for secure storage of Federal tax returns and return information consistently maintaining two barriers of protection to prevent unauthorized access to the information, including when in transit, in accordance with Publication 1075.

3. ICE will consistently label Federal tax returns and return information obtained under this MOU to make it clearly identifiable and to restrict access by unauthorized individuals. Any duplication or transcription of Federal tax returns and return information creates new records which must also be properly accounted for and safeguarded. Federal tax returns and return information should not be commingled with other ICE records unless the entire file is safeguarded in the same manner as required for Federal tax returns and return

6
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

information and the Federal tax information (FTI) within is clearly labeled in accordance with Publication 1075.

4. ICE will restrict access to Federal tax returns and return information solely to officers and employees of ICE as described in this MOU for the purposes of carrying out this MOU. Prior to access ICE must evaluate which employees require such access. Authorized individuals may only access Federal tax returns and return information to the extent necessary to perform services related to, and as authorized by, this MOU, in accordance with Publication 1075.

5. Prior to initial access to FTI and annually thereafter, ICE will ensure that employees and officers that will have access to Federal tax returns and return information receive awareness training regarding the confidentiality restrictions applicable to the Federal tax returns and return information and certify acknowledgement in writing that they are informed of the criminal penalties and civil liability provided by IRC §§ 7213, 7213A, and 7431 for any willful disclosure or inspection of Federal tax returns and return information that is not authorized by the IRC, in accordance with Publication 1075.

6. ICE will submit an annual Safeguard Security Report (SSR) to the Office of Safeguards by the submission deadline specified in Publication 1075 to provide an update on safeguarding activities during the reporting period. The SSR will also provide Head of Agency certification that the SSR addresses all Outstanding Actions identified by the IRS Office of Safeguards from the agency's prior year SSR; accurately and completely reflects ICE's current environment for the receipt, storage, processing, and transmission of FTI; accurately reflects the security controls in place to protect the FTI in accordance with Publication 1075 and of ICE's commitment to assist the Office of Safeguards in the joint effort of protecting the confidentiality of FTI; support the Office of Safeguards on-site review to assess ICE's compliance with Publication 1075 requirements by means of manual and automated compliance and vulnerability assessment testing, including coordination with information technology (IT) divisions to secure pre-approval, if needed, for automated system scanning and to support timely mitigation of identified risk to FTI in ICE's Corrective Action Plan (CAP) for as long as ICE maintains Federal tax returns and return information. Required reports will be transmitted in electronic format and on the template provided by IRS Office of Safeguards using an IRS-approved encryption method in accordance with Publication 1075.

7. ICE will timely report all data incidents involving FTI to the Office of Safeguards and cooperate with Office of Safeguards investigators, providing data and access as needed to determine the facts and circumstances of the incident.

8. When a data incident results in ICE taking adverse or disciplinary action against an employee based on an unauthorized inspection or disclosure of FTI in violation of ICE's procedures ICE must notify each impacted taxpayer in writing. The notification letter must include the date of the unauthorized inspection or disclosure and the rights of the taxpayer

7
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

under IRC § 7431. ICE must report to IRS Safeguards when taxpayer notification letters are issued, in accordance with Publication 1075.

9.  ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with Publication 1075.

10. ICE will conduct periodic internal inspections of facilities where Federal tax returns and return information is maintained to ensure IRS safeguarding requirements are met and will permit the IRS access to such facilities as needed to review the extent to which ICE is complying with the IRC § 6103(p)(4) requirements of this section.

11. IRC § 6103(p)(9) requires ICE to conduct on-site assessments of each contractor's compliance with safeguarding requirements. ICE must submit findings of the most recent review as part of the annual SSR submission. ICE must certify to the IRS that each contractor is in compliance with safeguarding standards in accordance with Pub 1075. ICE must ensure that contracts with contractors and subcontractors performing work involving returns or return information contain specific language requiring compliance with IRC § 6103(p)(4) and Publication 1075 standards. Contract language must enforce ICE's right to access contractor and subcontractor facilities in order to comply with IRC § 6103(p)(9) to ensure IRS safeguarding requirements are met.

12. Usage of FTI for Artificial Intelligence (AI) purposes must be disclosed to the Office of Safeguards for assessment of compliance with safeguard requirements.

B.  Generally, this MOU covers secure electronic transmission of Federal tax returns and return information to ICE, provided ICE computer systems are compliant with National Institute of Standards and Technology (NIST) Special Publication 800-53 standards and guidance for security of data at the moderate impact level. ICE's SSR must fully describe the computer system and security controls implemented for the receipt, processing, storage, and transmission of electronic Federal tax returns and return information. Required security controls for systems that receive, process, store, and transmit electronic Federal tax returns and return information are specified in Publication 1075.

C.  Any creation or receipt of Federal tax returns and return information in paper format must also be fully disclosed in ICE's SSR. Required security controls associated with the receipt, processing, and storage of any Federal tax returns and return information received in paper format are specified in Publication 1075.

D.  ICE must report suspected unauthorized inspection or disclosure of Federal tax returns and return information within 24 hours of discovery to the IRS Office of Safeguards in accordance with Publication 1075.

E.  IRS will conduct periodic safeguard reviews of ICE to assess whether security and confidentiality of Federal tax returns and return information is maintained consistent with the

8

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

safeguarding protocols described in Publication 1075, ICE's SSR, and in accordance with the terms of this MOU. Periodic safeguard reviews will involve the inspection of ICE's facilities where FTI is maintained; the testing of technical controls for computer systems storing, processing, or transmitting FTI; review of ICE's recordkeeping and policies; and interviews of ICE's employees to verify the use of FTI and to assess the adequacy of procedures established to protect FTI.

F.  ICE recognizes and will reflect in its actions and procedures that all Safeguards documents and related communications are IRS official records; that they are property of the IRS; that IRS records are subject to disclosure restrictions under Federal law and IRS rules and regulations and may not be released publicly under state Sunshine or Information Sharing/Open Records provisions and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. If ICE determines that it is appropriate to share Safeguards documents and related communications with another governmental function/branch for the purposes of operational accountability or to further facilitate protection of FTI, the recipient governmental function/branch must be made aware, in unambiguous terms, that Safeguards documents and related communications are property of the IRS; that they constitute IRS official records; that any request for the release of IRS records is subject to disclosure restrictions under Federal law and IRS rules and regulations and that any requestor seeking access to IRS records should be referred to the Federal Freedom of Information Act (FOIA) statute. Federal agencies in receipt of FOIA requests for Safeguards documents must forward them to IRS for reply.

G.  All information received from ICE under this MOU becomes return information as defined in IRC § 6103(b)(2) and will not be further disclosed or disseminated except as authorized by IRC § 6103.

## 10.  TRANSMITTAL PROCEDURES:

Transmittal procedures and transmittal security requirements will be included in a separate implementation agreement entered into between IRS and ICE.

9
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

TD_0000043

**11. LIABILITY:**

A. Each party to this MOU shall be liable for the acts and omissions of its own employees.

B. The IRS shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under the Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority. Similarly, ICE shall not be liable for any injury to another party's personnel or damage to another party's property unless such injury or damage is compensable under applicable Federal Tort Claims Act (28 U.S.C. § 1346(b)), or pursuant to other Federal statutory authority.

C. This MOU is not an obligation or commitment of funds, nor a basis for transfer of funds, but rather is a basic statement of the understanding between the parties. Unless otherwise agreed in writing, each party shall bear its own costs in relation to this MOU. Expenditures by each party will be subject to its budgetary processes and to the availability of funds and resources pursuant to applicable laws, regulations, and policies.

**12. THIRD PARTY RIGHTS:**

This MOU does not confer any rights or benefits on any third party.

**13. PRIVACY:**

The IRS and ICE will ensure the integrity and accuracy of personal and financial data. The IRS and ICE will perform their duties in a manner that recognizes and enhances individuals' right of privacy and will ensure their activities are consistent with laws, regulations, and good administrative practices.

**14. EFFECTIVE DATE:**

The effective date of this MOU is the date it has been signed by all parties to the Agreement. The information exchange contained in this agreement will not commence until a separate implementation agreement between the IRS and ICE has been signed and implemented.

10
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

## 15.  AMENDMENT OF MOU:

This MOU may be amended by deletion or modification of any provisions, provided that such amendment is in writing and is signed by all parties to the MOU.

## 16. TERMINATION OF MOU:

(U//LES) This MOU will remain in effect as necessary for the IRS to provide address information in response to ICE requests satisfying the requirements contained in this MOU.  This MOU may be terminated upon ninety  (90) days written notice by either the IRS or ICE, which shall describe the rationale for the termination and be publicly posted on the respective party's website 90 days prior to termination.

## 17. LIMITATIONS:

Any provision of this MOU which conflicts with Federal law will be null and void. The provisions of paragraph 11, *Liability*, will continue until all potential liabilities have lapsed.

11
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**APPROVALS**:

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

Secretary Scott Bessent

Date: April 07, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

Secretary Kristi Noem

Date: April ___, 2025

12
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**APPROVALS**:

U.S. DEPARTMENT OF TREASURY on behalf of the
INTERNAL REVENUE SERVICE

_____

Secretary Scott Bessent

Date: April ___, 2025

U.S. DEPARTMENT OF HOMELAND SECURITY on behalf of the
U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT

_____

Secretary Kristi Noem

Date: April 7, 2025

12

**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**

**EXHIBIT A – POINTS OF CONTACT**

**INTERNAL REVENUE SERVICE:**

Name:  ████████████
Title:      ████████████████
Phone:   ████████████
Email:    ███████████████

Name:  ████████████████
Title:      ██████████████████
Phone:   ██████████
Email:    █████████████

**U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT:**

Name:
Title:
Phone:
Email:

Name:
Title:
Phone:
Email:

13
**UNCLASSIFIED//LAW ENFORCEMENT SENSITIVE**