**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 26-5006**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

CENTER FOR TAXPAYER RIGHTS, et al.,

Plaintiffs-Appellees,

v.

INTERNAL REVENUE SERVICE, et al.,

Defendants-Appellants.

---

On Appeal from the United States District Court
for the District of Columbia

---

**APPENDIX**
**Vol. 2, pp. 386–770**

---

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. McARTHUR
  *Deputy Assistant Attorney General*

AUGUST FLENTJE
JACOB CHRISTENSEN
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7525*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-5048*
  *Attorneys for Appellants*

# TABLE OF CONTENTS

## VOLUME 1

Docket Seet ......................................................................................... A1

Amended Complaint (Dkt. 20) ........................................................... A19

Plaintiffs' Motion for Stay under 5 U.S.C. § 705 or, in the
　　Alternative, for Preliminary Injunction (with exhibits)
　　(Dkt. 30) ..................................................................................... A77

Defendants' Opposition (with exhibits) (Dkt. 31) ............................ A217

Plaintiffs' Reply (with exhibits) (Dkt. 34)........................................ A277

Plaintiffs' Response to Court Order (Dkt. 39) .................................. A311

Defendants' Response to Court Order (Dkt. 40) ............................... A322

Defendants' Notice of Submission of Administrative Record
　　(Dkt. 48) ..................................................................................... A331

Certification of Administrative Record (Dkt. 48-1)........................... A333

Administrative Record Index (Dkt. 48-2) .......................................... A335

Administrative Record (Dkt. 48-3)..................................................... A338

## VOLUME 2

Administrative Record (continued) (Dkt. 48-3 through 48-9) ........... A386

## VOLUME 3

Administrative Record (continued) (Dkt. 48-9 through 48-11) ......... A771

## VOLUME 4

Administrative Record (continued) (Dkt. 48-11 through 48-13) ..... A1156

# VOLUME 5

Administrative Record (continued) (Dkt. 48-13 through 48-15) ..... A1541

Plaintiffs' Notice Regarding Objections to Defendant's Designation
    of the Administrative Record (Dkt. 49) ................................... A1794

Plaintiffs' Motion for Leave to File Supplement (Dkt. 50) .............. A1802

Defendants' Response to Plaintiffs' Notice (Dkt. 51) ....................... A1811

Defendants' Opposition to Plaintiffs' Motion for Leave (Dkt. 52)... A1819

Order (Dkt. 53)................................................................................. A1827

Memorandum Opinion (Dkt. 54).................................................... A1831

Plaintiffs' Supplement (Dkt. 54) .................................................... A1925

Notice of Appeal (Dkt. 59) .............................................................. A1931

Corrected Notice of Appeal (Dkt. 61)............................................. A1932

**From:** Walters Kathleen E [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=D8BEE781F465493581F4BB950107AD94 [PII]]
**Sent:** 4/3/2025 1:29:30 PM
**To:** [PII]@irs.gov]
**Subject:** RE: Counsel contacts

Yes, it is a technical meeting to work out the details of implementation so that we can finalize the implementation agreement – so they need their technical folks and we'll have ours (RAAS, IT, us).

**From:** [PII]@irs.gov>
**Sent:** Thursday, April 3, 2025 9:28 AM
**To:** Walters Kathleen E <Kathleen.E.Walters@irs.gov>
**Subject:** RE: Counsel contacts

They just asked if this is a technical meeting and if they should invite their technical staffers....what do you think?

**From:** Walters Kathleen E <Kathleen.E.Walters@irs.gov>
**Sent:** Thursday, April 3, 2025 8:27 AM
**To:** [PII]@irs.gov>
**Subject:** RE: Counsel contacts

Just put it on the calendar. This is a priority of both of our Secretaries, so unless they have something more pressing, they'll make it work.

Thanks!

**From:** [PII]@irs.gov>
**Sent:** Thursday, April 3, 2025 9:16 AM
**To:** Walters Kathleen E <Kathleen.E.Walters@irs.gov>
**Subject:** RE: Counsel contacts

On it, thanks! I emailed them asking if 1pm EST worked for them...

**From:** Walters Kathleen E <Kathleen.E.Walters@irs.gov>
**Sent:** Thursday, April 3, 2025 8:02 AM
**To:** [PII]@irs.gov>
**Subject:** FW: Counsel contacts

Here are the two individuals to be included for the meeting. Subject: Implementation MOU Discussion

Thank you!

**From:** [PII]@IRSCOUNSEL.TREAS.GOV>
**Sent:** Wednesday, April 2, 2025 8:37 PM
**To:** Walters Kathleen E <Kathleen.E.Walters@irs.gov>
**Cc:** Loiacono, Adam V [PII]@ice.dhs.gov>; [PII]@hsi.dhs.gov>; [PII] [PII]@IRSCOUNSEL.TREAS.GOV>
**Subject:** RE: Counsel contacts

Hi Kathleen,

I'm looping in my contacts at DHS, Kathleen. Their names of Adam Loiacono and [ PII ] and they are cc'd to this email.

Adam/[ PII ] – I've looped in my colleague Ms. Kathleen Walters at the IRS – she is our Chief Privacy Officer and will coordinate the right parties at the IRS so that we can meet and coordinate to implement our sharing agreement between our two agencies.

Many thanks,

[ PII ]


[ PII ]
Senior Technician Reviewer
Internal Revenue Service
Office of Chief Counsel (Procedure & Administration)
1111 Constitution Ave., NW
Washington, D.C. 20224

[ PII ]

TD_0000050

| | |
|---|---|
| **From:** | PII /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A7FEB64DBAEF47F7807EA11FEF5E7283- PII |
| **Sent:** | 4/3/2025 1:34:42 PM |
| **To:** | PII e@irs.gov]; Loiacono, Adam V [ PII @ice.dhs.gov]; PII PII @hsi.dhs.gov]; Walters Kathleen E [kathleen.e.walters@irs.gov]; Grimes Phyllis T [phyllis.t.grimes@irs.gov]; PII @irscounsel.treas.gov]; PII PII @irscounsel.treas.gov]; Rashidi Reza [reza.rashidi@irs.gov]; Pandya Kaschit [kaschit.pandya@irs.gov]; Musselman Bryan L [bryan.musselman@irs.gov]; Egaas Todd O [todd.o.egaas@irs.gov]; PII @irs.gov]; PII @irs.gov] |
| **CC:** | PII l@hsi.dhs.gov]; PII @hsi.dhs.gov]; De Mello Andrew A [andrew.arthur.demello@irscounsel.treas.gov] |
| **Subject:** | Implementation MOU Discussion |
| **Location:** | Microsoft Teams Meeting |
| **Start:** | 4/3/2025 4:30:00 PM |
| **End:** | 4/3/2025 5:30:00 PM |
| **Show Time As:** | Busy |
| **Required Attendees:** | PII Loiacono, Adam V; PII Walters Kathleen E; Grimes Phyllis T; PII PII Rashidi Reza; Pandya Kaschit; Musselman Bryan L; Egaas Todd O; PII |
| **Optional Attendees:** | PII PII De Mello Andrew A |

Hi everyone – please forward as needed, thank you.

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: ▉▉▉▉▉

Passcode: ▉▉▉▉

## Dial in by phone

▉▉▉▉▉▉▉ United States, Georgetown

Find a local number

Phone conference ID: ▉▉▉▉▉

For organizers: Meeting options | Reset dial-in PIN

Meeting hosts (organizers, co-organizers) hold responsibility for controlling the meeting environment, such as removing unauthorized parties, muting audio or video when appropriate to protect privacy, giving notice and getting consent for recording, promoting others as presenters or co-organizers to help moderate the meeting and chat, and setting meeting options. Please refer to IRM 10.5.1.6.18.2 for more information.

TD_0000051

UNCLASSIFIED//FOR
OFFICIAL USE ONLY

# Implementing Agreement

# for the

# Memorandum of Understanding for the

# Exchange of Information for Nontax Criminal

# Enforcement

# between

# the U.S Department of Homeland Security,

# U.S. Immigration and Customs Enforcement

# and

# the U.S Department of the Treasury,

# Internal Revenue Service

UNCLASSIFIED//FOR OFFICIAL USE ONLY

TD_0000052

I.    Purpose

This Agreement provides implementing procedures for the Memorandum of Understanding between the U.S. Department of the Treasury, Internal Revenue Service (IRS) and the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) for the Exchange of Information for Nontax Criminal Enforcement. (MOU), dated April 7, 2025.  ICE will send, and IRS will receive, requests for information for specifically identified individuals via transmittal procedures contained in Section II of this Agreement.

II.    Procedures

01.    Disclosures by ICE to the IRS will be in accordance with IRC § 6103(i)(2) and all other applicable law, regulation, and policy.  Information may be securely transmitted via Kiteworks or as otherwise agreed upon.

02.    IRS will search the Integrated Data Retrieval System (IDRS) for the information requested.

03.    Disclosures by the IRS to ICE: Information may be securely transmitted via Kiteworks or as otherwise agreed upon.

III.    Description of the Records

01.    The IRS will

a.    disclose requested information from the following System(s) of Records:

1.    Treasury/IRS 22.060 Automated Non-Master File, 80 FR 54064 (Sept. 8, 2015)
2.    Treasury/IRS 34.037 IRS Audit Trail and Security Records System, 80 FR 54064 (Sept. 8, 2015)
3.    Treasury/IRS 24.030 Customer Account Data Engine Individual Master File, 80 FR 54064 (Sept. 8, 2015)
4.    Treasury/IRS 24.046 Customer Account Data Engine Business Master File, 80 FR 54064 (Sept. 8, 2015)
5.    Treasury/IRS 22.061 Individual Return Master File, 80 FR 54064 (Sept. 8, 2015)
6.    Treasury/IRS 42.008 Audit Information Management System, 80 FR 54064 (Sept. 8, 2015)

b.    treat the incoming data from ICE as transient data and destroy the data when no longer needed for business use, in accordance with General Record Schedule 5.2, item 010.

02.    ICE will

a.    disclose the following subject identifier information: CVID; A Number; First, Middle and Last Name; Date of Birth; Address Information; Country of Citizenship; FBI

2 UNCLASSIFIED//FOR OFFICIAL USE ONLY

Numbers; and Fingerprint Identification Number (FINS), from the following System(s) of Records:

1. Alien File, Index, and National File Tracking, 82 F.R. 43556 (Sep. 18, 2017).
2. External Investigations, 85 F.R. 74362 (Nov. 20, 2020).
3. Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 F.R. 55638 (Jul. 5, 2024).

b. maintain the information provided by IRS in the following Systems of Records:

1. Alien File, Index, and National File Tracking, 82 F.R. 43556, (Sep. 18, 2017).
2. External Investigations, 85 F.R. 74362 (Nov. 20, 2020).
3. Criminal Arrest Records and Immigration Enforcement Records (CARIER), 89 F.R. 55638 (Jul. 5, 2024)

c. ICE will ensure that Federal tax return and return information is properly destroyed or returned to the IRS when no longer needed based on established ICE record retention schedules in accordance with IRS Publication 1075, *Tax Information Security Guidelines for Federal, State and Local Agencies.*

The information in these systems of records notices may be updated during the effective period of this MOU as required by the Privacy Act.

IV. Reproduction Costs

It is mutually agreed that the parties signing this Agreement will not charge one another for costs incurred in production or reproduction of information provided under this Agreement.

Nothing in this MOU is intended or shall be construed to require the obligation, appropriation, or expenditure of funds from the U.S. Treasury in violation of the Anti-Deficiency Act, 31 U.S.C. §§ 1341-1519.

V. Approval Signatures

TODD M LYONS
Digitally signed by TODD M LYONS
DN: cn=TODD M LYONS, o=U.S. Government, ou=People, email=Todd.M.Lyons@ice.dhs.gov, c=US
Date: 2025-04-18T16:50:24-0400

_____        _____
Signature                                                    Date

Todd Lyons
Director (Acting)
Immigration and Customs Enforcement
500 12th St SW
Washington, DC 20536

3 UNCLASSIFIED//FOR OFFICIAL USE ONLY

TD_0000054

Dottie A.
Romo

Digitally signed by
Dottie A. Romo
Date: 2025.04.18
13:52:42 -04'00'

_____          _____
Signature                                Date

Dottie Romo
Chief Operating Officer (Acting)
Internal Revenue Service
1111 Constitution Ave NW
Washington DC 20224

4

A392

TD_0000055

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CENTRO DE TRABAJADORES UNIDOS,
*et al.*,

        *Plaintiffs*,

    v.

SCOTT BESSENT, *et al.*,

        *Defendants.*

No. 25-cv-0677 (DLF)

## MEMORANDUM OPINION & ORDER

Plaintiffs Centro de Trabajadores Unidos, Immigrant Solidarity DuPage, Somos Un Pueblo Unido, and Inclusive Action for the City bring this action seeking declaratory and injunctive relief to prevent the Internal Revenue Service (IRS) from sharing personal tax information with the Department of Homeland Security (DHS) for immigration enforcement purposes. Before the Court is the plaintiffs' Motion for Preliminary Injunction, Dkt. 28. For the reasons that follow, the Court will deny the motion.

## I.  BACKGROUND

The Internal Revenue Code requires taxes to be paid on all income earned in the United States, regardless of the earner's status in the country. Am. Compl. ¶ 39, Dkt. 17. United States citizens file taxes using a Social Security Number. *Id.* ¶ 40. Noncitizens generally cannot obtain SSNs, so they typically register with the IRS to obtain an Individual Taxpayer Identification Number (ITIN). *Id.* ¶ 41. To do so, registrants must provide their full name, address, and other identifying information. *Id.* Under the tax code, those records are kept confidential and may not be shared outside the IRS, unless a particular statutory exception applies. 26 U.S.C. § 6103(a).

As relevant here, one such exception, § 6103(i)(2), allows the head of any federal agency to request tax return information to aid in investigating or preparing for a judicial or administrative proceeding to enforce designated criminal statutes. *Id*. § 6103(i)(2); Am. Compl. ¶ 48. The agency head must first submit the request in writing and must specifically identify the name and address of the taxpayer, the relevant taxable periods, the statutory basis for the enforcement proceeding, and the need for the disclosure. 26 U.S.C. § 6103(i)(2)(B).

The plaintiffs allege that DHS is seeking access to taxpayer information to identify, locate and remove illegal immigrants, in violation of § 6103. Am. Compl. ¶ 35. In support, the plaintiffs point to newspaper articles reporting that DHS requested that the IRS provide identifying records for at least 700,000 illegal immigrants. *Id*. ¶ 36. As alleged, that request was denied. *Id*. ¶ 37. But according to certain media outlets and other unnamed IRS sources, the acting IRS commissioner is "negotiating an agreement" with DHS and is "reportedly close to terms." *Id*. Under the terms of this agreement, as alleged, the IRS would unlawfully provide address information so that DHS can locate illegal immigrants for civil enforcement proceedings. Am. Compl. ¶ 55.

On April 7, 2025, the defendant agencies entered into a Memorandum of Understanding, Dkt. 38-1, which sets forth a process for exchanging information under 26 U.S.C. § 6103(i)(2). As the Memorandum provides, its purpose is to establish procedures enabling "requests for addresses of persons subject to *criminal* investigation." *Id*. § 3 (emphasis added). Consistent with § 6103(i)(2), the head of DHS must first submit a written request to the IRS that satisfies the statutory requirements necessary for disclosure, and only then can the IRS provide DHS with certain tax return information. Memorandum § 5(B) (requiring the IRS to "[r]eview each request

2

TD_0000057

for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2)").

The plaintiffs are four nonprofit organizations representing the interests of immigrants. Centro de Trabajadores Unidos (Centro) and Immigrant Solidarity DuPage (Immigrant Solidarity) are located in Illinois and work to "build immigrant and worker power" and "advance the dignity of workers." *Id.* ¶¶ 10, 11. Somos Un Pueblo Unidos (Somos) is a Santa Fe, New Mexico nonprofit working to provide "education and legal support" to communities in New Mexico, including immigrant communities. *Id.* ¶ 12. Inclusive Action for the City (IAC) provides low-interest loans to entrepreneurs, including immigrants with ITINs. *Id.* ¶ 13. The plaintiffs seek to enjoin the IRS from disclosing tax information to DHS pursuant to the agencies' agreement. Pls.' Mot. at 2.

## II.     LEGAL STANDARDS

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To prevail, a party seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citations and internal quotation marks omitted). Where a federal agency is the defendant, the last two factors merge. *See Am. Immigr. Council v. DHS*, 470 F. Supp. 3d 32, 36 (D.D.C. 2020).

## III.    ANALYSIS

The Court's analysis begins and ends with the likelihood of success on the merits. To succeed on the merits, "[a] plaintiff must show a likelihood of success encompass[ing] not only

TD_0000058

substantive theories but also establishment of jurisdiction," including standing to sue. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. D.C.*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)).  "In the context of a preliminary injunction motion, [courts] require the plaintiff to show a substantial likelihood of standing under the heightened standard for evaluating a motion for summary judgment." *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,* 878 F.3d 371, 377 (D.C. Cir. 2017) (cleaned up).  The plaintiff "bear[s] the burdens of production and persuasion." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 281 (D.D.C. 2005) (citing *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  A plaintiff's "inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction." *Food & Water Watch*, 808 F.3d at 913.

### A.    Standing

To establish standing, a plaintiff must show: (1) an "injury in fact"; (2) a "causal connection between the injury" and the challenged action; and (3) a likelihood that the "injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks omitted).  When an organization seeks to bring suit on behalf of its members—that is, to assert associational standing—it must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wa. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  An organization's members have standing to sue in their own right when they can demonstrate that they would suffer an "injury in fact" that is "(a) concrete and particularized" and "(b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560–61 (cleaned up).

TD_0000059

Claims for declaratory or injunctive relief carry "a significantly more rigorous burden to establish standing." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (internal quotation marks omitted). That is because when "plaintiffs seek declaratory and injunctive relief, past injuries alone are insufficient to establish standing." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011). Instead, a plaintiff must show an "ongoing injury" or "immediate threat of injury." *Id.*

Three of the plaintiff organizations—Centro, Immigrant Solidarity, and Somos—assert associational standing on behalf of their members. Rough Hr'g Tr. at 7. Because "a plaintiff must demonstrate standing for each claim he seeks to press," *Davis v. FEC*, 554 U.S. 724, 734 (2008), the plaintiffs must establish that each alleged injury is imminent. The plaintiffs allege that their members will be injured by (1) the IRS sharing address information with DHS, in violation of 26 U.S.C. § 6103; (2) DHS using the information for civil enforcement purposes; and (3) the IRS disrupting settled reliance interests without due consideration. Pls.' Mot. at 15, 17; Rough Hr'g Tr. at 10. To assess whether the plaintiffs have standing, the Court will assume that the IRS's decision to share address information violates § 6103. *Tanner-Brown v. Haaland*, 105 F.4th 437, 444–45 (D.C. Cir. 2024) (assuming for the standing analysis the legal merits of plaintiffs' alleged injury). For the reasons that follow, all three plaintiffs have associational standing to challenge whether the IRS acted arbitrarily and capriciously by entering into an information sharing agreement with DHS, as reflected in the Memorandum, and Somos has standing to challenge the lawfulness of the agreement.

### 1.    IRS Disclosure of Information

Unlike at the Temporary Restraining Order stage, Somos has established an imminent and particularized risk of injury based on its claim that the IRS is poised to share information with

5

TD_0000060

DHS, in violation of 26 U.S.C. § 6103.  The Court now has the benefit of the Memorandum which explicitly authorizes the sharing of certain tax return information for criminal immigration enforcement purposes.  Memorandum § 1.  Somos, an organization that represents the interests of immigrants, has submitted a declaration attesting that its members have provided information to the IRS and are currently subject to final removal orders, *see, e.g.*, Diaz Decl. ¶ 9, Ex. G, Dkt. 28-8.[1]  This evidence establishes that the IRS and DHS intend to share taxpayer information and that this information is likely be used against Somos' members.  This is a cognizable injury that is both traceable to the IRS's interpretation of § 6103 and redressable by a court decision prohibiting the IRS from interpreting the statute in the manner that is contemplated by the IRS's agreement with DHS.  And it is not necessary that Somos' members participate in this lawsuit.  *Hunt*, 432 U.S. at 343.  Accordingly, Somos has established associational standing to challenge the information-sharing agreement, and the Court will reach the merits of its claim that the agreement is unlawful under § 6103.

  2.  DHS Use of Information for Civil Immigration Enforcement Proceedings

  The plaintiffs next claim that IRS disclosures will be used to "facilitate the *civil* enforcement of immigration laws," in violation of § 6103.  Pls.' Mot. at 14 (emphasis added); Am. Compl. ¶¶ 63, 65.  The Court agrees that requesting and receiving information for civil enforcement purposes would constitute a cognizable injury, but none of the organizations have established that such an injury is imminent.  As the plaintiffs acknowledge, the Memorandum only allows sharing information for *criminal* investigations and "the terms on the page [of the

---

[1] By contrast, Centro and Immigrant Solidarity submitted declarations from members stating that they had provided information to the IRS, but not that they were subject to final removal orders. *See* Doe Decl. ¶ 5, Ex. I, Dkt. 28-10; Doe Decl. ¶¶ 3–6, Ex. J, Dkt. 28-11; Doe Decl. ¶ 5, Ex. H, Dkt. 28-9.  Thus, they have not established that any member is likely to be imminently subject to the information-sharing agreement.

6

Memorandum] do appear to comply with the requirements" of § 6103(i)(2).  Rough Hr'g Tr. at 12. Even so, they argue that it is not "plausible" that DHS has the resources to conduct individualized criminal investigations on the large numbers of immigrants it seeks to remove from the United States.  *Id.* at 15.  For support, they rely on a newspaper article that reports that DHS is seeking location information for 700,000 or alternatively seven million, illegal immigrants, Pls.' Mot. at 15; Reply at 5, Dkt. 32.  Plaintiffs also point to Executive Order No. 14161, which directs agencies to take "immediate steps to identify, exclude, or remove aliens illegally present in the United States."  Memorandum, §1(a) (citing 90 Fed. Reg. 8451 (Jan. 20, 2025)).

On this limited record, the Court cannot assume that DHS intends to use the shared information to facilitate civil rather than criminal proceedings.  *Waite v. Macy*, 246 U.S. 606, 609 (1918).  The language of the Memorandum is clear: It authorizes the sharing of information related to individuals who are "under criminal investigation for violations of one or more specifically designed Federal criminal statutes," Memorandum § 1(c), and it affirms that its specific purpose is to assist DHS in criminal investigations and proceedings, *id.* § 3.  The government's representations at the hearing confirm this explicit understanding.  Counsel for the government unequivocally assured the Court that if the IRS received a request from DHS for information to support a civil proceeding, the IRS would deny that request.  *See, e.g.,* Rough Hr'g Tr. at 58. Counsel also confirmed that, should DHS decide to abort the criminal investigation and exclusively pursue deportation, DHS would not be allowed to rely on the information from the IRS and would have to return it.  *Id.* at 61.  At this stage, the plaintiffs have not established that it is likely that IRS disclosures will be used to "facilitate the civil enforcement of immigration laws," Pls' Mot. at 14, in violation of § 6103, and thus, they lack standing to raise this claim.

7

A399

TD_0000062

### 3.    Arbitrary and Capricious IRS Action

The plaintiffs do, however, have standing to pursue their claim that the IRS acted arbitrarily and capriciously in reversing its position on the sharing of tax information with DHS.  The plaintiffs offer declarations that their members relied on the IRS's past assurances that tax information would not be shared for immigration enforcement purposes.  *See, e.g.*, Doe Decl. ¶ 6, Ex. H; Doe Decl ¶ 6, Ex. I.  These individuals now fear that they will be harmed for relying on those assurances and for filing their taxes as obligated.  Ex. H ¶ 6; Ex. I ¶ 6–7.  And if the IRS reverses course without properly considering their reliance interests, as they allege, the plaintiffs' members will suffer injury.  This injury is both traceable to the IRS's change in position and redressable by a court order requiring the IRS to consider the plaintiff members' reliance interest before implementing the Memorandum.  The Court therefore will proceed to the merits on the claim that the defendants acted arbitrarily and capriciously by changing their policy to permit information sharing between the IRS and DHS.

* * *

In sum, Centro, Immigrant Solidarity, and Somos have established standing to challenge the agencies' agreement to share information as arbitrary and capricious, and Somos alone has established standing to challenge the agreement as in excess of the IRS's statutory authority.  The Court need not determine at this early stage whether IAC also has organizational standing to bring these claims.  For the reasons stated above, all of the plaintiffs, including IAC, lack standing to pursue their claim that the agencies will share information for *civil* enforcement purposes, in violation of § 6103.

8

A400

TD_0000063

**B.      Merits**

Turning to the merits, the plaintiffs argue that the information sharing agreement between the IRS and DHS violates the Administrative Procedures Act in two ways—it is "not in accordance with law" and was entered into "arbitrarily" and "capriciously." 5 U.S.C. § 706(2)(A).[2] According to the plaintiffs, § 6103(i)(2) does not allow the IRS to disclose *only* address information to DHS, as the Memorandum provides.  Pls.' Mot. at 14; Pls.' Suppl. Mem. at 3, Dkt. 48.  The plaintiffs further argue that the Memorandum is arbitrary and capricious because it constitutes a change in policy and the agency failed to adequately consider the reliance interests of immigrant taxpayers or provide a reasoned explanation.  Pls.' Mot. at 17–18.

The Court disagrees.  Section 6103 mandates that the IRS disclose address information to DHS, if DHS complies with the statutory provision.  Thus, the plaintiffs cannot show a likelihood of success on the merits.

1.      *Accordance with Law*

The Court begins, as it must, with the statutory text.  Under § 6103(i)(2), the IRS can share limited tax return information with other agencies if the information may assist in criminal enforcement proceedings or any "investigation which may result in such a proceeding."  26 U.S.C. § 6103(i)(2)(A).  To obtain information, the head of the federal agency conducting an investigation must first submit a written request to the Secretary of the Treasury identifying

> "(i) the name and address of the taxpayer with respect to whom the requested return information relates; (ii) the taxable period or periods to which such return information relates; (iii) the statutory authority under which the proceeding or investigation … is being

---

[2] The plaintiffs also raise non-statutory *ultra vires* claims.  The Court need not address those claims because "if the plaintiff's claims would fail review under the APA," then those claims necessarily "could not succeed under" ultra vires review, which has an even "narrow[er] scope[.]" *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006).

TD_0000064

conducted; and (iv) the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation."

*Id.* § 6103(i)(2)(B)(i)–(iv). If the request meets those requirements, the IRS must comply with it. *See* § 6103(i)(2)(A) (providing that the Secretary "shall disclose" the requested information).

Not all tax return information, however, can be disclosed under the statute. Section 6103(i)(2) exempts "taxpayer return information" from disclosure under this provision. *Id.* § 6103(i)(2)(A). And a related provision defines taxpayer return information as return information filed "by or on behalf of the taxpayer to whom such return information relates." *Id.* § 6103(b)(3). In other words, the IRS can disclose information it obtains itself (such as through audits), but not information it obtains exclusively from the taxpayer (such as a tax return filed by the taxpayer). Despite this broad prohibition on the disclosure of taxpayer return information, § 6103(i)(2)(C) allows one exception: "For purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information." *Id.* § 6103(i)(2)(C). A taxpayer's identity is further defined as the taxpayer's name, address, taxpayer identifying number, or some combination thereof. *Id.* § 6103(b)(6). To summarize, the IRS must disclose limited taxpayer identity information (e.g., the taxpayer's name and address) to assist another agency in criminal investigations and proceedings, if the agency has satisfied the statutory prerequisites in its written request.

The challenged Memorandum outlines the procedures that DHS and the IRS must follow when the agencies share information under 26 U.S.C. § 6103(i)(2)(B). *See* Memorandum §§ 5–6. The Memorandum explicitly states that the IRS must first determine whether DHS's request meets the statutory requirements necessary for disclosure, and it can provide information only if it falls within an exception. *Id.* § 5(B) (requiring the IRS to "[r]eview each request for completeness and validity and return to ICE any requests not meeting the requirements necessary for disclosure pursuant to IRC § 6103(i)(2)"). The Memorandum also explains that its purpose is to establish

TD_0000065

procedures enabling "requests for addresses of persons subject to *criminal* investigation." *Id.* § 3 (emphasis added).

The plaintiffs concede that the statute requires the IRS to share certain return information with DHS for the purposes of enforcing identified criminal statutes, if DHS submits a proper request. Rough Tr. at 11; *see* 26 U.S.C. § 6103(i). Nonetheless, they contend that § 6103(i)(2) does not allow the IRS to provide *only* address information in response to a DHS request. Pls.' Mot. at 14; Rough Hr'g Tr. at 10. According to the plaintiffs, the provision authorizes the IRS to disclose a taxpayer's address only where other information relevant to a criminal investigation is sought. Pls.' Suppl. Mem. at 2.

The plaintiffs' reading of § 6103(i)(2) does not comport with the text of the statute. By its plain language, the statute mandates that the IRS share a taxpayer's name and address with another agency, as long as its request for information is complete and valid and "meets the requirements of [§ 6103(i)(2)(B)]." 26 U.S.C. § 6103(i)(2)(A). The Court cannot read additional restrictions into the statute's clear text.

Resisting this conclusion, the plaintiffs rely on two internal IRS publications that purportedly prohibit the IRS from releasing address information under this provision. *See* I.R.M. 11.3.28.5(4) (July 23, 2018) ("Requests for addresses only cannot be honored because IRC 6103(i)(2) requires that the requester provide an address.")[3]; IRS Publication No. 4639, *Disclosure & Privacy Law Reference Guide* at 5-4 (Oct. 2012 ed.) ("Requests under section 6103(i)(2) seeking only taxpayers' addresses do not comply with the section."). The meaning of this language is

---

[3] Presently, the Internal Revenue Manual discusses address-only requests in a different sub-section of the manual and uses different language than that cited by the plaintiffs. *See* I.R.M. 11.3.28.4(5) (Apr. 17, 2025) ("Requests for addresses only are invalid because IRC 6103(i)(2) requires that the requester provide an address").

TD_0000066

unclear. *See* Gov't's Reply at 7, Dkt. 49 (noting that the quoted statement from the Internal Revenue Manual "may well anticipate another agency's request that does not include the taxpayer's address as required by Section 6103(i)(2)(B)(i)" and the quoted statement from Publication 4639 "may presume the requester did not provide the address as the statute requires"). But even accepting the plaintiffs' interpretation of these internal IRS manuals, they cannot supplant the plain meaning of the statute. For one, the manuals do not have the force of law. *Marks v. Commissioner*, 947 F.2d 983, 986 n.1 (D.C. Cir 1989); IRS Publication No. 4639, at iii ("This guide was prepared for reference purposes only; it may not be used or cited as authority for setting or sustaining a legal position."). For another, the Court is not obligated to defer to the IRS's interpretation of the statute. *See Loper Bright Enters. v. Raimundo*, 603 U.S. 369, 400 (2024). The Court instead must independently interpret the statute's plain meaning. *Id.* As explained above, the plain language of § 6103(i)(2) allows DHS to request address information as long as DHS first provides the taxpayer's name, address, and other requisite information in its written request.

The plaintiffs further argue that § 6103(i)(2) cannot be used to locate individuals because another provision of the statute, § 6103(i)(5) (the "fugitive" provision), provides the only mechanism for using tax records to locate individuals. Pls.' Mot. at 14. Although a statute's text should be interpreted in the context of the whole statute, *see* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 167 (2012); Pls.' Motion at 14, § 6103(i)(5) serves an entirely different purpose than § 6103(i)(2). It permits the Department of Justice to obtain vastly more information from the IRS—a taxpayer's tax return or taxpayer return information—as opposed to just a taxpayer's name and address. But to obtain such extensive tax return information, the Department of Justice must first obtain a court order and a federal arrest

12

TD_0000067

warrant for the fugitive.  *Id.* § 6103(i)(5)(B).  That the fugitive provision authorizes the IRS to release more extensive tax return information to the Department of Justice (assuming it meets the more onerous prerequisites in § 6103(i)(5)(B)) does not preclude the IRS from releasing a taxpayer's name and address to an agency (assuming it satisfies the much less demanding procedure set forth in § 6103(i)(2)).  These two statutory provisions establish separate information sharing mechanisms for different but potentially overlapping purposes.

The plaintiffs also invoke historical context—including earlier versions of the statute, legislative history, and other internal Treasury memoranda, to support their narrow interpretation of § 6103(i)(2).  *See generally* Pls.' Suppl. Mem. at 1–7.  But as explained, supra at 12, internal memoranda cannot override the plain meaning of the statute.  And "when a statute's language is plain on its face, courts do not ordinarily resort to legislative history." *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 818 (D.C. Cir. 2008) (internal quotation marks omitted).  For the reasons stated, the text of § 6103(i)(2) is clear—the provision plainly exempts taxpayer address information from the general prohibition on sharing taxpayer return information and requires that information to be disclosed upon a valid written request.  As long as the agency has a name and an address for a taxpayer, it can request address and name information from the IRS to assist the requesting agency in a criminal investigation or proceeding, and the IRS must comply.

Although the plaintiffs do not argue that the government's interpretation of § 6103(i)(2) is absurd, *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (quoting *Holy Trinity Church v. United States*, 143 U.S. 457, 459–60 (1892)), they question its reasonableness.  Rough Hr'g Tr. at 22–24.  As they argued at the hearing, there would be no reason for an agency to request a taxpayer's address information from the IRS if the agency already had it.  *Id.*  But as the government explained, there are a number of reasons why such information could be helpful to

13

A405

TD_0000068

DHS. For instance, if DHS is investigating an immigrant for remaining 90 days past a final removal order, a recent address could confirm that the immigrant did in fact overstay the order. *See* Rough Hr'g Tr. at 59; *see also* 8 U.S.C. § 1253(a)(1). An address could also confirm that an individual re-entered the U.S. *Id.* at 54, 60. And if a final removal order was issued in absentia, DHS might send a notice letter to ensure that the immigrants was aware of the order. *See* 8 U.S.C. § 1253(a)(1).

Putting aside the reasonableness of the agency's current interpretation of the statute, the Court's duty is to exercise independent judgment in determining its meaning. *See Loper Bright*, 603 U.S. at 400. Under the statute, the IRS must comply with an agency's request for information so long as the agency has complied with the statutory prerequisites. Thus, even in the absence of the information sharing memorandum between the IRS and DHS, the IRS would be statutorily required to release requested information if DHS met the requirements of § 6103(i)(2). Because the information sharing agreement is consistent with § 6103(i)(2), the plaintiffs cannot establish success on the merits of their APA challenge.

2. *Arbitrary or Capricious*

The plaintiffs further claim that IRS acted arbitrarily and capriciously by changing its position on whether it can lawfully provide address information to DHS without considering the immigrant taxpayers' reliance interests. Am. Compl. ¶ 69. In support, the plaintiffs again rely on IRS guidance publications, IRM 11.3.28.5 and IRS Publication No. 4639, and similar public assurances in which the IRS stated that it lacked "authorization under this provision to share tax data with ICE." Pls.' Mot. at 13 (citing Maria Sacchetti, *Undocumented and Paying Taxes, They Seek a Foothold in the American Dream*, Wash. Post. (Mar. 11, 2017), https://perma.cc/QU33-EYWM).

14

TD_0000069

As noted, however, the IRS guidance documents can be read another way. *See supra* 11–12. On the government's reading, these internal memoranda do not categorically bar the IRS from sharing information with another agency so long as the agency first provides a taxpayer's name and address and satisfies the other statutory requirements, 26 U.S.C. § 6103(i)(2); Rough Hr'g Tr. at 47–48. The IRS's public statements similarly affirm that taxpayer information must be kept confidential and can only be disclosed under particular statutory conditions.[4]  Under this interpretation, the IRS has not reversed course.

But even assuming that the IRS has changed its position, this type of policy change is not actionable under the APA because the cited IRS manuals do not create binding rules. *See* 5 U.S.C. § 553(b)(A); *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997). They are instead nonbinding policy statements that set out a procedure for information requests. *Id.* This is especially true here because § 6103(i)(2) does not give the IRS the discretion to turn down a lawful request for information. As the Court has found, § 6103(i)(2) allows DHS to obtain address information from the IRS, as long it first provides the IRS with the taxpayer's name and an address and satisfies the other statutory criteria. In such circumstances, the agency "*shall* disclose return information," 26 U.S.C. § 6103(i)(2)(A) (emphasis added), i.e., name and address information, *id.* § 6103(i)(2)(C), to the agency. Any substantive change under the challenged Memorandum thus stems not from the IRS's change in position but from the Administration's decision to use certain statutorily authorized tools to further criminal investigations. Because the plaintiffs have not established that the Memorandum constitutes a reviewable change in agency action under the

---

[4] The plaintiffs rely on a newspaper article quoting a statement from the IRS, Sacchetti, *Undocumented and Paying Taxes, They Seek a Foothold in the American Dream*, Wash. Post. (Mar. 11, 2017), but neither party has been able to locate or provide the underlying IRS report that the article references, *see* Rough Tr. at 46.

15

A407

TD_0000070

APA, they have not shown a substantial likelihood of success on their claim that the IRS acted arbitrarily and capriciously by reaching an agreement with DHS.

<center>*  *  *</center>

At its core, this case presents a narrow legal issue: Does the Memorandum of Understanding between the IRS and DHS violate the Internal Revenue Code?  It does not.  The plain language of 26 U.S.C. § 6103(i)(2) mandates disclosure under the specific circumstances and preconditions outlined in the Memorandum.  For this reason, the plaintiffs have failed to show they are likely to succeed on their claims.  Accordingly, it is

**ORDERED** that the plaintiffs' Motion for Preliminary Injunction, Dkt. 28, is **DENIED**.

<div align="right">
DABNEY L. FRIEDRICH<br>
United States District Judge
</div>

May 12, 2025

<center>16</center>

TD_0000071

From: [PII] /O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=796EAC855C444A99A4D5137445238112 [PII]

Sent: 6/5/2025 3:27:15 PM

To: [PII] @hsi.dhs.gov]; Pandya Kaschit [kaschit.pandya@irs.gov] [PII]
[PII] @hsi.dhs.gov]

CC: De Mello Andrew A [andrew.arthur.demello@irscounsel.treas.gov]; [PII]
[PII] @irscounsel.treas.gov]; [PII] @hsi.dhs.gov]; [PII]
[PII] @hsi.dhs.gov]; [PII] @associates.ice.dhs.gov]; [PII]
[PII] @associates.ice.dhs.gov]; Capece Louis P [louis.capece@irs.gov] [PII]
[PII] @irs.gov]

Subject: RE: [EXT] IRS - ICE data exchange

Attachments: SLFT Adhoc - User Guide for SFTP Connection Setup v1.0.pdf

Hi [PII]

We successfully created the account [LE] gov/#/ and invited [PII]
[PII] They should have received the invite by now.

Attached is the step-by-step guide to help you set the SFTP access. They will need the generate the public private key pair for each individual and send me the public key. You may also use the web browser to upload and download the files using this link [LE] gov/#/.

Kind regards,

[PII]

Chief, Division Management Office (DMO)
Infrastructure Services Division, Enterprise Operations
1111 Constitution Ave., NW, Washington, D.C. 20224 [PII]
[PII]

From: [PII]
Sent: Thursday, June 5, 2025 10:58 AM
To: [PII] @irs.gov>; Pandya Kaschit <Kaschit.Pandya@irs.gov> [PII]
[PII] @hsi.dhs.gov>
Cc: De Mello Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov>; [PII]
[PII] @irscounsel.treas.gov>; [PII] @hsi.dhs.gov>; [PII]
[PII] @hsi.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII]
[PII] @associates.ice.dhs.gov>; Capece Louis P <Louis.Capece@irs.gov> [PII]
Subject: RE: [EXT] IRS - ICE data exchange

Hi [PII]

I tried to call you on your cell and office number. I know we just spoke and my apologies for having to ask this so quickly, but do you have a timeframe for getting us access to kiteworks? We need to get this file transferred ASAP.

[PII]

Special Assistant to the Deputy Assistant Director
Cyber and Operational Technology
U.S. Department of Homeland Security
Homeland Security Investigations (HSI)

[PII]

TD_0000072

**From:** [PII] @irs.gov>
**Sent:** Thursday, June 5, 2025 9:17 AM
**To:** [PII] @hsi.dhs.gov>; Pandya Kaschit <Kaschit.Pandya@irs.gov>; [PII]
[PII] @hsi.dhs.gov>
**Cc:** De Mello Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov> [PII]
[PII] @irscounsel.treas.gov>; [PII] @hsi.dhs.gov>; [PII]
[PII] @hsi.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII]
[PII] @associates.ice.dhs.gov>; Capece Louis P <Louis.Capece@irs.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Just sent the invite for 9:30am ET so we can get more information.

Kind regards,

**PII**

Chief, Division Management Office (DMO)
Infrastructure Services Division, Enterprise Operations
1111 Constitution Ave., NW, Washington, D.C. 20224 | [PII]
**PII**

**From:** [PII] @hsi.dhs.gov>
**Sent:** Thursday, June 5, 2025 9:01 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov> [PII] @hsi.dhs.gov>; [PII]
[PII] @irs.gov>
**Cc:** De Mello Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov>; [PII]
[PII] @irscounsel.treas.gov>; [PII] @hsi.dhs.gov>; [PII]
[PII] @hsi.dhs.gov>; [PII] [PII] @associates.ice.dhs.gov>; [PII]
[PII] @associates.ice.dhs.gov>; Capece Louis P <Louis.Capece@irs.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

Thank you, Kaschit.

[PII] our team is standing by, if you can jump on a call, we are ready.

[PII]

Special Assistant to the Deputy Assistant Director
Cyber and Operational Technology
U.S. Department of Homeland Security
Homeland Security Investigations (HSI)
[PII]

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Thursday, June 5, 2025 8:59 AM
**To:** [PII] @hsi.dhs.gov>
**Cc:** De Mello Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov>; [PII]
[PII] @irscounsel.treas.gov>; [PII] @hsi.dhs.gov>; [PII]
[PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII]
[PII] @associates.ice.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII]

PII [    ]@irs.gov>; Capece Louis P <Louis.Capece@irs.gov>

**Subject:** RE: [EXT] IRS - ICE data exchange

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hi [PII] I'm adding [PII] to this reply. His team manages the Kiteworks environment.

[PII] please ensure this is worked quickly. Thank you.

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII] (C)

For appointments, please reach out to [PII] [@irs.gov)

**From:** [PII] @hsi.dhs.gov>
**Sent:** Thursday, June 5, 2025 8:56 AM
**To:** [PII] a@hsi.dhs.gov>; Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Cc:** De Mello Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov>; [PII]
[PII] @irscounsel.treas.gov>; [PII] @hsi.dhs.gov>; [PII]
[PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII]
[PII] @associates.ice.dhs.gov>; [PII] @associates.ice.dhs.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

Good morning Kaschit,

Please, let me know when you or someone from your office has time to meet this morning. We need to discuss details for Kiteworks as well as possible alternative solutions to expedite being able to share data with you. Thank you!

Respectfully,

[PII]
Criminal Analyst / Program Manager
Homeland Security Investigations (HSI) – Innovation Lab
[PII]

**From:** [PII]
**Date:** Wednesday, Jun 04, 2025 at 5:25 PM
**To:** [PII] @hsi.dhs.gov>, Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Cc:** De Mello Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov>, [PII]
[PII] @irscounsel.treas.gov>, [PII] @hsi.dhs.gov>, [PII]
[PII] @hsi.dhs.gov>, [PII] @hsi.dhs.gov>, [PII]
[PII] @associates.ice.dhs.gov>, [PII] @associates.ice.dhs.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

Feel free to reach out to us directly for account creations/provisioning/testing. Where are standing by to get everything set up tonight.

Respectfully,



**PII**

Criminal Analyst / Program Manager
Homeland Security Investigations (HSI) – Innovation Lab

**PII**

**From:** [PII] @hsi.dhs.gov>
**Date:** Wednesday, Jun 04, 2025 at 4:29 PM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Cc:** De Mello, Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov>, [PII]
[PII] @irscounsel.treas.gov>, [PII] @hsi.dhs.gov>,
[PII] @hsi.dhs.gov>, [PII] @hsi.dhs.gov>, [PII]
[PII] @associates.ice.dhs.gov>, [PII]
[PII] @associates.ice.dhs.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

Pandya,

That's going to be me and my two tech leads below.

**PII**

Respectfully,

**PII**

CRIMINAL ANALYST / PROGRAM MANAGER
HOMELAND SECURITY INVESTIGATIONS (HSI) – INNOVATION LAB

**PII**

**WARNING:** THIS COMMUNICATION IS COVERED BY FEDERAL AND STATE LAW GOVERNING ELECTRONIC COMMUNICATIONS AND MAY CONTAIN CONFIDENTIAL, LEGALLY PRIVILEGED INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, USE OR COPYING OF THIS MESSAGE OR ANY ATTACHMENTS IS PROHIBITED. IF YOU RECEIVED THIS MESSAGE IN ERROR, PLEASE REPLY IMMEDIATELY TO THE SENDER AND DELETE THIS MESSAGE.

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Wednesday, June 4, 2025 3:24 PM
**To:** [PII] @hsi.dhs.gov>
**Cc:** De Mello Andrew A <Andrew.Arthur.DeMello@irscounsel.treas.gov>, [PII]
[PII] @irscounsel.treas.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

**CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Hi [PII] - I'm hearing we have an urgent need to transfer data today. I'm happy to assist but will need a POC on your side for us to work with. Are you aware of this and if so, can you provide us a POC?

Thank you.

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII] (C)

For appointments, please reach out to [PII] @irs.gov)

**From:** [PII] @hsi.dhs.gov>
**Sent:** Wednesday, June 4, 2025 2:56 PM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; [PII] @irs.gov>
**Cc:** [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] y@hsi.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII] @ice.dhs.gov>; Capece Louis P <Louis.Capece@irs.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

Thank you so much for the quick response. Any time after 11 tomorrow or between 11 to 2 on Friday works for us on the HSI side.

Respectfully,

[PII]
CRIMINAL ANALYST / PROGRAM MANAGER
HOMELAND SECURITY INVESTIGATIONS (HSI) – INNOVATION LAB
[PII]

**WARNING:** THIS COMMUNICATION IS COVERED BY FEDERAL AND STATE LAW GOVERNING ELECTRONIC COMMUNICATIONS AND MAY CONTAIN CONFIDENTIAL, LEGALLY PRIVILEGED INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION, USE OR COPYING OF THIS MESSAGE OR ANY ATTACHMENTS IS PROHIBITED. IF YOU RECEIVED THIS MESSAGE IN ERROR, PLEASE REPLY IMMEDIATELY TO THE SENDER AND DELETE THIS MESSAGE.

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Wednesday, June 4, 2025 2:27 PM
**To:** [PII] @hsi.dhs.gov> [PII] @irs.gov>
**Cc:** [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII] @associates.ice.dhs.gov>; [PII] @ice.dhs.gov>; Capece Louis P <Louis.Capece@irs.gov>
**Subject:** RE: [EXT] IRS - ICE data exchange

TD_0000076

CAUTION: This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Please use the Cofense Report Phishing button to report. If the button is not present, click here and follow instructions.

Thanks for reaching out [PII]

[PII] – can you find some time for us? Please add Lou as well to that call. Thank you.

+Lou for awareness

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII]

For appointments, please reach out to [PII] @irs.gov)

**From:** [PII] @hsi.dhs.gov>
**Sent:** Wednesday, June 4, 2025 12:47 PM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov> [PII] @irs.gov>
**Cc:** [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] @hsi.dhs.gov>; [PII] @associates.ice.dhs.gov> [PII] [PII] @associates.ice.dhs.gov>; [PII] [PII] @associates.ice.dhs.gov> [PII] @ice.dhs.gov>
**Subject:** [EXT] IRS - ICE data exchange

Good afternoon CIO Pandya,

I am the Program Manager over HSI's Advance Data Science and Engineering Team. My apologies for reaching out directly. I figured it would be easier to go directly to you to expedite this coordination between our agencies.

Essentially, from our previous conversations it was agreed upon to use Kiteworks (per IRS's request) to facilitate this data exchange. We can still move forward with that option, however we do still need access to Kiteworks. We also have our own SFTP that could be used as an alternative.

As soon as possible, can we schedule a meeting between that teams involved to iron out some of the technical details and flush out the schemas?

Thank you in advance!

Respectfully,

[PII]
CRIMINAL ANALYST / PROGRAM MANAGER
HOMELAND SECURITY INVESTIGATIONS (HSI) – INNOVATION LAB
[PII]

WARNING: THIS COMMUNICATION IS COVERED BY FEDERAL AND STATE LAW GOVERNING ELECTRONIC COMMUNICATIONS AND MAY CONTAIN CONFIDENTIAL, LEGALLY PRIVILEGED INFORMATION. IF YOU ARE NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT

TD_0000077

ANY DISSEMINATION, DISTRIBUTION, USE OR COPYING OF THIS MESSAGE OR ANY ATTACHMENTS IS PROHIBITED. IF YOU RECEIVED THIS MESSAGE IN ERROR, PLEASE REPLY IMMEDIATELY TO THE SENDER AND DELETE THIS MESSAGE.

A415

A415

TD_0000078

# IRS SLFT

# Secure Large File Transfer

Kiteworks

Adhoc user SFTP Connection Setup

v1.0

By FMTS

TD_0000079

# Introduction

This user guide provides instructions on generating Secure File Transfer Protocol (SFTP) Public and Private keys for establishing an SFTP connection with IRS Secure Large File Transfer (SLFT). Kiteworks supports SFTP keys in OpenSSH format. If your SFTP client does not support the OpenSSH format, you can convert the public key to the OpenSSH format using the steps outlined below.

If you intend to generate the SFTP keys using your own SFTP client, ensure that the public key added to your SLFT account is in the openSSH format. We recommend a key length of 2048 or higher for the Rivest Shamir Adleman (RSA) algorithm type, and 256 or higher for Elliptic Curve Digital Signature Algorithm (ECDSA).

Please ensure that the client you use adheres to the cipher usage specified below.

| Cipher | Key Exchange Algorithms |
|---|---|
| aes256-ctr | ecdh-sha2-nistp256 |
| aes192-ctr | ecdh-sha2-nistp384 |
| aes128-ctr | ecdh-sha2-nistp521 |
| | diffie-hellman-group-exchange-sha256 |

If you generate the SFTP keys on the client installed on your system and provide public key to SLFT Administrator to be added to your account, make sure the public key is in OpenSSH format.

# 1. Provide the SFTP public key generated from your SFTP client.

You can provide the SSH public key to the SLFT Administrator to be added to your account. Make sure the SSH keys generated by your SFTP client are in OpenSSH format. If they are not in the OpenSSH you can convert them using the ssh-keygen on both Windows and LINUX Operating System's (See section 2 below for the command to convert the keys). Refer to the details mentioned at the beginning of this document about the key requirements.

After you create the SSH key pair, email your IRS contact requesting to import your public key to your SLFT account. The public key will be used for authentication when you logon to the SLFT system. No live data will be transferred without the use of a proper SSH public key.

- You can send email to your IRS contact following these four steps.

    o **Step 1**: Compose an e-mail



To: <Your IRS POC>
Cc: ____LE____@irs.gov
Subject line: SLFT Adhoc – Add adhoc user's Pub Key to SLFT account

    o **Step 2**: Paste the following into the body of the email:



SLFT Adhoc account; please import attached public key to account: <Your email based SLFT account>.

Agency/Organization:

    o **Step 3**: Attach your SSH Public Key as a text file to the email.

    o **Step 4**: Send the e-mail.

## 2.    Convert SSH2 Public Key to OpenSSH format.

If you open your public key file and you see the words BEGIN SSH2 PUBLIC KEY, this is an SSH2 formatted public key, and the key needs to be converted to OpenSSH.

Use the below command to convert the public key.

```
             LE           .pub > openssh.pub
```

# RE: Update

| | |
|---|---|
| **From:** | "McMaster, Hunter" <george.mcmaster@treasury.gov> |
| **To:** | "BARROW, CLARK" <_____PII_____@hq.dhs.gov> |
| **Date:** | Sat, 07 Jun 2025 09:46:00 -0400 |

Thanks for the quick response. I'm spoken with the relevant teams, and they are reviewing. Will come back with what we can.

This is the bad news… At first blush, I should alert you of the immediate hurdle. 6103 is straightforward that for the IRS to disclose taxpayer information in support of a criminal investigation, address and taxable period are required. See below. Like I said, we're reviewing, but we must be careful that any response fully complies with taxpayer privacy law. One more note, I think we will need the date of the final order of removal and the related case number assigned to each such order.

Let us take a look at the requests and we can discuss next steps.

<u>6103</u>

**(2) Disclosure of return information other than taxpayer return information for use in criminal investigations**

**(A) In general** Except as provided in paragraph (6), upon receipt by the Secretary of a request which meets the requirements of subparagraph (B) from the head of any <u>Federal agency</u> or the Inspector General thereof, or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, any United States attorney, any special prosecutor appointed under <u>section 593 of title 28</u>, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to <u>section 510 of title 28</u>, United States Code, the Secretary shall disclose <u>return information</u> (other than <u>taxpayer return information</u>) to officers and employees of such agency who are personally and directly engaged in—

**(i)** preparation for any judicial or administrative proceeding described in paragraph (1)(A)(i),

**(ii)** any investigation which may result in such a proceeding, or

**(iii)** any grand jury proceeding described in paragraph (1)(A)(iii), solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

**(B)Requirements** A request meets the requirements of this subparagraph if the request is in writing and sets forth—

**(i)** the name and address of the taxpayer with respect to whom the requested <u>return information</u> relates;

**(ii)** the taxable period or periods to which such <u>return information</u> relates;

**(iii)** the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and

**(iv)** the specific reason or reasons why such <u>disclosure</u> is, or may be, relevant to such proceeding or investigation.

G. Hunter McMaster II

D: **PII**
M:

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

---

**From:** BARROW, CLARK <_____PII_____@hq.dhs.gov>
**Sent:** Friday, June 6, 2025 1:53 PM

**To:** McMaster, Hunter<George.McMaster@treasury.gov>
**Subject:** RE: Update

** **Caution:** External email from: [⬚⬚⬚⬚ PII ⬚⬚⬚⬚@hq.dhs.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

This email is from a US Government agency.

Please see the below additional information, which has also been updated to the 10K request from yesterday and is now available for review by IRS in their file sharing platform:

1. The name and address of the individual.

a. There is a name associated with each line of data but there may not always be an address available due to not being located in any other database that this data has been enriched with.

- The taxable period or periods to which the requested information (i.e., address) relates.

a. We did not indicate which taxable period this data relates to as we do not specifically know the tax filing status of any of these individuals since they are illegal aliens. The request is to enrich the data with relevant address data so the most recent address that IRS can identify associated with any of the individuals would be the primary goal.

3. The specific nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding is being conducted.

a. 8 USC 1325 – Improper entry by alien, added as an additional row on the lines of data.

4. The date of the final order of removal and the related case number assigned to each order.

a. Added to the data field where applicable.

5. The specific reason(s) why disclosure is or may be relevant to the investigation/proceeding and any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.

a. Reasons are indicated as applicable (i.e. *ALIEN MOST SEVERE CHARGE – HOMICIDE, FTO = FOREIGN TERRORIST ORGANIZATION, ETC.*) and additional identifying numbers added where available.

6. Identity information for the ICE officers and employees personally and directly engaged in the investigation.

a. AD Jesse Williams, ⬚⬚ PII ⬚⬚ @ice.dhs.gov

---

**From:** BARROW, CLARK <⬚⬚⬚⬚ PII ⬚⬚⬚⬚@hq.dhs.gov>
**Sent:** Friday, June 6, 2025 8:59 AM
**To:** George.McMaster@treasury.gov
**Subject:** Re: Update

Checking

---

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Friday, June 6, 2025 8:56:22 AM

TD_0000084

**To:** BARROW, CLARK < [PII] @hq.dhs.gov>
**Subject:** RE: Update

Thank you. Each requests includes the below? This would be in line with the agreement.

1. The name and address of the individual.
2. The taxable period or periods to which the requested information (i.e., address) relates.
3. The specific nontax Federal criminal statute (i.e., 8 U.S.C. § 1253(a)(1) or other specifically designated nontax Federal criminal statute) under which an investigation or proceeding is being conducted.
4. The date of the final order of removal and the related case number assigned to each order.
5. The specific reason(s) why disclosure is or may be relevant to the investigation/proceeding and any other information ICE can provide to help the IRS identify each individual, such as SSNs, ITINs, etc.
6. Identity information for the ICE officers and employees personally and directly engaged in the investigation.

I don't ask to be a pain, but its important for 6103 taxpayer privacy considerations so I just want to be careful. Thanks!

G. Hunter McMaster II
M [PII]

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

---

**From:** BARROW, CLARK < [PII] @hq.dhs.gov>
**Sent:** Thursday, June 5, 2025 8:33 PM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** Re: Update

** **Caution:** External email from: [ [PII] @hq.dhs.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

This email is from a US Government agency.

The priority list of 10K has been provided to IRS through kiteworks.

---

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Thursday, June 5, 2025 2:54:58 PM
**To:** BARROW, CLARK < [PII] @hq.dhs.gov>
**Subject:** RE: Update

Call me pls

TD_0000085

G. Hunter McMaster II

M: [ PII ]

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

---

**From:** BARROW, CLARK [ PII @hq.dhs.gov>
**Sent:** Thursday, June 5, 2025 1:23 PM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Update

** **Caution:** External email from: [ PII @hq.dhs.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

| This email is from a US Government agency. |
| --- |

ICE has successfully provided IRS with the full alien population, which contains 7,615,279 records, via the Kiteworks exchange. At this point, IRS has all relevant data from ICE that requires enrichment. Once IRS completes the enrichment, ICE will receive the data and make it available for targeting and analytical solutions. Can you check this on your side and give us an ETA for a response from IRS?

---

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Thursday, June 5, 2025 10:52 AM
**To:** BARROW, CLARK < PII @hq.dhs.gov>
**Subject:** RE: Update

Thank you

G. Hunter McMaster II

M: [ PII ]

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

---

**From:** BARROW, CLARK < PII @hq.dhs.gov>
**Sent:** Thursday, June 5, 2025 10:51 AM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Update

** **Caution:** External email from: [ PII @hq.dhs.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

| This email is from a US Government agency. |
| --- |

Hunter,

TD_0000086

I understand from ICE (HSI) that they met with the IRS technical team this morning. As a result of the meeting, HSI identified to the IRS all the appropriate points of contact within HSI that need access to kiteworks.  IRS is currently provisioning access for HSI and as soon as access is granted, HSI will transfer the file containing the alien population to IRS for enrichment.  I asked ICE to give me an ETA for the expected access.

---

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Wednesday, June 4, 2025 5:43 PM
**To:** BARROW, CLARK <[____PII____]@hq.dhs.gov>
**Subject:** Re: Update

Wonderful

G. Hunter McMaster II
D:
M:  **PII**

---

**From:** BARROW, CLARK <[____PII____]@hq.dhs.gov>
**Sent:** Wednesday, June 4, 2025 5:42:01 PM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** Re: Update

** Caution: External email from: [____PII____@hq.dhs.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

> This email is from a US Government agency.

I understand ICE has responded to the IRS email and I am pushing them to set up a Kiteworks account.

---

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Wednesday, June 4, 2025 4:43:59 PM
**To:** BARROW, CLARK <[____PII____]@hq.dhs.gov>
**Subject:** RE: Update

Kaschit Pandya (IRS, Action Chief Technology Officer & CIO) reached out to [    PII    ]

From what I am told, [  PII  ] requested a meeting for tomorrow, but the message was relayed to Kaschit to get this done as quickly as possible, which from my understand, means sending a link to set up the connection.

Something could very easily have been lost in translation, so apologies if any of that is incorrect.

G. Hunter McMaster II
M:  **PII**

Contents in any emails are considered draft or pre-decisional unless otherwise noted.

**From:** BARROW, CLARK <[____PII____]@hq.dhs.gov>
**Sent:** Wednesday, June 4, 2025 4:38 PM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** Re: Update

** **Caution:** External email from: [____PII____]hq.dhs.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

> This email is from a US Government agency.

To avoid mislabeling recipients, can you tell me who the IRS reached out to at DHS regarding the appropriate contact? I'll make sure you get a response.

---

**From:** BARROW, CLARK <[____PII____]@hq.dhs.gov>
**Sent:** Wednesday, June 4, 2025 4:34 PM
**To:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Subject:** Re: Update

Thanks Hunter. Apologies again for you getting tagged as a recipient but I appreciate you moving this. I'll ping ICE on Kiteworks. Will follow up.

---

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Wednesday, June 4, 2025 4:28 PM
**To:** BARROW, CLARK <[____PII____]@hq.dhs.gov>
**Cc:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Subject:** Update

> This email is from an external US Government agency.

This is my understanding of where things stand, happy to be corrected:

As of today, there haven't been any information requests. The point that was raised in a previous meeting with the WH that a request was sent to me a couple of weeks ago was incorrect.

The outstanding hurdle is a systems access issue. Previously, it was decided that DHS and IRS would use Kiteworks to facilitate the data sharing. I am not an expert, but the short story is that Kiteworks is a third party encrypted data sharing program, which would protect sensitive information going back and forth, an important aspect of this program. In the MOUs, it was agreed to use this program for bulk requests.

IRS was notified today that HSI and ERO still need access to the platform. My understanding is that personnel on the HSI/ERO side need to get proper credentials for this program. I coordinated with the head of IT at IRS who can help however necessary.

TD_0000088

Next steps, IRS needs to send a Kiteworks link to the appropriate point of contact at DHS to establish the link between DHS systems and IRS systems. A couple of hours ago, IRS requested confirmation from DHS on who the appropriate contact is but has not heard back.

TD_0000089

# Telcon w DHSA

| | |
|---|---|
| **Where:** | Telcon & EEOB 367 (for those on campus) |
| **When:** | Tue Jun 24 15:30:00 2025 -04:00 |
| **Until:** | Tue Jun 24 16:00:00 2025 -04:00 |
| **Organisers** | "Santos, Dina M. EOP/NSC" < PII @nsc.eop.gov> |
| **Required Attendees:** | "Santos, Dina M. EOP/NSC" < PII @nsc.eop.gov> |
| | "Fitzhugh, Peter EOP/NSC" < PII @nsc.eop.gov> |
| | " PII T. EOP/WHO" < PII @who.eop.gov> |
| | "Gordon, Derek W" < PII @hsi.dhs.gov> |
| | "Wall, Charles" < PII @ice.dhs.gov> |
| | "McMaster, Hunter" <george.mcmaster@treasury.gov> |

** **Caution:** External email from: [ PII @nsc.eop.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

This email is from a US Government agency.

Please dial the WHSR ███████ and ask to **connect to** ███████ **3:30pm call**.

TD_0000090

# RE: Telcon w DHSA (follow-up from yesterday)

**From:** "McMaster, Hunter" <george.mcmaster@treasury.gov>
**To:** "Fitzhugh, Peter EOP/NSC" <  PII  @nsc.eop.gov>, "  PII  EOP/WHO"
<  PII  @who.eop.gov>, "Gordon, Derek W" <  PII  @hsi.dhs.gov>, "Wall, Charles"
<  PII  @ice.dhs.gov>, "Armstrong, Anthony J. EOP/NSC" <  PII  @nsc.eop.gov>, "Cash, Steven
P. EOP/NSC" <  PII  @nsc.eop.gov>, "Centorino, Scott G. EOP/WHO" <  PII  @who.eop.gov>,
"Adolphsen, Sam G. EOP/WHO" <  PII  @who.eop.gov>
**Bcc:** "McMaster, Hunter" <george.mcmaster@treasury.gov>
**Date:** Wed, 25 Jun 2025 14:39:24 -0400

Hi all – In preparation for the call, I want to share where we are from my perspective. For good order, I don't have visibility as I am not as IRS, but I am speaking with the team there.

They received the bulk request last night. From the first look, I am told the requests are missing a few fields, but they are continuing to dig through the data. On a technical point, it sounds like their visibility isn't immediate upon DHS sending the request because the files must be decrypted, and format then must be changed to be readable. I raise that just to point out that the below points could change as decryption takes place.

Anyways, this is what I am told. The current request is missing these fields:
1. Request from Agency Head
2. Attestation/Certification for Criminal Statute
3. Reason for the Request
4. Officer Information



**DPP**

**I was told 10 minutes ago that IRS received a new bulk file around 2pm which might have this information added. Unfortunately, the team is decrypting it right now, so I don't have much visibility into it.**

Hunter


G. Hunter McMaster II
M  PII
Contents in my emails are considered draft or pre-decisional unless otherwise noted.

-----Original Appointment-----
**From:** Santos, Dina M. EOP/NSC <  PII  @nsc.eop.gov>
**Sent:** Wednesday, June 25, 2025 1:05 PM
**To:** Santos, Dina M. EOP/NSC; Fitzhugh, Peter EOP/NSC;  PII  T. EOP/WHO; 'Gordon, Derek W'; 'Wall, Charles'; McMaster, Hunter; Armstrong, Anthony J. EOP/NSC; Cash, Steven P. EOP/NSC; Centorino, Scott G. EOP/WHO; Adolphsen, Sam G. EOP/WHO
**Subject:** Telcon w DHSA (follow-up from yesterday)
**When:** Wednesday, June 25, 2025 4:30 PM-5:30 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Telcon & EEOB 367 (for those on campus)


** **Caution:** External email from: [  PII  @nsc.eop.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov

This email is from a US Government agency.

TD_0000091

Please dial the WASSP and ask to connect to _ 3:30pm call.

A429

TD_0000092

**DHS Update**

---

**From:**  De Mello Andrew A <andrew.arthur.demello@irscounsel.treas.gov>
**To:**  "Pilkerton, Christopher" <christopher.pilkerton@treasury.gov>, "Badgley, Tyler" <tyler.badgley@treasury.gov>, "McMaster, Hunter" <george.mcmaster@treasury.gov>
**Date:**  Wed, 25 Jun 2025 16:39:40 -0400

---

Hunter,

This is an update.  This email follows up my written communication to you on Monday evening in which I provided you a list of deficiencies contained in the data file which was not processible by the IRS pursuant to the MOU signed by the Department of Homeland Security and the Department of Treasury on April 7, 2025.  Specifically I highlighted the following deficiencies in my Monday evening communication:

1. A written request from the head of Federal agency when submitting each request. This required item of information is set forth in Section 6(B) of the MOU, which states that each request must be made consistent with IRC § 6103(i)(2)(A).  This section of the IRC requires a written request from the head of a Federal agency.  The information submitted by ICE did not contain any written request;
2. The specific reason or reasons why disclosure is, or may be, relevant to the nontax criminal investigation or proceeding.  This item of information is set forth in Section 6(C)(5) of the MOU and is derived from section 6103(i)(2)(B)(iv) of the IRC.  The information submitted by ICE did not contain this item;
3. Identity information for the ICE officers and employees personally and directly engaged in the nontax criminal investigation that may result in criminal charges against the individual under the specifically designated Federal criminal statute ICE has identified.  This item of information is set forth in section 6(C)(6) of the MOU and is derived from section 6103(i)(2)(A) of the IRC.  The information submitted by ICE did not contain this item; and
4. Attestation for each request – stating the requested address information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C Section 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings.  This item of information is set forth in section 6(D) of the MOU and is derived from section 6103(i)(2)(A) of the IRC.  The information submitted by ICE did not contain this item.

We recently reviewed the new data transmission sent to the Internal Revenue Service (IRS) from the United States Immigration and Customs Enforcement (ICE) on June 24, 2025 which contained approximately 7.3 million records.  Unfortunately, the above listed deficiencies remained and unfortunately, the IRS is again unable to process this data file in accordance with the MOU.



# DPP

Thanks,
Andrew

TD_0000093

# Telcon w DHSA (follow-up from yesterday)

| | |
|---|---|
| **Where:** | Telcon & EEOB 367 (for those on campus) |
| **When:** | Wed Jun 25 16:45:00 2025 -04:00 |
| **Until:** | Wed Jun 25 17:45:00 2025 -04:00 |
| **Organisers** | "Santos, Dina M. EOP/NSC" < [PII] s@nsc.eop.gov> |
| **Required Attendees:** | "Santos, Dina M. EOP/NSC" < [PII] s@nsc.eop.gov> |
| | "Fitzhugh, Peter EOP/NSC" < [PII] @nsc.eop.gov> |
| | " [PII] EOP/WHO" < [PII] @who.eop.gov> |
| | "Gordon, Derek W" < [PII] @hsi.dhs.gov> |
| | "Wall, Charles" < [PII] @ice.dhs.gov> |
| | "McMaster, Hunter" <george.mcmaster@treasury.gov> |
| | "Armstrong, Anthony J. EOP/NSC" < [PII] @nsc.eop.gov> |
| | "Cash, Steven P. EOP/NSC" < [PII] @nsc.eop.gov> |
| | "Centorino, Scott G. EOP/WHO" < [PII] @who.eop.gov> |
| | "Adolphsen, Sam G. EOP/WHO" < [PII] @who.eop.gov> |
| | "Emrich, Matthew EOP/NSC" < [PII] @nsc.eop.gov> |
| **Optional Attendees:** | "DeLay, Joshua EOP/NSC" < [PII] @nsc.eop.gov> |

** **Caution:** External email from: [ [PII] @nsc.eop.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

<div style="background:black;color:white;text-align:center">This email is from a US Government agency.</div>

Update: Treasury asked for 15min delay…..thank you for your patience.

Please dial the WHSR ████████ and ask to **connect to** ███████████ **4:45pm call**.

TD_0000094

| From: | De Mello Andrew A [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=49582B7B674C427A9A62455EFCDA887D-[PII] |
| Sent: | 6/26/2025 6:59:25 PM |
| To: | De Mello Andrew A [andrew.arthur.demello@irscounsel.treas.gov]; Goldman Richard G [richard.g.goldman@irscounsel.treas.gov]; Butler Paul T [paul.t.butler@irscounsel.treas.gov]; [PII] [PII] ]irscounsel.treas.gov]; tyler.badgley@treasury.gov; christopher.pilkerton@treasury.gov; george.mcmaster@treasury.gov |

| Subject: | Discussion |
| Location: | Microsoft Teams Meeting |

| Start: | 6/26/2025 8:00:00 PM |
| End: | 6/26/2025 8:30:00 PM |
| Show Time As: | Tentative |

| Required Attendees: | Goldman Richard G; Butler Paul T; [PII] ; tyler.badgley@treasury.gov; christopher.pilkerton@treasury.gov; george.mcmaster@treasury.gov |

Continuation of discussion from 6/25. Please advise if this time does not work.

Thanks,
Andrew

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: ▮▮▮▮▮▮

Passcode: ▮▮▮▮

---

### Dial in by phone

▮▮▮▮▮▮▮ United States, Washington

Find a local number

Phone conference ID: ▮▮▮▮▮▮

For organizers: Meeting options | Reset dial-in PIN

Meeting hosts (organizers, co-organizers) hold responsibility for controlling the meeting environment, such as removing unauthorized parties, muting audio or video when appropriate to protect privacy, giving notice and getting consent for recording, promoting others as presenters or co-organizers to help moderate the meeting and chat, and setting meeting options. Please refer to IRM 10.5.1.6.18.2 for more information.

---

TD_0000095

# Telcon w DHSA (follow-up from Tuesday & Wednesday)

| | |
|---|---|
| **Where:** | Telcon & optional in-person for WH Campus |
| **When:** | Fri Jun 27 14:30:00 2025 -04:00 |
| **Until:** | Fri Jun 27 15:30:00 2025 -04:00 |
| **Organisers** | "Santos, Dina M. EOP/NSC" <[PII]@nsc.eop.gov> |
| **Required Attendees:** | "Santos, Dina M. EOP/NSC" <[PII]@nsc.eop.gov> |
| | "Fitzhugh, Peter EOP/NSC" <[PII]@nsc.eop.gov> |
| | "[PII] EOP/WHO" <[PII]@who.eop.gov> |
| | "Gordon, Derek W" <[PII]@hsi.dhs.gov> |
| | "Wall, Charles" <[PII]@ice.dhs.gov> |
| | "McMaster, Hunter" <george.mcmaster@treasury.gov> |
| | "Armstrong, Anthony J. EOP/NSC" <[PII]@nsc.eop.gov> |
| | "Cash, Steven P. EOP/NSC" <[PII]@nsc.eop.gov> |
| | "Centorino, Scott G. EOP/WHO" <[PII]@who.eop.gov> |
| | "Adolphsen, Sam G. EOP/WHO" <[PII]@who.eop.gov> |
| | "Emrich, Matthew EOP/NSC" <[PII]@nsc.eop.gov> |
| | "Badgley, Tyler" <tyler.badgley@treasury.gov> |
| | "Pilkerton, Christopher" <christopher.pilkerton@treasury.gov> |
| **Optional Attendees:** | "Fitzgerald, Richard S" <[PII]@hsi.dhs.gov> |
| | "Walker, William S" <[PII]r@hsi.dhs.gov> |
| | "DeLay, Joshua EOP/NSC" <[PII]@nsc.eop.gov> |

** **Caution:** External email from: [PII] @nsc.eop.gov] Pay attention to suspicious links and attachments. Send suspicious email to suspect@treasury.gov **

This email is from a US Government agency.

Please dial the WHSF ███████ and ask to **connect to** ███████ **2:30pm call**.

TD_0000096

| CIVID | ANumber | LName | FName | MName | DOB | COC | COB | FBI | SSN | FINS | SEX_CODE | PRIORITY_DSC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |



PII/6103

TD_0000097

A434

| CIVID | ANumber | LName | FName | MName | DOB | COC | COB | FBI | SSN | FINS | SEX_CODE | PRIORITY_DSC |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |
| | | | | | | | | | | | | To verify presence within the United States of America |



PII/6103

TD_0000098

| CIVID | ANumber | LName | FName | MName | DOB | COC | COB | FBI | SSN | FINS | SEX_CODE | PRIORITY_DSC |
|-------|---------|-------|-------|-------|-----|-----|-----|-----|-----|------|----------|--------------|
| | | | | | | PII/6103 | | | | | | To verify presence within the United States of America |

TD_0000099

| EARM_CASE_ID | FINAL_ORDER_DATE | EARM_ADDRESS | CASE_CREATE_DATE | FINAL_ORDER_Y_N | CRIMINAL STATUTE | TAXABLE PERIOD | ICE-POC | |
|---|---|---|---|---|---|---|---|---|
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |

**PII/6103**      **PII**

TD_0000100

| EARM_CASE_ID | FINAL_ORDER_DATE | EARM_ADDRESS | CASE_CREATE_DATE | FINAL_ORDER_Y_N | CRIMINAL STATUTE | TAXABLE PERIOD | ICE-POC | |
|---|---|---|---|---|---|---|---|---|
| | | **PII/6103** | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |
| | | | | Y | 8 U.S.C. § 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams; | @ice.dhs.gov |

TD_0000101

| EARM_CASE_ID | FINAL_ORDER_DATE | EARM_ADDRESS | CASE_CREATE_DATE | FINAL_ORDER_Y_N | CRIMINAL STATUTE | TAXABLE PERIOD | ICE-POC | | |
|---|---|---|---|---|---|---|---|---|---|
| | | PII/6103 | | Y | 8 U.S.C. §§ 1253(a)(1) | JAN_2022_PRESENT | Jesse Williams, J | PII | @ice.dhs.gov |

TD_0000102

| From: | Morris Audrey M [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5435A48E757B47DB9FAA0073CDE6DB1B **PII** ] |
|---|---|
| Sent: | 7/1/2025 6:15:54 PM |
| To: | Pandya Kaschit [kaschit.pandya@irs.gov] |
| CC: | Butler Paul T [paul.t.butler@irscounsel.treas.gov]; Goldman Richard G [richard.g.goldman@irscounsel.treas.gov]; **PII** @irscounsel.treas.gov]; **PII** **PII** @irscounsel.treas.gov] |
| Subject: | FW: Letter from ICE |
| Attachments: | AD1 Memo to IRS Commission Request for Information - OD Edits.pdf |
| Importance: | High |

Hi Kaschit,

I've met with our 6103 experts, and we agree that the attached letter to Commissioner Long satisfies the written request provisions in the MOU and meets the requirements of the statute. Accordingly, the IRS can begin processing the request received from DHS on 06/25/2025 that was specifically referenced in the letter (i.e., the one named "EARM_Full_Delta_Schema_v2.zip" and containing 1.2 million requests) and sharing information back to ICE.

However, the information being shared with ICE should be limited to that which is provided for in the MOU:

- For records where there is no match, we should be sharing only the fact that there is "NO MATCH"
- For records that produce a match, we should be sharing only the last known address for that record.

Finally, it's my understanding that Treasury/DHS/ICE want results as soon as possible. I will leave it up to you to fill them in on a realistic timeline for delivery.

Let me know if you have any questions.

Thanks,
Audrey

Audrey Morris
Deputy Chief Counsel (Operations)

From: Pandya Kaschit <Kaschit.Pandya@irs.gov>
Sent: Tuesday, July 1, 2025 10:34 AM
To: Morris Audrey M <Audrey.M.Morris@IRSCOUNSEL.TREAS.GOV>
Subject: RE: Letter from ICE

Here you go.

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
PII

For appointments, please reach out to **PII** @irs.gov)

TD_0000103

**From:** Morris Audrey M <Audrey.M.Morris@IRSCOUNSEL.TREAS.GOV>
**Sent:** Tuesday, July 1, 2025 11:33 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Subject:** RE: Letter from ICE

Can you send me the original attachment please

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 10:07 AM
**To:** Morris Audrey M <Audrey.M.Morris@IRSCOUNSEL.TREAS.GOV>
**Subject:** FW: Letter from ICE

Hi Audrey – see below for the full thread but a quick summary

- we have been receiving files from DHS for us to test/populate
- we were told by Andrew to not send anything back until he gave us the green light
- yesterday PII also said to hold off until we hear from him
- received a call from George who asked me to get the green light from you

Please let me know if you have any questions. Once we have the go-ahead from you, we can work on sending the file(s) back. Thank you.

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
PII

For appointments, please reach out to PII @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 11:02 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; Tyler.Badgley@treasury.gov; PII PII @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; PII @treasury.gov
**Subject:** RE: Letter from ICE

Thanks for the call.

As discussed, in PII 's absence, please touch base with Audrey for the greenlight. This needs to happen in the next couple of hours.

G. Hunter McMaster II
M: PII
Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** McMaster, Hunter <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:57 AM
**To:** Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; PII PII @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; PII

[PII] @treasury.gov>

**Subject:** RE: Letter from ICE

I have called you, as has Chris.

Call me back ASAP **M** [PII]

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 10:49 AM
**To:** McMaster, Hunter<George.McMaster@treasury.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; [PII] [PII] @treasury.gov>
**Subject:** RE: Letter from ICE

I'm free between now and 11:30. Any chance that works?

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII]

For appointments, please reach out to [PII] @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:44 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; Tyler.Badgley@treasury.gov; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; [PII] @treasury.gov
**Subject:** RE: Letter from ICE

We need to do a call ASAP.

11:30am or 12pm work?

G. Hunter McMaster II
M [PII]
Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 10:39 AM
**To:** McMaster, Hunter<George.McMaster@treasury.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; [PII] [PII] @treasury.gov>
**Subject:** RE: Letter from ICE

We have not shared anything back with ICE per the direction from Andrew (De Mello) and [PII]

TD_0000105

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer

PII

For appointments, please reach out to PII @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:34 AM
**To:** Tyler.Badgley@treasury.gov PII @IRSCOUNSEL.TREAS.GOV>; Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Cc:** Christopher.Pilkerton@treasury.gov; PII @treasury.gov
**Subject:** RE: Letter from ICE

Kaschit – Can you please confirm whether information sharing is taking place? We need an update within the next hour.

Feel free to call me M: PII

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Badgley, Tyler <Tyler.Badgley@treasury.gov>
**Sent:** Tuesday, July 1, 2025 9:59 AM
**To:** PII @IRSCOUNSEL.TREAS.GOV>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

It looks like PII is out this week. Kaschit, do you have some time to connect this afternoon? I'm free from 2-3 and 4-4:30.

Tyler

**From:** Badgley, Tyler
**Sent:** Monday, June 30, 2025 9:35 AM
**To:** PII @IRSCOUNSEL.TREAS.GOV>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

Thanks PII Can someone let us know when we expect to send back the first data?

Tyler

**From:** PII @IRSCOUNSEL.TREAS.GOV>
**Sent:** Friday, June 27, 2025 5:27 PM
**To:** Badgley, Tyler <Tyler.Badgley@treasury.gov>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

Thanks, Tyler. We are working on processing ICE's requests.

PII

TD_0000106

Senior Technician Reviewer
Internal Revenue Service
Office of Chief Counsel (Procedure & Administration)
1111 Constitution Ave., NW
Washington, D.C. 20224

**PII**

**From:** Tyler.Badgley@treasury.gov <Tyler.Badgley@treasury.gov>
**Sent:** Friday, June 27, 2025 3:32 PM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov> [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; George.McMaster@treasury.gov
**Subject:** Letter from ICE

Kaschit and [PII]

Please see the attached letter from Todd Lyons, the Acting Director of ICE, providing the required additional information needed to begin processing the request for information sharing pursuant to the MOU. We understand that this letter coupled with the data file comply with the requirements of the MOU and statute, and so IRS should begin processing and sharing information back to ICE. Please let me know if that is not the case for any reason.

Thank you,

Tyler

**Tyler S. Badgley**
Deputy General Counsel
U.S. Department of the Treasury
Tyler.Badgley@Treasury.gov | [PII]

TD_0000107

| | |
|---|---|
| **From:** | Pandya Kaschit [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ECE3A5115C7449F9A2856A92A5B2E6D7 PII |
| **Sent:** | 7/1/2025 9:11:39 PM |
| **To:** | Long William H II [william.h.longii@irs.gov]; Elleson Benjamin D [benjamin.d.elleson@irs.gov] |
| **Subject:** | FW: Letter from ICE |
| **Attachments:** | AD1 Memo to IRS Commission Request for Information - OD Edits.pdf |

Here's what I sent to Treasury earlier this afternoon.

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
PII

For appointments, please reach out to PII @irs.gov

**From:** Pandya Kaschit
**Sent:** Tuesday, July 1, 2025 3:37 PM
**To:** George.McMaster@treasury.gov; Tyler.Badgley@treasury.gov
**Cc:** Christopher.Pilkerton@treasury.gov; PII @treasury.gov PII
PII IRSCOUNSEL.TREAS.GOV>; Morris Audrey M <Audrey.M.Morris@IRSCOUNSEL.TREAS.GOV>;
PII @irscounsel.treas.gov>; Butler Paul T <Paul.T.Butler@IRSCOUNSEL.TREAS.GOV>;
PII @irscounsel.treas.gov>; Walker John J <John.J.Walker@irs.gov>
**Subject:** RE: Letter from ICE

Hunter/Tyler,

I want to provide an update based on a few conversations the IRS team has had today.

- Counsel met with 6103 experts and agreed the attached letter satisfies the written provisions in the MOU and meets the requirements of the statute
- IT will execute a sample run (100 records) using the file we received from DHS on 6/25 ("EARM_Full_Delta_Schema_v2.zip" and containing 1.2 million requests); we anticipate it will require approximately 1.5 days at which point we'll turn the file over to PGLD for quality control
- Once PGLD completes their quality control (and assuming everything looks as it should), Counsel will approve IT to send the file to DHS
- We're hopeful to we'll be able to send the output of the sample to DHS by Thursday (7/3) evening, barring any issues in running the file or during quality control
- The information shared will be limited to that which is provided for in the MOU
    - For records where there is no match, we should be sharing only the fact that there is "NO MATCH"
    - For records that produce a match, we should be sharing only the last known address for that record

Please let me know if you have any questions. Thank you.

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
PII

For appointments, please reach out to PII @irs.gov

TD_0000108

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 11:02 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; Tyler.Badgley@treasury.gov ⸀PII⸀
⸀PII⸀ @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; ⸀PII⸀ @treasury.gov
**Subject:** RE: Letter from ICE

Thanks for the call.

As discussed, in ⸀PII⸀ absence, please touch base with Audrey for the greenlight. This needs to happen in the next couple of hours.

G. Hunter McMaster II
M ⸀PII⸀
Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** McMaster, Hunter <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:57 AM
**To:** Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; ⸀PII⸀
⸀PII⸀ @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; ⸀PII⸀
⸀PII⸀ @treasury.gov>
**Subject:** RE: Letter from ICE

I have called you, as has Chris.

Call me back ASAP **M:** ⸀PII⸀

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 10:49 AM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; ⸀PII⸀
⸀PII⸀ @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; ⸀PII⸀
⸀PII⸀ @treasury.gov>
**Subject:** RE: Letter from ICE

I'm free between now and 11:30. Any chance that works?

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer

⸀PII⸀

For appointments, please reach out to ⸀PII⸀ @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:44 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; Tyler.Badgley@treasury.gov; ⸀PII⸀
⸀PII⸀ @IRSCOUNSEL.TREAS.GOV>

TD_0000109

**Cc:** Christopher.Pilkerton@treasury.gov; [PII] @treasury.gov
**Subject:** RE: Letter from ICE

We need to do a call ASAP.

11:30am or 12pm work?

G. Hunter McMaster II
M: [PII]
Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 10:39 AM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; [PII] [PII] @treasury.gov>
**Subject:** RE: Letter from ICE

We have not shared anything back with ICE per the direction from Andrew (De Mello) and [PII]

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII] (C)

For appointments, please reach out to [PII] @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:34 AM
**To:** Tyler.Badgley@treasury.gov [PII] @IRSCOUNSEL.TREAS.GOV>; Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Cc:** Christopher.Pilkerton@treasury.gov; [PII] @treasury.gov
**Subject:** RE: Letter from ICE

Kaschit – Can you please confirm whether information sharing is taking place? We need an update within the next hour.

Feel free to call me M: [PII]

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Badgley, Tyler <Tyler.Badgley@treasury.gov>
**Sent:** Tuesday, July 1, 2025 9:59 AM
**To:** [PII] @IRSCOUNSEL.TREAS.GOV>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

It looks like [PII] is out this week. Kaschit, do you have some time to connect this afternoon? I'm free from 2-3 and 4-4:30.

Tyler

TD_0000110

**From:** Badgley, Tyler
**Sent:** Monday, June 30, 2025 9:35 AM
**To:** [PII] @IRSCOUNSEL.TREAS.GOV>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

Thanks, [PII] Can someone let us know when we expect to send back the first data?

Tyler

**From:** [PII] @IRSCOUNSEL.TREAS.GOV>
**Sent:** Friday, June 27, 2025 5:27 PM
**To:** Badgley, Tyler <Tyler.Badgley@treasury.gov>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

Thanks, Tyler. We are working on processing ICE's requests.

[PII]
Senior Technician Reviewer
Internal Revenue Service
Office of Chief Counsel (Procedure & Administration)
1111 Constitution Ave., NW
Washington, D.C. 20224

**PII**

**From:** Tyler.Badgley@treasury.gov <Tyler.Badgley@treasury.gov>
**Sent:** Friday, June 27, 2025 3:32 PM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; George.McMaster@treasury.gov
**Subject:** Letter from ICE

Kaschit and [PII]

Please see the attached letter from Todd Lyons, the Acting Director of ICE, providing the required additional information needed to begin processing the request for information sharing pursuant to the MOU. We understand that this letter coupled with the data file comply with the requirements of the MOU and statute, and so IRS should begin processing and sharing information back to ICE. Please let me know if that is not the case for any reason.

Thank you,

Tyler

**Tyler S. Badgley**
Deputy General Counsel
U.S. Department of the Treasury
Tyler.Badgley@Treasury.gov | [PII]



*Office of the Director*

**U.S. Department of Homeland Security**
500 12ᵗʰ Street, NW
Washington, DC 20536

**U.S. Immigration
and Customs
Enforcement**

June 27, 2025

Dear Commissioner Long,

In accordance with the Memorandum of Understanding (MOU) signed between the U.S. Department of the Treasury, Internal Revenue Service (IRS) and the U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) for the Exchange of Information for Nontax Criminal Enforcement, signed on or about April 7, 2025, this letter serves as ICE's written request for the last known address of the individuals listed in the information request sent to the IRS by ICE via Kiteworks, the IRS' preferred file sharing platform, on June 25, 2025 (the "Information Request").

The Information Request was electronically submitted to the IRS by ICE and contained a data file titled EARM_Full_Delta_Schema_v2.zip (the "Data File"). As set forth in Section 6 of the MOU and as required by IRC § 6103(i)(2)(A) & (B), each line of the Data File is hereby modified to include the following information:

- the designated nontax Federal criminal statute is 8 U.S.C. § 1253(a)(1)); and

- the reason for this request is to permit the U.S. Department of Homeland Security to conduct its mission in furtherance of its statutory mandate, and in preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1), other specifically designated Federal criminal statute, or any subsequent criminal proceedings; and

- the reason why each requested disclosure is, or may be, relevant to such proceeding or investigation is that the requested information may contain address information which is potentially at issue with respect to investigating or proving a violation under 8 U.S.C. § 1253(a)(1); and

- the point of contact field in the Data File is the identity of the officer(s) and/or employe(es) who are personally and directly engaged in the criminal proceeding or criminal investigation; and

- ICE attests that the information will only be used by officers and employees of ICE solely for the preparation for judicial or administrative proceedings, or investigation that may lead to such proceedings, pertaining to the enforcement of 8 U.S.C. § 1253(a)(1),

**FOR OFFICIAL USE ONLY**

A449

TD_0000112

other specifically designated Federal criminal statute, or any subsequent criminal proceedings.

Thank you for your immediate attention to this matter.

Sincerely,

Todd M. Lyons
Acting Director

FOR OFFICIAL USE ONLY

TD_0000113

**From:** [PII] [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6950FB44A6A442ABA8E7AB7982608BFF [PII]

**Sent:** 7/2/2025 2:25:29 PM

**To:** Romo Dottie A [dottie.a.romo@irs.gov]

**Subject:** RE: Letter from ICE

Done... do you need it now?

**From:** Romo Dottie A <Dottie.A.Romo@irs.gov>
**Sent:** Wednesday, July 2, 2025 10:24 AM
**To:** [PII] @irs.gov>
**Subject:** Fw: Letter from ICE

Please print out this email for the CIR.

---

**From:** Romo Dottie A
**Sent:** Tuesday, July 1, 2025 5:19:27 PM
**To:** Elleson Benjamin D <Benjamin.D.Elleson@irs.gov>
**Subject:** FW: Letter from ICE

**Dottie Romo**
Chief Operating Officer (Acting)
Department of the Treasury | Internal Revenue Service
1111 Constitution Ave NW, Washington DC 20224
Dottie.A.Romo@irs.gov

Executive Assistant, [PII]
[PII]
Program Manager, [PII]
[PII]
Deputy COO (Acting): [PII]
[PII]

**From:** Walker John J <John.J.Walker@irs.gov>
**Sent:** Tuesday, July 1, 2025 4:30 PM
**To:** Romo Dottie A <Dottie.A.Romo@irs.gov> [PII] @irs.gov>
**Subject:** FW: Letter from ICE

*FYI only.* As you know, we have been working with IT and Counsel on validating the DHS request, requirements, etc. They have met the requirement, and IT will be pulling a sample of 100 from the request of 1.2 million. PGLD will do a 100% quality check on the sample and the goal is to provide the output to DHS by COB Thursday (Treasury appears to have been pushing for a full run but IT cannot do it and we still have to ensure the output is correct).

Kaschit will be looking for IT and PGLD approval before transmitting.

Moving forward, we may request RAAS assistance for QC assistance on the larger request of 1.2 million.

TD_0000114

Let me know if you have any questions, need more information, or want to talk.

Thanks
Jack

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 3:37 PM
**To:** George.McMaster@treasury.gov; Tyler.Badgley@treasury.gov
**Cc:** Christopher.Pilkerton@treasury.gov; [PII] @treasury.gov; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>; Morris Audrey M <Audrey.M.Morris@IRSCOUNSEL.TREAS.GOV>; [PII] @irscounsel.treas.gov>; Butler Paul T <Paul.T.Butler@IRSCOUNSEL.TREAS.GOV>; [PII] @irscounsel.treas.gov>; Walker John J <John.J.Walker@irs.gov>
**Subject:** RE: Letter from ICE

Hunter/Tyler,

I want to provide an update based on a few conversations the IRS team has had today.

- Counsel met with 6103 experts and agreed the attached letter satisfies the written provisions in the MOU and meets the requirements of the statute
- IT will execute a sample run (100 records) using the file we received from DHS on 6/25 ("EARM_Full_Delta_Schema_v2.zip" and containing 1.2 million requests); we anticipate it will require approximately 1.5 days at which point we'll turn the file over to PGLD for quality control
- Once PGLD completes their quality control (and assuming everything looks as it should), Counsel will approve IT to send the file to DHS
- We're hopeful to we'll be able to send the output of the sample to DHS by Thursday (7/3) evening, barring any issues in running the file or during quality control
- The information shared will be limited to that which is provided for in the MOU
  - For records where there is no match, we should be sharing only the fact that there is "NO MATCH"
  - For records that produce a match, we should be sharing only the last known address for that record

Please let me know if you have any questions. Thank you.

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII] (C)

For appointments, please reach out to [PII] @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 11:02 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; Tyler.Badgley@treasury.gov; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; [PII] @treasury.gov
**Subject:** RE: Letter from ICE

Thanks for the call.

As discussed, in [PII] 's absence, please touch base with Audrey for the greenlight. This needs to happen in the next couple of hours.

A452

TD_0000115

G. Hunter McMaster II
M: [PII]
Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** McMaster, Hunter <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:57 AM
**To:** Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov> [PII] [PII] @treasury.gov>
**Subject:** RE: Letter from ICE

I have called you, as has Chris.

Call me back ASAP **M:** [PII]

Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 10:49 AM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; [PII] < [PII] @treasury.gov>
**Subject:** RE: Letter from ICE

I'm free between now and 11:30. Any chance that works?

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII]

For appointments, please reach out to [PII] @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:44 AM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; Tyler.Badgley@treasury.gov; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; [PII] @treasury.gov
**Subject:** RE: Letter from ICE

We need to do a call ASAP.

11:30am or 12pm work?

G. Hunter McMaster II
M: [PII]
Contents in my emails are considered draft or pre-decisional unless otherwise noted.

TD_0000116

**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Tuesday, July 1, 2025 10:39 AM
**To:** McMaster, Hunter <George.McMaster@treasury.gov>; Badgley, Tyler <Tyler.Badgley@treasury.gov>; [PII]
[PII] )@IRSCOUNSEL.TREAS.GOV>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; [PII]
[PII] @treasury.gov>
**Subject:** RE: Letter from ICE

We have not shared anything back with ICE per the direction from Andrew (De Mello) and [PII]

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[PII]

For appointments, please reach out to [PII] @irs.gov)

**From:** George.McMaster@treasury.gov <George.McMaster@treasury.gov>
**Sent:** Tuesday, July 1, 2025 10:34 AM
**To:** Tyler.Badgley@treasury.gov; [PII] @IRSCOUNSEL.TREAS.GOV>; Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Cc:** Christopher.Pilkerton@treasury.gov; [PII] @treasury.gov
**Subject:** RE: Letter from ICE

Kaschit – Can you please confirm whether information sharing is taking place? We need an update within the next hour.

Feel free to call me M: [PII]


Contents in my emails are considered draft or pre-decisional unless otherwise noted.

**From:** Badgley, Tyler <Tyler.Badgley@treasury.gov>
**Sent:** Tuesday, July 1, 2025 9:59 AM
**To:** [PII] @IRSCOUNSEL.TREAS.GOV>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

It looks like [PII] is out this week. Kaschit, do you have some time to connect this afternoon? I'm free from 2-3 and 4-4:30.

Tyler

**From:** Badgley, Tyler
**Sent:** Monday, June 30, 2025 9:35 AM
**To:** [PII] @IRSCOUNSEL.TREAS.GOV>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

Thanks, [PII] Can someone let us know when we expect to send back the first data?

TD_0000117

Tyler

**From:** [PII] @IRSCOUNSEL.TREAS.GOV>
**Sent:** Friday, June 27, 2025 5:27 PM
**To:** Badgley, Tyler <Tyler.Badgley@treasury.gov>; Pandya, Kaschit (IRS) <Kaschit.Pandya@irs.gov>
**Cc:** Pilkerton, Christopher <Christopher.Pilkerton@treasury.gov>; McMaster, Hunter <George.McMaster@treasury.gov>
**Subject:** RE: Letter from ICE

Thanks, Tyler.  We are working on processing ICE's requests.

**PII**

Senior Technician Reviewer
Internal Revenue Service
Office of Chief Counsel (Procedure & Administration)
1111 Constitution Ave., NW
Washington, D.C. 20224

**PII**

**From:** Tyler.Badgley@treasury.gov <Tyler.Badgley@treasury.gov>
**Sent:** Friday, June 27, 2025 3:32 PM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; [PII] @IRSCOUNSEL.TREAS.GOV>
**Cc:** Christopher.Pilkerton@treasury.gov; George.McMaster@treasury.gov
**Subject:** Letter from ICE

Kaschit and [PII]

Please see the attached letter from Todd Lyons, the Acting Director of ICE, providing the required additional information needed to begin processing the request for information sharing pursuant to the MOU.  We understand that this letter coupled with the data file comply with the requirements of the MOU and statute, and so IRS should begin processing and sharing information back to ICE.  Please let me know if that is not the case for any reason.

Thank you,

Tyler

**Tyler S. Badgley**
Deputy General Counsel
U.S. Department of the Treasury
Tyler.Badgley@Treasury.gov | **PII**

TD_0000118

| | |
|---|---|
| **From:** | Pandya Kaschit [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ECE3A5115C7449F9A2856A92A5B2E6D7-[ PII ] |
| **Sent:** | 7/7/2025 6:13:17 PM |
| **To:** | Long William H II [william.h.longii@irs.gov]; George.McMaster@treasury.gov [george.mcmaster@treasury.gov]; Christopher.Pilkerton@treasury.gov [christopher.pilkerton@treasury.gov] |
| **CC:** | Elleson Benjamin D [benjamin.d.elleson@irs.gov] |
| **Subject:** | DHS Data Analysis |

CIR/Hunter/Chris,

Below is the breakdown of the 99 that didn't match. Please let me know if you have any questions. Thank you.

- No match found by name – **85**
- Name matches, but the address does not match (DHE sends address and should be used in matching, per the MOU) – **7**
- The SSN given by DHS exists but the name does not match – **7**

Sincerely,

Kaschit Pandya
Chief Information Officer / Chief Technology Officer
[ PII ](C)

For appointments, please reach out to [ PII ](@irs.gov)

TD_0000119

| From: | Pandya Kaschit [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=ECE3A5115C7449F9A2856A92A5B2E6D7- **PII** |
|---|---|
| Sent: | 7/14/2025 1:25:27 PM |
| To: | Pandya Kaschit [kaschit.pandya@irs.gov]; **PII** @hsi.dhs.gov]; **PII** **PII** @hsi.dhs.gov]; **PII** @irscounsel.treas.gov]; **PII** **PII** @hsi.dhs.gov]; **PII** @associates.hsi.dhs.gov] **PII** **PII** @hsi.dhs.gov]; **PII** @associates.hsi.dhs.gov]; **PII** **PII** @hsi.dhs.gov]; **PII** @ice.dhs.gov]; **PII** **PII** @ice.dhs.gov]; **PII** @hsi.dhs.gov] |
| CC: | Morris Audrey M [audrey.m.morris@irscounsel.treas.gov]; Butler Paul T [paul.t.butler@irscounsel.treas.gov]; Kies Kenneth J [kenneth.j.kies@irscounsel.treas.gov]; Goldman Richard G [richard.g.goldman@irscounsel.treas.gov] |
| Subject: | Data Exchange |
| Location: | Microsoft Teams Meeting |
| Start: | 7/14/2025 3:00:00 PM |
| End: | 7/14/2025 3:30:00 PM |
| Show Time As: | Tentative |
| Required Attendees: | Pandya Kaschit; **PII** **PII** **PII** **PII** |
| Optional Attendees: | Morris Audrey M; Butler Paul T; Kies Kenneth J; Goldman Richard G |

-----Original Appointment-----
**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Saturday, July 12, 2025 3:26 PM
**To:** Pandya Kaschit; Pandya Kaschit; **PII**

**PII**

**Cc:** Morris Audrey M; Butler Paul T; Kies Kenneth J
**Subject:** Data Exchange
**When:** Monday, July 14, 2025 11:00 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

-----Original Appointment-----
**From:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Sent:** Saturday, July 12, 2025 1:25 PM
**To:** Pandya Kaschit; **PII** **PII** ; **PII** **PII**

**Subject:** Data Exchange
**When:** Monday, July 14, 2025 11:00 AM-11:30 AM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: ██████████████

Passcode: █████████

---

**Dial in by phone**

+███████████████ United States, Georgetown

Find a local number

Phone conference ID: ████████████

For organizers: Meeting options | Reset dial-in PIN

Meeting hosts (organizers, co-organizers) hold responsibility for controlling the meeting environment, such as removing unauthorized parties, muting audio or video when appropriate to protect privacy, giving notice and getting consent for recording, promoting others as presenters or co-organizers to help moderate the meeting and chat, and setting meeting options. Please refer to IRM 10.5.1.6.18.2 for more information.

---

TD_0000121

| | |
|---|---|
| **From:** | [PII] [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=628F1998BAEB401BB3BDAB3B2007180[ PII ] |
| **Sent:** | 7/9/2025 9:24:31 PM |
| **To:** | [ PII ]@irscounsel.treas.gov]; Morris Audrey M [audrey.m.morris@irscounsel.treas.gov]; Paul William M [william.m.paul@irscounsel.treas.gov]; Butler Paul T [paul.t.butler@irscounsel.treas.gov]; Goldman Richard G [richard.g.goldman@irscounsel.treas.gov]; Wearing Robert T [robert.t.wearing@irscounsel.treas.gov]; Lesniak Emily M [emily.m.lesniak@irscounsel.treas.gov]; Kies Kenneth [Kenneth.Kies@treasury.gov]; Kies Kenneth J [kenneth.j.kies@irscounsel.treas.gov]; Pandya Kaschit [kaschit.pandya@irs.gov] |
| **CC:** | [ PII ]@treasury.gov]; [ PII ]@treasury.gov; [ PII ] [ PII ]@irscounsel.treas.gov]; Elleson Benjamin D [benjamin.d.elleson@irs.gov] |
| **Subject:** | DHS MOU Implementation |
| **Location:** | Microsoft Teams Meeting; and in-person, IRS ROOM 3026 |
| **Start:** | 7/15/2025 2:30:00 PM |
| **End:** | 7/15/2025 3:00:00 PM |
| **Show Time As:** | Tentative |
| **Required Attendees:** | [ PII ] Morris Audrey M; Paul William M; Butler Paul T; Goldman Richard G; Wearing Robert T; Lesniak Emily M; Kies Kenneth; Kies Kenneth J; Pandya Kaschit |
| **Optional Attendees:** | [ PII ]; [ PII ]@treasury.gov; [ PII ]; Elleson Benjamin D |

7/14/2025 Rescheduled from Friday, July 11th.  Thanks [ PII ]

Microsoft Teams

Need help? https://aka.ms/JoinTeamsMeeting?omkt=en-US

Join the meeting now: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Meeting ID: ▮▮▮▮▮▮▮▮
Passcode: ▮▮▮▮▮▮

Dial in by phone

+1 ▮▮▮▮▮▮▮▮▮▮

Find a local number: https://dialin.teams.microsoft.com ▮▮▮▮▮▮▮▮

Phone Conference ID: ▮▮▮▮▮▮

For organizers:

Meeting options: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Meeting hosts (organizers, co-organizers) hold responsibility for controlling the meeting environment, such as removing unauthorized parties, muting audio or video when appropriate to protect privacy, giving notice and getting consent for recording, promoting others as presenters or co-organizers to help moderate the meeting and chat, and setting meeting options. Please refer to IRM 10.5.1.6.18.2 for more information.

TD_0000122

| From: | Morris Audrey M [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=5435A48E757B47DB9FAA0073CDE6DB1B PII |
|---|---|
| Sent: | 7/18/2025 12:03:18 PM |
| To: | Morris Audrey M [audrey.m.morris@irscounsel.treas.gov]; Kies Kenneth J [kenneth.j.kies@irscounsel.treas.gov]; Kenneth.Kies@treasury.gov [kenneth.kies@treasury.gov]; Butler Paul T [paul.t.butler@irscounsel.treas.gov]; Goldman Richard G [richard.g.goldman@irscounsel.treas.gov]; Pandya Kaschit [kaschit.pandya@irs.gov] PII PII @irs.gov] |
| CC: | PII @irscounsel.treas.gov] PII @treasury.gov; Paul William M [william.m.paul@irscounsel.treas.gov]; PII @irs.gov]; PII PII @irs.gov]; Walker John J [john.j.walker@irs.gov]; Romo Dottie A [dottie.a.romo@irs.gov] |
| Subject: | DHS MOU |
| Location: | Microsoft Teams Meeting; and in-person IRS Room 3026 |
| Start: | 7/18/2025 6:30:00 PM |
| End: | 7/18/2025 7:00:00 PM |
| Show Time As: | Busy |

| Required Attendees: | Kies Kenneth J; Kenneth.Kies@treasury.gov; Butler Paul T; Goldman Richard G; Pandya Kaschit; PII |
|---|---|
| Optional Attendees: | PII @treasury.gov; Paul William M; PII PII Walker John J; Romo Dottie A |

---

**From:** Morris Audrey M
**Sent:** Tuesday, July 15, 2025 2:28:48 PM
**To:** Morris Audrey M <Audrey.M.Morris@IRSCOUNSEL.TREAS.GOV>; Kies Kenneth J <Kenneth.J.Kies@irscounsel.treas.gov>; Kenneth.Kies@treasury.gov <kenneth.kies@treasury.gov>; Butler Paul T <Paul.T.Butler@IRSCOUNSEL.TREAS.GOV>; Goldman Richard G <Richard.G.Goldman@IRSCOUNSEL.TREAS.GOV>; Pandya Kaschit <Kaschit.Pandya@irs.gov>; PII @irs.gov>
**Cc:** PII f@irscounsel.treas.gov>; PII @treasury.gov PII treasury.gov>; Paul William M<William.M.Paul@IRSCOUNSEL.TREAS.GOV>; Walker John J <John.J.Walker@irs.gov>; PII ?@irs.gov>; PII @irs.gov>; Keith James D<James.D.KeithJr@irs.gov>; PII a@irs.gov>; PII PII h@irs.gov>
**Subject:** DHS MOU
**When:** Friday, July 18, 2025 2:30 PM-3:00 PM.
**Where:** Microsoft Teams Meeting; and in-person IRS Room 3026

---

-----Original Appointment-----
**From:** Morris Audrey M <Audrey.M.Morris@IRSCOUNSEL.TREAS.GOV>
**Sent:** Tuesday, July 15, 2025 11:22 AM
**To:** Morris Audrey M; Kies Kenneth J; Kenneth.Kies@treasury.gov; Butler Paul T; Goldman Richard G; Pandya Kaschit; PII
**Cc:** PII PII @treasury.gov; Paul William M
**Subject:** DHS MOU
**When:** Friday, July 18, 2025 2:30 PM-3:00 PM (UTC-05:00) Eastern Time (US & Canada).
**Where:** Microsoft Teams Meeting; and in-person IRS Room 3026

TD_0000123

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID ███████████████

Passcode ████████████

---

**Dial in by phone**

+1 7████████████████ United States, Georgetown

Find a local number

Phone conference ID: ████████████

For organizers: Meeting options | Reset dial-in PIN

Meeting hosts (organizers, co-organizers) hold responsibility for controlling the meeting environment, such as removing unauthorized parties, muting audio or video when appropriate to protect privacy, giving notice and getting consent for recording, promoting others as presenters or co-organizers to help moderate the meeting and chat, and setting meeting options. Please refer to IRM 10.5.1.6.18.2 for more information.

---

TD_0000124

**DHS-ICE Data Exchange Overview**

**Step 1 - IRS receives input file from DHS**

- The input file is delivered via Kiteworks to IRS.
- Upon receipt, the file is downloaded to one of the Integrated Customer Communication Environment (ICCE) servers for pre-processing.
- The input file is in CSV format. It contains 21 data columns (see Appendix for the full list).

**Step 2- Preprocessing task**

- **Purpose:** The pre-processing task ensures data quality and requested business rules before proceeding to the next processing step.
- **Data Validation:** The preprocessing step validates specific data elements such as CIVID, LName, FNname, FINAL_ORDER_DATE, EARM_ADDRESS, CRIMINAL STATUTE, TAXABLE PERIOD, ICE-POC.
- **Specific Validation Rules:**
  - CIVID: Must not be empty.
  - LName: Must not be empty. Required for processing
  - FNname: Must not be empty. Required for processing
  - TAXABLE PERIOD: Must not be empty. Required for processing
  - FINAL_ORDER_DATE: Must not be empty. Must be valid date and over 90 days from the current date.
  - EARM_ADDRESS: Must not be empty and must contain zip code.
  - CRIMINAL STATUTE: Must not be empty, and must contain the specific value (8 U.S.C. Â§ 1253(a)(1))
  - ICE-POC: Must not be empty.
- **Rejecting Records:** If any record fails any of the above validation rules, the record is rejected and not processed further.
  - When a record is rejected, the REJECT_REASON is captured in the internal review file (Step 4(a)). This is for internal tracking and quality checks only and not shared with DHS.
- Once the preprocessing completes the records are ready to be processed and the file is transmitted to the EDP for processing.

**Step 3- Finding the last known address main process**

**Goal:** Process input records based on the input data fields.

**Process:**

- **SSN-Based Lookup**: If a record has an SSN, perform a lookup using SSN and name to identify the individual.
- **Name & Address-Based Processing**: If an SSN isn't available, process the record using the name and address.

**Step - 3a) SSN-Based Lookup:**

**SSN-Based Lookup Process Overview**

TD_0000125

The SSN-Based Lookup is utilized only when the SSN is provided in the input file. It will retrieve the most recent address data for a taxpayer by comparing input records with the CADE2 database using a multi-step validation process.

**Lookup Logic and Matching Criteria**

1. SSN Matching:
   - Search by SSN in the CADE2 database for the specified tax period range.
2. Name Verification:
   - If a matching SSN record is found within the tax periods window:
     - The last name and first name from the input file are compared against all the names that exists in CADE2 for that SSN.
     - Hyphens are ignored during the name comparison.
     - If the taxpayer has multi-word names (e.g., first and/or last names composed of two words), both first and last names must have a match on at least one of the words.
     - A successful name match proceeds to the address retrieval step (Step 3c).
3. When a record is MATCHED additional details are captured for internal review Ex: MATCHED ON PARTIAL NAME AND SSN when its partial name match.

**SSN Availability**

- Approximately 10% of the input data has the SSN based on the last file we received

---

**Step -3b) Name & Address-Based Processing:**

Address-Based Matching is applied when there is no SSN on the input record but the record contains both Name and Address fields. This process attempts to validate and match taxpayer data using name and address details against the CADE2 database.

**Look up logic and Matching Criteria**

1. Name Matching:
   - The process begins by matching the name from the input record against the Primary or Secondary Name in the CADE2 database.
   - This is an exact match process.
     - Hyphens are ignored during the comparison.
   - If a match is found on the name, the process proceeds to address matching.
2. Address Matching:
   - The address from the input file is matched against both the current and historical addresses of the taxpayer in CADE2.
   - The match must:
     - Be an exact match on the address.
     - Fall within the requested tax periods.
   - If a qualifying address is found, the record is considered a match and Status is set to MATCHED, and proceeds to the address retrieval step (Step 3c).
3. Unmatched Status:

TD_0000126

- o If no exact match is found on either name or address, the record is flagged with Status = UNMATCHED.

### Step -3c) Address Retrieval and Status Assignment

- When a match is confirmed:
  - o The last known address is retrieved from CADE2 taxpayer address data.
  - o The corresponding input record is updated with:
    - The IRS last known address.
    - The Status set to MATCHED.
- When no matching record is found:
  - o The Status is set to UNMATCHED.

### Step 4 – Post processing task

Two output files are generated after processing:

1. Internal Review File

- Purpose: Used for internal review by PGLD and Counsel.
- Contents:
  - o All original 21 columns from the input file.
  - o Additional columns appended:
    - IRS_STATUS (MATCHED/UNMATCHED/REJECTED)
    - IRS_LAST_KNOWN_ADDRESS
    - REASON : Will contain rejected reason(s), matched or unmatched reasons.

2. Summary Output File

- Purpose: For release to DHS-ICE
- Contents:
  - o CIVID
  - o IRS_STATUS
  - o IRS_LAST_KNOWN_ADDRESS

### Step -5 Long Term Storage

- The input and output files will be stored in a secure archival location, which is yet to be determined. Coordination is currently underway with the SharePoint team to establish this location.
- Upon completion of processing and successful transfer of files to long-term storage, the data will be removed from the EDP and ICCE processing locations.

**Appendix:** List of columns from the input file

1. CIVID
2. ANumber
3. LName

4. FName
5. MName
6. DOB
7. COC
8. COB
9. FBI
10. SSN
11. FINS
12. SEX_CODE
13. PRIORITY_DSC
14. EARM_CASE_ID
15. FINAL_ORDER_DATE
16. EARM_ADDRESS
17. CASE_CREATE_DATE
18. FINAL_ORDER_Y_N
19. CRIMINAL STATUTE
20. TAXABLE PERIOD
21. ICE-POC

TD_0000128

**DHS-ICE Data Exchange Draft QC**

**Objective-** To test the matching process and the output generated for the DHS-ICE Data Exchange. The testing process is done in the steps listed below.

- Provide a random sampling of the output data file created for internal review to PLGD for quality check.
- Refer to the DHS-ICE-overview doc for additional details on the specifications.

---

**Step-1:** Provide two random samples from the output data created for internal review and provide the outputs to PGLD for verification.

**Matched Sample:** Contains random sampling of 203 matched records.

- This will include records matched on name and SSN.
- Records matched on name and address
- Sample stats
  - Total records with SSN- 180
  - Total records without SSN -23

**Unmatched Sample:** Contains random sampling of 203 unmatched records.

- This will include records unmatched on name and SSN
- Records unmatched on names and address
- Sample stats
  - Total records with SSN- 14
  - Total records without SSN -189

---

**Step-2:** Provide source data for the matched sample for verification

**Source data for matched records:** Contains 2 sets of data files.

- First set is pulled based on SSNs
- Second set is pulled based on Name when there is no SSN

**First Set:** Data is pulled based on the SSNs from the matched sample file.

  - Only the current address information is pulled in this sample
  - Includes the following data elements from CADE2
    - 
    - 
    - 
    - 
    - 



TD_0000129



**Second Set:** Data is pulled based on the matching first name, last name

- o  Address history records within that State that match the input EARM address are pulled.
- o  Data also includes current address information for matched names
- o  The State filter only applies to the address history data.
- o  Contains the following data elements



- o  current address is determined by the effective end date. if the effective end date is set to 9999-12-31 that is the current address.
- o  The address history is provided to verify if the EARM address matches one of the addresses in the CADE2 address history or the current address.

---

**Step-3:** Provide source data for the unmatched sample for verification.

**Source data for unmatched records:** Contains 2 sets of data files.

- First set is pulled based on SSNs
- Second set is pulled based on Name when there is no SSN
- Data is pulled the same way as in Step 2

---

(Page 85 of Total)

A467

| | |
|---|---|
| From: | Walker John J [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E88A1FC6BE7C419E9B4D00BA936332A0- PII |
| Sent: | 7/29/2025 5:52:53 PM |
| To: | PII @irs.gov]; Romo Dottie A [dottie.a.romo@irs.gov] |
| CC: | PII @irs.gov]; PII r@irs.gov]; PII PII @irs.gov]; PII @irs.gov]; PII @irs.gov] |
| Subject: | IRS-DHS ICE Update (Information only) |

Dottie PII

I wanted to update you on the status of the DHS data sharing. PGLD continues to meet daily and work with Counsel and IT on this effort. One area that is not completely clear is who is updating the Commissioner on the status. Additionally, his approval will be required before any information is transmitted back to DHS.

Let me know if you have any questions.

### IRS-DHS ICE Update as of 7/29/2025

- 6/27/2025: DHS submitted the data file ~1.3M records.
- IT completed the matching run; result is:
  - 3.7% match,
  - 93.7% non-match,
  - 2.6% reject; data provided did not meet MOU specifications.
- Quality Control:
  - RAAS advised a sample of 406 records would provide a 95% confidence level, 203 match and 203 non-matches.
  - IT will provide the output file and an address file for PGLD to review for QC.
  - RAAS confirmed this sample and methodology will achieve 95 % confidence level.
- PGLD is completing an Interim Guidance Memo, to cover delegation for IT delivery of results.
- IT, Counsel, and PGLD have been coordinating IDR responses for the TIGTA audit for this matter. *PGLD is lead stakeholder.*
- Because the unique circumstances of this data exchange, it is unclear if the Commissioner has been briefed by Chief Counsel or IT on these results.
- No data will be exchanged until CIR approval.

**Jack Walker**
**IRS Chief Privacy Officer (acting)**
Cell:    PII
Office:    PII

TD_0000131

| From: | Walker John J [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=E88A1FC6BE7C419E9B4D00BA936332A0 **PII** |
|---|---|
| Sent: | 8/4/2025 7:39:27 PM |
| To: | **PII** @irs.gov] |
| CC: | **PII** @irs.gov]; **PII** @irs.gov]; **PII** **PII** @irs.gov] |
| Subject: | REQUEST: Meeting to update and request approval for the DHS/IRS data sharing |

Good afternoon **PII**

The DHS data extraction process has been created and quality reviewed. The data extraction process is ready and we would like to brief the Commissioner and request his approval on Wednesday. Since PGLD, IT, and Counsel worked closely on this can you include me, Dottie Romo, Kaschit Pandya and Paul Butler.

Thanks, let me know if you need anything else.

**Jack Walker**
**IRS Chief Privacy Officer (acting)**

**PII**

---

**From:** Romo Dottie A <Dottie.A.Romo@irs.gov>
**Sent:** Sunday, August 3, 2025 4:51 PM
**To:** Walker John J <John.J.Walker@irs.gov> **PII** @irs.gov>
**Cc:** **PII** @irs.gov> **PII** @irs.gov>; **PII** **PII** @irs.gov>; **PII** @irs.gov>; Elleson Benjamin D <Benjamin.D.Elleson@irs.gov>
**Subject:** RE: UPDATE : For Review: Draft 6103i2 Cover Letter

Thank you. The CIR will not be back until Wednesday. Can you work with **PII** to get time on his calendar for Wednesday to discuss.

**Dottie Romo**
Chief Operating Officer
Department of the Treasury | Internal Revenue Service
1111 Constitution Ave NW, Washington DC 20224
Dottie.A.Romo@irs.gov

Executive Assistant **PII**
**PII**
Program Manager **PII**
**PII**
Deputy COO (Acting): **PII**
**PII**

---

**From:** Walker John J <John.J.Walker@irs.gov>
**Sent:** Friday, August 1, 2025 4:13 PM
**To:** Romo Dottie A <Dottie.A.Romo@irs.gov> **PII** @irs.gov>
**Cc:** **PII** @irs.gov>; **PII** @irs.gov>; **PII** **PII** @irs.gov>; **PII** @irs.gov>

TD_0000132

**Subject:** UPDATE : For Review: Draft 6103i2 Cover Letter
**Importance:** High

Attached is the updated cover letter cleared by IT and Counsel. We will not be looking for CIR approval until Monday at the earliest (understanding that he is off the start of next week and it may take time for him to decide).

If you have any questions, let me know. I will be here for a bit longer. I don't always have my work phone on the weekends but can almost always be reached at [PII]

Have a great weekend!
Jack

**From:** Walker John J
**Sent:** Friday, August 1, 2025  9:59 AM
**To:** Romo Dottie A <Dottie.A.Romo@irs.gov>; [PII] @irs.gov>
**Cc:** [PII] @irs.gov>; [PII] @irs.gov>; [PII] @irs.gov>; [PII] @irs.gov>
**Subject:** For Review: Draft 6103i2 Cover Letter
**Importance:** High

Dottie/[PII]

For Review: draft cover letter to be sent with accompanying results for the DHS data request.

A couple of points on the cover letter:
- I wanted to get this in front of you ASAP, but Counsel and IT are reviewing as well. Counsel expects to complete the review today.
- Signature on the cover letter is from IT since they are pulling and transmitting the data. PGLD re-delegated the authority for this data exchange only.

Other notes of interest:
- We are 75% through the QC and there are no issues identified.
- There has been discussion that some in Treasury (not sure who as this was conveyed 3rd and 4th hand) had been targeting today for transmittal. No one on the IRS side has heard that formally.
- ***Everything may be in place this afternoon and at that point we will need you to brief and obtain necessary approval from CIR.*** I will keep you posted on the status.
- 

# AC/WP/DPP

Let me know if you have any feedback on the cover letter or questions about the status.
Thanks

Jack Walker
IRS Chief Privacy Officer (acting)
[PII]

TD_0000133

**From:** [PII] @irs.gov>
**Sent:** Friday, August 1, 2025 8:08 AM
**To:** Keith James D <James.D.KeithJr@irs.gov>; [PII] @irs.gov>; [PII] [PII] @irs.gov>; [PII] [PII] @irscounsel.treas.gov>; [PII] [PII] @IRSCOUNSEL.TREAS.GOV>; Goldman Richard G <Richard.G.Goldman@IRSCOUNSEL.TREAS.GOV>
**Cc:** [PII] @irs.gov>; [PII] @irs.gov>; [PII] [PII] @irs.gov>
**Subject:** Draft 6103i2 Cover Letter
**Importance:** High

Hi everyone,

Attached is a draft cover letter that can be edited and accompany the match results delivery to DHS-ICE once approved by the Commissioner.

Thank you!





[PII]

Acting Director
Governmental Liaison, Disclosure, & Safeguards, PGLD

Internal Revenue Service

[PII]

TD_0000134

| From: | PII [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A7FEB64DBAEF47F7807EA11FEF5E7283 PII |
|---|---|
| Sent: | 8/5/2025 4:23:55 PM |
| To: | Walker John J [john.j.walker@irs.gov] |
| CC: | PII @irs.gov]; PII @irs.gov] |
| Subject: | DHS Notes for Briefing |
| Attachments: | dhsdxoverview.pdf |

Jack – here are my high level notes for a CIR briefing, let me know if you have questions or need more information – thanks!

## IT Script Overview
- See attached.

## Timeline
- ICE submitted required written request and data file to IRS of almost 1.3M records on 6/27/2025.
- IT has been writing and revising the script based on quality control and reviews.
- PGLD, Counsel, and IT meet almost daily on this effort.

## ICE Required Submission Fields per MOU
- ICE will disclose the following subject identifier information: Case Identifier; Alien Number; First, Middle and Last Name; Date of Birth; Address Information; Country of Citizenship; FBI Numbers, and Fingerprint Identification Number (FINS).

## Results
- 3% match on 1.3M records

## Next Steps
- With CIR approval, IRS will share matches, unmatches, and rejects via Kiteworks with cover letter included to ICE.

TD_0000135

# Table of Contents

DHS-ICE Data Exchange Overview .................................................................. 1
    Architecture Overview ....................................................................... 1
Interface Specifications ............................................................................ 2
    Input Record Layout ......................................................................... 2
    Output Record Layout ....................................................................... 2
    Internal Output Record layout for validation .................................... 3
Draft Flow .............................................................................................. 4
Discussion points .................................................................................... 4

# DHS-ICE Data Exchange Overview

On demand process to provide last known address information based on the individaul's information request from ICE.

## Architecture Overview

The following diagram illustrates the high-level architecture overview:



*Figure 1. Architecture Overview Draft*

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 92 of 388

# Interface Specifications

input & output will be in csv format

## Input Record Layout

| Field Name | Example Value | Additional Info |
|---|---|---|
| CIVID | 919945990 | Unique Indentifier |
| ANumber | 077799888 | |
| LName | Smith | Required, reject when not present |
| FName | Joe | Required, reject when not present |
| MName | I | |
| DOB | 01/01/2001 | Not using or validating with dob |
| COC | POLAND | |
| COB | PANAMA | |
| FBI | KATPIEPA0 | |
| SSN | 123011234 | Not required, will be used as key when present |
| FINS | 5000001 | |
| SEX_CODE | M | |
| PRIORITY_DSC | CHARGE | |
| EARM_CASE_ID | 1119991 | |
| FINAL_ORDER_DATE | 12/28/1995 | Required (must be over 90 days from current day) |
| CASE_CREATE_DATE | 12/28/2008 | |
| EARM_ADDRESS | 123 E Main ST, NEW YORK, NY, 850073115 | Required, reject when zip code is not present |
| CRIMINAL STATUTE | 8 USC 1325 | Required, reject when doesn't match specific values provided |
| TAXABLE PERIOD | JAN_2022_PRESENT | Required using to limit address history search |
| ICE-POC | Joe smith joe.smith@dhs.gov | |

## Output Record Layout

| Field Name | Example Value | Additional Info |
|---|---|---|
| CIVID | 919945990 | Unique Indentifier |

TD_0000137

| Field Name | Example Value | Additional Info |
|---|---|---|
| IRS_STATUS | REJECT | Possible values REJECTED/MATCHED/UNMATCHED |
| IRS_LAST_KNO WN_ADDRESS | 123 E ELK CT, COLE, CT, 123456 | Only when the status is MATCHED |

# Internal Output Record layout for validation

| Field Name | Example Value | Additional Info |
|---|---|---|
| CIVID | 919945990 | Unique Indentifier |
| ANumber | 077799888 | |
| LName | Smith | Required, reject when not present |
| FName | Joe | Required, reject when not present |
| MName | I | |
| DOB | 01/01/2001 | Not using or validating with dob |
| COC | POLAND | |
| COB | PANAMA | |
| FBI | KATPIEPA0 | |
| SSN | 123011234 | Not required, will be used as key when present |
| FINS | 5000001 | |
| SEX_CODE | M | |
| PRIORITY_DSC | CHARGE | |
| EARM_CASE_ID | 1119991 | |
| FINAL_ORDER_ DATE | 12/28/1995 | Required (must be over 90 days from current day) |
| CASE_CREATE_ DATE | 12/28/2008 | |
| EARM_ADDRES S | 123 E Main ST, NEW YORK, NY, 850073115 | Required, reject when zip code is not present |
| CRIMINAL STATUTE | 8 USC 1325 | Required, reject when doesn't match specific values provided |
| TAXABLE PERIOD | JAN_2022_PRESENT | Required using to limit address history search |
| ICE-POC | Joe smith joe.smith@dhs.gov | |
| IRS_NAME_LIN E | JOE RAN SMITH | Filed Name |

| Field Name | Example Value | Additional Info |
|---|---|---|
| IRS_STATUS | REJECTED/MATCHED/UNMATCHED | |
| IRS_MATCH_TYPE | TIN/NAME/NAMEADDRESS | |
| IRS_LAST_KNOWN_ADDRESS | 123 E ELK CT, COLE, CT, 123456 | Only when the status matches |

# Draft Flow



# Discussion points

- How long should the data be retained?
- Where do we store the response data? Share point

A476

TD_0000139

• Should the response data be audited?

• volume & frequency of the data we are expecting

TD_0000140

| | |
|---|---|
| From: | Long Billy [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5cd48fc7ed6445dcbf58c1f70ed9b302-[ PII ]] |
| Sent: | 8/4/2025 9:04:14 PM |
| To: | Long Billy [billy.long@irs.gov]; Pandya Kaschit [kaschit.pandya@irs.gov]; Kies Kenneth J [kenneth.j.kies@irscounsel.treas.gov]; Walker John J [john.j.walker@irs.gov]; Romo Dottie A [dottie.a.romo@irs.gov]; Butler Paul T [paul.t.butler@irscounsel.treas.gov]; Morris Audrey M [audrey.m.morris@irscounsel.treas.gov]; Kenneth.Kies@treasury.gov [kenneth.kies@treasury.gov]; Keith James D [james.d.keithjr@irs.gov] |
| CC: | Elleson Benjamin D [benjamin.d.elleson@irs.gov]; Capece Louis P [louis.capece@irs.gov] |
| Subject: | URGENT: DHS x IRS Data Sharing Approval |
| Location: | IR 3000 or MS Teams |
| Start: | 8/6/2025 2:30:00 PM |
| End: | 8/6/2025 2:50:00 PM |
| Show Time As: | Busy |
| | |
| Recurrence: | (none) |
| Required Attendees: | Pandya Kaschit; Kies Kenneth J; Walker John J; Romo Dottie A; Butler Paul T; Morris Audrey M; Kenneth.Kies@treasury.gov; Keith James D |
| Optional Attendees: | Elleson Benjamin D; Capece Louis P |

8/5/25 – Hard stop at 10:55 for next meeting. CIR cannot be late. **PII**
8/4/25 – **PII**

Purpose: Meeting scheduled per request with a need for urgency regarding the data extraction process and request for CIR approval.

---

# Microsoft Teams Need help?

## Join the meeting now

Meeting ID: █████████████

Passcode: █████████

---

## Dial in by phone

+1 202-███████████████ United States, Washington

Find a local number

Phone conference ID: ███████████

For organizers: Meeting options | Reset dial-in PIN

Meeting hosts (organizers, co-organizers) hold responsibility for controlling the meeting environment, such as removing unauthorized parties, muting audio or video when appropriate to protect privacy, giving notice and getting consent for recording, promoting others as presenters or co-organizers to help moderate the meeting and chat, and setting meeting options. Please refer to IRM 10.5.1.6.18.2 for more information.

TD_0000141

A479

TD_0000142

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, DC 20224

INFORMATION TECHNOLOGY

Date: August 7, 2025

Todd M. Lyons
Acting Director
United States Immigration and Customs Enforcement (ICE)
Department of Homeland Security (DHS)
Washington, DC 20536

Subject:  IRS-DHS Memorandum of Understanding – Production of Address
Information

Dear Acting Director Lyons:

We are writing in response to your letter dated June 27, 2025, in which you requested, pursuant to the IRS-DHS Memorandum of Understanding dated April 7, 2025, and the IRS-DHS Implementing Agreement dated April 18, 2025 (collectively, the "MOU"), the last known addresses of individuals listed in a data file you transmitted separately to the IRS via Kiteworks on June 25, 2025.

The IRS has processed your request and is providing the last known addresses of identifiable individuals in a datafile titled earm_full_delta_schema_v2_irsoutput_20250806.csv (the "Data File") and transmitted to ICE via Kiteworks on August 6, 2025.  Pursuant to the MOU, the Data File also indicates a "no match" for the individuals whose addresses the IRS was unable to identify from the information you provided.  Please note that the addresses being provided in the datafile are the last known addresses of the identifiable individuals as of August 6, 2025, the date we completed processing your request.  Address information in IRS records may change thereafter if IRS receives change of address information from individuals or from the U.S. Postal Service.

You are provided this information with the understanding that it will be used strictly in accordance with, and subject to the limitations and disclosure provisions of, section 6103(i)(2) of the Internal Revenue Code (IRC) (26 U.S.C. § 6103(i)(2)) and the MOU. As provided therein, the information can only be disclosed to the persons and only for the purposes described in section 6103(i)(2).  Information disclosed or used contrary to these provisions may subject the agency to civil damages under IRC Section 7431, and its employees (including contractors) to criminal liability under IRC Sections 7213 or 7213A, as well as Section 1905 of Title 18 of the United States Code.

TD_0000143

2

If you have any questions, please contact me.

Very truly yours,

**James D. Keith Jr.**
Digitally signed by James D. Keith Jr.
Date: 2025.08.07 14:47:55 -04'00'

James Keith
Coordinating Director,
Taxpayer Services and Experience,
Information Technology
Internal Revenue Service

A481

TD_0000144

| From: | Capece Louis P [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=295416029B5B467DA3FA91ECFC3F3E2A ‾PII‾ |
|---|---|
| Sent: | 8/7/2025 8:04:15 PM |
| To: | Long Billy [billy.long@irs.gov] |
| CC: | Pandya Kaschit [kaschit.pandya@irs.gov]; Elleson Benjamin D [benjamin.d.elleson@irs.gov] |
| Subject: | RE: Next Steps: MOU |

Hi Commissioner,

Sending one final email to inform you that the data is now available in Kiteworks and DHS/ICE has been notified that the information is available.

If you have any questions, please let me know.

Thanks

## Lou Capece

Coordinating Director, Infrastructure
King of Prussia, Pa

PII

---

**From:** Capece Louis P
**Sent:** Thursday, August 7, 2025 3:20 PM
**To:** Long Billy <Billy.Long@irs.gov>
**Cc:** Pandya Kaschit <Kaschit.Pandya@irs.gov>; Elleson Benjamin D <Benjamin.D.Elleson@irs.gov>
**Subject:** RE: Next Steps: MOU

Hi Commissioner,

We reran the data set yesterday and the new match amount is **47,289**. Per our discussion yesterday, the final number of matches will change based on the date/time of the run, as it is associated with the Final Order Date. The date must be greater than 90 days or we reject the record. Running yesterday brought more records out of the 90-day window. We are preparing to have the data available on Kiteworks shortly and will notify DHS/ICE.

Thanks

## Lou Capece

Coordinating Director, Infrastructure
King of Prussia, Pa

PII

TD_0000145

**From:** Long Billy <Billy.Long@irs.gov>
**Sent:** Thursday, August 7, 2025 2:07 PM
**To:** Capece Louis P <Louis.Capece@irs.gov>
**Subject:** Fw: Next Steps: MOU

---

**From:** Long Billy <Billy.Long@irs.gov>
**Sent:** Thursday, August 7, 2025 1:59:53 PM
**To:** Pandya Kaschit <Kaschit.Pandya@irs.gov>
**Cc:** Elleson Benjamin D <Benjamin.D.Elleson@irs.gov>
**Subject:** Fw: Next Steps: MOU

Hi Kaschit,

Trust all is well! I would like for you to disclose via Kiteworks the responsive records (the 47,421 matches identified by the IRS from the data set of 1,277,464 records provided by ICE) to the appropriate point of contact at ICE.

Thanks,

Billy

---

**From:** Kenneth.Kies@treasury.gov <Kenneth.Kies@treasury.gov>
**Sent:** Wednesday, August 6, 2025 4:20 PM
**To:** Long Billy <Billy.Long@irs.gov>
**Cc:** Christopher.Pilkerton@treasury.gov <Christopher.Pilkerton@treasury.gov>; Tyler.Badgley@treasury.gov <Tyler.Badgley@treasury.gov>
**Subject:** Next Steps: MOU

Billy,

Here is our best advice on how to proceed on the ICE MOU:

Pursuant to the MOU and Implementing Agreement, you should direct Kaschit Pandya to disclose via Kiteworks the responsive records (the 47,421 matches identified by the IRS from the data set of 1,277,464 records provided by ICE) to the appropriate point of contact at ICE.

There is no need for a press release or broad disclosure of the fact that this information is being provided and the MOU does not discuss any publicizing of the disclosure.

# AC/WP/DPP

Ken

TD_0000146

A484

TD_0000147

United States Code Annotated
   Title 26. Internal Revenue Code (Refs & Annos)
      Subtitle F. Procedure and Administration (Refs & Annos)
         Chapter 61. Information and Returns
            Subchapter B. Miscellaneous Provisions

26 U.S.C.A. § 6103, I.R.C. § 6103

§ 6103. Confidentiality and disclosure of returns and return information

Currentness

**(a) General rule.**--Returns and return information shall be confidential, and except as authorized by this title--

**(1)** no officer or employee of the United States,

**(2)** no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(1)(C) or (7)(A), any tribal or local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section or section 6104(c), and

**(3)** no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (c), subsection (e)(1)(D)(iii), paragraph (10), (13), (14), or (15) of subsection (k), paragraph (6), (8), (10), (12), (13) (other than subparagraphs (D)(v) and (D)(vi) thereof), (16), (19), (20), or (21) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

**(b) Definitions.**--For purposes of this section--

**(1) Return.**--The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

**(2) Return information.**--The term "return information" means--

**(A)** a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to

(Page 103 of Total)

A485

TD_0000148

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 33 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 104 of 388

the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

**(B)** any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110(b)) which is not open to public inspection under section 6110,

**(C)** any advance pricing agreement entered into by a taxpayer and the Secretary and any background information related to such agreement or any application for an advance pricing agreement, and

**(D)** any agreement under section 7121, and any similar agreement, and any background information related to such an agreement or request for such an agreement,

but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer. Nothing in the preceding sentence, or in any other provision of law, shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws.

**(3) Taxpayer return information.**--The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

**(4) Tax administration.**--The term "tax administration"--

**(A)** means--

**(i)** the administration, management, conduct, direction, and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and

**(ii)** the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions, and

**(B)** includes assessment, collection, enforcement, litigation, publication, and statistical gathering functions under such laws, statutes, or conventions.

**(5) State.**--

**(A) In general.**--The term "State" means--

**(i)** any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands,

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000149

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 34 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 105 of 388

**(ii)** for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4), and (p), any municipality--

**(I)** with a population in excess of 250,000 (as determined under the most recent decennial United States census data available),

**(II)** which imposes a tax on income or wages, and

**(III)** with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure, and

**(iii)** for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4), and (p), any governmental entity--

**(I)** which is formed and operated by a qualified group of municipalities, and

**(II)** with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure.

**(B) Regional income tax agencies.**--For purposes of subparagraph (A)(iii)--

**(i) Qualified group of municipalities.**--The term "qualified group of municipalities" means, with respect to any governmental entity, 2 or more municipalities--

**(I)** each of which imposes a tax on income or wages,

**(II)** each of which, under the authority of a State statute, administers the laws relating to the imposition of such taxes through such entity, and

**(III)** which collectively have a population in excess of 250,000 (as determined under the most recent decennial United States census data available).

**(ii) References to State law, etc.**--For purposes of applying subparagraph (A)(iii) to the subsections referred to in such subparagraph, any reference in such subsections to State law, proceedings, or tax returns shall be treated as references to the law, proceedings, or tax returns, as the case may be, of the municipalities which form and operate the governmental entity referred to in such subparagraph.

**(iii) Disclosure to contractors and other agents.**--Notwithstanding any other provision of this section, no return or return information shall be disclosed to any contractor or other agent of a governmental entity referred to in subparagraph (A)(iii) unless such entity, to the satisfaction of the Secretary--

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.                3

TD_0000150

Case 1:25-cv-00457-CKK   Document 48-4   Filed 10/29/25   Page 35 of 130
USCA Case #26-5006      Document #2159317      Filed: 02/17/2026      Page 106 of 388

**(I)** has requirements in effect which require each such contractor or other agent which would have access to returns or return information to provide safeguards (within the meaning of subsection (p)(4)) to protect the confidentiality of such returns or return information,

**(II)** agrees to conduct an on-site review every 3 years (or a mid-point review in the case of contracts or agreements of less than 3 years in duration) of each contractor or other agent to determine compliance with such requirements,

**(III)** submits the findings of the most recent review conducted under subclause (II) to the Secretary as part of the report required by subsection (p)(4)(E), and

**(IV)** certifies to the Secretary for the most recent annual period that such contractor or other agent is in compliance with all such requirements.

The certification required by subclause (IV) shall include the name and address of each contractor and other agent, a description of the contract or agreement with such contractor or other agent, and the duration of such contract or agreement. The requirements of this clause shall not apply to disclosures pursuant to subsection (n) for purposes of Federal tax administration and a rule similar to the rule of subsection (p)(8)(B) shall apply for purposes of this clause.

**(6) Taxpayer identity.**--The term "taxpayer identity" means the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in section 6109), or a combination thereof.

**(7) Inspection.**--The terms "inspected" and "inspection" mean any examination of a return or return information.

**(8) Disclosure.**--The term "disclosure" means the making known to any person in any manner whatever a return or return information.

**(9) Federal agency.**--The term "Federal agency" means an agency within the meaning of section 551(1) of title 5, United States Code.

**(10) Chief executive officer.**--The term "chief executive officer" means, with respect to any municipality, any elected official and the chief official (even if not elected) of such municipality.

**(11) Terrorist incident, threat, or activity.**--The term "terrorist incident, threat, or activity" means an incident, threat, or activity involving an act of domestic terrorism (as defined in section 2331(5) of title 18, United States Code) or international terrorism (as defined in section 2331(1) of such title).

**(c) Disclosure of returns and return information to designee of taxpayer.**--The Secretary may, subject to such requirements and conditions as he may prescribe by regulations, disclose the return of any taxpayer, or return information with respect to such taxpayer, to such person or persons as the taxpayer may designate in a request for or consent to such disclosure, or to any other person at the taxpayer's request to the extent necessary to comply with a request for information or assistance made by

(Page 106 of Total)

A488

TD_0000151

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 36 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 107 of 388

the taxpayer to such other person. However, return information shall not be disclosed to such person or persons if the Secretary determines that such disclosure would seriously impair Federal tax administration. Persons designated by the taxpayer under this subsection to receive return information shall not use the information for any purpose other than the express purpose for which consent was granted and shall not disclose return information to any other person without the express permission of, or request by, the taxpayer.

**(d) Disclosure to State tax officials and State and local law enforcement agencies.--**

**(1) In general.**--Returns and return information with respect to taxes imposed by chapters 1, 2, 6, 11, 12, 21, 23, 24, 31, 32, 44, 51, and 52 and subchapter D of chapter 36 shall be open to inspection by, or disclosure to, any State agency, body, or commission, or its legal representative, which is charged under the laws of such State with responsibility for the administration of State tax laws for the purpose of, and only to the extent necessary in, the administration of such laws, including any procedures with respect to locating any person who may be entitled to a refund. Such inspection shall be permitted, or such disclosure made, only upon written request by the head of such agency, body, or commission, and only to the representatives of such agency, body, or commission designated in such written request as the individuals who are to inspect or to receive the returns or return information on behalf of such agency, body, or commission. Such representatives shall not include any individual who is the chief executive officer of such State or who is neither an employee or legal representative of such agency, body, or commission nor a person described in subsection (n). However, such return information shall not be disclosed to the extent that the Secretary determines that such disclosure would identify a confidential informant or seriously impair any civil or criminal tax investigation.

**(2) Disclosure to State audit agencies.--**

**(A) In general.**--Any returns or return information obtained under paragraph (1) by any State agency, body, or commission may be open to inspection by, or disclosure to, officers and employees of the State audit agency for the purpose of, and only to the extent necessary in, making an audit of the State agency, body, or commission referred to in paragraph (1).

**(B) State audit agency.**--For purposes of subparagraph (A), the term "State audit agency" means any State agency, body, or commission which is charged under the laws of the State with the responsibility of auditing State revenues and programs.

**(3) Exception for reimbursement under section 7624.**--Nothing in this section shall be construed to prevent the Secretary from disclosing to any State or local law enforcement agency which may receive a payment under section 7624 the amount of the recovered taxes with respect to which such a payment may be made.

**(4) Availability and use of death information.--**

**(A) In general.**--No returns or return information may be disclosed under paragraph (1) to any agency, body, or commission of any State (or any legal representative thereof) during any period during which a contract meeting the requirements of subparagraph (B) is not in effect between such State and the Secretary of Health and Human Services.

**(B) Contractual requirements.**--A contract meets the requirements of this subparagraph if--

TD_0000152

Case 1:25-cv-00457-CKK Document 48-4 Filed 10/29/25 Page 37 of 130

USCA Case #26-5006 Document #2159317 Filed: 02/17/2026 Page 108 of 388

**(i)** such contract requires the State to furnish the Secretary of Health and Human Services information concerning individuals with respect to whom death certificates (or equivalent documents maintained by the State or any subdivision thereof) have been officially filed with it, and

**(ii)** such contract does not include any restriction on the use of information obtained by such Secretary pursuant to such contract, except that such contract may provide that such information is only to be used by the Secretary (or any other Federal agency) for purposes of ensuring that Federal benefits or other payments are not erroneously paid to deceased individuals.

Any information obtained by the Secretary of Health and Human Services under such a contract shall be exempt from disclosure under section 552 of title 5, United States Code, and from the requirements of section 552a of such title 5.

**(C) Special exception.**--The provisions of subparagraph (A) shall not apply to any State which on July 1, 1993, was not, pursuant to a contract, furnishing the Secretary of Health and Human Services information concerning individuals with respect to whom death certificates (or equivalent documents maintained by the State or any subdivision thereof) have been officially filed with it.

**(5) Disclosure for combined employment tax reporting.**--

**(A) In general.**--The Secretary may disclose taxpayer identity information and signatures to any agency, body, or commission of any State for the purpose of carrying out with such agency, body, or commission a combined Federal and State employment tax reporting program approved by the Secretary. Subsections (a)(2) and (p)(4) and sections 7213 and 7213A shall not apply with respect to disclosures or inspections made pursuant to this paragraph.

**(B) Termination.**--The Secretary may not make any disclosure under this paragraph after December 31, 2007.

**(6) Limitation on disclosure regarding regional income tax agencies treated as States.**--For purposes of paragraph (1), inspection by or disclosure to an entity described in subsection (b)(5)(A)(iii) shall be for the purpose of, and only to the extent necessary in, the administration of the laws of the member municipalities in such entity relating to the imposition of a tax on income or wages. Such entity may not redisclose any return or return information received pursuant to paragraph (1) to any such member municipality.

**(e) Disclosure to persons having material interest.**--

**(1) In general.**--The return of a person shall, upon written request, be open to inspection by or disclosure to--

**(A)** in the case of the return of an individual--

**(i)** that individual,

---

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 6

(Page 108 of Total)

A490

TD_0000153

Case 1:25-cv-00457-CKK Document 48-4 Filed 10/29/25 Page 38 of 130
USCA Case #26-5006 Document #2159317 Filed: 02/17/2026 Page 109 of 388

**(ii)** the spouse of that individual if the individual and such spouse have signified their consent to consider a gift reported on such return as made one-half by him and one-half by the spouse pursuant to the provisions of section 2513; or

**(iii)** the child of that individual (or such child's legal representative) to the extent necessary to comply with the provisions of section 1(g);

**(B)** in the case of an income tax return filed jointly, either of the individuals with respect to whom the return is filed;

**(C)** in the case of the return of a partnership, any person who was a member of such partnership during any part of the period covered by the return;

**(D)** in the case of the return of a corporation or a subsidiary thereof--

**(i)** any person designated by resolution of its board of directors or other similar governing body,

**(ii)** any officer or employee of such corporation upon written request signed by any principal officer and attested to by the secretary or other officer,

**(iii)** any bona fide shareholder of record owning 1 percent or more of the outstanding stock of such corporation,

**(iv)** if the corporation was an S corporation, any person who was a shareholder during any part of the period covered by such return during which an election under section 1362(a) was in effect, or

**(v)** if the corporation has been dissolved, any person authorized by applicable State law to act for the corporation or any person who the Secretary finds to have a material interest which will be affected by information contained therein;

**(E)** in the case of the return of an estate--

**(i)** the administrator, executor, or trustee of such estate, and

**(ii)** any heir at law, next of kin, or beneficiary under the will, of the decedent, but only if the Secretary finds that such heir at law, next of kin, or beneficiary has a material interest which will be affected by information contained therein; and

**(F)** in the case of the return of a trust--

**(i)** the trustee or trustees, jointly or separately, and

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 39 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 110 of 388

**(ii)** any beneficiary of such trust, but only if the Secretary finds that such beneficiary has a material interest which will be affected by information contained therein.

**(2) Incompetency.**--If an individual described in paragraph (1) is legally incompetent, the applicable return shall, upon written request, be open to inspection by or disclosure to the committee, trustee, or guardian of his estate.

**(3) Deceased individuals.**--The return of a decedent shall, upon written request, be open to inspection by or disclosure to--

**(A)** the administrator, executor, or trustee of his estate, and

**(B)** any heir at law, next of kin, or beneficiary under the will, of such decedent, or a donee of property, but only if the Secretary finds that such heir at law, next of kin, beneficiary, or donee has a material interest which will be affected by information contained therein.

**(4) Title 11 cases and receivership proceedings.**--If--

**(A)** there is a trustee in a title 11 case in which the debtor is the person with respect to whom the return is filed, or

**(B)** substantially all of the property of the person with respect to whom the return is filed is in the hands of a receiver,

such return or returns for prior years of such person shall, upon written request, be open to inspection by or disclosure to such trustee or receiver, but only if the Secretary finds that such trustee or receiver, in his fiduciary capacity, has a material interest which will be affected by information contained therein.

**(5) Individual's title 11 case.**--

**(A) In general.**--In any case to which section 1398 applies (determined without regard to section 1398(b)(1)), any return of the debtor for the taxable year in which the case commenced or any preceding taxable year shall, upon written request, be open to inspection by or disclosure to the trustee in such case.

**(B) Return of estate available to debtor.**--Any return of an estate in a case to which section 1398 applies shall, upon written request, be open to inspection by or disclosure to the debtor in such case.

**(C) Special rule for involuntary cases.**--In an involuntary case, no disclosure shall be made under subparagraph (A) until the order for relief has been entered by the court having jurisdiction of such case unless such court finds that such disclosure is appropriate for purposes of determining whether an order for relief should be entered.

**(6) Attorney in fact.**--Any return to which this subsection applies shall, upon written request, also be open to inspection by or disclosure to the attorney in fact duly authorized in writing by any of the persons described in paragraph (1), (2), (3), (4), (5), (8), or (9) to inspect the return or receive the information on his behalf, subject to the conditions provided in such paragraphs.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(Page 110 of Total)

TD_0000155

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 40 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 111 of 388

**(7) Return information.**--Return information with respect to any taxpayer may be open to inspection by or disclosure to any person authorized by this subsection to inspect any return of such taxpayer if the Secretary determines that such disclosure would not seriously impair Federal tax administration.

**(8) Disclosure of collection activities with respect to joint return.**--If any deficiency of tax with respect to a joint return is assessed and the individuals filing such return are no longer married or no longer reside in the same household, upon request in writing by either of such individuals, the Secretary shall disclose in writing to the individual making the request whether the Secretary has attempted to collect such deficiency from such other individual, the general nature of such collection activities, and the amount collected. The preceding sentence shall not apply to any deficiency which may not be collected by reason of section 6502.

**(9) Disclosure of certain information where more than 1 person subject to penalty under section 6672.**--If the Secretary determines that a person is liable for a penalty under section 6672(a) with respect to any failure, upon request in writing of such person, the Secretary shall disclose in writing to such person--

**(A)** the name of any other person whom the Secretary has determined to be liable for such penalty with respect to such failure, and

**(B)** whether the Secretary has attempted to collect such penalty from such other person, the general nature of such collection activities, and the amount collected.

**(10) Limitation on certain disclosures under this subsection.**--In the case of an inspection or disclosure under this subsection relating to the return of a partnership, S corporation, trust, or an estate, the information inspected or disclosed shall not include any supporting schedule, attachment, or list which includes the taxpayer identity information of a person other than the entity making the return or the person conducting the inspection or to whom the disclosure is made.

**(11) Disclosure of information regarding status of investigation of violation of this section.**--In the case of a person who provides to the Secretary information indicating a violation of section 7213, 7213A, or 7214 with respect to any return or return information of such person, the Secretary may disclose to such person (or such person's designee)--

**(A)** whether an investigation based on the person's provision of such information has been initiated and whether it is open or closed,

**(B)** whether any such investigation substantiated such a violation by any individual, and

**(C)** whether any action has been taken with respect to such individual (including whether a referral has been made for prosecution of such individual).

**(f) Disclosure to Committees of Congress.--**

---

(Page 111 of Total)

TD_0000156

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 41 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 112 of 388

**(1) Committee on Ways and Means, Committee on Finance, and Joint Committee on Taxation.**--Upon written request from the chairman of the Committee on Ways and Means of the House of Representatives, the chairman of the Committee on Finance of the Senate, or the chairman of the Joint Committee on Taxation, the Secretary shall furnish such committee with any return or return information specified in such request, except that any return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure.

**(2) Chief of Staff of Joint Committee on Taxation.**--Upon written request by the Chief of Staff of the Joint Committee on Taxation, the Secretary shall furnish him with any return or return information specified in such request. Such Chief of Staff may submit such return or return information to any committee described in paragraph (1), except that any return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure.

**(3) Other committees.**--Pursuant to an action by, and upon written request by the chairman of, a committee of the Senate or the House of Representatives (other than a committee specified in paragraph (1)) specially authorized to inspect any return or return information by a resolution of the Senate or the House of Representatives or, in the case of a joint committee (other than the joint committee specified in paragraph (1)) by concurrent resolution, the Secretary shall furnish such committee, or a duly authorized and designated subcommittee thereof, sitting in closed executive session, with any return or return information which such resolution authorizes the committee or subcommittee to inspect. Any resolution described in this paragraph shall specify the purpose for which the return or return information is to be furnished and that such information cannot reasonably be obtained from any other source.

**(4) Agents of committees and submission of information to Senate or House of Representatives.**--

**(A) Committees described in paragraph (1).**--Any committee described in paragraph (1) or the Chief of Staff of the Joint Committee on Taxation shall have the authority, acting directly, or by or through such examiners or agents as the chairman of such committee or such chief of staff may designate or appoint, to inspect returns and return information at such time and in such manner as may be determined by such chairman or chief of staff. Any return or return information obtained by or on behalf of such committee pursuant to the provisions of this subsection may be submitted by the committee to the Senate or the House of Representatives, or to both. The Joint Committee on Taxation may also submit such return or return information to any other committee described in paragraph (1), except that any return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer shall be furnished to such committee only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure.

**(B) Other committees.**--Any committee or subcommittee described in paragraph (3) shall have the right, acting directly, or by or through no more than four examiners or agents, designated or appointed in writing in equal numbers by the chairman and ranking minority member of such committee or subcommittee, to inspect returns and return information at such time and in such manner as may be determined by such chairman and ranking minority member. Any return or return information obtained by or on behalf of such committee or subcommittee pursuant to the provisions of this subsection may be submitted by the committee to the Senate or the House of Representatives, or to both, except that any return or return information which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer, shall be furnished to the Senate or the House of Representatives only when sitting in closed executive session unless such taxpayer otherwise consents in writing to such disclosure.

(Page 112 of Total)

A494

TD_0000157

**(5) Disclosure by whistleblower.**--Any person who otherwise has or had access to any return or return information under this section may disclose such return or return information to a committee referred to in paragraph (1) or any individual authorized to receive or inspect information under paragraph (4)(A) if such person believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

**(g) Disclosure to President and certain other persons.--**

**(1) In general.**--Upon written request by the President, signed by him personally, the Secretary shall furnish to the President, or to such employee or employees of the White House Office as the President may designate by name in such request, a return or return information with respect to any taxpayer named in such request. Any such request shall state--

**(A)** the name and address of the taxpayer whose return or return information is to be disclosed,

**(B)** the kind of return or return information which is to be disclosed,

**(C)** the taxable period or periods covered by such return or return information, and

**(D)** the specific reason why the inspection or disclosure is requested.

**(2) Disclosure of return information as to Presidential appointees and certain other Federal Government appointees.**--The Secretary may disclose to a duly authorized representative of the Executive Office of the President or to the head of any Federal agency, upon written request by the President or head of such agency, or to the Federal Bureau of Investigation on behalf of and upon written request by the President or such head, return information with respect to an individual who is designated as being under consideration for appointment to a position in the executive or judicial branch of the Federal Government. Such return information shall be limited to whether such individual--

**(A)** has filed returns with respect to the taxes imposed under chapter 1 for not more than the immediately preceding 3 years;

**(B)** has failed to pay any tax within 10 days after notice and demand, or has been assessed any penalty under this title for negligence, in the current year or immediately preceding 3 years;

**(C)** has been or is under investigation for possible criminal offenses under the internal revenue laws and the results of any such investigation; or

**(D)** has been assessed any civil penalty under this title for fraud.

Within 3 days of the receipt of any request for any return information with respect to any individual under this paragraph, the Secretary shall notify such individual in writing that such information has been requested under the provisions of this paragraph.

---

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A495

TD_0000158

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 43 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 114 of 388

**(3) Restriction on disclosure.**--The employees to whom returns and return information are disclosed under this subsection shall not disclose such returns and return information to any other person except the President or the head of such agency without the personal written direction of the President or the head of such agency.

**(4) Restriction on disclosure to certain employees.**--Disclosure of returns and return information under this subsection shall not be made to any employee whose annual rate of basic pay is less than the annual rate of basic pay specified for positions subject to section 5316 of title 5, United States Code.

**(5) Reporting requirements.**--Within 30 days after the close of each calendar quarter, the President and the head of any agency requesting returns and return information under this subsection shall each file a report with the Joint Committee on Taxation setting forth the taxpayers with respect to whom such requests were made during such quarter under this subsection, the returns or return information involved, and the reasons for such requests. The President shall not be required to report on any request for returns and return information pertaining to an individual who was an officer or employee of the executive branch of the Federal Government at the time such request was made. Reports filed pursuant to this paragraph shall not be disclosed unless the Joint Committee on Taxation determines that disclosure thereof (including identifying details) would be in the national interest. Such reports shall be maintained by the Joint Committee on Taxation for a period not exceeding 2 years unless, within such period, the Joint Committee on Taxation determines that a disclosure to the Congress is necessary.

**(h) Disclosure to certain Federal officers and employees for purposes of tax administration, etc.--**

**(1) Department of the Treasury.**--Returns and return information shall, without written request, be open to inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for tax administration purposes.

**(2) Department of Justice.**--In a matter involving tax administration, a return or return information shall be open to inspection by or disclosure to officers and employees of the Department of Justice (including United States attorneys) personally and directly engaged in, and solely for their use in, any proceeding before a Federal grand jury or preparation for any proceeding (or investigation which may result in such a proceeding) before a Federal grand jury or any Federal or State court, but only if--

**(A)** the taxpayer is or may be a party to the proceeding, or the proceeding arose out of, or in connection with, determining the taxpayer's civil or criminal liability, or the collection of such civil liability in respect of any tax imposed under this title;

**(B)** the treatment of an item reflected on such return is or may be related to the resolution of an issue in the proceeding or investigation; or

**(C)** such return or return information relates or may relate to a transactional relationship between a person who is or may be a party to the proceeding and the taxpayer which affects, or may affect, the resolution of an issue in such proceeding or investigation.

**(3) Form of request.**--In any case in which the Secretary is authorized to disclose a return or return information to the Department of Justice pursuant to the provisions of this subsection--

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A496

TD_0000159

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 44 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 115 of 388

**(A)** if the Secretary has referred the case to the Department of Justice, or if the proceeding is authorized by subchapter B of chapter 76, the Secretary may make such disclosure on his own motion, or

**(B)** if the Secretary receives a written request from the Attorney General, the Deputy Attorney General, or an Assistant Attorney General for a return of, or return information relating to, a person named in such request and setting forth the need for the disclosure, the Secretary shall disclose return or return the information so requested.

**(4) Disclosure in judicial and administrative tax proceedings.**--A return or return information may be disclosed in a Federal or State judicial or administrative proceeding pertaining to tax administration, but only--

**(A)** if the taxpayer is a party to the proceeding, or the proceeding arose out of, or in connection with, determining the taxpayer's civil or criminal liability, or the collection of such civil liability, in respect of any tax imposed under this title;

**(B)** if the treatment of an item reflected on such return is directly related to the resolution of an issue in the proceeding;

**(C)** if such return or return information directly relates to a transactional relationship between a person who is a party to the proceeding and the taxpayer which directly affects the resolution of an issue in the proceeding; or

**(D)** to the extent required by order of a court pursuant to section 3500 of title 18, United States Code, or rule 16 of the Federal Rules of Criminal Procedure, such court being authorized in the issuance of such order to give due consideration to congressional policy favoring the confidentiality of returns and return information as set forth in this title.

However, such return or return information shall not be disclosed as provided in subparagraph (A), (B), or (C) if the Secretary determines that such disclosure would identify a confidential informant or seriously impair a civil or criminal tax investigation.

**(5) Withholding of tax from social security benefits.**--Upon written request of the payor agency, the Secretary may disclose available return information from the master files of the Internal Revenue Service with respect to the address and status of an individual as a nonresident alien or as a citizen or resident of the United States to the Social Security Administration or the Railroad Retirement Board (whichever is appropriate) for purposes of carrying out its responsibilities for withholding tax under section 1441 from social security benefits (as defined in section 86(d)).

**(6) Internal Revenue Service Oversight Board.**--

**(A) In general.**--Notwithstanding paragraph (1), and except as provided in subparagraph (B), no return or return information may be disclosed to any member of the Oversight Board described in subparagraph (A) or (D) of section 7802(b)(1) or to any employee or detailee of such Board by reason of their service with the Board. Any request for information not permitted to be disclosed under the preceding sentence, and any contact relating to a specific taxpayer, made by any such individual to an officer or employee of the Internal Revenue Service shall be reported by such officer or employee to the Secretary, the Treasury Inspector General for Tax Administration, and the Joint Committee on Taxation.

 WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 13

A497

TD_0000160

USCA Case #26-5006     Document #2159317     Filed: 02/17/2026     Page 116 of 388

**(B) Exception for reports to the Board.**--If--

**(i)** the Commissioner or the Treasury Inspector General for Tax Administration prepares any report or other matter for the Oversight Board in order to assist the Board in carrying out its duties; and

**(ii)** the Commissioner or such Inspector General determines it is necessary to include any return or return information in such report or other matter to enable the Board to carry out such duties,

such return or return information (other than information regarding taxpayer identity) may be disclosed to members, employees, or detailees of the Board solely for the purpose of carrying out such duties.

**(i) Disclosure to Federal officers or employees for administration of Federal laws not relating to tax administration.--**

**(1) Disclosure of returns and return information for use in criminal investigations.--**

**(A) In general.**--Except as provided in paragraph (6), any return or return information with respect to any specified taxable period or periods shall, pursuant to and upon the grant of an ex parte order by a Federal district court judge or magistrate judge under subparagraph (B), be open (but only to the extent necessary as provided in such order) to inspection by, or disclosure to, officers and employees of any Federal agency who are personally and directly engaged in--

**(i)** preparation for any judicial or administrative proceeding pertaining to the enforcement of a specifically designated Federal criminal statute (not involving tax administration) to which the United States or such agency is or may be a party, or pertaining to the case of a missing or exploited child,

**(ii)** any investigation which may result in such a proceeding, or

**(iii)** any Federal grand jury proceeding pertaining to enforcement of such a criminal statute to which the United States or such agency is or may be a party, or to such a case of a missing or exploited child,

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

**(B) Application for order.**--The Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, any United States attorney, any special prosecutor appointed under section 593 of title 28, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to section 510 of title 28, United States Code, may authorize an application to a Federal district court judge or magistrate judge for the order referred to in subparagraph (A). Upon such application, such judge or magistrate judge may grant such order if he determines on the basis of the facts submitted by the applicant that--

**(i)** there is reasonable cause to believe, based upon information believed to be reliable, that a specific criminal act has been committed,

(Page 116 of Total)

A498

TD_0000161

**(ii)** there is reasonable cause to believe that the return or return information is or may be relevant to a matter relating to the commission of such act, and

**(iii)** the return or return information is sought exclusively for use in a Federal criminal investigation or proceeding concerning such act (or any criminal investigation or proceeding, in the case of a matter relating to a missing or exploited child), and the information sought to be disclosed cannot reasonably be obtained, under the circumstances, from another source.

**(C) Disclosure to State and local law enforcement agencies in the case of matters pertaining to a missing or exploited child.**--

**(i) In general.**--In the case of an investigation pertaining to a missing or exploited child, the head of any Federal agency, or his designee, may disclose any return or return information obtained under subparagraph (A) to officers and employees of any State or local law enforcement agency, but only if--

**(I)** such State or local law enforcement agency is part of a team with the Federal agency in such investigation, and

**(II)** such information is disclosed only to such officers and employees who are personally and directly engaged in such investigation.

**(ii) Limitation on use of information.**--Information disclosed under this subparagraph shall be solely for the use of such officers and employees in locating the missing child, in a grand jury proceeding, or in any preparation for, or investigation which may result in, a judicial or administrative proceeding.

**(iii) Missing child.**--For purposes of this subparagraph, the term "missing child" shall have the meaning given such term by section 403 of the Missing Children's Assistance Act (42 U.S.C. 5772). [1]

**(iv) Exploited child.**--For purposes of this subparagraph, the term "exploited child" means a minor with respect to whom there is reason to believe that a specified offense against a minor (as defined by section 111(7) of the Sex Offender Registration and Notification Act (42 U.S.C. 16911(7))) [1] has or is occurring.

**(2) Disclosure of return information other than taxpayer return information for use in criminal investigations.**--

**(A) In general.**--Except as provided in paragraph (6), upon receipt by the Secretary of a request which meets the requirements of subparagraph (B) from the head of any Federal agency or the Inspector General thereof, or, in the case of the Department of Justice, the Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, the Director of the Federal Bureau of Investigation, the Administrator of the Drug Enforcement Administration, any United States attorney, any special prosecutor appointed under section 593 of title 28, United States Code, or any attorney in charge of a criminal division organized crime strike force established pursuant to section 510 of title 28, United States Code, the Secretary shall disclose return information (other than taxpayer return information) to officers and employees of such agency who are personally and directly engaged in--

Case 1:25-cv-00457-CKK     Document 48-4     Filed 10/29/25     Page 47 of 130
USCA Case #26-5006     Document #2159317     Filed: 02/17/2026     Page 118 of 388

**(i)** preparation for any judicial or administrative proceeding described in paragraph (1)(A)(i),

**(ii)** any investigation which may result in such a proceeding, or

**(iii)** any grand jury proceeding described in paragraph (1)(A)(iii),

solely for the use of such officers and employees in such preparation, investigation, or grand jury proceeding.

**(B) Requirements.**--A request meets the requirements of this subparagraph if the request is in writing and sets forth--

**(i)** the name and address of the taxpayer with respect to whom the requested return information relates;

**(ii)** the taxable period or periods to which such return information relates;

**(iii)** the statutory authority under which the proceeding or investigation described in subparagraph (A) is being conducted; and

**(iv)** the specific reason or reasons why such disclosure is, or may be, relevant to such proceeding or investigation.

**(C) Taxpayer identity.**--For purposes of this paragraph, a taxpayer's identity shall not be treated as taxpayer return information.

**(3) Disclosure of return information to apprise appropriate officials of criminal or terrorist activities or emergency circumstances.--**

**(A) Possible violations of Federal criminal law.--**

**(i) In general.**--Except as provided in paragraph (6), the Secretary may disclose in writing return information (other than taxpayer return information) which may constitute evidence of a violation of any Federal criminal law (not involving tax administration) to the extent necessary to apprise the head of the appropriate Federal agency charged with the responsibility of enforcing such law. The head of such agency may disclose such return information to officers and employees of such agency to the extent necessary to enforce such law.

**(ii) Taxpayer identity.**--If there is return information (other than taxpayer return information) which may constitute evidence of a violation by any taxpayer of any Federal criminal law (not involving tax administration), such taxpayer's identity may also be disclosed under clause (i).

**(B) Emergency circumstances.--**

(Page 118 of Total)

A500

TD_0000163

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 48 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 119 of 388

**(i) Danger of death or physical injury.**--Under circumstances involving an imminent danger of death or physical injury to any individual, the Secretary may disclose return information to the extent necessary to apprise appropriate officers or employees of any Federal or State law enforcement agency of such circumstances.

**(ii) Flight from Federal prosecution.**--Under circumstances involving the imminent flight of any individual from Federal prosecution, the Secretary may disclose return information to the extent necessary to apprise appropriate officers or employees of any Federal law enforcement agency of such circumstances.

**(C) Terrorist activities, etc.--**

**(i) In general.**--Except as provided in paragraph (6), the Secretary may disclose in writing return information (other than taxpayer return information) that may be related to a terrorist incident, threat, or activity to the extent necessary to apprise the head of the appropriate Federal law enforcement agency responsible for investigating or responding to such terrorist incident, threat, or activity. The head of the agency may disclose such return information to officers and employees of such agency to the extent necessary to investigate or respond to such terrorist incident, threat, or activity.

**(ii) Disclosure to the Department of Justice.**--Returns and taxpayer return information may also be disclosed to the Attorney General under clause (i) to the extent necessary for, and solely for use in preparing, an application under paragraph (7)(D).

**(iii) Taxpayer identity.**--For purposes of this subparagraph, a taxpayer's identity shall not be treated as taxpayer return information.

**(4) Use of certain disclosed returns and return information in judicial or administrative proceedings.--**

**(A) Returns and taxpayer return information.**--Except as provided in subparagraph (C), any return or taxpayer return information obtained under paragraph (1) or (7)(C) may be disclosed in any judicial or administrative proceeding pertaining to enforcement of a specifically designated Federal criminal statute or related civil forfeiture (not involving tax administration) to which the United States or a Federal agency is a party--

**(i)** if the court finds that such return or taxpayer return information is probative of a matter in issue relevant in establishing the commission of a crime or the guilt or liability of a party, or

**(ii)** to the extent required by order of the court pursuant to section 3500 of title 18, United States Code, or rule 16 of the Federal Rules of Criminal Procedure.

**(B) Return information (other than taxpayer return information).**--Except as provided in subparagraph (C), any return information (other than taxpayer return information) obtained under paragraph (1), (2), (3)(A) or (C), or (7) may be disclosed in any judicial or administrative proceeding pertaining to enforcement of a specifically designated Federal

TD_0000164

criminal statute or related civil forfeiture (not involving tax administration) to which the United States or a Federal agency is a party.

**(C) Confidential informant; impairment of investigations.**--No return or return information shall be admitted into evidence under subparagraph (A)(i) or (B) if the Secretary determines and notifies the Attorney General or his delegate or the head of the Federal agency that such admission would identify a confidential informant or seriously impair a civil or criminal tax investigation.

**(D) Consideration of confidentiality policy.**--In ruling upon the admissibility of returns or return information, and in the issuance of an order under subparagraph (A)(ii), the court shall give due consideration to congressional policy favoring the confidentiality of returns and return information as set forth in this title.

**(E) Reversible error.**--The admission into evidence of any return or return information contrary to the provisions of this paragraph shall not, as such, constitute reversible error upon appeal of a judgment in the proceeding.

**(5) Disclosure to locate fugitives from justice.--**

**(A) In general.**--Except as provided in paragraph (6), the return of an individual or return information with respect to such individual shall, pursuant to and upon the grant of an ex parte order by a Federal district court judge or magistrate judge under subparagraph (B), be open (but only to the extent necessary as provided in such order) to inspection by, or disclosure to, officers and employees of any Federal agency exclusively for use in locating such individual.

**(B) Application for order.**--Any person described in paragraph (1)(B) may authorize an application to a Federal district court judge or magistrate judge for an order referred to in subparagraph (A). Upon such application, such judge or magistrate judge may grant such order if he determines on the basis of the facts submitted by the applicant that--

**(i)** a Federal arrest warrant relating to the commission of a Federal felony offense has been issued for an individual who is a fugitive from justice,

**(ii)** the return of such individual or return information with respect to such individual is sought exclusively for use in locating such individual, and

**(iii)** there is reasonable cause to believe that such return or return information may be relevant in determining the location of such individual.

**(6) Confidential informants; impairment of investigations.**--The Secretary shall not disclose any return or return information under paragraph (1), (2), (3)(A) or (C), (5), (7), or (8) if the Secretary determines (and, in the case of a request for disclosure pursuant to a court order described in paragraph (1)(B) or (5)(B), certifies to the court) that such disclosure would identify a confidential informant or seriously impair a civil or criminal tax investigation.

**(7) Disclosure upon request of information relating to terrorist activities, etc.--**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000165

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 50 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 121 of 388

**(A) Disclosure to law enforcement agencies.--**

**(i) In general.**--Except as provided in paragraph (6), upon receipt by the Secretary of a written request which meets the requirements of clause (iii), the Secretary may disclose return information (other than taxpayer return information) to officers and employees of any Federal law enforcement agency who are personally and directly engaged in the response to or investigation of any terrorist incident, threat, or activity.

**(ii) Disclosure to State and local law enforcement agencies.**--The head of any Federal law enforcement agency may disclose return information obtained under clause (i) to officers and employees of any State or local law enforcement agency but only if such agency is part of a team with the Federal law enforcement agency in such response or investigation and such information is disclosed only to officers and employees who are personally and directly engaged in such response or investigation.

**(iii) Requirements.**--A request meets the requirements of this clause if--

**(I)** the request is made by the head of any Federal law enforcement agency (or his delegate) involved in the response to or investigation of any terrorist incident, threat, or activity, and

**(II)** the request sets forth the specific reason or reasons why such disclosure may be relevant to a terrorist incident, threat, or activity.

**(iv) Limitation on use of information.**--Information disclosed under this subparagraph shall be solely for the use of the officers and employees to whom such information is disclosed in such response or investigation.

**(v) Taxpayer identity.**--For purposes of this subparagraph, a taxpayer's identity shall not be treated as taxpayer return information.

**(B) Disclosure to intelligence agencies.--**

**(i) In general.**--Except as provided in paragraph (6), upon receipt by the Secretary of a written request which meets the requirements of clause (ii), the Secretary may disclose return information (other than taxpayer return information) to those officers and employees of the Department of Justice, the Department of the Treasury, and other Federal intelligence agencies who are personally and directly engaged in the collection or analysis of intelligence and counterintelligence information or investigation concerning any terrorist incident, threat, or activity. For purposes of the preceding sentence, the information disclosed under the preceding sentence shall be solely for the use of such officers and employees in such investigation, collection, or analysis.

**(ii) Requirements.**--A request meets the requirements of this subparagraph if the request--

**(I)** is made by an individual described in clause (iii), and

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    19
A503

TD_0000166

**(II)** sets forth the specific reason or reasons why such disclosure may be relevant to a terrorist incident, threat, or activity.

**(iii) Requesting individuals.**--An individual described in this subparagraph is an individual--

**(I)** who is an officer or employee of the Department of Justice or the Department of the Treasury who is appointed by the President with the advice and consent of the Senate or who is the Director of the United States Secret Service, and

**(II)** who is responsible for the collection and analysis of intelligence and counterintelligence information concerning any terrorist incident, threat, or activity.

**(iv) Taxpayer identity.**--For purposes of this subparagraph, a taxpayer's identity shall not be treated as taxpayer return information.

**(C) Disclosure under ex parte orders.--**

**(i) In general.**--Except as provided in paragraph (6), any return or return information with respect to any specified taxable period or periods shall, pursuant to and upon the grant of an ex parte order by a Federal district court judge or magistrate under clause (ii), be open (but only to the extent necessary as provided in such order) to inspection by, or disclosure to, officers and employees of any Federal law enforcement agency or Federal intelligence agency who are personally and directly engaged in any investigation, response to, or analysis of intelligence and counterintelligence information concerning any terrorist incident, threat, or activity. Return or return information opened to inspection or disclosure pursuant to the preceding sentence shall be solely for the use of such officers and employees in the investigation, response, or analysis, and in any judicial, administrative, or grand jury proceedings, pertaining to such terrorist incident, threat, or activity.

**(ii) Application for order.**--The Attorney General, the Deputy Attorney General, the Associate Attorney General, any Assistant Attorney General, or any United States attorney may authorize an application to a Federal district court judge or magistrate for the order referred to in clause (i). Upon such application, such judge or magistrate may grant such order if he determines on the basis of the facts submitted by the applicant that--

**(I)** there is reasonable cause to believe, based upon information believed to be reliable, that the return or return information may be relevant to a matter relating to such terrorist incident, threat, or activity, and

**(II)** the return or return information is sought exclusively for use in a Federal investigation, analysis, or proceeding concerning any terrorist incident, threat, or activity.

**(D) Special rule for ex parte disclosure by the IRS.--**

A504

TD_0000167

USCA Case #26-5006          Document #2159317          Filed: 02/17/2026          Page 123 of 388

Case 1:25-cv-00457-CKK          Document 48-4          Filed 10/29/25          Page 52 of 130

**(i) In general.**--Except as provided in paragraph (6), the Secretary may authorize an application to a Federal district court judge or magistrate for the order referred to in subparagraph (C)(i). Upon such application, such judge or magistrate may grant such order if he determines on the basis of the facts submitted by the applicant that the requirements of subparagraph (C)(ii)(I) are met.

**(ii) Limitation on use of information.**--Information disclosed under clause (i)--

**(I)** may be disclosed only to the extent necessary to apprise the head of the appropriate Federal law enforcement agency responsible for investigating or responding to a terrorist incident, threat, or activity, and

**(II)** shall be solely for use in a Federal investigation, analysis, or proceeding concerning any terrorist incident, threat, or activity.

The head of such Federal agency may disclose such information to officers and employees of such agency to the extent necessary to investigate or respond to such terrorist incident, threat, or activity.

**(8) Comptroller General.--**

**(A) Returns available for inspection.**--Except as provided in subparagraph (C), upon written request by the Comptroller General of the United States, returns and return information shall be open to inspection by, or disclosure to, officers and employees of the Government Accountability Office for the purpose of, and to the extent necessary in, making--

**(i)** an audit of the Internal Revenue Service, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Department of Justice, or the Tax and Trade Bureau, Department of the Treasury, which may be required by section 713 of title 31, United States Code, or

**(ii)** any audit authorized by subsection (p)(6),

except that no such officer or employee shall, except to the extent authorized by subsection (f) or (p)(6), disclose to any person, other than another officer or employee of such office whose official duties require such disclosure, any return or return information described in section 4424(a) in a form which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer, nor shall such officer or employee disclose any other return or return information, except as otherwise expressly provided by law, to any person other than such other officer or employee of such office in a form which can be associated with, or otherwise identify, directly or indirectly, a particular taxpayer.

**(B) Audits of other agencies.--**

**(i) In general.**--Nothing in this section shall prohibit any return or return information obtained under this title by any Federal agency (other than an agency referred to in subparagraph (A)) or by a Trustee as defined in the District of Columbia Retirement Protection Act of 1997, for use in any program or activity from being open to inspection by, or disclosure to, officers and employees of the Government Accountability Office if such inspection or disclosure is--

TD_0000168

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 53 of 130
USCA Case #26-5006        Document #2159317        Filed: 02/17/2026        Page 124 of 388

**(I)** for purposes of, and to the extent necessary in, making an audit authorized by law of such program or activity, and

**(II)** pursuant to a written request by the Comptroller General of the United States to the head of such Federal agency.

**(ii) Information from Secretary.**--If the Comptroller General of the United States determines that the returns or return information available under clause (i) are not sufficient for purposes of making an audit of any program or activity of a Federal agency (other than an agency referred to in subparagraph (A)), upon written request by the Comptroller General to the Secretary, returns and return information (of the type authorized by subsection (l) or (m) to be made available to the Federal agency for use in such program or activity) shall be open to inspection by, or disclosure to, officers and employees of the Government Accountability Office for the purpose of, and to the extent necessary in, making such audit.

**(iii) Requirement of notification upon completion of audit.**--Within 90 days after the completion of an audit with respect to which returns or return information were opened to inspection or disclosed under clause (i) or (ii), the Comptroller General of the United States shall notify in writing the Joint Committee on Taxation of such completion. Such notice shall include--

**(I)** a description of the use of the returns and return information by the Federal agency involved,

**(II)** such recommendations with respect to the use of returns and return information by such Federal agency as the Comptroller General deems appropriate, and

**(III)** a statement on the impact of any such recommendations on confidentiality of returns and return information and the administration of this title.

**(iv) Certain restrictions made applicable.**--The restrictions contained in subparagraph (A) on the disclosure of any returns or return information open to inspection or disclosed under such subparagraph shall also apply to returns and return information open to inspection or disclosed under this subparagraph.

**(C) Disapproval by Joint Committee on Taxation.**--Returns and return information shall not be open to inspection or disclosed under subparagraph (A) or (B) with respect to an audit--

**(i)** unless the Comptroller General of the United States notifies in writing the Joint Committee on Taxation of such audit, and

**(ii)** if the Joint Committee on Taxation disapproves such audit by a vote of at least two-thirds of its members within the 30-day period beginning on the day the Joint Committee on Taxation receives such notice.

**(j) Statistical use.--**

**(1) Department of Commerce.**--Upon request in writing by the Secretary of Commerce, the Secretary shall furnish--

(Page 124 of Total)

A506

TD_0000169

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 54 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 125 of 388

**(A)** such returns, or return information reflected thereon, to officers and employees of the Bureau of the Census, and

**(B)** such return information reflected on returns of corporations to officers and employees of the Bureau of Economic Analysis,

as the Secretary may prescribe by regulation for the purpose of, but only to the extent necessary in, the structuring of censuses and national economic accounts and conducting related statistical activities authorized by law.

**(2) Federal Trade Commission.**--Upon request in writing by the Chairman of the Federal Trade Commission, the Secretary shall furnish such return information reflected on any return of a corporation with respect to the tax imposed by chapter 1 to officers and employees of the Division of Financial Statistics of the Bureau of Economics of such commission as the Secretary may prescribe by regulation for the purpose of, but only to the extent necessary in, administration by such division of legally authorized economic surveys of corporations.

**(3) Department of Treasury.**--Returns and return information shall be open to inspection by or disclosure to officers and employees of the Department of the Treasury whose official duties require such inspection or disclosure for the purpose of, but only to the extent necessary in, preparing economic or financial forecasts, projections, analyses, and statistical studies and conducting related activities. Such inspection or disclosure shall be permitted only upon written request which sets forth the specific reason or reasons why such inspection or disclosure is necessary and which is signed by the head of the bureau or office of the Department of the Treasury requesting the inspection or disclosure.

**(4) Anonymous form.**--No person who receives a return or return information under this subsection shall disclose such return or return information to any person other than the taxpayer to whom it relates except in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer.

**(5) Department of Agriculture.**--Upon request in writing by the Secretary of Agriculture, the Secretary shall furnish such returns, or return information reflected thereon, as the Secretary may prescribe by regulation to officers and employees of the Department of Agriculture whose official duties require access to such returns or information for the purpose of, but only to the extent necessary in, structuring, preparing, and conducting the census of agriculture pursuant to the Census of Agriculture Act of 1997 (Public Law 105-113).

**(6) Congressional Budget Office.**--Upon written request by the Director of the Congressional Budget Office, the Secretary shall furnish to officers and employees of the Congressional Budget Office return information for the purpose of, but only to the extent necessary for, long-term models of the social security and medicare programs.

**(k) Disclosure of certain returns and return information for tax administration purposes.--**

**(1) Disclosure of accepted offers-in-compromise.**--Return information shall be disclosed to members of the general public to the extent necessary to permit inspection of any accepted offer-in-compromise under section 7122 relating to the liability for a tax imposed by this title.

TD_0000170

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 55 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 126 of 388

**(2) Disclosure of amount of outstanding lien.**--If a notice of lien has been filed pursuant to section 6323(f), the amount of the outstanding obligation secured by such lien may be disclosed to any person who furnishes satisfactory written evidence that he has a right in the property subject to such lien or intends to obtain a right in such property.

**(3) Disclosure of return information to correct misstatements of fact.**--The Secretary may, but only following approval by the Joint Committee on Taxation, disclose such return information or any other information with respect to any specific taxpayer to the extent necessary for tax administration purposes to correct a misstatement of fact published or disclosed with respect to such taxpayer's return or any transaction of the taxpayer with the Internal Revenue Service.

**(4) Disclosure to competent authority under tax convention.**--A return or return information may be disclosed to a competent authority of a foreign government which has an income tax or gift and estate tax convention, or other convention or bilateral agreement relating to the exchange of tax information, with the United States but only to the extent provided in, and subject to the terms and conditions of, such convention or bilateral agreement.

**(5) State agencies regulating tax return preparers.**--Taxpayer identity information with respect to any tax return preparer, and information as to whether or not any penalty has been assessed against such tax return preparer under section 6694, 6695, or 7216, may be furnished to any agency, body, or commission lawfully charged under any State or local law with the licensing, registration, or regulation of tax return preparers. Such information may be furnished only upon written request by the head of such agency, body, or commission designating the officers or employees to whom such information is to be furnished. Information may be furnished and used under this paragraph only for purposes of the licensing, registration, or regulation of tax return preparers.

**(6) Disclosure by certain officers and employees for investigative purposes.**--An internal revenue officer or employee and an officer or employee of the Office of Treasury Inspector General for Tax Administration may, in connection with his official duties relating to any audit, collection activity, or civil or criminal tax investigation or any other offense under the internal revenue laws, disclose return information to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax, liability for tax, or the amount to be collected or with respect to the enforcement of any other provision of this title. Such disclosures shall be made only in such situations and under such conditions as the Secretary may prescribe by regulation. This paragraph shall not apply to any disclosure to an individual providing information relating to any purpose described in paragraph (1) or (2) of section 7623(a) which is made under paragraph (13)(A).

**(7) Disclosure of excise tax registration information.**--To the extent the Secretary determines that disclosure is necessary to permit the effective administration of subtitle D, the Secretary may disclose--

**(A)** the name, address, and registration number of each person who is registered under any provision of subtitle D (and, in the case of a registered terminal operator, the address of each terminal operated by such operator), and

**(B)** the registration status of any person.

**(8) Levies on certain government payments.**--

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    24

(Page 126 of Total)

A508

TD_0000171

**(A) Disclosure of return information in levies on Financial Management Service.**--In serving a notice of levy, or release of such levy, with respect to any applicable government payment, the Secretary may disclose to officers and employees of the Financial Management Service--

**(i)** return information, including taxpayer identity information,

**(ii)** the amount of any unpaid liability under this title (including penalties and interest), and

**(iii)** the type of tax and tax period to which such unpaid liability relates.

**(B) Restriction on use of disclosed information.**--Return information disclosed under subparagraph (A) may be used by officers and employees of the Financial Management Service only for the purpose of, and to the extent necessary in, transferring levied funds in satisfaction of the levy, maintaining appropriate agency records in regard to such levy or the release thereof, notifying the taxpayer and the agency certifying such payment that the levy has been honored, or in the defense of any litigation ensuing from the honor of such levy.

**(C) Applicable government payment.**--For purposes of this paragraph, the term "applicable government payment" means--

**(i)** any Federal payment (other than a payment for which eligibility is based on the income or assets (or both) of a payee) certified to the Financial Management Service for disbursement, and

**(ii)** any other payment which is certified to the Financial Management Service for disbursement and which the Secretary designates by published notice.

**(9) Disclosure of information to administer section 6311.**--The Secretary may disclose returns or return information to financial institutions and others to the extent the Secretary deems necessary for the administration of section 6311. Disclosures of information for purposes other than to accept payments by checks or money orders shall be made only to the extent authorized by written procedures promulgated by the Secretary.

**(10) Disclosure of certain returns and return information to certain prison officials.**--

**(A) In general.**--Under such procedures as the Secretary may prescribe, the Secretary may disclose to officers and employees of the Federal Bureau of Prisons and of any State agency charged with the responsibility for administration of prisons any returns or return information with respect to individuals incarcerated in Federal or State prison systems whom the Secretary has determined may have filed or facilitated the filing of a false or fraudulent return to the extent that the Secretary determines that such disclosure is necessary to permit effective Federal tax administration.

**(B) Disclosure to contractor-run prisons.**--Under such procedures as the Secretary may prescribe, the disclosures authorized by subparagraph (A) may be made to contractors responsible for the operation of a Federal or State prison on behalf of such Bureau or agency.

A509

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 57 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 128 of 388

**(C) Restrictions on use of disclosed information.**--Any return or return information received under this paragraph shall be used only for the purposes of and to the extent necessary in taking administrative action to prevent the filing of false and fraudulent returns, including administrative actions to address possible violations of administrative rules and regulations of the prison facility and in administrative and judicial proceedings arising from such administrative actions.

**(D) Restrictions on redisclosure and disclosure to legal representatives.**--Notwithstanding subsection (h)--

**(i) Restrictions on redisclosure.**--Except as provided in clause (ii), any officer, employee, or contractor of the Federal Bureau of Prisons or of any State agency charged with the responsibility for administration of prisons shall not disclose any information obtained under this paragraph to any person other than an officer or employee or contractor of such Bureau or agency personally and directly engaged in the administration of prison facilities on behalf of such Bureau or agency.

**(ii) Disclosure to legal representatives.**--The returns and return information disclosed under this paragraph may be disclosed to the duly authorized legal representative of the Federal Bureau of Prisons, State agency, or contractor charged with the responsibility for administration of prisons, or of the incarcerated individual accused of filing the false or fraudulent return who is a party to an action or proceeding described in subparagraph (C), solely in preparation for, or for use in, such action or proceeding.

**(11) Disclosure of return information to Department of State for purposes of passport revocation under section 7345.**--

**(A) In general.**--The Secretary shall, upon receiving a certification described in section 7345, disclose to the Secretary of State return information with respect to a taxpayer who has a seriously delinquent tax debt described in such section. Such return information shall be limited to--

**(i)** the taxpayer identity information with respect to such taxpayer, and

**(ii)** the amount of such seriously delinquent tax debt.

**(B) Restriction on disclosure.**--Return information disclosed under subparagraph (A) may be used by officers and employees of the Department of State for the purposes of, and to the extent necessary in, carrying out the requirements of section 32101 of the FAST Act.

**(12) Qualified tax collection contractors.**--Persons providing services pursuant to a qualified tax collection contract under section 6306 may, if speaking to a person who has identified himself or herself as having the name of the taxpayer to which a tax receivable (within the meaning of such section) relates, identify themselves as contractors of the Internal Revenue Service and disclose the business name of the contractor, and the nature, subject, and reason for the contact. Disclosures under this paragraph shall be made only in such situations and under such conditions as have been approved by the Secretary.

**(13) Disclosure to whistleblowers.**--

---

(Page 128 of Total)

A510

TD_0000173

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 58 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 129 of 388

**(A) In general.**--The Secretary may disclose, to any individual providing information relating to any purpose described in paragraph (1) or (2) of section 7623(a), return information related to the investigation of any taxpayer with respect to whom the individual has provided such information, but only to the extent that such disclosure is necessary in obtaining information, which is not otherwise reasonably available, with respect to the correct determination of tax liability for tax, or the amount to be collected with respect to the enforcement of any other provision of this title.

**(B) Updates on whistleblower investigations.**--The Secretary shall disclose to an individual providing information relating to any purpose described in paragraph (1) or (2) of section 7623(a) the following:

(i) Not later than 60 days after a case for which the individual has provided information has been referred for an audit or examination, a notice with respect to such referral.

(ii) Not later than 60 days after a taxpayer with respect to whom the individual has provided information has made a payment of tax with respect to tax liability to which such information relates, a notice with respect to such payment.

(iii) Subject to such requirements and conditions as are prescribed by the Secretary, upon a written request by such individual--

(I) information on the status and stage of any investigation or action related to such information, and

(II) in the case of a determination of the amount of any award under section 7623(b), the reasons for such determination.

Clause (iii) shall not apply to any information if the Secretary determines that disclosure of such information would seriously impair Federal tax administration. Information described in clauses (i), (ii), and (iii) may be disclosed to a designee of the individual providing such information in accordance with guidance provided by the Secretary.

**(14) Disclosure of return information for purposes of cybersecurity and the prevention of identity theft tax refund fraud.**--

**(A) In general.**--Under such procedures and subject to such conditions as the Secretary may prescribe, the Secretary may disclose specified return information to specified ISAC participants to the extent that the Secretary determines such disclosure is in furtherance of effective Federal tax administration relating to the detection or prevention of identity theft tax refund fraud, validation of taxpayer identity, authentication of taxpayer returns, or detection or prevention of cybersecurity threats.

**(B) Specified ISAC participants.**--For purposes of this paragraph--

(i) In general.--The term "specified ISAC participant" means--

(Page 129 of Total)

A511

TD_0000174

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 59 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 130 of 388

**(I)** any person designated by the Secretary as having primary responsibility for a function performed with respect to the information sharing and analysis center described in section 2003(a) of the Taxpayer First Act, and

**(II)** any person subject to the requirements of section 7216 and which is a participant in such information sharing and analysis center.

**(ii) Information sharing agreement.**--Such term shall not include any person unless such person has entered into a written agreement with the Secretary setting forth the terms and conditions for the disclosure of information to such person under this paragraph, including requirements regarding the protection and safeguarding of such information by such person.

**(C) Specified return information.**--For purposes of this paragraph, the term "specified return information" means--

**(i)** in the case of a return which is in connection with a case of potential identity theft refund fraud--

**(I)** in the case of such return filed electronically, the internet protocol address, device identification, email domain name, speed of completion, method of authentication, refund method, and such other return information related to the electronic filing characteristics of such return as the Secretary may identify for purposes of this subclause, and

**(II)** in the case of such return prepared by a tax return preparer, identifying information with respect to such tax return preparer, including the preparer taxpayer identification number and electronic filer identification number of such preparer,

**(ii)** in the case of a return which is in connection with a case of a identity theft refund fraud which has been confirmed by the Secretary (pursuant to such procedures as the Secretary may provide), the information referred to in subclauses (I) and (II) of clause (i), the name and taxpayer identification number of the taxpayer as it appears on the return, and any bank account and routing information provided for making a refund in connection with such return, and

**(iii)** in the case of any cybersecurity threat to the Internal Revenue Service, information similar to the information described in subclauses (I) and (II) of clause (i) with respect to such threat.

**(D) Restriction on use of disclosed information.**--

**(i) Designated third parties.**--Any return information received by a person described in subparagraph (B)(i)(I) shall be used only for the purposes of and to the extent necessary in--

**(I)** performing the function such person is designated to perform under such subparagraph,

**(II)** facilitating disclosures authorized under subparagraph (A) to persons described in subparagraph (B)(i)(II), and

(Page 130 of Total)    A512    TD_0000175

§ 6103. Confidentiality and disclosure of returns and return information, 26 USCA § 6103

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 60 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 131 of 388

**(III)** facilitating disclosures authorized under subsection (d) to participants in such information sharing and analysis center.

**(ii) Return preparers.**--Any return information received by a person described in subparagraph (B)(i)(II) shall be treated for purposes of section 7216 as information furnished to such person for, or in connection with, the preparation of a return of the tax imposed under chapter 1.

**(E) Data protection and safeguards.**--Return information disclosed under this paragraph shall be subject to such protections and safeguards as the Secretary may require in regulations or other guidance or in the written agreement referred to in subparagraph (B)(ii). Such written agreement shall include a requirement that any unauthorized access to information disclosed under this paragraph, and any breach of any system in which such information is held, be reported to the Treasury Inspector General for Tax Administration.

**(15) Disclosures to Social Security Administration to identify tax receivables not eligible for collection pursuant to qualified tax collection contracts.**--In the case of any individual involved with a tax receivable which the Secretary has identified for possible collection pursuant to a qualified tax collection contract (as defined in section 6306(b)), the Secretary may disclose the taxpayer identity and date of birth of such individual to officers, employees, and contractors of the Social Security Administration to determine if such tax receivable is not eligible for collection pursuant to such a qualified tax collection contract by reason of section 6306(d)(3)(E).

**(l) Disclosure of returns and return information for purposes other than tax administration.**--

**(1) Disclosure of certain returns and return information to Social Security Administration and Railroad Retirement Board.**--The Secretary may, upon written request, disclose returns and return information with respect to--

**(A)** taxes imposed by chapters 2, 21, and 24, to the Social Security Administration for purposes of its administration of the Social Security Act;

**(B)** a plan to which part I of subchapter D of chapter 1 applies, to the Social Security Administration for purposes of carrying out its responsibility under section 1131 of the Social Security Act, limited, however to return information described in section 6057(d); and

**(C)** taxes imposed by chapter 22, to the Railroad Retirement Board for purposes of its administration of the Railroad Retirement Act.

**(2) Disclosure of returns and return information to the Department of Labor and Pension Benefit Guaranty Corporation.**--The Secretary may, upon written request, furnish returns and return information to the proper officers and employees of the Department of Labor and the Pension Benefit Guaranty Corporation for purposes of, but only to the extent necessary in, the administration of titles I and IV of the Employee Retirement Income Security Act of 1974.

**(3) Disclosure that applicant for Federal loan has tax delinquent account.**--

(Page 131 of Total)

A513

TD_0000176

**(A) In general.**--Upon written request, the Secretary may disclose to the head of the Federal agency administering any included Federal loan program whether or not an applicant for a loan under such program has a tax delinquent account.

**(B) Restriction on disclosure.**--Any disclosure under subparagraph (A) shall be made only for the purpose of, and to the extent necessary in, determining the creditworthiness of the applicant for the loan in question.

**(C) Included Federal loan program defined.**--For purposes of this paragraph, the term "included Federal loan program" means any program under which the United States or a Federal agency makes, guarantees, or insures loans.

**(4) Disclosure of returns and return information for use in personnel or claimant representative matters.**--The Secretary may disclose returns and return information--

**(A)** upon written request--

**(i)** to an employee or former employee of the Department of the Treasury, or to the duly authorized legal representative of such employee or former employee, who is or may be a party to any administrative action or proceeding affecting the personnel rights of such employee or former employee; or

**(ii)** to any person, or to the duly authorized legal representative of such person, whose rights are or may be affected by an administrative action or proceeding under section 330 of title 31, United States Code,

solely for use in the action or proceeding, or in preparation for the action or proceeding, but only to the extent that the Secretary determines that such returns or return information is or may be relevant and material to the action or proceeding; or

**(B)** to officers and employees of the Department of the Treasury for use in any action or proceeding described in subparagraph (A), or in preparation for such action or proceeding, to the extent necessary to advance or protect the interests of the United States.

**(5) Social Security Administration.**--Upon written request by the Commissioner of Social Security, the Secretary may disclose information returns filed pursuant to part III of subchapter A of chapter 61 of this subtitle for the purpose of--

**(A)** carrying out, in accordance with an agreement entered into pursuant to section 232 of the Social Security Act, an effective return processing program; or

**(B)** providing information regarding the mortality status of individuals for epidemiological and similar research in accordance with section 1106(d) of the Social Security Act.

**(6) Disclosure of return information to Federal, State, tribal, and local child support enforcement agencies.**--

A514

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 62 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 133 of 388

**(A) Return information from Internal Revenue Service.**--The Secretary may, upon written request, disclose to the appropriate Federal, State, tribal, or local child support enforcement agency--

**(i)** available return information from the master files of the Internal Revenue Service relating to the social security account number (or numbers, if the individual involved has more than one such number), address, filing status, amounts and nature of income, and the number of dependents reported on any return filed by, or with respect to, any individual with respect to whom child support obligations are sought to be established or enforced pursuant to the provisions of part D of title IV of the Social Security Act and with respect to any individual to whom such support obligations are owing, and

**(ii)** available return information reflected on any return filed by, or with respect to, any individual described in clause (i) relating to the amount of such individual's gross income (as defined in section 61) or consisting of the names and addresses of payors of such income and the names of any dependents reported on such return, but only if such return information is not reasonably available from any other source.

**(B) Disclosure to certain agents.**--The information disclosed to any child support enforcement agency under subparagraph (A) with respect to any individual with respect to whom child support obligations are sought to be established or enforced may be disclosed by such agency to any agent of such agency which is under contract with such agency to carry out the purposes described in subparagraph (C).

**(C) Restriction on disclosure.**--Information may be disclosed under this paragraph only for purposes of, and to the extent necessary in, establishing and collecting child support obligations from, and locating, individuals owing such obligations.

**(D) State, tribal, or local child support enforcement agency.**--For purposes of this paragraph, the following shall be treated as a State, tribal, or local child support enforcement agency:

**(i)** Any agency of a State or political subdivision thereof operating pursuant to a plan described in section 454 of the Social Security Act which has been approved by the Secretary of Health and Human Services under part D of title IV of such Act.

**(ii)** Any child support enforcement agency of an Indian tribe or tribal organization receiving a grant under section 455(f) of the Social Security Act.

**(7) Disclosure of return information to Federal, State, and local agencies administering certain programs under the Social Security Act, the Food and Nutrition Act of 2008, or title 38, United States Code, or certain housing assistance programs.**--

**(A) Return information from Social Security Administration.**--The Commissioner of Social Security shall, upon written request, disclose return information from returns with respect to net earnings from self-employment (as defined in section 1402), wages (as defined in section 3121(a) or 3401(a)), and payments of retirement income, which have been disclosed to the Social Security Administration as provided by paragraph (1) or (5) of this subsection, to any Federal, State, or local agency administering a program listed in subparagraph (D).

---

(Page 133 of Total)

A515

TD_0000178

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 63 of 130

USCA Case #26-5006      Document #2159317      Filed: 02/17/2026      Page 134 of 388

**(B) Return information from Internal Revenue Service.**--The Secretary shall, upon written request, disclose current return information from returns with respect to unearned income from the Internal Revenue Service files to any Federal, State, or local agency administering a program listed in subparagraph (D).

**(C) Restriction on disclosure.**--The Commissioner of Social Security and the Secretary shall disclose return information under subparagraphs (A) and (B) only for purposes of, and to the extent necessary in, determining eligibility for, or the correct amount of, benefits under a program listed in subparagraph (D).

**(D) Programs to which rule applies.**--The programs to which this paragraph applies are:

**(i)** a State program funded under part A of title IV of the Social Security Act;

**(ii)** medical assistance provided under a State plan approved under title XIX of the Social Security Act or subsidies provided under section 1860D-14 of such Act;

**(iii)** supplemental security income benefits provided under title XVI of the Social Security Act, and federally administered supplementary payments of the type described in section 1616(a) of such Act (including payments pursuant to an agreement entered into under section 212(a) of Public Law 93-66);

**(iv)** any benefits provided under a State plan approved under title I, X, XIV, or XVI of the Social Security Act (as those titles apply to Puerto Rico, Guam, and the Virgin Islands);

**(v)** unemployment compensation provided under a State law described in section 3304 of this title;

**(vi)** assistance provided under the Food and Nutrition Act of 2008;

**(vii)** State-administered supplementary payments of the type described in section 1616(a) of the Social Security Act (including payments pursuant to an agreement entered into under section 212(a) of Public Law 93-66);

**(viii)(I)** any needs-based pension provided under chapter 15 of title 38, United States Code, or under any other law administered by the Secretary of Veterans Affairs;

**(II)** parents' dependency and indemnity compensation provided under section 1315 of title 38, United States Code;

**(III)** health-care services furnished under sections 1710(a)(2)(G), 1710(a)(3), and 1710(b) of such title; and

---

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 64 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 135 of 388

**(IV)** compensation paid under chapter 11 of title 38, United States Code, at the 100 percent rate based solely on unemployability and without regard to the fact that the disability or disabilities are not rated as 100 percent disabling under the rating schedule; and

**(ix)** any housing assistance program administered by the Department of Housing and Urban Development that involves initial and periodic review of an applicant's or participant's income, except that return information may be disclosed under this clause only on written request by the Secretary of Housing and Urban Development and only for use by officers and employees of the Department of Housing and Urban Development with respect to applicants for and participants in such programs.

Only return information from returns with respect to net earnings from self-employment and wages may be disclosed under this paragraph for use with respect to any program described in clause (viii)(IV).

**(8) Disclosure of certain return information by Social Security Administration to Federal, State, tribal, and local child support enforcement agencies.--**

**(A) In general.**--Upon written request, the Commissioner of Social Security shall disclose directly to officers and employees of a Federal, State, tribal, or local child support enforcement agency return information from returns with respect to social security account numbers, net earnings from self-employment (as defined in section 1402), wages (as defined in section 3121(a) or 3401(a)), and payments of retirement income which have been disclosed to the Social Security Administration as provided by paragraph (1) or (5) of this subsection.

**(B) Restriction on disclosure.**--The Commissioner of Social Security shall disclose return information under subparagraph (A) only for purposes of, and to the extent necessary in, establishing and collecting child support obligations from, and locating, individuals owing such obligations. For purposes of the preceding sentence, the term "child support obligations" only includes obligations which are being enforced pursuant to the provisions of part D of title IV of the Social Security Act. The information disclosed to any child support enforcement agency under subparagraph (A) with respect to any individual with respect to whom child support obligations are sought to be established or enforced may be disclosed by such agency to any agent of such agency which is under contract with such agency for purposes of, and to the extent necessary in, establishing and collecting child support obligations from, and locating, individuals owing such obligations.

**(C) State, tribal, or local child support enforcement agency.**--For purposes of this paragraph, the term "State, tribal, or local child support enforcement agency" has the same meaning as when used in paragraph (6)(D).

**(9) Disclosure of alcohol fuel producers to administrators of State alcohol laws.**--Notwithstanding any other provision of this section, the Secretary may disclose--

**(A)** the name and address of any person who is qualified to produce alcohol for fuel use under section 5181, and

**(B)** the location of any premises to be used by such person in producing alcohol for fuel,

to any State agency, body, or commission, or its legal representative, which is charged under the laws of such State with responsibility for administration of State alcohol laws solely for use in the administration of such laws.

(Page 135 of Total)

A517

TD_0000180

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 65 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 136 of 388

**(10) Disclosure of certain information to agencies requesting a reduction under subsection (c), (d), (e), or (f) of section 6402.--**

**(A) Return information from Internal Revenue Service.**--The Secretary may, upon receiving a written request, disclose to officers and employees of any agency seeking a reduction under subsection (c), (d), (e), or (f) of section 6402, to officers and employees of the Department of Labor for purposes of facilitating the exchange of data in connection with a notice submitted under subsection (f)(5)(C) of section 6402, and to officers and employees of the Department of the Treasury in connection with such reduction--

**(i)** taxpayer identity information with respect to the taxpayer against whom such a reduction was made or not made and with respect to any other person filing a joint return with such taxpayer,

**(ii)** the fact that a reduction has been made or has not been made under such subsection with respect to such taxpayer,

**(iii)** the amount of such reduction,

**(iv)** whether such taxpayer filed a joint return, and

**(v)** the fact that a payment was made (and the amount of the payment) to the spouse of the taxpayer on the basis of a joint return.

**(B) Restriction on use of disclosed information.--(i)** Any officers and employees of an agency receiving return information under subparagraph (A) shall use such information only for the purposes of, and to the extent necessary in, establishing appropriate agency records, locating any person with respect to whom a reduction under subsection (c), (d), (e), or (f) of section 6402 is sought for purposes of collecting the debt with respect to which the reduction is sought, or in the defense of any litigation or administrative procedure ensuing from a reduction made under subsection (c), (d), (e), or (f) of section 6402.

**(ii)** Notwithstanding clause (i), return information disclosed to officers and employees of the Department of Labor may be accessed by agents who maintain and provide technological support to the Department of Labor's Interstate Connection Network (ICON) solely for the purpose of providing such maintenance and support.

**(iii)** The information disclosed to any child support enforcement agency under subparagraph (A) with respect to any individual with respect to whom child support obligations are sought to be established or enforced may be disclosed by such agency to any agent of such agency which is under contract with such agency for purposes of, and to the extent necessary in, establishing and collecting child support obligations from, and locating, individuals owing such obligations.

**(11) Disclosure of return information to carry out Federal Employees' Retirement System.--**

---

(Page 136 of Total)

A518

TD_0000181

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 66 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 137 of 388

**(A) In general.**--The Commissioner of Social Security shall, on written request, disclose to the Office of Personnel Management return information from returns with respect to net earnings from self-employment (as defined in section 1402), wages (as defined in section 3121(a) or 3401(a)), and payments of retirement income, which have been disclosed to the Social Security Administration as provided by paragraph (1) or (5).

**(B) Restriction on disclosure.**--The Commissioner of Social Security shall disclose return information under subparagraph (A) only for purposes of, and to the extent necessary in, the administration of chapters 83 and 84 of title 5, United States Code.

**(12) Disclosure of certain taxpayer identity information for verification of employment status of medicare beneficiary and spouse of medicare beneficiary.--**

**(A) Return information from Internal Revenue Service.**--The Secretary shall, upon written request from the Commissioner of Social Security, disclose to the Commissioner available filing status and taxpayer identity information from the individual master files of the Internal Revenue Service relating to whether any medicare beneficiary identified by the Commissioner was a married individual (as defined in section 7703) for any specified year after 1986, and, if so, the name of the spouse of such individual and such spouse's TIN.

**(B) Return information from Social Security Administration.**--The Commissioner of Social Security shall, upon written request from the Administrator of the Centers for Medicare & Medicaid Services, disclose to the Administrator the following information:

**(i)** The name and TIN of each medicare beneficiary who is identified as having received wages (as defined in section 3401(a)), above an amount (if any) specified by the Secretary of Health and Human Services, from a qualified employer in a previous year.

**(ii)** For each medicare beneficiary who was identified as married under subparagraph (A) and whose spouse is identified as having received wages, above an amount (if any) specified by the Secretary of Health and Human Services, from a qualified employer in a previous year--

**(I)** the name and TIN of the medicare beneficiary, and

**(II)** the name and TIN of the spouse.

**(iii)** With respect to each such qualified employer, the name, address, and TIN of the employer and the number of individuals with respect to whom written statements were furnished under section 6051 by the employer with respect to such previous year.

**(C) Disclosure by Centers for Medicare & Medicaid Services.**--With respect to the information disclosed under subparagraph (B), the Administrator of the Centers for Medicare & Medicaid Services may disclose--

TD_0000182

§ 6103. Confidentiality and disclosure of returns and return information, 26 USCA § 6103

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 67 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 138 of 388

**(i)** to the qualified employer referred to in such subparagraph the name and TIN of each individual identified under such subparagraph as having received wages from the employer (hereinafter in this subparagraph referred to as the "employee") for purposes of determining during what period such employee or the employee's spouse may be (or have been) covered under a group health plan of the employer and what benefits are or were covered under the plan (including the name, address, and identifying number of the plan),

**(ii)** to any group health plan which provides or provided coverage to such an employee or spouse, the name of such employee and the employee's spouse (if the spouse is a medicare beneficiary) and the name and address of the employer, and, for the purpose of presenting a claim to the plan--

**(I)** the TIN of such employee if benefits were paid under title XVIII of the Social Security Act with respect to the employee during a period in which the plan was a primary plan (as defined in section 1862(b)(2)(A) of the Social Security Act), and

**(II)** the TIN of such spouse if benefits were paid under such title with respect to the spouse during such period, and

**(iii)** to any agent of such Administrator the information referred to in subparagraph (B) for purposes of carrying out clauses (i) and (ii) on behalf of such Administrator.

**(D) Special rules.--**

**(i) Restrictions on disclosure.**--Information may be disclosed under this paragraph only for purposes of, and to the extent necessary in, determining the extent to which any medicare beneficiary is covered under any group health plan.

**(ii) Timely response to requests.**--Any request made under subparagraph (A) or (B) shall be complied with as soon as possible but in no event later than 120 days after the date the request was made.

**(E) Definitions.**--For purposes of this paragraph--

**(i) Medicare beneficiary.**--The term "medicare beneficiary" means an individual entitled to benefits under part A, or enrolled under part B, of title XVIII of the Social Security Act, but does not include such an individual enrolled in part A under section 1818.

**(ii) Group health plan.**--The term "group health plan" means any group health plan (as defined in section 5000(b)(1)).

**(iii) Qualified employer.**--The term "qualified employer" means, for a calendar year, an employer which has furnished written statements under section 6051 with respect to at least 20 individuals for wages paid in the year.

**(13) Disclosure of return information to carry out the Higher Education Act of 1965.--**

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 68 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 139 of 388

**(A) Applications and recertifications for income-contingent or income-based repayment.**--The Secretary shall, upon written request from the Secretary of Education, disclose to any authorized person, only for the purpose of (and to the extent necessary in) determining eligibility for, or repayment obligations under, income-contingent or income-based repayment plans under title IV of the Higher Education Act of 1965 with respect to loans under part D of such title, the following return information from returns (for any taxable year specified by the Secretary of Education as relevant to such purpose) of an individual certified by the Secretary of Education as having provided approval under section 494(a)(2) of such Act (as in effect on the date of enactment of this paragraph) for such disclosure:

(i) Taxpayer identity information.

(ii) Filing status.

(iii) Adjusted gross income.

(iv) Total number of exemptions claimed, if applicable.

(v) Number of dependents taken into account in determining the credit allowed under section 24.

(vi) If applicable, the fact that there was no return filed.

**(B) Discharge of loan based on total and permanent disability.**--The Secretary shall, upon written request from the Secretary of Education, disclose to any authorized person, only for the purpose of (and to the extent necessary in) monitoring and reinstating loans under title IV of the Higher Education Act of 1965 that were discharged based on a total and permanent disability (within the meaning of section 437(a) of such Act), the following return information from returns (for any taxable year specified by the Secretary of Education as relevant to such purpose) of an individual certified by the Secretary of Education as having provided approval under section 494(a)(3) of such Act (as in effect on the date of enactment of this paragraph) for such disclosure:

(i) The return information described in clauses (i), (ii), and (vi) of subparagraph (A).

(ii) The return information described in subparagraph (C)(ii).

**(C) Federal student financial aid.**--The Secretary shall, upon written request from the Secretary of Education, disclose to any authorized person, only for the purpose of (and to the extent necessary in) determining eligibility for, and amount of, Federal student financial aid under a program authorized under subpart 1 of part A, part C, or part D of title IV of the Higher Education Act of 1965 the following return information from returns (for the taxable year used for purposes of section 480(a) of such Act) of an individual certified by the Secretary of Education as having provided approval under section 494(a)(1) of such Act (as in effect on the date of enactment of this paragraph) for such disclosure:

(i) Return information described in clauses (i) through (vi) of subparagraph (A).

---

(Page 139 of Total)

A521

TD_0000184

**(ii)** The amount of any net earnings from self-employment (as defined in section 1402(a)), wages (as defined in section 3121(a) or 3401(a)), and taxable income from a farming business (as defined in section 263A(e)(4)).

**(iii)** Amount of total income tax.

**(iv)** Amount of any credit allowed under section 25A.

**(v)** Amount of individual retirement account distributions not included in adjusted gross income.

**(vi)** Amount of individual retirement account contributions and payments to self-employed SEP, Keogh, and other qualified plans which were deducted from income.

**(vii)** Amount of tax-exempt interest received.

**(viii)** Amounts from retirement pensions and annuities not included in adjusted gross income.

**(ix)** If applicable, the fact that any of the following schedules (or equivalent successor schedules) were filed with the return:

**(I)** Schedule A.

**(II)** Schedule B.

**(III)** Schedule D.

**(IV)** Schedule E.

**(V)** Schedule F.

**(VI)** Schedule H.

**(x)** If applicable, the amount reported on Schedule C (or an equivalent successor schedule) as net profit or loss.

**(D) Additional uses of disclosed information.--**

**(i) In general.--**In addition to the purposes for which information is disclosed under subparagraphs (A), (B), and (C), return information so disclosed may be used by an authorized person, with respect to income-contingent or income-

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 70 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 141 of 388

based repayment plans, awards of Federal student financial aid under a program authorized under subpart 1 of part A, part C, or part D of title IV of the Higher Education Act of 1965, and discharges of loans based on a total and permanent disability (within the meaning of section 437(a) of such Act), for purposes of--

**(I)** reducing the net cost of improper payments under such plans, relating to such awards, or relating to such discharges,

**(II)** oversight activities by the Office of Inspector General of the Department of Education as authorized by the Inspector General Act of 1978, and

**(III)** conducting analyses and forecasts for estimating costs related to such plans, awards, or discharges.

**(ii) Limitation.**--The purposes described in clause (i) shall not include the conduct of criminal investigations or prosecutions.

**(iii) Redisclosure to institutions of higher education, State higher education agencies, and designated scholarship organizations.**--Authorized persons may redisclose return information received under subparagraph (C), solely for the use in the application, award, and administration of financial aid awarded by the Federal government or awarded by a person described in subclause (I), (II), or (III), to the following persons:

**(I)** An institution of higher education participating in a program under subpart 1 of part A, part C, or part D of title IV of the Higher Education Act of 1965.

**(II)** A State higher education agency.

**(III)** A scholarship organization which is an entity designated (prior to the date of the enactment of this clause) by the Secretary of Education under section 483(a)(3)(E) of such Act.

This clause shall only apply to the extent that the taxpayer with respect to whom the return information relates provides written consent for such redisclosure to the Secretary of Education. Under such terms and conditions as may be prescribed by the Secretary, after consultation with the Department of Education, an institution of higher education described in subclause (I) or a State higher education agency described in subclause (II) may designate a contractor of such institution or state agency to receive return information on behalf of such institution or state agency to administer aspects of the institution's or state agency's activities for the application, award, and administration of such financial aid.

**(iv) Redisclosure to Office of Inspector General, independent auditors, and contractors.**--Any return information which is redisclosed under clause (iii)--

**(I)** may be further disclosed by persons described in subclauses (I), (II), or (III) of clause (iii) or persons designated in the last sentence of clause (iii) to the Office of Inspector General of the Department of Education and independent auditors conducting audits of such person's administration of the programs for which the return information was received, and

---

(Page 141 of Total)

A523

TD_0000186

§ 6103. Confidentiality and disclosure of returns and return information, 26 USCA § 6103

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 71 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 142 of 388

**(II)** may be further disclosed by persons described in subclauses (I), (II), or (III) of clause (iii) to contractors of such entities,

but only to the extent necessary in carrying out the purposes described in such clause (iii).

**(v) Redisclosure to family members.**--In addition to the purposes for which information is disclosed and used under subparagraphs (A) and (C), or redisclosed under clause (iii), any return information so disclosed or redisclosed may be further disclosed to any individual certified by the Secretary of Education as having provided approval under paragraph (1) or (2) of section 494(a) of the Higher Education Act of 1965, as the case may be, for disclosure related to the income-contingent or income-based repayment plan under subparagraph (A) or the eligibility for, and amount of, Federal student financial aid described in subparagraph (C).

**(vi) Redisclosure of FAFSA information.**--Return information received under subparagraph (C) may be redisclosed in accordance with subsection (c) of section 494 of the Higher Education Act of 1965 (as in effect on the date of enactment of the COVID-related Tax Relief Act of 2020) to carry out the purposes specified in such subsection.

**(E) Authorized person.**--For purposes of this paragraph, the term "authorized person" means, with respect to information disclosed under subparagraph (A), (B), or (C), any person who--

**(i)** is an officer, employee, or contractor, of the Department of Education, and

**(ii)** is specifically authorized and designated by the Secretary of Education for purposes of such subparagraph (applied separately with respect to each such subparagraph).

**(F) Joint returns.**--In the case of a joint return, any disclosure authorized under subparagraph (A), (B), or (C), and any redisclosure authorized under clause (iii), (iv) [2] (v), or (vi) of subparagraph (D), with respect to an individual shall be treated for purposes of this paragraph as applying with respect to the taxpayer.

**(14) Disclosure of return information to United States Customs Service.**--The Secretary may, upon written request from the Commissioner of the United States Customs Service, disclose to officers and employees of the Department of the Treasury such return information with respect to taxes imposed by chapters 1 and 6 as the Secretary may prescribe by regulations, solely for the purpose of, and only to the extent necessary in--

**(A)** ascertaining the correctness of any entry in audits as provided for in section 509 of the Tariff Act of 1930 ( 19 U.S.C. 1509), or

**(B)** other actions to recover any loss of revenue, or to collect duties, taxes, and fees, determined to be due and owing pursuant to such audits.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

40

A524

TD_0000187

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 72 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 143 of 388

**(15) Disclosure of returns filed under section 6050I.**--The Secretary may, upon written request, disclose to officers and employees of--

**(A)** any Federal agency,

**(B)** any agency of a State or local government, or

**(C)** any agency of the government of a foreign country,

information contained on returns filed under section 6050I. Any such disclosure shall be made on the same basis, and subject to the same conditions, as apply to disclosures of information on reports filed under section 5313 of title 31, United States Code; except that no disclosure under this paragraph shall be made for purposes of the administration of any tax law.

**(16) Disclosure of return information for purposes of administering the District of Columbia Retirement Protection Act of 1997**

**(A) In general.**--Upon written request available return information (including such information disclosed to the Social Security Administration under paragraph (1) or (5) of this subsection), relating to the amount of wage income (as defined in section 3121(a) or 3401(a)), the name, address, and identifying number assigned under section 6109, of payors of wage income, taxpayer identity (as defined in section 6103(b)(6)), and the occupational status reflected on any return filed by, or with respect to, any individual with respect to whom eligibility for, or the correct amount of, benefits under the District of Columbia Retirement Protection Act of 1997, is sought to be determined, shall be disclosed by the Commissioner of Social Security, or to the extent not available from the Social Security Administration, by the Secretary, to any duly authorized officer or employee of the Department of the Treasury, or a Trustee or any designated officer or employee of a Trustee (as defined in the District of Columbia Retirement Protection Act of 1997), or any actuary engaged by a Trustee under the terms of the District of Columbia Retirement Protection Act of 1997, whose official duties require such disclosure, solely for the purpose of, and to the extent necessary in, determining an individual's eligibility for, or the correct amount of, benefits under the District of Columbia Retirement Protection Act of 1997.

**(B) Disclosure for use in judicial or administrative proceedings.**--Return information disclosed to any person under this paragraph may be disclosed in a judicial or administrative proceeding relating to the determination of an individual's eligibility for, or the correct amount of, benefits under the District of Columbia Retirement Protection Act of 1997.

**(17) Disclosure to National Archives and Records Administration.**--The Secretary shall, upon written request from the Archivist of the United States, disclose or authorize the disclosure of returns and return information to officers and employees of the National Archives and Records Administration for purposes of, and only to the extent necessary in, the appraisal of records for destruction or retention. No such officer or employee shall, except to the extent authorized by subsection (f), (i)(8), or (p), disclose any return or return information disclosed under the preceding sentence to any person other than to the Secretary, or to another officer or employee of the National Archives and Records Administration whose official duties require such disclosure for purposes of such appraisal.

**(18) Disclosure of return information for purposes of carrying out a program for advance payment of credit for health insurance costs of eligible individuals.**--The Secretary may disclose to providers of health insurance for any certified

---

(Page 143 of Total)    A525

TD_0000188

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 73 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 144 of 388

individual (as defined in section 7527(c)) return information with respect to such certified individual only to the extent necessary to carry out the program established by section 7527 (relating to advance payment of credit for health insurance costs of eligible individuals).

**(19) Disclosure of return information for purposes of providing transitional assistance under medicare discount card program.--**

**(A) In general.**--The Secretary, upon written request from the Secretary of Health and Human Services pursuant to carrying out section 1860D-31 of the Social Security Act, shall disclose to officers, employees, and contractors of the Department of Health and Human Services with respect to a taxpayer for the applicable year--

**(i)(I)** whether the adjusted gross income, as modified in accordance with specifications of the Secretary of Health and Human Services for purposes of carrying out such section, of such taxpayer and, if applicable, such taxpayer's spouse, for the applicable year, exceeds the amounts specified by the Secretary of Health and Human Services in order to apply the 100 and 135 percent of the poverty lines under such section, (II) whether the return was a joint return, and (III) the applicable year, or

**(ii)** if applicable, the fact that there is no return filed for such taxpayer for the applicable year.

**(B) Definition of applicable year.**--For the purposes of this subsection, the term "applicable year" means the most recent taxable year for which information is available in the Internal Revenue Service's taxpayer data information systems, or, if there is no return filed for such taxpayer for such year, the prior taxable year.

**(C) Restriction on use of disclosed information.**--Return information disclosed under this paragraph may be used only for the purposes of determining eligibility for and administering transitional assistance under section 1860D-31 of the Social Security Act.

**(20) Disclosure of return information to carry out Medicare part B premium subsidy adjustment and part D base beneficiary premium increase.--**

**(A) In general.**--The Secretary shall, upon written request from the Commissioner of Social Security, disclose to officers, employees, and contractors of the Social Security Administration return information of a taxpayer whose premium (according to the records of the Secretary) may be subject to adjustment under section 1839(i) or increase under section 1860D-13(a)(7) of the Social Security Act. Such return information shall be limited to--

**(i)** taxpayer identity information with respect to such taxpayer,

**(ii)** the filing status of such taxpayer,

**(iii)** the adjusted gross income of such taxpayer,

(Page 144 of Total)

A526

TD_0000189

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 74 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 145 of 388

**(iv)** the amounts excluded from such taxpayer's gross income under sections 135 and 911 to the extent such information is available,

**(v)** the interest received or accrued during the taxable year which is exempt from the tax imposed by chapter 1 to the extent such information is available,

**(vi)** the amounts excluded from such taxpayer's gross income by sections 931 and 933 to the extent such information is available,

**(vii)** such other information relating to the liability of the taxpayer as is prescribed by the Secretary by regulation as might indicate in the case of a taxpayer who is an individual described in subsection (i)(4)(B)(iii) of section 1839 of the Social Security Act that the amount of the premium of the taxpayer under such section may be subject to adjustment under subsection (i) of such section or increase under section 1860D-13(a)(7) of such Act and the amount of such adjustment, and

**(viii)** the taxable year with respect to which the preceding information relates.

**(B) Restriction on use of disclosed information.--**

**(i) In general.**--Return information disclosed under subparagraph (A) may be used by officers, employees, and contractors of the Social Security Administration only for the purposes of, and to the extent necessary in, establishing the appropriate amount of any premium adjustment under such section 1839(i) or increase under such section 1860D-13(a)(7) or for the purpose of resolving taxpayer appeals with respect to any such premium adjustment or increase.

**(ii) Disclosure to other agencies.**--Officers, employees, and contractors of the Social Security Administration may disclose--

**(I)** the taxpayer identity information and the amount of the premium subsidy adjustment or premium increase with respect to a taxpayer described in subparagraph (A) to officers, employees, and contractors of the Centers for Medicare and Medicaid Services, to the extent that such disclosure is necessary for the collection of the premium subsidy amount or the increased premium amount,

**(II)** the taxpayer identity information and the amount of the premium subsidy adjustment or the increased premium amount with respect to a taxpayer described in subparagraph (A) to officers and employees of the Office of Personnel Management and the Railroad Retirement Board, to the extent that such disclosure is necessary for the collection of the premium subsidy amount or the increased premium amount,

**(III)** return information with respect to a taxpayer described in subparagraph (A) to officers and employees of the Department of Health and Human Services to the extent necessary to resolve administrative appeals of such premium subsidy adjustment or increased premium, and

(Page 145 of Total)

A527

TD_0000190

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 75 of 130
USCA Case #26-5006       Document #2159317        Filed: 02/17/2026       Page 146 of 388

**(IV)** return information with respect to a taxpayer described in subparagraph (A) to officers and employees of the Department of Justice for use in judicial proceedings to the extent necessary to carry out the purposes described in clause (i).

**(21) Disclosure of return information to carry out eligibility requirements for certain programs.**--

**(A) In general.**--The Secretary, upon written request from the Secretary of Health and Human Services, shall disclose to officers, employees, and contractors of the Department of Health and Human Services return information of any taxpayer whose income is relevant in determining any premium tax credit under section 36B or any cost-sharing reduction under section 1402 of the Patient Protection and Affordable Care Act or eligibility for participation in a State medicaid program under title XIX of the Social Security Act, a State's children's health insurance program under title XXI of the Social Security Act, or a basic health program under section 1331 of Patient Protection and Affordable Care Act. Such return information shall be limited to--

**(i)** taxpayer identity information with respect to such taxpayer,

**(ii)** the filing status of such taxpayer,

**(iii)** the number of individuals for whom a deduction is allowed under section 151 with respect to the taxpayer (including the taxpayer and the taxpayer's spouse),

**(iv)** the modified adjusted gross income (as defined in section 36B) of such taxpayer and each of the other individuals included under clause (iii) who are required to file a return of tax imposed by chapter 1 for the taxable year,

**(v)** such other information as is prescribed by the Secretary by regulation as might indicate whether the taxpayer is eligible for such credit or reduction (and the amount thereof), and

**(vi)** the taxable year with respect to which the preceding information relates or, if applicable, the fact that such information is not available.

**(B) Information to exchange and State agencies.**--The Secretary of Health and Human Services may disclose to an Exchange established under the Patient Protection and Affordable Care Act or its contractors, or to a State agency administering a State program described in subparagraph (A) or its contractors, any inconsistency between the information provided by the Exchange or State agency to the Secretary and the information provided to the Secretary under subparagraph (A).

**(C) Restriction on use of disclosed information.**--Return information disclosed under subparagraph (A) or (B) may be used by officers, employees, and contractors of the Department of Health and Human Services, an Exchange, or a State agency only for the purposes of, and to the extent necessary in--

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    44

(Page 146 of Total)

A528

TD_0000191

§ 6103. Confidentiality and disclosure of returns and return information, 26 USCA § 6103

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 76 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 147 of 388

**(i)** establishing eligibility for participation in the Exchange, and verifying the appropriate amount of, any credit or reduction described in subparagraph (A),

**(ii)** determining eligibility for participation in the State programs described in subparagraph (A).

**(22) Disclosure of return information to Department of Health and Human Services for purposes of enhancing Medicare program integrity.**--

**(A) In general.**--The Secretary shall, upon written request from the Secretary of Health and Human Services, disclose to officers and employees of the Department of Health and Human Services return information with respect to a taxpayer who has applied to enroll, or reenroll, as a provider of services or supplier under the Medicare program under title XVIII of the Social Security Act. Such return information shall be limited to--

**(i)** the taxpayer identity information with respect to such taxpayer;

**(ii)** the amount of the delinquent tax debt owed by that taxpayer; and

**(iii)** the taxable year to which the delinquent tax debt pertains.

**(B) Restriction on disclosure.**--Return information disclosed under subparagraph (A) may be used by officers and employees of the Department of Health and Human Services for the purposes of, and to the extent necessary in, establishing the taxpayer's eligibility for enrollment or reenrollment in the Medicare program, or in any administrative or judicial proceeding relating to, or arising from, a denial of such enrollment or reenrollment, or in determining the level of enhanced oversight to be applied with respect to such taxpayer pursuant to section 1866(j)(3) of the Social Security Act.

**(C) Delinquent tax debt.**--For purposes of this paragraph, the term "delinquent tax debt" means an outstanding debt under this title for which a notice of lien has been filed pursuant to section 6323, but the term does not include a debt that is being paid in a timely manner pursuant to an agreement under section 6159 or 7122, or a debt with respect to which a collection due process hearing under section 6330 is requested, pending, or completed and no payment is required.

**(m) Disclosure of taxpayer identity information.**--

**(1) Tax refunds.**--The Secretary may disclose taxpayer identity information to the press and other media for purposes of notifying persons entitled to tax refunds when the Secretary, after reasonable effort and lapse of time, has been unable to locate such persons.

**(2) Federal claims.**--

TD_0000192

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 77 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 148 of 388

**(A) In general.**--Except as provided in subparagraph (B), the Secretary may, upon written request, disclose the mailing address of a taxpayer for use by officers, employees, or agents of a Federal agency for purposes of locating such taxpayer to collect or compromise a Federal claim against the taxpayer in accordance with sections 3711, 3717, and 3718 of title 31.

**(B) Special rule for consumer reporting agency.**--In the case of an agent of a Federal agency which is a consumer reporting agency (within the meaning of section 603(f) of the Fair Credit Reporting Act (15 U.S.C. 1681a(f))), the mailing address of a taxpayer may be disclosed to such agent under subparagraph (A) only for the purpose of allowing such agent to prepare a commercial credit report on the taxpayer for use by such Federal agency in accordance with sections 3711, 3717, and 3718 of title 31.

**(3) National Institute for Occupational Safety and Health.**--Upon written request, the Secretary may disclose the mailing address of taxpayers to officers and employees of the National Institute for Occupational Safety and Health solely for the purpose of locating individuals who are, or may have been, exposed to occupational hazards in order to determine the status of their health or to inform them of the possible need for medical care and treatment.

**(4) Individuals who owe an overpayment of Federal Pell Grants or who have defaulted on student loans administered by the Department of Education.**--

**(A) In general.**--Upon written request by the Secretary of Education, the Secretary may disclose the mailing address of any taxpayer--

**(i)** who owes an overpayment of a grant awarded to such taxpayer under subpart 1 of part A of title IV of the Higher Education Act of 1965, or

**(ii)** who has defaulted on a loan--

**(I)** made under part B, D, or E of title IV of the Higher Education Act of 1965, or

**(II)** made pursuant to section 3(a)(1) of the Migration and Refugee Assistance Act of 1962 to a student at an institution of higher education,

for use only by officers, employees, or agents of the Department of Education for purposes of locating such taxpayer for purposes of collecting such overpayment or loan.

**(B) Disclosure to educational institutions, etc.**--Any mailing address disclosed under subparagraph (A)(i) may be disclosed by the Secretary of Education to--

**(i)** any lender, or any State or nonprofit guarantee agency, which is participating under part B or D of title IV of the Higher Education Act of 1965, or

(Page 148 of Total)

TD_0000193

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 78 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 149 of 388

**(ii)** any educational institution with which the Secretary of Education has an agreement under subpart 1 of part A, or part D or E, of title IV of such Act,

for use only by officers, employees, or agents of such lender, guarantee agency, or institution whose duties relate to the collection of student loans for purposes of locating individuals who have defaulted on student loans made under such loan programs for purposes of collecting such loans.

**(5) Individuals who have defaulted on student loans administered by the Department of Health and Human Services.--**

**(A) In general.--**Upon written request by the Secretary of Health and Human Services, the Secretary may disclose the mailing address of any taxpayer who has defaulted on a loan made under part C of title VII of the Public Health Service Act or under subpart II of part B of title VIII of such Act, for use only by officers, employees, or agents of the Department of Health and Human Services for purposes of locating such taxpayer for purposes of collecting such loan.

**(B) Disclosure to schools and eligible lenders.--**Any mailing address disclosed under subparagraph (A) may be disclosed by the Secretary of Health and Human Services to--

**(i)** any school with which the Secretary of Health and Human Services has an agreement under subpart II of part C of title VII of the Public Health Service Act or subpart II of part B of title VIII of such Act, or

**(ii)** any eligible lender (within the meaning of section 737(4) of such Act) participating under subpart I of part C of title VII of such Act,

for use only by officers, employees, or agents of such school or eligible lender whose duties relate to the collection of student loans for purposes of locating individuals who have defaulted on student loans made under such subparts for the purposes of collecting such loans.

**(6) Blood Donor Locator Service.--**

**(A) In general.--**Upon written request pursuant to section 1141 of the Social Security Act, the Secretary shall disclose the mailing address of taxpayers to officers and employees of the Blood Donor Locator Service in the Department of Health and Human Services.

**(B) Restriction on disclosure.--**The Secretary shall disclose return information under subparagraph (A) only for purposes of, and to the extent necessary in, assisting under the Blood Donor Locator Service authorized persons (as defined in section 1141(h)(1) of the Social Security Act) in locating blood donors who, as indicated by donated blood or products derived therefrom or by the history of the subsequent use of such blood or blood products, have or may have the virus for acquired immune deficiency syndrome, in order to inform such donors of the possible need for medical care and treatment.

**(C) Safeguards.--**The Secretary shall destroy all related blood donor records (as defined in section 1141(h)(2) of the Social Security Act) in the possession of the Department of the Treasury upon completion of their use in making the disclosure required under subparagraph (A), so as to make such records undisclosable.

(Page 149 of Total)

A531

TD_0000194

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 79 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 150 of 388

**(7) Social security account statement furnished by Social Security Administration.**--Upon written request by the Commissioner of Social Security, the Secretary may disclose the mailing address of any taxpayer who is entitled to receive a social security account statement pursuant to section 1143(c) of the Social Security Act, for use only by officers, employees or agents of the Social Security Administration for purposes of mailing such statement to such taxpayer.

**(n) Certain other persons.**--Pursuant to regulations prescribed by the Secretary, returns and return information may be disclosed to any person, including any person described in section 7513(a), to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration.

**(o) Disclosure of returns and return information with respect to certain taxes.**--

**(1) Taxes imposed by subtitle E.**--

**(A) In general.**--Returns and return information with respect to taxes imposed by subtitle E (relating to taxes on alcohol, tobacco, and firearms) shall be open to inspection by or disclosure to officers and employees of a Federal agency whose official duties require such inspection or disclosure.

**(B) Use in certain proceedings.**--Returns and return information disclosed to a Federal agency under subparagraph (A) may be used in an action or proceeding (or in preparation for such action or proceeding) brought under section 625 of the American Jobs Creation Act of 2004 for the collection of any unpaid assessment or penalty arising under such Act.

**(2) Taxes imposed by chapter 35.**--Returns and return information with respect to taxes imposed by chapter 35 (relating to taxes on wagering) shall, notwithstanding any other provision of this section, be open to inspection by or disclosure only to such person or persons and for such purpose or purposes as are prescribed by section 4424.

**(3) Taxes imposed by section 4481.**--Returns and return information with respect to taxes imposed by section 4481 shall be open to inspection by or disclosure to officers and employees of United States Customs and Border Protection of the Department of Homeland Security whose official duties require such inspection or disclosure for purposes of administering such section.

**(p) Procedure and recordkeeping.**--

**(1) Manner, time, and place of inspections.**--Requests for the inspection or disclosure of a return or return information and such inspection or disclosure shall be made in such manner and at such time and place as shall be prescribed by the Secretary.

**(2) Procedure.**--

(Page 150 of Total)

A532

TD_0000195

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 80 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 151 of 388

**(A) Reproduction of returns.**--A reproduction or certified reproduction of a return shall, upon written request, be furnished to any person to whom disclosure or inspection of such return is authorized under this section. A reasonable fee may be prescribed for furnishing such reproduction or certified reproduction.

**(B) Disclosure of return information.**--Return information disclosed to any person under the provisions of this title may be provided in the form of written documents, reproductions of such documents, films or photoimpressions, or electronically produced tapes, disks, or records, or by any other mode or means which the Secretary determines necessary or appropriate. A reasonable fee may be prescribed for furnishing such return information.

**(C) Use of reproductions.**--Any reproduction of any return, document, or other matter made in accordance with this paragraph shall have the same legal status as the original, and any such reproduction shall, if properly authenticated, be admissible in evidence in any judicial or administrative proceeding as if it were the original, whether or not the original is in existence.

**(3) Records of inspection and disclosure.--**

**(A) System of recordkeeping.**--Except as otherwise provided by this paragraph, the Secretary shall maintain a permanent system of standardized records or accountings of all requests for inspection or disclosure of returns and return information (including the reasons for and dates of such requests) and of returns and return information inspected or disclosed under this section and section 6104(c). Notwithstanding the provisions of section 552a(c) of title 5, United States Code, the Secretary shall not be required to maintain a record or accounting of requests for inspection or disclosure of returns and return information, or of returns and return information inspected or disclosed, under the authority of subsection (c), (e), (f)(5), (h)(1), (3)(A), or (4), (i)(4), or (8)(A)(ii), (k)(1), (2), (6), (8), or (9), (l)(1), (4)(B), (5), (7), (8), (9), (10), (11), (12), (13)(D)(iv), (13)(D)(v), (13)(D)(vi) [2] (14), (15), (16), (17), or (18), (m), or (n). The records or accountings required to be maintained under this paragraph shall be available for examination by the Joint Committee on Taxation or the Chief of Staff of such joint committee. Such record or accounting shall also be available for examination by such person or persons as may be, but only to the extent, authorized to make such examination under section 552a(c)(3) of title 5, United States Code.

**(B) Report by the Secretary.**--The Secretary shall, within 90 days after the close of each calendar year, furnish to the Joint Committee on Taxation a report with respect to, or summary of, the records or accountings described in subparagraph (A) in such form and containing such information as such joint committee or the Chief of Staff of such joint committee may designate. Such report or summary shall not, however, include a record or accounting of any request by the President under subsection (g) for, or the disclosure in response to such request of, any return or return information with respect to any individual who, at the time of such request, was an officer or employee of the executive branch of the Federal Government. Such report or summary, or any part thereof, may be disclosed by such joint committee to such persons and for such purposes as the joint committee may, by record vote of a majority of the members of the joint committee, determine.

**(C) Public report on disclosures.**--The Secretary shall, within 90 days after the close of each calendar year, furnish to the Joint Committee on Taxation for disclosure to the public a report with respect to the records or accountings described in subparagraph (A) which--

**(i)** provides with respect to each Federal agency, each agency, body, or commission described in subsection (d), (i)(3) (B)(i) or (7)(A)(ii), or (l)(6), and the Government Accountability Office the number of--

---

(Page 151 of Total)

A533

TD_0000196

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 81 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 152 of 388

**(I)** requests for disclosure of returns and return information,

**(II)** instances in which returns and return information were disclosed pursuant to such requests or otherwise,

**(III)** taxpayers whose returns, or return information with respect to whom, were disclosed pursuant to such requests, and

**(ii)** describes the general purposes for which such requests were made.

**(4) Safeguards.**--Any Federal agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5), or (7), (j)(1), (2), or (5), (k) (8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (17), or (22), (o)(1)(A), or (o) (3), the Government Accountability Office, the Congressional Budget Office, or any agency, body, or commission described in subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), or (k)(10), (l)(6), (7), (8), (9), (12), (15), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or (15), subsection (l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20), or any Indian tribe or tribal organization receiving a grant under section 455(f) of the Social Security Act, or any entity described in subsection (l)(21), shall, as a condition for receiving returns or return information--

**(A)** establish and maintain, to the satisfaction of the Secretary, a permanent system of standardized records with respect to any request, the reason for such request, and the date of such request made by or of it and any disclosure of return or return information made by or to it;

**(B)** establish and maintain, to the satisfaction of the Secretary, a secure area or place in which such returns or return information shall be stored;

**(C)** restrict, to the satisfaction of the Secretary, access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title;

**(D)** provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the returns or return information;

**(E)** furnish a report to the Secretary, at such time and containing such information as the Secretary may prescribe, which describes the procedures established and utilized by such agency, body, or commission, the Government Accountability Office, or the Congressional Budget Office for ensuring the confidentiality of returns and return information required by this paragraph; and

**(F)** upon completion of use of such returns or return information--

**(i)** in the case of an agency, body, or commission described in subsection (d), (i)(3)(B)(i), (k)(10), or (l)(6), (7), (8), (9), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)

(Page 152 of Total)

A534

TD_0000197

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 82 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 153 of 388

(10) or (15) or subsection (l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) return to the Secretary such returns or return information (along with any copies made therefrom) or make such returns or return information undisclosable in any manner and furnish a written report to the Secretary describing such manner,

**(ii)** in the case of an agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5) or (7), (j)(1), (2), or (5), (k)(8), (10), (11), or (15), (l)(1), (2), (3), (5), (10), (11), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (15), (17), or (22),,[3] (o)(1)(A), or (o)(3) or any entity described in subsection (l)(21), the Government Accountability Office, or the Congressional Budget Office, either--

    **(I)** return to the Secretary such returns or return information (along with any copies made therefrom),

    **(II)** otherwise make such returns or return information undisclosable, or

    **(III)** to the extent not so returned or made undisclosable, ensure that the conditions of subparagraphs (A), (B), (C), (D), and (E) of this paragraph continue to be met with respect to such returns or return information, and

**(iii)** in the case of the Department of Health and Human Services for purposes of subsection (m)(6), destroy all such return information upon completion of its use in providing the notification for which the information was obtained, so as to make such information undisclosable;

except that the conditions of subparagraphs (A), (B), (C), (D), and (E) shall cease to apply with respect to any return or return information if, and to the extent that, such return or return information is disclosed in the course of any judicial or administrative proceeding and made a part of the public record thereof. If the Secretary determines that any such agency, body, or commission, including an agency, an appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or (15) or subsection (l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20), or any Indian tribe or tribal organization receiving a grant under section 455(f) of the Social Security Act, or any entity described in subsection (l)(21), or the Government Accountability Office or the Congressional Budget Office, has failed to, or does not, meet the requirements of this paragraph, he may, after any proceedings for review established under paragraph (7), take such actions as are necessary to ensure such requirements are met, including refusing to disclose returns or return information to such agency, body, or commission, including an agency, an appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or (15) or subsection (l)(6), (8), (10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20), or any Indian tribe or tribal organization receiving a grant under section 455(f) of the Social Security Act, or any entity described in subsection (l)(21), or the Government Accountability Office or the Congressional Budget Office, until he determines that such requirements have been or will be met. In the case of any agency which receives any mailing address under paragraph (2), (4), (6), or (7) of subsection (m) and which discloses any such mailing address to any agent or which receives any information under paragraph (6)(A), (8), (10), (12)(B), or (16) of subsection (l) and which discloses any such information to any agent, or any person including an agent described in subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), or (16), this paragraph shall apply to such agency and each such agent or other person (except that, in the case of an agent, or any person including an agent described in subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), or (16), any report to the Secretary or other action with respect to the Secretary shall be made or taken through such agency). For purposes of applying this paragraph in any case to which subsection (m)(6) applies, the term "return information" includes related blood donor records (as defined in section 1141(h)(2) of the Social Security Act).

(Page 153 of Total)

A535

TD_0000198

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 83 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 154 of 388

**(5) Report on procedures and safeguards.**--After the close of each calendar year, the Secretary shall furnish to each committee described in subsection (f)(1) a report which describes the procedures and safeguards established and utilized by such agencies, bodies, or commissions, the Government Accountability Office, and the Congressional Budget Office for ensuring the confidentiality of returns and return information as required by this subsection. Such report shall also describe instances of deficiencies in, and failure to establish or utilize, such procedures.

**(6) Audit of procedures and safeguards.**--

**(A) Audit by Comptroller General.**--The Comptroller General may audit the procedures and safeguards established by such agencies, bodies, or commissions and the Congressional Budget Office pursuant to this subsection to determine whether such safeguards and procedures meet the requirements of this subsection and ensure the confidentiality of returns and return information. The Comptroller General shall notify the Secretary before any such audit is conducted.

**(B) Records of inspection and reports by the Comptroller General.**--The Comptroller General shall--

**(i)** maintain a permanent system of standardized records and accountings of returns and return information inspected by officers and employees of the Government Accountability Office under subsection (i)(8)(A)(ii) and shall, within 90 days after the close of each calendar year, furnish to the Secretary a report with respect to, or summary of, such records or accountings in such form and containing such information as the Secretary may prescribe, and

**(ii)** furnish an annual report to each committee described in subsection (f) and to the Secretary setting forth his findings with respect to any audit conducted pursuant to subparagraph (A).

The Secretary may disclose to the Joint Committee any report furnished to him under clause (i).

**(7) Administrative review.**--The Secretary shall by regulations prescribe procedures which provide for administrative review of any determination under paragraph (4) that any agency, body, or commission described in subsection (d) has failed to meet the requirements of such paragraph.

**(8) State law requirements.**--

**(A) Safeguards.**--Notwithstanding any other provision of this section, no return or return information shall be disclosed after December 31, 1978, to any officer or employee of any State which requires a taxpayer to attach to, or include in, any State tax return a copy of any portion of his Federal return, or information reflected on such Federal return, unless such State adopts provisions of law which protect the confidentiality of the copy of the Federal return (or portion thereof) attached to, or the Federal return information reflected on, such State tax return.

**(B) Disclosure of returns or return information in State returns.**--Nothing in subparagraph (A) or paragraph (9) shall be construed to prohibit the disclosure by an officer or employee of any State of any copy of any portion of a Federal return or any information on a Federal return which is required to be attached or included in a State return to another officer or employee of such State (or political subdivision of such State) if such disclosure is specifically authorized by State law.

(Page 154 of Total)

A536

TD_0000199

Case 1:25-cv-00457-CKK     Document 48-4     Filed 10/29/25     Page 84 of 130
USCA Case #26-5006     Document #2159317     Filed: 02/17/2026     Page 155 of 388

**(9) Disclosure to contractors and other agents.**--Notwithstanding any other provision of this section, no return or return information shall be disclosed to any contractor or other agent of a Federal, State, tribal, or local agency unless such agency, to the satisfaction of the Secretary--

**(A)** has requirements in effect which require each such contractor or other agent which would have access to returns or return information to provide safeguards (within the meaning of paragraph (4)) to protect the confidentiality of such returns or return information,

**(B)** agrees to conduct an on-site review every 3 years (or a mid-point review in the case of contracts or agreements of less than 3 years in duration) of each contractor or other agent to determine compliance with such requirements,

**(C)** submits the findings of the most recent review conducted under subparagraph (B) to the Secretary as part of the report required by paragraph (4)(E), and

**(D)** certifies to the Secretary for the most recent annual period that such contractor or other agent is in compliance with all such requirements.

The certification required by subparagraph (D) shall include the name and address of each contractor or other agent, a description of the contract or agreement with such contractor or other agent, and the duration of such contract or agreement. The requirements of this paragraph shall not apply to disclosures pursuant to subsection (n) for purposes of Federal tax administration.

**(q) Regulations.**--The Secretary is authorized to prescribe such other regulations as are necessary to carry out the provisions of this section.

## CREDIT(S)

(Aug. 16, 1954, c. 736, 68A Stat. 753; Pub.L. 88-563, § 3(c), Sept. 2, 1964, 78 Stat. 844; Pub.L. 89-44, Title VI, § 601(a), June 21, 1965, 79 Stat. 153; Pub.L. 89-713, § 4(a), Nov. 2, 1966, 80 Stat. 1109; Pub.L. 93-406, Title II, § 1022(h), Sept. 2, 1974, 88 Stat. 941; Pub.L. 94-202, § 8(g), Jan. 2, 1976, 89 Stat. 1139; Pub.L. 94-455, Title XII, § 1202(a)(1), Oct. 4, 1976, 90 Stat. 1667; Pub.L. 95-210, § 5, Dec. 13, 1977, 91 Stat. 1491; Pub.L. 95-600, Title V, § 503, Title VII, § 701(bb)(1)(A), (B), (2) to (5), Nov. 6, 1978, 92 Stat. 2879, 2921; Pub.L. 96-249, Title I, § 127(a)(1), (2)(A) to (C), May 26, 1980, 94 Stat. 365, 366, as amended Pub.L. 96-611, § 11(a)(1), Dec. 28, 1980, 94 Stat. 3573, and Pub.L. 98-369, Div. A, Title IV, § 453(b)(5), July 18, 1984, 98 Stat. 820; Pub.L. 96-265, Title IV, § 408(a)(1) to (2)(C), June 9, 1980, 94 Stat. 468, as amended Pub.L. 96-611, § 11(a) (2)(A) to (B)(iii), Dec. 28, 1980, 94 Stat. 3573; Pub.L. 96-499, Title III, § 302(a), Dec. 5, 1980, 94 Stat. 2604; Pub.L. 96-589, § 3(c), Dec. 24, 1980, 94 Stat. 3401; Pub.L. 96-598, § 3(a), Dec. 24, 1980, 94 Stat. 3487; Pub.L. 97-34, Title VII, § 701(a), Aug. 13, 1981, 95 Stat. 340; Pub.L. 97-248, Title III, §§ 356(a), (b)(1), 358(a), (b), Sept. 3, 1982, 96 Stat. 641, 645, 646, 648; Pub.L. 97-258, § 3(f)(4) to (6), Sept. 13, 1982, 96 Stat. 1064; Pub.L. 97-365, §§ 7(a), (b), 8(a) to (c)(1), Oct. 25, 1982, 96 Stat. 1752 to 1754; Pub.L. 97-452, § 2(c)(4), Jan. 12, 1983, 96 Stat. 2478; Pub.L. 98-21, Title I, § 121(c)(3)(A), (B), Apr. 20, 1983, 97 Stat. 83; Pub.L. 98-369, Div. A, Title IV, §§ 449(a), 453(a) to (b)(3), (6), Div. B, Title VI, §§ 2651(k), 2653(b)(3), 2663(j) (5)(E), July 18, 1984, 98 Stat. 818, 820, 1150, 1155, 1171; Pub.L. 98-378, §§ 19(b), 21(f)(1) to (4), Aug. 16, 1984, 98 Stat. 1322, 1325, 1326; Pub.L. 99-92, § 8(h), Aug. 16, 1985, 99 Stat. 399; Pub.L. 99-335, Title III, § 310(a), (b), June 6, 1986, 100 Stat. 607, 608; Pub.L. 99-386, Title II, § 206(b), Aug. 22, 1986, 100 Stat. 823; Pub.L. 99-514, Title XIV, § 1411(b), Title XV, § 1568(a), Title XVIII, § 1899A(53), Oct. 22, 1986, 100 Stat. 2715, 2764, 2961; Pub.L. 100-485, Title VII, § 701(b)(1), (2)(A),

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000200

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 85 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 156 of 388

(B), Oct. 13, 1988, 102 Stat. 2425, 2426; Pub.L. 100-647, Title I, §§ 1012(bb)(3)(A), (B), 1014(e)(4), Title VI, § 6251, Title VIII, § 8008(c)(1), (2)(A), Nov. 10, 1988, 102 Stat. 3534, 3561, 3752, 3786, 3787; Pub.L. 100-690, Title VII, §§ 7601(b)(1), (2), 7602(c), (d)(2), Nov. 18, 1988, 102 Stat. 4504, 4508; Pub.L. 101-239, Title VI, § 6202(a)(1)(A), (B), Title VII, § 7841(d)(1), Dec. 19, 1989, 103 Stat. 2226, 2227, 2428; Pub.L. 101-508, Title IV, § 4203(a)(2), Title V, § 5111(b)(1), (2), Title VIII, § 8051(a), Title XI, §§ 11101(d)(6), 11212(b)(3), 11313(a), Nov. 5, 1990, 104 Stat. 1388-107, 1388-272, 1388-273, 1388-349, 1388-405, 1388-431, 1388-455; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117; Pub.L. 102-568, Title VI, § 602(b), Oct. 29, 1992, 106 Stat. 4342; Pub.L. 103-66, Title XIII, §§ 13401(a), 13402(a), (b), 13403(a), (b), 13444(a), 13561(a)(2), (e)(2)(B), Aug. 10, 1993, 107 Stat. 563, 564, 565, 570, 593, 595; Pub.L. 103-182, Title V, § 522(a), (b), Dec. 8, 1993, 107 Stat. 2161; Pub.L. 103-296, Title I, § 108(h)(6), Title III, § 311(b), Aug. 15, 1994, 108 Stat. 1487, 1525; Pub.L. 104-134, Title III, § 31001(g)(2), (i)(2), Apr. 26, 1996, 110 Stat. 1321-363, 1321-364; Pub.L. 104-168, Title IV, § 403(a), Title IX, § 902(a), Title XII, §§ 1206(a) to (b)(4), 1207, July 30, 1996, 110 Stat. 1459, 1466, 1472, 1473; Pub.L. 104-188, Title I, § 1704(t)(41), Aug. 20, 1996, 110 Stat. 1889; Pub.L. 104-193, Title I, § 110(l)(2), formerly (l)(3), (l)(4), (5), Title III, § 316(g)(4), Aug. 22, 1996, 110 Stat. 2173, 2219, renumbered Pub.L. 105-33, Title V, § 5514(a)(2), Aug. 5, 1997, 111 Stat. 620; Pub.L. 105-33, Title IV, § 4631(c)(2), Title V, § 5514(a)(1), Title XI, § 11024(b)(1) to (7), Aug. 5, 1997, 111 Stat. 486, 620, 721, 722; Pub.L. 105-34, Title IX, § 976(c), Title X, §§ 1023(a), 1026(a), (b)(1), Title XII, §§ 1201(b)(2), 1205(c)(1), (3), 1283(a), (b), Aug. 5, 1997, 111 Stat. 899, 923, 924, 925, 994, 998, 1038; Pub.L. 105-65, Title V, § 542(b), Oct. 27, 1997, 111 Stat. 1412; Pub.L. 105-206, Title I, § 1101(b), Title III, §§ 3702(a), (b), 3708(a), 3711(b), Title VI, §§ 6007(f)(4), 6009(d), 6012(b)(2), (4), 6019(c), 6023(22), July 22, 1998, 112 Stat. 696, 776, 777, 778, 781, 810, 812, 819, 823, 826; Pub.L. 105-277, Div. J, Title I, § 1006, Title IV, §§ 4002(a), (h), 4006(a)(1), (2), Oct. 21, 1998, 112 Stat. 2681-900, 2681-906, 2681-907, 2681-912; Pub.L. 106-170, Title V, § 521(a)(1), Dec. 17, 1999, 113 Stat. 1925; Pub.L. 106-554, § 1(a)(7) [Title III, §§ 304(a), 310(a), 313(c), 319(8)(B), (17)], Dec. 21, 2000, 114 Stat. 2763, 2763A-632, 2763A-638, 2763A-643, 2763A-646, 2763A-647; Pub.L. 107-134, Title II, § 201(a) to (c)(8), Jan. 23, 2002, 115 Stat. 2440, 2443, 2444; Pub.L. 107-147, Title IV, § 416(c)(1), Mar. 9, 2002, 116 Stat. 55; Pub.L. 107-210, Div. A, Title II, § 202(b)(1), (2), Aug. 6, 2002, 116 Stat. 961; Pub.L. 107-296, Title XI, § 1112(j), Nov. 25, 2002, 116 Stat. 2277; Pub.L. 107-330, Title III, § 306, Dec. 6, 2002, 116 Stat. 2827; Pub.L. 108-89, Title II, § 201(a), Oct. 1, 2003, 117 Stat. 1132; Pub.L. 108-173, Title I, §§ 101(e)(6), 105(e)(1) to (3), Title VIII, § 811(c)(1) to (2)(B), Title IX, § 900(e)(3), Dec. 8, 2003, 117 Stat. 2151, 2167, 2368, 2372; Pub.L. 108-311, Title III, §§ 311(a), 317, 320(a), (b), Title IV, § 408(a)(24), Oct. 4, 2004, 118 Stat. 1180 to 1182, 1192; Pub.L. 108-357, Title IV, § 413(c)(27), Oct. 22, 2004, 118 Stat. 1509; Pub.L. 108-429, Title II, § 2004(a)(22), Dec. 3, 2004, 118 Stat. 2592; Pub.L. 109-135, Title III, § 305(a)(1), (b)(1), (c)(1), Title IV, §§ 406(a), 412(rr)(3), (4), (yy), Dec. 21, 2005, 119 Stat. 2609, 2634, 2640; Pub.L. 109-280, Title XII, § 1224(b)(1) to (3), Aug. 17, 2006, 120 Stat. 1093; Pub.L. 109-432, Div. A, Title I, § 122(a)(1), (b)(1), (c)(1), Title IV, § 421(a), (b), Dec. 20, 2006, 120 Stat. 2944, 2971; Pub.L. 110-28, Title VIII, § 8246(a)(2)(B), May 25, 2007, 121 Stat. 201; Pub.L. 110-142, § 8(c)(1), Dec. 20, 2007, 121 Stat. 1807; Pub.L. 110-172, § 11(a)(34)(A), Dec. 29, 2007, 121 Stat. 2487; Pub.L. 110-234, Title IV, § 4002(b)(1)(B), (H), (2)(O), May 22, 2008, 122 Stat. 1096, 1097; Pub.L. 110-245, Title I, § 108(a), (b), June 17, 2008, 122 Stat. 1631; Pub.L. 110-246, § 4(a), Title IV, § 4002(b)(1)(B), (H), (2)(O), June 18, 2008, 122 Stat. 1664, 1857, 1858; Pub.L. 110-328, § 3(b), Sept. 30, 2008, 122 Stat. 3572; Pub.L. 110-343, Div. C, Title IV, § 402(a), (b), Oct. 3, 2008, 122 Stat. 3875; Pub.L. 110-428, § 2(a), (b), Oct. 15, 2008, 122 Stat. 4839; Pub.L. 111-3, Title VII, § 702(f)(1), (2), Feb. 4, 2009, 123 Stat. 110; Pub.L. 111-148, Title I, § 1414(a)(1), (b), (c), Title III, § 3308(b)(2), Mar. 23, 2010, 124 Stat. 236, 237, 474; Pub.L. 111-152, Title I, § 1004(a)(1)(B), Mar. 30, 2010, 124 Stat. 1034; Pub.L. 111-192, Title I, § 103(a), June 25, 2010, 124 Stat. 1282; Pub.L. 111-198, § 4(a) to (d), July 2, 2010, 124 Stat. 1356; Pub.L. 112-240, Title II, § 209(a) to (b)(2), Jan. 2, 2013, 126 Stat. 2324; Pub.L. 114-94, Div. C, Title XXXII, §§ 32101(c), 32102(d), Dec. 4, 2015, 129 Stat. 1731, 1734; Pub.L. 114-113, Div. Q, Title IV, § 403(a), Dec. 18, 2015, 129 Stat. 3117; Pub.L. 114-184, § 2(a) to (b)(2)(B), June 30, 2016, 130 Stat. 536; Pub.L. 115-141, Div. U, Title IV, § 401(a)(267) to (275), Mar. 23, 2018, 132 Stat. 1197; Pub.L. 116-25, Title I, § 1405(a)(1), (2)(A), (C), Title II, §§ 2003(c)(1), (2)(A), 2004(a), (b), 2202(a), (b), July 1, 2019, 133 Stat. 997, 998, 1001, 1003, 1004, 1012; Pub.L. 116-91, § 3(a) to (c), Dec. 19, 2019, 133 Stat. 1189; Pub.L. 116-94, Div. O, Title IV, § 404, Dec. 20, 2019, 133 Stat. 3180; Pub.L. 116-136, Div. A, Title III, § 3516(a), Mar. 27, 2020, 134 Stat. 407; Pub.L. 116-260, Div. N, Title II, §§ 283(b)(1) to (2)(B), 284(a)(1) to (3), Div. FF, Title I, §§ 102(b)(1) to (2)(B), 103(a)(1) to (3), Dec. 27, 2020, 134 Stat. 1984, 1985, 3084; Pub.L. 118-258, Title II, § 202(a)(2)(A) to (E), Jan. 4, 2025, 138 Stat. 2970.)

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    54

A538

TD_0000201

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 86 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 157 of 388

## EXECUTIVE ORDERS

### EXECUTIVE ORDER NO. 11805

Ex. Ord. No. 11805, Sept. 20, 1974, 39 F.R. 34261, which related to the inspection of tax returns by the President and certain employees of the White House Office, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

Notes of Decisions (411)

### Footnotes

1    Reclassified. See References in Text notes set out for this section.

2    So in original. Probably should be followed by a comma.

3    So in original.

26 U.S.C.A. § 6103, 26 USCA § 6103
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

End of Document                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000202

United States Code Annotated
  Title 8. Aliens and Nationality (Refs & Annos)
    Chapter 12. Immigration and Nationality (Refs & Annos)
      Subchapter II. Immigration
        Part V. Adjustment and Change of Status (Refs & Annos)

8 U.S.C.A. § 1253

§ 1253. Penalties related to removal

Currentness

**(a) Penalty for failure to depart**

**(1) In general**

Any alien against whom a final order of removal is outstanding by reason of being a member of any of the classes described in section 1227(a) of this title, who--

**(A)** willfully fails or refuses to depart from the United States within a period of 90 days from the date of the final order of removal under administrative processes, or if judicial review is had, then from the date of the final order of the court,

**(B)** willfully fails or refuses to make timely application in good faith for travel or other documents necessary to the alien's departure,

**(C)** connives or conspires, or takes any other action, designed to prevent or hamper or with the purpose of preventing or hampering the alien's departure pursuant to such, or

**(D)** willfully fails or refuses to present himself or herself for removal at the time and place required by the Attorney General pursuant to such order,

shall be fined under Title 18, or imprisoned not more than four years (or 10 years if the alien is a member of any of the classes described in paragraph (1)(E), (2), (3), or (4) of section 1227(a) of this title), or both.

**(2) Exception**

It is not a violation of paragraph (1) to take any proper steps for the purpose of securing cancellation of or exemption from such order of removal or for the purpose of securing the alien's release from incarceration or custody.

**(3) Suspension**

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000203

The court may for good cause suspend the sentence of an alien under this subsection and order the alien's release under such conditions as the court may prescribe. In determining whether good cause has been shown to justify releasing the alien, the court shall take into account such factors as--

**(A)** the age, health, and period of detention of the alien;

**(B)** the effect of the alien's release upon the national security and public peace or safety;

**(C)** the likelihood of the alien's resuming or following a course of conduct which made or would make the alien deportable;

**(D)** the character of the efforts made by such alien himself and by representatives of the country or countries to which the alien's removal is directed to expedite the alien's departure from the United States;

**(E)** the reason for the inability of the Government of the United States to secure passports, other travel documents, or removal facilities from the country or countries to which the alien has been ordered removed; and

**(F)** the eligibility of the alien for discretionary relief under the immigration laws.

**(b) Willful failure to comply with terms of release under supervision**

An alien who shall willfully fail to comply with regulations or requirements issued pursuant to section 1231(a)(3) of this title or knowingly give false information in response to an inquiry under such section shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

**(c) Penalties relating to vessels and aircraft**

**(1) Civil penalties**

**(A) Failure to carry out certain orders**

If the Attorney General is satisfied that a person has violated subsection (d) or (e) of section 1231 of this title, the person shall pay to the Commissioner the sum of $2,000 for each violation.

**(B) Failure to remove alien stowaways**

If the Attorney General is satisfied that a person has failed to remove an alien stowaway as required under section 1231(d)(2) of this title, the person shall pay to the Commissioner the sum of $5,000 for each alien stowaway not removed.

**(C) No compromise**

The Attorney General may not compromise the amount of such penalty under this paragraph.

---

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A541

TD_0000204

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 89 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 160 of 388

**(2) Clearing vessels and aircraft**

**(A) Clearance before decision on liability**

A vessel or aircraft may be granted clearance before a decision on liability is made under paragraph (1) only if a bond approved by the Attorney General or an amount sufficient to pay the civil penalty is deposited with the Commissioner.

**(B) Prohibition on clearance while penalty unpaid**

A vessel or aircraft may not be granted clearance if a civil penalty imposed under paragraph (1) is not paid.

**(d) Discontinuing granting visas to nationals of country denying or delaying accepting alien**

On being notified by the Attorney General that the government of a foreign country denies or unreasonably delays accepting an alien who is a citizen, subject, national, or resident of that country after the Attorney General asks whether the government will accept the alien under this section, the Secretary of State shall order consular officers in that foreign country to discontinue granting immigrant visas or nonimmigrant visas, or both, to citizens, subjects, nationals, and residents of that country until the Attorney General notifies the Secretary that the country has accepted the alien.

**(e) Enforcement by attorney general of a State**

The attorney general of a State, or other authorized State officer, alleging a violation of the requirement to discontinue granting visas to citizens, subjects, nationals, and residents as described in subsection (d) that harms such State or its residents shall have standing to bring an action against the Secretary of State on behalf of such State or the residents of such State in an appropriate district court of the United States to obtain appropriate injunctive relief. The court shall advance on the docket and expedite the disposition of a civil action filed under this subsection to the greatest extent practicable. For purposes of this subsection, a State or its residents shall be considered to have been harmed if the State or its residents experience harm, including financial harm in excess of $100.

**CREDIT(S)**

(June 27, 1952, c. 477, Title II, c. 5, § 243, 66 Stat. 212; Pub.L. 89-236, § 11(f), Oct. 3, 1965, 79 Stat. 918; Pub.L. 95-549, Title I, § 104, Oct. 30, 1978, 92 Stat. 2066; Pub.L. 96-212, Title II, § 203(e), Mar. 17, 1980, 94 Stat. 107; Pub.L. 97-116, § 18(i), Dec. 29, 1981, 95 Stat. 1620; Pub.L. 101-649, Title V, § 515(a)(2), Title VI, § 603(b)(3), Nov. 29, 1990, 104 Stat. 5053, 5085; Pub.L. 104-132, Title IV, § 413(a), (f), Apr. 24, 1996, 110 Stat. 1269; Pub.L. 104-208, Div. C, Title III, § 307(a), Sept. 30, 1996, 110 Stat. 3009-612; Pub.L. 119-1, § 3(c), Jan. 29, 2025, 139 Stat. 4.)

Notes of Decisions (19)

8 U.S.C.A. § 1253, 8 USCA § 1253
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.    3

TD_0000205

United States Code Annotated
   Title 26. Internal Revenue Code (Refs & Annos)
      Subtitle F. Procedure and Administration (Refs & Annos)
         Chapter 75. Crimes, Other Offenses, and Forfeitures
            Subchapter A. Crimes
               Part I. General Provisions (Refs & Annos)

26 U.S.C.A. § 7213A, I.R.C. § 7213A

§ 7213A. Unauthorized inspection of returns or return information

Currentness

**(a) Prohibitions.--**

  **(1) Federal employees and other persons.**--It shall be unlawful for--

    **(A)** any officer or employee of the United States, or

    **(B)** any person described in subsection (l)(18) or (n) of section 6103 or an officer or employee of any such person,

    willfully to inspect, except as authorized in this title, any return or return information.

  **(2) State and other employees.**--It shall be unlawful for any person (not described in paragraph (1)) willfully to inspect, except as authorized in this title, any return or return information acquired by such person or another person under a provision of section 6103 referred to in section 7213(a)(2) or under section 6104(c).

**(b) Penalty.--**

  **(1) In general.**--Any violation of subsection (a) shall be punishable upon conviction by a fine in any amount not exceeding $1,000, or imprisonment of not more than 1 year, or both, together with the costs of prosecution.

  **(2) Federal officers or employees.**--An officer or employee of the United States who is convicted of any violation of subsection (a) shall, in addition to any other punishment, be dismissed from office or discharged from employment.

**(c) Definitions.**--For purposes of this section, the terms "inspect", "return", and "return information" have the respective meanings given such terms by section 6103(b).

**CREDIT(S)**

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works. 1

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 91 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 162 of 388

(Added Pub.L. 105-35, § 2(a), Aug. 5, 1997, 111 Stat. 1104; amended Pub.L. 107-210, Div. A, Title II, § 202(b)(3), Aug. 6, 2002, 116 Stat. 961; Pub.L. 109-280, Title XII, § 1224(b)(6), Aug. 17, 2006, 120 Stat. 1093.)

Notes of Decisions (2)

26 U.S.C.A. § 7213A, 26 USCA § 7213A
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A544

TD_0000207

Case 1:25-cv-00457-CKK   Document 48-4   Filed 10/29/25   Page 92 of 130

USCA Case #26-5006   Document #2159317   Filed: 02/17/2026   Page 163 of 388

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle F. Procedure and Administration (Refs & Annos)
      Chapter 75. Crimes, Other Offenses, and Forfeitures
        Subchapter A. Crimes
          Part I. General Provisions (Refs & Annos)

26 U.S.C.A. § 7213, I.R.C. § 7213

§ 7213. Unauthorized disclosure of information

Currentness

**(a) Returns and return information.--**

**(1) Federal employees and other persons.--**It shall be unlawful for any officer or employee of the United States or any person described in section 6103(n) (or an officer or employee of any such person), or any former officer or employee, willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)). Any violation of this paragraph shall be a felony punishable upon conviction by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution, and if such offense is committed by any officer or employee of the United States, he shall, in addition to any other punishment, be dismissed from office or discharged from employment upon conviction for such offense.

**(2) State and other employees.--**It shall be unlawful for any person (not described in paragraph (1)) willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)) acquired by him or another person under subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), (k)(10), (13), (14), or (15), (l)(6), (7), (8), (9), (10), (12), (15), (16), (19), (20), or (21) or (m)(2), (4), (5), (6), or (7) of section 6103 or under section 6104(c). Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

**(3) Other persons.--**It shall be unlawful for any person to whom any return or return information (as defined in section 6103(b)) is disclosed in a manner unauthorized by this title thereafter willfully to print or publish in any manner not provided by law any such return or return information. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

**(4) Solicitation.--**It shall be unlawful for any person willfully to offer any item of material value in exchange for any return or return information (as defined in section 6103(b)) and to receive as a result of such solicitation any such return or return information. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

**(5) Shareholders.--**It shall be unlawful for any person to whom a return or return information (as defined in section 6103(b)) is disclosed pursuant to the provisions of section 6103(e)(1)(D)(iii) willfully to disclose such return or return information in any manner not provided by law. Any violation of this paragraph shall be a felony punishable by a fine in any amount not to exceed $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   1

A545

TD_0000208

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 93 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 164 of 388

**(b) Disclosure of operations of manufacturer or producer.**--Any officer or employee of the United States who divulges or makes known in any manner whatever not provided by law to any person the operations, style of work, or apparatus of any manufacturer or producer visited by him in the discharge of his official duties shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with the costs of prosecution; and the offender shall be dismissed from office or discharged from employment.

**(c) Disclosures by certain delegates of Secretary.**--All provisions of law relating to the disclosure of information, and all provisions of law relating to penalties for unauthorized disclosure of information, which are applicable in respect of any function under this title when performed by an officer or employee of the Treasury Department are likewise applicable in respect of such function when performed by any person who is a "delegate" within the meaning of section 7701(a)(12)(B).

**(d) Disclosure of software.**--Any person who willfully divulges or makes known software (as defined in section 7612(d)(1)) to any person in violation of section 7612 shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

**(e) Cross references.**--

**(1) Penalties for disclosure of information by preparers of returns.**--

For penalty for disclosure or use of information by preparers of returns, see section 7216.

**(2) Penalties for disclosure of confidential information.**--

For penalties for disclosure of confidential information by any officer or employee of the United States or any department or agency thereof, see 18 U.S.C. 1905.

## CREDIT(S)

(Aug. 16, 1954, c. 736, 68A Stat. 855; Pub.L. 85-866, Title I, § 90(c), Sept. 2, 1958, 72 Stat. 1666; Pub.L. 86-778, Title I, § 103(s), Sept. 13, 1960, 74 Stat. 940; Pub.L. 94-455, Title XII, § 1202(d), (h)(3), Oct. 4, 1976, 90 Stat. 1686, 1688; Pub.L. 95-600, Title VII, § 701(bb)(1)(C), (6), Nov. 6, 1978, 92 Stat. 2922, 2923; Pub.L. 96-249, Title I, § 127(a)(2)(D), May 26, 1980, 94 Stat. 366; Pub.L. 96-265, Title IV, § 408(a)(2)(D), June 9, 1980, 94 Stat. 468, as amended Pub.L. 96-611, § 11(a)(2)(B)(iv), Dec. 28, 1980, 94 Stat. 3574; Pub.L. 96-499, Title III, § 302(b), Dec. 5, 1980, 94 Stat. 2604; Pub.L. 96-611, § 11(a)(4)(A), Dec. 28, 1980, 94 Stat. 3574; Pub.L. 97-248, Title III, § 356(b)(2), Sept. 3, 1982, 96 Stat. 645; Pub.L. 97-365, § 8(c)(2), Oct. 25, 1982, 96 Stat. 1754; Pub.L. 98-369, Div. A, Title IV, § 453(b)(4), Div. B, Title VI, § 2653(b)(4), July 18, 1984, 98 Stat. 820, 1156; Pub.L. 98-378, § 21(f)(5), Aug. 16, 1984, 98 Stat. 1326; Pub.L. 100-485, Title VII, § 701(b)(2)(C), Oct. 13, 1988, 102 Stat. 2426; Pub.L. 100-647, Title VIII, § 8008(c)(2)(B), Nov. 10, 1988, 102 Stat. 3787; Pub.L. 101-239, Title VI, § 6202(a)(1)(C), Dec. 19, 1989, 103 Stat. 2228; Pub.L. 101-508, Title V, § 5111(b)(3), Nov. 5, 1990, 104 Stat. 1388-273; Pub.L. 104-168, Title XII, § 1206(b)(5), July 30, 1996, 110 Stat. 1473; Pub.L. 105-33, Title XI, § 11024(b)(8), Aug. 5, 1997, 111 Stat. 722; Pub.L. 105-35, § 2(b)(1), Aug. 5, 1997, 111 Stat. 1105; Pub.L. 105-206, Title III, § 3413(b), July 22, 1998, 112 Stat. 754; Pub.L. 107-134, Title II, § 201(c)(10), Jan. 23, 2002, 115 Stat. 2444; Pub.L. 108-173, Title I, § 105(e)(4), Title VIII, § 811(c)(2)(C), Dec. 8, 2003, 117 Stat. 2167, 2369; Pub.L. 109-280, Title XII, § 1224(b)(5), Aug. 17, 2006, 120 Stat. 1093; Pub.L. 111-148, Title I, § 1414(d), Mar. 23, 2010, 124 Stat. 237; Pub.L. 112-240, Title II, § 209(b)(3), Jan. 2, 2013, 126 Stat.

(Page 164 of Total)

A546

TD_0000209

Case 1:25-cv-00457-CKK   Document 48-4   Filed 10/29/25   Page 94 of 130

USCA Case #26-5006   Document #2159317   Filed: 02/17/2026   Page 165 of 388

2326; Pub.L. 114-184, § 2(b)(2)(C), June 30, 2016, 130 Stat. 537; Pub.L. 116-25, Title I, § 1405(a)(2)(B), Title II, § 2003(c)(2)(B), July 1, 2019, 133 Stat. 998, 1003; Pub.L. 116-260, Div. N, Title II, § 283(b)(2)(C), Div. FF, Title I, § 102(b)(2)(C), Dec. 27, 2020, 134 Stat. 1985, 3084.)

Notes of Decisions (38)

26 U.S.C.A. § 7213, 26 USCA § 7213
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

---

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle F. Procedure and Administration (Refs & Annos)
      Chapter 76. Judicial Proceedings
        Subchapter B. Proceedings by Taxpayers and Third Parties (Refs & Annos)

26 U.S.C.A. § 7431, I.R.C. § 7431

§ 7431. Civil damages for unauthorized inspection or disclosure of returns and return information

Currentness

**(a) In general.--**

**(1) Inspection or disclosure by employee of United States.**--If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

**(2) Inspection or disclosure by a person who is not an employee of United States.**--If any person who is not an officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103 or in violation of section 6104(c), such taxpayer may bring a civil action for damages against such person in a district court of the United States.

**(b) Exceptions**.--No liability shall arise under this section with respect to any inspection or disclosure--

**(1)** which results from a good faith, but erroneous, interpretation of section 6103, or

**(2)** which is requested by the taxpayer.

**(c) Damages.**--In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of--

**(1)** the greater of--

**(A)** $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or

**(B)** the sum of--

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.                1

TD_0000211

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 96 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 167 of 388

**(i)** the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus

**(ii)** in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus

**(2)** the costs of the action, plus

**(3)** in the case of a plaintiff which is described in section 7430(c)(4)(A)(ii), reasonable attorneys fees, except that if the defendant is the United States, reasonable attorneys fees may be awarded only if the plaintiff is the prevailing party (as determined under section 7430(c)(4)).

**(d) Period for bringing action.**--Notwithstanding any other provision of law, an action to enforce any liability created under this section may be brought, without regard to the amount in controversy, at any time within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure.

**(e) Notification of unlawful inspection and disclosure**.--If any person is criminally charged by indictment or information with inspection or disclosure of a taxpayer's return or return information in violation of--

**(1)** paragraph (1) or (2) of section 7213(a),

**(2)** section 7213A(a), or

**(3)** subparagraph (B) of section 1030(a)(2) of title 18, United States Code,

the Secretary shall notify such taxpayer as soon as practicable of such inspection or disclosure. The Secretary shall also notify such taxpayer if the Internal Revenue Service or a Federal or State agency (upon notice to the Secretary by such Federal or State agency) proposes an administrative determination as to disciplinary or adverse action against an employee arising from the employee's unauthorized inspection or disclosure of the taxpayer's return or return information. The notice described in this subsection shall include the date of the unauthorized inspection or disclosure and the rights of the taxpayer under such administrative determination.

**(f) Definitions**.--For purposes of this section, the terms "inspect", "inspection", "return", and "return information" have the respective meanings given such terms by section 6103(b).

**(g) Extension to information obtained under section 3406.**--For purposes of this section--

**(1)** any information obtained under section 3406 (including information with respect to any payee certification failure under subsection (d) thereof) shall be treated as return information, and

(Page 167 of Total)

A549

TD_0000212

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 97 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 168 of 388

**(2)** any inspection or use of such information other than for purposes of meeting any requirement under section 3406 or (subject to the safeguards set forth in section 6103) for purposes permitted under section 6103 shall be treated as a violation of section 6103.

For purposes of subsection (b), the reference to section 6103 shall be treated as including a reference to section 3406.

**(h) Special rule for information obtained under section 6103(k)(9).**--For purposes of this section, any reference to section 6103 shall be treated as including a reference to section 6311(e).

## CREDIT(S)

(Added Pub.L. 97-248, Title III, § 357(a), Sept. 3, 1982, 96 Stat. 645; amended Pub.L. 98-67, Title I, § 104(b), Aug. 5, 1983, 97 Stat. 379; Pub.L. 105-34, Title XII, § 1205(c)(2), Aug. 5, 1997, 111 Stat. 998; Pub.L. 105-35, § 3(a) to (d)(4), (6), Aug. 5, 1997, 111 Stat. 1105, 1106; Pub.L. 105-206, Title III, § 3101(f), Title VI, § 6012(b)(3), July 22, 1998, 112 Stat. 729, 819; Pub.L. 109-280, Title XII, § 1224(b)(7), Aug. 17, 2006, 120 Stat. 1093; Pub.L. 116-25, Title III, § 3002(a), July 1, 2019, 133 Stat. 1015.)

Notes of Decisions (128)

26 U.S.C.A. § 7431, 26 USCA § 7431
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000213

United States Code Annotated
  Title 26. Internal Revenue Code (Refs & Annos)
    Subtitle F. Procedure and Administration (Refs & Annos)
      Chapter 80. General Rules
        Subchapter A. Application of Internal Revenue Laws

26 U.S.C.A. § 7803, I.R.C. § 7803

§ 7803. Commissioner of Internal Revenue; other officials

Currentness

**(a) Commissioner of Internal Revenue.--**

**(1) Appointment.--**

**(A) In general.**--There shall be in the Department of the Treasury a Commissioner of Internal Revenue who shall be appointed by the President, by and with the advice and consent of the Senate. Such appointment shall be made from individuals who, among other qualifications, have a demonstrated ability in management.

**(B) Term.**--The term of the Commissioner of Internal Revenue shall be a 5-year term, beginning with a term to commence on November 13, 1997. Each subsequent term shall begin on the day after the date on which the previous term expires.

**(C) Vacancy.**--Any individual appointed as Commissioner of Internal Revenue during a term as defined in subparagraph (B) shall be appointed for the remainder of that term.

**(D) Removal.**--The Commissioner may be removed at the will of the President.

**(E) Reappointment.**--The Commissioner may be appointed to serve more than one term.

**(2) Duties.**--The Commissioner shall have such duties and powers as the Secretary may prescribe, including the power to--

**(A)** administer, manage, conduct, direct, and supervise the execution and application of the internal revenue laws or related statutes and tax conventions to which the United States is a party; and

**(B)** recommend to the President a candidate for appointment as Chief Counsel for the Internal Revenue Service when a vacancy occurs, and recommend to the President the removal of such Chief Counsel.

If the Secretary determines not to delegate a power specified in subparagraph (A) or (B), such determination may not take effect until 30 days after the Secretary notifies the Committees on Ways and Means, Government Reform and

TD_0000214

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 99 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 170 of 388

Oversight, and Appropriations of the House of Representatives and the Committees on Finance, Governmental Affairs, and Appropriations of the Senate.

**(3) Execution of duties in accord with taxpayer rights.**--In discharging his duties, the Commissioner shall ensure that employees of the Internal Revenue Service are familiar with and act in accord with taxpayer rights as afforded by other provisions of this title, including--

**(A)** the right to be informed,

**(B)** the right to quality service,

**(C)** the right to pay no more than the correct amount of tax,

**(D)** the right to challenge the position of the Internal Revenue Service and be heard,

**(E)** the right to appeal a decision of the Internal Revenue Service in an independent forum,

**(F)** the right to finality,

**(G)** the right to privacy,

**(H)** the right to confidentiality,

**(I)** the right to retain representation, and

**(J)** the right to a fair and just tax system.

**(4) Consultation with Board.**--The Commissioner shall consult with the Oversight Board on all matters set forth in paragraphs (2) and (3) (other than paragraph (3)(A)) of section 7802(d).

**(b) Chief Counsel for the Internal Revenue Service.**--

**(1) Appointment.**--There shall be in the Department of the Treasury a Chief Counsel for the Internal Revenue Service who shall be appointed by the President, by and with the consent of the Senate.

**(2) Duties.**--The Chief Counsel shall be the chief law officer for the Internal Revenue Service and shall perform such duties as may be prescribed by the Secretary, including the duty--

(Page 170 of Total)

A552

TD_0000215

**(A)** to be legal advisor to the Commissioner and the Commissioner's officers and employees;

**(B)** to furnish legal opinions for the preparation and review of rulings and memoranda of technical advice;

**(C)** to prepare, review, and assist in the preparation of proposed legislation, treaties, regulations, and Executive orders relating to laws which affect the Internal Revenue Service;

**(D)** to represent the Commissioner in cases before the Tax Court; and

**(E)** to determine which civil actions should be litigated under the laws relating to the Internal Revenue Service and prepare recommendations for the Department of Justice regarding the commencement of such actions.

If the Secretary determines not to delegate a power specified in subparagraph (A), (B), (C), (D), or (E), such determination may not take effect until 30 days after the Secretary notifies the Committees on Ways and Means, Government Reform and Oversight, and Appropriations of the House of Representatives and the Committees on Finance, Governmental Affairs, and Appropriations of the Senate.

**(3) Persons to whom Chief Counsel reports.**--The Chief Counsel shall report directly to the Commissioner of Internal Revenue, except that--

**(A)** the Chief Counsel shall report to both the Commissioner and the General Counsel for the Department of the Treasury with respect to--

**(i)** legal advice or interpretation of the tax law not relating solely to tax policy;

**(ii)** tax litigation; and

**(B)** the Chief Counsel shall report to the General Counsel with respect to legal advice or interpretation of the tax law relating solely to tax policy.

If there is any disagreement between the Commissioner and the General Counsel with respect to any matter jointly referred to them under subparagraph (A), such matter shall be submitted to the Secretary or Deputy Secretary for resolution.

**(4) Chief Counsel personnel.**--All personnel in the Office of Chief Counsel shall report to the Chief Counsel.

**(c) Office of the Taxpayer Advocate.**--

**(1) Establishment.**--

**WESTLAW** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 101 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 172 of 388

**(A) In general.**--There is established in the Internal Revenue Service an office to be known as the "Office of the Taxpayer Advocate".

**(B) National Taxpayer Advocate.--**

**(i) In general.**--The Office of the Taxpayer Advocate shall be under the supervision and direction of an official to be known as the "National Taxpayer Advocate". The National Taxpayer Advocate shall report directly to the Commissioner of Internal Revenue and shall be entitled to compensation at the same rate as the highest rate of basic pay established for the Senior Executive Service under section 5382 of title 5, United States Code.

**(ii) Appointment.**--The National Taxpayer Advocate shall be appointed by the Secretary of the Treasury after consultation with the Commissioner of Internal Revenue and the Oversight Board and without regard to the provisions of title 5, United States Code, relating to appointments in the competitive service or the Senior Executive Service.

**(iii) Qualifications.**--An individual appointed under clause (ii) shall have--

**(I)** a background in customer service as well as tax law; and

**(II)** experience in representing individual taxpayers.

**(iv) Restriction on employment.**--An individual may be appointed as the National Taxpayer Advocate only if such individual was not an officer or employee of the Internal Revenue Service during the 2-year period ending with such appointment and such individual agrees not to accept any employment with the Internal Revenue Service for at least 5 years after ceasing to be the National Taxpayer Advocate. Service as an officer or employee of the Office of the Taxpayer Advocate shall not be taken into account in applying this clause.

**(2) Functions of office.--**

**(A) In general.**--It shall be the function of the Office of the Taxpayer Advocate to--

**(i)** assist taxpayers in resolving problems with the Internal Revenue Service;

**(ii)** identify areas in which taxpayers have problems in dealings with the Internal Revenue Service;

**(iii)** to the extent possible, propose changes in the administrative practices of the Internal Revenue Service to mitigate problems identified under clause (ii); and

**(iv)** identify potential legislative changes which may be appropriate to mitigate such problems.

(Page 172 of Total)

A554

TD_0000217

**(B) Annual reports.--**

**(i) Objectives.**--Not later than June 30 of each calendar year, the National Taxpayer Advocate shall report to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate on the objectives of the Office of the Taxpayer Advocate for the fiscal year beginning in such calendar year. Any such report shall contain full and substantive analysis, in addition to statistical information.

**(ii) Activities.**--Not later than December 31 of each calendar year, the National Taxpayer Advocate shall report to the Committee on Ways and Means of the House of Representatives and the Committee on Finance of the Senate on the activities of the Office of the Taxpayer Advocate during the fiscal year ending during such calendar year. Any such report shall contain full and substantive analysis, in addition to statistical information, and shall--

**(I)** identify the initiatives the Office of the Taxpayer Advocate has taken on improving taxpayer services and Internal Revenue Service responsiveness;

**(II)** contain recommendations received from individuals with the authority to issue Taxpayer Assistance Orders under section 7811;

**(III)** contain a summary of the 10 most serious problems encountered by taxpayers, including a description of the nature of such problems;

**(IV)** contain an inventory of the items described in subclauses (I), (II), and (III) for which action has been taken and the result of such action;

**(V)** contain an inventory of the items described in subclauses (I), (II), and (III) for which action remains to be completed and the period during which each item has remained on such inventory;

**(VI)** contain an inventory of the items described in subclauses (I), (II), and (III) for which no action has been taken, the period during which each item has remained on such inventory, the reasons for the inaction, and identify any Internal Revenue Service official who is responsible for such inaction;

**(VII)** identify any Taxpayer Assistance Order which was not honored by the Internal Revenue Service in a timely manner, as specified under section 7811(b);

**(VIII)** identify any Taxpayer Advocate Directive which was not honored by the Internal Revenue Service in a timely manner, as specified under paragraph (5);

**(IX)** contain recommendations for such administrative and legislative action as may be appropriate to resolve problems encountered by taxpayers;

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A555

TD_0000218

Case 1:25-cv-00457-CKK   Document 48-4   Filed 10/29/25   Page 103 of 130
USCA Case #26-5006   Document #2159317   Filed: 02/17/2026   Page 174 of 388

**(X)** identify areas of the tax law that impose significant compliance burdens on taxpayers or the Internal Revenue Service, including specific recommendations for remedying these problems;

**(XI)** identify the 10 most litigated issues for each category of taxpayers, including recommendations for mitigating such disputes;

**(XII)** with respect to any statistical information included in such report, include a statement of whether such statistical information was reviewed or provided by the Secretary under section 6108(d) and, if so, whether the Secretary determined such information to be statistically valid and based on sound statistical methodology; and

**(XIII)** include such other information as the National Taxpayer Advocate may deem advisable.

**(iii) Report to be submitted directly.**--Each report required under this subparagraph shall be provided directly to the committees described in clause (i) without any prior review or comment from the Commissioner, the Secretary of the Treasury, the Oversight Board, any other officer or employee of the Department of the Treasury, or the Office of Management and Budget. The preceding sentence shall not apply with respect to statistical information provided to the Secretary for review, or received from the Secretary, under section 6108(d).

**(iv) Coordination with report of Treasury Inspector General for Tax Administration.**--To the extent that information required to be reported under clause (ii) is also required to be reported under paragraph (1) or (2) of subsection (d) by the Treasury Inspector General for Tax Administration, the National Taxpayer Advocate shall not contain such information in the report submitted under such clause.

**(C) Other responsibilities.**--The National Taxpayer Advocate shall--

**(i)** monitor the coverage and geographic allocation of local offices of taxpayer advocates;

**(ii)** develop guidance to be distributed to all Internal Revenue Service officers and employees outlining the criteria for referral of taxpayer inquiries to local offices of taxpayer advocates;

**(iii)** ensure that the local telephone number for each local office of the taxpayer advocate is published and available to taxpayers served by the office; and

**(iv)** in conjunction with the Commissioner, develop career paths for local taxpayer advocates choosing to make a career in the Office of the Taxpayer Advocate.

**(D) Personnel actions.**--

**(i) In general.**--The National Taxpayer Advocate shall have the responsibility and authority to--

---

A556

TD_0000219

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 104 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 175 of 388

(I) appoint local taxpayer advocates and make available at least 1 such advocate for each State; and

(II) evaluate and take personnel actions (including dismissal) with respect to any employee of any local office of a taxpayer advocate described in subclause (I).

(ii) **Consultation.**--The National Taxpayer Advocate may consult with the appropriate supervisory personnel of the Internal Revenue Service in carrying out the National Taxpayer Advocate's responsibilities under this subparagraph.

(E) **Coordination with Treasury Inspector General for Tax Administration.**--Before beginning any research or study, the National Taxpayer Advocate shall coordinate with the Treasury Inspector General for Tax Administration to ensure that the National Taxpayer Advocate does not duplicate any action that the Treasury Inspector General for Tax Administration has already undertaken or has a plan to undertake.

(3) **Responsibilities of Commissioner.**--The Commissioner shall establish procedures requiring a formal response to all recommendations submitted to the Commissioner by the National Taxpayer Advocate within 3 months after submission to the Commissioner.

(4) **Operation of local offices.--**

(A) **In general.**--Each local taxpayer advocate--

(i) shall report to the National Taxpayer Advocate or delegate thereof;

(ii) may consult with the appropriate supervisory personnel of the Internal Revenue Service regarding the daily operation of the local office of the taxpayer advocate;

(iii) shall, at the initial meeting with any taxpayer seeking the assistance of a local office of the taxpayer advocate, notify such taxpayer that the taxpayer advocate offices operate independently of any other Internal Revenue Service office and report directly to Congress through the National Taxpayer Advocate; and

(iv) may, at the taxpayer advocate's discretion, not disclose to the Internal Revenue Service contact with, or information provided by, such taxpayer.

(B) **Maintenance of independent communications.**--Each local office of the taxpayer advocate shall maintain a separate phone, facsimile, and other electronic communication access, and a separate post office address.

(5) **Taxpayer Advocate Directives.**--In the case of any Taxpayer Advocate Directive issued by the National Taxpayer Advocate pursuant to a delegation of authority from the Commissioner of Internal Revenue--

(Page 175 of Total)

A557

TD_0000220

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 105 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 176 of 388

**(A)** the Commissioner or a Deputy Commissioner shall modify, rescind, or ensure compliance with such directive not later than 90 days after the issuance of such directive, and

**(B)** in the case of any directive which is modified or rescinded by a Deputy Commissioner, the National Taxpayer Advocate may (not later than 90 days after such modification or rescission) appeal to the Commissioner, and the Commissioner shall (not later than 90 days after such appeal is made) ensure compliance with such directive as issued by the National Taxpayer Advocate or provide the National Taxpayer Advocate with the reasons for any modification or rescission made or upheld by the Commissioner pursuant to such appeal.

**(d) Additional duties of the Treasury Inspector General for Tax Administration.--**

**(1) Annual reporting.**--The Treasury Inspector General for Tax Administration shall include in one of the semiannual reports under section 405 of title 5, United States Code--

**(A)** an evaluation of the compliance of the Internal Revenue Service with--

**(i)** restrictions under section 1204 of the Internal Revenue Service Restructuring and Reform Act of 1998 on the use of enforcement statistics to evaluate Internal Revenue Service employees;

**(ii)** restrictions under section 7521 on directly contacting taxpayers who have indicated that they prefer their representatives be contacted;

**(iii)** required procedures under section 6320 upon the filing of a notice of a lien;

**(iv)** required procedures under subchapter D of chapter 64 for seizure of property for collection of taxes, including required procedures under section 6330 regarding levies; and

**(v)** restrictions under section 3707 of the Internal Revenue Service Restructuring and Reform Act of 1998 on designation of taxpayers;

**(B)** a review and a certification of whether or not the Secretary is complying with the requirements of section 6103(e)(8) to disclose information to an individual filing a joint return on collection activity involving the other individual filing the return;

**(C)** information regarding extensions of the statute of limitations for assessment and collection of tax under section 6501 and the provision of notice to taxpayers regarding requests for such extension;

**(D)** an evaluation of the adequacy and security of the technology of the Internal Revenue Service;

(Page 176 of Total)

A558

TD_0000221

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 106 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 177 of 388

**(E)** any termination or mitigation under section 1203 of the Internal Revenue Service Restructuring and Reform Act of 1998;

**(F)** information regarding improper denial of requests for information from the Internal Revenue Service identified under paragraph (3)(A); and

**(G)** information regarding any administrative or civil actions with respect to violations of the fair debt collection provisions of section 6304, including--

   **(i)** a summary of such actions initiated since the date of the last report; and

   **(ii)** a summary of any judgments or awards granted as a result of such actions.

**(2) Semiannual reports.--**

**(A) In general.**--The Treasury Inspector General for Tax Administration shall include in each semiannual report under section 405 of title 5, United States Code--

   **(i)** the number of taxpayer complaints during the reporting period;

   **(ii)** the number of employee misconduct and taxpayer abuse allegations received by the Internal Revenue Service or the Inspector General during the period from taxpayers, Internal Revenue Service employees, and other sources;

   **(iii)** a summary of the status of such complaints and allegations; and

   **(iv)** a summary of the disposition of such complaints and allegations, including the outcome of any Department of Justice action and any monies paid as a settlement of such complaints and allegations.

**(B)** Clauses (iii) and (iv) of subparagraph (A) shall only apply to complaints and allegations of serious employee misconduct.

**(3) Other responsibilities.**--The Treasury Inspector General for Tax Administration shall--

**(A)** conduct periodic audits of a statistically valid sample of the total number of determinations made by the Internal Revenue Service to deny written requests to disclose information to taxpayers on the basis of section 6103 of this title or section 552(b)(7) of title 5, United States Code;

---

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 107 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 178 of 388

**(B)** establish and maintain a toll-free telephone number for taxpayers to use to confidentially register complaints of misconduct by Internal Revenue Service employees and incorporate the telephone number in the statement required by section 6227 of the Omnibus Taxpayer Bill of Rights (Internal Revenue Service Publication No. 1); and

**(C)** not later than December 31, 2010, submit a written report to Congress on the implementation of section 6103(k)(10).

**(e) Independent Office of Appeals.--**

**(1) Establishment.--**There is established in the Internal Revenue Service an office to be known as the "Internal Revenue Service Independent Office of Appeals".

**(2) Chief of Appeals.--**

**(A) In general.--**The Internal Revenue Service Independent Office of Appeals shall be under the supervision and direction of an official to be known as the "Chief of Appeals". The Chief of Appeals shall report directly to the Commissioner of Internal Revenue and shall be entitled to compensation at the same rate as the highest rate of basic pay established for the Senior Executive Service under section 5382 of title 5, United States Code.

**(B) Appointment.--**The Chief of Appeals shall be appointed by the Commissioner of Internal Revenue without regard to the provisions of title 5, United States Code, relating to appointments in the competitive service or the Senior Executive Service.

**(C) Qualifications.--**An individual appointed under subparagraph (B) shall have experience and expertise in--

**(i)** administration of, and compliance with, Federal tax laws,

**(ii)** a broad range of compliance cases, and

**(iii)** management of large service organizations.

**(3) Purposes and duties of Office.--**It shall be the function of the Internal Revenue Service Independent Office of Appeals to resolve Federal tax controversies without litigation on a basis which--

**(A)** is fair and impartial to both the Government and the taxpayer,

**(B)** promotes a consistent application and interpretation of, and voluntary compliance with, the Federal tax laws, and

**(C)** enhances public confidence in the integrity and efficiency of the Internal Revenue Service.

(Page 178 of Total)

A560

TD_0000223

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 108 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 179 of 388

**(4) Right of appeal.**--The resolution process described in paragraph (3) shall be generally available to all taxpayers.

**(5) Limitation on designation of cases as not eligible for referral to Independent Office of Appeals.**--

**(A) In general.**--If any taxpayer which is in receipt of a notice of deficiency authorized under section 6212 requests referral to the Internal Revenue Service Independent Office of Appeals and such request is denied, the Commissioner of Internal Revenue shall provide such taxpayer a written notice which--

**(i)** provides a detailed description of the facts involved, the basis for the decision to deny the request, and a detailed explanation of how the basis of such decision applies to such facts, and

**(ii)** describes the procedures prescribed under subparagraph (C) for protesting the decision to deny the request.

**(B) Report to Congress.**--The Commissioner of Internal Revenue shall submit a written report to Congress on an annual basis which includes the number of requests described in subparagraph (A) which were denied and the reasons (described by category) that such requests were denied.

**(C) Procedures for protesting denial of request.**--The Commissioner of Internal Revenue shall prescribe procedures for protesting to the Commissioner of Internal Revenue a denial of a request described in subparagraph (A).

**(D) Not applicable to frivolous positions.**--This paragraph shall not apply to a request for referral to the Internal Revenue Service Independent Office of Appeals which is denied on the basis that the issue involved is a frivolous position (within the meaning of section 6702(c)).

**(6) Staff.**--

**(A) In general.**--All personnel in the Internal Revenue Service Independent Office of Appeals shall report to the Chief of Appeals.

**(B) Access to staff of Office of the Chief Counsel.**--The Chief of Appeals shall have authority to obtain legal assistance and advice from the staff of the Office of the Chief Counsel. The Chief Counsel shall ensure, to the extent practicable, that such assistance and advice is provided by staff of the Office of the Chief Counsel who were not involved in the case with respect to which such assistance and advice is sought and who are not involved in preparing such case for litigation.

**(7) Access to case files.**--

**(A) In general.**--In any case in which a conference with the Internal Revenue Service Independent Office of Appeals has been scheduled upon request of a specified taxpayer, the Chief of Appeals shall ensure that such taxpayer is provided

access to the nonprivileged portions of the case file on record regarding the disputed issues (other than documents provided by the taxpayer to the Internal Revenue Service) not later than 10 days before the date of such conference.

**(B) Taxpayer election to expedite conference.**--If the taxpayer so elects, subparagraph (A) shall be applied by substituting "the date of such conference" for "10 days before the date of such conference".

**(C) Specified taxpayer.**--For purposes of this paragraph--

**(i) In general.**--The term "specified taxpayer" means--

**(I)** in the case of any taxpayer who is a natural person, a taxpayer whose adjusted gross income does not exceed $400,000 for the taxable year to which the dispute relates, and

**(II)** in the case of any other taxpayer, a taxpayer whose gross receipts do not exceed $5 million for the taxable year to which the dispute relates.

**(ii) Aggregation rule.**--Rules similar to the rules of section 448(c)(2) shall apply for purposes of clause (i)(II).

**(f) Internal Revenue Service Chief Information Officer.**--

**(1) In general.**--There shall be in the Internal Revenue Service an Internal Revenue Service Chief Information Officer (hereafter referred to in this subsection as the "IRS CIO") who shall be appointed by the Commissioner of Internal Revenue.

**(2) Centralized responsibility for Internal Revenue Service information technology.**--The Commissioner of Internal Revenue (and the Secretary) shall act through the IRS CIO with respect to all development, implementation, and maintenance of information technology for the Internal Revenue Service. Any reference in this subsection to the IRS CIO which directs the IRS CIO to take any action, or to assume any responsibility, shall be treated as a reference to the Commissioner of Internal Revenue acting through the IRS CIO.

**(3) General duties and responsibilities.**--The IRS CIO shall--

**(A)** be responsible for the development, implementation, and maintenance of information technology for the Internal Revenue Service,

**(B)** ensure that the information technology of the Internal Revenue Service is secure and integrated,

**(C)** maintain operational control of all information technology for the Internal Revenue Service,

**(D)** be the principal advocate for the information technology needs of the Internal Revenue Service, and

A562

TD_0000225

Case 1:25-cv-00457-CKK     Document 48-4     Filed 10/29/25     Page 110 of 130

USCA Case #26-5006     Document #2159317     Filed: 02/17/2026     Page 181 of 388

**(E)** consult with the Chief Procurement Officer of the Internal Revenue Service to ensure that the information technology acquired for the Internal Revenue Service is consistent with--

**(i)** the goals and requirements specified in subparagraphs (A) through (D), and

**(ii)** the strategic plan developed under paragraph (4).

**(4) Strategic plan.**--

**(A) In general.**--The IRS CIO shall develop and implement a multiyear strategic plan for the information technology needs of the Internal Revenue Service. Such plan shall--

**(i)** include performance measurements of such technology and of the implementation of such plan,

**(ii)** include a plan for an integrated enterprise architecture of the information technology of the Internal Revenue Service,

**(iii)** include and take into account the resources needed to accomplish such plan,

**(iv)** take into account planned major acquisitions of information technology by the Internal Revenue Service, and

**(v)** align with the needs and strategic plan of the Internal Revenue Service.

**(B) Plan updates.**--The IRS CIO shall, not less frequently than annually, review and update the strategic plan under subparagraph (A) (including the plan for an integrated enterprise architecture described in subparagraph (A)(ii)) to take into account the development of new information technology and the needs of the Internal Revenue Service.

**(5) Scope of authority.**--

**(A) Information technology.**--For purposes of this subsection, the term "information technology" has the meaning given such term by section 11101 of title 40, United States Code.

**(B) Internal Revenue Service.**--Any reference in this subsection to the Internal Revenue Service includes a reference to all components of the Internal Revenue Service, including--

**(i)** the Office of the Taxpayer Advocate,

**(ii)** the Criminal Investigation Division of the Internal Revenue Service, and

---

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(Page 181 of Total)

TD_0000226

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 111 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 182 of 388

**(iii)** except as otherwise provided by the Secretary with respect to information technology related to matters described in subsection (b)(3)(B), the Office of the Chief Counsel.

## CREDIT(S)

(Aug. 16, 1954, c. 736, 68A Stat. 915; Pub.L. 92-310, Title II, § 230(e), June 6, 1972, 86 Stat. 209; Pub.L. 94-455, Title XIX, § 1906(a)(58), (b)(13)(A), Oct. 4, 1976, 90 Stat. 1833, 1834; Pub.L. 105-206, Title I, § 1102(a), July 22, 1998, 112 Stat. 697; Pub.L. 110-176, § 1(a), Jan. 4, 2008, 121 Stat. 2532; Pub.L. 110-428, § 2(c), Oct. 15, 2008, 122 Stat. 4840; Pub.L. 114-113, Div. Q, Title IV, § 401(a), Dec. 18, 2015, 129 Stat. 3117; Pub.L. 116-25, Title I, §§ 1001(a), 1301(a) to (b)(2), (3)(B) to (c), Title II, § 2101(a), July 1, 2019, 133 Stat. 983, 991, 992, 1008; Pub.L. 117-286, § 4(b)(46), Dec. 27, 2022, 136 Stat. 4348.)

Notes of Decisions (23)

26 U.S.C.A. § 7803, 26 USCA § 7803
Current through P.L. 119-36. Some statute sections may be more current, see credits for details.

End of Document                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 112 of 130
USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 183 of 388

Code of Federal Regulations
  Title 26. Internal Revenue
    Chapter I. Internal Revenue Service, Department of the Treasury
      Subchapter F. Procedure and Administration
        Part 301. Procedure and Administration (Refs & Annos)
          Information and Returns
            Returns and Records
              Miscellaneous Provisions

26 C.F.R. § 301.6103(i)–1, Treas. Reg. § 301.6103(i)–1

§ 301.6103(i)–1 Disclosure of returns and return information (including taxpayer return information) to and by officers and employees of the Department of Justice or another Federal agency for use in Federal grand jury proceeding, or preparation for proceeding or investigation, involving enforcement of Federal criminal statute not involving tax administration.

Currentness

**(a) Disclosure of returns and return information (including taxpayer return information) to officers and employees of the Department of Justice or another Federal agency.** Returns and return information (including taxpayer return information), as defined in section 6103(b)(1), (2), and (3) of the Internal Revenue Code, shall, to the extent provided by section 6103(i)(1), (2), and (3) and subject to the requirements of section 6103(i)(1) and (2), be open to inspection by or disclosure to officers and employees of the Department of Justice (including United States attorneys) or of another Federal agency (as defined in section 6103(b)(9)) personally and directly engaged in, and for their necessary use in, any Federal grand jury proceeding, or preparation for any administration or judicial proceeding (or their necessary use in an investigation which may result in such a proceeding), pertaining to enforcement of a specifically designated Federal criminal statute not involving or related to tax administration to which the United States or such agency is or may be a party.

**(b) Disclosure of returns and return information (including taxpayer return information) by officers and employees of the Department of Justice or another Federal agency. (1)** Returns and return information (including taxpayer return information), as defined in section 6103(b)(1), (2), and (3) of the Code, disclosed to officers and employees of the Department of Justice or other Federal agency (as defined in section 6103(b)(9)) as provided by paragraph (a) of this section may be disclosed by such officers and employees to other persons, including, but not limited to, persons described in subparagraph (2) of this paragraph, but only to the extent necessary in connection with a Federal grand jury proceeding, or the proper preparation for a proceeding (or in connection with an investigation which may result in such a proceeding), described in paragraph (a). Such disclosures may include, but are not limited to, disclosures where necessary—

**(i)** To properly obtain the services of persons having special knowledge or technical skills (such as, but not limited to, handwriting analysis, photographic development, sound recording enhancement, or voice identification);

**(ii)** To properly interview, consult, depose, or interrogate or otherwise obtain relevant information from, the taxpayer to whom such return or return information relates (or such taxpayer's legal representative) or any witness who may be called to give evidence in the proceeding; or

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

A565

TD_0000228

§ 301.6103(h)–1 Disclosure of returns and return..., 26 C.F.R. §...

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 113 of 130

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 184 of 388

**(iii)** To properly conduct negotiations concerning, or obtain authorization for, disposition of the proceeding, in whole or in part, or stipulations of fact in connection with the proceeding.

Disclosure of a return or return information to a person other than the taxpayer to whom such return or return information relates or such taxpayer's legal representative to properly accomplish any purpose or activity described in this subparagraph should be made, however, only if such purpose or activity cannot otherwise properly be accomplished without making such disclosures.

**(2)** Among those persons to whom returns and return information may be disclosed by officers and employees of the Department of Justice or other Federal agency as provided by subparagraph (1) of this paragraph are—

**(i)** Other officers and employees of the Department of Justice (including an office, board, division, or bureau of such department, such as the Federal Bureau of Investigation or the Drug Enforcement Administration) or other Federal agency described in subparagraph (1), such as clerical personnel (for example, secretaries, stenographers, docket and file room clerks, and mail room employees) and supervisory personnel (for example, in the case of the Department of Justice, Section Chiefs, Deputy Assistant Attorneys General, Assistant Attorneys General, the Deputy Attorney General, the Attorney General, and supervisory personnel of the Federal Bureau of Investigation or the Drug Enforcement Administration);

**(ii)** Officers and employees of another Federal agency (as defined in section 6103(b)(9)) working under the direction and control of such officers and employees of the Department of Justice or other Federal agency described in subparagraph (1); and

**(iii)** Court reporters.

(Authority: Secs. 6103 and 7805 of the Internal Revenue Code of 1954 (90 Stat. 1667, 68A Stat. 917; 26 U.S.C. 6103 and 7805))

**Credits**
[T.D. 7723, 45 FR 65568, Oct. 3, 1980]

SOURCE: 32 FR 15241, Nov. 3, 1967; T.D. 9610, 78 FR 5994, Jan. 28, 2013; T.D. 9628, 78 FR 49369, Aug. 14, 2013; T.D. 9679, 79 FR 41891, July 18, 2014; T.D. 9687, 79 FR 47264, Aug. 12, 2014; T.D. 9764, 81 FR 25334, April 28, 2016; T.D. 9768, 81 FR 27322, May 6, 2016; T.D. 9780, 81 FR 51797, Aug. 5, 2016; T.D. 9844, 84 FR 6530, Feb. 27, 2019; T.D. 9849, 84 FR 9239, March 14, 2019; T.D. 9860, 84 FR 24382, May 28, 2019; T.D. 9922, 85 FR 72074, Nov. 12, 2020; T.D. 9940, 85 FR 83447, Dec. 22, 2020; T.D. 9964, 87 FR 50244, Aug. 16, 2022; T.D. 9969, 87 FR 75489, Dec. 9, 2022; T.D. 9972, 88 FR 11766, Feb. 23, 2023; T.D. 9988, 89 FR 17595, March 11, 2024; T.D. 9995, 37774, May 6, 2024; T.D. 10011, 89 FR 87785, Nov. 5, 2024; T.D. 10013, 89 FR 93175, Nov. 26, 2024; T.D. 10017, 89 FR 104422, Dec. 23, 2024; T.D. 10026, 90 FR 3021, Jan. 14, 2025; T.D. 10030, 90 FR 3662, Jan. 15, 2025, unless otherwise noted.

AUTHORITY: 26 U.S.C. 7805.; Section 301.1474–1 also issued under 26 U.S.C. 1474(f).; Section 301.6011–2 also issued under 26 U.S.C. 6011(e).; Section 301.6011–3 also issued under 26 U.S.C. 6011.; Section 301.6011–5 also issued under 26 U.S.C. 6011.; Section 301.6011–6 also issued under 26 U.S.C. 6011(a).; Section 301.6011–7 also issued under 26 U.S.C. 6011(e).; Section 301.6011–10 also issued under 26 U.S.C. 6011.; Section 301.6011–11 also issued under 26 U.S.C. 6011.; Section 301.6011–12 also issued under 26 U.S.C. 6011.; Section 301.6011–13 also issued under 26 U.S.C. 6011.; Section 301.6011–

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

TD_0000229

14 also issued under 26 U.S.C. 6011.; Section 301.6011–15 also issued under 26 U.S.C. 6011.; Section 301.6012–2 also issued under 26 U.S.C. 6012.; Section 301.6033–4 also issued under 26 U.S.C. 6033.; Section 301.6036–1 also issued under 26 U.S.C. 6036.; Section 301.6037–2 also issued under 26 U.S.C. 6037.; Section 301.6039E–1 also issued under 26 U.S.C. 6039E.; Section 301.6050M–1 also issued under 26 U.S.C. 6050M.; Section 301.6057–3 also issued under 26 U.S.C. 6011 and 6057.; Section 301.6058–2 also issued under 26 U.S.C. 6011 and 6058.; Section 301.6059–2 also issued under 26 U.S.C. 6011 and 6059.; Section 301.6061–1 also issued under 26 U.S.C. 6061.; Section 301.6081–2 also issued under 26 U.S.C. 6081(a).; Section 301.6103(c)–1 also issued under 26 U.S.C. 6103(c).; Section 301.6103(h)(4)–1 also issued under 26 U.S.C. 6103(h)(4) and 26 U.S.C. 6103(q).; Section 301.6103(j)(1)–1 also issued under 26 U.S.C. 6103(j)(1) and 6103(q).; Section 301.6103(j)(5)–1 also issued under 26 U.S.C. 6103(j)(5).; Section 301.6103(k)(6)–1 also issued under 26 U.S.C. 6103(k)(6).; Section 301.6103(k)(6)–1T also issued under 26 U.S.C. 6103(k)(6).; Section 301.6103(k)(9)–1 also issued under 26 U.S.C. 6103(k)(9) and 26 U.S.C. 6103(q).; Section 301.6103(l)–1 also issued under 26 U.S.C. 6103(q).; Section 301.6103(l)(14)–1 also issued under 26 U.S.C. 6103(l)(14).; Section 301.6103(l)(21)–(1) also issued under 26 U.S.C. 6103(l)(21) and 6103(q).; Section 301.6103(m)–1 also issued under 26 U.S.C. 6103(q).; Section 301.6103(n)–1 also issued under 26 U.S.C. 6103(n).; Section 301.6103(n)–2 also issued under 26 U.S.C. 6103(n).; Section 301.6103(n)–2 also issued under 26 U.S.C. 6103(q).; Section 301.6103(p)(2)(B)–1 also issued under 26 U.S.C. 6103(p)(2).; Section 301.6103(p)(2)(B)–1T also issued under 26 U.S.C. 6103(p)(2).; Sections 301.6103(p)(4)–1 and 301.6103(p)(7)–1T also issued under 26 U.S.C. 6103(p)(4) and (7) and (q).; Section 301.6104(a)–6(d) is also issued under 5 U.S.C. 552.; Section 301.6104(b)–1(d)(4) is also issued under 5 U.S.C. 552.; Section 301.6104(c)–1 also issued under 26 U.S.C. 6104(c).; Section 301.6104(d)–1(d)(3)(i) is also issued under 5 U.S.C. 552.; Section 301.6104(d)–2 also issued under 26 U.S.C. 6104(d)(3).; Section 301.6104(d)–3 also issued under 26 U.S.C. 6104(d)(3).; Section 301.6104(d)–4 also issued under 26 U.S.C. 6104(e)(3).; Section 301.6104(d)–5 also issued under 26 U.S.C. 6104(e)(3).; Section 301.6109–1 also issued under 26 U.S.C. 6109 (a), (c), and (d).

Section 301.6109–3 also issued under 26 U.S.C. 6109.; Section 301.6111–1T also issued under 26 U.S.C. 6111.; Section 301.6111–2T also issued under 26 U.S.C. 6111(f)(4).; Section 301.6111–3 also issued under 26 U.S.C. 6111.; Section 301.6111–3T also issued under 26 U.S.C. 6111.; Section 301.6112–1T also issued under 26 U.S.C. 6112.; Section 301.6114–1 also issued under 26 U.S.C. 6114.; Section 301.6213–2 also issued under 26 U.S.C. 6213.; Section 301.6221(a)–1 also issued under 26 U.S.C. 6221.; Section 301.6221(b)–1 also issued under sections 6221 and 6241.; Section 301.6222–1 also issued under 26 U.S.C. 6222 and 6223.; Section 301.6222(a)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6222(a)–2T also issued under 26 U.S.C. 6230(k).; Section 301.6222(b)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6222(b)–2T also issued under 26 U.S.C. 6230(k).; Section 301.6222(b)–3T also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6223(a)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6223(a)–2T also issued under 26 U.S.C. 6230(k).; Section 301.6223(b)–1T also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6223(b)–2T also issued under 26 U.S.C. 6230(k).; Section 301.6223(c)–1T also issued under 26 U.S.C. 6223(c) and 6230 (i) and (k).; Section 301.6223(e)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6223(e)–2T also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6223(f)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6223(g)–1T also issued under 26 U.S.C. 6223(g) and 6230 (i) and (k).; Section 301.6223(h)–1T also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6224(a)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6224(b)–1T also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6224(c)–1T also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6224(c)–2T also issued under 26 U.S.C. 6230(k).; Section 301.6224(c)–3T also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6225–1 also issued under 26 U.S.C. 6225.; Section 301.6225–2 also issued under 26 U.S.C. 6223 and 6225.; Section 301.6225–3 also issued under 26 U.S.C. 6225.; Section 301.6226–1 also issued under 26 U.S.C. 6223 and 6226.; Section 301.6226–2 also issued under 26 U.S.C. 6226.; Section 301.6226–3 also issued under 26 U.S.C. 6226.; Section 301.6226(a)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6226(b)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6226(e)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6226(f)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6227–1 also issued under 26 U.S.C. 6223 and 6227.; Section 301.6227–2 also issued under 26 U.S.C. 6227.; Section 301.6227–3 also issued under 26 U.S.C. 6227.; Section 301.6229(c)(2)–1 is also issued under 26 U.S.C. 6230(k).; Section 301.6229(c)(2)–1T is also issued under 26 U.S.C. § 6230(k).; Section 301.6231–1 also issued under 26 U.S.C. 6231.; Section 301.6231(a)(6)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6231(a)(7)–1 also issued under 26 U.S.C. 6230 (i) and (k).; Section 301.6231(a)(7)–2 also issued under 26 U.S.C. 6230 (i) and (k).

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00457-CKK    Document 48-4    Filed 10/29/25    Page 115 of 130

§ 301.6103(i)–1 Disclosure of returns and return... 26 C.F.R. §...

USCA Case #26-5006    Document #2159317    Filed: 02/17/2026    Page 186 of 388

Section 301.6231(a)(12)–1T also issued under 26 U.S.C. 6230(k) and 6231(a)(12).; Section 301.6231(c)–1 also issued under 26 U.S.C. 6231(c)(1) and (3).; Section 301.6231(c)–2 also issued under 26 U.S.C. 6231(c)(1) and (3).; Section 301.6231(c)–3T also issued under 26 U.S.C. 6230(k) and 6231(c).; Section 301.6231(c)–4T also issued under 26 U.S.C. 6230(k) and 6231(c).; Section 301.6231(c)–5T also issued under 26 U.S.C. 6230(k) and 6231(c).; Section 301.6231(c)–6T also issued under 26 U.S.C. 6230(k) and 6231(c).; Section 301.6231(c)–7T also issued under 26 U.S.C. 6230(k) and 6231(c).; Section 301.6231(c)–8T also issued under 26 U.S.C. 6230(k) and 6231(c).; Section 301.6231(d)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6231(e)–1T also issued under 26 U.S.C. 6230(k).; Section 301.6231(e)–2T also issued under 26 U.S.C. 6230(k).; Section 301.6231(f)–1T also issued under 26 U.S.C. 6230 (i) and (k) and 6231(f).; Section 301.6232–1 also issued under 26 U.S.C. 6232.; Section 301.6233–1T also issued under 26 U.S.C. 6230(k) and 6233.; Section 301.6233(a)–1 also issued under 26 U.S.C. 6233.; Section 301.6233(b)–1 also issued under 26 U.S.C. 6233.; Section 301.6234–1 also issued under 26 U.S.C. 6234.; Section 301.6235–1 also issued under 26 U.S.C. 6235.; Section 301.6241–1 also issued under sections 48D(d), 6241, and 6417.; Section 301.6241–2 also issued under 26 U.S.C. 6241.; Section 301.6241–3 also issued under 26 U.S.C. 6241.; Section 301.6241–4 also issued under 26 U.S.C. 6241.; Section 301.6241–5 also issued under 26 U.S.C. 6241.; Section 301.6241–6 also issued under 26 U.S.C. 6241.; Section 301.6241–7 also issued under sections 48D(d), 6241, and 6417.; Section 301.6311–2 also issued under 26 U.S.C. 6311.; Section 301.6323(f)–(1)(c) also issued under 26 U.S.C. 6323(f)(3).; Section 301.6325–1T also issued under 26 U.S.C. 6326.; Section 301.6335–1 also issued under 26 U.S.C. 6335(e)(2).; Section 301.6343–1 also issued under 26 U.S.C. 6343.; Section 301.6343–2 also issued under 26 U.S.C. 6343.; Section 301.6402–2(g) also issued under 26 U.S.C. 6402(n).; Section 301.6402–3 also issued under 95 Stat. 357 amending 88 Stat. 2351.; Section 301.6402–7 also issued under 26 U.S.C. 6402(i) and 6411(c).; Section 301.6404–2 also issued under 26 U.S.C. 6404.; Section 301.6404–3 also issued under 26 U.S.C. 6404(f)(3).; Section 301.6621–1 also issued under 26 U.S.C. 6230(k).; Section 301.6689–1 also issued under 26 U.S.C. 6689(a), 26 U.S.C. 6227(d), and 26 U.S.C. 6241(11).; Section 301.6689–1T also issued under 26 U.S.C. 6689(a).; Section 301.6708–1 also issued under 26 U.S.C. 6708.; Section 301.6721–1 also issued under 26 U.S.C. 6011 and 6721.; Section 301.6751(b)–1(a)(4) also issued under 26 U.S.C. 6751(b)(1).; Section 301.7216–2, paragraphs (o) and (p) also issued under 26 U.S.C. 7216(b)(3).; Section 301.7502–1 also issued under 26 U.S.C. 7502.; Section 301.7502–2 also issued under 26 U.S.C. 7502.; Section 301.7507–1 also issued under 26 U.S.C. 597.; Section 301.7507–9 also issued under 26 U.S.C. 597.; Section 301.7508–1 also issued under 26 U.S.C. 7508(a)(1)(K).; Section 301.7508A–1 also issued under 26 U.S.C. 7508(a)(1)(K) and 7508A(a).

Section 301.7605–1 also issued under Section 6228(b) of the Technical and Miscellaneous Revenue Act of 1988.; Sections 301.7623–1 through 301.7623–4 also issued under 26 U.S.C. 7623.; Section 301.7624–1 also issued under 26 U.S.C. 7624.; Section 301.7701–2 also issued under 26 U.S.C. 7701.; Sections 301.7701(b)–1 through 301.7701(b)–9 also issued under 26 U.S.C. 7701(b)(11).; Section 301.7701(i)–1(g)(1) also issued under 26 U.S.C. 7701(i)(2)(D).; Section 301.7701(i)–4(b) also issued under 26 U.S.C. 7701(i)(3).; Section 301.7705–1 also issued under 26 U.S.C. 7705(h).; Section 301.7705–2 also issued under 26 U.S.C. 7705(h).; Section 301.7803–2 is also issued under 26 U.S.C. 7803(e).; Section 301.7803–3 is also issued under 26 U.S.C. 7803(e).; Section 301.9000–1 also issued under 5 U.S.C. 301 and 26 U.S.C. 6103(q) and 7804.; Section 301.9000–2 also issued under 5 U.S.C. 301 and 26 U.S.C. 6103(q) and 7804.; Section 301.9000–3 also issued under 5 U.S.C. 301 and 26 U.S.C. 6103(q) and 7804.; Section 301.9000–4 also issued under 5 U.S.C. 301 and 26 U.S.C. 6103(q) and 7804.; Section 301.9000–5 also issued under 5 U.S.C. 301 and 26 U.S.C. 6103(q) and 7804.; Section 301.9000–6 also issued under 5 U.S.C. 301 and 26 U.S.C. 6103(q) and 7804.; Section 301.9100–1T also issued under 26 U.S.C. 6081.; Section 301.9100–2T also issued under 26 U.S.C. 6081.; Section 301.9100–3T also issued under 26 U.S.C. 6081.; Section 301.9100–4T also issued under 26 U.S.C. 168(f)(8)(G).; Section 301.9100–7T also issued under 26 U.S.C. 42, 48, 56, 83, 141, 142, 143, 145, 147, 165, 168, 216, 263, 263A, 448, 453C, 468B, 469, 474, 585, 616, 617, 1059, 2632, 2652, 3121, 4982, 7701; and under the Tax Reform Act of 1986, 100 Stat. 2746, sections 203, 204, 243, 311, 646, 801, 806, 905, 1704, 1801, 1802, and 1804.; Section 301.9100–8 also issued under 26 U.S.C. 1(i)(7), 41(h), 42(b)(2)(A)(ii), 42(d)(3), 42(f)(1), 42(g)(3), 42(i)(2)(B), 42(j)(5)(B), 121(d)(9), 142(i)(2), 165(l), 168(b)(2), 219(g)(4), 245(a)(10), 263A(d)(1), 263A(d)(3)(B), 263A(h), 460(b)(3), 643(g)(2), 831(b)(2)(A), 835(a), 865(f), 865(g)(3), 865(h)(2), 904(g)(10), 2056(b)(7)(c)(ii), 2056A(d), 2523(f)(6)(B), 3127, and 7520(a); the Technical and Miscellaneous Revenue Act of 1988, 102 Stat. 3324 [So in original; probably should read "102 Stat. 3342".], sections 1002(a)(23)(B), 1005(c)(11), 1006(d)(15), 1006(j)(1)(C), 1006(t)(18)(B), 1012(n)(3), 1014(c)(1), 1014(c)(2), 2004(j)(1), 2004(m)(5), 5012(e)(4), 6181(c)(2), and 6277; and under the Tax Reform Act of 1986, 100 Stat. 2746, section 905(a).; Sections 301.9100–9T, 301.9100–10T and 301.9100–11T also issued under 26 U.S.C. 1103 (g) and (h) and 6158(a).; Sections 301.9100–13T,

301.9100–14T and 301.9100–15T also issued under 26 U.S.C. 108(d)(8) and 1017(b)(3)(E).; Section 301.9100–16T also issued under 26 U.S.C. 463(d).; Section 301.9100–22T is also issued under section 1101(g)(4) of Public Law 114–74.

## HISTORICAL NOTES

### Effective and Applicability Notes

The regulations apply to disclosures of returns and return information made after October 3, 1980.

Notes of Decisions (6)

Current through October 15, 2025, 90 FR 48266. Some sections may be more current. See credits for details.

_____

End of Document                                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

A569

TD_0000232

# Publication **1075**

# Tax Information Security Guidelines

## For Federal, State and Local Agencies

Safeguards for Protecting Federal Tax Returns and Return Information

   

(Page 188 of Total)

A570

TD_0000233

A571

## IRS Mission Statement

Provide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all.

## Office of Safeguards Mission Statement

The Mission of Safeguards is to promote taxpayer confidence in the integrity of the tax system by ensuring the confidentiality of IRS information provided to federal, state, and local agencies. Safeguards verifies compliance with Internal Revenue Code (IRC) § 6103(p)(4) safeguard requirements through the identification and mitigation of any risk of loss, breach or misuse of Federal Tax Information (FTI) held by external government agencies.

## Office of Safeguards Vision Statement

To serve as a trusted advisor to our Partners, ensuring they have full understanding and insight into FTI requirements and their risk profile, obtain consistent and timely guidance from a "single voice" and receive service and support that is aligned to their risk profile.

We will drive the customer experience and FTI compliance via a collaborative and empowered culture and a cross-trained workforce that is built around a risk-based operating model that integrates infrastructure and processes to enable efficient and effective operations.

TD_0000234

# Contents

*IRS Mission Statement* ........................................................................... 2

*Office of Safeguards Mission Statement* ................................................. 2

*Office of Safeguards Vision Statement* ................................................... 2

*Highlights for November 2021 Revision* ................................................. 12

*Security and Privacy Control Table* ........................................................ 17

*INTRODUCTION* ...................................................................................... 23

   General ................................................................................................ 23

   Overview of Publication 1075 .............................................................. 24

*SAFEGUARD RESOURCES* ..................................................................... 24

   Safeguards Website ............................................................................. 24

   Safeguards Mailbox ............................................................................. 25

*KEY DEFINITIONS* ................................................................................... 25

   Federal Tax Information ........................................................................ 25

   Return and Return Information ............................................................. 26

   Personally Identifiable Information (PII) ............................................... 26

   Information Received from Taxpayers or Third Parties ........................ 27

   Access ................................................................................................. 27

   Cloud Computing ................................................................................. 27

   Inadvertent Access .............................................................................. 27

   Inadvertent Disclosure ........................................................................ 27

   Incidental Access ................................................................................. 27

   Unauthorized Access ........................................................................... 27

   Unauthorized Disclosure ..................................................................... 28

   Need-to-Know ...................................................................................... 28

   Adverse Action .................................................................................... 28

   Disciplinary Action .............................................................................. 28

   Personnel Sanction ............................................................................. 28

*1.0 FEDERAL TAX INFORMATION, REVIEWS and OTHER REQUIREMENTS* ____ 29

*1.1 General* ............................................................................................... 29

*1.2 Authorized Use of FTI* ....................................................................... 29

*1.3 Secure Data Transfer* ........................................................................ 30

*1.4 State Tax Agency Limitations* ............................................................ 30

3

*1.5 Coordinating Safeguards within an Agency* _____ **31**

*1.6 Safeguard Reviews* _____ **31**

1.6.1 Before the Review _____ 31

1.6.2 During the Review _____ 32

1.6.3 After the Review _____ 32

*1.7 Termination of FTI* _____ **33**

1.7.1 Agency Request _____ 33
    **1.7.1.1 Termination Documentation** _____ **33**
    **1.7.1.2 Archiving FTI Procedure** _____ **34**

1.7.2 FTI Suspension, Termination and Administrative Review _____ 34

*1.8 Reporting Improper Inspections or Disclosures* _____ **34**

1.8.1 Terms _____ 34
    **1.8.1.1 Data Incident** _____ **34**
    **1.8.1.2 Data Breach** _____ **35**

1.8.2 General _____ 35

1.8.3 Office of Safeguards Notification Process _____ 36

1.8.4 Incident Response Procedures _____ 37

1.8.5 Incident Response Notification to Impacted Individuals _____ 37

*1.9 Disclosure to Other Persons* _____ **38**

1.9.1 General _____ 38

1.9.2 Authorized Disclosure Precautions _____ 38

1.9.3 External Personnel Security _____ 38

1.9.4 Disclosing FTI to Contractors or Sub-Contractors _____ 38

1.9.5 Re-Disclosure Agreements _____ 40

*1.10 Return Information in Statistical Reports* _____ **40**

1.10.1 General _____ 40

1.10.2 Making a Request under IRC § 6103(j) _____ 41

1.10.3 State Tax Agency Statistical Analysis _____ 41

*2.0 PHYSICAL SECURITY REQUIREMENTS* _____ **42**

*2.A Recordkeeping Requirement – IRC § 6103(p)(4)(A)* _____ **42**

2.A.1 General _____ 42

2.A.2 Logs of FTI (Electronic and Non-Electronic Receipts) _____ 42

Figure 1 – Sample FTI Logs _____ 43

2.A.3 Converted Media _____ 43

2.A.4 Recordkeeping of Disclosures to State Auditors _____ 43

*2.B Secure Storage – IRC § 6103(p)(4)(B)* _____ **43**

4

TD_0000236

2.B.1 General _____ 43

2.B.2 Minimum Protection Standards _____ 44

Table 1 – Minimum Protection Standards _____ 44

2.B.3 Restricted Area Access _____ 45
    2.B.3.1 Visitor Access Logs _____ 45
    Figure 2 – Visitor Access Log _____ 46
    2.B.3.2 Authorized Access List _____ 46
    2.B.3.3 Controlling Access to Areas Containing FTI _____ 47
    2.B.3.4 Control and Safeguarding Keys and Combinations _____ 47
    2.B.3.5 Locking Systems for Secured Areas _____ 48

2.B.4 FTI in Transit _____ 48
    2.B.4.1 Security During Office Moves _____ 48

2.B.5 Physical Security of Computers, Electronic and Removable Media ___ 48

2.B.6 Media Off-Site Storage Requirements _____ 49

2.B.7 Alternate Work Site _____ 49
    2.B.7.1 Equipment _____ 49
    2.B.7.2 Storing Data _____ 50
    2.B.7.3 Other Safeguards _____ 50

**2.C Restricting Access – IRC § 6103(p)(4)(C)** _____ **50**

2.C.1 General _____ 50

2.C.2 Policies and Procedures _____ 51

2.C.3 Background Investigation Minimum Requirements _____ 53
    2.C.3.1 Background Investigation Requirement Implementation _____ 54

2.C.4 Personnel Actions _____ 54
    2.C.4.1 Personnel Transfer _____ 54
    2.C.4.2 Personnel Sanctions _____ 55
    2.C.4.3 Personnel Termination _____ 55

2.C.5 Commingling of FTI _____ 55
    2.C.5.1 Commingling of Electronic Media _____ 56

2.C.6 Access to FTI via State Tax Files or Through Other Agencies ____ 56

2.C.7 Offshore Operations _____ 57

2.C.8 Controls Over Processing _____ 57
    2.C.8.1 Agency-owned and Operated Facility _____ 57
    2.C.8.2 Agency, Contractor or Sub-Contractor Shared Facilities ____ 57

2.C.9 Service Level Agreements (SLA) _____ 58

2.C.10 Review Availability of Contractor and Sub-Contractor Facilities ___ 59

2.C.11 Restricting Access – Other Disclosures _____ 59
    2.C.11.1 Child Support Agencies—IRC §§ 6103(l)(6), (l)(8) and (l)(10) ___ 59
    2.C.11.2 Human Services Agencies—IRC § 6103(l)(7) _____ 60
    2.C.11.3 Deficit Reduction Agencies—IRC § 6103(l)(10) _____ 60
    2.C.11.4 Centers for Medicare and Medicaid Services—IRC § 6103(l)(12)(C) ___ 60
    2.C.11.5 Disclosures under IRC § 6103(l)(20) _____ 60
    2.C.11.6 Disclosures under IRC § 6103(l)(21) _____ 60
    2.C.11.7 Disclosures under IRC § 6103(i) _____ 61

5

2.C.11.8 Disclosures under IRC § 6103(m)(2) _____ 61

**2.D Other Safeguards - IRC § 6103(p)(4)(D)** _____ 61

2.D.1 General _____ 61

2.D.2 Training Requirements _____ 61
   **Table 2 – Training Requirements** _____ 62
   **2.D.2.1 Disclosure Awareness Training** _____ 62
   **2.D.2.2 Disclosure Awareness Training Products** _____ 64

2.D.3 Internal Inspections and On-Site Reviews _____ 64
   **2.D.4 Recordkeeping** _____ 65
   **2.D.5 Secure Storage** _____ 65
   **2.D.6 Limited Access** _____ 65
   **2.D.7 Disposal** _____ 66
   **2.D.8 Computer Systems Security** _____ 66
   **2.D.9 Plan of Action and Milestones (POA&M)** _____ 66

**2.E Reporting Requirements – IRC § 6103(p)(4)(E)** _____ 66

2.E.1 General _____ 66

2.E.2 Report Submission Instructions _____ 66

2.E.3 Encryption Requirements _____ 67

2.E.4 Safeguards Security Reports (SSR) _____ 67
   **2.E.4.1 Initial SSR Submission Instructions – New Agency Responsibilities** ___ 68

Table 3 – SSR Evidentiary Documentation _____ 69
   **2.E.4.2 Agencies Requesting New FTI Data Streams** _____ 71
   **2.E.4.3 Annual SSR Update Submission Instructions** _____ 72
   **2.E.4.4 SSR Submission Dates** _____ 72
   **Table 4 - SSR Submission Dates** _____ 73

2.E.5 Corrective Action Plan _____ 73
   **2.E.5.1 CAP Submission Instructions** _____ 74
   **2.E.5.2 CAP Submission Dates** _____ 75
   **Table 5 – CAP Submission Dates** _____ 75

2.E.6 Notification Reporting Requirements _____ 76
   **Table 6 – Notification Reporting** _____ 76
   **2.E.6.1 Cloud Computing** _____ 76
   **2.E.6.2 Contractor or Sub-Contractor Access** _____ 77
   **2.E.6.3 Tax Modeling** _____ 77
   **2.E.6.4 Live Data Testing** _____ 77

**2.F Disposing of FTI – IRC § 6103(p)(4)(F)** _____ 77

2.F.1 General _____ 77

2.F.2 Returning IRS Information to the Source _____ 78

2.F.3 Destruction and Disposal _____ 78
   **Table 7 - FTI Destruction Methods** _____ 78
   **2.F.3.1 Media Sanitization** _____ 79

2.F.4 Other Precautions _____ 79

3.1 General _____ 81

3.2 Assessment Process _____ 81

ᵇ

TD_0000238

Table 8 – Assessment Methodologies _____ 82

3.3 Technology-Specific Requirements _____ 82
  3.3.1 Cloud Computing _____ 82
  3.3.2 Email Communications _____ 83
  3.3.3 Facsimile and Facsimile Devices _____ 84
  3.3.4 Mobile Devices _____ 85
  3.3.5 Multifunction Devices (MFDs) and High-Volume Printers (HVPs) _____ 85
  3.3.6 Network Boundary and Infrastructure _____ 85
  3.3.7 Virtual Desktop Infrastructure _____ 86
  3.3.8 Public-Facing Systems _____ 86

**4.0 NIST 800-53 SECURITY AND PRIVACY CONTROLS** _____ 88
  4.1 ACCESS CONTROL _____ 88
    AC-1 Access Control Policy and Procedures _____ 88
    AC-2 Account Management _____ 88
    AC-3 Access Enforcement _____ 90
    AC-4 Information Flow Enforcement_____ 91
    AC-5 Separation of Duties _____ 91
    AC-6 Least Privilege _____ 91
    AC-7: Unsuccessful Logon Attempts _____ 92
    AC-8: System Use Notification _____ 93
    AC-11: Device Lock_____ 93
    AC-12: Session Termination _____ 94
    AC-14: Permitted Actions Without Identification or Authentication _____ 94
    AC-17: Remote Access_____ 94
    AC-18: Wireless Access _____ 95
    AC-19: Access Control for Mobile Devices _____ 96
    AC-20: Use of External Systems _____ 96
    AC-21: Information Sharing _____ 97
    AC-22: Publicly Accessible Content _____ 97
    AC-23: Data Mining Protection _____ 98

  4.2 AWARENESS AND TRAINING _____ 99
    AT-1: Awareness and Training Policy and Procedures _____ 99
    AT-2: Awareness Training _____ 99
    AT-3: Role-Based Training_____ 100
    AT-4: Training Records _____ 101
    AT-6: Training Feedback _____ 101

  4.3 AUDIT AND ACCOUNTABILITY _____ 102
    AU-1: Audit and Accountability Policy and Procedures_____ 102
    AU-2: Audit Events _____ 102
    AU-3: Content of Audit Records _____ 103
    AU-4: Audit Storage Capacity _____ 103
    AU-5: Response to Audit Processing Failures _____ 103
    AU-6: Audit Review, Analysis and Reporting_____ 104
    AU-7: Audit Reduction and Report Generation _____ 104
    AU-8: Time Stamps _____ 105
    AU-9: Protection of Audit _____ 105
    AU-11: Audit Record Retention _____ 105
    AU-12: Audit Generation _____ 105
    AU-16: Cross-Organizational Auditing Logging _____ 106

  4.4 ASSESSMENT, AUTHORIZATION AND MONITORING _____ 107
    CA-1: Assessment, Authorization and Monitoring Policy and Procedures _____ 107
    CA-2: Control Assessments_____ 107

TD_0000239

CA-3: Information Exchange _____ 108
CA-5: Plan of Action and Milestones _____ 108
CA-6: Authorization _____ 109
CA-7: Continuous Monitoring _____ 109
CA-8: Penetration Testing _____ 110
CA-9: Internal System Connections _____ 110

4.5 CONFIGURATION MANAGEMENT _____ 112
CM-1: Configuration Management Policy and Procedures _____ 112
CM-2: Baseline Configuration _____ 112
CM-3: Configuration Change Control _____ 113
CM-4: Security and Privacy Impact Analyses _____ 114
CM-5: Access Restrictions for Change_____ 114
CM-6: Configuration Settings _____ 115
CM-7: Least Functionality _____ 115
CM-8: System Component Inventory _____ 116
CM-9: Configuration Management Plan _____ 117
CM-10: Software Usage Restrictions _____ 117
CM-11: User-Installed Software _____ 118
CM-12: Information Location _____ 118
CM-13: Data Action Mapping _____ 118
CM-14: Signed Components _____ 118

4.6 CONTINGENCY PLANNING _____ 119
CP-1: Contingency Planning Policy and Procedures _____ 119
CP-2: Contingency Plan _____ 119
CP-3: Contingency Training_____ 120
CP-4: Contingency Plan Testing _____ 121
CP-9: System Backup _____ 121
CP-10: System Recovery and Reconstitution _____ 122

4.7 IDENTIFICATION AND AUTHENTICATION _____ 123
IA-1: Identification and Authentication Policy and Procedures_____ 123
IA-2: Identification and Authentication (Organizational Users) _____ 123
IA-3: Device Identification and Authentication _____ 124
IA-4: Identifier Management_____ 125
IA-5: Authenticator Management_____ 125
IA-6: Authenticator Feedback _____ 127
IA-7: Cryptographic Module Authentication_____ 128
IA-8: Identification and Authentication (Non-Organizational Users)_____ 128
IA-9: Service Identification and Authentication _____ 128
IA-11: Re-Authentication _____ 129
IA-12: Identity Proofing_____ 129

4.8 INCIDENT RESPONSE _____ 131
IR-1: Incident Response Policy and Procedures _____ 131
IR-2: Incident Response Training _____ 131
IR-3: Incident Response Testing_____ 132
IR-4: Incident Handling_____ 132
IR-5: Incident Monitoring _____ 133
IR-6: Incident Reporting _____ 133
IR-7: Incident Response Assistance _____ 134
IR-8: Incident Response Plan_____ 134
IR-9: Information Spillage Response _____ 135

4.9 MAINTENANCE _____ 136
MA-1: System Maintenance Policy and Procedures _____ 136
MA-2: Controlled Maintenance _____ 136

8

TD_0000240

MA-3: Maintenance Tools _____ 137
MA-4: Nonlocal Maintenance _____ 137
MA-5: Maintenance Personnel _____ 138
MA-6: Timely Maintenance _____ 139

4.10 MEDIA PROTECTION _____ 140
MP-1: Media Protection Policy and Procedures _____ 140
MP-2: Media Access _____ 140
MP-3: Media Marking _____ 140
MP-4: Media Storage _____ 140
MP-5: Media Transport _____ 141
MP-6: Media Sanitization _____ 141
MP-7: Media Use _____ 142

4.11 PHYSICAL AND ENVIRONMENTAL PROTECTION _____ 143
PE-1: Physical and Environmental Policy and Procedures _____ 143
PE-2: Physical Access Authorizations _____ 143
PE-3: Physical Access Control _____ 143
PE-4: Access Control for Transmission _____ 144
PE-5: Access Control for Output Devices _____ 144
PE-6: Monitoring Physical Access _____ 145
PE-8: Visitor Access Records _____ 145
PE-16: Delivery and Removal _____ 145
PE-17: Alternate Work Site _____ 145

4.12 PLANNING _____ 147
PL-1: Planning Policy and Procedures _____ 147
PL-2: System Security and Privacy Plans _____ 147
PL-4: Rules of Behavior _____ 149
PL-8: Security and Privacy Architectures _____ 149

4.13 PROGRAM MANAGEMENT _____ 151
PM-1: Information Security Program Plan _____ 151
PM-2: Information Security Program Leadership Role _____ 151
PM-3: Information Security and Privacy Resources _____ 152
PM-4: Plan of Action and Milestones Process _____ 152
PM-5: System Inventory _____ 152
PM-7: Enterprise Architecture _____ 153
PM-9: Risk Management Strategy _____ 153
PM-10: Authorization Process _____ 154
PM-12: Insider Threat Program _____ 154
PM-14: Testing, Training and Monitoring _____ 154
PM-18: Privacy Program Plan _____ 155
PM-19: Privacy Program Leadership Role _____ 155
PM-21: Accounting of Disclosures _____ 156
PM-29: Risk Management Program Leadership Roles _____ 156

4.14 PERSONNEL SECURITY _____ 157
PS-1: Personnel Security Policy and Procedures _____ 157
PS-2: Position Risk Designation _____ 157
PS-3: Personnel Screening _____ 157
PS-4: Personnel Termination _____ 158
PS-5: Personnel Transfer _____ 158
PS-6: Access Agreements _____ 158
PS-7: External Personnel Security _____ 159
PS-8: Personnel Sanctions _____ 159
PS-9: Position Descriptions _____ 159

9

TD_0000241

4.15 PERSONALLY IDENTIFIABLE INFORMATION PROCESSING AND TRANSPARENCY ___ 160
  PT-1: Personally Identifiable Information Processing and Transparency Policy and Procedures ___ 160
  PT-2: Authority to Process Personally Identifiable Information ___ 160

4.16 RISK ASSESSMENT ___ 161
  RA-1: Risk Assessment Policy and Procedures ___ 161
  RA-3: Risk Assessment ___ 161
  RA-5: Vulnerability Monitoring and Scanning ___ 162
  RA-7: Risk Response ___ 163
  RA-8: Privacy Impact Assessments ___ 163

4.17 SYSTEM AND SERVICES ACQUISITION ___ 163
  SA-1: System and Services Acquisition Policy and Procedures ___ 163
  SA-2: Allocation of Resources ___ 164
  SA-3: System Development Life Cycle ___ 164
  SA-4: Acquisition Process ___ 165
  SA-5: System Documentation ___ 166
  SA-8: Security Engineering Principles ___ 167
  SA-9: External System Services ___ 167
  SA-10: Developer Configuration Management ___ 168
  SA-11: Developer Testing and Evaluation ___ 169
  SA-15: Development Process, Standards and Tools ___ 169
  SA-22: Unsupported System Components ___ 170

4.18 SYSTEM AND COMMUNICATIONS PROTECTION ___ 171
  SC-1: System and Communications Protection Policy and Procedures ___ 171
  SC-2: Application Partitioning ___ 171
  SC-4: Information in Shared System Resources ___ 171
  SC-7: Boundary Protection ___ 171
  SC-8: Transmission Confidentiality and Integrity ___ 174
  SC-10: Network Disconnect ___ 174
  SC-12: Cryptographic Key Establishment and Management ___ 175
  SC-13: Cryptographic Protection ___ 175
  SC-15: Collaborative Computing Devices and Applications ___ 175
  SC-17: Public Key Infrastructure Certificates ___ 175
  SC-18: Mobile Code ___ 176
  SC-20: Secure Name/Address Resolution Service (Authoritative Source) ___ 176
  SC-21: Secure Name/Address Resolution Service (Recursive or Caching Resolver) ___ 176
  SC-22: Architecture and Provisioning for Name/Address Resolution Service ___ 177
  SC-23: Session Authenticity ___ 177
  SC-28: Protection of Information at Rest ___ 177
  SC-35: External Malicious Code Identification ___ 178
  SC-39: Process Isolation ___ 178
  SC-45: System Time Synchronization ___ 178

4.19 SYSTEM AND INFORMATION INTEGRITY ___ 179
  SI-1: System and Information Integrity Policy and Procedures ___ 179
  SI-2: Flaw Remediation ___ 179
  SI-3: Malicious Code Protection ___ 180
  SI-4: System Monitoring ___ 181
  SI-5: Security Alerts, Advisories and Directives ___ 183
  SI-7: Software, Firmware and Information Integrity ___ 183
  SI-8: Spam Protection ___ 184
  SI-10: Information Input Validation ___ 184
  SI-11: Error Handling ___ 184

(Page 197 of Total)

A579

TD_0000242

SI-12: Information Management and Retention _____ 184
SI-16: Memory Protection_____ 185
  4.20 SUPPLY CHAIN RISK MANAGEMENT_____ 186
SR-1: Supply Chain Risk Management Policy and Procedures_____ 186
SR-2: Supply Chain Risk Management Plan _____ 186
SR-3: Supply Chain Controls and Processes _____ 186
SR-6: Supplier Assessments and Reviews _____ 187
SR-10: Inspection of Systems and Components_____ 187
SR-11: Component Authenticity _____ 187

Exhibit 1 IRC §§ 6103(a) and (b) _____ 188

Exhibit 2 IRC § 6103(p)(4) _____ 192

Exhibit 3 Code of Federal Regulations (CFR) § 301.6103(p)(7)-1 [T.D. 9445, 74 FR
6830, Feb. 11, 2009] _____ 194

Exhibit 4 IRC §§ 7213 and 7213A – Sanctions for Unauthorized Disclosure and
Access_____ 196

Exhibit 5 IRC § 7431 - Civil Damages for Unauthorized Inspection or Disclosure of
Returns and Return Information _____ 198

Exhibit 6 Contractor 45-Day Notification Procedures _____ 200

Exhibit 7 Safeguarding Contract Language_____ 202

Exhibit 8 Warning Banner Examples _____ 205

Exhibit 9 Record Retention Schedules_____ 206
  Table 9 - Record Retention Schedules _____ 206

GLOSSARY AND KEY TERMS _____ 207

INDEX _____ 214

A580

TD_0000243

## Highlights for November 2021 Revision

This publication revises and supersedes Publication 1075 (November 2016) and is effective 6 months after the publication date. Feedback for Publication 1075 is highly encouraged. Please send any comments to SafeguardReports@irs.gov, using "Publication 1075 comment/feedback" in the subject line. Editorial changes have been made throughout to update references and terms. Web and citation references were added/updated throughout to make the text easier to research in electronic format. Following are the highlighted changes:

1)  Publication 1075 has been reformatted, and all sections have been renumbered. Section 1.0 is Federal Tax Information, Reviews and Other Requirements; Section 2.0 is Physical Security Requirements and is numbered to include the applicable IRC § 6103 subsections, the key Safeguarding elements; Section 3.0 is CyberSecurity Requirements; and Section 4.0 is the NIST 800-53 Revision 5 Security and Privacy Controls.

2)  Section 4.0, NIST (National Institutes of Standards and Technology) 800-53 Security and Privacy Controls has been updated to align with NIST 800-53 *Revision 5* Security and Privacy controls. Some controls have been added, but all have been reviewed and/or updated.

3)  Privacy controls previously in NIST 800-53 Rev 4 Appendix J, are now fully integrated into the NIST controls.

4)  NIST SP 800-63, Digital Identity Guidelines, requirements have been adapted into this revision.

5)  Treasury Directive 85-01 defined requirements have been included in several Section 4.0 NIST 800-53 Security and Privacy Controls and are shown as *IRS-Defined*.

6)  Security and Privacy Control Table has been added for reference. This table identifies the controls, which are privacy related, which overlap with physical controls and identifies those controls new to this revision of the Publication 1075.

7)  Many instances of "should" throughout the document have been changed to "must".

8)  Key Definitions "Information Spillage", Access, "Unauthorized Inadvertent Access and Incidental Access" have been added. "Unauthorized Disclosure and Need-to-Know have been updated for clarification. The term "Access" was also added.

9)  Section 1.2, Authorized Use of FTI has been updated.

10)  Section 1.6, Safeguards Reviews now includes the terms "on-site, remote, or a combination of both (hybrid)" as types of assessments and descriptions for on-site reviews and remote reviews.

11)  Former Section 2.7, Conducting the Review, has been split into the current Sections 1.6.1, Before the Review, 1.6.2, During the Review and 1.6.3 After the Review, and updated to reflect current on-site review procedures.

12)  Former Section 2.7.2, Computer Security Review has been removed and incorporated into Section 3.2 Assessment Process.

13)  Former Tables 1 and 2 – Safeguard Review Cycle and IT Testing Techniques have been removed and incorporated into Section 3.2, Assessment Process.

14)  Former Section 2.9, Termination of FTI, has been changed to Section 1.7, Termination of FTI-Agency Request.

12

TD_0000244

15) Sections 1.8, Reporting Improper Inspections or Disclosures, 1.9 Disclosures to Other Persons and 1.10 Return Information in Statistical Reports, formerly Sections 10, 11 and 12 have been relocated to the front of Publication 1075.

16) Sections 1.8.1, Terms, 1.8.1.1 Incident and 1.8.1.2 Data Breach are new items.

17) Section 1.8.2, General – Reporting Improper Inspections or Disclosures, was updated to include information regarding spillage and was also updated to reflect the NIST IR Control requirements.

18) Section 1.8.4, Incident Response Procedures now includes requirement for tabletop incident response testing from NIST IR-3 and the requirement to track and document incidents from NIST IR-5.

19) The requirement in former Section 3.1, General Recordkeeping Requirement (now Section 2.A.1), for an inventory of IT systems has been removed. Please see NIST Controls CM-8, System Component Inventory and PM-5, System Inventory, for guidance.

20) Section 2.A.2, Logs of FTI (Electronic and Non-Electronic Receipts), has been updated and references NIST Control AU-2, Audit Events. Additionally, Figure 1 – Sample FTI Logs was updated to include the Electronic Receipts Sample log.

21) Section 2.B.2, Minimum Protection Standards, was updated to include requirements for MFDs or High-Volume Printers.

22) Created new heading for Section 2.B.3.1, Visitor Access Logs and included previous Section 4.2 information.

23) Section 2.B.3.1, Visitor Access Logs, has been updated for clarity and adds retention requirement.

24) Section 2.B.3.2, Authorized Access List has been updated for clarity. The Authorized Access List must be reviewed monthly or upon occurrence or potential indication of an event such as a possible security breach or personnel change.

25) Section 2.B.3.3, Controlling Access to Areas Containing FTI, has been updated for clarity. The agency must maintain a policy addressing issuance of appropriate authorization credentials, including badges, identification cards or smart cards. This policy must include proper use and accountability requirements.

26) Section 2.B.4.1, Security During Office Moves, has been added.

27) Section 2.B.7, Alternate Work Site was formerly Section 4.7, Telework Locations.

28) Section 2.B.7, Alternate Work Site, no longer includes requirement for agency inspections of telework locations

29) Section 2.C.1 General - Restricting Access has been updated to include requirements for auditing controls.

30) Section 2.C.2, Policies and Procedures has been added and includes required policies and procedures related to physical controls. New policies and procedures include Access Control, Audit and Accountability, Media Protection, Privacy Authorization, Physical and Environmental Security, and Personnel Security. Insider Threat Program and Privacy Program plans have also been included.

TD_0000245

31) Section 2.C.3, Background Investigation Minimum Requirements has been changed to reflect updated requirement for *reinvestigations to be conducted every five (5) years* (previously 10 years).

32) Section 2.C.3, Background Investigation Minimum Requirements, was rearranged for clarity.

33) Section 2.C.3.1, Background Investigation Requirement Implementation – Removed first paragraph that referenced a one-year implementation period beginning with the last revision of the Publication 1075.

34) Added new Section 2.C.4, Personnel Actions, which includes new Section 2.C.4.1, Personnel Transfer (PS-5), Section 2.C.4.2 Personnel Sanctions (PS-8) and Section 2.C.4.3, Personnel Terminations (PS-4).

35) Added new Section 2.C.7, Offshore Operations, which contains some information that was previously included in former Section 5.3 Access to FTI via State Tax Files or Through Other Agencies.

36) Section 2.C.9, Service Level Agreements (SLA) was formerly Section 5.4.2.2, Consolidated Data Centers and has been updated to reflect more inclusive language, state support functions and includes requirement for Exhibit 7 language.

37) Section 2.D.2.1, Disclosure Awareness Training, has been updated to include the prohibition of FTI in training and a requirement to add role-based training and practical exercises. Training must also include security and privacy updates at least quarterly in addition to annual awareness. The Safeguards' Disclosure Awareness Training video can be used to supplement training but is not intended to fulfill all training requirements.

38) Section 2.D.2.1, Disclosure Awareness Training, has been updated to better align with NIST 800-53 Controls.

39) Section 2.D.2, Table 2, Training Requirements, has been updated to include Insider Threat Awareness Training.

40) Section 2.D.2.2, Disclosure Awareness Training Products, has been updated with current titles of available products.

41) Section 2.D.3, Internal Inspections, has been updated to include self-certification requirements.

42) Section 2.D.9, Plan of Action and Milestones (POA&M) has been updated for clarity.

43) Section 2.E.2 Report Submission Instructions, has been updated to include the Head of Agency may delegate authority to sign Safeguard report submissions.

44) Sections 2.E.4.4, SSR Submission Dates and 2.E.5.2 CAP Submission Dates, have been updated to reflect the correct postal code for CNMI and associated due dates.

45) Previous Section 7.3.1 CAP Submission Instructions and Submission Dates, has been split up into new Sections 2.E.5.1 CAP Submission Instructions and 2.E.5.2, CAP Submission Dates, for clarity.

46) Table 6 in Section 2.E.6, Notification Reporting Requirements has been updated.

47) Section 2.E.6.1 Cloud Computing, and Section 2.E.6.4 Live Data Testing have been updated for

TD_0000246

clarity.

48) Removed former Section 7.4.2 Consolidated Data Center.

49) Removed former Section 7.4.4, Data Warehouse Processing.

50) Removed former Section 7.4.5, Non-Agency-owned Information Systems.

51) Removed former Section 7.4.8 Virtualization of Information Technology Systems.

52) Section 2.F.4, Other Precautions, has been updated to reflect *annual* requirement to validate and maintain most recent copy of NAID certification.

53) Former Section 9.4.5, Interactive Voice Response, has been incorporated into Section 3.3.8, Public-Facing Systems (NIST SP 800-63-3).

54) Former Section, 9.4.7, Media Sanitization is now moved to Section 2.F.3.1, under Destruction and Disposal.

55) Former Sections 9.4.11, Storage Area Networks and 9.4.12, System Component Inventory, 9.4.14, Virtualization Requirements, 9.4.15, VoIP Systems and 9.4.18, Wireless Networks, have been removed, as the base requirements are included in NIST controls.

56) Section 3.3.8, Public-Facing Systems, has been added and includes guidance from NIST SP 800-63-3, Digital Identity Guidelines.

57) Former Section 10.5, FTI Suspension, Termination and Administrative Review language was changed and moved to Section 1.7.2.

58) Control IA-2, Identification and Authentication (Organizational Users), Multifactor authentication is now required for all privileged and non-privileged accounts.

59) Exhibit 6, Contractor 45-Day Notification Procedures, has updated the signature requirement to include the Head of Agency, or their delegate.

60) Exhibit 7 has been updated to include Exhibit 7a, Safeguarding Contract Language for General Services and Exhibit 7b, Safeguarding Contract Language for Technology Services.

61) Exhibits 7a and 7b have been updated to include Data Incident Response language.

62) Exhibit 10, Data Warehouse Security Requirements has been removed. Please see the Safeguards Website for technical guidance.

63) Exhibit 11, Media Sanitization Techniques has been removed. Please see NIST 800-88, Guidelines for Media Sanitization for approved sanitization techniques. Also see MP-6.

64) Glossary and Key Terms has been updated to include the terms Access, Contractor, External Systems, Inadvertent and Incidental Access, Information Spillage, Insider Threat, Mobile Code, Mobile Device, Need-to-Know, Object, Remote Access, Subject, Unauthorized Access and Unauthorized Disclosure.

65) Glossary and Key Terms - The definition for Personally Identifiable Information (PII) has been updated to clarify that for the purposes of Publication 1075 and Safeguarding requirements, PII is FTI.

15

(Page 202 of Total)

A584

66) Agencies must wipe mobile devices after 10 (ten) unsuccessful login attempts. See AC-7, CE-2.

67) Agencies must employ data mining prevention and detection techniques. See AC-23.

68) Added penetration testing requirements. See CA-8.

69) Perform security and privacy compliance checks prior to allowing connections. See CA-9, CE-1.

70) Multi-factor authentication is required to be at Authenticator Assurance Level 2 as defined in NIST SP 800-63. See IA-2, CE-6.

71) Password complexity requirements have been updated. See IA-5.

72) Agencies must provide training specific training for incidents related to breaches. See IR-2, CE-3.

73) Coordination with contractors, data centers, counties, and other agencies is required for incidents involving Federal Tax Information. See IR-4, CE-8.

74) A custodian must be identified when transporting controls outside of controlled areas. See MP-5, CE-3.

75) Major change to PE-6. The requirement moved from annually to monthly for inspection of physical access logs.

76) Perimeter security checks are required daily for exfiltration of information. See PE-3, CE-2.

77) New Control Enhancement for Defense in Depth. See PL-8, CE-1.

78) Agency contractors (including sub-contractors) must remove data within 7 (seven) calendar days of contract termination. See SA-4, CE-12.

79) Control Enhancement to restrict the accessing, processing, storage, and transmission of FTI to the United States and its territories. See SA-9, CE-5.

80) Change from specifying FIPS 140-3 to latest FIPS validated mechanisms. See SC-13.

81) Added visibility of encrypted communications to system monitoring requirements. See SI-4, CE-10.

TD_0000248

## Security and Privacy Control Table

| Control Number | Control Name | Control Enhancements | Privacy-Related | Physical | Information Technology | Physical Security Reference Section |
|---|---|---|---|---|---|---|
| AC-1 | Access Control Policy and Procedures | | | | X | |
| AC-2 | Account Management | X | | | X | |
| AC-3 | Access Enforcement | X | | | X | |
| AC-4 | Information Flow Enforcement | | | | X | |
| AC-5 | Separation of Duties | | | | X | |
| AC-6 | Least Privilege | X | | X | X | Need-to-Know |
| AC-7 | Unsuccessful Logon Attempts | X | | | X | |
| AC-8 | System Use Notification | | | X | X | Exhibit 8 |
| AC-11 | Device Lock | X | | | X | |
| AC-12 | Session Termination | | | | X | |
| AC-14 | Permitted Actions Without Identification or Authentication | | | | X | |
| AC-17 | Remote Access | X | | X | X | 2.B.7 |
| AC-18 | Wireless Access | X | | | X | |
| AC-19 | Access Control for Mobile Devices | X | | | X | |
| AC-20 | Use of External Systems | X | | X | X | 2.B.7.1 |
| AC-21 | Information Sharing | | X | X | X | Exhibit 7 |
| AC-22 | Publicly Accessible Content | | | X | X | 3.3.8 |
| AC-23 | Data Mining Protection* | | | | X | |
| AT-1 | Awareness and Training Policy and Procedures | | X | X | X | 2.C.2 |
| AT-2 | Awareness Training | X | X | X | X | 2.D.2.1 |
| AT-3 | Role-Based Training | X | X | X | X | 2.D.2.1 |
| AT-4 | Training Records | | X | X | X | 2.D.2.1 |
| AT-6 | Training Feedback* | | | | X | |
| AU-1 | Audit and Accountability Policy and Procedures | | | X | X | 2.C.2 |
| AU-2 | Audit Events | X | | X | X | 2.C.1 |
| AU-3 | Content of Audit Records | X | | | X | |
| AU-4 | Audit Storage Capacity | | | | X | |
| AU-5 | Response to Audit Processing Failures | | | | X | |
| AU-6 | Audit Review, Analysis and Reporting | X | | X | X | 2.C.1 |
| AU-7 | Audit Reduction and Report Generation | X | | X | X | 2.C.1 |
| AU-8 | Time Stamps | X | | | X | |
| AU-9 | Protection of Audit | X | | | X | |

17

TD_0000249

| Control Number | Control Name | Control Enhancements | Privacy-Related | Physical | Information Technology | Physical Security Reference Section |
|---|---|---|---|---|---|---|
| AU-11 | Audit Record Retention | | X | | X | |
| AU-12 | Audit Generation | | | X | X | 2.C.1 |
| AU-16 | Cross-Organizational Auditing* | | X | | X | |
| CA-1 | Assessment, Authorization and Monitoring Policy and Procedures | | X | | X | |
| CA-2 | Assessments | X | X | | X | |
| CA-3 | System Interconnections | X | | | X | |
| CA-5 | Plan of Action and Milestones | | X | X | X | 2.D.9 |
| CA-6 | Authorization | | | | X | |
| CA-7 | Continuous Monitoring | X | X | X | X | 2.D.3 |
| CA-8 | Penetration Testing | | | | X | |
| CA-9 | Internal System Connections* | X | | | X | |
| CM-1 | Configuration Management Policy and Procedures | | X | | X | |
| CM-2 | Baseline Configuration | X | | | X | |
| CM-3 | Configuration Change Control | X | | | X | |
| CM-4 | Security and Privacy Impact Analyses | X | X | | X | |
| CM-5 | Access Restrictions for Change | X | | X | X | 2.C.1 |
| CM-6 | Configuration Settings | | | | X | |
| CM-7 | Least Functionality | X | | | X | |
| CM-8 | System Component Inventory | X | | | X | |
| CM-9 | Configuration Management Plan | | | | X | |
| CM-10 | Software Usage Restrictions | | | | X | |
| CM-11 | User-Installed Software | X | | | X | |
| CM-12 | Information Location* | X | X | X | X | 3.2 |
| CM-13 | Data Action Mapping* | | | | X | |
| CM-14 | Signed Components* | | | | X | |
| CP-1 | Contingency Planning Policy and Procedures | | X | | X | |
| CP-2 | Contingency Plan | X | X | | X | |
| CP-3 | Contingency Training | | X | | X | |
| CP-4 | Contingency Plan Testing | X | X | | X | |
| CP-9 | System Backup | X | | X | X | 2.B.6 |
| CP-10 | System Recovery and Reconstitution | X | | | X | |
| IA-1 | Identification and Authentication Policy and Procedures | | X | | X | |
| IA-2 | Identification and Authentication (Organizational Users) | X | | | X | |
| IA-3 | Device Identification and Authentication | | | | X | |

18

TD_0000250

| Control Number | Control Name | Control Enhancements | Privacy-Related | Physical | Information Technology | Physical Security Reference Section |
|---|---|---|---|---|---|---|
| IA-4 | Identifier Management | X | X | | X | |
| IA-5 | Authenticator Management | X | | | X | |
| IA-6 | Authenticator Feedback | | | | X | |
| IA-7 | Cryptographic Module Authentication | | | | X | |
| IA-8 | Identification and Authentication (Non-Organizational Users) | X | | | X | |
| IA-9 | Service Identification and Authentication* | | | | X | |
| IA-11 | Re-Authentication* | | | | X | |
| IA-12 | Identity Proofing* | X | | | X | |
| IR-1 | Incident Response Policy and Procedures | | X | X | X | 2.C.2 |
| IR-2 | Incident Response Training | X | X | X | X | 2.D.2.1 |
| IR-3 | Incident Response Testing | X | X | X | X | 1.8.4 |
| IR-4 | Incident Handling | X | X | X | X | 1.8.4 |
| IR-5 | Incident Monitoring | X | X | X | X | 1.8.4 |
| IR-6 | Incident Reporting | X | X | X | X | 1.8.2 |
| IR-7 | Incident Response Assistance | X | X | | X | |
| IR-8 | Incident Response Plan | | X | X | X | 1.8.2 |
| IR-9 | Information Spillage Response | X | | | X | |
| MA-1 | System Maintenance Policy and Procedures | | | | X | |
| MA-2 | Controlled Maintenance | X | | X | X | 2.B.3.2 |
| MA-3 | Maintenance Tools | X | | | X | |
| MA-4 | Nonlocal Maintenance | X | | | X | |
| MA-5 | Maintenance Personnel | X | | X | | 2.B.3.3 |
| MA-6 | Timely Maintenance* | | | | X | |
| MP-1 | Media Protection Policy and Procedures | | | X | | 2.C.2 |
| MP-2 | Media Access | | | X | | 2.C.11 |
| MP-3 | Media Marking | | | X | | 2.B.6 |
| MP-4 | Media Storage | | | X | | 2.B.6 |
| MP-5 | Media Transport | X | | X | | 2.B.4 |
| MP-6 | Media Sanitization | X | | X | | 2.F.3.1 |
| MP-7 | Media Use* | X | | X | X | 2.B.7.1 |
| PE-1 | Physical and Environmental Policy and Procedures | | | X | | 2.C.2 |
| PE-2 | Physical Access Authorizations | | | X | | 2.B.3.2 |
| PE-3 | Physical Access Control | X | | X | | 2.B.3 |
| PE-4 | Access Control for Transmission | | | X | | 2.B.2 |
| PE-5 | Access Control for Output | | | X | | 2.B.3.3 |

19

| Control Number | Control Name | Control Enhancements | Privacy-Related | Physical | Information Technology | Physical Security Reference Section |
|---|---|---|---|---|---|---|
| | Devices | | | | | |
| PE-6 | Monitoring Physical Access | X | | X | | 2.B.3.2 |
| PE-8 | Visitor Access Records | | | X | | 2.B.3.1 |
| PE-16 | Delivery and Removal | | | X | | 2.B.4 |
| PE-17 | Alternate Work Site | | | X | | 2.B.7 |
| PL-1 | Planning Policy and Procedures | | X | | X | |
| PL-2 | Security and Privacy Plans | | X | X | X | 2.E.4 |
| PL-4 | Rules of Behavior | X | X | | X | |
| PL-8 | Security and Privacy Architectures | X | X | | X | |
| PM-1 | Information Security Program Plan* | | | | X | |
| PM-2 | Information Security Program Roles | | | | X | |
| PM-3 | Information Security and Privacy Resources* | | X | | X | |
| PM-4 | Plan of Action and Milestones Process* | | X | X | X | 2.D.9 |
| PM-5 | System Inventory* | X | | | X | |
| PM-7 | Enterprise Architecture* | X | X | | X | |
| PM-9 | Risk Management Strategy* | | X | | X | |
| PM-10 | Authorization Process | | X | | X | |
| PM-12 | Insider Threat Program* | | | X | X | 2.C.2 |
| PM-14 | Testing, Training and Monitoring* | | X | X | X | 2.D.2 |
| PM-18 | Privacy Program Plan* | | X | X | X | 2.C.2 |
| PM-19 | Privacy Program Roles* | | X | X | X | 2.C.2 |
| PM-21 | Accounting of Disclosures* | | X | | X | |
| PM-29 | Risk Management Program Leadership Roles* | | | | X | |
| PS-1 | Personnel Security Policy and Procedures | | | X | | 2.C.2 |
| PS-2 | Position Risk Designation | | | X | | 2.C.2 |
| PS-3 | Personnel Screening | | | X | | 2.C.2 |
| PS-4 | Personnel Termination | | | X | | 2.C.4.3 |
| PS-5 | Personnel Transfer | | | X | | 2.C.4.1 |
| PS-6 | Access Agreements | X | | X | | 2.C.2 |
| PS-7 | External Personnel Security | | | X | | 1.9.3 |
| PS-8 | Personnel Sanctions | | | X | | 2.C.4.2 |
| PS-9 | Position Descriptions* | | | X | | |
| PT-1 | Personally Identifiable Information Processing and Transparency Policy and Procedures* | | | X | | |

20

TD_0000252

| Control Number | Control Name | Control Enhancements | Privacy-Related | Physical | Information Technology | Physical Security Reference Section |
|---|---|---|---|---|---|---|
| PT-2 | Authority to Process Personally Identifiable Information* | | X | | | |
| RA-1 | Risk Assessment Policy and Procedures | | X | | X | |
| RA-3 | Risk Assessment | X | X | | X | |
| RA-5 | Vulnerability Scanning | X | | | X | |
| RA-7 | Risk Response* | | X | | X | |
| RA-8 | Privacy Impact Assessments* | | X | X | X | 2.E.4.1 |
| SA-1 | System and Services Acquisition Policy and Procedures | | X | | X | |
| SA-2 | Allocation of Resources | | | | X | |
| SA-3 | System Development Life Cycle | X | X | | X | |
| SA-4 | Acquisition Process | X | X | X | X | 2.C.7 |
| SA-5 | Information System Documentation | | | | X | |
| SA-8 | Security Engineering Principles | | X | | X | |
| SA-9 | External System Services | X | X | | X | |
| SA-10 | Developer Configuration Management | X | | | X | |
| SA-11 | Developer Security Testing and Evaluation | X | X | | X | |
| SA-15 | Development Process, Standards and Tools* | X | | | X | |
| SA-22 | Unsupported System Components | | | | X | |
| SC-1 | System and Communications Protection Policy and Procedures | | X | | X | |
| SC-2 | Application Partitioning | X | | | X | |
| SC-4 | Information in Shared System Resources | | | | X | |
| SC-7 | Boundary Protection | X | | | X | |
| SC-8 | Transmission Confidentiality and Integrity | X | | | X | |
| SC-10 | Network Disconnect | | | | X | |
| SC-12 | Cryptographic Key Establishment and Management | X | | | X | |
| SC-13 | Cryptographic Protection | | | | X | |
| SC-15 | Collaborative Computing Devices and Applications | | | | X | |
| SC-17 | Public Key Infrastructure Certificates | | | | X | |
| SC-18 | Mobile Code | X | | | X | |

(Page 208 of Total)

A590

TD_0000253

| Control Number | Control Name | Control Enhancements | Privacy-Related | Physical | Information Technology | Physical Security Reference Section |
|---|---|---|---|---|---|---|
| SC-20 | Secure Name/Address Resolution Service (Authoritative Source)* | X | | | X | |
| SC-21 | Secure Name/Address Resolution Service (Recursive or Caching Resolver)* | | | | X | |
| SC-22 | Architecture and Provisioning for Name/Address Resolution Service* | | | | X | |
| SC-23 | Session Authenticity | X | | | X | |
| SC-28 | Protection of Information at Rest | X | | | X | |
| SC-35 | External Malicious Code Identification* | | | | X | |
| SC-39 | Process Isolation* | | | | X | |
| SC-45 | System Time Synchronization* | X | | | X | |
| SI-1 | System and Information Integrity Policy and Procedures | | X | | X | |
| SI-2 | Flaw Remediation | X | | | X | |
| SI-3 | Malicious Code Protection | X | | | X | |
| SI-4 | System Monitoring | X | | | X | |
| SI-5 | Security Alerts, Advisories and Directives | | | | X | |
| SI-7 | Software, Firmware and Information Integrity* | X | | | X | |
| SI-8 | Spam Protection | X | | | X | |
| SI-10 | Information Input Validation | | | | X | |
| SI-11 | Error Handling | | | | X | |
| SI-12 | Information Management and Retention* | X | X | | X | |
| SI-16 | Memory Protection | | | | X | |
| SR-1 | Policy and Procedures | | | | X | |
| SR-2 | Supply Chain Risk Management Plan | X | | | X | |
| SR-3 | Supply Chain Controls and Processes | X | | | X | |
| SR-6 | Supplier Assessments and Reviews | | | | X | |
| SR-10 | Inspection of Systems or Components | | | | X | |
| SR-11 | Component Authenticity | X | | | X | |

*New to this revision of Publication 1075

22

A591

TD_0000254

# INTRODUCTION

## General

To foster a tax system based on voluntary compliance, the public must maintain a high degree of confidence that the personal and financial information furnished to the Internal Revenue Service (IRS) is protected against unauthorized use, inspection, or disclosure.

The IRS must administer the disclosure provisions of the Internal Revenue Code (IRC) according to the spirit and intent of these laws, ever mindful of the public trust. The IRC defines and protects the confidential relationship between the taxpayer and the IRS and makes it a crime to violate this confidence. IRC § 7213 prescribes criminal penalties, making it a felony offense for federal and state employees and others who illegally disclose federal tax returns and return information (FTI). Additionally, IRC § 7213A makes the unauthorized inspection of FTI a misdemeanor, punishable by fines, imprisonment, or both. And finally, IRC § 7431 prescribes civil damages available to the taxpayer upon notification that a criminal indictment or the existence of information that an unauthorized inspection or disclosure has occurred under IRC §§ 7213 or 7213(A).

The concerns of citizens and Congress regarding individual rights to privacy require the IRS to continuously assess disclosure practices and the safeguards used to protect the confidential information entrusted. While the sanctions of the IRC are designed to protect the privacy of taxpayers, the IRS recognizes the importance of cooperating to the fullest extent permitted by law with other federal, state, and local authorities in their administration and enforcement of laws.

Those agencies or agents that legally receive FTI directly from either the IRS or from secondary sources (e.g., Social Security Administration [SSA]), pursuant to IRC § 6103 or by an IRS-approved exchange agreement must have adequate programs in place to protect the data received. Furthermore, as agencies procure contractor or sub-contractor services, it becomes equally important that contractors or sub-contractors protect that information from unauthorized use, access, and disclosure.

IRS Safeguards reports and related communications in possession of federal, state, and local agencies are considered the property of the IRS and may not be disclosed to anyone outside the agency and are subject to disclosure restrictions under federal law and IRS rules and regulations. This includes, but is not limited to, Preliminary Findings Report (PFR); Safeguard Review Report (SRR); Safeguard Security Report (SSR) and Corrective Action Plan (CAP).

Release of any IRS Safeguards document requires the express permission of the Internal Revenue Service. Requests received through Sunshine and/or Information Sharing/Open Records provisions must be referred to the federal Freedom of Information Act (FOIA) statute for processing. State and local agencies receiving such requests must refer the requestor to the instructions to file a FOIA request with the IRS. Federal agencies must follow established procedures that require consultation before citing FOIA exemptions on IRS agency records, or directly refer the FOIA request to IRS for processing.

The intent of this requirement is to address any public request for sensitive information and prevent disclosure of data that would put FTI at risk. The agency may still distribute these reports internally and within other state agencies, or to auditors or oversight panels as required to either take corrective actions or report status without further IRS approval.

Additional guidance may be found at, https://www.irs.gov/uac/IRS-Freedom-of-Information, and questions should be referred to the Safeguards mailbox at Safeguardreports@irs.gov.

(Page 210 of Total)                    A592

TD_0000255

## Overview of Publication 1075

This publication provides guidance to ensure the policies, practices, controls, and safeguards employed by recipient agencies, agents, contractors, or sub-contractors adequately protect the confidentiality of FTI.

Enterprise security policies address the purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance to implement all applicable security controls. This document contains the managerial, operational, and technical security controls that must be implemented as a condition of receipt of FTI.

The guidelines outlined herein apply to all FTI, no matter the amount or the media in which it is recorded. FTI must be afforded the same levels of protection regardless of it residing on paper or electronic form. Systematic, procedural, or manual security policies must minimize circumvention.

A mutual interest exists in our responsibility to ensure that FTI is disclosed only to persons authorized and used only as authorized by statute or regulation. The IRS is confident of your diligence in this area and believes that this publication will be a helpful resource.

Conforming to these guidelines meets the safeguard requirements of IRC § 6103(p)(4) and makes our joint efforts beneficial.

Requirements throughout this document apply to all organizational segments of an agency receiving FTI. It is the agency's responsibility to ensure all functions within the agency, including consolidated data centers, contractors, and sub-contractors (where allowed by federal statute) with access to FTI, understand and implement the requirements in this publication.

This publication provides the preliminary steps to consider before submitting a request to receive FTI, requirements for proper protection, expectations from the IRS and considerations that may be helpful in establishing a program to protect FTI. The exhibits in this publication are provided for additional guidance.

IRS Safeguards is responsible for all interpretations of safeguarding requirements. Publication 1075 requirements may be supplemented or modified between editions of Publication 1075 via guidance issued by Safeguards and posted on the Safeguards website.

## SAFEGUARD RESOURCES

### Safeguards Website

Safeguards maintains Publication 1075, templates, guidance and frequently asked questions online at http://www.irs.gov/uac/Safeguards-Program. Agencies are highly encouraged to regularly visit the website for updates.

The website contains many resources to assist agencies with meeting Publication 1075 requirements. Examples of the website's features include:

- Safeguard alerts and technical assistance documents

- Recommendations on how to comply with Publication 1075 requirements

- Reporting requirement templates (e.g., SSR) and guidance

- Instructions for reporting unauthorized accesses, disclosures, or data breaches

- Internal inspections report templates and instructions

24

A593

TD_0000256

- IRS disclosure awareness videos and resources

- Review Preparation Questionnaire (RPQ)

- Cybersecurity requirements documented in Safeguard Computer Security Evaluation Matrix (SCSEM) templates organized by technology or topic

- Nessus audit files

## Safeguards Mailbox

The Safeguards Mailbox is an acceptable alternative for communicating information or questions to the Office of Safeguards relative to safeguarding requirements and Publication 1075. The Mailbox is located at SafeguardReports@irs.gov. The Office of Safeguards requires that all reports, when sent to the Office of Safeguards via email, be transmitted using IRS-approved encryption methods as described in Section 2.E.3 Encryption Requirements.  Below are items that are appropriate for submission to the Mailbox:

- Safeguards Reports and Extension Requests

- 45-Day Notifications

- Publication 1075 Technical Inquiries

- Re-Disclosure Agreements

- Data Incident Reporting

- Ad hoc Points of Contact changes

## KEY DEFINITIONS

This section establishes a baseline of key terms used throughout this publication. For additional definitions of terms and phrases, refer to Glossary and Key Terms.

## Federal Tax Information

Safeguarding FTI is critically important to continuously protect taxpayer confidentiality as required by IRC § 6103. FTI consists of federal tax returns and return information (and information derived from it) that is in the agency's possession or control that is covered by the confidentiality protections of the IRC and subject to the IRC § 6103(p)(4) safeguarding requirements including IRS oversight. FTI is categorized as Sensitive But Unclassified (SBU) information and may contain personally identifiable information (PII).

FTI includes return or return information received directly from the IRS or obtained through an authorized secondary source such as Social Security Administration (SSA), Federal Office of Child Support Enforcement (OCSE), Bureau of the Fiscal Service (BFS) or Centers for Medicare and Medicaid Services (CMS) or another entity acting on behalf of the IRS pursuant to an IRC § 6103(p)(2)(B) Agreement.

FTI includes any information created by the recipient that is derived from federal return or return information received from the IRS or obtained through a secondary source.

FTI may not be masked to change the character of information to circumvent IRC § 6103 confidentiality requirements.

25

A594

TD_0000257

## Return and Return Information

IRC § 6103(b)(1) defines a return as any tax or information return, estimated tax declaration or refund claim (including amendments, supplements, supporting schedules, attachments or lists) required by or permitted under the IRC and filed with the IRS by, on behalf of, or with respect to any person or entity. Examples of returns include forms filed on paper or electronically, such as Forms 1040, 941, 1120 and other informational forms, such as 1099 or W-2.[1] Forms include supporting schedules, attachments or lists that are supplemental to or part of such a return.

Return information, in general, is any information collected or generated by the IRS regarding any person's liability or possible liability under the IRC. IRC § 6103(b)(2)(A) defines return information very broadly. It includes but is not limited to:

- Information that IRS obtained from any source or developed through any means that relates to the potential liability of any person under the IRC for any tax, penalty, interest, fine, forfeiture or other imposition or offense

- Information extracted from a return, including names of dependents or the location of business

- The taxpayer's name, address, and identification number

- Information collected by the IRS about any person's tax affairs, even if identifiers, such as name, address and identification number are deleted

- Status of whether a return was filed, under examination or subject to other investigation or processing, including collection activities

- Information contained on transcripts of accounts

## Personally Identifiable Information (PII)

FTI may include Personally Identifiable Information (PII). FTI may include the following PII elements:

- Name of a person with respect to whom a return is filed

- Taxpayer mailing address

- Taxpayer identification number

- Email addresses

- Telephone numbers

- Social Security Numbers

- Bank account numbers

- Date and place of birth

- Mother's maiden name

---

[1] Refer to IRS.gov for a complete catalog of IRS forms

26

TD_0000258

- Biometric data (e.g., height, weight, eye color, fingerprints)

- Any combination of the above

For the purposes of Publication 1075 and Safeguarding requirements, PII is FTI when provided by the IRS or a secondary source (i.e., SSA, BFS).

## Information Received from Taxpayers or Third Parties

Copies of tax returns or return information provided to the agency directly by the taxpayer or their representative (e.g. W-2's, Form 1040, etc.) or obtained from public information files (e.g. federal tax lien on file with the county clerk, Offers in Compromise available for public inspection, court records, etc.) is not protected FTI that is subject to the safeguarding requirements of IRC § 6103(p)(4). If the agency independently verifies FTI provided by the IRS or a secondary source (i.e., SSA, BFS) with the taxpayer or a third-party source (linked to the taxpayer), the verified information is no longer FTI as long as the IRS source information is replaced or overwritten with the newly provided information.

## Access

Access means when an individual: (1) enters a restricted or locked area, room, container, or system containing federal tax information; or (2) obtains, acquires, receives, examines, uses, or gains knowledge of federal tax information, by physical, electronic, or any other methods.

Users (e.g., system administrators, database administrators) have access to FTI if they have the ability to modify or bypass security controls protecting FTI (to include decryption keys).

## Cloud Computing

Cloud computing is a model for enabling ubiquitous, convenient, on-demand network access to a shared pool of configurable, computing resources (e.g., networks, servers, storage, applications and services) that can be rapidly provisioned and released with minimal management effort or service provider interaction.

## Inadvertent Access

Access to FTI without authority that is non-willful and unanticipated or accidental.

## Inadvertent Disclosure

Accidental exposure of information to a person not authorized access.

## Incidental Access

Access to FTI without a need-to-know that may occur in extraordinary circumstances (i.e., system failure, data incident response, disaster response).

## Unauthorized Access

Unauthorized access occurs when a person gains logical or physical access to FTI without authority under IRC § 6103 and without a need-to-know (which would include but is not limited to agency employees with no need to know and/or janitors and security guards when there is no second barrier securing the federal tax information as well as developers/administrators of electronic systems/applications receiving, processing, storing or transmitting federal tax information).

27

TD_0000259

Access to FTI is permitted only to individuals who require the FTI to perform their official duties and as authorized under the IRC. FTI must never be indiscriminately disseminated, even within the recipient agency, body, or commission. Agencies must evaluate the need for FTI before the data is requested or disseminated. Inadvertent access is access to FTI without authority and is non-willful. Willful access to FTI by a person without authorization or need-to-know may be prosecuted under IRC § 7213A.

## Unauthorized Disclosure

Unauthorized disclosure occurs when a person with access to FTI discloses it to another person without authority under IRC § 6103.

An unauthorized disclosure has occurred when FTI is knowingly or due to gross negligence provided to an individual who does not have the statutory right to have access to it under the IRC. Even without willfulness or gross negligence FTI is not to be disclosed to entities or individuals who are not authorized by IRC § 6103 to have it. Inadvertent disclosure is disclosure of FTI without authority and is non-willful. Willful disclosure of FTI to a person without authorization or need-to-know may be prosecuted under IRC § 7213.

## Need-to-Know

Need-to-know is established when individuals require FTI to perform their official duties and are authorized under the IRC.

Limiting access to individuals on a need-to-know basis reduces opportunities to "browse" or improperly view FTI. Restricting access to designated personnel minimizes improper access or disclosure. FTI disclosures must be limited to what is essential to accomplish official duties.

## Adverse Action

An adverse action includes a suspension of 15 days or more, a reduction in pay, or termination of employment.

## Disciplinary Action

A disciplinary action includes an admonishment, written reprimand, or suspension of 14 days or less.

## Personnel Sanction

A disciplinary or adverse action for individuals failing to comply with established information security policies and procedures constitutes a personnel sanction.

28

TD_0000260

## 1.0 FEDERAL TAX INFORMATION, REVIEWS and OTHER REQUIREMENTS

### 1.1 General

IRC § 6103 is a confidentiality statute and generally prohibits the disclosure of FTI (see Exhibit 1, IRC § 6103(a) and (b), for general rules and definitions). Exceptions to the general rule authorize disclosure of FTI to certain federal, state, and local agencies. Generally, these disclosures are made by the IRS in response to written requests signed by the head of the requesting agency or an authorized delegate. FTI so disclosed may be used by the receiving agency solely for the purpose described in the exception authorizing the disclosure. The statutes providing authorization to disclose FTI contain specific conditions that may require different procedures in maintaining and using the information. These conditions are outlined under specific sections in this publication.

As a condition of receiving FTI, the receiving agency must show, to the satisfaction of the IRS, the ability to protect the confidentiality of that information. Certain safeguards must be implemented to prevent unauthorized access and use. Besides written requests, the IRS may require formal agreements that specify, among other things, how the information will be protected. An agency must ensure its safeguards will be ready for immediate implementation upon receipt of FTI. Copies of the initial and subsequent requests for data and any formal agreement must be retained by the agency a minimum of five (5) years as a part of its recordkeeping system.

Agencies must always maintain the latest SSR on file. The initial request for FTI must be followed by submitting a SSR to Safeguards at least 90 days before the scheduled or requested receipt of FTI (see Section 2.E, Reporting Requirements—6103(p)(4)(E)). The SSR must include processing and safeguard procedures for all FTI received and distinguish between agency programs and functional organizations using FTI. Multiple organizations, divisions or programs within a federal agency using FTI must be consolidated into a single report for that agency at the direction of Safeguards.

Agencies entering into an agreement to disclose FTI to agents, contractors, or sub-contractors requires advance notice to IRS Safeguards (see Section 2.E.6 Notification Reporting Requirements and Section 1.9.4, Disclosing FTI to Contractors or Sub-Contractors.)

> Agencies must exercise care in outlining their safeguard program. Reports that lack clarity or sufficient information will be returned to the submitting agency for additional documentation.

### 1.2 Authorized Use of FTI

Any agency that receives FTI for an authorized use may not use that information in any manner or for any purpose not consistent with that authorized use. If an agency needs FTI for a different authorized use under a different provision of IRC § 6103, a separate request must be sent to IRS Disclosure.

> An unauthorized secondary use of FTI is specifically prohibited and may result in discontinuation of disclosures to the agency and imposition of civil or criminal penalties on the responsible officials.

The Office of Safeguards validates that an agency's "need and use" of FTI conforms with the governing provisions allowing the disclosure of FTI. The agency's SSR must describe the purpose(s) for which FTI is collected, used, maintained and shared.

29

TD_0000261

## 1.3 Secure Data Transfer

The IRS established a Secure Data Transfer (SDT) program to provide encrypted electronic transmission of FTI between the IRS and trading partners. For support with establishing an IRS SDT account, please submit an SDT Customer Support Request. Complete information on establishing an SDT account is available in the SDT Handbook. The SDT Handbook is available from a local IRS governmental liaison or a request to the Safeguards mailbox.

Only the following types of documents will be accepted via SDT:

- Control File (.txt)

- Adobe (.pdf)

- Word Document (.doc or .docx)

- Excel Document (.xls or.xlsx)

- Zipped File (.zip)

Contact the SafeguardReports@irs.gov mailbox for specific details on how to submit information via SDT.

## 1.4 State Tax Agency Limitations

FTI may be obtained per IRC § 6103(d) by state tax agencies only to the extent the information is needed for and is reasonably expected to be used for state tax administration. An agency's records must include some account of the result of its use of FTI (e.g., disposition of closed cases and summary of revenues generated) or include reasons why the information was not used. If any agency continually receives FTI that it is unable to use for any reason, it must contact the IRS official liaison and discuss the need to stop the receipt of this FTI.

State tax agencies using FTI to conduct statistical analysis, tax modeling or revenue projections must notify the IRS by submitting a signed Need and Use Justification Statement for Use of Federal Tax Information form and follow the established guidelines (available through the assigned Governmental Liaison).

Annually, the agency must provide updated information in the SSR regarding its modeling activities that include FTI. In the SSR, the agency must describe:

- Any use of FTI that is in addition to what was described in the original Need and Use Justification Form

- Any new, previously unreported internal tax administration compilations that include FTI

- Changes to the listing of authorized employees (Attachment B to the Need and Use Justification Form)

If the agency intends to use a contractor or sub-contractor for conducting statistical analysis, tax modeling or revenue projections, it must submit a 45-day notification (see Section 1.9.4, Disclosing FTI to Contractors or Sub-Contractors) prior to contractor or sub-contractor access to the FTI. The agency's SSR must detail the use of FTI for this purpose. In addition, the agency must submit a separate statement detailing the methodology used and data to be used by the contractor or sub-contractor. The Office of Safeguards and Statistics of Income functions will review the information provided to confirm that

30

A599

TD_0000262

adequate safeguarding protocols are in place and that the modeling methodology to be used to remove taxpayer identifying information is appropriate.

## 1.5 Coordinating Safeguards within an Agency

Because of the diverse purposes that authorized disclosures may be made to an agency and the division of responsibilities among different components of an agency, FTI may be received and used by several quasi-independent units within the agency's organizational structure. Where there is such a dispersal of FTI, the agency must centralize safeguarding responsibilities to the greatest extent practical and establish and maintain uniform safeguard standards consistent with IRS guidelines. The official(s) assigned these responsibilities must hold a position high enough in the agency's organizational structure to ensure compliance with the agency safeguard standards and procedures.

The selected official(s), or point(s) of contact (POC(s)) must also be responsible for ensuring that internal inspections are conducted, submission of required safeguard reports to the IRS, properly reporting any data breach incidents, disclosure awareness training and for any necessary liaison with the IRS.

## 1.6 Safeguard Reviews

A safeguard review is an on-site, remote, or a combination of both (hybrid) evaluation of the use of FTI and the measures employed by the receiving agency and its agents (where authorized) to protect the data.

- **On-site reviews**: Disclosure Enforcement Specialists (DES), Cybersecurity Reviewers (CSR), and Management Officials will conduct an on-site evaluation of the security and privacy controls implemented by the agency and all supporting parties. Assessment techniques include, but are not limited to visual inspections, observations, interviews, document exchange, and automated scanning.

- **Remote reviews**: Disclosure Enforcement Specialists, Cybersecurity Reviewers, and Management Officials will conduct a remote evaluation of the security and privacy controls implemented by the agency and all supporting parties using secured collaborative technologies (e.g., screen-sharing capabilities, teleconferences, video enabled software, etc.). Assessment techniques include, but are not limited to visual inspections, observations, interviews, document exchange, and automated scanning.

This review includes all FTI received whether from the IRS or a secondary source such as SSA, Bureau of the Fiscal Service or another agency (see Federal Tax Information). Safeguard reviews are conducted to determine the adequacy of safeguards as opposed to evaluating an agency's programs. Several factors will be considered when determining the need for a review, the type of review, and the frequency of which a review will be conducted.

### 1.6.1 Before the Review

The IRS initiates the review by communication with an agency point of contact (POC) as reported by the agency in the SSR. The preliminary discussion will be followed by a formal engagement letter to the agency head, which provides official notification of the planned safeguard review.

This engagement letter outlines what the review will encompass. Additional requests for specific information will be provided to the agency POC. These requests may include a list of records to be reviewed (e.g., training manuals, flowcharts, policies, awareness program documentation and organizational charts relating to the processing of FTI). Prior to the review, the agency POC will receive information regarding the manner in which the review will be conducted (e.g., on-site and/or remote), the

TD_0000263

scope and purpose of the review, a list of the specific areas to be reviewed and agency personnel to be interviewed.

A Preliminary Security Evaluation (PSE) call will be held to determine the scope of the review (see NIST Control PM-5 CE-1, Inventory of PII). The electronic flow of FTI will be discussed to provide the review team with a thorough understanding of the location and use of FTI throughout the agency's infrastructure. During the call primary POCs will be introduced, the scope of the review will be defined, assessment logistics will be discussed, and any questions will be answered. Participants should include agency IT staff knowledgeable about the location and flow of FTI throughout the agency as well as staff or contractors from other locations such as consolidated data centers. Additionally, mini-PSE calls for contractors, sub-contractors, off-site locations, etc. may be needed to obtain additional information in determining the review scope. Requests for additional information and clarification to include automated scanning procedures will be discussed after the PSE call(s) and a proposed scope will be provided.

### 1.6.2 During the Review

The review process validates the accuracy of the SSR and conformance with the current version of Publication 1075 requirements and National Institute of Standards and Technology (NIST) Special Publication 800-53. At the opening conference, review procedures will be communicated, followed by a data flow discussion, and confirming the flow of FTI (see NIST Control PM-5 CE-1, Inventory of PII). Observing actual operations is a required step in the review process. Sites to be reviewed will be based on the flow of the FTI, which may include, but are not limited to, field offices, consolidated data centers, off-site storage facilities, disaster recovery sites, contractor and sub-contractor sites.

Review methods may include but are not limited to:

- Spot check agency records for FTI

- Employee interviews

- Facility tours

- Document review

- Automated/manual testing (See Safeguards website for tools used for automated testing)

- Remote assessment tools

Agencies must facilitate execution of the review methods utilized by Safeguards staff. Agency management approval must be obtained prior to review, if agency policies and procedures contradict any of these methods.

The agency POC will be advised the of critical issues and findings as the review progresses. A briefing will be held with the POC to go over the Preliminary Findings Report (PFR) before the closing conference.

The closing conference is held upon completion of the agency's review, where the PFR is issued to provide the agency an overview of the findings identified during the review.

### 1.6.3 After the Review

An SRR and CAP will be issued within 45 days of the closing conference to document the review findings. Requests for corrections to the SRR must be emailed to the SafeguardReports@irs.gov mailbox. The Office of Safeguards will respond with an acknowledgement and a determination.

32

TD_0000264

Each finding will be identified with a criticality level that identifies potential risk to loss, breach or disclosure of FTI.

**Safeguards Finding Criticality Definitions**

| Impact Level | Definition |
|---|---|
| Limited | The potential impact is *Limited* if the vulnerability could be expected to have a *low or minimal adverse* effect on the ability to maintain the confidentiality and integrity of FTI. |
| Moderate | The potential impact is *Moderate* if the vulnerability could be expected to have a *demonstratable* adverse effect on the ability to maintain the confidentiality and integrity of FTI. |
| Significant | The potential impact is *Significant* if the vulnerability could be expected to have *severe* and/or *imminent* adverse effect on the ability to maintain the confidentiality and integrity of FTI. |
| Critical | The potential impact is *Critical* if the vulnerability has an *immediate* adverse effect on the confidentiality and integrity of FTI. |

All findings must be addressed in a timely fashion. The Office of Safeguards will identify deadlines for resolution based upon the risk associated with each finding. Outstanding issues must be resolved and addressed in the next reporting cycle of the CAP.

If the Agency has any critical findings, the agency must submit a mitigation plan to Safeguards within 7 days from the closing conference date. Safeguards will report the critical findings along with your agency plan to the Treasury Inspector General for Tax Administration (TIGTA).

The CAP must be updated and submitted semi-annually using the last CAP issued by the Office of Safeguards (see Section 2.E.5, Corrective Action Plan) until all review findings are accepted as closed.

If an agency has a CAP due within 60 days of the review, that CAP is not required because the remaining open findings will be handled as part of the upcoming on-site or remote Safeguard Review

Each CAP submission must include an explanation and/or evidence of actions already taken or planned to resolve all outstanding findings. The agency must submit an actual or planned implementation date for each outstanding finding.

## 1.7 Termination of FTI

### 1.7.1 Agency Request

#### 1.7.1.1 Termination Documentation

When an agency no longer requires FTI, notify Safeguards at SafeguardReports@irs.gov by providing the following:

1. Copies of notifications to all agencies from which FTI is received, that FTI will no longer be requested, and

2. Letter from the Head of Agency certifying that all residual FTI has been destroyed. (See Section 2.F Disposal of FTI – IRC § 6103(p)(4)(F))

TD_0000265

Once documentation is reviewed, the Office of Safeguards will send an acknowledgement of the agency's termination, instructions on Safeguard reporting and on-site review obligations. Instructions for reinstatement will be included in the acknowledgement letter.

### 1.7.1.2 Archiving FTI Procedure

This section is for agencies terminating receipt of FTI but required by statute to retain FTI for designated periods. If residual FTI is required to be retained by statute for a designated period (e.g., 5 or 10 years), then agencies must:

- Ensure that a currently authorized agency, contractors, or sub-contractor retain FTI in accordance with Publication 1075 security standards

- Provide copies of notifications as shown in Section 1.7.1.1, Termination Documentation

- Submit an annual SSR each year while the agency has possession or oversight of the data

- Continue to be subject to periodic Safeguard Reviews

- Submit a letter from Head of Agency certifying that all residual FTI has been destroyed when the retention period has ended

### 1.7.2 FTI Suspension, Termination and Administrative Review

The IRS may terminate or suspend disclosure of return and return information to any authorized recipient under 6103(p)(4), if the IRS determines that:

1. The authorized recipient (or agency) has allowed an unauthorized inspection or disclosure of FTI and has not taken adequate corrective action to prevent the recurrence of an unauthorized inspection or disclosure; or

2. The authorized recipient does not satisfactorily maintain the safeguards prescribed by Section 6103(p)(4) and Publication 1075 and has made no adequate plan to improve its system to maintain the safeguards satisfactorily.

Prior to terminating FTI, the IRS will notify the authorized recipient in writing and may suspend further disclosures if it is deemed that federal tax administration would be seriously impaired.

Agencies in receipt of the termination or suspension letter may appeal the determination as outlined in Exhibit 3, USC Title 26, CFR § 301.6103(p)(7)-1.

### 1.8 Reporting Improper Inspections or Disclosures

### 1.8.1 Terms

### 1.8.1.1 Data Incident

A data incident is an occurrence that (1) actually or imminently jeopardizes, without lawful authority, the integrity, confidentiality or availability of information or an information system; or (2) constitutes a violation or imminent threat of violation of law, security policies, security procedures or acceptable use policies. Incidental and inadvertent accesses are considered data incidents.

An incident involving the loss or theft of an IRS asset containing FTI, or the loss or theft of a physical document that includes FTI, or the inadvertent disclosure of FTI, is known as a data breach. See the Data Breach definition below. Often, an occurrence may be first identified as an incident, but later identified as

34

TD_0000266

a data breach once it is determined that the incident involves FTI. This is often the case with a lost or stolen laptop or electronic storage device.

## 1.8.1.2 Data Breach

A data breach is a type of incident involving a loss, theft, or inadvertent disclosure of FTI. A data breach is defined as the loss of control, compromise, unauthorized disclosure, unauthorized acquisition, or any similar occurrence where:

- a person other than an authorized user accesses or potentially accesses FTI or,

- an authorized user accesses or potentially accesses FTI for an unauthorized purpose.

A data breach is not limited to an occurrence where a person other than an authorized user potentially accesses FTI by means of a network intrusion, a targeted attack that exploits website vulnerabilities, or an attack executed through an email message or attachment. A data breach may also include the loss or theft of physical documents that include FTI and portable electronic storage media that store FTI, the inadvertent disclosure of FTI on a public website or an oral disclosure of FTI to a person who is not authorized to receive that information. It may also include an authorized user accessing FTI for an unauthorized purpose.

Some common examples of a data breach include:

- A laptop or portable storage device storing FTI is lost or stolen.

- An email containing FTI is inadvertently sent to the wrong person.

- A box of documents with FTI is lost or stolen during shipping.

- An unauthorized third party overhears agency employees discussing FTI.

- A user with authorized access to FTI sells it for personal gain or disseminates it.

- An IT system that maintains FTI is accessed by a malicious actor.

- FTI is posted inadvertently on a public website.

## 1.8.2 General

A written policy must be established and distributed that covers incident management. The policy must clearly state the actions that will be taken for the improper inspection or disclosure of FTI. Upon discovering a possible improper inspection or disclosure of FTI, including breaches and incidents, by a federal employee, a state employee or any other person, the individual making the observation or receiving information must contact the local Treasury Inspector General for Tax Administration (TIGTA) Field Division office, to the Special Agent-in-Charge, immediately, but no later than 24 hours after identification of a possible issue involving FTI. See NIST IR-6, Incident Reporting and IR-8, Incident Response Plan.

Local TIGTA Field Division Office contact information can be found on the TIGTA website at https://www.treasury.gov/tigta/oi_office.shtml.

If unable to contact the local TIGTA Field Division, contact the Hotline Number.

**Hotline Number:**      800-366-4484 during normal working hours for immediate assistance.

35

TD_0000267

Note: After regular business hours, call 800-589-3718. This number reaches an answering service which answers all calls from all locations in the United States 24 hours a day 7 days a week. The answering service will contact the on-call TIGTA agent.

**TIGTA Homepage:**    https://www.treasury.gov/tigta

**Mailing Address:**    Treasury Inspector General for Tax Administration
Ben Franklin Station
P.O. Box 589
Washington, DC 20044-0589

For intrusions, manipulations or compromises of computer networks, as well as external cyber-based actions that interfere with the IRS's ability to conduct electronic tax administration, or any breach that involves unauthorized disclosure within an IT environment, contact TIGTA Electronic Crimes & Intelligence Division at cybercrimes@tigta.treas.gov .

> Information spillage refers to instances where FTI is inadvertently placed on systems that are not authorized to handle FTI or are not part of the agency's intended FTI workflow. Upon discovery, corrective action is required to remove the FTI from the unintended system and ensure there were no unauthorized accesses or disclosures. If no FTI is involved, then there is no need to report the spill to the Office of Safeguards or TIGTA. If the agency cannot show FTI was not involved within that 24-hour period, then the spill will need to be reported to the Office of Safeguards and TIGTA.

## 1.8.3 Office of Safeguards Notification Process

Concurrent to notifying TIGTA, the agency must notify the Office of Safeguards by email to Safeguards mailbox, safeguardreports@irs.gov. To notify the Office of Safeguards, the agency must document the specifics of the incident or breach known at that time into a data incident report, including but not limited to:

- Name of agency and agency POC for resolving data incident with contact information

- Date and time the incident/breach occurred

- Date and time the incident/breach was discovered

- How the incident/breach was discovered

- Description of the incident/breach and the data involved, including specific data elements, if known

- Potential number of FTI records involved; if unknown, provide a range if possible

- Address where the incident/breach occurred

- IT involved (e.g., laptop, server, mainframe)

- Does the incident involve an unauthorized access or disclosure by an agency employee? (Y/N)

TD_0000268

- If a criminal indictment is not pursued, will a disciplinary or adverse action be proposed against the agency employee involved in this unauthorized access or disclosure? (Y/N)

Reports must be sent electronically and encrypted via IRS-approved encryption techniques as outlined in Section 2.E.3, Encryption Requirements. Use the term "*data incident report*" in the subject line of the email. *Do not include any FTI in the data incident report.*

Even if all information is not available, immediate notification is the most important factor, not the completeness of the data incident report. Additional information must be provided to the Office of Safeguards as soon as it is available.

The agency will cooperate with TIGTA and Office of Safeguards investigators, providing data and access as needed to determine the facts and circumstances of the incident.

## 1.8.4 Incident Response Procedures

In the event of an unauthorized disclosure or data breach, the agency must contact TIGTA and the IRS immediately. Both TIGTA and the IRS must be contacted within 24 hours of the discovery of the disclosure or breach. The agency must not wait to conduct an internal investigation to determine if FTI was involved. Any internal investigation conducted by the agency should not delay the timely reporting of the disclosure or breach.

Incident response policies and procedures required in NIST Control IR-1, Incident Response Policy and Procedure, must be used when responding to an identified unauthorized disclosure or data breach incident.

The Office of Safeguards will coordinate with the agency regarding appropriate follow-up actions required to be taken by the agency to ensure continued protection of FTI. Once the incident has been addressed, the agency will conduct a post-incident review to ensure the incident response policies and procedures provide adequate guidance. Any identified deficiencies in the incident response policies and procedures must be resolved as soon as reasonably possible. Additional training on any changes to the incident response policies and procedures must be provided to all employees, including contractors, sub-contractors and consolidated data center employees, immediately. See NIST Control IR-4, Incident Handling for additional information.

The agency must test the incident response capability annually using tabletop exercises to determine the incident response effectiveness and document the results. See NIST Control IR-3, Incident Response Testing.

The agency must track and document system security and privacy incidents. See NIST Control IR-5, Incident Monitoring.

## 1.8.5 Incident Response Notification to Impacted Individuals

The agency must provide written notification to a taxpayer whose FTI was subject to unauthorized access or disclosure when a disciplinary or adverse action is proposed against the agency employee responsible. The required written notification to the taxpayer must include the date of the unauthorized inspection or disclosure and the rights of the taxpayer under IRC § 7431.

The agency must confirm to the Office of Safeguards when the required written notification to the taxpayer is completed. In addition, the agency must inform the Office of Safeguards of any pending media releases, including sharing a draft of the release, prior to distribution.

37

TD_0000269

## 1.9 Disclosure to Other Persons

### 1.9.1 General

Disclosure of FTI is prohibited unless authorized by statute. Agencies with access to FTI are not allowed to make further disclosures of that information to their agents, contractor, or sub-contractor unless authorized by statute. See NIST Control AC-21, Information Sharing.

Agencies must use specific language in their contractual agreements that clearly state the requirements necessary to protect the confidentiality of FTI and avoid ambivalence or ambiguity (see the model language of Exhibit 7). For additional requirements on contracts, see Exhibit 6, Contractor 45-Day Notification Procedures.

> Absent specific language in the IRC or where the IRC is silent in authorizing an agency to make further disclosures, the IRS's position is that further disclosures are unauthorized.

### 1.9.2 Authorized Disclosure Precautions

When disclosure of FTI is authorized, the agency must take certain precautions prior to redisclosure to a contractor or sub-contractor, namely:

- Has the IRS been given sufficient notice prior to releasing FTI to a contractor or sub-contractor?

- Has the agency been given reasonable assurance through a visitation or received a report certifying that all security standards (physical and IT systems) have been addressed?

- Does the contract authorizing the disclosure of FTI have the appropriate safeguard language? See the model language of Exhibit 7, Safeguarding Contract Language.

Agencies must fully report to the IRS in their SSRs all disclosures of FTI to contractors and sub-contractors. Any additional disclosures to contractors and sub-contractors must be reported using the Notification process and reported on the next annual SSR.

An agency may not contract for the disclosure of FTI that is not authorized by IRC § 6103. Only contracts for services that require access to FTI to perform their duties under the contract are required to comply with these standards.

### 1.9.3 External Personnel Security

An external provider refers to organizations other than the agency operating or acquiring the system. External providers include, for example, contractors or sub-contractors and other organizations providing system development, information technology services, outsourced applications, testing/assessment services and network and security management. Agencies must include personnel security requirements in contracts. External providers may have personnel working at agency facilities with credentials, badges or system privileges. Notifications of external personnel changes ensure appropriate termination of privileges and credentials. See NIST Control PS-7, External Personnel Security.

### 1.9.4 Disclosing FTI to Contractors or Sub-Contractors

The agency must notify the Office of Safeguards prior to re-disclosing FTI to contractors or sub-contractors. The agency must notify and obtain written approval from the Office of Safeguards prior to re-disclosing FTI to sub-contractors (when the agency's contractor uses or desires to re-disclose FTI to another contractor). See Section 2.E, Reporting Requirements - 6103(p)(4)(E) and Section 2.E.6, Notification Reporting Requirements, for additional information.

38

TD_0000270

In addition to the notification, the agency must:

- Establish privacy roles and responsibilities for contractors or sub-contractors and service providers to safeguard the confidentiality and integrity of FTI.

- Include privacy requirements in contracts and other acquisition-related documents.

- Share FTI externally only for the purposes statutorily authorized.

- Where appropriate, enter into a contract, an SLA, memoranda of understanding, memoranda of agreement, letters of intent, computer matching agreement or similar agreement, with third parties that specifically describe the FTI covered and specifically enumerate the purposes for which the FTI may be used.

- Monitor, audit and train its staff on the authorized uses and sharing of FTI with third parties and on the consequences of unauthorized use or sharing of FTI.

- Require agency notification of contractor or sub-contractor personnel changes to ensure appropriate termination of privileges and credentials. See NIST Control PS-7, External Personnel Security.

- Evaluate any proposed new instances of sharing FTI with third parties to assess whether they are authorized.

- Require contractor or sub-contractor employ a formal sanction process for contractor employees and, when permitted by statute, sub-contractor employees failing to comply with established information security policies and procedures for FTI. Notification of designated agency personnel is required within 72 hours.

> If the agency requires the use of a contractor to conduct tax modeling, revenue estimation or other statistical activities, 45-day notification requirements apply (see Section 1.9.4, Disclosing FTI to Contractors).

> The Taxpayer First Act § 2004, which added IRC § 6103(p)(9), formalizes in statute the following agency requirements effective December 31, 2022:
>
> - Agencies must require that contractors, sub-contractors, or other agents have requirements in effect to provide safeguards required under IRC § 6103(p)(4) to protect FTI.
>
> - The Taxpayer First Act also codifies agency responsibilities to conduct **on-site** reviews of contractors, sub-contractors, and other agents and provide the findings of these reviews to Safeguards as part of the report required under IRC § 6103(p)(4)(E).
>
> - Agencies will provide the Office of Safeguards with an annual certification that each contractor, sub-contractor, or other agent is in compliance with the above requirements. This certification will be included as part of the report required under IRC § 6103(p)(4)(E).

> - Agency requirements for this new legislation will be issued prior to implementation in the form of an Interim Guidance memorandum.

TD_0000271

### 1.9.5 Re-Disclosure Agreements

When required regulatory prerequisite steps are satisfied and where appropriate, under the authority of IRC § 6103(p)(2)(B), the IRS may execute an agreement with an agency that authorizes the re-disclosure of FTI to another entity. These agreements are negotiated and approved by IRS Disclosure with concurrence of the Office of Safeguards.

Agreements must include language to enforce the requirements for:

- Incident reporting related to FTI

- Implementing personnel sanctions for failure to comply with established information security policy and procedures related to FTI

- Confirmation to the agency any proposals of disciplinary and adverse action concerning unauthorized accesses and disclosures involving FTI

- Notification of individuals whose FTI was subject to unauthorized access or disclosure including the date the unauthorized access or disclosure of FTI occurred.

Federal agencies authorized by statute to enter into re-disclosure agreements are required to provide a list of all executed agreements annually in the SSR. When requested by the Office of Safeguards, agencies must provide a copy of all re-disclosure agreements within 30 days. An electronic copy must be sent to the Office of Safeguards via SDT. If SDT is not available, the agreements may be emailed to the SafeguardReports@irs.gov mailbox.

## 1.10 Return Information in Statistical Reports

### 1.10.1 General

IRC § 6103 authorizes the disclosure of FTI to specific federal agencies for use in statistical reports, tax administration purposes and certain other purposes specified in IRC § 6103(j). Statistical reports may only be released in a form that cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer.

Agencies authorized to produce statistical reports must adhere to the following guidelines or an equivalent alternative that has been approved by the IRS:

- Access to FTI must be restricted to authorized personnel.

- No statistical tabulation may be released outside the agency with cells containing data from fewer than three returns. The exception to this rule is for corporation returns where no tabulation with cells containing data for fewer than five returns may be released.

- Statistical tabulations prepared at the state level may not be released for cells containing data for fewer than 10 returns. Data for geographic areas below the state level such as county may not be released with cells containing data from fewer than 20 returns. In addition, for tabular data at the ZIP Code level, additional procedures must be employed. Individual ZIP Code areas with fewer than 100 returns cannot be shown. Additionally, any cell in the ZIP Code table based on fewer than 20 returns cannot be shown. Finally, individual returns that represent a large percentage of the total of a particular cell must be excluded from the data.

- Tabulations that would pertain to specifically identified taxpayers or that would tend to identify a particular taxpayer, either directly or indirectly, may not be released.

40

TD_0000272

## 1.10.2 Making a Request under IRC § 6103(j)

Federal agencies seeking statistical information from the IRS must make their requests under IRC § 6103(j). The requests must be addressed to:

Director, Statistics of Income Division
Internal Revenue Service, OS:P:S
1111 Constitution Avenue, NW
Washington, D.C. 20224

## 1.10.3 State Tax Agency Statistical Analysis

State tax agencies must provide written notification and obtain IRS approval prior to performing tax modeling, revenue estimation or other statistical activities involving FTI. The agency must demonstrate that the activity is required for tax administration purposes. The agency must adhere to the following process to submit a request:

1.  Contact the local IRS disclosure manager[2] and complete a Need and Use Justification for Federal Tax Information Form.

2.  The completed and signed form must be returned to the IRS disclosure manager for review and approval. The Office of Safeguards will be notified by the IRS disclosure manager of the request and approval.

3.  Changes to the terms of the statistical analysis activities documented in the form must be submitted to the IRS Office of Safeguards as part of the annual SSR (see Section 1.4, State Tax Agency Limitations and Section 2.E.4, Safeguard Security Report).

4.  Updates to the form must be made as requested by the IRS disclosure manager.

If the agency requires the use of a contractor to conduct tax modeling, revenue estimation or other statistical activities, 45-day notification requirements apply (see Section 1.9.4, Disclosing FTI to Contractors).

---

[2] Refer to https://www.irs.gov/privacy-disclosure/irs-freedom-of-information for contact information.

41

TD_0000273

## 2.0 PHYSICAL SECURITY REQUIREMENTS

### 2.A Recordkeeping Requirement – IRC § 6103(p)(4)(A)

#### 2.A.1 General

Federal, state and local agencies, bodies, commissions and agents authorized under IRC § 6103 to receive FTI are required by IRC § 6103(p)(4)(A) to establish a permanent system of standardized records of requests made by or to them for disclosure of FTI. For additional guidance, see Exhibit 2, USC Title 26, IRC § 6103(p)(4).

This recordkeeping must include internal requests among agency employees as well as requests outside of the agency. These records are required to track the movement of FTI. The records are to be maintained for a minimum of five (5) years. The Safeguards website contains guidance, job aids, helpful tools and frequently asked questions to assist agencies in meeting safeguard requirements; see http://www.irs.gov/uac/Safeguards-Program.

#### 2.A.2 Logs of FTI (Electronic and Non-Electronic Receipts)

The agency must establish a tracking system to identify and track the location of electronic and non-electronic FTI from receipt until it is destroyed. The FTI log may include the following tracking elements:

- Taxpayer Identifier*

- Tax year(s)

- Type of information (e.g., revenue agent reports, Form 1040, work papers)

- The reason for the request

- Date requested

- Date received

- Exact location of the FTI

- Who has had access to the data

- If disposed of, the date and method of disposition

*To the extent possible, do not include FTI in the log. If FTI is used, the log must be secured in accordance with all other safeguarding requirements.

If the authority to make further disclosures is present (e.g., agents/contractors/sub-contractors), information disclosed outside the agency must be recorded on a separate list or log. The log must:

- Reflect to whom the disclosure was made

- What was disclosed

- Why it was disclosed

- When it was disclosed

42

TD_0000274

Agencies transmitting FTI from one mainframe computer to another, as in the case of the SSA sending FTI to state human services agencies, need only identify the bulk records transmitted. This identification will contain the approximate number of taxpayer records, the date of the transmissions, the best possible description of the records and the name of the individual making/receiving the transmission.

## Figure 1 – Sample FTI Logs

| FTI Log | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date Requested | Date Received | Taxpayer Identifier | Tax Year(s) | Type of Information | Reason for Request | Exact Location | Who has access? | Disposition Date | Disposition Method |

| FTI Bulk Transfer Log | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date Received | Control Number/File Name | Content (do not include FTI) | Recipient/Title Location | Number of Records | Movement Date | Recipient/Title Location | Disposition Date | Disposition Method | |

## 2.A.3 Converted Media

Conversion of FTI from paper to electronic media (scanning) or from electronic media to paper (print screens or printed reports) also requires tracking from creation to destruction of the converted FTI. All converted FTI must be tracked on logs containing the fields detailed in Section 2.A.2, Logs of FTI, (Electronic and Non-Electronic Receipts) depending upon the current form of the FTI, electronic or non-electronic.

## 2.A.4 Recordkeeping of Disclosures to State Auditors

When disclosures are made by a state tax agency to state auditors, recordkeeping requirements pertain only in instances where the auditors use FTI for further scrutiny and inclusion in their work papers. In instances where auditors read large volumes of records containing FTI, whether in paper or electronic format, the state tax agency need only identify bulk records examined. This identification will contain the approximate number of taxpayer records, the date of inspection, a description of the records and the name of the individual(s) making the inspection. Recordkeeping log samples are provided in Section 2.A.2, Logs of FTI, (Electronic and Non-Electronic Receipts).

Disclosure of FTI to auditors external to child support enforcement, human services or labor benefit agencies is not authorized by statute. FTI in case files must be removed prior to access by the auditors.

## 2.B Secure Storage – IRC § 6103(p)(4)(B)

### 2.B.1 General

Security may be provided for a document, an item, or an area in several ways. These include but are not limited to locked containers of various types, vaults, locked rooms, locked rooms that have reinforced perimeters, locked buildings, guards, electronic security systems, fences, identification systems and control measures.

TD_0000275

How the required security is provided depends on the facility, the function of the activity, how the activity is organized and what equipment is available. Proper planning and organization will enhance the security while balancing the costs.

The IRS has categorized federal tax information as moderate risk. The minimum protection standards (MPS) must be used as an aid in determining the method of safeguarding FTI. These controls are intended to protect FTI in paper and electronic form.

## 2.B.2 Minimum Protection Standards

MPS establishes a uniform method of physically protecting data and systems as well as non-electronic forms of FTI. This method contains minimum standards that will be applied on a case-by-case basis. Because local factors may require additional security measures, management must analyze local circumstances to determine location, container, and other physical security needs at individual facilities. MPS have been designed to provide management with a basic framework of minimum-security requirements.

The objective of these standards is to prevent unauthorized access to FTI. MPS thus requires two barriers. Example barriers under the concept of MPS are outlined in the following table. Each topic represents one barrier and must be used as a starting point to identify two barriers of MPS to protect FTI.

## Table 1 – Minimum Protection Standards

| | |
|---|---|
| Secured Perimeter | The perimeter is enclosed by slab-to-slab walls constructed of durable materials and supplemented by periodic inspection. Any lesser-type partition must be supplemented by electronic intrusion detection and fire detection systems. All doors entering the space must be locked in accordance with Locking Systems for Secured Areas. In the case of a fence/gate, the fence must have intrusion detection devices or be continually guarded, and the gate must be either guarded or locked with intrusion alarms. |
| Security Room | A security room is a room that has been constructed to resist forced entry. The entire room must be enclosed by slab-to-slab walls constructed of approved materials (e.g., masonry brick, concrete) and supplemented by periodic inspection and entrance must be limited to specifically authorized personnel. Door hinge pins must be non-removable or installed on the inside of the room. |
| Badged Employee | During business hours, if authorized personnel serve as the second barrier between FTI and unauthorized individuals, the authorized personnel must wear picture identification badges or credentials. The badge must be clearly displayed and worn above the waist. |
| Security Container | A security container is a storage device (e.g., turtle case, safe/vault, locked IT cabinet) with a resistance to forced penetration, and a security lock with controlled access to keys or combinations. |

The MPS or "two-barrier" rule applies to FTI, beginning at the FTI itself and extending outward to individuals without a need-to-know. MPS provides the capability to deter, delay or detect surreptitious entry. Protected information must be containerized in areas where unauthorized employees may have access after-hours.

44

TD_0000276

As an example, an agency often desires or requires that security personnel, custodial service workers, or landlords for non-government-owned facilities have access to locked buildings and rooms. This may be permitted if there is a second barrier to prevent access to FTI. A security guard, custodial services worker or landlord may have access to a locked building or a locked room if FTI is in a locked security container. If FTI is in a locked room but not in a locked security container, the guard, janitor, or landlord may have a key to the building but not the room.

Additional controls have been integrated into this document that map to NIST Special Publication (SP) 800-53 Revision 5. These are identified in Section 4.0, NIST 800-53 Security and Privacy Controls. Per NIST guidelines, policies and procedures must be developed, documented and disseminated, as necessary, to facilitate implementing physical and environmental protection controls.

Multifunction Devices (MFDs) or High-Volume Printers must be locked with a mechanism to prevent physical access to the hard disk or meet MPS.

For additional guidance, see NIST Control PE-3, Physical Access Control.

## 2.B.3 Restricted Area Access

Care must be taken to deny unauthorized access to areas containing FTI during duty and non-duty hours. This can be accomplished by creating restricted areas, security rooms or locked rooms. Additionally, FTI in any form (computer printout, photocopies, tapes, notes) must be protected during non-duty hours. This can be done through a combination of methods, including secured or locked perimeter, secured area or containerization.

A restricted area is an area where entry is limited to authorized personnel (individuals assigned to the area). All restricted areas must either meet secured area criteria or provisions must be made to store FTI in appropriate containers during non-duty hours. Using restricted areas is an effective method for eliminating unnecessary traffic through critical areas, thereby reducing the opportunity for unauthorized access, disclosure, or theft of FTI. All the following procedures must be implemented to qualify as a restricted area.

Restricted areas will be prominently posted and separated from non-restricted areas by physical barriers that control access. The number of entrances must be kept to a minimum and must have controlled access (e.g., electronic access control, key access, door monitor) to prevent unauthorized entry. The main entrance must be controlled by locating the desk of a responsible employee at the entrance to ensure that only authorized personnel with an official need may enter.

### 2.B.3.1 Visitor Access Logs

A visitor access log must be maintained at a designated entrance to a restricted area and all visitors (persons not assigned to the area) entering the area shall be directed to the designated entrance.

Prior to accessing areas that contain FTI, a visitor must sign a visitor access log. The security personnel must validate the person's identity by examining government-issued identification (e.g., state driver's license or passport). The security personnel must compare the name and signature entered in the access log with the name and signature of the government-issued identification. When leaving the area, the security personnel or escort must enter the visitor's time of departure.

The visitor access log must require the visitor to provide the following information:

- Name and organization of the visitor

- Signature of the visitor

45

TD_0000277

- Form of identification

- Date of access

- Time of entry and departure

- Purpose of visit

- Name and organization of person visited

Each restricted area access log must be closed out at the end of each month and reviewed by management. Visitor access logs must be retained for five (5) years, see Exhibit 9, Table 9.

## Figure 2 – Visitor Access Log

| Visitor Access Log | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | Name & Org of Visitor | Form of Visitor ID | Purpose of Visit | Name & Org of Person Visited | Time of Entry | Time of Departure | Signature of Visitor |

## 2.B.3.2 Authorized Access List

To facilitate the entry of employees/vendor/contractor/non-agency personnel who have a frequent and continuing need to enter a restricted area, but who are not assigned to the area, an Authorized Access List (AAL) can be maintained so long as MPS are enforced. See Section 2.B.2, Minimum Protection Standards.

The AAL must contain the following:

- Name of employee/vendor/contractor/non-agency personnel

- Agency or department name

- Name and phone number of the agency POC authorizing access

- Address of agency/vendor/contractor

- Purpose and level of access

AAL must be reviewed monthly or upon occurrence or potential indication of an event such as a possible security breach or personnel change.

If there is any doubt of the identity of the individual, the security monitor must verify the identity of the individual against the AAL prior to allowing entry into the restricted area.

For additional guidance, see NIST Control PE-2, Physical Access Authorizations. Also, see NIST Control PE-16, Delivery and Removal, for guidance on controlling information system components entering and exiting the restricted area.

TD_0000278

## 2.B.3.3 Controlling Access to Areas Containing FTI

Management or a designee must maintain an authorized list of all personnel who have access to information system areas, where these systems contain FTI. This does not apply to those areas within the facility officially designated as publicly accessible.

The agency must maintain a policy addressing issuance of appropriate authorization credentials, including badges, identification cards or smart cards. This policy must include proper use and accountability requirements.

In addition, a list must be maintained that identifies those individuals who have authorized access to any systems where FTI is housed. Access authorizations and records maintained in electronic form are acceptable.

Each agency must control physical access to the information system devices that display FTI information or where FTI is processed to prevent unauthorized individuals from observing the display output. For additional information, see NIST Control PE-5, Access Control for Output Devices.

The agency or designee must monitor physical access to the information system where FTI is stored to detect and respond to physical security incidents. For additional information, see NIST Control PE-6, Monitoring Physical Access.

For all areas that process FTI, the agency must position information system components within the facility to minimize the opportunity for unauthorized access.

When cleaning and facility maintenance personnel work in restricted areas containing unsecured FTI, those activities must be performed in the presence of an authorized employee.

The agency must establish a process for maintenance personnel authorization and maintain a list of authorized maintenance organizations or personnel. The agency must verify that non-escorted personnel performing maintenance on the system possess the required access authorizations and if not, then the agency must designate organizational personnel with required access authorizations and technical competence to supervise the maintenance activities. See NIST MA-5, Maintenance Personnel.

Allowing an individual to "piggyback" or "tailgate" into restricted locations must be prohibited and documented in agency policy. The agency must ensure that all individuals entering an area containing FTI do not bypass access controls or allow unauthorized entry of other individuals. Unauthorized access must be challenged by authorized individuals (e.g., those with access to FTI). Security personnel must be notified of piggyback/tailgate attempts.

## 2.B.3.4 Control and Safeguarding Keys and Combinations

All containers, rooms, buildings, and facilities containing FTI must be locked when not in actual use.

Access to a locked area, room or container can be controlled only when the key or combination is controlled. Compromising a combination or losing a key negates the security provided by that lock. Combinations to locks must be changed annually or when an employee who knows the combination retires, terminates employment or transfers to another position.

Combinations must be given only to those who have a need to have access to the area, room or container and must never be written on a sticky-note, calendar pad or any other item (even though it is carried on one's person or hidden from view). An envelope containing the combination must be secured using the same security measures for the envelope as the locked material.

TD_0000279

Access control measures (keys, proximity cards, combinations) must be issued only to individuals having a need to access an area, room, or container. Inventory records must be maintained and must account for the total number of keys, proximity cards, combinations, etc. that are available and issued. The inventory must account for master keys and key duplicates. An annual reconciliation must be done on all key records.

The number of keys or persons with knowledge of the combination to a secured area must be kept to a minimum. Keys and combinations will be given only to those individuals who have a frequent need to access the area.

## 2.B.3.5 Locking Systems for Secured Areas

Access control systems (e.g., badge readers, smart cards, and biometrics) that provide the capability to audit access control attempts must maintain access control logs with successful and failed access attempts to secure areas containing FTI or systems that process FTI. Agency personnel must review access control logs on a monthly basis. The access control log must contain the following elements:

- Owner of the access control device requesting access

- Success/failure of the request

- Date and time of the request

## 2.B.4 FTI in Transit

Handling FTI must be such that the FTI does not become misplaced or available to unauthorized personnel.

Any time FTI is transported from one location to another, care must be taken to provide appropriate safeguards. When FTI is hand-carried by an individual in connection with a trip or in the course of daily activities, it must be kept with that individual and protected from unauthorized disclosures.

All shipments of paper or electronic FTI (including compact disk [CD], digital video disk [DVD], thumb drives, hard drives, tapes and microform) must be documented on a transmittal form and monitored to ensure that each shipment is properly and timely received and acknowledged. All FTI transported through the mail or courier/messenger service must be double-sealed; that is, one envelope within another envelope. The inner envelope must be marked confidential with some indication that only the designated official or delegate is authorized to open it. The outermost envelope must not be labeled as FTI or provide any indication that the contents contain FTI, since that may actually increase risk to the contents.

## 2.B.4.1 Security During Office Moves

When it is necessary for an office to move to another location, plans must be made to protect and account for all FTI properly. FTI must be in locked cabinets or sealed packing cartons while in transit. Using sealed boxes serves the same purpose as double-sealing and prevents anyone from viewing the contents. FTI must remain in the custody of an agency employee and accountability must be maintained to ensure that cabinets or cartons do not become misplaced or lost during the move.

## 2.B.5 Physical Security of Computers, Electronic and Removable Media

Computers and electronic media (including telephones using Voice Over Internet Protocol [VOIP]) that receive, process, store, access, protect and/or transmit FTI must be in a secure area with restricted access. In situations when requirements of a secure area with restricted access cannot be maintained, such as home work sites, remote terminals or other office work sites, the equipment must receive the highest level of protection practical, including full disk encryption. All computers and mobile devices that

TD_0000280

contain FTI and reside at an alternate work site must employ encryption mechanisms to ensure that FTI may not be accessed if the computer is lost or stolen.

Basic security requirements must be met, such as keeping FTI locked up when not in use. When removable media contains FTI, it must be labeled as FTI.

All computers, electronic media and removable media containing FTI must be kept in a secured area under the immediate protection and control of an authorized employee or locked up. When not in use, the media must be promptly returned to a proper storage area/container.

Inventory records of computers, electronic and removable media must be maintained and reviewed semi-annually for control and accountability. Section 2.A, Recordkeeping Requirement, contains additional information. For additional guidance on log retention requirements, see Exhibit 9, Record Retention Schedules.

For physical security protections of transmission medium (e.g., cabling), see NIST Control PE-4, Access Control for Transmission.

## 2.B.6 Media Off-Site Storage Requirements

Media containing FTI that is sent to an off-site storage facility must be properly secured, labeled, and always protected from access by unauthorized individuals. The media may not be stored on open shelving, unless the shelving is in a restricted area (see Section 2.B.3, Restricted Area Access) accessible only to individuals with authorized access to FTI.  The agency must ensure that contractor-operated off-site storage facilities maintaining FTI on open shelving comply with all safeguarding requirements (e.g., visitor access logs, internal inspections, contractor access restrictions, and employee training) and the contract must include Exhibit 7 safeguarding language. These facilities are subject to IRS safeguard reviews.

Agencies that do not have the statutory authority to contract for services that involve the disclosure of FTI (e.g. state Human Services and certain workforce agencies not receiving data under 6103(d)), may not allow the release of media containing FTI to a contractor-operated off-site storage facility unless the following conditions are met:

- The media is encrypted and labeled as containing "federal tax information"

- The media is locked in a turtle case or security container

- The agency retains the key to the turtle case

## 2.B.7 Alternate Work Site

If the confidentiality of FTI can be adequately protected, telework sites such as employee's homes or other non-traditional work sites can be used. FTI remains subject to the same safeguard requirements and the highest level of attainable security. All the requirements of Section 2.B.5, Physical Security of Computers, Electronic and Removable Media, apply to alternate work sites.

## 2.B.7.1 Equipment

The agency must retain ownership and control for all hardware, software and end-point equipment connecting to public communication networks, where these are present at alternate work sites. The use of virtual desktop infrastructure with non-agency-owned devices (including personally owned devices) is an acceptable alternative, where all requirements in Section 3.3.7 Virtual Desktop Infrastructure are met.

49

A618

TD_0000281

Employees must have a specific room or area in a room that has the appropriate space and facilities for the type of work done. Employees also must have a way to communicate with their managers or other members of the agency if security problems arise.

The agency must ensure employees have access to locking file cabinets or desk drawers so that documents, disks, and tax returns may be properly secured when not in use. If agency furniture is not furnished to the employee, the agency must ensure that an adequate means of storage exists at the alternate work site. The agency must provide "locking hardware" to secure automated data processing equipment to large objects, such as desks or tables. Smaller, agency-owned equipment must be locked in a filing cabinet or desk drawer when not in use.

## 2.B.7.2 Storing Data

FTI may be stored on hard disks only if agency-approved security access control devices (hardware/software) have been installed, are receiving regularly scheduled maintenance including upgrades and are being used. Access controls must include password security, an audit trail, encryption, virus detection and data overwriting capabilities.

## 2.B.7.3 Other Safeguards

Only agency-approved security access control devices and agency-approved software will be used. Use of illegal and/or non-approved software is prohibited. Electronic media that is to be reused must follow media sanitization requirements.

The agency must maintain a policy for the security of alternative work sites. The agency must coordinate with the managing host system(s) and any networks and maintain documentation on the test. Before implementation, the agency must certify that the security controls are adequate for security needs. Additionally, the agency must develop and disseminate rules and procedures to ensure that employees do not leave computers unprotected at any time. These rules must address brief absences while employees are away from the computer.

The agency must provide specialized training in security, disclosure awareness and ethics for all participating employees and managers. This training must cover situations that could occur as the result of an interruption of work by family, friends, or other sources.

## 2.C Restricting Access – IRC § 6103(p)(4)(C)

### 2.C.1 General

Agencies are required by IRC § 6103(p)(4)(C) to restrict access to FTI to only persons whose duties or responsibilities require access (see Exhibit 2, USC Title 26, IRC § 6103(p)(4) and Exhibit 4, Sanctions for Unauthorized Disclosure). To assist with this requirement, FTI must be clearly labeled and handled in such a manner that it does not become misplaced or available to unauthorized personnel. Additionally, warning banners advising of safeguarding requirements must be used for computer screens (see Section 4.14 Program Management (PM) and Exhibit 8, Warning Banner Examples).

Auditing controls, with the capability to generate records, to detect browsing within all systems that receive, process, store, access, protect and/or transmit FTI (i.e., TDS, case management systems, etc.) must be implemented. See NIST Sections AU-6 Audit Review, Analysis and Reporting, AU-7, Audit Reduction and Report Generation and AU-12, Audit Generation, for additional requirements.

To understand the key terms of access, unauthorized disclosure, unauthorized access and need-to-know, see section on Key Definitions.

TD_0000282

## 2.C.2 Policies and Procedures

Agencies must maintain the following policies and procedures relating to the safeguarding of FTI. For policies and procedures to be current, they need to have been updated or revalidated within the last three (3) years.

- **Alternate Work Site** – See Section 2.B.7 Alternate Work Sites
  If permitted, a policy/procedure must address the security of FTI at alternate work sites. A policy is required even if alternate work sites are prohibited.

- **Email** – See Section 3.3.2 Email Communications
  A policy/procedure must address the proper protection of FTI when transmitted by email, or if emailing of FTI is not allowed, a policy must state that it is prohibited.

- **Facsimile** - See Section 3.3.3 Facsimile and Facsimile Devices
  A policy/procedure must address the proper protection of FTI when transmitted by facsimile, or if facsimile transmission of FTI is not allowed, a policy must state that it is prohibited.

- **Employee Badge** – See Section 2.B.2 and Table 1 Minimum Protection Standards
  The policy/procedures must address when employees serve as secondary barriers for safeguarding FTI, picture identification badges or credentials must be visible and worn above the waist.

- **FTI Disposal/Destruction** – See Sections 2.A.2 FTI Logs, (Electronic and Non-Electronic Receipts), 2.F.3 Destruction and Disposal, 2.F.4 Other Precautions and 2.F.3.1 Media Sanitization
  The policy/procedures must address the proper safeguarding of FTI including the tracking and the schedule/method of disposal or destruction.

- **Incident Response** – See NIST Control IR-1 and Sections 1.8.4 Incident Response Procedures
  The policy/procedures must include the proper response to identified unauthorized disclosure or data breach incidents.

- **Internal Inspections** – See Sections 2.D.3 Internal Inspections and 2.D.9 Plan of Action and Milestones
  The policy/procedures must include a documented schedule to ensure that all internal inspections are conducted timely. Additionally, a POA&M must be developed and monitored, including tracking the corrective actions identified during the internal inspections and identified actions planned to resolve the findings.

- **Restricting Use of Personally Owned Computers** – See Section 2.B.7.1 Equipment
  The policy/procedures must include only agency-owned computers, media and software used to process, access and store FTI.

- **Disclosure Awareness, Security and Privacy, Role-Based and Contingency Training** – See Sections 2.D.2 Training Requirements, 2.D.2.1 Disclosure Awareness Training, NIST Controls AT-2 Awareness Training, AT-3 Role-Based Training and CP-3 Contingency Training
  These policies/procedures must contain a signed certification by the employee or contractor stating they understand the security policy and procedures for safeguarding FTI, prior to access to FTI.

- **Transcript Delivery System (TDS) Audit Log Review (if applicable)** – See Section 4.1, Access Control

TD_0000283

The policy/procedures must address the development, documentation, and dissemination of audit/accountability security controls.

- **Background Investigation** – See Section 2.C.3 Background Investigation Minimum Requirements
  The policy/procedure requires that employees, contractors, and sub-contractors (if authorized) with access to FTI must have a background investigation completed and favorably adjudicated.

- **Access Control** – See Section 2.B.3.3 Controlling Access to Areas Containing FTI and NIST Control AC-1, Access Control Policy and Procedures.
  The policy/procedures must address the issuance of appropriate authorization credentials, including badges, identification cards or smart cards and include proper use and accountability requirements. The policy/procedures must also include the prohibition of allowing individuals to "piggyback" or "tailgate" into any location containing FTI.

- **Audit and Accountability** - see NIST Control AU-1, Audit and Accountability Policies and Procedures
  The policy/procedures must address purpose, scope, roles, responsibilities, compliance, management commitment and coordination among organizational entities. Agencies must develop, document, and implement remediation actions for violations of the audit and accountability policy.

- **Media Protection** – see NIST Control MP-1, Media Protection Policies and Procedures
  The policy/procedures must cover the protection of media to include access, marking, storage, transport, use and sanitization. See NIST Controls MP-1 through MP 7.

- **Physical and Environmental** – See NIST Control PE-1
  The policy/procedures must include a clean desk policy for the protection of FTI; designate restricted IT areas that house IT assets such as, but not limited to, mainframes, servers, controlled interface equipment, associated peripherals, and communications equipment; and address specific building access systems, as needed.

- **Personnel Security** – See NIST PS-1, Personnel Security Policy and Procedures
  The policy/procedures must address position risk designation, personnel screening, personnel termination, personnel transfer, access agreements and personnel sanctions.

- **Insider Threat Program**– See NIST Control PM-12, Insider Threat Program
  The policy/procedures must address an insider threat program that includes a cross-discipline insider threat incident handling team and designate a senior official as the responsible individual to implement and provide oversight for the program.

- **Privacy Program Plan**[3] – See NIST Control PM-18, Privacy Program Plan
  A privacy program plan is a formal document that provides an overview of an agency's privacy program, including a description of the structure of the privacy program, the resources dedicated to the privacy program, the role of the Senior Agency Official for Privacy and other privacy officials and staff, the strategic goals and objectives of the privacy program and the program management and common controls in place or planned for meeting applicable privacy requirements and managing privacy risks.

---

[3] NIST Privacy Control

A621

TD_0000284

## 2.C.3 Background Investigation Minimum Requirements

Determining the suitability of individuals who require access to U.S. government SBU information, including FTI, is a key factor in ensuring adequate information security. Prior to granting access to FTI and periodically thereafter, the Agency must complete a suitability background investigation that is favorably adjudicated by the Agency and to include, at a minimum, the following requirements:

- Agencies must develop a written policy requiring that employees, contractors, and sub-contractors (if authorized), with access to FTI must complete a background investigation that is favorably adjudicated. The policy will identify the process, steps, timeframes, and favorability standards that the agency has adopted. The agency may adopt the favorability standards set by the Federal Investigative Standards (FIS) or one that is currently used by another state agency, or the Agency may develop its own standards specific to FTI access.

- The written background investigation policy must establish a result criterion for each required element that defines what would result in preventing or removing an employee's, contractor's and sub-contractor's access to FTI.

- Agencies must initiate a background investigation for all employees, contractors, and sub-contractors prior to permitting access to FTI.

- State agencies must ensure a reinvestigation is conducted within five (5) years from the date of the previous background investigation for each employee, contractor, and sub-contractor requiring access to FTI.

- Agencies must make written background investigation policies and procedures as well as a sample of completed employee, contractor, and sub-contractor background investigations available for inspection upon request.

- Background investigations for any individual granted access to FTI must include, at a minimum:

  1. FBI fingerprinting (FD-258) - review of Federal Bureau of Investigation (FBI) fingerprint results conducted to identify possible suitability issues. Contact the appropriate state identification bureau for the correct procedures to follow. A listing of state identification bureaus can be found at: https://www.fbi.gov/about-us/cjis/identity-history-summary-checks/state-identification-bureau-listing.

     This national agency check is the key to evaluating the history of a prospective candidate for access to FTI. It allows the Agency to check the applicant's criminal history in all 50 states, not only current or known past residences.

  2. Check of local law enforcement agencies where the subject has lived, worked, and/or attended school within the last five (5) years and if applicable, of the appropriate agency for any identified arrests.

     The local law enforcement check will assist agencies in identifying trends of misbehavior that may not rise to the criteria for reporting to the FBI database but is a good source of information regarding an applicant.

  3. Citizenship/residency – Validate the subject's eligibility to legally work in the United States (e.g., a United States citizen or foreign citizen with the necessary authorization).

53

TD_0000285

Employers must complete USCIS Form I-9 to document verification of the identity and employment authorization of each new employee hired after November 16, 1986, to work in the United States. Within three (3) days of completion, any new employee must also be processed through E-Verify to assist with verification of their status and the documents provided with the Form I-9. The E-Verify system is free of charge and can be located at www.uscis.gov/e-verify. This verification process may only be completed on new employees. Any employee with expiring employment eligibility must be documented and monitored for continued compliance.

Federal agencies must conduct a suitability or security background investigation based on the position sensitivity of the individual's assigned position and risk designation associated with the investigative Tier established by the FIS. Granting access to FTI requires, at a minimum, a Tier 2 level investigation.

A FIS Tier 2 standard background investigation meets the suitability investigative requirement for non-sensitive positions designated as moderate risk public trust (requested using Standard Form 85P). Investigations conducted at Tiers 2-5 meet the minimum standard for an employee, contractor, and sub-contractor with access to FTI. Federal agencies may be asked to provide evidence that the required background investigation was conducted for each individual granted access to FTI. FIS standards require reinvestigation, at a minimum, every five (5) years.

State and local agencies that are not required to implement the federal background investigation standards must establish a personnel security program that ensures a background investigation is completed at the appropriate level for any individual who will have access to FTI using the guidance above as the minimum standard, with a reinvestigation conducted within five (5) years from the previous investigation.

## 2.C.3.1 Background Investigation Requirement Implementation

Agencies must establish a written background investigation policy that conforms to the standards of Section 2.C.3. Agencies must also identify all employees, contractors, and sub-contractors who currently have access to FTI and have not completed the required personnel security screening and initiate a background investigation that meets these standards. Agencies must initiate a background investigation for all newly hired employees, contractors, and sub-contractors who will require access to FTI to perform assigned duties. All adjudications must be done by the agency or another state agency delegated to perform, such as an Office of Administration or HR agency.

Federal agencies that completed a Moderate-Risk Background Investigation (MBI) or higher for individuals with access to FTI, prior to the October 2014 implementation date of the FIS Tier 2 standard investigation, have met the minimum standard and no further investigation is needed so long as reinvestigation is timely scheduled. Individuals granted access to FTI based on a National Agency Check with Inquiries (NACI) is not sufficient and a Tier 2 investigation must be initiated for continued access to FTI.

## 2.C.4 Personnel Actions

## 2.C.4.1 Personnel Transfer

When reassignments or transfers of individuals are permanent or of such extended durations certain actions are warranted. Agencies must define actions appropriate for these types of reassignments or transfers, whether permanent or extended. Actions that may be required for personnel transfers or reassignments to other positions within organizations include, for example, returning old and issuing new keys, identification cards and building passes; closing system accounts and establishing new accounts; changing system access authorizations (i.e., privileges); and access to official records to which individuals

TD_0000286

had access at previous work locations and in previous system accounts. See NIST Control PS-5, Personnel Transfer.

## 2.C.4.2 Personnel Sanctions

Agencies must document in policy and procedure a formal sanctions process for individuals failing to comply with established information security policies and procedures. Agencies must notify designated agency personnel within 72 hours when a formal employee sanction process is initiated, identifying the individual sanctioned and any required administrative actions. See NIST Control PS-8, Personnel Sanctions.

When the formal sanction is a proposed disciplinary or adverse action involving an unauthorized access or disclosure of FTI, the agency must provide written notification to the taxpayer whose FTI was subject to unauthorized access or disclosure. The required written notification must include the date the unauthorized access or disclosure of FTI occurred and the rights of the taxpayer under IRC § 7431 (see Section 1.8.5, Incident Response Notification to Impacted Individuals).

## 2.C.4.3 Personnel Termination

In personnel termination situations, certain actions are required. Timely execution of termination actions is essential for individuals terminated for cause. In certain situations, agencies must consider disabling the system accounts of individuals that are being terminated prior to the individuals being notified.

Exit interviews ensure that terminated individuals understand the security constraints imposed by being former employees and that proper accountability is achieved for system-related property. System-related property includes, for example, hardware authentication tokens, system administration technical manuals, keys, identification cards and building passes. See NIST Control PS-4, Personnel Termination.

## 2.C.5 Commingling of FTI

Commingling of FTI refers to having FTI and non-FTI data stored together, regardless of format. For example, commingling occurs when FTI is included in a sentence of text in a paper notice or letter; a row or column containing FTI in a database table; files stored on electronic media where some contain FTI and some do not; or at a shared data center where some systems contain FTI that require access restrictions, and some do not. Any kind of commingling creates the need for additional controls, since the introduction of FTI requires the entire letter, data table, removable media, etc. be handled and protected as FTI.

It is recommended that FTI be kept physically and logically separate from other information to the maximum extent possible to avoid inadvertent disclosures and need for additional controls. Agencies should attempt to avoid maintaining FTI as part of their case files including any recordation or transcription in case notes or activity logs, whether paper or electronic.

In situations where physical separation is impractical, the file must be clearly labeled to indicate that FTI is included and the file must be safeguarded.

If a new address is received from IRS records and entered into a computer database, the address must be identified as FTI and safeguarded.

If the taxpayer or third party subsequently provides the address independently, the address will not be considered FTI as long as the address is overwritten using individual or third-party knowledge or records as the source of information to replace the IRS source address.

A624

TD_0000287

All FTI must be removed prior to releasing files to an individual or agency without authorized access to FTI.

## 2.C.5.1 Commingling of Electronic Media

If FTI is recorded on electronic media (e.g., tapes) with other data, it must be protected as if it were entirely FTI. Such commingling of data on electronic media should be avoided.

When data processing equipment is used to process or store FTI and the information is mixed with agency data, access must be controlled by:

- Restricting computer access only to authorized personnel

- Systemic means, including labeling; for additional information, see NIST Control MP-3, Media Marking

- When technically possible, data files, data sets and shares must be overwritten after each use

> Commingled data at multi-purpose facilities results in security and privacy risks that must be addressed. If the agency shares physical or computer facilities with other agencies, departments or individuals not authorized to have FTI, strict physical and systemic controls must be maintained to prevent unauthorized disclosure of this information.

## 2.C.6 Access to FTI via State Tax Files or Through Other Agencies

Some state disclosure statutes and administrative procedures permit access to state tax files by other agencies, organizations or employees not involved in tax matters. As a general rule, IRC § 6103(d) does not permit access to FTI by such employees, agencies, or other organizations. The IRC clearly provides that FTI will be furnished to state tax agencies only for tax administration purposes and made available only to designated state tax personnel and legal representatives or to the state audit agency for an audit of the tax agency. Questions about whether particular state employees are entitled to access FTI must be forwarded to the Disclosure Manager at the IRS Office that serves your location[4].

Generally, the IRC does not permit state tax agencies to furnish FTI to other state agencies or to political subdivisions, such as cities or counties. State tax agencies may not furnish FTI to any other state or local agency, even where agreements have been made, informally or formally, for the reciprocal exchange of state tax information unless formally approved by the IRS. Also, non-government organizations, such as universities or public interest organizations performing research, cannot have access to FTI.

Although state tax agencies are specifically addressed previously in this section, the restrictions on data access and non-disclosure to another agency or third party applies to all agencies authorized to receive FTI. Generally, statutes that authorize disclosure of FTI do not authorize further disclosures by the recipient agency. Unless IRC § 6103 provides for further disclosures by the agency, the agency cannot make such disclosures or otherwise grant access to FTI to either employees of another component of the agency not involved with administering the program for which the FTI was specifically received or to another state agency for any purpose.

Agencies and subdivisions within an agency may be authorized to obtain the same FTI for different purposes, such as a state tax agency administering tax programs (IRC § 6103(d)) and a component

---

[4] Refer to https://www.irs.gov/privacy-disclosure/irs-freedom-of-information for contact information.

TD_0000288

human services agency administering benefit eligibility verification programs (IRC § 6103(l)(7)) or child support enforcement programs (IRC § 6103(l)(6)).

## 2.C.7 Offshore Operations

FTI cannot be accessed by agency employees, agents, representatives, contractors, or sub-contractors located outside of the legal jurisdictional boundary of the United States (outside of the United States, its territories, embassies, or military installations). FTI must not be received, processed, stored, accessed, or transmitted to (IT) systems located offshore nor may FTI be sent offshore for disposal. Systems containing FTI must be located, operated and maintained by personnel physically located within the United States (this prohibits foreign remote maintenance, foreign call centers, help desks and the like) and should follow Publication 1075 requirements including the Background Investigation Requirements in Section 2.C.3.

Some agencies may have a need for their employees to travel internationally for business purposes. As such, agencies must develop procedures to follow during foreign travel. When agency employees travel abroad, they must not:

- Bring IT equipment containing stored FTI (e.g., laptop computers, tablets, phones, removable media); or

- Access agency systems that receive, process, store, protect and/or transmit FTI.

During international travel, batteries of agency-managed or Bring Your Own Device (BYOD) mobile devices and laptops must be removed from battery-powered mobile devices and stored separate from the device when left unattended. SIM cards must be removed and stored separate from devices that employ them when entering non-U.S. customs. Once agency employees return from abroad, it is important for agencies to ensure the continued security of networks where FTI resides. Agencies must sanitize all devices taken abroad prior to allowing them to connect to their trusted network. Additionally, agencies must disable wireless connectivity options until devices have been sanitized and may wish to provide additional security training for employees travelling abroad.

## 2.C.8 Controls Over Processing

The agency must establish adequate controls to prevent disclosing FTI to other state agencies, tax or non-tax, or to political subdivisions, such as cities or counties, for any purpose, including tax administration, absent explicit written IRS authority granted under IRC § 6103(p)(2)(B).

Processing of FTI in an electronic media format including removable media, microfilms, photo impressions or the conversion to other formats (including tape reformatting or duplication, reproduction or conversion to digital images or hard copy printout) will be performed as indicated in the environments listed in 2.C.8.1 and 2.C.8.2.

### 2.C.8.1 Agency-owned and Operated Facility

Processing under this method will take place in a manner that will protect the confidentiality of the information on the electronic media. All safeguards outlined in this publication also must be followed and will be subject to IRS safeguard reviews.

### 2.C.8.2 Agency, Contractor or Sub-Contractor Shared Facilities

Recipients of FTI are permitted to use a shared facility but only in a manner that does not allow access to FTI by employees, agents, representatives, or contractors of other agencies using the shared facility.

TD_0000289

For purposes of applying sections 6103(l), (m) and (n), the term "agent" includes contractors and sub-contractors.

Access restrictions pursuant to the IRC authority by which the FTI is received continue to apply; for example, human services agencies administering benefit eligibility programs may not allow contractors or sub-contractors, including consolidated data center contractors, access to any FTI.

The agency must include, as appropriate, the requirements specified in Exhibit 7, Safeguarding Contract Language.

The agency, as well as its contractor, sub-contractor and shared sites that receive, process, store, access, protect and/or transmit FTI, are subject to Safeguard reviews.

These requirements also apply to releasing electronic media to a private contractor, sub-contractor or other agency office, even if the purpose is merely to erase the old media for reuse.

## 2.C.9 Service Level Agreements (SLA)

Agencies using support functions, including, but not limited to, consolidated data centers, shared print facilities, and disaster recovery sites, must implement appropriate controls to ensure the protection of FTI. This includes a service level agreement (SLA) between the agency authorized to receive FTI and support functions. The SLA must cover the following:

- The agency with authority to receive FTI is responsible for ensuring the protection of all FTI received. The state support function shares responsibility for safeguarding FTI.

- The Exhibit 7 language must be included in the SLA between the recipient agency and support functions and in all contracts involving contractors or sub-contractors hired by the state support function.

- The SLA provides written notification to the state support function's management that they are bound by the provisions of Publication 1075, relative to protecting all FTI within their possession or control.

- The SLA shall detail the IRS's right to inspect state support function facilities and operations receiving, processing, storing, accessing, protecting and/or transmitting FTI under this agreement to assess compliance with requirements defined in IRS Publication 1075. The SLA shall specify that IRS's right of inspection includes the use of manual and/or automated scanning tools to perform compliance and vulnerability assessments of information technology (IT) assets that access, store, process or transmit FTI.

- The SLA shall detail the state support function's responsibilities to address corrective action recommendations to resolve findings of noncompliance identified by IRS inspections.

- The agency will conduct an internal inspection of the state support function every 18 months, as described in Section 2.D.3, Internal Inspections. Multiple agencies sharing a state support function such as a consolidated data center may partner together to conduct a single, comprehensive internal inspection. However, care must be taken to ensure agency representatives do not gain unauthorized access to other agencies' FTI during the internal inspection.

- The employees from the state support function with access to or use of FTI, including system administrators and programmers, must:

TD_0000290

1.  Meet the background check requirements defined in Background Investigation Minimum Requirements and

2.  Receive disclosure awareness training and sign a confidentiality statement, prior to initial access to or use of FTI, as well as annually thereafter. These provisions also extend to any contractors or sub-contractors hired by the state support function that have authorized access to or use of FTI.

- The specific data breach incident reporting procedures for all state support function employees, contractors and sub-contractors must be covered. The required disclosure awareness training must include a review of these procedures.

- Responsibilities must be identified for coordination of the 45-day notification of the use of contractors or sub-contractors with access to FTI.

- Require a formal sanction process for individuals covered by the SLA for failing to comply with established FTI security policies and procedures. Notification of designated agency personnel is required within 72 hours when the formal sanction is a proposed disciplinary or adverse action involving an unauthorized access or disclosure of FTI and must include the date the unauthorized access or disclosure of FTI occurred.

> Generally, consolidated data centers are operated either by a separate state agency (e.g., Department of Information Services) or by a private contractor or sub-contractor. If an agency is considering transitioning to either a state-owned or private vendor consolidated data center, the Office of Safeguards strongly suggests the agency submit a request for discussions with Safeguards as early as possible in the decision making or implementation planning process. The purpose of these discussions is to ensure the agency remains compliant with safeguarding requirements during the transition to the consolidated data center.

## 2.C.10 Review Availability of Contractor and Sub-Contractor Facilities

As part of the agency review process, all affiliated contractors and sub-contractors who receive, transmit, process and store FTI on behalf of the agency are subject to review and testing.

The agency must include Exhibit 7, Safeguarding Contract Language for all contracts.

> These requirements also apply to releasing electronic media to a private contractor, sub-contractor or other agency office, even if the purpose is merely to erase the old media for reuse.

## 2.C.11 Restricting Access – Other Disclosures

### 2.C.11.1 Child Support Agencies—IRC §§ 6103(l)(6), (l)(8) and (l)(10)

In general, no officer or employee of any state or local child support enforcement agency can make further disclosures of FTI.

However, limited information may be disclosed to agents, contractors or sub-contractors of the agency for the purpose of, and to the extent necessary in, establishing and collecting child support obligations from and locating individuals owing such obligations.

The information that may be disclosed for this purpose to an agent, contractor, or a sub-contractor is limited to:

- The address

59

A628

TD_0000291

- Social Security Number of an individual with respect to whom child support obligations are sought to be established or enforced

- The amount of any reduction under IRC § 6402(c) in any overpayment otherwise payable to such individual

Tax refund offset payment information may not be disclosed by any federal, state or local child support enforcement agency employee, representative, agent, contractor, or sub-contractor into any court proceeding. To satisfy the re-disclosure prohibition, submit only payment date and payment amount for all payment sources (not just tax refund offset payments) into court proceedings.

Additional information regarding the use of FTI for child support enforcement purposes can be found at: https://www.irs.gov/privacy-disclosure/use-of-federal-tax-information-fti-for-child-support-enforcement-purposes-matrix

> Forms 1099 and W-2 information are not authorized by statute to be disclosed to contractors or sub-contractors under the child support enforcement program (IRC § 6103(l)(6)).

## 2.C.11.2 Human Services Agencies—IRC § 6103(l)(7)

No officer or employee of any federal, state, or local agency administering certain programs under the Social Security Act, the Food Stamp Act of 1977, or Title 38, United States Code, or certain housing assistance programs is permitted to make further disclosures of FTI for any purpose. Human services agencies may not contract for services that involve the disclosure of FTI to contractors or sub-contractors.

## 2.C.11.3 Deficit Reduction Agencies—IRC § 6103(l)(10)

Agencies receiving FTI from Bureau of Fiscal Service (BFS) related to tax refund offsets are prohibited from making further disclosures of the FTI received unless authorized.

## 2.C.11.4 Centers for Medicare and Medicaid Services—IRC § 6103(l)(12)(C)

The Administrator of the Centers for Medicare and Medicaid Services (CMS) is authorized under IRC § 6103(l)(12)(C) to disclose FTI it receives from SSA to its agents for the purpose of, and to the extent necessary in, determining the extent that any Medicare beneficiary is covered under any group health plan. A contractual relationship must exist between CMS and the agent. The agent, however, is not authorized to make further disclosures of FTI for any purpose.

## 2.C.11.5 Disclosures under IRC § 6103(l)(20)

Disclosures to officers, employees, contractors, and sub-contractors of SSA and other specified agencies are authorized to receive specific tax information for the purpose of carrying out the Medicare Part B premium subsidy adjustment and Part D Base Beneficiary Premium Increase. These disclosures and any redisclosures authorized by this provision are subject to safeguards requirements.

## 2.C.11.6 Disclosures under IRC § 6103(l)(21)

Disclosures to officers, employees, contractors, and sub-contractors of the U.S. Department of Health and Human Services (HHS) are at the request of a taxpayer seeking financial assistance for health insurance affordability programs. HHS may release FTI to an Exchange established under the Affordable Care Act or a state agency administering eligibility determinations for Medicaid or Children's Health Insurance Programs for the purpose of establishing eligibility for participation in the Exchange, verifying the appropriate amount of any credits and determining eligibility for participation in the state program. These

60

TD_0000292

disclosures are subject to safeguards requirements. Any agent contractor, or sub-contractor is also subject to IRS safeguard requirements and review.

IRC § 6103(l)(21)(C) may allow HHS Office of Inspector General to have access to FTI maintained in the eligibility records of an Exchange or state entity administering these programs, under certain limited circumstances. This authority does not extend to independent state audit agencies that may not have access to FTI in eligibility records unless a contractual relationship is established that conforms to the disclosure requirements of IRC § 6103.

## 2.C.11.7 Disclosures under IRC § 6103(i)

Federal law enforcement agencies receiving FTI pursuant to court orders or by specific request under section 6103(i) for purposes of investigation and prosecution of non-tax federal crimes, or to apprise of or investigate terrorist incidents, are subject to safeguards requirements and review.

The Department of Justice (DOJ) must report in its SSR the number of FTI records provided and to which federal law enforcement agency the data was shared for the calendar year processing period.

## 2.C.11.8 Disclosures under IRC § 6103(m)(2)

Disclosures to agents of a federal agency under IRC § 6103(m)(2) are authorized for the purposes of locating individuals in collecting or compromising a federal claim against the taxpayer in accordance with Sections 3711, 3717 and 3718 of Title 31. If the FTI is shared with agents, contractors, or sub-contractors, the agency and agents, contractors, or sub-contractors are all subject to IRS safeguarding requirements and reviews.

## 2.D Other Safeguards - IRC § 6103(p)(4)(D)

### 2.D.1 General

IRC § 6103(p)(4)(D) requires that agencies receiving FTI provide other safeguard measures, as appropriate, to ensure the confidentiality of the FTI. Agencies are required to provide a training program for their employees, contractors, or sub-contractors.

### 2.D.2 Training Requirements

Education and awareness are necessary to provide employees, contractors, sub-contractors, and other persons with the information to protect FTI. There are multiple components to a successful training program. In this section, training requirements are consolidated to ensure agencies understand the requirements to comply with this publication.

Disclosure awareness training is described in detail within Section 2.D.2.1, Disclosure Awareness Training. Additional training requirements are located in various sections of the document and identified in the following table.

61

TD_0000293

## Table 2 – Training Requirements

| Training Component | Applicability | Section |
|---|---|---|
| Disclosure Awareness Training | • Specific to protection of FTI and prevention of unauthorized disclosure | **2.D.2.1** |
| Security and Privacy Awareness Training | • Provides basic security and privacy awareness training to information system users | **AT-2** |
| Role-Based Training | • Provides individualized training to personnel based on assigned security roles and responsibilities | **AT-3** |
| Contingency Training | • Provides individualized training to personnel based on assigned roles and responsibilities as they relate to recovery of backup copies of FTI | **CP-3** |
| Incident Response Training | • Provides individuals with agency-specific procedures to handle incidents<br>• Provides individuals with IRS-specific requirements pertaining to incidents involving FTI | **IR-2** and<br><br>**1.8** |
| Insider Threat Awareness Training | • Provides individuals with agency-specific procedures to increase insider threat awareness | **PM-12** |

## 2.D.2.1 Disclosure Awareness Training

Prior to granting an authorized agency employee, state support employee, contractor, or sub-contractor access to FTI, or to systems containing FTI, each employee, contractor, or sub-contractor must certify their understanding of the agency's security and privacy policy and procedures for safeguarding FTI through the agency's disclosure awareness training. The use of FTI in any training environment, including Disclosure Awareness training or material, is prohibited.

Disclosure awareness training (including role-based training) must provide personnel who have access to FTI with initial and annual training on:

- Organizational authority for receiving FTI

- Authorized uses of FTI

- Disclosure of FTI with external parties only when authorized

(Page 249 of Total)

A631

TD_0000294

- Consequences of unauthorized access, use or disclosure of FTI

Employees, contractors, and sub-contractors must be advised of the penalty provisions of IRC §§ 7431, 7213, and 7213A (see Exhibit 4, Sanctions for Unauthorized Disclosure, and Exhibit 5, Civil Damages for Unauthorized Disclosure).

The training provided before the initial certification and annually thereafter must also cover the incident response policy and procedure for reporting unauthorized disclosures and data breaches (see Section 1.8, Reporting Improper Inspections or Disclosures).

During this training, agencies must make employees, contractors, or sub-contractors aware that disclosure restrictions and penalties apply even after employment or contract with the agency has ended.

For the initial certification, and each annual recertification thereafter, the employee, contractor or sub-contractor must sign, either with ink or electronic signature, a confidentiality statement certifying their understanding of penalty provisions and the security requirements. It must also contain a statement that the employee understands they must report possible improper inspection or disclosure of FTI, including breaches and security incidents to both TIGTA and Safeguards within 24 hours.

> Example: I understand the penalty provisions of IRC §§ 7431, 7213 and 7213A.

> Example: I understand upon discovering a possible improper inspection or disclosure of FTI, including breaches and security incidents, I must follow the proper incident reporting requirements to ensure the Office of Safeguards and the Treasury Inspector General for Tax Administration are notified of a possible issue involving FTI.

The initial certification and recertification must be documented and placed in the agency's files for review and retained for at least five (5) years.

The agency must include practical exercises in awareness training that simulate security and privacy incidents. Practical exercises may include, for example, social engineering attempts to collect information, gain unauthorized access, or simulate the adverse impact of opening malicious email attachments or invoking, via spear phishing attacks, malicious web links. Privacy-related practical exercises may include, for example, practice modules with quizzes on handling FTI and affected individuals in various scenarios. See NIST Control AT- 2 (CE1).

The agency must include role-based security and privacy training, including insider threat awareness, to personnel with access to FTI. Role-based training for security and privacy may include, for example, security and privacy training for software developers that includes simulated cyber-attacks exploiting common software vulnerabilities, or spear/whale phishing attacks targeted at senior leaders/executives. Role-based training on handling FTI helps prevent unauthorized collections or uses of FTI. See NIST Control AT-3 (CE3 and CE5)

At least once per quarter, agencies must distribute security and privacy awareness reminders/updates to all users. This is in addition to annual awareness training. Security and privacy awareness updates can be disseminated to appropriate personnel by using a variety of methods, such as, but not limited to:

- Email and other electronic messages to inform users

- Discussion at group and managerial meetings

- Security bulletin boards throughout the secure work areas

63

TD_0000295

- Security articles in employee newsletters

- Pertinent articles that appear in the technical or popular press to share with members of the management staff

- Posters to display with short, simple educational messages (e.g., instructions on reporting unauthorized access "UNAX" violations)

- Additional formal and informal training

## 2.D.2.2 Disclosure Awareness Training Products

The following resources are available from the IRS to assist your agency in meeting the federal safeguard requirements for disclosure awareness and the protection of FTI. Technical information is available to you on the Office of Safeguards website at https://www.irs.gov/uac/safeguards-program.

Some of the following products can be ordered from the IRS Distribution Center by calling 800-TAX-FORM (829-3676). Be sure to identify yourself as a (state) government employee and please provide the publication number and quantity. Please note that all Notice 129 quantities are ordered by pad or roll count (100 pieces per, so 10 rolls = 1,000 labels). All products will be delivered to the agency address you provide and to the attention of the person you specify. Please do not call the tax help number (800-829-4933) but, if you experience an ordering problem, obtain the employee's name and ID number and send an email to SafeguardReports@irs.gov mailbox so the Office of Safeguards can assist you.

**Protecting FTI, Pocket Guide for Government Employees** (Provides basic disclosure concepts and warns of civil and criminal sanctions for misuse of FTI)
Available through Distribution Center: Publication 4761

**UNAX is Serious** 11" x 17" Poster
Available through Distribution Center:  Document 12800

**Stop UNAX In Its Tracks** Tri-fold handout
Available through Distribution Center:  Document 12612

**Publication 1075, Tax Information Security and Privacy Guidelines for Federal, State and Local Agencies** (Key publication explains the federal safeguard requirements)
Available online: http://www.irs.gov/pub/irs-pdf/p1075.pdf

**Safeguards Disclosure Awareness Videos** (Explains key safeguard concepts for protecting the confidentiality of FTI)[5]
Available online through Safeguards website: https://www.irs.gov/uac/irs-disclosure-awareness-videos

## 2.D.3 Internal Inspections and On-Site Reviews

Another measure IRS requires for the safeguarding of FTI is internal inspections by the recipient agency. The purpose is to ensure that the security and privacy policies and procedures established by the agency to protect FTI are functioning, maintained, and enforced. The agency must submit copies of these inspection reports (see Internal Inspection Template on the Office of Safeguards website) to the IRS with the SSR (see Section 2.E.4, Safeguard Security Report). To provide an objective assessment, the inspection should be conducted by agency personnel outside the FTI using function being inspected.

---

[5] The use of the Safeguards Disclosure Awareness Video does not completely satisfy the training requirements of NIST 800-53 Revision 5.

TD_0000296

To provide reasonable assurance that FTI is adequately safeguarded, the inspection must address the safeguard requirements the IRC and IRS impose. The agency must monitor and audit privacy controls and internal privacy policy to ensure effective implementation.

In a situation where it is unwieldy or otherwise not feasible for agency leadership to personally conduct the inspection, it is permissible for off-site locations with access to FTI to self-certify the internal inspection. If possible, the agency should make an initial visit to the off-site location prior to disclosing FTI and conduct an initial inspection. The agency must ensure the self-certified inspection is signed by an agency employee, received timely, reviewed thoroughly, have in-depth discussions with the person conducting the self-certification and submit the self-certified inspections with the agency SSR.

Contractors and sub-contractors may not conduct self-certification internal inspections.

Agencies must establish a review cycle as follows:

- Field offices receiving FTI at least every three (3) years

- Headquarters office facilities housing FTI and the agency computer facility at least every 18 months

- All contractors and sub-contractors with access to FTI, including a consolidated data center or off-site storage facility: at least every 18 months

The agency must complete a documented schedule (internal inspection plan), detailing the timing of all internal inspections in the current year and next two years (three-year cycle). The plan must be included as part of the SSR, as described in Section 2.E.4.

Inspection reports, including a record of corrective actions, must be retained by the agency for a minimum of five years from the date the inspection was completed. IRS personnel may review these reports during a safeguard review. A summary of the agency's findings and the actions taken to correct any deficiencies must be included with the SSR submitted to the IRS.

Required items to review during internal inspections include recordkeeping, secure storage, limited access, disposal, and cybersecurity.

## 2.D.4 Recordkeeping

Each agency and function within that agency shall maintain a log of all requests for FTI, including receipt and disposal of returns or return information. This includes any medium containing FTI, such as computer tapes, cartridges, CDs, or data received electronically.

## 2.D.5 Secure Storage

FTI (including tapes, cartridges, or other removable media) must be stored in a secure location, safe from unauthorized access.

## 2.D.6 Limited Access

Access to returns and return information (including tapes, cartridges, or other removable media) must be limited to only those employees, officers, contractors, and sub-contractors who are authorized access by law or regulation and whose official duties require such access.

The physical and systemic barriers to unauthorized access must be reviewed and reported. An assessment of facility security features must be included in the report.

TD_0000297

## 2.D.7 Disposal

Upon completion of use, agencies must ensure that the FTI is destroyed or returned to the IRS or the SSA according to the guidelines contained in Section 2.F, Disposing of FTI - IRC § 6103(p)(4)(F).

## 2.D.8 Computer Systems Security

The agency's review of the adequacy of its cybersecurity provisions must provide reasonable assurance that access to FTI is limited to personnel who have a need-to-know. This need-to-know must be enforced electronically as well as physically (see Internal Inspection Template on the Office of Safeguards website and Section 4.1, Access Control, and other portions of Section 3.0, Cyber security Requirements, as applicable).

> The review of the computer facility must include the evaluation of cybersecurity and physical security controls.

## 2.D.9 Plan of Action and Milestones (POA&M)

The agency must implement a process for ensuring that corrective actions are developed and monitored. The process must include the findings identified during the internal inspections and the remediation plans and dates to resolve these findings.

> Although similar, the IRS CAP covers findings identified by the Office of Safeguards during the safeguard review and would not include or track agency findings from the internal inspection process.

## 2.E Reporting Requirements – IRC § 6103(p)(4)(E)

### 2.E.1 General

> IRC § 6103(p)(4)(E) requires agencies receiving FTI to report on procedures established and used for ensuring the confidentiality of FTI that is received, processed, stored, accessed, protected, and/or transmitted to or from the agency. The major reporting requirements include the SSR, CAP and 45-day notification.

### 2.E.2 Report Submission Instructions

Correspondence, reports, and attachments must be sent electronically to the Office of Safeguards using one of the following two methods:

- SDT, if the agency participates in the SDT program.

- Email to Safeguards mailbox at SafeguardReports@irs.gov. Email transmissions must be sent by an IRS-approved encrypted method as outlined in Section 2.E.3, Encryption Requirements.

Agencies must follow the requirements below when submitting correspondence, reports, and attachments to the Office of Safeguards:

- Submissions must include a signed certification letter from the Head of Agency or a designee. In the event the agency submits a report signed by a designee, there must be a delegation of authority signed by the Head of Agency (HOA).

- All correspondence requiring HOA signature must be in the form of a handwritten (aka. Wet) signature or a digital certificate signature. The HOA can delegate individuals to sign these

66

TD_0000298

documents on their behalf. To do so, the HOA must provide a delegation of authority for individual they will assign as their designee. The delegation of authority must be kept current by the agency and retained for at least three years and will be reviewed by IRS personnel during Safeguard reviews.

- Submissions must be made using official templates provided by the Office of Safeguards.

- Reports referencing file attachments must clearly identify the filename and section contained within the attachment being referenced.

- Attachments must be named clearly and identify the associated section in the SSR, CAP or 45-day notification.

- Attachment filenames must follow a standardized naming convention, either by a logical order (e.g., CAPATT1, CAPATT2) or by finding number (e.g., D.1, H.1.3, H.13.4).

- Attachments must not be embedded into the SSR, CAP or 45-day notification.

## 2.E.3 Encryption Requirements

The Office of Safeguards requires that all reports, when sent to the Office of Safeguards via email, be transmitted using IRS-approved encryption methods to protect sensitive information. Agencies are requested to adhere to the following guidelines to use encryption:

- Compress files in .zip or .zipx formats

- Encrypt the compressed file using Advanced Encryption Standard

- Use a minimum of 128-bit encryption key string

- Ensure a strong password or passphrase is generated to encrypt the file

- Communicate the password or passphrase with the Office of Safeguards through a separate email or via a telephone call to your IRS contact person. Do not provide the password or passphrase in the same email containing the encrypted attachment.

Refer to your specific file compression software user guide for instructions on how to compress and encrypt files. Known compatible products with IRS include but are not limited to WinZip and Secure Zip.

Please remember, while the attachment is encrypted, the subject line and content of the email message will not be encrypted, so it is important that any sensitive information be contained in the attachment (encrypted document).

## 2.E.4 Safeguards Security Reports (SSR)

The SSR is the primary method for agencies to report to the IRS Office of Safeguards processes, procedures, and security and privacy controls in place to protect FTI in compliance with IRC § 6103(p)(4). Agencies have an annual requirement to submit SSRs after their initial receipt of FTI. There are enhanced requirements for agencies that are applying to receive FTI for the first time and for existing agencies requesting new FTI data streams.

67

A636

TD_0000299

## 2.E.4.1 Initial SSR Submission Instructions – New Agency Responsibilities

Agencies executing data exchange agreements involving access to FTI will be subject to safeguarding requirements and must provide evidence that adequate safeguard protections and controls are in place before IRS will authorize the release of FTI. The agency must submit an initial SSR for approval at least 90 days prior to the agency's planned FTI receipt date.

In order to obtain initial IRS approval to receive FTI, an agency must have an approved SSR. To facilitate IRS approval, the agency is expected to:

- Designate an agency Safeguards POC, see Section 1.5 Coordinating Safeguards Within an Agency

- Make program officials, contractors, and/or sub-contractors available to discuss access and use of FTI, as needed

The agency is required to submit evidentiary documentation for the controls shown in Table 3 in conjunction with the first submission of the agency's SSR.

68

A637

TD_0000300

| | Table 3 – SSR Evidentiary Documentation | |
|---|---|---|
| **800-53 Control** | **Control Name** | **Evidentiary Documents (Artifacts) for Review** |
| Section 2.C.5 | Commingling and Labeling | • Screenshots of database schemas that will show electronic FTI labeling<br>• Sample output (report/notice) that will show how FTI is labeled |
| AC-6 | Least Privilege | • FTI data flow diagram (physical and logical) that will include all devices and inputs/outputs<br>• Access Control Policy and Procedures |
| AC-17 | Remote Access | • Screenshot of authentication screens |
| AC-20 | Use of External Systems | • Access Control Policy and Procedures that will show the prohibition of using non-agency owned devices to access FTI and the FTI network |
| AU-2 | Audit Events | • Audit and accountability policy and procedures for FTI information systems (e.g., network infrastructure, operating systems, databases, and applications with FTI)<br>• Log Monitoring Policy (recordkeeping) |
| AU-3 | Content of Audit Records | • Sample audit logs for all technologies/components associated with FTI |
| AT-4 | Training Records | • Training material (for users and system security personnel)<br>• Sample certification statement |
| CA-2 | Assessments | • Independent Security Assessment Report (SAR) or other report reflecting the results of security testing, highlighting findings deemed "critical" or "high" |
| CA-5 | Plan of Action and Milestones | • POA&M report that will show the completed risk mitigation activities and planned mitigation activities for identified weaknesses |
| CA-6 | Authorization | • Documentation appointing the system Authorization Official<br>• Signed Authority to Operate (ATO) for new systems (or DRAFT if ATO not yet granted) |

69

A638

TD_0000301

| | Table 3 – SSR Evidentiary Documentation | |
|---|---|---|
| 800-53 Control | Control Name | Evidentiary Documents (Artifacts) for Review |
| CM-8 | System Component Inventory | • Complete listing of FTI inventory (includes networking devices, boundary protection devices and information system components) identifying: platform, operating system, and applicable software (e.g., DBMS, application development environments, web servers)<br>• *Note*: The agency must provide sufficient version detail for each system component such that the Office of Safeguards can determine whether the system component is subject to receiving ongoing security support from the vendor |
| IA-2 | Identification and Authentication (Organizational Users) | • Screenshots that will show the configuration of multifactor authentication solution(s) in place for all remote network access to systems containing FTI<br>• Description of Authenticator Assurance Level implementation for public-facing systems displaying FTI |
| IA-5 | Authenticator Management | • Password and Authenticator Management Policy and Procedures<br>• Screenshots of local security policy for password management |
| IA-12 | Identity Proofing | • Description of Identity Assurance Level (IAL) implementation for public-facing systems displaying FTI |
| IR-6 | Incident Reporting | • Incident Response Plan and Procedures |
| MP-6 | Media Sanitization | • Media Sanitization Policy and Procedures<br>• Destruction log template |
| PE-3 | Physical Access Control | • Physical Access Policy and Procedures<br>• Alternative Worksite Policy and Procedures |
| PE-8 | Visitor Access Records | • Sample visitor access log |
| PM-5 | Inventory of Personally Identifiable Information | • Diagrams depicting the logical flow of FTI within the agency's network to include specific boundary protection, infrastructure devices and endpoints where FTI will be stored |
| PS-8 | Personnel Sanctions | • Personnel Sanctions Policy and Procedures |
| RA-5 | Vulnerability Scanning | • Vulnerability scanning Policy and Procedures |

70

TD_0000302

| Table 3 – SSR Evidentiary Documentation | | |
|---|---|---|
| **800-53 Control** | **Control Name** | **Evidentiary Documents (Artifacts) for Review** |
| SA-9 | External Information System Services | • System and Services Acquisition Policy and/or Access Control Policy<br>• Contracts with service providers containing Publication 1075 Exhibit 7 language |
| SC-4 | Information in Shared System Resources | • System and Communication Policy and Procedures |
| SC-7 | Boundary Protection | • Network architecture and design documents to include internet-facing network security components that will protect the FTI network |
| SC-8 | Transmission Confidentiality and Integrity | • System and Communication Policy and Procedures<br>• Network design diagram and documentation showing all FTI transmission protocols and encryption mechanisms identified |
| SI-2 | Flaw Remediation | • Patch Management Policy and Procedure |
| SI-3 | Malicious Code Protection | • Malicious Code Protection Policy and Procedure |

If the agency does not submit all required evidentiary documentation as described above, the IRS reserves the right to conduct a safeguard review to assess the effectiveness of the controls established in order to approve the SSR prior to initial release of FTI. Subsequently, Safeguards will conduct a risk-based assessment to determine when to schedule an agency's first safeguard review after initial receipt of FTI.

Refer to the Office of Safeguards website for additional guidance and instructions for completing the document.

### 2.E.4.2 Agencies Requesting New FTI Data Streams

Agencies currently receiving FTI with an approved SSR and seeking additional FTI data streams (i.e., FTI to be received under newly assigned program authority or expanded statutory authority under IRC § 6103), must submit the following documentation along with the request to receive the new data stream(s):

- Approved SSR for the most recent reporting period

- Current CAP with approved mitigation strategies for critical and significant findings

- Documentation of security testing for the system(s) where the new data stream will be processed. Any findings deemed "critical" must be mitigated

- A signed Authority to Operate (ATO) for the system(s) that will be receiving, processing, storing, accessing, protecting and/or transmitting the new FTI data stream that is not covered in the agency's SSR already on file

71

After the agency receives its new data stream, the subsequent SSR submission must reference the receipt of the new data stream and must describe all systems that receive, process, store, access, protect and/or transmit FTI. This SSR submission must also describe all security and privacy control implementations for the FTI environment(s).

## 2.E.4.3 Annual SSR Update Submission Instructions

The agency must update and submit the SSR annually. The purpose of the SSR is for agencies to document the implementation of security and privacy controls that impact the protection of FTI. Agencies must document significant changes to the environment, as applicable. Examples of changes include, but are not limited to:

- New data exchange agreements

- New computer equipment, systems or applications (hardware or software) (e.g., moving FTI systems to a FedRAMP authorized cloud environment, re-engineering legacy case management systems)

- New facilities including, office moves, new contractor or sub-contractor locations (e.g., print vendor, call center)

- Organizational changes, such as moving IT operations to a consolidated data center from an embedded IT operation

- Development of new business processes or procedures for handling FTI

The following information must be updated in each SSR submission to reflect routine updates or changes to the implementation of security and privacy controls and/or the agency's safeguarding program:

- Changes to information or procedures previously reported

- Current annual period safeguard activities (e.g., performing internal inspections, performing ongoing security and privacy control testing, providing security and privacy awareness training to employees)

- Planned actions affecting safeguard procedures (e.g., system upgrades, development of new policy framework, use of a new audit log monitoring solution)

- Agency use of contractors or sub-contractors (non-agency employees)

The annual SSR update must be submitted on the prior year's SSR analysis that was returned to the agency. This will allow for a version control of the document, assurance that the agency addressed all outstanding items previously noted and reduces the need for recreating the entire document.

## 2.E.4.4 SSR Submission Dates

The SSR must be submitted annually with all applicable attachments. Each submission of the SSR must include a description of updates or changes that have occurred during the reporting period.

Submission due dates are defined below:

72

TD_0000304

| Table 4 - SSR Submission Dates | | |
|---|---|---|
| | **Reporting Period** | **SSR Due** |
| **Federal Agencies** | | |
| All Federal Agencies | January 1 through December 31 | January 31 |
| **All State Agencies and Territories** | | |
| AK, AL, AR, AS, AZ, CA | February 1 through January 31 | February 28 |
| CO, CT, DC, DE, FL, GA, MP* | March 1 through February 28 | March 31 |
| GU, HI, IA, ID, IL, IN, KS | April 1 through March 31 | April 30 |
| KY, LA, MA, MD, ME, MI, | May 1 through April 30 | May 31 |
| MN, MO, MS, MT, NE | June 1 through May 31 | June 30 |
| NC, NH, NJ, NM, NV, NY | July 1 through June 30 | July 31 |
| ND, OH, OK, OR | August 1 through July 31 | August 31 |
| PA, PR, RI, SC, SD, TN | September 1 through August 31 | September 30 |
| TX, UT, VA, VI, VT, WA | October 1 through September 30 | October 31 |
| WI, WV, WY | November 1 through October 31 | November 30 |

*The Postal abbreviation for Commonwealth of the Northern Mariana Islands was updated to MP.

Educational institutions receiving IRS addresses to locate debtors under IRC § 6103(m)(4)(B) must send compliance reports to the Department of Education as the federal oversight agency for this program.

When extenuating circumstances exist, agencies may request an SSR extension, in 30-day increments, with a maximum of 60 days. Extension requests must be submitted not later than 30 days prior to the scheduled SSR due date. Request for extensions will not be considered after the scheduled SSR due date. A request for a second extension must be accompanied by a draft SSR.

Extension requests must be sent to the Office of Safeguards via SDT or sent via email to SafeguardReports@irs.gov, with the subject "SSR Extension Request". The body of the email must address the reasons for the request. All extension requests will be evaluated on a case by case basis. Safeguards will provide an email response, approving or disapproving the request, within five (5) business days after receipt of the request.

### 2.E.5 Corrective Action Plan

The Corrective Action Plan (CAP) is a report containing the findings, the recommended corrective actions, and targeted implementation dates for each weakness identified during an on-site, remote, or hybrid review. The CAP and SRR documents are the same in content, however, the CAP document has functionality to allow agencies to report their progress on corrective actions. The IRS will provide each agency an SRR along with a CAP upon completion of an on-site, remote or hybrid review. The agency

must complete the CAP by providing an updated status to each unresolved finding, including the projected or actual date to close the finding, as well as provide status updates to any remaining planned actions.

All findings must be addressed in a timely fashion or an out of cycle CAP review may be done to further address an agency's open critical and significant findings.

Safeguards will initiate communication with the agency's POC, and a formal engagement letter will be sent. At that time, the agency will be required to update their CAP and provide documentation for closure consideration of the remaining critical and significant findings. The out of cycle CAP review process will include:

- A preliminary discussion held prior to the review of the findings.

- During the review, the agency's CAP responses and supporting documentation will be addressed. Requests for additional information and clarification, including automated scanning reports, will be made by Safeguards.

- A closing conference will be held upon the completion of the agency's CAP review and a Preliminary Assessment Report (PAR) will be issued to provide the agency an overview of the findings addressed during the review.

The agency may be required to submit a mitigation plan if any critical findings remain open and escalation of the p7 process maybe initiated per Exhibit 3, USC Title 26, CFR § 301.6103(p)(7)-1.

The agency will receive an updated CAP to resolve outstanding issues in the next reporting cycle.

## 2.E.5.1 CAP Submission Instructions

The agency must update and submit the CAP semi-annually to document all corrective actions, taken or planned, in response to the findings enumerated in the SRR. To complete the CAP document, agencies must:

- Use the version sent by the Office of Safeguards with the SRR and must not alter the format

- Provide a written narrative in response to each finding

- Provide a planned implementation date or actual completion date in MM/DD/YYYY format for each finding response

- Provide evidentiary documentation to validate the closure of any findings identified as Critical or Significant

- Provide a signed certification from the Chief Information Security Officer (CISO) or Head of Agency to document and close findings that are no longer applicable to the agency's handling of FTI. Often, this occurs when agencies decommission systems that once transmitted FTI, replace applications or systems with newer technologies, or perform major upgrades to versions of systems that continue to receive, process, store, access, protect and/or transmit FTI.

74

TD_0000306

## 2.E.5.2 CAP Submission Dates

CAP Submission due dates are defined below.

| Table 5 – CAP Submission Dates | | |
|---|---|---|
| | **CAP with SSR** | **CAP (only)** |
| **Federal Agencies** | | |
| All Federal Agencies | January 31 | July 31 |
| **State Agencies and Territories** | | |
| AK, AL, AR, AS, AZ, CA | February 28 | August 31 |
| CO, CT, DC, DE, FL, GA, MP* | March 31 | September 30 |
| GU, HI, IA, ID, IL, IN, KS | April 30 | October 31 |
| KY, LA, MA, MD, ME, MI | May 31 | November 30 |
| MN, MO, MS, MT, NE | June 30 | December 31 |
| NC, NH, NJ, NM, NV, NY | July 31 | January 31 |
| ND, OH, OK, OR | August 31 | February 28 |
| PA, PR, RI, SC, SD, TN | September 30 | March 31 |
| TX, UT, VA, VI, VT, WA | October 31 | April 30 |
| WI, WV, WY | November 30 | May 31 |

*The Postal abbreviation for Commonwealth of the Northern Mariana Islands was updated to MP.

If the SRR was issued within 60 days from the upcoming CAP due date in the preceding chart, the agency's first CAP will be due on the subsequent reporting date to allow the agency adequate time to document all corrective actions proposed and taken. Agency CAP submissions provided to the Office of Safeguards within 60 days of an upcoming review will be responded to as part of the review process.

When extenuating circumstances exist, agencies may request an extension for no more than 30 days. Extension requests must be submitted not later than 30 days prior to the scheduled CAP due date. Request for extensions will not be considered after the scheduled CAP due date. Extension requests must be sent to the Office of Safeguards via SDT or sent via email to SafeguardReports@irs.gov, with the subject "CAP Extension Request". The body of the email must address the reasons for the request. All extension requests will be evaluated on a case by case basis. Safeguards will provide an email response approving or disapproving the request within five (5) business days after receipt of the request.

TD_0000307

## 2.E.6 Notification Reporting Requirements

IRC § 6103 limits the usage of FTI to only those purposes explicitly stated. Due to the security and privacy implications, higher risk of unauthorized disclosure and potential for unauthorized use of FTI based on specific activities conducted, the Office of Safeguards requires advanced notification of at least 45 days prior to implementing certain operations or technology capabilities that require additional uses of the FTI.

In addition to the initial receipt of FTI (see Section 1.1), the following circumstances or technology implementations require the agency to submit notification to the Office of Safeguards via the SafeguardReports@irs.gov, mailbox, a minimum of 45 days ahead of the planned implementation:

### Table 6 – Notification Reporting

| Prior to... | Requirement |
|---|---|
| Implementing Cloud Computing | Submit Notification |
| Disclosure to a Contractor | Submit Notification |
| Re-disclosure by Contractor to Sub-Contractor | Submit Notification and receive approval |
| Using FTI in Tax Modeling for Tax Administration | Submit Notification and receive approval |
| Using FTI in Pre-Production Environment | Submit Notification and receive approval |

See additional details pertaining to each notification topic in the following sections. Contact the Office of Safeguards mailbox with any questions pertaining to notification requirements.

### 2.E.6.1 Cloud Computing

Receiving, processing, storing, accessing, protecting, and/or transmitting FTI in a cloud environment requires prior notification to the Office of Safeguards.

The intent of the notification is to require agencies to:

- Document the physical locations where FTI will be processed to ensure FTI remains onshore

- Document the cloud service provider's FedRAMP authorization such that Safeguards does not have the responsibility to assess the physical security of cloud service provider facilities

- Explain how encryption will be used to prevent unauthorized disclosures to cloud service provider employees

- Document all agency-managed security and privacy controls

If the agency cannot demonstrate it prevents the cloud service provider from having logical access to the data, the agency must submit a notification for disclosure to a contractor or sub-contractor.

Refer to Section 3.3.1, Cloud Computing and the Safeguards website for more information related to cloud computing requirements.

76

TD_0000308

## 2.E.6.2 Contractor or Sub-Contractor Access

Rediscosure of FTI to contractors or sub-contractors by authorized agencies requires notification to IRS at least 45 days prior to the planned re-disclosure. Contractors or sub-contractors consist of but are not limited to cloud computing providers, consolidated data centers, off-site storage facilities, shred companies, IT support or tax modeling/revenue forecasting providers.

The contractor notification requirement also applies in the circumstance where the contractor hires additional sub-contractor services. Approval is required if the (prime) contractor hires additional sub-contractor services in accordance with  Exhibit 6, Contractor 45-Day Notification Procedures.

> Notification is also required for contractors or sub-contractors to perform statistical analysis, tax modeling or revenue projections (see Section 1.4, State Tax Agency Limitations).

## 2.E.6.3 Tax Modeling

The agency must notify the Office of Safeguards if planning to include FTI in statistical analysis, tax modeling or revenue projections.

The Office of Safeguards will forward the notification to the IRS Statistics of Income and Disclosure for approval of the modeling methodology (see Section 1.4, State Tax Agency Limitations).

Tax modeling approvals are valid up to three years. If the agency needs to continue the use of FTI in tax modeling past the approved timeframe, a new request must be submitted to the Office of Safeguards.

## 2.E.6.4 Live Data Testing

Agencies must submit a Data Testing Request (DTR) form to request approval to use live FTI in a testing environment. The intent of the notification is to ensure agencies do not process FTI in environments that do not have the same security and privacy controls as the production environment. Safeguards must review the security posture of the development or test environment as described in the agency's notification document submission to determine whether the agency has reduced the risk to an acceptable level.

The IRS defines live data as primarily unmodified, non-sanitized data extracted from taxpayer files that identifies specific individual or corporate taxpayers and includes taxpayer information or tax return information. State taxing agencies must ensure their Need and Use Justification statements include the use of FTI in a test environment.

Testing request approvals are valid up to three years from the date of the approval. If testing FTI data is no longer required before the approval expires, FTI must be removed from the test environment. If the agency needs to continue the use of FTI in pre-production testing activities past the approved timeframe, a new request for live data must be submitted to the Office of Safeguards.

Please see the Office of Safeguards website for additional information.

## 2.F Disposing of FTI – IRC § 6103(p)(4)(F)

### 2.F.1 General

Users of FTI are required by IRC § 6103(p)(4)(F) to take certain actions after using FTI to protect its confidentiality (see Exhibit 2, USC Title 26, IRC § 6103(p)(4) and Exhibit 5, Civil Damages for Unauthorized Disclosure). Agency officials and employees will either return the information (including any copies made) to the office from which it was originally obtained or destroy the FTI. Agencies will include a

77

TD_0000309

description of the procedures implemented in their annual SSR. See Section 2.E, Reporting Requirements - 6103(p)(4)(E) for additional reporting requirements.

## 2.F.2 Returning IRS Information to the Source

Agencies electing to return IRS information must use a receipt process and ensure that the confidentiality is protected at all times during transport (see Section 2.B.4, FTI in Transit).

## 2.F.3 Destruction and Disposal

FTI furnished to the user and any paper material generated from it, such as copies, photo impressions, computer printouts, notes and work papers, must be destroyed by burning or shredding. If a method other than burning or shredding is used, that method must make the FTI unreadable or unusable.

The following guidelines must be observed when destroying paper FTI:

| Table 7 - FTI Destruction Methods | |
| --- | --- |
| Burning | The material must be burned in an incinerator that produces enough heat to burn the entire bundle, or the bundle must be separated to ensure that all pages are incinerated. |
| Shredding | To make reconstruction more difficult:<br><br>• Destroy paper using crosscut shredders that produce particles that are 1 mm x 5 mm (0.04 in. x 0.2 in.) in size (or smaller) or pulverize/disintegrate paper materials using disintegrator devices equipped with a 3/32 in. (2.4 mm) security screen.<br><br>If shredding deviates from the above specification, FTI must be safeguarded until it reaches the stage where it is rendered unreadable through additional means, such as burning or pulping. |

FTI furnished or stored in electronic format must be destroyed in the following manner:

* Electronic media (e.g., hard drives, tapes, CDs and flash media) must be destroyed according to guidance in NIST Control MP-6, Media Sanitization. Electronic media containing FTI must not be made available for reuse by other offices or released for destruction without first being subjected to electromagnetic erasing. If reuse is not intended, the tape must be destroyed by burning or shredding in accordance with applicable standards (see Section 2.F.3.1, Media Sanitation).

* Destroy microforms (microfilm, microfiche, or other reduced image photo negatives) by burning.

Whenever physical media leaves the physical or systemic control of the agency for maintenance, exchange or other servicing, any FTI on it must be destroyed by sanitizing according to guidance in NIST Control MP-6, Media Sanitization and Section 2.F.3.1, Media Sanitization. FTI must be purged from the media prior to allowing release.

78

A647

TD_0000310

When using either method for destruction, every third piece of physical electronic media must be checked to ensure appropriate destruction of FTI.

Hand tearing, recycling, or burying information in a landfill are unacceptable methods of disposal.

## 2.F.3.1 Media Sanitization

The type of sanitization performed depends on whether or not the media will be reused by the agency or leaving agency control.

If the media will be reused by the agency for the same purpose of storing FTI and will not be leaving organization control, then clearing is a sufficient method of sanitization. If the media will be reused and repurposed for a non-FTI function or will be leaving organization control (i.e., media being exchanged for warranty, cost rebate or other purposes and where the specific media will not be returned to the agency), then purging must be selected as the sanitization method. If the media will not be reused at all, then destruction is the method for media sanitization. The requirements are applicable for media used in "pre-production" or "test" environments. The technique for clearing, purging, and destroying media depends on the type of media being sanitized.

The following media sanitization requirements are required:

- Every third piece of media must be tested after sanitization has been completed.

- Media sanitization must be witnessed or verified by an agency employee.

- Media sanitization requirements are the same, regardless of where the information system media is located. However, the party responsible for each step of the sanitization process may differ.

See also MP-6. Media Sanitization. Additional media sanitization requirements are available on the Office of Safeguards website.

## 2.F.4 Other Precautions

FTI must never be disclosed to an agency's agents, contractors, or sub-contractors during disposal without legal authorization and destruction must be witnessed by an agency employee.

The Department of Justice, state tax agencies, and SSA may be exempted from the requirement of having agency personnel witness destruction by a contractor or sub-contractor.

If a contractor or sub-contractor is used:

- The contract must contain safeguard language in Exhibit 7a and 7b, Safeguarding Contract Language as appropriate to the contract to ensure the protection of FTI.

- Destruction of FTI must be certified by the contractor or sub-contractor when not witnessed by an agency employee.

- It is recommended that the agency periodically observe the process to ensure compliance with security of FTI until it reaches a non-disclosable state and that an approved destruction method is utilized.

If the agency has legal authority to disclose FTI to a disposal contractor or sub-contractor and chooses one that is National Association for Information Destruction (NAID) certified, the agency will not be

79

TD_0000311

required to complete an internal inspection every 18 months of that facility. However, the agency must annually validate and maintain the most recent copy of the NAID certification.

80

TD_0000312

## 3.0 CYBERSECURITY REQUIREMENTS

### 3.1 General

This section details the information technology (IT) security and privacy requirements agencies must meet to adequately protect FTI under their administrative control. While the Office of Safeguards has the responsibility to ensure the protection of FTI, it is the responsibility of the agency to implement effective security and privacy controls into its own IT infrastructure.

Section 4.0, NIST 800-53 Security and Privacy Controls, contains a catalog of technical and nontechnical security and privacy control requirements that must be implemented to protect electronic FTI. These requirements apply to the equipment, facilities and people that collect, process, store, display and disseminate information. This includes computers, hardware, software, and communications, as well as policies and procedures for their use. Selected controls are defined using guidelines specified in the latest version of NIST SP 800-53, Security and Privacy Controls for Information Systems and Organizations, and in IRS directives.

### 3.2 Assessment Process

The Office of Safeguards will assess agency compliance with the security and privacy requirements identified in this publication as part of the annual reporting and review processes. The IT assessment will include a review of the agency's FTI inventory. All IT systems and supporting components receiving, accessing, storing, processing, protecting, or transmitting FTI must be included in the agency's FTI inventory. This includes, for example: end user and administrator workstations, host operating system(s), contractor systems or laptops, web servers, database management systems, hypervisors, storage arrays and cloud environments. The FTI inventory must also include networking components used to protect or transmit FTI and access an FTI environment. This includes, for example: border/perimeter firewall, virtual private network (VPN), core routers, wireless networks, voice over IP systems and site to site endpoints established with external networks when FTI is shared and/or accessed outside of the LAN.

The scope of assessments includes any technology used to receive, process, store, access, protect and/or transmit FTI that is owned and managed by 1) the agency, 2) a state's consolidated IT organization, 3) the agency's contractors and sub-contractors (e.g., print vendors, collections agencies, application development contractors, network engineers at a state consolidated IT office, etc.) and 4) the agency's constituent counties included in an assessment.

Requirements are assessed using manual and automated assessment procedures as they relate to NIST SP 800-53 security and privacy controls as outlined in this publication. To ensure a standardized cybersecurity review process, Cybersecurity Reviewers will conduct assessments using Safeguards Computer Security Evaluation Matrices (SCSEM) to evaluate agency policies, procedures and IT systems that receive, process, store, access, protect and/or transmit FTI. The following techniques will be used to collect evidence required to complete SCSEM assessments:

01

TD_0000313

**Table 8 – Assessment Methodologies**

| Testing Technique | Description |
|---|---|
| Automated Compliance Assessment Testing | Cybersecurity Reviewers will use compliance assessment software tools to validate the adequate protection of FTI on agency and contractor-owned equipment. These automated tools will be launched from either IRS-issued laptop computers or when applicable, agency software instances compatible with IRS testing software. Automated testing must be performed using IRS Safeguards-specific audit profiles that are available on the Office of Safeguards website. |
| Manual Security and Privacy Control Testing | Cybersecurity Reviewer manual test methods will include interviews and examination of documentation and onscreen configuration settings. |

Please see Section 1.6.2, During the Review for information on the review process.

## 3.3 Technology-Specific Requirements

### 3.3.1 Cloud Computing

To use a cloud computing model to receive, process, store, access, protect and/or transmit FTI, the agency must comply with all requirements in this publication. The following mandatory requirements are in effect for using cloud services to receive, process, store, access, protect and/or transmit FTI:

a. FedRAMP Authorization: FTI may only be introduced to cloud environments that have been provided an authorization by the Joint Advisory Board (JAB) or a Federal Agency.

b. Onshore Access: Agencies must leverage vendors and services where (i) all FTI physically resides in systems located within the United States; and (ii) all accesses, and support of the systems and services are performed from the United States, its possessions and territories.

c. Physical Description: Agencies and their cloud providers must provide a complete listing of all data center addresses where FTI will be received, processed, stored, accessed, protected and/or transmitted in their 45-Day notification form.

d. Data Encryption in Transit: FTI must be encrypted in transit within the cloud environment. All mechanisms used to encrypt FTI must be FIPS 140 certified and operate utilizing the latest FIPS 140 compliant module(s). This requirement must be included in the SLA.

e. Data Encryption at Rest: FTI must be encrypted while at rest in the cloud using the latest FIPS 140 certified encryption mechanism. This requirement must be included in the SLA.

   Supplemental Guidance: If the agency is able to encrypt data in transit and at rest using the latest FIPS 140 certified solutions and maintain sole ownership of encryption keys, preventing logical access from the cloud service providers, Safeguards will consider this a logical barrier and will allow data types with restrictions (e.g., IRC § 6103 (l)(7) data) to move to a cloud environment. Using FIPS 140 certified encryption at rest exempts third-party contractors from some protection requirements such as training and background investigation requirements.

f. 45-Day Notification: The agency must notify the IRS Office of Safeguards at least 45 days prior to transmitting FTI into a cloud environment, per Section 2.E.6, Notification Reporting Requirements.

TD_0000314

g.  Service Level Agreements and Contracts: The agency must establish security and privacy controls, based on IRS Publication 1075, for how FTI is received, processed, stored, accessed, protected and/or transmitted inside the cloud environment. Agencies must provide the requirements through a legally binding contract or SLA with their third-party cloud provider.

h.  Data Isolation: Software and/or services that receive, transmit, process or store FTI must be isolated within the cloud environment so that other cloud customers sharing physical or virtual space cannot access other customer data or applications.

i.  Risk Assessment: The agency must conduct an annual assessment of the security and privacy controls in place on all information systems used for receiving, processing, storing, accessing, protecting and/or transmitting FTI.

j.  Persistence of Data in Relieved Assets: Storage devices where FTI has resided must be securely sanitized and/or destroyed using methods acceptable by NIST. This requirement must be included in the SLA.

k.  Multifactor Authentication: Agencies must implement sufficient multifactor authentication when their cloud solutions are available from the internet (i.e., there is access to the cloud solution from outside of the agency's trusted network). If the cloud can only be accessed from an agency's internal network, multifactor authentication must be implemented by agency solution(s) when establishing a remote connection.

l.  Security Control Implementation: Customer defined security and privacy controls must be identified, documented and implemented, and must comply with Publication 1075 requirements.

Supplemental Guidance: If the agency or system has the ability to automatically provision or deprovision resources based on need, then it is considered a cloud environment. The service and deployment model used in a cloud computing environment will determine the responsibility for security and privacy controls implementation between the agency and the cloud provider for the protection of FTI that is stored or processed in the cloud environment. The Office of Safeguards tailors its assessment of an agency's cloud solution based on the cloud vendor's FedRAMP authorization boundary. For systems where cloud service providers maintain complete control over and have documented the security and privacy controls of those systems in its FedRAMP authorization framework, the Office of Safeguards will assess those controls using the Cloud SCSEM. For agency-managed systems that reside logically in the cloud environment, but remain outside of the FedRAMP authorization boundary, the Office of Safeguards will leverage its SCSEMs to assess the security posture of those systems. All testing will be performed using the methods described in Section 3.2, Table 8, Assessment Methodologies.

Additional cloud computing guidance is available on the Office of Safeguards website.

To determine if your agency is utilizing a cloud please use the following Cloud Decision Tree

Note:  https://www.irs.gov/pub/irs-utl/cloud-decision-tree.pdf

### 3.3.2 Email Communications

If the agency determines FTI is not permitted to be included in email, a written policy must be established and distributed to:

a.  Prohibit FTI in email transmissions; and

b.  Clearly state the actions that will be taken if FTI is inadvertently sent in email.

TD_0000315

If the agency determines FTI is permitted to be included in email, a written policy must be established and distributed to:

a. Prohibit FTI in email transmissions outside of the agency's internal network;

b. Ensure transmissions are sent only to authorized recipients; and

c. Require adequate labeling (e.g., email subject contains "FTI") and protection.

Additionally, the agency must ensure FTI is properly protected and secured when being transmitted via email. At a minimum:

a. Mail servers and clients must be securely configured. Underlying operating systems of on-premises mail servers must be hardened and included in the agency's FTI inventory. A 45-day cloud notification must be submitted for cloud-hosted mail solutions.

b. The network infrastructure must be securely configured to block unauthorized traffic, limit security vulnerabilities, and provide an additional security layer to an agency's mail servers and clients.

c. Audit logging must be implemented to track all sent and received emails containing FTI.

d. Email transmissions containing FTI must be encrypted using the latest FIPS 140 validated mechanism.

e. Malware protection must be implemented at one or more points within the email delivery process to protect against viruses, worms and other forms of malware.

### 3.3.3 Facsimile and Facsimile Devices

If the agency determines FTI is not permitted to be included in fax communications, a written policy must be established and distributed to:

a. Prohibit FTI in fax communications; and

b. Clearly state the actions that will be taken if FTI is inadvertently faxed.

If the agency determines FTI is permitted to be included in fax communications, a written policy must be established and distributed to ensure fax communications are transmitted to an authorized recipient and must adhere to the following requirements:

a. Have a trusted staff member at both the sending and receiving fax machines

b. Accurately maintain broadcast lists and other preset numbers of frequent recipients of FTI

c. Place fax machines in a secured area

d. Include a cover sheet on fax transmissions that explicitly provides guidance to the recipient, that includes:

1. A notification of the sensitivity of the data and the need for protection

2. A notice to unintended recipients to telephone the sender via collect call, if necessary, to report the disclosure and confirm destruction of the information

84

TD_0000316

Additionally, the agency must ensure facsimile devices used to transmit FTI are properly protected and secured. At a minimum:

    a. When applicable, encrypt information or be connected to a secure network

    b. Securely configure multifunction devices (MFD) used to receive or transmit fax communications

If digital fax servers are used, they should be hardened like other servers containing FTI.

### 3.3.4 Mobile Devices

To use FTI in a mobile device environment, the agency must implement a centralized mobile device management (MDM) solution to authenticate and manage the configuration of agency-owned and personally owned mobile devices prior to allowing access to the internal network. Further guidance of the configuration of mobile device solutions can be found on the Office of Safeguards website.

See also AC-19: Access Control for Mobile Devices.

### 3.3.5 Multifunction Devices (MFDs) and High-Volume Printers (HVPs)

If the agency determines FTI is not permitted to be printed, a written policy must be established and distributed to:

    a. Prohibit FTI from being printed

    b. Clearly state the actions that will be taken if FTI is inadvertently printed

If the agency determines FTI is permitted to be printed, a written policy must be established and distributed to:

    a. Prohibit printing FTI to printers outside of the agency's internal network

    b. Ensure printed FTI is sent only to authorized printers (e.g., multifunction devices, standalone printers, high-volume printers)

    c. Require adequate labeling and protection of all printed FTI

Additionally, the agency must ensure MFDs and HVPs are configured securely and included in the agency's FTI inventory.

### 3.3.6 Network Boundary and Infrastructure

Agencies must implement boundary protection devices throughout their system architecture, including routers, firewalls, switches, and intrusion detection systems to protect FTI and FTI systems. The agency's managed interfaces employing boundary protection must deny network traffic by default and allow network traffic by exception (e.g., deny all, permit by exception). Inbound services shall be prohibited unless a valid business case can establish their necessity. All remote access must be routed and monitored through a managed solution and accomplished using multifactor authentication per the requirements of NIST Control IA-2, Identification and Authentication (Organizational Users). FTI end users and privileged administrators may access the FTI environment over a secured wireless local area network (WLAN) infrastructure that complies with the Institute of Electrical and Electronic Engineers (IEEE) 802.11i wireless security standard and uses WPA2-certified equipment and software.

All networking devices responsible for protecting the FTI environment or used to access the FTI environment must be included in the agency's FTI inventory.

TD_0000317

Additional network protection requirements are available on the Office of Safeguards website.

### 3.3.7 Virtual Desktop Infrastructure

A virtual desktop infrastructure (VDI) provides users access to enterprise resources, including a virtual desktop from locations both internal to and external to the agency's networks. In a VDI environment, a user can access FTI by connecting to a virtual workstation via a vendor-specific agent, connection client, or through an Internet browser from practically any mobile device with Internet access. Using VDI environments is the only manner in which agencies may authorize their users to leverage personally owned devices to access and/or manage information systems that receive, process, store, access, protect and/or transmit FTI.

See AC-20, Use of External Systems and the IRS Office of Safeguards website for more information.

### 3.3.8 Public-Facing Systems

FTI is considered nonpublic information and may never be posted or shared on an unauthenticated publicly accessible system (e.g., public website). Agencies may have business needs to provide FTI to its individual constituents, customers, clients and/or stakeholders using interactive applications. Examples of such systems include tax applications meant to provide account information to taxpayers or practitioners, state-based marketplace systems, child support online portals, etc. Publicly facing systems are typically internet-based applications but may also include interactive voice response technology.

Should an agency choose to provide FTI through a publicly facing system, it must implement the following requirements:

   a. The system architecture is configured as a multi-tier architecture with physically and/or logically separate systems that provide layered security of the FTI. Access to FTI in a back-end database must be brokered through multiple layers such that a public user cannot query the database directly.

   b. Each individual technology (e.g., application server, web server software, firewall) within the system architecture that receives, processes, stores, accesses, protects and/or transmits FTI is hardened in accordance with the requirements in this publication, the appropriate SCSEM and is subject to the agency's security testing capability.

   c. Access to FTI via the system must only occur when following strong identity proofing and authentication processes consistent with the latest guidance in NIST SP 800-63-3, *Digital Identity Guidelines* and the other documents in the 800-63 suite: NIST SP 800-63A, *Enrollment and Identity Proofing*, NIST SP 800-63B, *Authentication and Lifecycle Management and* NIST SP800-63C, *Federation and Assurances*. Consistent with choosing a moderate-level baseline for security controls, the Office of Safeguards has determined that public-facing systems must implement Identity Assurance Level (IAL) 2 to confirm the identity at the point an account is established and then must use Authentication Assurance Level (AAL) 2 to confirm the veracity of the account's use upon each user login. Agencies may use Federation Assurance Level (FAL) 2 should they leverage federated identities.

   **IAL2**: There is evidence that supports the real-world existence of the claimed identity and the evidence verifies that the applicant is appropriately associated with this real-world identity. Either remote or physical identity proofing may be used depending on the evidence provided during the identity proofing step.

   **AAL2**: There is a high confidence that the claimant controls authenticator(s) bound to the subscriber's account. Proof of possession and control of two distinct authentication factors is

86

TD_0000318

required through secure authentication protocols. Approved cryptographic techniques are required.

**FAL2**: There is a need to use federated identities to leverage sufficient encryption such that the agency is 1) the only party capable of decrypting the assertion from the third-party identity provider and 2) the identity provider cryptographically signs the assertion.

A656

TD_0000319

## 4.0 NIST 800-53 SECURITY AND PRIVACY CONTROLS

Section 4.0, NIST SP 800-53 Control Requirements, provides the security and privacy control requirements that relate to protecting FTI. Selected controls are based on the moderate security baseline defined by NIST and have been tailored based on the integration of privacy control requirements and those controls required to protect the confidentiality of FTI.

Where applicable, the Office of Safeguards has included NIST control enhancements, IRS and Treasury defined requirements to protect the confidentiality of FTI. NIST control enhancements are identified with a CE designation. IRS and Treasury defined requirements are identified as *IRS-Defined*.

### 4.1 ACCESS CONTROL

### AC-1 Access Control Policy and Procedures

a. Develop, document, and disseminate to **designated agency personnel**:

  1. An agency or organization-level access control policy that:

    (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

    (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

  2. Procedures to facilitate the implementation of the access control policy and associated access controls;

b. Designate an **agency official** to manage the access control policy and procedures

c. Review and update the current access control

  1. Policy **every three (3) years (or if there is a significant change)**; and

  2. Procedures **every three (3) years (or if there is a significant change)**.

### AC-2 Account Management

a. Define and document the types of accounts allowed and specifically prohibited for use within the system;

b. Assign account managers;

c. Require conditions for group and role membership;

d. Specify:

  1. Authorized users of the system;

  2. Group and role membership; and

  3. Access authorizations (i.e., privileges) and other attributes (as required) for each account.

88

TD_0000320

e. Require approvals by **the system owner or designated representative** for requests to create accounts;

f. Create, enable, modify, disable and remove accounts in accordance with **agency account management procedures prerequisites;**

g. Monitor the use of accounts;

h. Notify account managers and designated agency official within:

    1. 24 hours when accounts are no longer required;

    2. 24 hours when users are terminated or transferred; and

    3. 24 hours when system usage or need-to-know changes for an individual;

i. Authorize access to the system based on:

    1. A valid access authorization;

    2. Intended system usage; and

    3. Under the authority to re-disclosed FTI under the provisions of IRC § 6103;

j. Review accounts for compliance with account management requirements **annually for user account and semi-annually for privileged accounts;**

k. Establish and implement a process for changing shared or group account authenticators (if deployed) when individuals are removed from the group; and

l. Align account management processes with personnel termination and transfer processes.

Control Enhancements:

*(CE-1) Automated System Account Management:* Support the management of system accounts using automated mechanisms.

Supplemental Guidance: Automated mechanisms can include internal system functions and email, telephonic, and text messaging notifications.

*(CE-2): Removal of Temporary and Emergency Accounts:* Automatically **disable and remove** temporary and emergency accounts after **two (2) business** days.

*(CE-3): Disable Accounts:* Disable accounts within 120 days when the accounts:

a. Have expired;

b. Are no longer associated to a user or individual;

c. Are in violation of organizational policy; or

d. Have been inactive for 120 days for non-privileged accounts and 60 days for privileged accounts

A658

TD_0000321

*(CE-4) Automated Audit Actions:* Automatically audit account creation, modification, enabling, disabling and removal actions.

*(CE-7) Privileged User Accounts:*

    a.  Establish and administer privileged user accounts in accordance with a role-based access scheme; an attribute-based access scheme

    b.  Monitor privileged role or attribute assignments;

    c.  Monitor changes to roles or attributes; and

    d.  Revoke access when privileged role or attribute assignments are no longer appropriate.

*(CE-9): Restrictions on Use of Shared and Group Accounts:* Only permit the use of shared and group accounts that meet agency-defined conditions for establishing shared and group accounts.

Supplemental Guidance: Before permitting the use of shared or group accounts, organizations consider the increased risk due to the lack of accountability with such accounts. This includes service accounts that can be used for computer logon by a user (e.g., interactive logon is not disabled).

*(CE-12) Account Monitoring for Atypical Usage:*

    a.  Monitor system accounts for agency-defined atypical usage; and

    b.  Report atypical usage of system accounts to agency-defined personnel or roles.

Supplemental Guidance: Atypical usage includes accessing systems at certain times of the day or from locations that are not consistent with the normal usage patterns of individuals.

*(CE-13): Disable Accounts for High-Risk Individual:* Disable accounts of users posing a significant risk within **one (1) day** of discovery of the risk.

Supplemental Guidance: Users posing a significant risk to organizations include individuals for whom reliable evidence or intelligence indicates either the intention to use authorized access to systems to cause harm or through whom adversaries will cause harm. Such harm includes the potential adverse impacts to organizational operations and assets, individuals, other organizations, the state, or the Nation. Close coordination and cooperation among authorizing officials, system administrators and human resource managers is essential for timely execution of this control enhancement.

## AC-3 Access Enforcement

Enforce approved authorizations for logical access to information and system resources in accordance with applicable access control policies.

*(IRS-Defined):* Users having accounts with administrator access privileges may access those accounts only from agency-owned or authorized contractor systems.

Supplemental Guidance: A key intent is to prohibit personally-owned or public kiosk (e.g., library) systems from being used for remote administrator access. If individuals with administrator rights require email or Internet access beyond local boundaries, one alternative would be to issue separate, non-privileged accounts (one per affected individual) for that purpose. For the considerations of this section, administrator accounts/rights are those that allow for the installation or configuration of software on agency assets receiving, processing, storing, accessing, protecting and/or transmitting FTI.

TD_0000322

Control Enhancements:

*(CE-9) Controlled Release:* Release information outside of the system only if:

    a.   The receiving system accessing, processing, storing, or transmitting FTI provides Publication 1075 required protections; and

    b.   Agency-defined controls, Publication 1075 requirements, FedRAMP ATO are used to validate the appropriateness of the information designated for release.

*(CE-11) Restrict Access to Specific Information Types:* Restrict access to data repositories containing Federal Tax Information.

## AC-4 Information Flow Enforcement

Enforce approved authorizations for controlling the flow of information within the system and between interconnected systems based **on the technical safeguards in place to protect Federal Tax Information (FTI).**

Additional requirements for protecting the flow of FTI can be found in Section 3.3, Technology-Specific Requirements.

## AC-5 Separation of Duties

    a.   Identify and document separate duties of individuals to prevent harmful activity without collusion; and

    b.   Define system access authorizations to support separation of duties.

## AC-6 Least Privilege

Employ the principle of least privilege, allowing only authorized accesses for users (or processes acting on behalf of users) that are necessary to accomplish assigned organizational tasks.

Control Enhancements:

*(CE-1): Authorize Access to Security Functions:* Authorize Access for Security Functions to:

    a.   Explicitly authorize access to security functions deployed in hardware, software, and firmware; and

    b.   Security-relevant information.

*(CE-2): Non-Privileged Access for Nonsecurity Functions:* Require that users of system accounts or roles with access to security functions including but not limited to: establishing system accounts, configuring access authorizations (i.e., permissions, privileges), setting events to be audited and setting intrusion detection parameters use non-privileged accounts or roles, when accessing nonsecurity functions.

*(IRS-Defined):* Prohibit accounts with administrative privileges (including local administrator rights) from web browsing and other Internet connections outside of the local protected boundary unless such risk is accepted in writing by the agency's CISO.

*(IRS-Defined):* Block accounts with administrative privileges (including local administrator rights) from access to email unless such risk is accepted in writing by the agency's CISO.

91

A660

TD_0000323

*(CE-6): Privileged Access by Non-Organizational Users:* Prohibit privileged access to the system by non-organizational users.

*(CE-7): Review of User Privileges*

    a. Review **annually** the privileges assigned to **FTI** to validate the need for such privileges; and

    b. Reassign or remove privileges, if necessary, to correctly reflect organizational mission and business needs.

*(CE-8): Privilege Levels for Code Execution:* Prevent the following software from executing at higher privilege levels than users executing the software: agency-defined software.

Supplemental Guidance: This item should be tracked on the agency's POA&M.

*(CE-9): Auditing Use of Privileged Functions:* Audit the execution of privileged functions.

*(CE-10): Prohibit Non-privileged Users from Executing Privileged Functions:* Prevent non-privileged users from executing privileged functions.

Supplemental Guidance: If individuals with administrator rights require email or Internet access beyond local boundaries, one alternative would be to issue separate, non-privileged accounts (one per affected individual) for that purpose. For the considerations of this section, administrator accounts/rights are those that allow for the installation or configuration of software on any agency assets receiving, processing, storing, accessing, protecting and/or transmitting FTI.

Supplemental Guidance: If individuals with administrator rights require email or Internet access beyond local boundaries, one alternative would be to issue separate, non-privileged accounts (one per affected individual) for that purpose. For the considerations of this section, administrator accounts/rights are those that allow for the installation or configuration of software on any agency assets storing, processing, transmitting, or protecting FTI.

## AC-7: Unsuccessful Logon Attempts

    a. Enforce a limit of **three (3) consecutive** invalid logon attempts by a user during a **120-minute** period; and

    b. Automatically lock the account for **15 minutes** or until **released by an administrator** when the maximum number of unsuccessful attempts is exceeded.

Control Enhancements:

*(CE-2): Purge or Wipe Mobile Device:* Purge or wipe information from mobile devices based on agency-defined purging or wiping requirements and techniques after **ten (10) consecutive**, unsuccessful device logon attempts.

Supplemental Guidance: This control enhancement applies only to mobile devices for which a logon occurs. The logon is to the mobile device, not to any one account on the device. Successful logons to accounts on mobile devices reset the unsuccessful logon count to zero. Purging or wiping may be unnecessary if the information on the device is protected with sufficiently strong encryption mechanisms.

A661

TD_0000324

## AC-8: System Use Notification

a.  Display a warning banner to users before granting access to the system that provides privacy and security notices consistent with applicable laws, executive orders, directives, regulations, policies, standards, and guidelines and state that:

1.  Users are accessing a U.S. Government System;

2.  System usage may be monitored, recorded, and subject to audit;

3.  Unauthorized use of the system is prohibited and subject to criminal and civil penalties; and

4.  Use of the system indicates consent to monitoring and recording;

b.  Retain the notification message or banner on the screen until users acknowledge the usage conditions and take explicit actions to log on to or further access the system; and

c.  For publicly accessible systems:

1.  Display system use information warning banner before granting further access to the publicly accessible system;

2.  Display references, if any, to monitoring, recording, or auditing that are consistent with privacy accommodations for such systems that generally prohibit those activities and

3.  Include a description of the authorized uses of the system.

Supplemental Guidance: The warning banner must be applied at the application, database, operating system, and network device levels for all systems that receive, process, store, or transmit FTI.

For sample warning banners approved by the Office of Safeguards, see Exhibit 8.

## AC-11: Device Lock

a.  Prevent further access to the system by initiating a device lock after **15 minutes** of inactivity; requiring the user to initiate a device lock before leaving the system unattended; and

b.  Retain the device lock until the user reestablishes access using established identification and authentication procedures.

Supplemental Guidance: Device locks are temporary actions taken to prevent logical access to organizational systems when users stop work and move away from the immediate vicinity of those systems but do not want to log out because of the temporary nature of their absences. Device locks are implemented where session activities can be determined. This is typically at the operating system level but can also be at the application level. Device locks are not an acceptable substitute for logging out of systems, for example, if organizations require users to log out at the end of workdays.

Control Enhancements:

(CE-1): Pattern-Hiding Displays: Conceal, via the device lock, information previously visible on the display with a publicly viewable image.

Supplemental Guidance: The pattern-hiding display can include static or dynamic images, for example,

93

TD_0000325

patterns used with screen savers, photographic images, solid colors, clock, battery life indicator or a blank screen, with the caveat that controlled unclassified information is not displayed.

## AC-12: Session Termination

Automatically terminate a user session after **30 minutes of inactivity.**

Supplemental Guidance: This control addresses the termination of user-initiated logical sessions in contrast to SC-10 which addresses the termination of network connections that are associated with communications sessions (i.e., network disconnect). A logical session (for local, network and remote access) is initiated whenever a user (or process acting on behalf of a user) accesses an agency system. Such user sessions can be terminated without terminating network sessions. Session termination terminates all processes associated with a user's logical session except those processes that are specifically created by the user (i.e., session owner) to continue after the session is terminated. Conditions or trigger events requiring automatic session termination can include, for example, organization-defined periods of user inactivity, targeted responses to certain types of incidents, time-of-day restrictions on system use.

Control Enhancements:

*(CE-1): User-Initiated Logouts:* Provide a logout capability for user-initiated communications sessions whenever authentication is used to gain access to systems accessing, processing, storing, or transmitting FTI.

## AC-14: Permitted Actions Without Identification or Authentication

    a.  Identify specific user actions that can be performed on the system without identification or authentication consistent with organizational mission and business functions and

    b.  Document and provide supporting rationale in the security plan for the system, user actions not requiring identification or authentication.

Supplemental Guidance:  This control addresses situations in which agencies determine that no identification or authentication is required in agency systems. Agencies may allow a limited number of user actions without identification or authentication including, for example, when individuals access public websites. Access to FTI without identification and authentication is strictly prohibited.

## AC-17: Remote Access

    a.  Establish and document usage restrictions, configuration/connection requirements and implementation guidance for each type of remote access allowed; and

    b.  Authorize each type of remote access to the system prior to allowing such connections.

Supplemental Guidance: Remote access is access to agency systems (or processes acting on behalf of users) communicating through external networks such as the Internet. Remote access methods include, for example, dial-up, broadband, and wireless. Remote access controls apply to systems other than public web servers or systems designed for public access. Any remote access where (i) FTI is accessed or (ii) an FTI environment is administered over the remote connection must be performed using multifactor authentication. Requirements of multifactor authentication are provided in NIST Control IA-2: Identification and Authentication (Organizational Users).

TD_0000326

Control Enhancements:

*(CE-1): Monitoring and Control:* Employ automated mechanisms to monitor and control remote access methods.

*(CE-2): Protection of Confidentiality and Integrity Using Encryption:* Implement cryptographic mechanisms to protect the confidentiality and integrity of remote access sessions.

*(CE-3): Managed Access Control Points:* Route remote accesses through authorized and managed network access control points.

*(CE-4): Privileged Commands and Access*

    a.  Authorize the execution of privileged commands and access to security-relevant information via remote access only in a format that provides assessable evidence and for the following needs: compelling operational needs defined by the agency; and

    b.  Document the rationale for remote access in the security plan for the system.

Supplemental Guidance: Rationale must be documented in agency's SSR as it relates to the FTI environment.

*(CE-9): Disconnect or Disable Access:* Provide the capability to disconnect or disable remote access to the system within agency-defined time period.

## AC-18: Wireless Access

    1.  Establish configuration requirements, connection requirements, and implementation guidance for each type of wireless access; and

    2.  Authorize each type of wireless access to the system prior to allowing such connections.

Control Enhancements:

*(CE-1): Authentication and Encryption:* Protect wireless access to the system using authentication of both users and devices and encryption.

*(CE-3): Disable Wireless Networking:* Disable, when not intended for use, wireless networking capabilities embedded within system components prior to issuance and deployment.

Supplemental Guidance: Disable (through automated means, where technically possible) unapproved wireless networking capabilities of desktops, laptops, printers, copiers, fax machines, SCADA systems and other devices; and monitor through automated means for unauthorized changes. One alternative yet acceptable approach to "monitoring through automated means" is regularly pushing out settings that restrict unapproved wireless connections.

*(IRS-Defined):* Guest wireless networks operated by or on behalf of the agency, data center or vendor managed facilities must be completely logically separate from all other secured internal networks.

*(IRS-Defined):* Monitor for unauthorized wireless access to the information system and enforce requirements for wireless connections to the information system.

95

TD_0000327

*(IRS-Defined):* Employ security mechanisms for wireless networks consistent with the sensitivity of the information to be transmitted. FIPS 140 validated encryption must be employed in all wireless networks used to access FTI and/or manage an FTI environment.

*(IRS-Defined):* Perform both attack monitoring and vulnerability monitoring on the wireless network to support WLAN security.

Additional requirements for protecting FTI on wireless networks are provided in Section 3.3.6, Network Boundary and Infrastructure.

## AC-19: Access Control for Mobile Devices

a. Establish configuration requirements, connection requirements and implementation guidance for organization-controlled mobile devices to include when such devices are outside of controlled areas; and

b. Authorize the connection of mobile devices to organizational systems.

Supplemental Guidance: A mobile device is considered a computing device that has a small form factor such that it can easily be carried by a single individual; is designed to operate without a physical connection; possesses local, non-removable or removable data storage; and includes a self-contained power source. Mobile device requirements are not applicable to laptop computers.

Control Enhancements:

*(CE-5): Full Device and Container-Based Encryption:* Employ full-device encryption using the latest FIPS 140 validated encryption on areas where FTI resides to protect the confidentiality and integrity of information on agency-owned mobile devices and mobile devices that are part of a BYOD implementation. POA&M findings must be documented and tracked when no such encryption technology solutions are available to address a specific device,

Additional requirements on protecting FTI accessed by mobile devices are provided in Section 3.3.4, Mobile Devices, Section 2.C.7, Offshore Operations and on the Office of Safeguards website.

## AC-20: Use of External Systems

a. Establish terms and conditions, consistent with the trust relationships established with other organizations owning, operating and/or maintaining external systems, allowing authorized individuals to:

1. Access the system from external systems; and

2. Process, store, or transmit organization-controlled information using external systems; or

b. Prohibit the use of non-agency managed external systems.

Supplemental Guidance: External information systems, or non-agency-owned equipment, include any technology used to receive, process, store, access, protect and/or transmit FTI that is not owned and managed by 1) the agency or the agency-run mobile device management system, 2) a state's consolidated IT office, 3) one of the agency's approved contractors or sub-contractors (e.g., print vendors, collections agencies, application development contractors, network engineers at a state consolidated IT office, etc.) or 4) one of the agency's constituent counties. To ensure a third-party contractor system is not considered an external information system, the agency must include Exhibit 7 language in its contract with the service provider. Examples of external information systems include but are not limited to: 1)

96

TD_0000328

personally-owned devices, which includes any device owned by an individual employee, rather than the agency itself; and 2) devices owned and managed by agency stakeholders that do not have proper approvals to receive, process, store, access, protect and/or transmit FTI.

Control Enhancements:

*(CE-2): Portable Storage Devices - Restricted Use*: Restrict the use of organization-controlled portable storage devices by authorized individuals on external systems using organizational-defined policy.

*(CE-3): Non-Organizationally Owned Systems and Components - Restricted Use:* Restrict the use of non-organizationally owned systems or system components to process, store, or transmit organizational information using Publication 1075 requirements.

Supplemental Guidance: The IRS Office of Safeguards allows connections from external information systems only in the event the agency has configured a virtual desktop infrastructure (VDI) solution to receive, secure and manage remote connections.

*(IRS-Defined)*: Approval by the agency CISO is required for connection of non-government furnished or contractor-owned IT devices (including USB-connected portable storage and mobile devices) to agency-owned systems or networks receiving, processing, storing, accessing, protecting and/or transmitting FTI. This requirement does not apply to networks and systems intended for use by the general public.

Additional VDI requirements are provided in Section 3.3.7, Virtual Desktop Infrastructure and on the Office of Safeguards website.

*(CE-5): Portable Storage Devices - Prohibited Use:* Prohibit the use of organization-controlled portable storage devices by authorized individuals on external systems.

## AC-21: Information Sharing

a. Enable authorized users to determine whether access authorizations assigned to a sharing partner match the information's access and **use restrictions for information sharing circumstances where user discretion is required and permitted by IRC § 6103**; and

b. Employ **automated mechanisms or manual processes compliant with IRC § 6103** to assist users in making information sharing and collaboration decisions.

Supplemental Guidance: The agency must restrict the sharing/re-disclosure of FTI to only those authorized in IRC § 6103 and as approved by the Office of Safeguards.

## AC-22: Publicly Accessible Content

a. Designate individuals authorized to make information publicly accessible;

b. Train authorized individuals to ensure that publicly accessible information does not contain nonpublic information;

c. Review the proposed content of information prior to posting onto the publicly accessible system to ensure that nonpublic information is not included; and

d. Review the content on the publicly accessible system for nonpublic information at a **minimum quarterly** and remove such information, if discovered.

97

TD_0000329

Supplemental Guidance: FTI is considered nonpublic information and may never be posted or shared on a publicly accessible system.

## AC-23: Data Mining Protection

Employ agency-defined data mining prevention and detection techniques for agency-defined data storage objects to detect and protect against unauthorized data mining.

98

TD_0000330

## 4.2 AWARENESS AND TRAINING

### AT-1: Awareness and Training Policy and Procedures

a.  Develop, document, and disseminate to **designated agency officials:**

1.  An agency or organization-level security and privacy and awareness and training policy that:

    (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

    (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

2.  Procedures to facilitate the implementation of the awareness and training policy and the associated awareness and training controls;

b.  Designate an agency official to manage the development, documentation, and dissemination of the awareness training policy and procedures; and

c.  Review and update the current awareness and training:

1.  Policy **every three (3) years (or if there is a significant change)**; and

2.  Procedures **every three (3) years (or if there is a significant change).**

### AT-2: Awareness Training

a.  Provide security and privacy literacy training to system users (including managers, senior executives, and contractors):

1.  As part of initial training for new users and annually thereafter; and

2.  When required by system changes or following assessment or audit findings, security or privacy incidents, or changes in applicable laws, executive orders, directives, regulations, policies, standards, and guidelines;

b.  Employ the following techniques to increase the security and privacy awareness of system users by providing one or more short ad hoc sessions and include topical information on recent attack schemes, changes to organizational security and privacy policies, revised security and privacy expectations, or a subset of topics from the initial training.

c.  Update literacy training and awareness content annually and following system changes and

d.  Incorporate lessons learned from internal or external security or privacy incidents into literacy training and awareness techniques.

Control Enhancements:

*(CE-1): Practical Exercises:* Provide practical exercises in literacy training that simulate events and incidents.

Supplemental Guidance: Practical exercises may include, for example, no-notice social engineering

TD_0000331

attempts to collect information, gain unauthorized access or simulate the adverse impact of opening malicious email attachments or invoking, via spear phishing attacks, malicious web links. Privacy-related practical exercises may include, for example, practice modules with quizzes on handling personally identifiable information and affected individuals in various scenarios.

*(CE-2): Insider Threat:* Provide literacy training on recognizing and reporting potential indicators of insider threat.

Supplemental Guidance: Potential indicators and possible precursors of insider threat can include behaviors such as inordinate, long-term job dissatisfaction, attempts to gain access to information not required for job performance, unexplained access to financial resources, bullying or sexual harassment of fellow employees, workplace violence and other serious violations of organizational policies, procedures, directives, rules or practices. Security and privacy awareness training includes how to communicate the concerns of employees and management regarding potential indicators of insider threat through organizational channels in accordance with established policies and procedures.

*(CE-3): Social Engineering and Mining:* Provide literacy training on recognizing and reporting potential and actual instances of social engineering and social mining.

Supplemental Guidance: Social engineering is an attempt to trick someone into revealing information or taking an action that can be used to attack or compromise systems. Examples of social engineering include phishing, pretexting, baiting, quid pro quo, and tailgating. Social mining is an attempt, in a social setting, to gather information about the organization that may support future attacks. Security and privacy awareness training includes information on how to communicate concerns of employees and management regarding potential and actual instances of social engineering and mining through organizational channels based on established policies and procedures.

Treasury Directive: Train users and provide means to ensure workstations are adequately protected from theft, particularly regarding laptops acting as workstations.

*(IRS-Defined):* Distribute security and privacy awareness reminders/updates to all users on at least a quarterly basis.

Supplemental Guidance: This is in addition to annual awareness training. Security awareness updates may be sent via email. Unlike the need to track annual training by individual, agencies are not required to track quarterly awareness updates by individual.

*(IRS-Defined):* Conduct phishing email simulation exercises on at least a quarterly basis.

*(CE-4): Suspicious Communications and Anomalous System Behavior:* Provide literacy training on recognizing suspicious communications and anomalous behavior in organizational systems using agency-defined indicators of malicious code

### AT-3: Role-Based Training

    a. Provide role-based security and privacy training to personnel with the following roles and responsibilities: information system security manager (ISSM); information system security officer (ISSO); security specialist; system and software developers; system, network and database administrators; programmer/systems analyst; and personnel having access to FTI

        1. Before authorizing access to the system, information, or performing assigned duties, and annually thereafter; and

        2. When required by system changes;

100

TD_0000332

b.  Update role-based training content annually and following system changes and Update literacy training and awareness content annually and following system changes; and

c.  Incorporate lessons learned from internal or external security or privacy incidents into role-based training.

Supplemental Guidance: Agencies may determine the appropriate content of security and privacy training based on the assigned roles and responsibilities of individuals and the specific security and privacy requirements of organizations and the systems to which personnel have authorized access, including security-related technical training specifically tailored for assigned duties. Additional roles that may require role-based security and privacy training include, for example, system owners; authorizing officials; system security officers; privacy officers; enterprise architects; acquisition and procurement officials; systems engineers; personnel conducting configuration management activities; personnel performing verification and validation activities; auditors; personnel having access to system-level software; security and privacy control assessors; personnel with contingency planning and incident response duties; and personnel with privacy management responsibilities.

## AT-4: Training Records

a.  Document and monitor information security and privacy training activities, including security and privacy awareness training and specific role-based security and privacy training; and

b.  Retain individual training records for a **period of five (5) years.**

## AT-6: Training Feedback

Provide feedback on organizational training results to the following personnel: Agency Senior Management and Agency Disclosure Personnel on an annual basis.

101

TD_0000333

## 4.3 AUDIT AND ACCOUNTABILITY

### AU-1: Audit and Accountability Policy and Procedures

a. Develop, document, and disseminate to **designated agency officials:**

    1. An agency or organization-level audit and accountability policy that:

        (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

        (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

    2. Procedures to facilitate the implementation of the audit and accountability policy and the associated audit and accountability controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the audit and accountability policy and procedures; and

c. Review and update the current audit and accountability:

    1. Policy **every three (3) years (or if there is a significant change)**; and

    2. Procedures **every three (3) years (or if there is a significant change).**

### AU-2: Audit Events

a. Identify the types of events that the system is capable of logging in support of the audit function:

    1. All accesses or attempts to access an FTI system, including the identity of each user and device;
    2. Logoff activities;
    3. Activities that might modify, bypass, or negate IT security safeguards;
    4. Security-relevant actions associated with processing FTI;
    5. User generation of reports and extracts containing FTI;
    6. Any interaction with FTI through an application;
    7. Password changes;
    8. Creation or modification of groups;
    9. Privileged user actions;
    10. Access to the system;
    11. Creating and deleting files;
    12. Change of permissions or privileges;
    13. Command line changes and queries;
    14. Changes made to an application or database;
    15. System and data interactions;
    16. Opening and/or closing of files; and
    17. Program execution activities.

b. Coordinate the event logging function with other organizational entities requiring audit related information to guide and inform the selection criteria for events to be logged;

102

TD_0000334

c.   Specify the following event types for logging within the system: agency-defined subset of AU-2a requirements (e.g. Systems capable of required event types relevant to the use or administration of FTI);

d.   Provide a rationale for why the event types selected for logging are deemed to be adequate to support after-the-fact investigations of incidents; and

e.   Review and update the event types selected for logging annually or when there is a system change. Document changes in the SSR.

## AU-3: Content of Audit Records

Ensure that audit records contain information that establishes the following:

a.   What type of event occurred;

b.   When the event occurred;

c.   Where the event occurred;

d.   Source of the event;

e.   Outcome of the event; and

f.   Identity of any individuals, subjects, or objects/entities associated with the event.

### Control Enhancements:

*(CE-1) Additional Audit Information:* Generate audit records containing the following additional information:

a.   Details that facilitate the reconstruction of events if

   1.   Unauthorized activity occurs or is suspected; or

   2.   A malfunction occurs or is suspected.

*(CE-3) Limit Personally Identifiable Information Elements:* Limit personally identifiable information contained in audit records to the following elements identified in the privacy risk assessment: agency-defined elements.

## AU-4: Audit Storage Capacity

Allocate audit log storage capacity to accommodate the retention of audit records for the retention period.

## AU-5: Response to Audit Processing Failures

a.   Alert designated organizational officials (e.g., SA, ISSO) in the event of an audit processing failure; and

b.   Take the following additional actions:

   1.   Monitor system operational status using operating system or system audit logs and verify functions and performance of the system. operating system or system audit logs and verify functions and performance of the system. Logs shall be able to identify where

103

TD_0000335

system process failures have taken place and provide information relative to corrective actions to be taken by the system administrator

2.  If logs are not available, shut down the system.

Control Enhancements:

*(CE-1) Storage Warning Capacity:* Provide a warning to the SA and ISSO within 24 hours when allocated audit logs storage volume reaches a specified percentage of repository maximum audit log storage capacity.

## AU-6: Audit Review, Analysis and Reporting

a.  Review and analyze system audit records weekly for indications of inappropriate or unusual activity and the potential impact of the inappropriate or unusual activity;

b.  Report findings to the individual(s) specified within the agency's incident response procedures; and

c.  Adjust the level of audit record review, analysis, and reporting within the system when there is a change in risk based on law enforcement information, intelligence information, or other credible sources of information.

Control Enhancements:

*(CE-1) Automated Process Integration:* Integrate audit record review, analysis, and reporting processes using automated mechanisms to support organizational processes for investigation and response to suspicious activities.

*(CE-3) Correlate Audit Repositories:* Analyze and correlate audit records across different repositories to gain organization-wide situational awareness.

*(CE-7) Permitted Actions:* Specify the permitted actions for each role or user associated with the review, analysis, and reporting of audit record information.

*(CE-9) Correlation with Information from Nontechnical Sources:* Correlate information from nontechnical sources with audit record information to enhance organization-wide situational awareness.

Supplemental Guidance: Nontechnical sources include records that document organizational policy violations related to harassment incidents and the improper use of information assets. Such information can lead to a directed analytical effort to detect potential malicious insider activity. Organizations limit access to information that is available from nontechnical sources due to its sensitive nature. Limited access minimizes the potential for inadvertent release of privacy-related information to individuals who do not have a need to know. The correlation of information from nontechnical sources with audit record information generally occurs only when individuals are suspected of being involved in an incident. Organizations obtain legal advice prior to initiating such actions.

## AU-7: Audit Reduction and Report Generation

Provide and implement an audit record reduction and report generation capability that:

a.  Supports on-demand audit record review, analysis, and reporting requirements and after-the-fact investigations of incidents; and

TD_0000336

b.  Does not alter the original content or time ordering of audit records.

Control Enhancements:

(CE-1) Automatic Processing: Provide and implement the capability to process, sort, and search audit records for events of interest based on the following content: likelihood of potential inappropriate access or unauthorized disclosure of FTI.

Supplemental Guidance: Events of interest is the content of specific audit record fields including, for example, identities of individuals, event types, event locations, event times, event dates, system resources involved, IP addresses involved, or information objects accessed.

## AU-8: Time Stamps

a.  Use internal system clocks to generate time stamps for audit records; and

b.  Record time stamps for audit records that meet agency-defined granularity and that use Coordinated Universal Time, have a fixed local time offset from Coordinated Universal Time, or that include the local time offset as part of the time stamp.

## AU-9: Protection of Audit

a.  Protect audit information and audit logging tools from unauthorized access, modification, and deletion; and

b.  Alert ISSO upon detection of unauthorized access, modification, or deletion of audit information.

Control Enhancements:

(CE-4) Access by Subset of Privileged Users: Authorize access to management of audit logging functionality to only authorized system administrators.

## AU-11: Audit Record Retention

Retain audit records **seven (7) years** to provide support for after-the-fact investigations of incidents and to meet regulatory and organizational information retention requirements.

## AU-12: Audit Generation

a.  Provide audit record generation capability for the event types the system is capable of auditing as defined in AU-2a on all systems that receive, process, store, access, protect and/or transmit FTI;

b.  Allow SA and ISSO to select the event types that are to be logged by specific components of the system; and

c.  Generate audit records for the event types defined in AU-2c that include the audit record content defined in AU-3.

Control Enhancements:

(CE-1) System-Wide and Time-Correlated Audit Trail: Compile audit records from systems that receive, process, store, access, protect and/or transmit FTI into a system-wide logical audit trail that is time-correlated to within agency-defined level of tolerance for the relationship between time stamps of individual records in the audit trail.

105

A674

TD_0000337

## AU-16: Cross-Organizational Auditing Logging

Employ agency-defined methods for coordinating agency-defined audit information among external organizations when audit information is transmitted across organizational boundaries.

Supplemental Guidance: This requirement applies to consolidated and outsourced data centers, third-party vendors, and/or cloud providers handling FTI. When agencies use systems and/or services of external organizations, the auditing capability necessitates a coordinated approach across organizations. For example, maintaining the identity of individuals that requested specific services across organizational boundaries may often be very difficult, and doing so may prove to have significant performance and privacy ramifications. Therefore, it is often the case that cross-organizational auditing simply captures the identity of individuals issuing requests at the initial system, and subsequent systems record that the requests emanated from authorized individuals.

Control Enhancements:

*(CE-1) Identity Preservation:* Preserve the identity of individuals in cross-organizational audit trails.

*(CE-2) Sharing of Audit Information:* Provide cross-organizational audit information to agency-defined organizations based on agency-defined cross-organizational sharing agreements.

106

TD_0000338

## 4.4 ASSESSMENT, AUTHORIZATION AND MONITORING

### CA-1: Assessment, Authorization and Monitoring Policy and Procedures

a.  Develop, document, and disseminate to **designated agency personnel**

    1.  A security and privacy assessment, authorization, and monitoring policy that:

        (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

        (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

    2.  Procedures to facilitate the implementation of the security and privacy assessment, authorization and monitoring policy and the associated security and privacy assessment, authorization, and monitoring controls;

b.  Designate an **agency official** to manage the security and privacy assessment, authorization and monitoring policy and procedures;

c.  Review and update the current security and privacy assessment, authorization, and monitoring:

    1.  Policy **every three (3) years (or if there is a significant change)**; and

    2.  Procedures **every three (3) years (or if there is a significant change)**.

### CA-2: Control Assessments

a.  Select the appropriate assessor or assessment team for the type of assessment to be conducted;

b.  Develop a control assessment plan that describes the scope of the assessment including:

    1.  Controls and control enhancements under assessment;

    2.  Assessment procedures to be used to determine control effectiveness; and

    3.  Assessment environment, assessment team, and assessment roles and responsibilities;

c.  Ensure the control assessment plan is reviewed and approved by the authorizing official or designated representative prior to conducting the assessment;

d.  Assess the controls in the system and its environment of operation annually to determine the extent to which the controls are implemented correctly, operating as intended, and producing the desired outcome with respect to meeting established security and privacy requirements;

e.  Produce a control assessment report that document the results of the assessment; and

f.  Provide the results of the control assessment to agency's Authorizing Official (AO) or the Authorizing Official Designated Representative.

107

TD_0000339

Control Enhancements:

*(CE-1) Independent Assessors:* Employ independent assessors or assessment teams to conduct control assessments.

Supplemental Guidance: Independent assessors or assessment teams are individuals or groups conducting impartial assessments of systems. Impartiality implies that assessors are free from any perceived or actual conflicts of interest regarding development, operation, sustainment, or management of the systems under assessment or the determination of control effectiveness. To achieve impartiality, assessors should not create a mutual or conflicting interest with the agencies where the assessments are being conducted; assess their own work; act as management or employees of the agencies they are serving; or place themselves in positions of advocacy for the agencies acquiring their services. Independent assessments can be obtained from elements within agencies (e.g., internal audit departments, security offices, etc.) or can be contracted to public or private sector entities outside of the agency.

## CA-3: Information Exchange

a.  Approve and manage the exchange of information between the system and other systems using Interconnection Security Agreements (ISAs).

b.  Document, as part of each exchange agreement, the interface characteristics, security and privacy requirements, controls, and responsibilities for each system, and the impact level of the information communicated; and

c.  Review and update the system interconnection on an annual basis.

Supplemental Guidance: This control applies to dedicated connections between two or more separate systems and does not apply to transitory, user-controlled connections such as email and website browsing. Interconnected systems falling under the same FTI environment, or authorization boundary, do not require a formal Interconnection Security Agreement.

## CA-5: Plan of Action and Milestones

a.  Develop a plan of action and milestones for the system to document the planned remediation actions of the agency to correct weaknesses or deficiencies noted during the assessment of the controls and to reduce or eliminate known vulnerabilities in the system; and

b.  Update existing plan of action and milestones on a quarterly basis, at a minimum, based on the findings from control assessments, independent audits or reviews, and continuous monitoring activities.

Supplemental Guidance: The POA&M must comprise of an all-inclusive tool or document for the agency to track vulnerabilities identified by the self-assessments, internal inspections, external audits and any other vulnerabilities identified for information systems that receive, process, store, access, protect and/or transmit FTI.

Control Enhancements:

*(IRS-Defined):* Agencies must ensure that the individual and/or office responsible for correcting each weakness is identified in the appropriate POA&M.

*(IRS-Defined):* Agencies must enter all new weaknesses into appropriate POA&Ms within two (2) months for weaknesses identified during assessments.

TD_0000340

Supplemental Guidance: The results of scans/automated testing can be added to POA&Ms as multiple items or one finding per weakness for like systems.

Additional information is available in Section 2.D.9, Plan of Action and Milestones.

## CA-6: Authorization

   a.   Assign a senior official as the authorizing official for the system;

   b.   Assign a senior official as the authorizing official for common controls available for inheritance by organizational systems;

   c.   Ensure that the authorizing official for the system, before commencing operations:

      1.   Accepts the use of common controls inherited by the system; and

      2.   Authorizes the system to operate;

   d.   Ensure that the authorizing official for common controls authorizes the use of those controls for inheritance by organizational systems;

   e.   Update the authorizations whenever there is a significant change to the system, or every three (3) years, whichever occurs first.

Supplemental Guidance: Authorizations are official management decisions by senior officials to authorize operation of systems and to explicitly accept the risk to agency operations and assets, individuals and other agencies based on the implementation of agreed-upon security and privacy controls. Authorizing officials provide budgetary oversight for agency systems or assume responsibility for the mission and business operations supported by those systems. Authorizing officials are responsible and accountable for security and privacy risks associated with the operation and use of agency systems. The authorization comes in the form of a memorandum signed by an agency official with fiduciary control over the security control implementation within the system. Agencies may choose to perform authorizations at the agency level (i.e., authorize all systems that receive, process, store, access, protect and/or transmit FTI at once) or at the system level (i.e., create a memo for each application and supporting infrastructure that receives, processes, stores, accesses, protects and/or transmits FTI). Authorization memos should come after processes where security controls are selected and assessed and should incorporate robust risk management processes to identify, mitigate and reduce risk to an acceptable level. Agencies may conduct ongoing authorizations of systems by implementing continuous monitoring programs. Robust continuous monitoring programs reduce the need for separate reauthorization processes.

## CA-7: Continuous Monitoring

Develop a system-level continuous monitoring strategy and implement continuous monitoring in accordance with the organization-level continuous monitoring strategy that includes:

   a.   Establish agency-defined metrics to be monitored;

   b.   Establish agency-defined frequencies (no less than annually) for monitoring and agency-defined frequencies (no less than annually) for ongoing assessment of security and privacy control effectiveness;

   c.   Ongoing control assessments in accordance with the continuous monitoring strategy;

109

TD_0000341

d.  Ongoing monitoring of system and organization-defined metrics in accordance with the continuous monitoring strategy;

e.  Correlation and analysis of information generated by control assessments and monitoring;

f.  Response actions to address results of the analysis of control assessment and monitoring information; and

g.  Reporting the security and privacy status of the system to agency-defined personnel annually, at a minimum.

Control Enhancements:

*(CE-1) Independent Assessors:* Employ independent assessors or assessment teams to monitor the controls in the system on an ongoing basis.

Supplemental Guidance: Agencies can maximize the value of control assessments during the continuous monitoring process by requiring that assessments be conducted by assessors with appropriate levels of independence. Assessor independence provides a degree of impartiality to the monitoring process. To achieve such impartiality, assessors should not create a mutual or conflicting interest with the agencies where the assessments are being conducted; assess their own work; act as management or employees of the agencies they are serving; or place themselves in advocacy positions for the agencies acquiring their services. Independent assessments can be obtained from elements within agencies (e.g., internal audit departments, security offices, etc.) or can be contracted to public or private sector entities outside of the agency.

*(CE-4) Risk Monitoring:* Ensure risk monitoring is an integral part of the continuous monitoring strategy that includes the following:

a.  Effectiveness monitoring;

b.  Compliance monitoring; and

c.  Change monitoring.

## CA-8: Penetration Testing

Conduct penetration testing every 3 years on the FTI environment.

Supplemental Guidance: Penetration testing is a specialized type of assessment conducted on systems or individual system components to identify vulnerabilities that could be exploited by adversaries. Penetration testing goes beyond automated vulnerability scanning and is conducted by agents and teams with demonstrable skills and experience that include technical expertise in network, operating system, and/or application level security. All parties agree to the rules of engagement before commencing penetration testing scenarios. Organizations correlate the rules of engagement for the penetration tests with the tools, techniques, and procedures that are anticipated to be employed by adversaries. Penetration testing could result in the exposure of FTI to individuals conducting the testing. Rules of engagement, contracts, or other appropriate mechanisms must be used to communicate expectations for protecting FTI. Risk assessments guide the decisions on the level of independence required for the personnel conducting penetration testing.

## CA-9: Internal System Connections

a.  Authorize internal connections of information system components or classes of components to the system;

110

TD_0000342

b.   Document, for each internal connection, the interface characteristics, security and privacy requirements, and the nature of the information communicated;

c.   Terminate internal system connections after agency-defined conditions; and

d.   Review annually the continued need for each internal connection.

Control Enhancements:

*(CE-1) Compliance Checks:* Perform security and privacy compliance checks on constituent system components prior to the establishment of the internal connection.

TD_0000343

## 4.5 CONFIGURATION MANAGEMENT

### CM-1: Configuration Management Policy and Procedures

a. Develop, document, and disseminate to designated agency officials:

    1. An agency or organization-level configuration management policy that:

        (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

        (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

    2. Procedures to facilitate the implementation of the configuration management policy and the associated configuration management controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the configuration management policy and procedures; and

c. Review and update the current configuration management:

    1. Policy **every three (3) years (or if there is a significant change)**; and

    2. Procedures **every three (3) years (or if there is a significant change)**.

### CM-2: Baseline Configuration

a. Develop, document, and maintain under configuration control, a current baseline configuration of the system; and

b. Review and update the baseline configuration of the system:

    1. **At a minimum annually**;

    2. When required due to **reorganizations, refreshes, etc.**; and

    3. When system components are installed or upgraded.

Control Enhancements:

*(CE-2) Automation Support for Accuracy and Currency:* Maintain the currency, completeness, accuracy, and availability of the baseline configuration of the system using automated mechanisms.

Supplemental Guidance: Automated mechanisms that help agencies maintain consistent baseline configurations for systems include, for example, hardware and software inventory tools, configuration management tools and network management tools. Such tools can be deployed and/or allocated at the system level, or at the operating system or component level including, for example, on workstations, servers, notebook computers, network components or mobile devices. Tools can be used, for example, to track version numbers on operating systems, applications, types of software installed and current patch levels.

*(CE-3) Retention of Previous Configurations:* Retain older versions of baseline configurations of the system to support rollback.

A681

TD_0000344

*(IRS-Defined):* Agencies must use SCSEMs provided on the <u>Office of Safeguards website</u> to ensure secure configurations of all agency information technology and communication systems receiving, processing, storing, accessing, protecting and/or transmitting FTI.

*(CE-7) Configure Systems and Components for High-Risk Areas:*

    a.  Issue a specifically configured computing device with more stringent configuration settings and the minimum-needed access to FTI to individuals traveling to locations that are deemed to be of significant risk; and

    b.  Apply the following controls to the systems or components when the individuals return from travel: examine for signs of tampering, reformat storage media before reintroduction to the FTI environment

<u>Supplemental Guidance:</u> When it is known that systems or system components will be in high-risk areas external to the organization, additional controls may be implemented to counter the increased threat in such areas. For example, organizations can take actions for notebook computers used by individuals departing on and returning from travel that may include international stops or layovers. Actions include determining the locations that are of concern, defining the required configurations for the components, ensuring that components are configured as intended before travel is initiated, and applying controls to the components after travel is completed. Specially configured notebook computers include computers with sanitized hard drives, limited applications, minimum sensitive data (e.g., FTI), and more stringent configuration settings. Controls applied to mobile devices upon return from travel include examining the mobile device for signs of physical tampering and purging and reimaging disk drives. Protecting information that resides on mobile devices is addressed in the MP (Media Protection) family.

## CM-3: Configuration Change Control

    a.  Determine and document the types of changes to the system that are configuration-controlled;

    b.  Review proposed configuration-controlled changes to the system and approve or disapprove such changes with explicit consideration for security and privacy impact analyses;

    c.  Document configuration change decisions associated with the system;

    d.  Implement approved configuration-controlled changes to the system;

    e.  Retain records of configuration-controlled changes to the system for **3 years;**

    f.  Monitor and review activities associated with configuration-controlled changes to the system; and

    g.  Coordinate and provide oversight for configuration change control activities through a **Configuration Control Board** that convenes on a **monthly basis** when changes are proposed.

Control Enhancements:

*(CE-2) Testing, Validation and Documentation of Changes:* Test, validate, and document changes to the system before finalizing the implementation of the changes.

*(CE-4) Security and Privacy Representative:* Require ISSO/ISSM and Privacy Representatives to be members of the Configuration Control Board.

<u>Supplemental Guidance:</u> Information security representatives can include, for example, Senior Agency Information Security Officers, system security officers or system security managers. Representation by

TD_0000345

personnel with information security expertise is important because changes to system configurations can have unintended side effects, some of which may be security-relevant. Detecting such changes early in the process can help avoid unintended, negative consequences that could ultimately affect the security state of organizational systems.

## CM-4: Security and Privacy Impact Analyses

Analyze changes to the system to determine potential security and privacy impacts prior to change implementation.

Supplemental Guidance: Agency or data center personnel with security or privacy responsibilities conduct impact analyses. Individuals conducting impact analyses possess the necessary skills and technical expertise to analyze the changes to systems and the associated security or privacy ramifications. Security and privacy impact analyses include, for example, reviewing security and privacy plans, policies and procedures to understand security and privacy control requirements; reviewing system design documentation to understand control implementation and how specific changes might affect the controls; and determining how potential changes to a system create new risks to the privacy of individuals and the ability of implemented controls to mitigate those risks. Impact analyses may also include assessments of risk to better understand the impact of the changes and to determine if additional security or privacy controls are required.

Control Enhancements:

(CE-2) Verification of Controls: After system changes, verify that the impacted controls are implemented correctly, operating as intended, and producing the desired outcome with regard to meeting the security and privacy requirements for the system.

## CM-5: Access Restrictions for Change

Define, document, approve, and enforce physical and logical access restrictions associated with changes to the system.

Control Enhancements:

(CE-5) Privilege Limitation for Production and Operations:

   a.   Limit privileges to change system components and system-related information within a production or operational environment; and

   b.   Review and reevaluate privileges semi-annually.

(IRS-Defined): Restrict administration of configurations to only authorized administrators.

(IRS-Defined): Verify the authenticity and integrity of Basic Input/Output System (BIOS) or Unified Extensible Firmware Interface (UEFI) updates to ensure that the BIOS or UEFI is protected from modification outside of the secure update process.

Supplemental Guidance: Inventory of BIOS or UEFI information should be incorporated into existing inventory control systems, where feasible. Most agencies will rely upon the manufacturer as the source for the authenticated BIOS or UEFI. System BIOS or UEFI updates should be performed using a secure authenticated update process. After BIOS or UEFI updates, the configuration baseline should be validated to confirm that the computer system is still in compliance with the agency's defined policy. The BIOS or UEFI image and configuration baseline should be continuously monitored and deviations from the baseline should be investigated, documented, and remediated as part of incident response activities.

114

TD_0000346

## CM-6: Configuration Settings

    a. Establish and document configuration settings for components employed within the system that reflect the most restrictive mode consistent with operational requirements using Office of Safeguards–approved compliance tools (e.g., SCSEMs, automated assessment tools);

    b. Implement the configuration settings;

    c. Identify, document, and approve any deviations from established configuration settings for information systems that receive, process, store, or transmit FTI based on explicit operational requirements; and

    d. Monitor and control changes to the configuration settings in accordance with organizational policies and procedures.

Supplemental Guidance: The authoritative source for many SCSEMs used by the Office of Safeguards is the Center for Internet Security (CIS). Office of Safeguards SCSEMs may include compliance requirements from one or more of the following additional sources:

- National Institute of Standards and Technology Special Publication 800 Series

- Internal Revenue Manuals

- Department of the Treasury guidance

- Defense Information Systems Agency (DISA) Security Technical Implementation Guides (STIG)

(IRS-Defined): The agency shall ensure that all devices across the enterprise that store agency data are appropriately reviewed for security purposes prior to connection or reconnection to the agency's network, (e.g. checks for malicious code, updates to malware detection software, critical software updates and patches, operating system integrity and disabled hardware).

## CM-7: Least Functionality

    a. Configure the system to provide only mission essential capabilities and

    b. Prohibit or restrict the use of the following functions, ports, protocols, software, and/or services:

        1. Those not needed to conduct business;

        2. Those defined in the IRS Office of Safeguards approved compliance requirements (e.g., SCSEMs, assessment tools);

        3. Maintenance ports when not in use; and

        4. File Transfer Protocol (FTP).

Control Enhancements:

(CE-1) Periodic Review:

    a. Review the system annually to identify unnecessary and/or nonsecure functions, ports, protocols, software, and services; and

115

A684

TD_0000347

b.   Disable or remove identified functions, ports, protocols, and services within the information system deemed to be unnecessary and/or nonsecure.

*(CE-5) Authorized Software – Allow By Exception*

a.   Identify software programs authorized to execute on the system;

b.   Employ a deny-all, permit-by-exception policy to allow the execution of authorized software programs on the system; and

c.   Review and update the list of authorized software programs at a minimum annually.

*(IRS-Defined):* Periodically scan FTI networks to detect and remove any unauthorized or unlicensed software.

*(CE-9) Prohibiting the Use of Unauthorized Hardware:*

a.   Identify agency-defined hardware components authorized for system use;

b.   Prohibit the use or connection of unauthorized hardware components;

c.   Review and update the list of authorized hardware components annually.

## CM-8: System Component Inventory

a.   Develop and document an inventory of system components that:

1.   Accurately reflects the system;

2.   Includes all components within the system;

3.   Does not include duplicate accounting of components or components assigned to any other system;

4.   Is at the level of granularity deemed necessary for tracking and reporting; and

5.   Includes the following information to achieve system component accountability: for example, hardware inventory specifications, software license information, software version numbers, component owners and for networked components or devices, machine names and network addresses. Inventory specifications include, for example, manufacturer, device type, model, serial number, and physical location and

b.   Review and update the system component inventory at a minimum annually.

Supplemental Guidance: Information deemed necessary for effective accountability of information system components includes, for example, hardware inventory specifications, software license information, software version numbers, component owners and for networked components or devices, machine names and network addresses. Inventory specifications include, for example, manufacturer, device type, model, serial number, and physical location. The inventory should be sufficient to enable recovery of IT assets that are identified as lost, stolen, or disclosed.

116

A685

TD_0000348

Control Enhancements:

*(CE-1) Updates During Installation and Removal:* Update the inventory of system components as part of component installations, removals, and system updates.

*(CE-3) Automated Unauthorized Component Detection:*

    a.  Detect the presence of unauthorized hardware, software, and firmware components within the system using automated mechanisms at all times; and

    b.  Take the following actions when unauthorized components are detected:

        1.  Disable network access by such components.

        2.  Isolate the components.

        3.  Notify designated Agency IT personnel

<u>Supplemental Guidance</u>: This control enhancement is applied in addition to the monitoring for unauthorized remote connections and mobile devices. Monitoring for unauthorized system components may be accomplished on an ongoing basis or by the periodic scanning of systems for that purpose. Automated mechanisms can be implemented within systems or in other separate devices. Isolation can be achieved, for example, by placing unauthorized system components in separate domains or subnets or otherwise quarantining such components. This type of component isolation is commonly referred to as sandboxing.

## CM-9: Configuration Management Plan

Develop, document, and implement a configuration management plan for the system that:

    a.  Addresses roles, responsibilities and configuration management processes and procedures;

    b.  Establishes a process for identifying configuration items throughout the systems development lifecycle (SDLC) and for managing the configuration of the configuration items;

    c.  Defines the configuration items for the system and places the configuration items under configuration management;

    d.  Is reviewed and approved by designated agency personnel and

    e.  Protects the configuration management plan from unauthorized disclosure and modification.

## CM-10: Software Usage Restrictions

    a.  Use software and associated documentation in accordance with contract agreements and copyright laws;

    b.  Track the use of software and associated documentation protected by quantity licenses to control copying and distribution; and

    c.  Control and document the use of peer-to-peer file sharing technology to ensure that this capability is not used for the unauthorized distribution, display, performance, or reproduction of copyrighted work.

117

TD_0000349

## CM-11: User-Installed Software

a.  Establish policies governing the installation of software by users;

b.  Enforce software installation policies through the following methods:  procedural methods (e.g., periodic examination of user accounts), automated methods (e.g., configuration settings implemented on organizational information systems), or both; and

c.  Monitor policy compliance at a minimum annually.

## CM-12: Information Location

a.  Identify and document the location of FTI and the specific system components on which the information is processed and stored;

b.  Identify and document the users who have access to the system and system components where the information is processed and stored; and

c.  Document changes to the location (i.e., system or system components) where the information is processed and stored.

Supplemental Guidance: This control addresses the need to understand where information is being processed and stored and is typically applied with respect to FTI. Information location includes identifying where specific information types and associated information reside in the system components that compose agency systems; and how information is being processed so that information flow can be understood, and adequate protection and policy management provided for such information and system components.

Control Enhancements:

(CE-1) Automated Tools to Support Information Location: Use automated tools to identify FTI on system components to ensure controls are in place to protect organizational information and individual privacy.

Supplemental Guidance: This control enhancement gives agencies the capability to check systems and selected system components for FTI to confirm such information resides on the component and to ensure that the required protection measures are in place for that component.

Include all FTI system and system components in the agency's FTI inventory. See NIST Control PM-29, Inventory of Personally Identifiable Information.

## CM-13: Data Action Mapping

Develop and document a map of system data actions.

## CM-14: Signed Components

Prevent the installation of agency-defined software and firmware components without verification that the component has been digitally signed using a certificate that is recognized and approved by the organization.

118

A687

TD_0000350

## 4.6 CONTINGENCY PLANNING

The focus of contingency planning controls is on the protection of FTI stored in backup media or used at alternative facilities and not focused on the availability of data.

### CP-1: Contingency Planning Policy and Procedures

    a.  Develop, document, and disseminate to designated agency personnel:

        1.  An agency or organization-level contingency planning policy that:

            (a)  Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

            (b)  Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

        2.  Procedures to facilitate the implementation of the contingency planning policy and the associated contingency planning controls;

    b.  Designate an agency official to manage the development, documentation, and dissemination of the contingency planning policy and procedures; and

    c.  Review and update the current contingency planning:

        1.  Policy **every three (3) years (or if there is a significant change)**; and

        2.  Procedures **every three (3) years (or if there is a significant change)**.

Supplemental Guidance: This control is applicable to all agencies receiving or storing FTI in an information technology environment. If FTI is not backed up or replicated to a secondary environment for disaster recovery purposes, the agency is required to develop and disseminate contingency planning policies prohibiting such action and supporting procedures documenting how FTI is excluded from any system backup processes. The remaining contingency planning controls would not be applicable. If FTI is backed up or replicated to a secondary environment(s) all contingency planning controls would be applicable to protect the confidentiality of FTI.

### CP-2: Contingency Plan

    a.  Develop a contingency plan for the information system that:

        1.  Identifies essential missions and business functions and associated contingency requirements;

        2.  Provides recovery objectives, restoration priorities and metrics;

        3.  Addresses contingency roles, responsibilities, assigned individuals with contact information;

        4.  Addresses maintaining essential missions and business functions despite a system disruption, compromise, or failure;

        5.  Addresses eventual, full system restoration without deterioration of the controls originally planned and implemented;

A688

TD_0000351

6. Addresses the sharing of contingency information; and

7. Is reviewed and approved by designated agency officials and other applicable agency stakeholders.

b. Distributes copies of the contingency plan to key contingency personnel;

c. Coordinate contingency planning activities with incident handling activities;

d. Review the contingency plan for the information system at a minimum annually;

e. Update the contingency plan to address changes to the organization, system, or environment of operation and problems encountered during contingency plan implementation, execution, or testing;

f. Communicate contingency plan changes to key contingency personnel;

g. Incorporate lessons learned from contingency plan testing, training, or actual contingency activities into contingency testing and training; and

h. Protect the contingency plan from unauthorized disclosure and modification.

Supplemental Guidance: Contingency planning for systems is part of an overall program for achieving continuity of operations for organizational mission and business functions. This control and its enhancements do not mandate a contingency plan for information systems with FTI. If agencies include their FTI information system in their contingency plan, essential mission and business functions must include ensuring the confidentiality and integrity of FTI, as well as the integrity and availability of associated records (e.g., audit logs).

Control Enhancements:

(CE-1) Coordinate with Related Plans: Coordinate contingency plan development with organizational elements responsible for related plans.

Supplemental Guidance: Plans related to contingency plans for FTI include, for example, Business Continuity Plans, Disaster Recovery Plans, Continuity of Operations Plans, Crisis Communications Plans, Critical Infrastructure Plans, Cyber Incident Response Plans, Insider Threat Implementation Plan and Occupant Emergency Plans. Agencies should coordinate with agency IT personnel and when applicable, data center and vendor personnel to protect the confidentiality of FTI.

(CE-3) Resume Essential Missions and Business Functions: Plan for the resumption of essential mission and business functions within an agency-defined specified time-period of contingency plan activation.

(CE-8) Identify Critical Assets: Identify critical system assets supporting essential mission and business functions.

## CP-3: Contingency Training

a. Provide contingency training to system users consistent with assigned roles and responsibilities:

1. Within 30 days of assuming a contingency role or responsibility;

2. When required by system changes; and

120

TD_0000352

3. Annually thereafter; and

b. Review and update contingency training content every three (3) years and following a significant change.

## CP-4: Contingency Plan Testing

a. Test the contingency plan for the system at a minimum, annually using the following tests to determine the effectiveness of the plan and the readiness to execute the plan: In accordance with NIST SP 800-84 Guide to Test, Training, and Exercise Process for IT Plans and Capabilities, NIST SP-34 Contingency Planning Guide for Federal Information Systems and other applicable guidance, and Business-unit Defined Tests and Exercises; and

b. Review the contingency plan test results; and

c. Initiate corrective actions, if needed.

Supplemental Guidance: Contingency testing templates should include: a) Name of the test, b) Name of the system(s) or environment, c) Date of the test, d) Testing point of contact, e) Purpose, type of test and scope, f) Objectives, g) Methodology, h) Activities and results (action, expected results, actual results) and i) Action item assessment.

Control Enhancements:

(CE-1) Coordinate with Related Plans: Coordinate contingency plan testing with organizational elements responsible for related plans.

Supplemental Guidance: Plans related to contingency plans for FTI include, for example, business continuity plans, disaster recovery plans, continuity of operations plans, crisis communications plans, critical infrastructure plans, cyber incident response plans and occupant emergency plans. Agencies should coordinate with agency IT personnel and when applicable, data center and vendor personnel to protect the confidentiality of FTI.

## CP-9: System Backup

a. Conduct backups of user-level information contained in system documentation, including security-related documentation, weekly;

b. Conduct backups of system-level information contained in the system weekly;

c. Conduct backups of system documentation, including security- and privacy-related documentation weekly; and

d. Protect the confidentiality, integrity, and availability of backup information.

Supplemental Guidance: Security-related documentation includes secure baselines, system configuration files, etc. required to maintain the secure state of systems receiving, processing, storing, accessing, protecting and/or transmitting FTI. Agencies must ensure the confidentiality and integrity of FTI if it is being backed up. This control does not mandate the backup of FTI. However, the availability and integrity of records associated with FTI (e.g., audit logs) must be ensured.

121

TD_0000353

Control Enhancements:

*(CE-8) Cryptographic Protection:* Implement cryptographic mechanisms to prevent unauthorized disclosure and modification of backup information containing FTI.

Supplemental Guidance: The selection of cryptographic mechanisms is based on the need to protect the confidentiality and integrity of backup information. This control enhancement applies to system backup information in storage at primary and alternate locations to ensure only those authorized individuals have access to FTI.

## CP-10: System Recovery and Reconstitution

Provide for the recovery and reconstitution of the system to a known state within agency-defined time period consistent with recovery time and recovery point objectives after a disruption, compromise, or failure.

Supplemental Guidance: Recovery is executing contingency plan activities to restore organizational missions and business functions. Reconstitution takes place following recovery and includes activities for returning systems to fully operational states. Recovery and reconstitution operations reflect mission and business priorities, recovery point, time and reconstitution objectives and established organizational metrics consistent with contingency plan requirements. Reconstitution includes the deactivation of any interim system capabilities that may have been needed during recovery operations. Reconstitution also includes assessments of fully restored system capabilities (including validation that the system maintains its initial security state), reestablishment of continuous monitoring activities, system reauthorizations (if required) and activities to prepare the systems against future disruptions, compromises, or failures. Recovery and reconstitution capabilities employed by organizations can include both automated mechanisms and manual procedures. During system recovery and reconstitution publication 1075 requirements should be in place and functional before FTI is made accessible in the system.

Control Enhancements:

*(CE-2) Transaction Recovery:* Implement transaction recovery for systems that are transaction-based.

Supplemental Guidance: Transaction-based systems include, for example, database management systems and transaction processing systems. Mechanisms supporting transaction recovery include, for example, transaction rollback and transaction journaling.

122

A691

TD_0000354

## 4.7 IDENTIFICATION AND AUTHENTICATION

### IA-1: Identification and Authentication Policy and Procedures

a. Develop, document, and disseminate to designated agency officials:

   1. An agency or organization-level identification and authentication policy that:

      (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

      (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

   2. Procedures to facilitate the implementation of the access control policy and the associated access controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the access control policy and procedures; and

c. Review and update the current identification and authentication:

   1. Policy **every three (3) years (or if there is a significant change)**; and

   2. Procedures **every three (3) years (or if there is a significant change)**.

### IA-2: Identification and Authentication (Organizational Users)

Uniquely identify and authenticate organizational users and associate that unique identification with processes acting on behalf of those users.

Supplemental Guidance: Organizational users include employees or individuals that agencies consider having the equivalent status of employees including, for example, contractors, data center administrators, field office users, etc. Agencies employ passwords, physical authenticators, or biometrics to authenticate user identities, or in the case of multifactor authentication, some combination thereof. Non-Organizational users are individuals or entities that interact with public-facing systems in order to complete agency transactions where FTI can be accessed (e.g., determine eligibility for benefits, review tax account, access payment histories, etc.).

Control Enhancements:

(CE-1) Multifactor Authentication to Privileged Accounts: Implement multi-factor authentication for access to privileged accounts.

Supplemental Guidance: Regardless of the type of access (i.e., local, network or remote) privileged accounts must always authenticate using multifactor options, except in the event of direct terminal access from within a restricted area (as defined in Section 2.B.3, Restricted Area Access). Local access is any access to agency systems by users or processes acting on behalf of users, where such access is obtained through direct connections without the use of networks. Network access is access to agency systems by users (or processes acting on behalf of users) where such access is obtained through network connections (i.e., nonlocal accesses). Remote access is a type of network access that involves communication through external networks. Internal networks include local area networks and wide area networks. The use of encrypted virtual private networks for network connections between agency-

123

TD_0000355

controlled endpoints and non-agency-controlled endpoints may be treated as internal networks with respect to protecting the confidentiality and integrity of information traversing the network.

*(CE-2) Multifactor Authentication to Non-Privileged Accounts:* Implement multi-factor authentication for access to non-privileged accounts.

Supplemental Guidance: Regardless of the type of access (i.e., local, network or remote) non-privileged accounts must always authenticate using multifactor options. Local access is any access to agency systems by users or processes acting on behalf of users, where such access is obtained through direct connections without the use of networks. Network access is access to agency systems by users (or processes acting on behalf of users) where such access is obtained through network connections (i.e., nonlocal accesses). Remote access is a type of network access that involves communication through external networks. Internal networks include local area networks and wide area networks. The use of encrypted virtual private networks for network connections between agency-controlled endpoints and non-agency-controlled endpoints may be treated as internal networks with respect to protecting the confidentiality and integrity of information traversing the network.

*(CE-6) Access to Accounts – Separate Device:* Implement multi-factor authentication for remote access to privileged accounts and non-privileged accounts such that:

    a.  One of the factors is provided by a device separate from the system gaining access; and

    b.  The device meets Authenticator Assurance Level 2 (AAL) per NIST SP 800-63.

*(CE-8) Access to Accounts – Replay Resistant:* Implement replay-resistant authentication mechanisms for access to privileged accounts with network access.

Supplemental Guidance: Authentication processes resist replay attacks if it is impractical to achieve successful authentications by replaying previous authentication messages. Replay-resistant techniques include, for example, protocols that use nonces or challenges such as time synchronous or challenge-response one-time authenticators.

## IA-3: Device Identification and Authentication

Uniquely identify and authenticate devices before establishing a remote or network connection.

Supplemental Guidance: Devices requiring unique device-to-device identification and authentication are defined by type, by device or by a combination of type and device. Organization-defined device types may include devices that are not owned by the agency. Systems use shared known information (e.g., Media Access Control [MAC] or Transmission Control Protocol/Internet Protocol [TCP/IP] addresses) for device identification or organizational authentication solutions (e.g., IEEE 802.1x and Extensible Authentication Protocol [EAP], RADIUS server with EAP-Transport Layer Security [TLS] authentication, Kerberos) to identify and authenticate devices on local and wide area networks. Agencies determine the required strength of authentication mechanisms based on the security categories of systems and mission/business requirements. Because of the challenges of implementing this control on large scale, agencies can restrict the application of the control to a limited number (and type) of devices based on organizational need.

Control Enhancements:

*(CE-1) Cryptographic Bidirectional Authentication:* Authenticate all devices before establishing a remote network connection using bidirectional authentication that is cryptographically based.

124

A693

TD_0000356

## IA-4: Identifier Management

Manage system identifiers by:

    a.   Receiving authorization from designated agency officials to assign an individual, group, role, service, or device identifier;

    b.   Selecting an identifier that identifies an individual, group, role, service, or device;

    c.   Assigning the identifier to the intended individual, group, role, service, or device; and

    d.   Preventing reuse of identifiers indefinitely

Control Enhancements:

*(CE-4) Identify User Status:* Manage individual identifiers by uniquely identifying each individual as agency-defined characteristic identifying individual status (e.g., Contractor).

Supplemental Guidance: Characteristics identifying the status of individuals include, for example, contractors and foreign nationals. Identifying the status of individuals by specific characteristics provides additional information about the people with whom agency personnel are communicating. For example, it might be useful for an agency employee to know that one of the individuals on an email message is a contractor.

*(IRS-Defined):* Change all default vendor-set or factory-set administrator accounts prior to implementation (e.g., during installation or immediately after installation).

## IA-5: Authenticator Management

Manage system authenticators by:

    a.   Verifying, as part of the initial authenticator distribution, the identity of the individual, group, role, service, or device receiving the authenticator;

    b.   Establishing initial authenticator content for any authenticators issued by the organization;

    c.   Ensuring that authenticators have sufficient strength of mechanism for their intended use;

    d.   Establishing and implementing administrative procedures for initial authenticator distribution, for lost or compromised or damaged authenticators, and for revoking authenticators;

    e.   Changing default authenticators prior to first use;

    f.   Changing or refreshing authenticators every 90 days for all user accounts and every 366 days for service accounts or when events such as loss, theft or compromise occur;

    g.   Protecting authenticator content from unauthorized disclosure and modification;

    h.   Requiring individuals to take, and having devices implement, specific controls to protect authenticators; and

    i.   Changing authenticators for group or role accounts when membership to those accounts changes.

A694

TD_0000357

Control Enhancements:

*(CE-1) Password-Based Authentication:* For password-based authentication:

a.  Maintain a list of commonly-used, expected, or compromised passwords and update the list every three (3) years and when organizational passwords are suspected to have been compromised directly or indirectly;

b.  Verify, when users create or update passwords, that the passwords are not found on the list of commonly-used, expected, or compromised passwords in IA-5(1)(a);

c.  Transmit passwords only over cryptographically-protected channels;

d.  Store passwords using an approved salted key derivation function, preferably using a keyed hash;

e.  Require immediate selection of a new password upon account recovery;

f.  Allow user selection of long passwords and passphrases, including spaces and all printable characters;

g.  Employ automated tools to assist the user in selecting strong password authenticators; and

h.  Enforce the following composition and complexity rules:

    1.  Enforce minimum password length of fourteen (14) characters.

    2.  Enforce minimum password complexity to contain a combination of numbers, uppercase letters, lowercase letters, and special characters.

    3.  Enforce at least one (1) character change when new passwords are selected for use.

    4.  Store and transmit only cryptographically protected passwords.

    5.  Enforce password lifetime restrictions:

        i.  One (1) day minimum and 90 days maximum.

        ii.  Service accounts passwords shall expire within 366 days (inclusive).

    6.  Password History/Reuse:

        i.  For all systems: 24 generations.

        ii.  For systems unable to implement history/reuse restriction by generations but are able to restrict history/reuse for a specified time period, passwords shall not be reusable for a period of six (6) months.

    7.  Allow the use of a temporary password for system logons with an immediate change to a permanent password.

Supplemental Guidance: If all parameters of this control are not able to be implemented through technical means, compensations and mitigations must be documented and implemented. For example: If a component is unable to enforce 4 types of characters (numbers, uppercase letters, lowercase letters, and

126

TD_0000358

special characters) for complexity requirements, then the number of characters required should be increased to compensate. Users should be encouraged to make their passwords (or passphrases) as lengthy as they want, within reason.

*(IRS-Defined):* Train users not to use a single dictionary word as their password.

*(IRS-Defined):* For IT devices using a personal identification number (PIN) as an authenticator for MFA, enforce the following requirements:

    a.   Minimum length of eight (8) digits. If the system does not enforce a minimum length of 8 digits, the maximum length possible must be used;

    b.   Enforce complex sequences (e.g., 73961548 – no repeating digits and no sequential digits);

    c.   Do not store with the SmartCard; and

    d.   Do not share.

*(CE-2) Public Key-Based Authentication:*

    a.   For public key-based authentication:

        1.   Enforce authorized access to the corresponding private key; and

        2.   Map the authenticated identity to the account of the individual or group; and

    b.   When public key infrastructure (PKI) is used:

        1.   Validate certificates by constructing and verifying a certification path to an accepted trust anchor, including checking certificate status information; and

        2.   Implement a local cache of revocation data to support path discovery and validation.

*(CE-5) Change Authenticators Prior to Delivery:* Require developers and installers of system components to provide unique authenticators or change default authenticators prior to delivery and installation.

<u>Supplemental Guidance</u>: This typically does not apply to developers of commercial off-the-shelf information technology products.

*(CE-6) Protection of Authenticators:* Protect authenticators commensurate with the security category of the information to which use of the authenticator permits access.

*(CE-7) No Embedded Unencrypted Static Authenticators:* Ensure that unencrypted static authenticators are not embedded in applications or other forms of static storage.

*(CE-12) Biometric Authentication Performance:* For biometric-based authentication, employ mechanisms that satisfy the following biometric quality requirements defined in NIST SP 800-63.

## IA-6: Authenticator Feedback

Obscure feedback of authentication information during the authentication process to protect the information from possible exploitation and use by unauthorized individuals.

TD_0000359

## IA-7: Cryptographic Module Authentication

Implement mechanisms for authentication to a cryptographic module that meet the requirements of applicable laws, executive orders, directives, policies, regulations, standards, and guidelines for such authentication.

Supplemental Guidance: Authentication mechanisms may be required within a cryptographic module to authenticate an operator accessing the module and to verify that the operator is authorized to assume the requested role and perform services within that role. Authentication traffic must be encrypted using the latest FIPS 140 validated cryptographic modules. A product does not meet the FIPS 140 requirements by simply implementing an approved security function. Only modules tested and validated to FIPS 140 standards meet the applicability requirements for cryptographic modules to protect sensitive information.

## IA-8: Identification and Authentication (Non-Organizational Users)

Uniquely identify and authenticate non-organizational users or processes acting on behalf of non-organizational users.

Supplemental Guidance: Non-organizational users include system users other than organizational users explicitly covered by IA-2. Non-organizational users are individuals or entities that interact with public-facing systems in order to complete agency transactions where FTI can be accessed (e.g., determine eligibility for benefits, review tax account, access payment histories, etc.).

Control Enhancements:

(CE-2) Acceptance of External Credentials:

    a.   Accept only external authenticators that are NIST-compliant; and

    b.   Document and maintain a list of accepted external authenticators.

Supplemental Guidance: This control enhancement applies to agency systems that are accessible to the public, for example, public-facing websites or web portals. External credentials must be certified as compliant with NIST Special Publication 800-63.

(CE-4) Use of Defined Profiles: Conform to the following profiles for identity management: NIST or FICAM-issued profiles.

Supplemental Guidance: This control enhancement addresses open identity management standards. To ensure that these identity management standards are viable, robust, reliable, sustainable, and interoperable as documented, the United States Government assesses and scopes the standards and technology implementations against applicable laws, Executive Orders, directives, policies, regulations, standards, and guidelines. The result is NIST-issued implementation profiles of approved protocols.

(IRS-Defined): Deploy identification and authentication technology consistent with the results of the e-authentication risk analysis.

See Section 3.3.8, Public-Facing Systems, for additional information regarding public-facing identification and authentication.

## IA-9: Service Identification and Authentication

Uniquely identify and authenticate agency-defined system services and applications before establishing communications with devices, users, or other services or applications.

TD_0000360

## IA-11: Re-Authentication

Require users to re-authenticate when switching to a privileged user role.

Supplemental Guidance: In addition to the re-authentication requirements associated with device locks, agencies may require re-authentication of individuals in certain situations including, for example, when authenticators or roles change; when security categories of systems change; when the execution of privileged functions occurs; after a fixed time-period; or periodically.

## IA-12: Identity Proofing

a. Identity proof users that require accounts for logical access to systems based on appropriate identity assurance level requirements as specified in applicable standards and guidelines;

b. Resolve user identities to a unique individual; and

c. Collect, validate, and verify identity evidence.

Supplemental Guidance: Identity proofing is the process of collecting, validating and verifying user's identity information for the purposes of issuing credentials for accessing a system. This control is intended to mitigate threats to the registration of users and the establishment of their accounts. Standards and guidelines specifying identity assurance levels for identity proofing include NIST Special Publications 800-63 and 800-63A.

Control Enhancements:

(CE-1) Supervisor Authorization: Require that the registration process to receive an account for logical access includes supervisor or sponsor authorization.

(CE-2) Identity Evidence: Require evidence of individual identification be presented to the registration authority.

Supplemental Guidance: Requiring identity evidence, such as documentary evidence or a combination of documents and biometrics, reduces the likelihood of individuals using fraudulent identification to establish an identity, or at least increases the work factor of potential adversaries. Acceptable forms of evidence are consistent with the risk to the systems, roles and privileges associated with the user's account.

(CE-3) Identity Evidence Validation and Verification: Require that the presented identity evidence be validated and verified through NIST SP 800-63 compliant methods of validation and verification.

Supplemental Guidance: Validating and verifying identity evidence increases the assurance that accounts, identifiers, and authenticators are being issued to the correct user. Validation refers to the process of confirming that the evidence is genuine and authentic, and that the data contained in the evidence is correct, current, and related to an actual person or individual. Verification confirms and establishes a linkage between the claimed identity and the actual existence of the user presenting the evidence. Acceptable methods for validating and verifying identity evidence are consistent with the risk to the systems, roles and privileges associated with the user's account.

(CE-5) Address Confirmation: Require that a registration code or notice of proofing be delivered through an out-of-band channel to verify the users address (physical or digital) of record.

Supplemental Guidance: To make it more difficult for adversaries to pose as legitimate users during the identity proofing process, agencies must use out-of-band methods to increase assurance that the individual associated with an address of record was the same person that participated in the registration.

129

TD_0000361

Confirmation can take the form of a temporary enrollment code or a notice of proofing. The delivery address for these artifacts are obtained from records and not self-asserted by the user. The address can include a physical or a digital address. A home address is an example of a physical address. Email addresses and telephone numbers are examples of digital addresses.

See Section 3.3.8, Public-Facing Systems, for additional information regarding multifactor requirements and solutions.

130

TD_0000362

## 4.8 INCIDENT RESPONSE

Reference Section 1.8.4 Incident Response for specific instructions on incident response requirements where FTI is involved.

### IR-1: Incident Response Policy and Procedures

    a.  Develop, document, and disseminate to designated agency officials:

        1.  An agency or organization-level incident response policy that:

            (a)  Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

            (b)  Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

        2.  Procedures to facilitate the implementation of the incident response policy and the associated Incident response controls;

    b.  Designate an agency official to manage the development, documentation, and dissemination of the incident response policy and procedures; and

    c.  Review and update the current incident response:

        1.  Policy **every three (3) years (or if there is a significant change)**; and

        2.  Procedures **every three (3) years (or if there is a significant change)**.

### IR-2: Incident Response Training

    a.  Provide incident response training to system users consistent with assigned roles and responsibilities:

        1.  Within 30 days of assuming an incident response role or responsibility or acquiring system access;

        2.  When required by system changes; and

        3.  Annually thereafter; and

    b.  Review and update incident response training content every three (3) years and following major business and system change impacting the FTI environment.

Supplemental Guidance: Incident response training is linked to assigned roles and responsibilities of agency personnel to ensure the appropriate content and level of detail is included in such training. For example, users may only need to know who to call or how to recognize an incident; system administrators may require additional training on how to handle and remediate incidents; and finally, incident responders may receive more specific training on forensics, reporting, system recovery and restoration. Incident response training includes user training in the identification and reporting of suspicious activities, both from external and internal sources.

A700

TD_0000363

Control Enhancements:

*(CE-1) Simulated Events:* Incorporate simulated events into incident response training to facilitate the required response by personnel in crisis situations.

Supplemental Guidance: This control can be met by performing a table-top exercise using simulated events. Simulated events must include an event where FTI is compromised.

*(CE-3) Breach:* Provide incident response training on how to identify and respond to a breach, including the organization's process for reporting a breach.

## IR-3: Incident Response Testing

Test the effectiveness of the incident response capability for the system annually using the following tests: tabletop exercises.

Control Enhancements:

*(CE-2) Coordination with Related Plans:* Coordinate incident response testing with organizational elements responsible for related plans.

Supplemental Guidance: Organizational plans related to incident response testing include, for example, Business Continuity Plans, Contingency Plans, Disaster Recovery Plans, Continuity of Operations Plans, Crisis Communications Plans, Occupant Emergency Plans and Critical Infrastructure Plans. Agencies should coordinate with agency IT personnel and when applicable, data center and vendor personnel to protect the confidentiality of FTI.

*(CE-3) Continuous Improvement:* Use qualitative and quantitative data from testing to:

   a. Determine the effectiveness of incident response processes;

   b. Continuously improve incident response processes; and

   c. Provide incident response measures and metrics that are accurate, consistent, and in a reproducible format.

## IR-4: Incident Handling

   a. Implement an incident handling capability for incidents that is consistent with the incident response plan and includes preparation, detection and analysis, containment, eradication, and recovery; Coordinate incident handling activities with contingency planning activities;

   b. Coordinate incident handling activities with contingency planning activities;

   c. Incorporate lessons learned from ongoing incident handling activities into incident response procedures, training, and testing, and implement the resulting changes accordingly; and

   d. Ensure the rigor, intensity, scope, and results of incident handling activities are comparable and predictable across the organization.

Control Enhancements:

*(CE-1) Automated Incident Handling Processes:* Support the incident handling process using automated mechanisms.

A701

TD_0000364

Supplemental Guidance: Automated mechanisms supporting incident handling processes include, for example, online incident management systems; and tools that support collection of live response data, full network packet capture and forensic analysis.

*(CE-6) Insider Threats:* Implement an incident handling capability for incidents involving insider threats.

*(CE-8) Correlation with External Organizations:* Coordinate with contractors, data centers, counties, and other agencies to correlate and share incidents involving FTI to achieve a cross-organization perspective on incident awareness and more effective incident responses.

Supplemental Guidance: The coordination of incident information with external organizations—including mission or business partners, customers, and developers—can provide significant benefits. Cross-organizational coordination can serve as an important risk management capability. This capability allows organizations to leverage information from a variety of sources to effectively respond to incidents and breaches that could potentially affect the organization's operations, assets, and individuals.

## IR-5: Incident Monitoring

Track and document incidents.

## IR-6: Incident Reporting

    a.   Require personnel to report suspected incidents to the organizational incident response capability immediately upon discovery; and

    b.   Report incident information immediately, but no later than 24 hours after identification of a possible issue involving FTI to the appropriate special agent-in-charge, TIGTA and the IRS Office of Safeguards.

Control Enhancements:

*(CE-1) Automated Reporting:* Report incidents using automated mechanisms.

Supplemental Guidance: Automated mechanisms for tracking incidents and for collecting and analyzing incident information include, for example, Computer Incident Response Centers or other electronic databases of incidents and network monitoring devices.

*(CE-2) Vulnerabilities Related to Incidents:* Report system vulnerabilities associated with reported incidents to designated agency personnel.

Supplemental Guidance: Reported incidents that uncover system vulnerabilities are analyzed by organizational personnel including system owners, mission and business owners, senior agency information security officers, senior agency officials for privacy, authorizing officials, and the risk executive (function). The analysis can serve to prioritize and initiate mitigation actions to address the discovered system vulnerability.

*(CE-3) Supply Chain Coordination:* Provide incident information to the provider of the product or service and other organizations involved in the supply chain or supply chain governance for systems or system components related to the incident.

Supplemental Guidance: Agencies involved in supply chain activities include, for example, system/product developers, integrators, manufacturers, packagers, assemblers, distributors, vendors, and resellers. Supply chain incidents include, for example, compromises/breaches involving system components, information technology products, development processes or personnel and distribution

TD_0000365

processes or warehousing facilities. Organizations determine the appropriate information to share considering the value gained from support by external organizations with the potential for harm due to controlled unclassified information being released to outside organizations of perhaps questionable trustworthiness.

## IR-7: Incident Response Assistance

Provide an incident response support resource, integral to the organizational incident response capability, that offers advice and assistance to users of the system for the handling and reporting of incidents.

Supplemental Guidance: Automated mechanisms can provide a push and/or pull capability for users to obtain incident response assistance. For example, individuals might have access to a website to query the assistance capability, or the assistance capability can proactively send information to users (general distribution or targeted) as part of increasing understanding of current response capabilities and support.

Control Enhancements:

*(CE-1) Automation Support for Availability of Information and Support:* Increase the availability of incident response information and support using automated mechanisms.

Supplemental Guidance: Automated mechanisms can provide a push and/or pull capability for users to obtain incident response assistance. For example, individuals might have access to a website to query the assistance capability, or the assistance capability can proactively send information to users (general distribution or targeted) as part of increasing understanding of current response capabilities and support.

*(CE-2) Coordination with External Providers:*

    a.  Establish a direct, cooperative relationship between its incident response capability and external providers of system protection capability; and

    b.  Identify organizational incident response team members to the external providers.

## IR-8: Incident Response Plan

    a.  Develop an incident response plan that:

        1.  Provides the organization with a roadmap for implementing its incident response capability;

        2.  Describes the structure and organization of the incident response capability;

        3.  Provides a high-level approach for how the incident response capability fits into the overall organization;

        4.  Meets the unique requirements of the organization, which relate to mission, size, structure, and functions;

        5.  Defines reportable incidents;

        6.  Provides metrics for measuring the incident response capability within the organization;

        7.  Defines the resources and management support needed to effectively maintain and mature an incident response capability;

134

A703

TD_0000366

8. Addresses the sharing of incident information;

9. Is reviewed and approved by designated agency officials at a minimum on an annual basis; and

10. Explicitly designates responsibility for incident response to agency-defined personnel.

b. Distribute copies of the incident response plan to authorized incident response personnel and agency personnel with access to FTI;

c. Update the incident response plan to address system and organizational changes or problems encountered during plan implementation, execution, or testing;

d. Communicate incident response plan changes to authorized incident response personnel and agency personnel with access to FTI;

e. Protect the incident response plan from unauthorized disclosure and modification.

Control Enhancements:

*(CE-1) Breaches:* Include the following in the Incident Response Plan for breaches involving personally identifiable information:

a. A process to determine if notice to individuals or other organizations, including oversight organizations, is needed;

b. An assessment process to determine the extent of the harm, embarrassment, inconvenience, or unfairness to affected individuals and any mechanisms to mitigate such harms; and

c. Identification of applicable privacy requirements.

## IR-9: Information Spillage Response

Respond to information spills by:

a. Assigning designated incident response agency personnel with responsibility for responding to information spills;

b. Identifying the specific information involved in the system contamination;

c. Alerting designated agency officials of the information spill using a method of communication not associated with the spill;

d. Isolating the contaminated system or system component;

e. Eradicating the information from the contaminated system or component;

f. Identifying other systems or system components that may have been subsequently contaminated; and

g. Performing the following additional actions: Report incident information to the appropriate special agent-in-charge, TIGTA and the IRS Office of Safeguards.

135

A704

TD_0000367

## 4.9 MAINTENANCE

### MA-1: System Maintenance Policy and Procedures

a.  Develop, document, and disseminate to designated agency officials:

  1.  An agency or organization-level system maintenance policy that:

      (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

      (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

  2.  Procedures to facilitate the implementation of the system maintenance policy and the associated system maintenance controls;

b.  Designate an agency official to manage the development, documentation, and dissemination of the access control policy and procedures; and

c.  Review and update the current system maintenance:

  1.  Policy **every three (3) years (or if there is a significant change)**; and

  2.  Procedures **every three (3) years (or if there is a significant change)**.

### MA-2: Controlled Maintenance

a.  Schedule, document, and review records of maintenance, repair, and replacement on system components in accordance with manufacturer or vendor specifications and/or organizational requirements;

b.  Approve and monitor all maintenance activities, whether performed on site or remotely and whether the system or system components are serviced on site or removed to another location;

c.  Require that designated agency officials explicitly approve the removal of the system or system components from organizational facilities for off-site maintenance, repair, or replacement;

d.  Sanitize equipment to remove the following information from associated media prior to removal from organizational facilities for off-site maintenance, repair, or replacement: all information on the equipment being sanitized;

e.  Check all potentially impacted controls to verify that the controls are still functioning properly following maintenance, repair, or replacement actions; and

f.  Include the following information in organizational maintenance records:

  1.  Date and time of maintenance;

  2.  Name of the individual performing the maintenance;

  3.  Name of escort, if necessary;

  4.  A description of the maintenance performed; and

136

TD_0000368

5.  A list of equipment removed or replaced (including identification numbers, if applicable).

## MA-3: Maintenance Tools

a.  Approve, control, and monitor the use of system maintenance tools; and

b.  Review previously approved system maintenance tools **on at least an annual basis**.

Control Enhancements:

*(CE-1) Inspect Tools:* Inspect the maintenance tools used by maintenance personnel for improper or unauthorized modifications.

Supplemental Guidance: If, upon inspection of maintenance tools, agencies determine that the tools have been modified in an improper/unauthorized manner or contain malicious code, the incident is handled consistent with agency policies and procedures for incident handling.

*(CE-2) Inspect Media:* Check media containing diagnostic and test programs for malicious code before the media are used in the system.

Supplemental Guidance: If, upon inspection of media containing maintenance diagnostic and test programs, agencies determine that the media contain malicious code, the incident is handled consistent with agency incident handling policies and procedures.

*(CE-3) Prevent Unauthorized Removal:* Prevent the removal of maintenance equipment containing organizational information by:

a.  Verifying that there is no organizational information contained on the equipment;

b.  Sanitizing or destroying the equipment;

c.  Retaining the equipment within the facility; or

d.  Obtaining an exemption from **a designated agency official(s)** explicitly authorizing removal of the equipment from the facility.

Supplemental Guidance: Organizational information includes all information specifically owned by agencies and information provided to agencies in which agencies serve as information stewards.

*(CE-4) Restricted Tool Use:* Restrict the use of maintenance tools to authorized personnel only.

*(CE-5) Execution with Privilege:* Monitor the use of maintenance tools that execute with increased privilege.

## MA-4: Nonlocal Maintenance

a.  Approve and monitor nonlocal maintenance and diagnostic activities;

b.  Allow the use of nonlocal maintenance and diagnostic tools only as consistent with organizational policy and documented in the security plan for the system;

c.  Employ strong authenticators in the establishment of nonlocal maintenance and diagnostic sessions;

137

TD_0000369

d.  Maintain records for nonlocal maintenance and diagnostic activities; and

e.  Terminate session and network connections when nonlocal maintenance is completed.

Supplemental Guidance: Nonlocal maintenance and diagnostic activities are those activities conducted by individuals communicating through a network, either an external network or an internal network. Local maintenance and diagnostic activities are those activities carried out by individuals physically present at the system or system component and not communicating across a network connection. Authentication techniques used in the establishment of nonlocal maintenance and diagnostic sessions reflect the network access requirements in IA-2. Strong authentication requires authenticators that are resistant to replay attacks and employ multifactor authentication. Strong authenticators include, for example, PKI where certificates are stored on a token protected by a password, passphrase or biometric. Enforcing requirements in MA-4 is accomplished in part by other controls.

Control Enhancements:

(CE-1) Logging and Review:

a.  Log events defined in AU-2a for nonlocal maintenance and diagnostic sessions; and

b.  Review the audit records of the maintenance and diagnostic sessions to detect anomalous behavior.

(CE-4) Authentication and Separation of Maintenance Sessions: Protect nonlocal maintenance sessions by:

a.  Employing multifactor authentication consistent with NIST 800-63 Digital Identity Guidelines requirements; and

b.  Separating the maintenance sessions from other network sessions with the system by either:

1.  Physically separated communications paths; or

2.  Logically separated communications paths.

(CE-6) Cryptographic Protection: Implement the following cryptographic mechanisms to protect the integrity and confidentiality of nonlocal maintenance and diagnostic communications: Virtual Private Network (VPN) connection.

(CE-7) Disconnect Verification: Verify session and network connection termination after the completion of nonlocal maintenance and diagnostic sessions.

## MA-5: Maintenance Personnel

a.  Establish a process for maintenance personnel authorization and maintain a list of authorized maintenance organizations or personnel;

b.  Verify that non-escorted personnel performing maintenance on the system possess the required access authorizations; and

c.  Designate organizational personnel with required access authorizations and technical competence to supervise the maintenance activities of personnel who do not possess the required access authorizations

TD_0000370

Control Enhancements:

*(CE-5) Non-System Maintenance:* Ensure that non-escorted personnel performing maintenance activities not directly associated with the system but in the physical proximity of the system, have required access authorizations.

## MA-6: Timely Maintenance

Obtain maintenance support and/or spare parts for security-critical information system components and/or key information technology components within the Recovery Time Objective/Recovery Point Objective (RTO/RPO) timelines and Maximum Tolerable Downtime (MTD) parameters agreed upon in the information systems Information System Contingency Plan (ISCP).

139

A708

TD_0000371

## 4.10 MEDIA PROTECTION

Information system media is defined to include both digital and non-digital media.

### MP-1: Media Protection Policy and Procedures

a. Develop, document, and disseminate to designated agency officials:

   1. An agency or organization-level media protection policy that:

      (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

      (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

   2. Procedures to facilitate the implementation of the media protection policy and the associated media protection controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the media protection policy and procedures; and

c. Review and update the current media protection:

   1. Policy **every three (3) years (or if there is a significant change)**; and

   2. Procedures **every three (3) years (or if there is a significant change)**.

### MP-2: Media Access

Restrict access to digital and/or non-digital media containing FTI to authorized individuals.

### MP-3: Media Marking

a. Mark system media indicating the distribution limitations, handling caveats, and applicable security markings (if any) of the information; and

b. Exempt information media containing FTI from marking if the media remain within agency-controlled areas.

Supplemental Guidance: The agency must label information system media containing FTI to indicate the distribution limitations and handling caveats. This includes removable media (CDs, DVDs, diskettes, magnetic tapes, external hard drives, and flash drives) and information system output containing FTI (reports, documents, data files, back-up tapes) indicating "Federal Tax Information". Notice 129-A and Notice 129-B IRS provided labels can be used for this purpose.

### MP-4: Media Storage

a. Physically control and securely store digital and non-digital media containing FTI within agency-controlled areas; and

b. Protect system media types defined in MP-4a until the media are destroyed or sanitized using approved equipment, techniques, and procedures.

Reference Section 2.B, Secure Storage - IRC § 6103(p)(4)(B), on additional secure storage requirements.

140

TD_0000372

## MP-5: Media Transport

a. Protect and control digital and/or non-digital media containing FTI during transport outside of controlled areas using organization defined safeguards in accordance with (i) secure storage section and (ii) SC-28 control requirements;

b. Maintain accountability for system media during transport outside of controlled areas;

c. Document activities associated with the transport of system media; and

d. Restrict the activities associated with the transport of system media to authorized personnel.

Control Enhancements:

*(CE-3) Custodians:* Employ an identified custodian during transport of system media outside of controlled areas.

## MP-6: Media Sanitization

a. Sanitize digital and non-digital media containing FTI prior to disposal, release out of organizational control, or release for reuse using NIST 800-88, Guidelines for Media Sanitization approved sanitization techniques and procedures; and

b. Employ sanitization mechanisms with the strength and integrity commensurate with the security category or classification of the information.

Supplemental Guidance: This control applies to all system media, both digital and non-digital, subject to disposal or reuse, whether or not the media is considered removable. Examples include: digital media found in scanners, copiers, printers, notebook computers, workstations, network components, mobile devices; and non-digital media such as paper and microfilm. The sanitization process removes information from the media such that the information cannot be retrieved or reconstructed. Sanitization techniques, including clearing, purging, cryptographic erase and destruction, prevent the disclosure of information to unauthorized individuals when such media is reused or released for disposal.

Control Enhancements:

*(CE-1) Review, Approve, Track, Document, and Verify:* Review, approve, track, document, and verify media sanitization and disposal actions.

*(IRS-Defined):* Clear or purge any sensitive data from the system BIOS or UEFI before a computer system is disposed of and leaves the agency. Reset the BIOS or UEFI to the manufacturer's default profile, to ensure the removal of sensitive settings such as passwords or keys.

*(IRS-Defined):* Media provided by foreign visitors (end users) may only be loaded into a standalone agency system. The system must remain standalone until such time as it is sanitized. Additionally, no other media loaded into the standalone system can be loaded into a non-standalone agency system until sanitized.

Supplemental Guidance: The control above permits, for example, foreign visitors to provide files for presentation at an agency conference or meeting provided the computer is standalone. If such a file is required for other purposes, the preferred means for obtaining it would be to ask the visitor to email it. The control also seeks to minimize the risk that malicious code on the standalone machine will be moved via media to other systems.

141

A710

TD_0000373

Additional requirements for protecting FTI during media sanitization are provided on the Office of Safeguards website.

## MP-7: Media Use

    a.  Prohibit the use of personally-owned media on agency systems or system components; and

    b.  Prohibit the use of portable storage devices in agency systems when such devices have no identifiable owner.

Control Enhancements:

*(IRS-Defined):* Develop policy to disable all portable storage devices with the exception of those required for explicit business need, which shall be restricted to specific workstations or laptops. In the absence of an agency-developed and issued policy, the default policy is:

    a.  That the connection of non-agency portable storage devices is disallowed; and

    b.  Technical controls are implemented to enforce the policy (e.g., Implement data loss prevention software to limit the use of removable media to known devices, blacklist usb-storage, prevent the mounting of USB storage, Deny All Access to All Removable Storage Classes).

TD_0000374

## 4.11 PHYSICAL AND ENVIRONMENTAL PROTECTION

### PE-1: Physical and Environmental Policy and Procedures

a. Develop, document, and disseminate to designated agency officials:

    1. An agency or organization-level physical and environmental protection policy that:

        (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

        (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

    2. Procedures to facilitate the implementation of the physical and environmental protection policy and the associated physical and environmental protection controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the physical and environmental protection policy and procedures; and

c. Review and update the current physical and environmental protection:

    1. Policy **every three (3) years (or if there is a significant change)**; and

    2. Procedures **every three (3) years (or if there is a significant change)**.

Control Enhancements:

*(IRS-Defined):* Develop policy and procedures as needed to address their specific building access systems (e.g., restriction of physical access, identification and authentication and audit logging), that are critical to the security of a facility.

*(IRS-Defined):* Develop and implement a clean desk policy for the protection of FTI (e.g., paper output, electronic storage media) to preclude unauthorized disclosures.

*(IRS-Defined):* Designate restricted IT areas that house IT assets such as, but not limited to, mainframes, servers, controlled interface equipment, associated peripherals and communications equipment.

### PE-2: Physical Access Authorizations

a. Develop, approve, and maintain a list of individuals with authorized access to the facility where the system resides;

b. Issue authorization credentials for facility access;

c. Review the access list detailing authorized facility access by individuals **at least annually**; and

d. Remove individuals from the facility access list when access is no longer required.

### PE-3: Physical Access Control

a. Enforce physical access authorizations at entry/exit points to facilities where the information systems that receive, process, store, access, or transmit FTI by:

143

A712

TD_0000375

1.  Verifying individual access authorizations before granting access to the facility; and

2.  Controlling ingress and egress to the facility using organization-defined physical access control systems or devices.

b.  Maintain physical access audit logs for organization-defined entry or exit points;

c.  Control access to areas within the facility designated as publicly accessible by implementing the following controls: organization-defined physical access controls.

d.  Escort visitors and control visitor activity in accordance with agency policies (e.g., personnel and physical security);

e.  Secure keys, combinations, and other physical access devices;

f.  Inventory organization-defined physical access devices every twelve (12) months; and

g.  Change combinations and keys at least annually and/or when keys are lost, combinations are compromised, or when individuals possessing the keys or combinations are transferred or terminated.

Supplemental guidance: This control applies to employees and visitors. Individuals with permanent physical access authorization credentials are not considered visitors. Agencies determine the types of facility guards needed including, for example, professional security staff, administrative staff, or system users. Physical access devices include, for example, keys, locks, combinations, and card readers. Physical access control systems comply with applicable laws, Executive Orders, directives, policies, regulations, standards, and guidelines. Physical access points can include facility access points, interior access points to systems or system components requiring supplemental access controls, or both. Components of systems may be in areas designated as publicly accessible with agencies safeguarding access to such devices.

Control Enhancements:

(CE-2) Facility and Systems: Perform security checks at a minimum daily at the physical perimeter of the facility or system for exfiltration of information or removal of system components.

## PE-4: Access Control for Transmission

Control physical access to information system distribution and transmission lines within agency facilities using physical security safeguards.

Supplemental Guidance: Security safeguards applied to system distribution and transmission lines prevent accidental damage, disruption, and physical tampering. Such safeguards may also be necessary to help prevent eavesdropping or modification of unencrypted transmissions. Safeguards used to control physical access to system distribution and transmission lines include, for example, locked wiring closets; disconnected or locked spare jacks; protection of cabling by conduit or cable trays; and wiretapping sensors.

## PE-5: Access Control for Output Devices

Control physical access to output from output devices (e.g., monitors, printers, and audio devices) to prevent unauthorized individuals from obtaining the output.

144

A713

TD_0000376

Supplemental Guidance: Controlling physical access to output devices includes, for example, placing output devices in locked rooms or other secured areas and allowing access to authorized individuals only; placing output devices in locations that can be monitored by organizational personnel; installing monitor or screen filters; and using headphones. Output devices include, for example, monitors, printers, copiers, scanners, facsimile machines, and audio devices.

## PE-6: Monitoring Physical Access

   a. Monitor physical access to the facility where the system resides to detect and respond to physical security incidents;

   b. Review physical access logs at a minimum **monthly** and upon occurrence of a potential indication of an event; and

   c. Coordinate results of reviews and investigations with the organizational incident response capability.

Reference  Section 2.B.3, Restricted Area Access, for additional information.

Control Enhancements:

*(CE-1) Intrusion Alarms and Surveillance Equipment:* Monitor physical access to the facility where the system resides using physical intrusion alarms and surveillance equipment.

## PE-8: Visitor Access Records

   a. Maintain visitor access records to the facility where the system resides for **five (5) years**;

   b. Review visitor access records at least **monthly**; and

   c. Report anomalies in visitor access records to agency-defined personnel.

Reference Section 2.B.3.2, Authorized Access List for visitor access (AAL) requirements.

## PE-16: Delivery and Removal

   a. Authorize and control information system components that receive, store, process, transmit FTI entering and exiting the facility; and

   b. Maintain records of the system components.

## PE-17: Alternate Work Site

   a. Determine and document the agency permitted alternate work sites allowed for use by employees;

   b. Employ information system security and privacy controls at alternate work sites;

   c. Assess the effectiveness of security and privacy controls at alternate work sites; and

   d. Provide a means for employees to communicate with information security and privacy personnel in case of security or privacy incidents.

Supplemental Guidance: Alternate work sites include, for example, government facilities or private residences of employees. While distinct from alternative processing sites, alternate work sites can provide

145

TD_0000377

readily available alternate locations during contingency operations. Organizations can define different sets of controls for specific alternate work sites or types of sites depending on the work-related activities conducted at those sites. This control supports the contingency planning activities of organizations.

Reference Section 2.B.7, Alternate Work Site, for additional requirements.

146

A715

TD_0000378

## 4.12 PLANNING

### PL-1: Planning Policy and Procedures

a.  Develop, document, and disseminate to designated agency officials:

1.  An agency or organization-level planning policy that:

(a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

(b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

2.  Procedures to facilitate the implementation of the planning policy and the associated access controls;

b.  Designate an agency official to manage the development, documentation, and dissemination of the planning policy and procedures; and

c.  Review and update the current planning:

1.  Policies **every three (3) years (or if there is a significant change)**; and

2.  Procedures **every three (3) years (or if there is a significant change)**.

### PL-2: System Security and Privacy Plans

a.  Develop security and privacy plans for the system that:

1.  Are consistent with the organization's enterprise architecture;

2.  Explicitly define the constituent system components;

3.  Describe the operational context of the system in terms of mission and business processes;

4.  Identify the individuals that fulfill system roles and responsibilities;

5.  Identify the information types processed, stored, and transmitted by the system;

6.  Provide the security categorization of the system, including supporting rationale;

7.  Describe any specific threats to the system that are of concern to the organization;

8.  Provide the results of a privacy risk assessment for systems processing personally identifiable information;

9.  Describe the operational environment for the system and any dependencies on or connections to other systems or system components;

10. Provide an overview of the security and privacy requirements for the system;

11. Identify any relevant control baselines or overlays, if applicable;

147

A716

TD_0000379

12. Describe the controls in place or planned for meeting the security and privacy requirements, including a rationale for any tailoring decisions;

13. Include risk determinations for security and privacy architecture and design decisions;

14. Include security- and privacy-related activities affecting the system that require planning and coordination with authorized agency personnel; and

15. Are reviewed and approved by the authorizing official or designated representative prior to plan implementation. Distribute copies of the security and privacy plans and communicate subsequent changes to the plans to **designated agency officials**;

b. Distribute copies of the plans and communicate subsequent changes to the plans to authorized agency personnel;

c. Review the plans at a minimum annually (or as a result of a significant change);

d. Update the plans to address changes to the system and environment of operation or problems identified during plan implementation or control assessments; and

e. Protect the plans from unauthorized disclosure and modification.

Supplemental Guidance: An approved and accurate SSR satisfies the requirements for the security and privacy plans (see Section 2.E.4, Safeguards Security Reports (SSR)). Security and privacy plans relate security and privacy requirements to a set of security and privacy controls and control enhancements. The plans describe how the security and privacy controls and control enhancements meet those security and privacy requirements, but do not provide detailed, technical descriptions of the specific design or implementation of the controls and control enhancements. Security and privacy plans contain sufficient information (including the specification of parameter values for assignment and selection statements either explicitly or by reference) to enable a design and implementation that is unambiguously compliant with the intent of the plans and subsequent determinations of risk to agency operations and assets, individuals, other organizations, the state and the Nation if the plan is implemented as intended.

Security and privacy plans need not be single documents. The plans can be a collection of various documents including documents that already exist. Effective security and privacy plans make extensive use of references to policies, procedures and additional documents including, for example, design and implementation specifications where more detailed information can be obtained. This reduces the documentation associated with security and privacy programs and maintains the security- and privacy-related information in other established management and operational areas including, for example, enterprise architecture, system development life cycle, systems engineering and acquisition. Thus, security and privacy plans do not contain detailed contingency plan or incident response plan information, but instead provide explicitly or by reference, sufficient information to define what needs to be accomplished by those plans.

Control Enhancements:

(IRS-Defined): Include or reference a plan for media sanitization and disposition that addresses all system media and backups in the agency's system security and privacy plans.

See Section MP-6: Media Sanitization for additional information on media sanitization.

148

## PL-4: Rules of Behavior

a. Establish and provide to individuals requiring access to the system, the rules that describe their responsibilities and expected behavior for information and system usage, security, and privacy;

b. Receive a signed acknowledgement from such individuals, indicating that they have read, understand, and agree to abide by the rules of behavior, before authorizing access to information and the information system;

c. Review and update the rules of behavior at a minimum annually; and

d. Require individuals who have acknowledged a previous version of the rules of behavior to read and re-acknowledge when the rules are revised or updated.

Control Enhancements:

*(CE-1) Social Media and Networking Restrictions:* Include in the rules of behavior, restrictions on:

a. Use of social media, social networking sites, and external sites/applications;

b. Posting organizational information on public websites; and

c. Use of organization-provided identifiers (e.g., email addresses) and authentication secrets (e.g., passwords) for creating accounts on external sites/applications.

*(IRS-Defined):* Unless superseded by centrally-issued cross-agency policy, establish usage restrictions and implementation guidance for using Internet-supported technologies (e.g. Instant messaging) based on the potential for these technologies to cause damage or disruption to the information system or the agency's accomplishment of its mission. Document the use of Internet-supporting technologies.

## PL-8: Security and Privacy Architectures

a. Develop security and privacy architectures for the system that:

   1. Describe the requirements and approach to be taken for protecting the confidentiality, integrity, and availability of organizational information;

   2. Describe the requirements and approach to be taken for processing personally identifiable information to minimize privacy risk to individuals;

   3. Describe how the architectures are integrated into and support the enterprise architecture; and

   4. Describe any assumptions about, and dependencies on, external systems and services;

b. Review and update the architectures at a minimum annually to reflect changes in the enterprise architecture; and

c. Reflect planned architecture changes in security and privacy plans, Concept of Operations (CONOPS), criticality analysis, organizational procedures, and procurements and acquisitions.

Supplemental Guidance: This control addresses actions taken by agencies in the design and development of systems. The security and privacy architectures at the system level are consistent with

149

and complement the organization-wide security and privacy architectures described in PM-7 that are integral to and developed as part of the enterprise architecture. The security and privacy architectures include an architectural description, the placement and allocation of security and privacy functionality (including security and privacy controls), security- and privacy-related information for external interfaces, information being exchanged across the interfaces and the protection mechanisms associated with each interface. In addition, the security and privacy architectures can include other information, for example, user roles and the access privileges assigned to each role, unique security and privacy requirements, types of information processed, stored and transmitted by the system, restoration priorities of information and system services and any other specific protection needs.

Control Enhancements:

*(CE-1) Defense-In-Depth:* Design the security and privacy architectures for the system using a defense-in-depth approach that:

    a.   Allocates system communication and other relevant controls to information systems processing, storing, and transmitting FTI; and

    b.   Ensures that the allocated controls operate in a coordinated and mutually reinforcing manner.

150

TD_0000382

## 4.13 PROGRAM MANAGEMENT

### PM-1: Information Security Program Plan

a.  Develop and disseminate an organization-wide information security program plan that:

   1.  Provides an overview of the requirements for the security program and a description of the security program management controls and common controls in place or planned for meeting those requirements;

   2.  Includes the identification and assignment of roles, responsibilities, management commitment, coordination among organizational entities and compliance;

   3.  Reflects the coordination among organizational entities responsible for information security; and

   4.  Is approved by a senior official with responsibility and accountability for the risk being incurred to organizational operations (including mission, functions, image, and reputation), organizational assets, individuals, other organizations, the state, and the Nation;

b.  Review the organization-wide information security program plan every three (3) years and following significant changes; and

c.  Protect the information security program plan from unauthorized disclosure and modification.

Supplemental Guidance: Information security program plans can be represented in single documents or compilations of documents at the discretion of organizations. The plans document the program management controls and organization-defined common controls. Information security program plans provide sufficient information about the program management controls/common controls (including specification of parameters for any assignment and selection statements either explicitly or by reference) to enable implementations that are unambiguously compliant with the intent of the plans and a determination of the risk to be incurred if the plans are implemented as intended. Security plans for individual systems and the organization-wide information security program plan, provide complete coverage for all security controls employed within the organization. Common controls are documented in an appendix to the agency's information security program plan unless the controls are included in a separate security plan for a system. The organization-wide information security program plan will indicate which separate security plans contain descriptions of common controls.

Agencies have the flexibility to describe common controls in a single document or in multiple documents. For multiple documents, the documents describing common controls are included as attachments to the information security program plan. If the information security program plan contains multiple documents, the organization specifies in each document the organizational official or officials responsible for the development, implementation, assessment, authorization, and monitoring of the respective common controls. For example, the Facilities Management Office may develop, implement, assess, authorize, and continuously monitor common physical and environmental protection controls from the PE family when such controls are not associated with a particular system but instead, support multiple systems.

### PM-2: Information Security Program Leadership Role

Appoint a senior agency information security officer with the mission and resources to coordinate, develop, implement, and maintain an organization-wide information security program.

TD_0000383

Supplemental Guidance: The senior information security officer is an organizational (e.g., state, local, agency, etc.) official. For federal agencies (as defined by applicable laws, Executive Orders, regulations, directives, policies, and standards), this official is the Senior Agency Information Security Officer. Agencies may also refer to this official as the Senior Information Security Officer or Chief Information Security Officer. The senior accountable official for risk management leads the risk executive (function) in organization-wide risk management activities.

## PM-3: Information Security and Privacy Resources

a. Include the resources needed to implement the information security and privacy programs in capital planning and investment requests and document all exceptions to this requirement;

b. Prepare documentation required for addressing information security and privacy programs in capital planning and investment requests in accordance with applicable laws, executive orders, directives, policies, regulations, standards; and

c. Make available for expenditure, the planned information security and privacy resources.

Supplemental Guidance: Agencies consider establishing champions for information security and privacy efforts and as part of including the necessary resources, assign specialized expertise and resources as needed. Agencies may designate and empower an Investment Review Board or similar group to manage and provide oversight for the information security-and privacy-related aspects of the capital planning and investment control process.

## PM-4: Plan of Action and Milestones Process

a. Implement a process to ensure that plans of action and milestones for the information security, privacy, and supply chain risk management programs and associated organizational systems:

   1. Are developed and maintained;

   2. Document the remedial information security, privacy, and supply chain risk management actions to adequately respond to risk to organizational operations and assets, individuals, other organizations, and the Nation; and

   3. Are reported in accordance with established reporting requirements.

b. Review plans of action and milestones for consistency with the organizational risk management strategy and organization-wide priorities for risk response actions.

Supplemental Guidance: The plan of action and milestones is a key document in the information security and privacy programs and is subject to reporting requirements established by the Office of Management and Budget. Organizations view plans of action and milestones from an enterprise-wide perspective, prioritizing risk response actions and ensuring consistency with the goals and objectives of the organization. Plan of action and milestones updates are based on findings from control assessments and continuous monitoring activities. Agency POA&Ms must include, as applicable, all recommendations from external audits, reviews, or evaluations (e.g. Office of Inspector General (OIG), Federal agencies, internal assessments or departmental compliance and assistance review reports). POA&M documents must include a risk-based criticality of each finding, actions to mitigate vulnerabilities and actions to correct deficiencies found in assessments.

## PM-5: System Inventory

Develop and update continually an inventory of organizational systems.

152

A721

TD_0000384

Supplemental Guidance: This control is only for systems that process, store, or transmit FTI.

Control Enhancements:

*(CE-1) Inventory of Personally Identifiable Information:* Establish, maintain, and update continually an inventory of all systems, applications, and projects that process personally identifiable information.

## PM-7: Enterprise Architecture

Develop and maintain an enterprise architecture with consideration for information security, privacy, and the resulting risk to organizational operations and assets, individuals, other organizations, and the Nation.

Supplemental Guidance: The integration of security and privacy requirements and controls into the enterprise architecture ensures that security and privacy considerations are addressed early in the SDLC and are directly and explicitly related to the organization's mission and business processes. The process of security and privacy requirements integration also embeds into the enterprise architecture, the organization's security and privacy architectures consistent with the organizational risk management and information security and privacy strategies. For PM-7, the security and privacy architectures are developed at a system-of-systems level, representing all organizational systems. For PL-8, the security and privacy architectures are developed at a level representing an individual system. The system-level architectures are consistent with the security and privacy architectures defined for the organization. Security and privacy requirements and control integration are most effectively accomplished through the rigorous application of the Risk Management Framework and supporting security standards and guidelines.

Control Enhancements:

*(IRS-Defined):* Review and update the security enterprise architecture data based on the enterprise architecture timeframes.

## PM-9: Risk Management Strategy

    a.   Develops a comprehensive strategy to manage:

          1.   Security risk to organizational operations and assets, individuals, other organizations, and the Nation associated with the operation and use of organizational systems; and

          2.   Privacy risk to individuals resulting from the authorized processing of personally identifiable information;

    b.   Implement the risk management strategy consistently across the organization; and

    c.   Review and update the risk management strategy every three (3) years or as required, to address organizational changes.

Supplemental Guidance: An organization-wide risk management strategy includes, for example, an expression of the security, privacy and supply chain risk tolerance for the organization; acceptable risk assessment methodologies; security, privacy and supply chain risk mitigation strategies; a process for consistently evaluating security, privacy and supply chain risk across the organization with respect to the organization's risk tolerance; and approaches for monitoring risk over time. The senior accountable official for risk management (agency head or designated official) aligns information security management processes with strategic, operational, and budgetary planning processes. The use of a risk executive function, led by the senior accountable official for risk management, can facilitate consistent application of the risk management strategy organization-wide. The organization-wide risk management strategy can be

153

A722

TD_0000385

informed by security, privacy, and supply chain risk-related inputs from other sources, internal and external to the organization, to ensure the strategy is both broad-based and comprehensive.

## PM-10: Authorization Process

a.  Manage the security and privacy state of organizational systems and the environments in which those systems operate through authorization processes;

b.  Designate individuals to fulfill specific roles and responsibilities within the organizational risk management process; and

c.  Integrate the authorization processes into an organization-wide risk management program.

## PM-12: Insider Threat Program

Implement an insider threat program that includes a cross-discipline insider threat incident handling team.

Supplemental Guidance: Insider threat programs include controls to detect and prevent malicious insider activity through the centralized integration and analysis of both technical and non-technical information to identify potential insider threat concerns. A senior official is designated by the department or agency head as the responsible individual to implement and provide oversight for the program. In addition to the centralized integration and analysis capability, insider threat programs as a minimum, prepare department or agency insider threat policies and implementation plans; conduct host-based user monitoring of individual employee activities on government-owned computers; provide insider threat awareness training to employees; receive access to information from all offices within the department or agency for insider threat analysis; and conduct self-assessments of department or agency insider threat posture.

Insider threat programs can leverage the existence of incident handling teams that organizations may already have in place, such as cybersecurity incident response teams. Human resources records are especially important in this effort, as there is compelling evidence to show that some types of insider crimes are often preceded by nontechnical behaviors in the workplace including, for example, ongoing patterns of disgruntled behavior and conflicts with coworkers and other colleagues. These precursors can better inform and guide organizational officials in more focused, targeted monitoring efforts.

## PM-14: Testing, Training and Monitoring

a.  Implement a process for ensuring that organizational plans for conducting security and privacy testing, training, and monitoring activities associated with organizational systems:

1.  Are developed and maintained; and

2.  Continue to be executed; and

b.  Review testing, training, and monitoring plans for consistency with the organizational risk management strategy and organization-wide priorities for risk response actions.

Supplemental Guidance: This control ensures that organizations provide oversight for the security and privacy testing, training, and monitoring activities conducted organization-wide and that those activities are coordinated. With the growing importance of continuous monitoring programs, the implementation of information security and privacy across the three tiers of the risk management hierarchy and the widespread use of common controls, organizations coordinate and consolidate the testing and monitoring activities that are routinely conducted as part of ongoing organizational assessments supporting a variety of security and privacy controls. Security and privacy training activities, while focused on individual

TD_0000386

systems and specific roles, also necessitate coordination across all organizational elements. Testing, training, and monitoring plans and activities are informed by current threat and vulnerability assessments.

## PM-18: Privacy Program Plan

a. Establish policy and procedures to ensure that requirements for the protection of controlled unclassified information that is processed, stored, or transmitted on external systems, are implemented in accordance with applicable laws, executive orders, directives, policies, regulations, and standards; and

b. Review and update the policy and procedures every three (3) years or when there is a significant change.

Supplemental Guidance: A Privacy program plan is a formal document that provides an overview of an agency's privacy program, including a description of the structure of the privacy program, the resources dedicated to the privacy program, the role of the Senior Agency Official for Privacy and other privacy officials and staff, the strategic goals and objectives of the privacy program and the program management and common controls in place or planned for meeting applicable privacy requirements and managing privacy risks.

Privacy program plans can be integrated with information security plans or can be represented independently, either in a single document or in compilations of documents at the discretion of organizations. The plans document the program management controls and organization-defined common controls. Privacy program plans provide sufficient information about the program management and common controls (including specification of parameters and assignment and selection statements either explicitly or by reference) to enable control implementations that are unambiguously compliant with the intent of the plans and a determination of the risk incurred if the plans are implemented as intended.

The privacy plans for individual systems and the organization-wide privacy program plan together provide complete coverage for all privacy controls employed within the organization. Common controls are documented in an appendix to the organization's privacy program plan unless the controls are included in a separate privacy plan for a system. The organization-wide privacy program plan indicates which separate privacy plans contain descriptions of privacy controls.

Organizations have the flexibility to describe common controls in a single document or in multiple documents. In the case of multiple documents, the documents describing common controls are included as attachments to the privacy program plan. If the privacy program plan contains multiple documents, the organization specifies in each document, the organizational official or officials responsible for the development, implementation, assessment, authorization, and monitoring of the respective common controls.

## PM-19: Privacy Program Leadership Role

Appoint a senior agency official for privacy with the authority, mission, accountability, and resources to coordinate, develop, and implement, applicable privacy requirements and manage privacy risks through the organization-wide privacy program.

Supplemental Guidance: The privacy officer described in this control is an organizational official. For federal agencies, as defined by applicable laws, Executive Orders, directives, regulations, policies, standards and guidelines, this official is designated as the Senior Agency Official for Privacy. Organizations may also refer to this official as the Chief Privacy Officer.

155

TD_0000387

## PM-21: Accounting of Disclosures

a. Develop and maintain an accurate accounting of disclosures of personally identifiable information, including:

    1. Date, nature, and purpose of each disclosure; and

    2. Name and address, or other contact information of the individual or organization to which the disclosure was made;

b. Retain the accounting of disclosures for the length of the time the personally identifiable information is maintained or five years after the disclosure is made, whichever is longer; and

c. Make the accounting of disclosures available to the individual to whom the personally identifiable information relates upon request.

## PM-29: Risk Management Program Leadership Roles

a. Appoint a Senior Accountable Official for Risk Management to align organizational information security and privacy management processes with strategic, operational, and budgetary planning processes; and

b. Establish a Risk Executive (function) to view and analyze risk from an organization-wide perspective and ensure management of risk is consistent across the organization.

156

TD_0000388

## 4.14 PERSONNEL SECURITY

### PS-1: Personnel Security Policy and Procedures

a. Develop, document, and disseminate to designated agency officials:

1. An agency or organization-level personnel security policy that:

    (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

    (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

2. Procedures to facilitate the implementation of the personnel security policy and the associated personnel security controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the personnel security policy and procedures; and

c. Review and update the current personnel security:

1. Policies **every three (3) years (or if there is a significant change)**; and

2. Procedures **every three (3) years (or if there is a significant change)**.

### PS-2: Position Risk Designation

a. Assign a risk designation to all organizational positions;

b. Establish screening criteria for individuals filling those positions; and

c. Review and update position risk designations when recruitment actions are taken or when position descriptions are rewritten.

Supplemental Guidance: The IRS Office of Safeguards requires risk designations only for agency personnel or authorized contractors with access to FTI or responsible for administering FTI environments.

### PS-3: Personnel Screening

a. Screen individuals prior to authorizing access to the system; and

b. Rescreen individuals in accordance with agency-defined conditions requiring rescreening but no less than once every five years.

See Section 2.C.3, Background Investigation Minimum Requirements for additional requirements.

(Page 344 of Total)

A726

TD_0000389

## PS-4: Personnel Termination

Upon termination of individual employment:

a. Disable system access within three (3) business days;

b. Terminate or revoke any authenticators and credentials associated with the individual;

c. Conduct exit interviews that include a discussion of information security topics, specifically nondisclosure agreements;

d. Retrieve all security-related organizational system-related property; and

e. Retain access to organizational information and systems formerly controlled by terminated individual.

## PS-5: Personnel Transfer

a. Review and confirm ongoing operational need for current logical and physical access authorizations to systems and facilities when individuals are reassigned or transferred to other positions within the organization;

b. Initiate transfer or when warranted extended reassignment actions within five (5) business days of the formal transfer action;

c. Modify access authorization as needed to correspond with any changes in operational need due to reassignment or transfer; and

d. Notify designated agency personnel within five (5) business days of transfer.

## PS-6: Access Agreements

a. Develop and document access agreements for organizational systems;

b. Review and update the access agreements **at a minimum annually**; and

c. Verify that individuals requiring access to organizational information and systems:

1. Sign appropriate access agreements prior to being granted access; and

2. Re-sign access agreements to maintain access to organizational systems when access agreements have been updated or **at a minimum annually**.

Control Enhancements:

*(CE-3) Post-Employment Requirements:*

a. Notify individuals of applicable, legally binding post-employment requirements for protection of organizational information; and

b. Require individuals to sign an acknowledgment of these requirements, if applicable, as part of granting initial access to covered information.

A727

TD_0000390

## PS-7: External Personnel Security

a. Establish personnel security requirements, including security roles and responsibilities for external providers;

b. Require external providers to comply with personnel security policies and procedures established by the organization;

c. Document personnel security requirements;

d. Require external providers to notify designated agency personnel of any personnel transfers or terminations of external personnel who possess organizational credentials and/or badges, or who have system privileges within three (3) business days; and

e. Monitor provider compliance with personnel security requirements.

## PS-8: Personnel Sanctions

a. Employ a formal sanctions process for individuals failing to comply with established information security and privacy policies and procedures; and

b. Notify designated agency personnel within 72 hours when a formal employee sanctions process is initiated, identifying the individual sanctioned and the reason for the sanction.

## PS-9: Position Descriptions

Incorporate security and privacy roles and responsibilities into organizational position descriptions.

159

A728

TD_0000391

## 4.15 PERSONALLY IDENTIFIABLE INFORMATION PROCESSING AND TRANSPARENCY

### PT-1: Personally Identifiable Information Processing and Transparency Policy and Procedures

a. Develop, document, and disseminate to agency officials:

1. An agency or organization-level personally identifiable information processing and transparency policy that:

   (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

   (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

2. Procedures to facilitate the implementation of the personally identifiable information processing and transparency policy and the associated personally identifiable information processing and transparency controls;

b. Designate an agency official to manage the development, documentation, and dissemination of the personally identifiable information processing and transparency policy and procedures; and

c. Review and update the current personally identifiable information processing and transparency:

1. Policies **every three (3) years (or if there is a significant change)**; and

2. Procedures **every three (3) years (or if there is a significant change)**.

### PT-2: Authority to Process Personally Identifiable Information

a. Determine and document the IRC § 6103 section that permits the receipt of personally identifiable information; and

b. Restrict the access of personally identifiable information to only that which is authorized.

160

## 4.16 RISK ASSESSMENT

### RA-1: Risk Assessment Policy and Procedures

   d.  Develop, document, and disseminate to designated agency officials:

      1.  An agency or organization-level risk assessment policy that:

         a.  Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

         b.  Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

      2.  Procedures to facilitate the implementation of the risk assessment policy and the associated risk assessment controls;

   e.  Designate an agency official to manage the development, documentation, and dissemination of the risk assessment policy and procedures; and

   f.  Review and update the current risk assessment:

      1.  Policies **every three (3) years (or if there is a significant change)**; and

      2.  Procedures **every three (3) years (or if there is a significant change)**.

### RA-3: Risk Assessment

   a.  Conduct a risk assessment, including:

      1.  Identifying threats to and vulnerabilities in the system;

      2.  Determining the likelihood and magnitude of harm from unauthorized access, use, disclosure, disruption, modification, or destruction of the system, the information it processes, stores, or transmits, and any related information; and

      3.  Determining the likelihood and impact of adverse effects on individuals arising from the processing of personally identifiable information;

   b.  Integrate risk assessment results and risk management decisions from the organization and mission or business process perspectives with system-level risk assessments;

   c.  Document risk assessment results in system security plans and risk assessment plans;

   d.  Review risk assessment results at least **annually**;

   e.  Disseminate risk assessment results to agency-defined personnel (e.g., AO, System Owner, system administrator); and

   f.  Update the risk assessment at least **every three years** or when there are significant changes to the system, its environment of operation, or other conditions that may impact the security or privacy state of the system.

161

TD_0000393

Control Enhancements:

*(CE-1) Supply Chain Risk Assessment:*

   c.   Assess supply chain risks associated with Federal Tax Information and

   d.   Update the supply chain risk assessment every three (3) years, when there are significant changes to the relevant supply chain, or when changes to the system, environments of operation, or other conditions may necessitate a change in the supply chain.

Supplemental Guidance: Supply chain-related events include, for example, disruption, theft, use of defective components, insertion of counterfeits, malicious development practices, improper delivery practices and insertion of malicious code. These events can have a significant impact on the confidentiality, integrity or availability of a system and its information and therefore, can also adversely impact organizational operations (including mission, functions, image or reputation), organizational assets, individuals, other organizations, the state and the Nation. The supply chain-related events may be unintentional or malicious and can occur at any point during the system life cycle. An analysis of supply chain risk can help an organization identify systems or components for which additional supply chain risk mitigations are required.

## RA-5: Vulnerability Monitoring and Scanning

   a.   Monitor and scan for vulnerabilities in the system and hosted applications every thirty (30) days, prior to placing a new information system on the agency network, to confirm remediation actions, and when new vulnerabilities potentially affecting the system are identified and reported;

   b.   Employ vulnerability monitoring tools and techniques that facilitate interoperability among tools and automate parts of the vulnerability management process by using standards for:

      1.   Enumerating platforms, software flaws and improper configurations;

      2.   Formatting checklists and test procedures; and

      3.   Measuring vulnerability impact;

   c.   Analyze vulnerability scan reports and results from vulnerability monitoring;

   d.   Remediate legitimate vulnerabilities in accordance with an agency assessment of risk;

   e.   Share information obtained from the vulnerability monitoring process and control assessments with agency-defined personnel to help eliminate similar vulnerabilities in other systems; and

   f.   Employ vulnerability monitoring tools that include the capability to readily update the vulnerabilities to be scanned.

Supplemental Guidance: Automated security scanning of assets (including wireless networks) for inventory, configuration, and vulnerability data, including at the application-level, must be included in monthly required vulnerability scans.

Control Enhancements:

*(CE-2) Update by Vulnerabilities to be Scanned:* Update the system vulnerabilities to be scanned at least every 30 days; prior to a new scan; when new vulnerabilities are identified and reported.

162

A731

TD_0000394

*(CE-4) Discoverable Information:* Determine information about the system that is discoverable and take appropriate corrective actions.

*(CE-5) Privileged Access:* Implement privileged access authorization to all information system components for selected vulnerability scanning activities.

Supplemental Guidance: In certain situations, the nature of the vulnerability scanning may be more intrusive or the system component that is the subject of the scanning may contain classified or controlled unclassified information. Privileged access authorization to selected system components facilitates more thorough vulnerability scanning and protects the sensitive nature of such scanning.

*(IRS-Defined):* Implement a vulnerability management process for IT software systems (including wireless networks) to complement their patch management process.

## RA-7: Risk Response

Respond to findings from security and privacy assessments, monitoring, and audits in accordance with organizational risk tolerance.

Supplemental Guidance: Agencies have a variety of options for responding to risk including mitigating the risk by implementing new controls or strengthening existing controls; accepting the risk with appropriate justification or rationale; sharing or transferring the risk; or rejecting the risk. Organizational risk tolerance influences risk response decisions and actions. Risk response is also known as risk treatment. This control addresses the need to determine an appropriate response to risk before a plan of action and milestones entry is generated. For example, the response may be to accept risk or reject risk, or it may be possible to mitigate the risk immediately, so a plan of action and milestones entry is not needed. However, if the risk response is to mitigate the risk and the mitigation cannot be completed immediately, a plan of action and milestones entry is generated.

## RA-8: Privacy Impact Assessments

Conduct privacy impact assessments for systems, programs, or other activities before:

   a.  Developing or procuring information technology that processes personally identifiable information; and

   b.  Initiating a new collection of personally identifiable information that:

      1.  Will be processed using information technology; and

      2.  Includes personally identifiable information permitting the physical or virtual (online) contacting of a specific individual, if identical questions have been posed to, or identical reporting requirements imposed on, ten or more individuals, other than agencies, instrumentalities, or employees of the federal government.

Supplemental Guidance: A privacy impact assessment must be conducted specifically for new systems used to process, store, or transmit FTI.

## 4.17 SYSTEM AND SERVICES ACQUISITION

## SA-1: System and Services Acquisition Policy and Procedures

   a.  Develop, document, and disseminate to designated agency officials:

163

A732

TD_0000395

1. An agency or organization-level system and services acquisition policy that:

   (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

   (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

2. Procedures to facilitate the implementation of the system and services acquisition policy and the associated system and services acquisition controls;

b. Designate an agency designated official to manage the development, documentation, and dissemination of the system and services acquisition policy and procedures; and

c. Review and update the current system and services acquisition:

   1. Policy **every three (3) years (or if there is a significant change)**; and

   2. Procedures **every three (3) years (or if there is a significant change)**.

## SA-2: Allocation of Resources

a. Determine the high-level information security and privacy requirements for the system or system service in mission and business process planning;

b. Determine, document, and allocate the resources required to protect the system or system service as part of the organizational capital planning and investment control process; and

c. Establish a discrete line item for information security and privacy in organizational programming and budgeting documentation.

## SA-3: System Development Life Cycle

a. Acquire, develop, and manage the system using an agency or organization-level system development life cycle that incorporates information security and privacy considerations;

b. Define and document information security and privacy roles and responsibilities throughout the systems development lifecycle (SDLC);

c. Identify individuals having information security and privacy roles and responsibilities; and

d. Integrate the organizational information security and privacy risk management process into SDLC activities.

Control Enhancements

(CE-2) Use of Live Data:

a. Approve, document, and control the use of live data in preproduction environments for the system, system component, or system service; and

b. Protect preproduction environments for the system, system component, or system service at the same impact or classification level as any live data in use within the preproduction environments.

164

A733

TD_0000396

Supplemental Guidance: Live data is also referred to as operational data. The use of live data in preproduction environments can result in significant risk to agencies. Agencies can minimize such risk by using test or dummy data during the design, development and testing of systems, system components and system services. To use live FTI in a test or development environment, agencies must submit a notification as described in Section 2.E.6, Notification Reporting Requirements.

## SA-4: Acquisition Process

Include the following requirements, descriptions, and criteria, explicitly or by reference, using organization-defined contract language in the acquisition contract for the system, system component, or system service:

a.  Security and privacy functional requirements;

b.  Strength of mechanism requirements;

c.  Security and privacy assurance requirements;

d.  Controls needed to satisfy the security and privacy requirements;

e.  Security and privacy documentation requirements;

f.  Requirements for protecting security and privacy documentation;

g.  Description of the system development environment and environment in which the system is intended to operate;

h.  Allocation of responsibility or identification of parties responsible for information security, privacy, and supply chain risk management; and

i.  Acceptance criteria.

Control Enhancements

(CE-1) Functional Properties of Controls: Require the developer of the system, system component, or system service to provide a description of the functional properties of the controls to be implemented.

(CE-2) Design and Implementation Information for Controls: Require the developer of the system, system component, or system service to provide design and implementation information for the controls that includes: security-relevant external system interfaces; high-level design; low-level design; source code or hardware schematics; organization-defined design and implementation information for the security controls to be employed at sufficient level of detail to permit analysis and testing of controls.

(CE-8) Continuous Monitoring Plan for Controls: Require the developer of the system, system component, or system service to produce a plan for continuous monitoring of control effectiveness that is consistent with the continuous monitoring program of the organization.

(CE-9) Functions, Ports, Protocols and Services in Use: Require the developer of the system, system component, or system service to identify the functions, ports, protocols, and services intended for organizational use.

(CE-12) Data Ownership:

a.  Include organizational data ownership requirements in the acquisition contract; and

165

TD_0000397

b.  Require all data to be removed from the contractor's system and returned to the organization within 7 calendar days prior to contract termination.

Supplemental Guidance: The contactor must provide the agency with certification of destruction using NIST approved standards or certification that the data has been returned.

*(IRS-Defined):* Information systems that receive, process, store, access, protect and/or transmit FTI must be located, operated, and accessed within the United States. When a contract developer is used, agencies must document, through contract requirements, that all FTI systems (i.e., beyond commercial products used as components) are located within the United States and are developed physically within the United States by United States citizens or those with lawful resident status.

Supplemental Guidance: This includes any contractor systems or cloud environments where FTI is received, processed, stored, accessed, protected and/or transmitted. See Section 2.C.7, Offshore Operations, for additional information.

*(IRS-Defined):* In acquiring information technology, agencies must use common security configurations, when applicable, by (a) requiring vendors to configure IT with common security configurations (when available and applicable, e.g., Center for Internet Security benchmarks) prior to delivery or (b) configuring acquired IT to meet agency-tailored, secure parameters (e.g., configurations that meet Publication 1075 and applicable SCSEM requirements) after delivery but prior to deployment.

Supporting Guidance: In the latter case, agencies do not need to require that vendors securely configure IT for delivery.

## SA-5: System Documentation

a.  Obtain or develop administrator documentation for the system, system component, or system service that describes:

1.  Secure configuration, installation, and operation of the system, component, or service;

2.  Effective use and maintenance of security and privacy functions and mechanisms; and

3.  Known vulnerabilities regarding configuration and use of administrative or privileged functions;

b.  Obtain or develop user documentation for the system, system component, or system service that describes:

1.  User-accessible security and privacy functions and mechanisms and how to effectively use those functions and mechanisms;

2.  Methods for user interaction, which enables individuals to use the system, component, or service in a more secure manner and protect individual privacy; and

3.  User responsibilities in maintaining the security of the system, component, or service and privacy of individuals;

c.  Document attempts to obtain system, system component, or system service documentation when such documentation is either unavailable or nonexistent and take agency-defined actions (e.g., recreates documentation that is essential to the effective implementation or operation of security controls) in response; and

TD_0000398

d.   Distribute documentation to designated agency officials.

## SA-8: Security Engineering Principles

Apply the following systems security and privacy engineering principles in the specification, design, development, implementation, and modification of the system and system components: agency-defined systems security and privacy engineering principles.

Supplemental Guidance: Agencies can apply systems security and privacy engineering principles to new systems under development or to systems undergoing upgrades. For legacy systems, agencies apply systems security and privacy engineering principles to system upgrades and modifications to the extent feasible, given the current state of hardware, software, and firmware components within those systems. The application of systems security and privacy engineering concepts and principles help to develop trustworthy, secure systems and system components and reduce the susceptibility of agencies to disruptions, hazards, threats and creating privacy-related problems for individuals. Examples of these concepts and principles include, developing layered protections; establishing security and privacy policies, architecture and controls as the foundation for design and development; incorporating security and privacy requirements into the system development life cycle; delineating physical and logical security boundaries; ensuring that developers are trained on how to build secure software; tailoring security and privacy controls to meet agency and operational needs; performing threat modeling to identify use cases, threat agents, attack vectors and patterns, design patterns and compensating controls needed to mitigate risk. Agencies that apply security and privacy engineering concepts and principles can facilitate the development of trustworthy, secure systems, system components and system services; reduce risk to acceptable levels; and make informed risk management decisions. Security engineering principles can also be used to protect against certain supply chain risks including, for example, incorporating tamper-resistant hardware into a design.

## SA-9: External System Services

a.   Require that providers of external system services comply with organizational security and privacy requirements and employ the following controls: the security and privacy requirements contained within this publication and applicable federal laws, Executive Orders, directives, policies, regulations, standards and established service-level agreements;

b.   Define and document organizational oversight and user roles and responsibilities with regard to external system services; and

c.   Employ the following processes, methods, and techniques to monitor control compliance by external service providers on an ongoing basis: continuous monitoring activities (e.g., perform internal inspections, complete self-assessments using SCSEM, perform automated configuration compliance scans, etc.)

Control Enhancements

*(CE-1) Risk Assessments and Organizational Approvals:*

a.   Conduct an organizational assessment of risk prior to the acquisition or outsourcing of information security services; and

b.   Verify that the acquisition or outsourcing of dedicated information security services is approved by a designated agency official.

TD_0000399

*(CE-2) Identification of Functions, Ports, Protocols and Services:* Require providers of external information system services that process, store, or transmit FTI to identify the functions, ports, protocols, and other services required for the use of such services.

*(CE-3) Establish and Maintain Trust Relationship with Providers:* Establish, document, and maintain trust relationships with external service providers based on the following requirements, properties, factors, or conditions: IRS Publication 1075 requirements for information systems that process, store, or transmit FTI.

*(CE-5) Processing, Storage and Service Location:* Restrict the location of accessing, processing, storage, transmission of FTI to The U.S. and territories based on IRS Publication 1075 requirements.

*(CE-6) Organization-Controlled Cryptographic Keys:* Maintain exclusive control of cryptographic keys for encrypted material stored or transmitted through an external system.

*(CE-8) Processing and Storage Location – U.S. Jurisdiction:* Restrict the geographic location of information processing and data storage to facilities located within in the legal jurisdictional boundary of the United States.

## SA-10: Developer Configuration Management

Require the developer of the system, system component, or system service to:

  a. Perform configuration management during system, component, or service: design, development, implementation, and operation and disposal;

  b. Document, manage, and control the integrity of changes to configuration items under configuration management;

  c. Implement only organization-approved changes to the system, component, or service;

  d. Document approved changes to the system, component, or service and the potential security and privacy impacts of such changes; and

  e. Track security flaws and flaw resolution within the system, component, or service and report findings to the designated agency official.

Control Enhancements

*(CE-1) Software and Firmware Integrity Verification:* Require the developer of the system, system component, or system service to enable integrity verification of software and firmware components.

Supplemental Guidance: Verification of the integrity of software and firmware can be accomplished though confirmation of the hash value. For example, checksums from well-known and safe hash functions. MD5 is not considered a safe hash function to use.

*(CE-3) Hardware Integrity Verification:* Require the developer of the system, system component, or system service to enable integrity verification of hardware components.

*(CE-7) Security and Privacy Representatives:* Require agency designated security and privacy representatives to be included in the configuration change management and control process.

TD_0000400

## SA-11: Developer Testing and Evaluation

Require the developer of the system, system component, or system service, at all post-design stages of the system development life cycle, to:

a. Develop and implement a plan for ongoing security and privacy assessments;

b. Perform system testing/evaluation at the depth of one or more of the following: security-related functional properties, security-related externally visible interfaces, high-level design, low-level design and/or implementation representation (i.e., source code and hardware schematics) at all post-design phases of the SDLC;

c. Produce evidence of the execution of the assessment plan and the results of the testing and evaluation;

d. Implement a verifiable flaw remediation process; and

e. Correct flaws identified during testing and evaluation.

### Control Enhancements

*(CE-1) Static Code Analysis:* Require the developer of the system, system component, or system service to employ static code analysis tools to identify common flaws and document the results of the analysis.

*(CE-4) Manual Code Reviews:* Require the developer of the system, system component, or system service to perform a manual code review of FTI-related applications using the following processes, procedures, and/or techniques: agency-defined manual review process.

*(CE-5) Penetration Testing:* Require the developer of the system, system component, or system service to perform penetration testing:

a. At the following level of rigor: at a minimum Whitebox testing; and

b. Under the following constraints: where FTI is processed, stored, or transmitted.

*(CE-6) Attack Surface Reviews:* Require the developer of the system, system component, or system service to perform attack surface reviews.

## SA-15: Development Process, Standards and Tools

a. Require the developer of the system, system component, or system service to follow a documented development process that:

1. Explicitly addresses security and privacy requirements;

2. Identifies the standards and tools used in the development process;

3. Documents the specific tool options and tool configurations used in the development process; and

4. Documents, manages, and ensures the integrity of changes to the process and/or tools used in development; and

169

A738

TD_0000401

b.  Review the development process, standards, tools, tool options, and tool configurations at a minimum annually to determine if the process, standards, tools, tool options and tool configurations selected and employed can satisfy the following security and privacy requirements IRS Publication 1075 security and privacy requirements.

Supplemental Guidance: Development tools include, for example, programming languages and computer-aided design systems. Reviews of development processes can include, for example, the use of maturity models to determine the potential effectiveness of such processes. Maintaining the integrity of changes to tools and processes facilitates effective supply chain risk assessment and mitigation. Such integrity requires configuration control throughout the SDLC to track authorized changes and to prevent unauthorized changes.

### Control Enhancements

(CE-3) Criticality Analysis: Require the developer of the system, system component, or system service to perform a criticality analysis:

a.  At the following decision points in the system development life cycle: the agency-defined breadth/depth; and

b.  At the following level of rigor: post-design phases of the SDLC.

Supplemental Guidance: This control enhancement provides developer input to the criticality analysis performed by agencies. Developer input is essential to such analysis because agencies may not have access to detailed design documentation for system components that are developed as commercial off-the-shelf products. Such design documentation includes, for example, functional specifications, high-level designs, low-level designs and source code and hardware schematics.

## SA-22: Unsupported System Components

a.  Replace system components when support for the components is no longer available from the developer, vendor, or manufacturer; or

b.  Provide the following options for alternative sources for continued support for unsupported components: Extended security support agreement that include security software patches and firmware updates from an external source for each unsupported component.

Supplemental Guidance: Support for system components includes, for example, software patches, firmware updates, replacement parts and maintenance contracts. Unsupported components, for example, when vendors no longer provide critical software patches or product updates, provide an opportunity for adversaries to exploit weaknesses in the installed components. Exceptions to replacing unsupported system components may include, for example, systems that provide critical mission or business capability where newer technologies are not available or where the systems are so isolated that installing replacement components is not an option. Systems that no longer receive security patches or product updates may receive critical findings during Safeguards reviews. For more information on unsupported system components, see the Office of Safeguards website.

TD_0000402

## 4.18 SYSTEM AND COMMUNICATIONS PROTECTION

### SC-1: System and Communications Protection Policy and Procedures

a.  Develop, document, and disseminate to designated agency officials:

1.  An agency or organization-level system and communications protection policy that:

    (a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

    (b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

2.  Procedures to facilitate the implementation of the system and communications protection policy and the associated system and communications protection controls;

b.  Designate an agency official to manage the development, documentation, and dissemination of the system and communications protection policy and procedures; and

c.  Review and update the current system and communications protection:

1.  Policy **every three (3) years (or if there is a significant change)**; and

2.  Procedures **every three (3) years (or if there is a significant change)**.

### SC-2: Application Partitioning

Separate user functionality, including user interface services, from system management functionality.

Control Enhancements:

*(CE-1) Interfaces for Non-Privileged Users*: Prevent the presentation of system management functionality at interfaces to non-privileged users.

### SC-4: Information in Shared System Resources

Prevent unauthorized and unintended information transfer via shared system resources.

### SC-7: Boundary Protection

a.  Monitor and control communications at the external managed interfaces to the system and at key internal managed interfaces within the system;

b.  Implement subnetworks for publicly accessible system components that are physically and logically separated from internal organizational networks; and

c.  Connect to external networks or systems only through managed interfaces consisting of boundary protection devices arranged in accordance with an organizational security and privacy architecture.

More information about network protections can be found in Section 3.3.6, Network Boundary and Infrastructure.

Control Enhancements:

*(CE-3) Access Points*: Limit the number of external network connections to the system.

*(CE-4) External Telecommunications Services*:

    a.   Implement a managed interface for each external telecommunication service;

    b.   Establish a traffic flow policy for each managed interface;

    c.   Protect the confidentiality and integrity of the information being transmitted across each interface;

    d.   Document each exception to the traffic flow policy with a supporting mission or business need and duration of that need;

    e.   Review exceptions to the traffic flow policy at a minimum quarterly and remove exceptions that are no longer supported by an explicit mission or business need;

    f.   Prevent unauthorized exchange of control plane traffic with external networks;

    g.   Publish information to enable remote networks to detect unauthorized control plane traffic from internal networks; and

    h.   Filter unauthorized control plane traffic from external networks.

*(CE-5) Deny by Default – Allow by Exception*: Deny network communications traffic by default and allow network communications traffic by exception on information systems where FTI is accessed, processed, stored, or transmitted.

*(CE-7) Prevent Split Tunneling for Remote Devices*: Prevent split tunneling for remote devices connecting to organizational systems unless the split tunnel is securely provisioned using:

    a.   Individual users shall not have the ability to configure split tunneling

    b.   Auditing must be performed semi-annually on each workstation with split tunneling enabled. Auditing must include:

        1.   Only those users authorized for split tunneling have it enabled in their user profile or policy object

        2.   There is a continued need for split tunneling for the user

        3.   Only the correct and authorized split tunneling configurations are present on the workstation

    c.   Host Checking is enabled and configured on the VPN server;

        1.   Ensure the OS is supported

        2.   Ensure that anti-malware is installed and up to date

        3.   The most current hotfixes are applied

        4.   Agency-defined additional parameters

A741

TD_0000404

*(CE-8) Route Traffic to Authenticated Proxy Servers*: Route internal communications traffic to external networks through authenticated proxy servers at managed interfaces.

Supplemental Guidance: External networks are networks outside of organizational control. A proxy server is a server (i.e., system or application) that acts as an intermediary for clients requesting system resources from non-organizational or other organizational servers. These system resources can include, for example, files, connections, web pages or services. Client requests established through an initial connection to the proxy server are evaluated to manage complexity and to provide additional protection by limiting direct connectivity. Web content filtering devices are one of the most common proxy servers providing access to the Internet. Proxy servers can support logging of individual Transmission Control Protocol sessions and blocking specific Uniform Resource Locators, Internet Protocol addresses and domain names. Web proxies can be configured with organization-defined lists of authorized and unauthorized websites.

*(CE-9) Restrict Threatening Outgoing Communications Traffic*:

    a.   Detect and deny outgoing communications traffic posing a threat to external systems; and

    b.   Audit the identity of internal users associated with denied communications.

*(CE-10) Prevent Exfiltration*:

    a.   Prevent the exfiltration of information; and

    b.   Conduct exfiltration tests at least semi-annually.

*(CE-11) Restrict Incoming Communications Traffic*: Only allow incoming communications from agency-defined authorized sources to be routed to agency-defined authorized destinations.

*(CE-12) Host-Based Protection*: Implement firewalls and intrusion detection systems at access points and end user equipment as appropriate.

*(CE-15) Networked Privileged Accesses*: Route networked, privileged accesses through a dedicated, managed interface for purposes of access control and auditing.

*(CE-17) Automated Enforcement of Protocol Format*: Enforce adherence to protocol formats.

*(CE-18) Fail Secure*: Prevent systems from entering unsecure states in the event of an operations failure of a boundary protection area.

*(IRS-Defined)*: Agencies shall implement and manage boundary protection (typically using firewalls) at trust boundaries. Each trust boundary shall be monitored and communications across each boundary shall be controlled.

Supplemental Guidance: For the purposes of this requirement, trust boundary is defined as a border between two connected zones with different trust levels.

Supplemental Guidance: This requirement is meant for border firewalls only. Internal firewalls used for network segmentation do not need to be stateful.

Supplemental Guidance: This capability should be placed inline. Wherever possible, intrusion prevention capabilities should be utilized.

TD_0000405

*(IRS-Defined)*: Agencies must block known malicious sites (inbound or outbound), as identified to the agency from US-CERT, MS-ISAC or other sources, at each Internet Access Point (unless explicit instructions are provided to agencies not to block specific sites). Blocking is to be accomplished within two business days following release of such sites.

Supplemental Guidance: US-CERT issues a monthly list of known malicious/suspicious sites as well as ad hoc notices as needed. MS-ISAC provides information to its member organizations about potential threat vectors as well.

Supplemental Guidance: Malicious beaconing activity can sometimes be detected by enabling log capture on network devices such as proxies, DNS servers and routers to record a log of possible communications with specific domains. Creating logs allows an administrator to see precisely which internal network hosts are originating communications to those domains. The internal IP addresses responsible for the communications should be the first places for incident response and mitigation for removal of malware.

## SC-8: Transmission Confidentiality and Integrity

Protect the confidentiality and integrity of transmitted information.

Supplemental Guidance: This control applies to both internal and external networks and all types of information system components from which information can be transmitted (e.g., servers, mobile devices, notebook computers, printers, copiers, scanners, fax machines).

### Control Enhancements:

*(CE-1) Cryptographic Protection*: Implement cryptographic mechanisms to prevent unauthorized disclosure of information and detect changes to information during transmission.

*(IRS-Defined)*: Agencies shall ensure appropriate transmission protections are in place commensurate with the highest sensitivity of information to be discussed over video and voice telecommunication and teleconferences.

Supporting Guidance: Voice, video and multimedia communications can occur over traditional or digital telephone systems, cellular or other wireless networks or data networks. Transmitting voice, video, or multimedia communications over packet-switched networks (such as Local Area Networks) that were designed for data transfer rather than over dedicated circuit networks raises security concerns.

Supporting Guidance: Wireless communications are vulnerable to interception, denial of service and deception. Under any circumstances, use of wireless to transmit or receive information sensitive to disclosure can present significant risks. When implementing this policy, bureaus should recognize the convergence of (point-to-point) PTP devices with those described.

## SC-10: Network Disconnect

Terminate the network connection associated with a communications session at the end of the session or after 30 minutes of inactivity.

Supplemental Guidance: This control applies to internal and external networks. Terminating network connections associated with specific communications sessions include, for example, de-allocating associated TCP/IP address or port pairs at the operating system level and de-allocating networking assignments at the application level if multiple application sessions are using a single operating system-level network connection. Periods of inactivity may be established by organizations and include, for example, time-periods by type of network access or for specific network accesses.

TD_0000406

## SC-12: Cryptographic Key Establishment and Management

The agency must establish and manage cryptographic keys when cryptography is employed within the system in accordance with the following key management requirements: NIST SP 800-57, Recommendation for Key Management, for key generation, distribution, storage, access, and destruction.

Supplemental Guidance: Cryptographic key management and establishment can be performed using manual procedures or automated mechanisms with supporting manual procedures. Organizations define their key management requirements in accordance with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines, specifying appropriate options, levels, and parameters. Organizations manage trust stores to ensure that only approved trust anchors are in such trust stores. This includes certificates with visibility external to organizational systems and certificates related to the internal operations of systems.

## SC-13: Cryptographic Protection

a.  Determine the cryptographic uses; and

b.  Implement the following types of cryptography required for each specified cryptographic use: Latest FIPS-140 validated encryption mechanism, NIST 800-52, Guidelines for the Selection, Configuration, and Use of Transport Layer Security (TLS) Implementations, Encryption in transit (payload encryption). Use of SHA-1 for digital signatures is prohibited.

## SC-15: Collaborative Computing Devices and Applications

a.  Prohibit remote activation of collaborative computing devices and applications with the following exceptions: users are notified by signage of the presence of such devices; and

b.  Provide an explicit indication of use to users physically present at the devices.

Supplemental Guidance: Collaborative computing devices and applications include, for example, remote meeting devices and applications, networked white boards, cameras, and microphones. Explicit indication of use includes, for example, signals to users when collaborative computing devices and applications are activated.

Control Enhancements:

(CE-4) Explicitly Indicate Current Participants: Provide an explicit indication of current participants in meetings that involve FTI.

Supplemental Guidance: Explicitly indicating current participants prevents unauthorized individuals from participating in collaborative computing sessions without the explicit knowledge of other participants.

## SC-17: Public Key Infrastructure Certificates

a.  Issue public key certificates under an agency-defined certificate authority or obtain public key certificates from an approved service provider; and

b.  Include only approved trust anchors in trust stores or certificate stores managed by the organization.

Supplemental Guidance: For all certificates, organizations manage system trust stores to ensure only approved trust anchors are in the trust stores. This control addresses certificates with visibility external to organizational systems and certificates related to the internal operations of systems, for example, application-specific time services.

TD_0000407

## SC-18: Mobile Code

a.  Define acceptable and unacceptable mobile code and mobile code technologies; and

b.  Authorize, monitor, and control the use of mobile code within the system.

Supplemental Guidance: Decisions regarding the use of mobile code within organizational systems are based on the potential for the code to cause damage to the systems if used maliciously. Mobile code technologies include, for example, Java, JavaScript, ActiveX, Postscript, PDF, Shockwave movies, Flash animations and VBScript. Usage restrictions and implementation guidelines apply to both the selection and use of mobile code installed on servers and mobile code downloaded and executed on individual workstations and devices including, for example, notebook computers and smart phones. Mobile code policy and procedures address the specific actions taken to prevent the development, acquisition, and introduction of unacceptable mobile code within organizational systems.

### Control Enhancements

*(CE-1) Identify Unacceptable Code and Take Corrective Actions:* Identify unacceptable mobile code and take corrective actions.

*(CE-2) Acquisition, Development and Use:* Verify that the acquisition, development, and use of mobile code to be deployed in the system meets IRS Publication 1075 requirements.

## SC-20: Secure Name/Address Resolution Service (Authoritative Source)

a.  Provide additional data origin authentication and integrity verification artifacts along with the authoritative name resolution data the system returns in response to external name/address resolution queries; and

b.  Provide the means to indicate the security status of child zones and (if the child supports secure resolution services) to enable verification of a chain of trust among parent and child domains, when operating as part of a distributed, hierarchical namespace.

Supplemental Guidance: This control enables external clients including, for example, remote Internet clients, to obtain origin authentication and integrity verification assurances for the host/service name to network address resolution information obtained through the service. Systems that provide name and address resolution services include, for example, domain name system (DNS) servers. Additional artifacts include, for example, DNS Security (DNSSEC) digital signatures and cryptographic keys. DNS resource records are examples of authoritative data. The means to indicate the security status of child zones includes, for example, the use of delegation signer resource records in the DNS. Systems that use technologies other than the DNS to map between host and service names and network addresses provide other means to assure the authenticity and integrity of response data.

### Control Enhancements

*(CE-2) Data Origin and Integrity:* Provide data origin and integrity protection artifacts for internal name/address resolution queries.

## SC-21: Secure Name/Address Resolution Service (Recursive or Caching Resolver)

Request and perform data origin authentication and data integrity verification on the name/address resolution responses the system receives from authoritative sources.

A745

TD_0000408

Supplemental Guidance: Each client of name resolution services either performs this validation on its own or has authenticated channels to trusted validation providers. Systems that provide name and address resolution services for local clients include, for example, recursive resolving or caching DNS servers. DNS client resolvers either perform validation of DNSSEC signatures, or clients use authenticated channels to recursive resolvers that perform such validations. Systems that use technologies other than the DNS to map between host/service names and network addresses provide some other means to enable clients to verify the authenticity and integrity of response data.

## SC-22: Architecture and Provisioning for Name/Address Resolution Service

Ensure the systems that collectively provide name/address resolution service for an organization are fault-tolerant and implement internal and external role separation.

Supplemental Guidance: Systems that provide name and address resolution services include, for example, DNS servers. To eliminate single points of failure and to enhance redundancy, organizations employ at least two authoritative domain name system servers; one configured as the primary server and the other configured as the secondary server. Additionally, organizations typically deploy the servers in two geographically separated network subnetworks (i.e., not located in the same physical facility). For role separation, DNS servers with internal roles only process name and address resolution requests from within organizations (i.e., from internal clients). DNS servers with external roles only process name and address resolution information requests from clients external to organizations (i.e., on external networks including the Internet). Organizations specify clients that can access authoritative DNS servers in certain roles, for example, by address ranges and explicit lists.

## SC-23: Session Authenticity

Protect the authenticity of communications sessions.

Supplemental Guidance: This control addresses communications protection at the session, versus packet level. Such protection establishes grounds for confidence at both ends of communications sessions in the ongoing identities of other parties and in the validity of information transmitted. Authenticity protection includes, for example, protecting against man-in-the-middle attacks and session hijacking and the insertion of false information into sessions.

Control Enhancements:

(CE-1) Invalidate Session Identifies at Logout: Invalidate session identifiers upon user logout or other session termination.

(CE-3) Unique System-Generate Session Identifiers: Generate a unique session identifier for each session with session with agency-defined randomness requirements and recognize only session identifiers that are system-generated.

Supplemental Guidance: Generating unique session identifiers curtails the ability of adversaries to reuse previously valid session IDs. Employing the concept of randomness in the generation of unique session identifiers protects against brute-force attacks to determine future session identifiers.

(CE-5) Allowed Certificate Authorities: Only allow the use of agency-defined certificate authorities for verification of the establishment of protected sessions.

## SC-28: Protection of Information at Rest

Protect the confidentiality and integrity of the following information at rest:

    a.  FTI

177

A746

TD_0000409

b.  IT System-related information (e.g., configurations, rule sets);

Control Enhancements:

*(CE-1) Cryptographic Protection*: Implement cryptographic mechanisms to prevent unauthorized disclosure and modification of FTI at rest on end user computing systems (i.e., desktop computers, laptop computers, mobile devices, portable and removable storage devices) in non-volatile storage.

## SC-35: External Malicious Code Identification

Include system components that proactively seek to identify network-based malicious code or malicious websites.

## SC-39: Process Isolation

Maintain a separate execution domain for each executing system process.

Supplemental Guidance: Systems can maintain separate execution domains for each executing process by assigning each process a separate address space. Each system process has a distinct address space so that communication between processes is performed in a manner controlled through the security functions and one process cannot modify the executing code of another process. Maintaining separate execution domains for executing processes can be achieved, for example, by implementing separate address spaces. This capability is readily available in most commercial operating systems that employ multi-state processor technologies.

## SC-45: System Time Synchronization

Synchronize system clocks within and between systems and system components.

Control Enhancements:

*(CE-1) Synchronization with Authoritative Time Source*:

a.  Compare the internal system clocks daily with an agency-defined authoritative time source; and

b.  Synchronize the internal system clocks to the authoritative time source when the time difference is greater than agency-defined time period.

A747

TD_0000410

## 4.19 SYSTEM AND INFORMATION INTEGRITY

### SI-1: System and Information Integrity Policy and Procedures

a.  Develop, document, and disseminate to designated agency officials:

1.  An agency or organization-level system and information integrity policy that:

(a) Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

(b) Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

2.  Procedures to facilitate the implementation of the system and information integrity policy and the associated system and information integrity controls;

b.  Designate an agency official to manage the development, documentation, and dissemination of the system and information integrity policy and procedures; and

c.  Review and update the current system and information integrity:

1.  Policy **every three (3) years (or if there is a significant change)**; and

2.  Procedures **every three (3) years (or if there is a significant change)**.

### SI-2: Flaw Remediation

a.  Identify, report and correct system flaws;

b.  Test software and firmware updates related to flaw remediation for effectiveness and potential side effects before installation;

c.  Install security-relevant software and firmware updates promptly after the release of the updates; and

d.  Incorporate flaw remediation into the organizational configuration management process.

Supplemental Guidance: Organizations identify systems affected by software flaws including potential vulnerabilities resulting from those flaws and report this information to designated organizational personnel with information security and privacy responsibilities. Security-relevant software updates include, for example, patches, service packs, hot fixes, and anti-virus signatures. Organizations also address flaws discovered during assessments, continuous monitoring, incident response activities and system error handling. By incorporating flaw remediation into ongoing configuration management processes, required remediation actions can be tracked and verified. Organization-defined time-periods for updating security-relevant software and firmware may vary based on a variety of factors including, for example, the security category of the system or the criticality of the update (i.e., severity of the vulnerability related to the discovered flaw). Some types of flaw remediation may require more testing than other types. Organizations determine the type of testing needed for the specific type of flaw remediation activity under consideration and the types of changes that are to be configuration-managed. In some situations, organizations may determine that testing of software or firmware updates is not necessary or practical, for example, when implementing simple anti-virus signature updates. Organizations also consider in testing decisions, whether security-relevant software or firmware updates are obtained from authorized sources with appropriate digital signatures.

179

TD_0000411

Control Enhancements

*(CE-2) Automated Flaw Remediation Status:* Determine if system components have applicable security-relevant software and firmware updates installed using automated mechanisms at a minimum monthly; daily for networked workstations and malicious code protection.

*(CE-3) Time to Remediate Flaws and Benchmarks for Corrective Actions:*

    a.  Measure the time between flaw identification and flaw remediation; and
    b.  Establish the following benchmarks for taking corrective actions: Agency defined based on criticality.

*(CE-4) Automated Patch Management Tools:* Employ automated patch management tools to facilitate flaw remediation to all FTI systems that includes but not limited to mainframes, workstations, applications, and network components

*(CE-5) Automatic Software and Firmware Updates:* Install security-relevant software and firmware updates automatically to all FTI systems.

*(CE-6) Removal of Previous Versions of Software and Firmware:* Remove previous versions of security relevant software and firmware components after updated versions have been installed.

*(IRS-Defined):* The agency shall ensure that, upon daily power up and connection to the agency's network, workstations (as defined in policy and including remote connections using GFE workstations) are checked to ensure that the most recent agency-approved patches have been applied and that any absent or new patches are applied as necessary or otherwise checked not less than once every 24 hours (excluding weekends, holidays, etc.)

## SI-3: Malicious Code Protection

    a.  Implement signature-based and/or non-signature-based malicious code protection mechanisms at system entry and exit points to detect and eradicate malicious code;

    b.  Automatically update malicious code protection mechanisms as new releases are available in accordance with organizational configuration management policy and procedures;

    c.  Configure malicious code protection mechanisms to:

        1.  Perform periodic scans of the system and implement weekly and real-time scans of files from external sources at endpoint and network entry/exit points as the files are downloaded, opened, or executed in accordance with agency security policy; and

        2.  Either block or quarantine take and send alert to system administrator in response to malicious code detection; and

    d.  Address the receipt of false positives during malicious code detection and eradication and the resulting potential impact on the availability of the system.

Control Enhancements

*(IRS-Defined):* All removable media must be scanned for malicious code upon introduction of the media into any system on the network and before users may access the media.

A749

TD_0000412

*(IRS-Defined):* Not less than daily, the agency shall check for updates to malicious code scanning tools, including anti-virus (AV) and anti-spyware software and intrusion detection tools and when updates are available, implement on all devices on which such tools reside.

## SI-4: System Monitoring

a. Monitor the system to detect:

1. Attacks and indicators of potential attacks in accordance with the following monitoring objectives as defined in IT/Cybersecurity monitoring objectives as defined in the agency policy; and

2. Unauthorized local, network, and remote connections;

b. Identify unauthorized use of the system through a variety of techniques and methods

c. Invoke internal monitoring capabilities or deploy monitoring devices:

1. Strategically within the system to collect organization-determined essential information; and

2. At ad hoc locations within the system to track specific types of transactions of interest to the organization;

d. Analyze detected events and anomalies;

e. Adjust the level of system monitoring activity when there is a change in risk to organizational operations and assets, individuals, other organizations, or the Nation;

f. Obtain legal opinion regarding system monitoring activities; and

g. Provide the output from system monitoring to designated agency officials at a minimum every two weeks or sooner if deemed necessary.

Supplemental Guidance: System monitoring includes external and internal monitoring. External monitoring includes the observation of events occurring at system boundaries. Internal monitoring includes the observation of events occurring within the system. Organizations monitor systems, for example, by observing audit activities in real-time or by observing other system aspects such as access patterns, characteristics of access and other actions. The monitoring objectives guide and inform the determination of the events. System monitoring capability is achieved through a variety of tools and techniques, including, for example, intrusion detection systems, intrusion prevention systems, malicious code protection software, scanning tools, audit record monitoring software and network monitoring software. The distribution and configuration of monitoring devices can impact throughput at key internal and external boundaries and at other locations across a network due to the introduction of network throughput latency. Therefore, such devices are strategically located and deployed as part of an established organization-wide security architecture. Strategic locations for monitoring devices include, for example, selected perimeter locations and near key servers and server farms supporting critical applications. Monitoring devices are typically employed at the managed interfaces associated with controls SC-7 and AC-17. The information collected is a function of the organizational monitoring objectives and the capability of systems to support such objectives. Specific types of transactions of interest include, for example, Hyper Text Transfer Protocol (HTTP) traffic that bypasses HTTP proxies. System monitoring is an integral part of organizational continuous monitoring and incident response programs and output from system monitoring serves as input to those programs. Adjustments to levels of system monitoring are based on law enforcement information, intelligence information or other credible

181

TD_0000413

sources of information. The legality of system monitoring activities is based on applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines.

Control Enhancements

*(CE-1) System-wide Intrusion Detection System:* Connect and configure individual intrusion detection tools into a system-wide intrusion detection system.

*(CE-2) Automated Tools and Mechanisms for Real-Time Analysis:* Employ automated tools and mechanisms to support near real-time analysis of events.

Supplemental Guidance: Automated tools and mechanisms include, for example, host-based, network-based, transport-based, or storage-based event monitoring tools and mechanisms or Security Information and Event Management technologies that provide real-time analysis of alerts and notifications generated by organizational systems.

*(CE-4) Inbound and Outbound Communications Traffic:*

    a.  Determine criteria for unusual or unauthorized activities or conditions for inbound and outbound communications traffic;
    b.  Monitor inbound and outbound communications traffic continuously for unusual or unauthorized activities or conditions.

*(CE-5) System-Generated Alerts:* Alert the appropriate agency personnel when the following system generated indications of compromise or potential compromise occur: suspicious activity reported from firewalls, intrusion detection systems, malware detection systems, and other agency-defined security tools that report indications of compromise or potential compromise.

Supplemental Guidance: Alerts may be generated from a variety of sources, including, for example, audit records or inputs from malicious code protection mechanisms, intrusion detection or prevention mechanisms or boundary protection devices such as firewalls, gateways, and routers. Alerts can be automated, or they may be transmitted, for example, telephonically, by electronic mail messages or by text messaging. Organizational personnel on the alert notification list can include, for example, system administrators, mission or business owners, system owners, system security officers or privacy officers. This control enhancement focuses on the security alerts generated by the system. Alternatively, alerts generated by organizations in SI-4(12) focus on information sources external to the system such as suspicious activity reports and reports on potential insider threats.

*(CE-10) Visibility of Encrypted Communications:* Make provisions so that agency-defined encrypted communications traffic is visible to agency-defined system monitoring tools and mechanisms.

Supplemental Guidance: Organizations balance the need to encrypt communications traffic to protect data confidentiality with the need to maintain visibility into such traffic from a monitoring perspective. Organizations determine whether the visibility requirement applies to internal encrypted traffic, encrypted traffic intended for external destinations, or a subset of the traffic types.

*(CE-11) Analyze Communications Traffic Anomalies:* Analyze outbound communications traffic at the external interfaces to the system and selected agency defined interior points within the system to discover anomalies.

Supplemental Guidance: Agency defined interior points include subnetworks and subsystems. Anomalies within agency systems include large file transfers, long-time persistent connections, attempts to access information from unexpected locations, the use of unusual protocols and ports, the use of unmonitored

182

TD_0000414

A752

network protocols (e.g., IPv6 usage during IPv4 transition) and attempted communications with suspected malicious external addresses.

*(CE-12) Automated Organization-Generated Alerts:* Alert agency-defined personnel or roles using automated mechanisms when the following indications of inappropriate or unusual activities with security or privacy implications occur: agency-defined activities that trigger events.

*(CE-18) Analyze Traffic and Covert Exfiltration:* Analyze outbound communications traffic at external interfaces to the system and at the following interior points to detect covert exfiltration of information at agency defined interior points within the system.

*(CE-24) Indicators of Compromise:* Discover, collect, and distribute to organization-defined personnel or roles, indicators of compromise provided by government and non-government sources.

*(IRS-Defined):* All Internet Access Points/portals shall capture and retain, for at least one year, inbound and outbound traffic header information, with the exclusion of approved Internet "anonymous" connections, as may be approved by the agency CISO.

Supplemental Guidance: If/when this information is captured and retained (one year) by DHS via Project Einstein (or a similar service) (for the Internet access point at hand) duplicative capturing/retention is not required.

## SI-5: Security Alerts, Advisories and Directives

    a.  Receive system security alerts, advisories, and directives from third parties such as US-CERT, MS-ISAC, product vendors, etc. on an ongoing basis;

    b.  Generate internal security alerts, advisories, and directives as deemed necessary;

    c.  Disseminate security alerts, advisories, and directives to appropriate personnel with security responsibilities (e.g., system administrators, ISSOs, system owners, incident response capabilities, etc.) and;

    d.  Implement security directives in accordance with established time frames or notify the issuing organization of the degree of noncompliance.

Supplemental Guidance: The United States Computer Emergency Readiness Team (US-CERT) is an organization within the Department of Homeland Security's Cybersecurity & Infrastructure Security Agency (CISA) that generates security alerts and advisories to maintain situational awareness across the federal government. Security directives are issued by OMB or other designated organizations with the responsibility and authority to issue such directives. Compliance to security directives is essential due to the critical nature of many of these directives and the potential immediate adverse effects on organizational operations and assets, individuals, other organizations, the state and the Nation should the directives not be implemented in a timely manner. External organizations include, for example, external mission or business partners, supply chain partners, external service providers and other peer or supporting organizations.

## SI-7: Software, Firmware and Information Integrity

    a.  Employ integrity verification tools to detect unauthorized changes to the following software, firmware, and information: system kernels, drivers, firmware (e.g., BIOS, UEFI), software (e.g., OS, applications, middleware) and security attributes.

183

TD_0000415

b.  Take the following actions when unauthorized changes to the software, firmware, and information are detected: immediately disconnect the device from the network and notify designated agency officials.

Control Enhancements

*(CE-1) Integrity Checks:* Perform an integrity check of software, firmware, and information at startup; at the identification of a new threat to which the information system is susceptible; the installation of new hardware, software, or firmware; or at a minimum annually.

*(CE-7) Integration of Detection and Response:* Incorporate the detection of the following unauthorized changes into the organizational incident response capability:

a.  Unauthorized changes to baseline configuration setting; and

b.  Unauthorized elevation of system privileges.

*(CE-10) Protection of Boot Firmware:* Implement the following mechanisms to protect the integrity of boot firmware in system where FTI is accessed, processed, stored, and transmitted: verifying the checksum of downloaded firmware.

## SI-8: Spam Protection

a.  Employ spam protection mechanisms at system entry and exit points to detect and act on unsolicited messages; and

b.  Update spam protection mechanisms when new releases are available in accordance with agency configuration management policy and procedures.

Control Enhancements

*(CE-2) Automatic Updates:* Automatically update spam protection mechanisms at a minimum quarterly.

## SI-10: Information Input Validation

Check the validity of information inputs. (e.g., character set, length, numerical range, acceptable values).

## SI-11: Error Handling

a.  Generate error messages that provide information necessary for corrective actions without revealing information that could be exploited; and

b.  Reveal error messages only to designated agency officials.

## SI-12: Information Management and Retention

Manage and retain information within the system and information output from the system in accordance with applicable laws, executive orders, directives, regulations, policies, standards, guidelines, and operational requirements.

Control Enhancements

*(CE-2) Minimize Personally identifiable Information in Testing, Training, and Research:* Use the following techniques to minimize the use of personally identifiable information for research, testing, or training: Submission of the DTR form for review and approval by IRS Office of Safeguards.

184

TD_0000416

## SI-16: Memory Protection

Implement the following controls to protect the system memory from unauthorized code execution: hardware-based or software-based data execution prevention.

<u>Supplemental Guidance</u>: Some adversaries launch attacks with the intent of executing code in non-executable regions of memory or in memory locations that are prohibited. Security safeguards employed to protect memory include, for example, data execution prevention and address space layout randomization. Data execution prevention safeguards can either be hardware-enforced or software-enforced with hardware enforcement providing the greater strength of mechanism.

185

TD_0000417

## 4.20 SUPPLY CHAIN RISK MANAGEMENT

### SR-1: Supply Chain Risk Management Policy and Procedures

a.   Develop, document, and disseminate to designated agency officials:

   1.   An agency or organization-level supply chain risk management policy that:

      (a)  Addresses purpose, scope, roles, responsibilities, management commitment, coordination among organizational entities and compliance; and

      (b)  Is consistent with applicable laws, Executive Orders, directives, regulations, policies, standards, and guidelines; and

   2.   Procedures to facilitate the implementation of the supply chain risk management policy and the associated supply chain risk management controls;

b.   Designate an agency official to manage the development, documentation, and dissemination of the supply chain risk management policy and procedures; and

c.   Review and update the current supply chain risk management:

   1.   Policy **every three (3) years (or if there is a significant change)**; and

   2.   Procedures **every three (3) years (or if there is a significant change)**.

### SR-2: Supply Chain Risk Management Plan

a.   Develop a plan for managing supply chain risks associated with the research and development, design, manufacturing, acquisition, delivery, integration, operations and maintenance, and disposal of the following systems, system components or system services: Information systems that process, store, or transmit FTI

b.   Review and update the supply chain risk management plan every three (3) years or as required, to address threat, organizational or environmental changes; and

c.   Protect the supply chain risk management plan from unauthorized disclosure and modification.

Control Enhancements

*(CE-1) Establish SCRM Team:* Establish a supply chain risk management team consisting of agency-defined personnel to lead and support the following SCRM activities: provide expertise in acquisition processes, legal practices, vulnerabilities, threats, and attack vectors, as well as an understanding of the technical aspects and dependencies of systems.

### SR-3: Supply Chain Controls and Processes

a.   Establish a process or processes to identify and address weaknesses or deficiencies in the supply chain elements and processes of systems that access, process, store, or transmit FTI in coordination with agency-defined supply chain personnel;

b.   Employ the following controls to protect against supply chain risks to the system, system component, or system service and to limit the harm or consequences from supply chain related events: Agency-defined Supply Chain Risk Controls and controls identified in Pub 1075; and

186

A755

TD_0000418

c.  Document the selected and implemented supply chain processes and controls in security and privacy plans; supply chain risk management plan; Agency System Security Plan.

Control Enhancements

*(CE-2) Limitation of Harm:* Employ the following controls to limit harm from potential adversaries identifying and targeting the organizational supply chain: agency-defined controls.

**Supplemental Guidance**: Controls that can be implemented to reduce the probability of adversaries successfully identifying and targeting the supply chain include avoiding the purchase of custom or non-standardized configurations, employing approved vendor lists with standing reputations in industry, following pre-agreed maintenance schedules and update and patch delivery mechanisms, maintaining a contingency plan in case of a supply chain event, using procurement carve-outs that provide exclusions to commitments or obligations, using diverse delivery routes, and minimizing the time between purchase decisions and delivery.

*(CE-3) Sub-Tier Flow Down:* Ensure that the controls included in the contracts of prime contractors are also included in the contracts of s.

## SR-6: Supplier Assessments and Reviews

Assess and review the supply chain-related risks associated with suppliers or contractors and the system, system component, or system service they provide at a minimum annually.

## SR-10: Inspection of Systems and Components

Inspect the following systems or system components at agency-defined frequency, upon delivery to detect tampering: hardware /software components that access, process, store, or transmit FTI.

## SR-11: Component Authenticity

a.  Develop and implement anti-counterfeit policy and procedures that include the means to detect and prevent counterfeit components from entering the system; and

b.  Report counterfeit system components to source of counterfeit component; agency-defined personnel or roles.

Control Enhancements

*(CE-1) Anti-Counterfeit Training:* Train agency-defined personnel or roles to detect counterfeit system components (including hardware, software, and firmware).

*(CE-2) Configuration Control for Component Service and Repair:* Maintain configuration control over the following system components awaiting service or repair and serviced or repaired components awaiting return to service: hardware used to receive, access, process, store, transmit or protect FTI.

187

A756

TD_0000419

## Exhibit 1 IRC §§ 6103(a) and (b)

a. General rule: Returns and return information shall be confidential and except as authorized by this title—

(1) no officer or employee of the United States,

(2) no officer or employee of any State, any local law enforcement agency receiving information under subsection (i)(7)(C) or (7)(A), any local child support enforcement agency, or any local agency administering a program listed in subsection (l)(7)(D) who has or had access to returns or return information under this section or section 6104(c), and

(3) no other person (or officer or employee thereof) who has or had access to returns or return information under subsection (c), subsection (e)(1)(D)(iii), paragraph (10), (13), or (14) of subsection (k), paragraph (6), (10), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (19), (20), or (21) of subsection (l), paragraph (2) or (4)(B) of subsection (m), or subsection (n),

shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section. For purposes of this subsection, the term "officer or employee" includes a former officer or employee.

b. Definitions: For purposes of this section—

(1) Return: The term "return" means any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed.

(2) Return information: The term "return information" means—

(A) a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, over assessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense,

(B) any part of any written determination or any background file document relating to such written determination (as such terms are defined in section 6110 (b)) which is not open to public inspection under section 6110,

(C) any advance pricing agreement entered into by a taxpayer and the Secretary and any background information related to such agreement or any application for an advance pricing agreement and

(D) any agreement under section 7121 and any similar agreement and any background information related to such an agreement or request for such an agreement, but such term does not include data in a form which cannot be associated with, or otherwise identify, directly or indirectly, a particular taxpayer. Nothing in the preceding sentence, or in any other provision of law, shall be construed to require the disclosure of standards used or to be used for the selection of returns for examination, or data used or to be used for determining such

188

TD_0000420

standards, if the Secretary determines that such disclosure will seriously impair assessment, collection, or enforcement under the internal revenue laws.

(3) Taxpayer return information: The term "taxpayer return information" means return information as defined in paragraph (2) which is filed with, or furnished to, the Secretary by or on behalf of the taxpayer to whom such return information relates.

(4) Tax administration: The term "tax administration"—

    (A) means—

        (i)    the administration, management, conduct, direction and supervision of the execution and application of the internal revenue laws or related statutes (or equivalent laws and statutes of a State) and tax conventions to which the United States is a party, and

        (ii)   the development and formulation of Federal tax policy relating to existing or proposed internal revenue laws, related statutes, and tax conventions, and

    (B) includes assessment, collection, enforcement, litigation, publication and statistical gathering functions under such laws, statutes, or conventions.

(5) State

    (A) In general, the term "State" means—

        (i)    any of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, and the Commonwealth of the Northern Mariana Islands,

        (ii)   for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4) and (p), any municipality—

            (I)  with a population in excess of 250,000 (as determined under the most recent decennial United States census data available),

            (II)  which imposes a tax on income or wages, and

            (III) with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure, and

        (iii)  for purposes of subsections (a)(2), (b)(4), (d)(1), (h)(4) and (p), any governmental entity—

            (I)  which is formed and operated by a qualified group of municipalities, and

            (II)  with which the Secretary (in his sole discretion) has entered into an agreement regarding disclosure.

    (B) Regional income tax agencies: For purposes of subparagraph (A)(iii)—

        (i)    Qualified group of municipalities: The term "qualified group of municipalities" means, with respect to any governmental entity, 2 or more municipalities—

            (I)  each of which imposes a tax on income or wages,

189

TD_0000421

  (II) each of which, under the authority of a State statute, administers the laws relating to the imposition of such taxes through such entity, and

  (III) which collectively have a population in excess of 250,000 (as determined under the most recent decennial United States census data available).

 (ii) References to State law, etc. For purposes of applying subparagraph (A)(iii) to the subsections referred to in such subparagraph, any reference in such subsections to State law, proceedings, or tax returns shall be treated as references to the law, proceedings, or tax returns, as the case may be, of the municipalities which form and operate the governmental entity referred to in such subparagraph.

 (iii) Disclosure to contractors and other agents; Notwithstanding any other provision of this section, no return or return information shall be disclosed to any contractor or other agent of a governmental entity referred to in subparagraph (A)(iii) unless such entity, to the satisfaction of the Secretary—

  (I) has requirements in effect which require each such contractor or other agent which would have access to returns or return information to provide safeguards (within the meaning of subsection (p)(4)) to protect the confidentiality of such returns or return information,

  (II) agrees to conduct a review every 3 years (or a mid-point review in the case of contracts or agreements of less than 3 years in duration) of each contractor or other agent to determine compliance with such requirements,

  (III) submits the findings of the most recent review conducted under sub-clause (II) to the Secretary as part of the report required by subsection (p)(4)(E), and

  (IV) certifies to the Secretary for the most recent annual period that such contractor or other agent is in compliance with all such requirements. The certification required by sub- clause (IV) shall include the name and address of each contractor and other agent, a description of the contract or agreement with such contractor or other agent, and the duration of such contract or agreement. The requirements of this clause shall not apply to disclosures pursuant to subsection (n) for purposes of Federal tax administration and a rule similar to the rule of subsection (p)(8)(B) shall apply for purposes of this clause.

(6) **Taxpayer identity**

The term "taxpayer identity" means the name of a person with respect to whom a return is filed, his mailing address, his taxpayer identifying number (as described in section 6109), or a combination thereof.

(7) **Inspection**

The terms "inspected", and "inspection" means any examination of a return or return information.

(8) **Disclosure**

The term "disclosure" means providing return or return information known to any person.

190

TD_0000422

(9) **Federal agency**

The term "Federal agency" means an agency within the meaning of section 551(1) of Title 5, United States Code.

(10) **Chief executive officer**

The term "chief executive officer" means, with respect to any municipality, any elected official and the chief official (even if not elected) of such municipality

(11) **Terrorist incident, threat, or activity**

The term "terrorist incident, threat, or activity" means an incident, threat, or activity involving an act of domestic terrorism (as defined in section 2331(5) of Title 18, United States Code) or international terrorism (as defined in section 2331(1) of such title).

191

TD_0000423

## Exhibit 2 IRC § 6103(p)(4)

Any Federal agency described in subsection (h)(2), (h)(5), (i)(1), (2), (3), (5), or (7), (j)(1), (2), or (5), (k)(8), (10), or (11), (l)(1), (2), (3), (5), (10), (11), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (17), or (22), (o)(1)(A), or (o)(3), the Government Accountability Office, the Congressional Budget Office, or any agency, body, or commission described in subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), or (k)(10), (l)(6), (7), (8), (9), (12), (15), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10), subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20), or any entity described in subsection (l)(21), shall, as a condition for receiving returns or return information—

(A) establish and maintain, to the satisfaction of the Secretary, a permanent system of standardized records with respect to any request, the reason for such request and the date of such request made by or of it and any disclosure of return or return information made by or to it;

(B) establish and maintain, to the satisfaction of the Secretary, a secure area or place in which such returns or return information shall be stored;

(C) restrict, to the satisfaction of the Secretary, access to the returns or return information only to persons whose duties or responsibilities require access and to whom disclosure may be made under the provisions of this title;

(D) provide such other safeguards which the Secretary determines (and which he prescribes in regulations) to be necessary or appropriate to protect the confidentiality of the returns or return information;

(E) furnish a report to the Secretary, at such time and containing such information as the Secretary may prescribe, which describes the procedures established and utilized by such agency, body, or commission, the Government Accountability Office, or the Congressional Budget Office for ensuring the confidentiality of returns and return information required by this paragraph; and

(F) upon completion of use of such returns or return information—

(i) in the case of an agency, body, or commission described in subsection (d), (i)(3)(B)(i), (k)(10), or (l)(6), (7), (8), (9), or (16), any appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) return to the Secretary such returns or return information (along with any copies made therefrom) or make such returns or return information undisclosable in any manner and furnish a written report to the Secretary describing such manner,

(ii) in the case of an agency described in subsections (h)(2), (h)(5), (i)(1), (2), (3), (5) or (7), (j)(1), (2), or (5), (k)(8), (10), or (11), (l)(1), (2), (3), (5), (10), (11), (12), (13)(A), (13)(B), (13)(C), (13)(D)(i), (14), (15), (17), or (22), (o)(1)(A), or (o)(3) or any entity described in subsection (l)21, the Government Accountability Office, or the Congressional Budget Office, either—

(I) return to the Secretary such returns or return information (along with any copies made therefrom),

(II) otherwise make such returns or return information undisclosable, or

192

TD_0000424

(II) to the extent not so returned or made undisclosable, ensure that the conditions of subparagraphs (A), (B), (C), (D) and (E) of this paragraph continue to be met with respect to such returns or return information, and

(iii) in the case of the Department of Health and Human Services for purposes of subsection (m)(6), destroy all such return information upon completion of its use in providing the notification for which the information was obtained, so as to make such information undisclosable;

except that the conditions of subparagraphs (A), (B), (C), (D) and (E) shall cease to apply with respect to any return or return information if, and to the extent that, such return or return information is disclosed in the course of any judicial or administrative proceeding and made a part of the public record thereof. If the Secretary determines that any such agency, body, or commission, including an agency, an appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) or any entity described in subsection (l)(21), or the Government Accountability Office or the Congressional Budget Office has failed to, or does not, meet the requirements of this paragraph, he may, after any proceedings for review established under paragraph (7), take such actions as are necessary to ensure such requirements are met, including refusing to disclose returns or return information to such agency, body, or commission, including an agency, an appropriate State officer (as defined in section 6104(c)), or any other person described in subsection (k)(10) or subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), (16), (18), (19), or (20) or any entity described in subsection (l)(21), or the Government Accountability Office or the Congressional Budget Office, until he determines that such requirements have been or will be met. In the case of any agency which receives any mailing address under paragraph (2), (4), (6), or (7) of subsection (m) and which discloses any such mailing address to any agent or which receives any information under paragraph (6)(A), (10), (12)(B), or (16) of subsection (l) and which discloses any such information to any agent, or any person including an agent described in subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), or (16), this paragraph shall apply to such agency and each such agent or other person (except that, in the case of an agent, or any person including an agent described in subsection (l)(10), (13)(A), (13)(B), (13)(C), (13)(D)(i), or (16), any report to the Secretary or other action with respect to the Secretary shall be made or taken through such agency). For purposes of applying this paragraph in any case to which subsection (m)(6) applies, the term "return information" includes related blood donor records (as defined in section 1141(h)(2) of the Social Security Act).

193

TD_0000425

**Exhibit 3 Code of Federal Regulations (CFR) § 301.6103(p)(7)-1 [T.D. 9445, 74 FR 6830, Feb. 11, 2009]**

USC Title 26, Section 6103(p)(4), requires external agencies and other authorized recipients of federal tax return and return information (FTI) to establish procedures to ensure the adequate protection of the FTI they receive. That provision of the United States Code also authorizes the IRS to take actions, including suspending or terminating FTI disclosures to any external agencies and other authorized recipients, if there is misuse, or if the safeguards in place are inadequate to protect the confidentiality of the information, or both.

Procedures for administrative review of a determination that an authorized recipient has failed to safeguard returns or return information:

(a) *In general.* Notwithstanding any section of the Internal Revenue Code (Code), the Internal Revenue Service (IRS) may terminate or suspend disclosure of returns and return information to any authorized recipient specified in section (p)(4) of section 6103, if the IRS determines that:

    (1) The authorized recipient has allowed an unauthorized inspection or disclosure of returns or return information and that the authorized recipient has not taken adequate corrective action to prevent the recurrence of an unauthorized inspection or disclosure; or

    (2) The authorized recipient does not satisfactorily maintain the safeguards prescribed by section 6103(p)(4) and has made no adequate plan to improve its system to maintain the safeguards satisfactorily.

(b) *Notice of IRS's intention to terminate or suspend disclosure.* Prior to terminating or suspending authorized disclosures, the IRS will notify the authorized recipient in writing of the IRS's preliminary determination and of the IRS's intention to discontinue disclosure of returns and return information to the authorized recipient. Upon so notifying the authorized recipient, the IRS, if it determines that tax administration otherwise would be seriously impaired, may suspend further disclosures of returns and return information to the authorized recipient pending a final determination by the Commissioner or a Deputy Commissioner described in paragraph (d)(2) of this section.

(c) *Authorized recipient's right to appeal.* An authorized recipient shall have 30 days from the date of receipt of a notice described in paragraph (b) of this section to appeal the preliminary determination described in paragraph (b) of this section. The appeal shall be made directly to the Commissioner.

(d) *Procedures for administrative review.*

    (1) To appeal a preliminary determination described in paragraph (b) of this section, the authorized recipient shall send a written request for a conference to: Commissioner of Internal Revenue (Attention: SE:S:CLD:GLD), 1111 Constitution Avenue, NW., Washington, DC 20224. The request must include a complete description of the authorized recipient's present system of safeguarding returns or return information received by the authorized recipient (and its authorized contractors or agents, if any). The request must state the reason or reasons the authorized recipient believes that such system or practice (including improvements, if any, to such system or practice expected to be made in the near future) is or will be adequate to safeguard returns or return information.

    (2) Within 45 days of the receipt of the request made in accordance with the provisions of paragraph (d)(1) of this section, the Commissioner or Deputy Commissioner personally shall hold a conference with representatives of the authorized recipient, after which the Commissioner or Deputy Commissioner shall make a final determination with respect to the appeal.

TD_0000426

(e) *Effective/applicability date.* This section applies to all authorized recipients of returns and return information that are subject to the safeguard requirements set forth in section 6103(p)(4) on or after February 11, 2009.

195

TD_0000427

## Exhibit 4 IRC §§ 7213 and 7213A – Sanctions for Unauthorized Disclosure and Access

### IRC § 7213 UNAUTHORIZED DISCLOSURE OF INFORMATION

(a) RETURNS AND RETURN INFORMATION

(1) FEDERAL EMPLOYEES AND OTHER PERSONS – It shall be unlawful for any officer or employee of the United States or any person described in section 6103(n) (or an officer or employee of any such person), or any former officer or employee, willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)). Any violation of this paragraph shall be a felony punishable upon conviction by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the costs of prosecution, and if such offense is committed by any officer or employee of the United States, he shall, in addition to any other punishment, be dismissed from office or discharged from employment upon conviction for such offense.

(2) STATE AND OTHER EMPLOYEES—It shall be unlawful for any person (not described in paragraph (1)) willfully to disclose to any person, except as authorized in this title, any return or return information (as defined in section 6103(b)) acquired by him or another person under subsection (d), (i)(1)(C), (3)(B)(i), or (7)(A)(ii), (k)(10), (13), or (14), (l)(6), (7), (8), (9), (10), (12), (15), (16), (19), (20), or (21) or (m)(2), (4), (5), (6), or (7) of section 6103 or under section 6104(c). Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

(3) OTHER PERSONS – It shall be unlawful for any person to whom any return or return information (as defined in section 6103(b)) is disclosed in an manner unauthorized by this title thereafter willfully to print or publish in any manner not provided by law any such return or return information. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

(4) SOLICITATION – It shall be unlawful for any person willfully to offer any item of material value in exchange for any return or return information (as defined in 6103(b)) and to receive as a result of such solicitation any such return or return information. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

(5) SHAREHOLDERS – It shall be unlawful for any person to whom return or return information (as defined in 6103(b)) is disclosed pursuant to the provisions of 6103(e)(1)(D)(iii) willfully to disclose such return or return information in any manner not provided by law. Any violation of this paragraph shall be a felony punishable by a fine in any amount not exceeding $5,000, or imprisonment of not more than 5 years, or both, together with the cost of prosecution.

### IRC § 7213A. UNAUTHORIZED INSPECTION OF RETURNS OR RETURN INFORMATION

(a) PROHIBITIONS

(1) FEDERAL EMPLOYEES AND OTHER PERSONS – It shall be unlawful for

(A) any officer or employee of the United States, or

(B) any person described in subsection (l)(18) or (n) of section 6103 or an officer or employee of such person,

196

TD_0000428

willfully to inspect, except as authorized in this title, any return or return information.

    (2)  STATE AND OTHER EMPLOYEES – It shall be unlawful for any person (not described in paragraph (1)) willfully to inspect, except as authorized by this title, any return or return information acquired by such person or another person under a provision of section 6103 referred to in section 7213(a)(2) or under section 6104(c).

(b)  PENALTY

    (1)  IN GENERAL – Any violation of subsection (a) shall be punishable upon conviction by a fine in any amount not exceeding $1,000, or imprisonment of not more than 1 year, or both, together with the costs of prosecution.

    (2)  FEDERAL OFFICERS OR EMPLOYEES – An officer or employee of the United States who is convicted of any violation of subsection (a) shall, in addition to any other punishment, be dismissed from office or discharged from employment.

(c)  DEFINITIONS – For purposes of this section, the terms "inspect" "return" and "return information" have respective meanings given such terms by section 6103(b).

197

TD_0000429

## Exhibit 5 IRC § 7431 - Civil Damages for Unauthorized Inspection or Disclosure of Returns and Return Information

IRC § 7431 CIVIL DAMAGES FOR UNAUTHORIZED INSPECTION OR DISCLOSURE OF RETURNS AND RETURN INFORMATION.

(a) In general

(1) Inspection or Disclosure by employee of United States

If any officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103, such taxpayer may bring a civil action for damages against the United States in a district court of the United States.

(2) Inspection or disclosure by a person who is not an employee of United States

If any person who is not an officer or employee of the United States knowingly, or by reason of negligence, inspects or discloses any return or return information with respect to a taxpayer in violation of any provision of section 6103 or in violation of section 6104(c), such taxpayer may bring a civil action for damages against such person in a district court of the United States.

(b) Exceptions

No liability shall arise under this section with respect to any inspection or disclosure-

(1) which results from good faith, but erroneous, interpretation of section 6103, or

(2) which is requested by the taxpayer.

(c) Damages

In any action brought under subsection (a), upon a finding of liability on the part of the defendant, the defendant shall be liable to the plaintiff in an amount equal to the sum of –

(1) the greater of –

(A) $1,000 for each act of unauthorized inspection or disclosure of a return or return information with respect to which such defendant is found liable, or

(B) the sum of –

(i) the actual damages sustained by the plaintiff as a result of such unauthorized inspection or disclosure, plus

(ii) in the case of a willful inspection or disclosure or an inspection or disclosure which is the result of gross negligence, punitive damages, plus

(2) the cost of the action, plus

(3) in the case of a plaintiff which is described in section 7430(c)(4)(A)(ii), reasonable attorneys fees, except that if the defendant is the United States, reasonable attorneys fees may be awarded only if the plaintiff is the prevailing party (as determined under section 7430(c)(4)).

198

TD_0000430

(d) Period for Bringing Action

Notwithstanding any other provision of law, an action to enforce any liability created under this section may be brought, without regard to the amount in controversy, at any time within 2 years after the date of discovery by the plaintiff of the unauthorized inspection or disclosure.

(e) Notification of Unlawful Inspection and Disclosure

If any person is criminally charged by indictment or information with inspection or disclosure of a taxpayer's return or return information in violation of –

(1) paragraph (1) or (2) of section 7213 (a),

(2) section 7213A(a), or

(3) subparagraph (B) of section 1030(a)(2) of title 18, United States Code,

the Secretary shall notify such taxpayer as soon as practicable of such inspection or disclosure. The Secretary shall also notify such taxpayer if the Internal Revenue Service or a Federal or State agency (upon notice to the Secretary by such Federal or State agency) proposes an administrative determination as to disciplinary or adverse action against an employee arising from the employee's unauthorized inspection or disclosure of the taxpayer's return or return information. The notice described in this subsection shall include the date of the unauthorized inspection or disclosure and the rights of the taxpayer under such administrative determination.

(f) Definitions

For purposes of this section, the terms "inspect", "inspection", "return" and "return information" have the respective meanings given such terms by section 6103(b).

(g) Extension to information obtained under section 3406

For purposes of this section –

(1) any information obtained under section 3406 (including information with respect to any payee certification failure under subsection (d) thereof) shall be treated as return information, and

(2) any inspection or use of such information other than for purposes of meeting any requirement under section 3406 or (subject to the safeguards set forth in section 6103) for purposes permitted under section 6103 shall be treated as a violation of section 6103.

For purposes of subsection (b), the reference to section 6103 shall be treated as including a reference to section 6311 (e).

(h) Special rule for information obtained under section 6103(k)(9)

For purposes of this section, any reference to section 6103 shall be treated as including a reference to section 3406.

199

A768

TD_0000431

## Exhibit 6 Contractor 45-Day Notification Procedures

Federal agencies, state tax agencies and state child support enforcement agencies in the possession of FTI may use contractors, sometimes in limited circumstances.

- State tax authorities are authorized by statute to disclose information to contractors for the purpose of, and to the extent necessary in, administering state tax laws, pursuant to Treasury Regulation 301.6103(n)-1.

Agencies that receive FTI under authority of IRC § 6103(l)(7) (human services agencies) may not disclose FTI to contractors for any purpose. Contractors consist of, but are not limited to, cloud computing providers, consolidated data centers, off-site storage facilities, disposal companies, information technology support, or tax modeling or revenue forecasting providers.

Agencies must notify the IRS prior to executing any agreement to disclose FTI to a contractor, or at least 45 days prior to the disclosure of FTI, to ensure that appropriate contractual language is included and that contractors are held to safeguarding requirements. Further, any contractors authorized access to or possession of FTI must notify and secure the approval of the IRS prior to making any redisclosures to sub-contractors. For additional information, see Section 2.E.6.2, Contractor or Sub-contractor Access.

To provide agency notification of intent to enter into an agreement to make disclosures of FTI to a contractor, submit a letter in electronic format, on agency letterhead over the head of agency's or their delegate's signature, to SafeguardReports@irs.gov. Ensure that the letter contains the following specific information:

- Name, address, phone number and email address of agency point of contact

- Name and address of contractor

- Contract number and date awarded

- Contract period covered (e.g., 2021–2024)

- Type of service covered by the contract

- Number of contracted workers

- Name and description of agency program that contractor will support

- Detailed description of FTI to be disclosed to contractor

- Description of work to be performed by contractor, including phased timing, how FTI will be accessed, and how tasks may change throughout the different phases

- Procedures for agency oversight on contractor access, storage and destruction of FTI, disclosure awareness training and incident reporting

- Location where work will be performed (contractor site or agency location) and how data will be secured if it is moved from the secure agency location

- Statement whether sub-contractor(s) will have access to FTI

- Name(s) and address(es) of all sub-contractor(s), if applicable

200

TD_0000432

- Description of FTI to be disclosed to sub-contractor(s)

- Description of work to be performed by sub-contractor(s)

- Location(s) where work will be performed by sub-contractor(s) and how data will be secured if it is moved from a secure agency location

- Certification that contractor personnel accessing FTI and contractor information systems containing FTI are all located within the United States or territories, given that FTI is not allowed offshore.

After receipt of an agency's request, the IRS will analyze the information provided to ensure that contractor access is authorized and consistent with all requirements. The IRS will send the agency an email acknowledgement of receipt of agency notification. A written response, along with a reminder of the requirements associated with the contract, is issued once the notification review process is complete. Agency disclosure personnel may wish to discuss local procedures with their procurement colleagues to ensure that they are part of the contract review process and that the appropriate contract language is included from the beginning of the contract.

If the 45-day notification pertains to the use of a contractor to conduct tax modeling, estimate revenue, or employ FTI for other statistical purposes, the agency must also submit a separate statement detailing the methodology and data to be used by the contractor. The Office of Safeguards will forward the methodology and data statement to the IRS Statistics of Income office for approval of the methodology (see Section 2.E.6.2, Contractor or Sub-contractor Access). Templates can be located on the Office of Safeguards website.

If the 45-day notification is not possible, please contact the Safeguards mailbox at SafeguardReports@irs.gov for assistance.

201

TD_0000433