**ORAL ARGUMENT NOT SCHEDULED**

No. 26-5006

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**CENTER FOR TAXPAYER RIGHTS, et al,**
*Appellees*

v.

**INTERNAL REVENUE SERVICE, et al.,**
*Appellants*

_____

*On Appeal from The United States District Court
for the District of Columbia*

**BRIEF OF *AMICI CURIAE* LAWYERS DEFENDING AMERICAN
DEMOCRACY  IN SUPPORT OF APPELLEES
AND AFFIRMANCE OF THE DISTRICT COURT'S
ORDER OF NOVEMBER 21, 2025**

JEFFREY S. GUTMAN
JEFFREY S. GUTMAN, PLLC
1712 Hobart St., N.W.
Washington, D.C. 20009
(202) 631-5129

# <u>RULE 26.1. DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1. and D.C. Cir. Rule 29(b), Lawyers Defending American Democracy is a non-profit organization incorporated under the laws of Delaware.  It is without any parent corporation, and no publicly held corporation owns this organization or any portion of this organization.

# TABLE OF CONTENTS

Disclosure Statement.................................................................................... i

Table of Authorities.................................................................................... iii

Statement of Identity, Independence, and Authorization....................................... vii

Certificate as to Length ............................................................................. viii

SUMMARY OF ARGUMENT......................................................................... 1

STATUTORY AND FACTUAL BACKGROUND ................................................... 3

ARGUMENT .......................................................................................... 7

I.  THE PRE-1976 HISTORY. ...................................................................... 7

II.  THE PRELUDE TO THE 1976 TAX REFORM ACT. .................................... 12

III. THE HISTORY OF THE TRA UNDERSCORES THAT  EXCEPTIONS TO THE PRINCIPLE OF CONFIDENTIALITY OF RETURN INFORMATION SHOULD BE NARROWLY CONSTRUED.......................................................... 19

CONCLUSION ...................................................................................... 28

# TABLE OF AUTHORITIES

**CASES**

*Aronson v. I.R.S.*, 973 F.2d 962, 966 (1st Cir. 1992)....................................................4

*Baskin v. United States*, 135 F.3d 338, 340 (5th Cir. 1998) ...................................19

*Church of Scientology v. IRS*, 484 U.S. 9, 16 (1987)...............................................2

*Cmty. Econ. Dev. Ctr. of S.E. Mass. v. Bessent*, 2026 U.S. Dist. LEXIS 24212, (D. Mass. Feb. 5, 2026). .......................................................................................24

*Ctr. for Taxpayer Rts. et al. v. IRS*, 2026 U.S. Dist. LEXIS 43738 at \*9 (D.D.C. Feb. 26, 2026). ........................................................................................5

*Ctr. for Taxpayer Rts. v. IRS*, Civ. No. 25-0457 (CKK), 2025 U.S. Dist. LEXIS 229803 at \*59-63 (Nov. 21, 2025). ...............................................................5, 22

*National Assn. of Mfrs.* v. *Department of Defense*, 583 U.S. 109, 128 (2018) .......20

*Nat'l Treasury Employees Union v. FLRA*, 791 F.2d 183, 184 (D.C. Cir. 1986).......3

*Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429 (1895), *aff'd on reh'g*, 158 U.S. 601 (1895). .........................................................................................8

*Pulsifer v. United States*, 601 U.S. 124, 125 (2024) ...............................................20

*Stokwitz v. United States*, 831 F.2d 893, 895 (9th Cir. 1987)..................................19

*United States v. Dickey*, 268 U.S. 378, 387 (1925)..................................................10

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend XVI 1,............................................................................................1, 8

**STATUTES**

8 U.S.C. § 1253(a)(1)...........................................................................................23, 24, 25

8 U.S.C. § 1221(b), (c)......................................................................................................25

26 U.S.C. § 6103..................................................................................................................6

26 U.S.C. § 6103(a) .......................................................................................................3, 19

26 U.S.C. § 6103(c)-(o) .......................................................................................................3

26 U.S.C. § 6103(i)............................................................................................................19

26 U.S.C. § 6103(i)(2) .........................................................................................................5

26 U.S.C. § 6103(i)(2)(A)..................................................................................................21

26 U.S.C. § 6103(i)(2)(B) ..................................................................6, 20

26 U.S.C. § 6103(i)(2)(B)(i) ...................................................................26

26 U.S.C. § 6103(i)(2)(B)(ii) ..................................................................25

26 U.S.C. § 6103(i)(2)(B)(iv) ................................................1, 19, 21, 22

26 U.S.C. §1, 7701(a)(30) .........................................................................4

26 U.S.C. § 7701(b). ..................................................................................4

26 U.S.C. § 6103(i)(2) .............................................................................20

26 U.S.C. § 6103(j)(5) .............................................................................23

Act of Nov. 2, 1966, Pub. L. No. 89-713, § 4(a), 80 Stat. 1107, 1109 ....................10

Internal Revenue Manual (IRM) §11.3.28.1.1 (April 17, 2025) ..............................3

Naturalization Act of July 14, 1870, ch. 255, § 11, 16 Stat. 256, 259. ....................8

Revenue Act of 1918, ch. 18, § 257, 40 Stat. 1057, 1086-87 ..................................9

Revenue Act of 1924, ch. 234 § 257(b), 43 Stat. 253, 293. ....................................9

Revenue Act of 1926, 44 Stat. 9 (Pub. Law 69-20). ..............................................10

Revenue Act of 1934, ch. 277, 48 Stat. 680, 698, amended by Act of April 19, 1935, ch. 74, 49 Stat. 158 ..............................................................................11

Revenue Act of July 1, 1862, 12 Stat. 432, 437 ......................................................8

Revenue Act of 1894, ch. 349, 28 Stat. 509 ............................................................8

Tariff Act of 1894, ch. 349, § 34, 28 Stat. 509, 557 ................................................8

Tariff Act of 1913, Pub. L. No. 63-16, 38 Stat. 114, 117. ......................................9

Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520 ................2, 13. 15, 23

**OTHER AUTHORITIES**

Brief for the United States, Ctr. For Taxpayer Rts., et al. No. 26-5006 1 (D.C. Cir. 2026). ................................................................ 23, 24, 25, 26

Confidentiality of Tax Return Information Hearing Before the H. Comm. on Ways and Means, 94th Cong. 90 (1976) ................................................ 16,17

Edward Morse, *Taxpayer Privacy Protections: Restrictions and Remedies for Releasing Return Information*, 12 BELMONT L. REV. 500, 505 (2025).....9, 10, 11, 13

Exec. Order No. 11,697, 3 C.F.R. 158 (1973) .......................................................16

Exec. Order No. 11,773, 3 C.F.R. 857 (1974). ......................................................16

Federal Tax Return Privacy Hearing Before the Subcomm. on Admin. of the Internal Revenue Code of the S. Comm. on Fin., 94th Cong. 147 (April 28, 1975) ..............................................................................................................14

Federal Tax Return Privacy Hearing Before the Subcomm. on Admin. of the Internal Revenue Code of the S. Comm. on Fin., 94th Cong. 157 (April 28, 1975). ..................................................................................... 17,18

General Explanation of the Tax Reform Act of 1976, 94th Cong. 314 (1976).........15

George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Lawyer 103-160 (2015). ........................................................................7

George Yin, *Reforming (and Saving) the IRS By Respecting the Public's Right to Know*, 100 Va. L. Rev. 1115, 1124-25 (2014) .......................................8

H.R. Rep. No. 93-1305, at 3 (1974)...................................................................13

Joseph Thorndike, *How a Dispute Over Counting Farms Shaped Taxpayer Privacy Protections*, Tax Notes (April 21, 2025) https://www.taxnotes.com/tax-history-project/how-dispute-over-counting-farms-shaped-taxpayer-privacy-protections/2025/04/18/7s0ly .................................................................16

Joseph Thorndike, *Nixon Gave USDA Access to Tax Returns; Farmers Decried 'Snooping'*, Tax Notes (April 28, 2025) https://www.taxnotes.com/tax-history-project/nixon-gave-usda-access-tax-returns-farmers-decried-snooping/2025/04/25/7s16t. ...........................................................16

Joseph J. Thorndike, *Taxpayer Confidentiality Evolves: From Public Lists to Presumptive Secrecy*, Tax Notes (September. 29, 2025), https://www.taxnotes.com/tax-history-project/taxpayer-confidentiality-evolves-public-lists-presumptive-secrecy/2025/09/26/7t1pv. ......................................7, 11

Marjorie Kornhauser, *Shaping Public Opinion and the Law: How a 'Common Man' Campaign Ended a Rich Man's Law*, 73 L. & Contemp. Probs. 123 (2010).......................................................................................11

Michael Hatfield, *Privacy in Taxation*, 44 Fla. St. U. L. Rev. 579, 600-01 (2018). 9,

Paul Schwartz, *The Future of Tax Privacy,* National Tax Journal, 883, 884 (2008). 8

Proposals for Administrative Changes in Internal Revenue Service Procedures Hearings Before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 94th Cong. 8-9 (1975)........................................................ 14, 15

Report on Admin. Procedures of the Int'l Rev. Serv. to the U.S. Admin. Conf., S. Doc. 94-266, 94th Cong., 2d Sess. at 837 (1975)............................. passim

Richard Pomp, *The Disclosure of Individual Tax Returns: A Historical Overview*, Faculty Articles and Papers, at 1121 (2019) https://digitalcommons.lib.uconn.edu/law_papers/563.................................8, 10

S. Rep. No. 89-1625, at 8-9 (1966)............................................................................10

S. Rep. No. 93-981, at 130-43 (1974)........................................................................13

S. Rep. No. 94-938, at 328 (1976). ........................................................................2, 19

The Budget Lab, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing- tax-compliance............................................................................4

The Freedom of Information Act Hearings Before Subcomm. of the House Comm. on Government Operations, 93rd Cong. 168 (1973)...........................................17

## REGULATIONS

60 Fed. Reg. 30,211, 30,213 (June 8, 1995) ..........................................................3, 4

T.D. 4873, Nov. 12, 1938, pt. III, art. 3. ....................................................................11

Treas. Reg. § 301.6109-1(d)(3) (1974). ....................................................................26

**STATEMENT OF IDENTITY, INDEPENDENCE, AND AUTHORIZATION**

*Identity*.  Lawyers Defending American Democracy (LDAD) is a non-profit, non-partisan organization devoted to encouraging the legal profession to enforce and uphold principles of American democracy and law, consistent with our obligations as lawyers; demanding accountability from lawyers and public officials; and identifying attacks on legal norms and prescribing redress for them. LDAD's mission is to defend the underlying constitutional values and norms of political behavior on which our democracy depends, including the rule of law, institutional checks and balances, separation of powers, press freedom, and the integrity of our system of justice.  LDAD's Board of Directors includes, among others, a retired state supreme court justice, a former state attorney general, retired partners and managing partners of major law firms, past presidents of two state bar associations, business entrepreneurs, and legal academics.

LDAD files this amicus brief in support of Appellees because the provision of massive amounts of taxpayer information by the Internal Revenue Service to the Department of Homeland Security opens the door to use such information for large-scale law enforcement purposes that are not tied to the specific need for information in particular cases. This poses a serious threat to personal liberty by undermining the assurance to taxpayers that their information will not be used for law enforcement purposes except in narrowly defined circumstances.  The

arrangement at issue in this case would significantly disrupt the careful balance between privacy and the needs of law enforcement that such an assurance represents.

*Independence*.  No counsel for a party has drafted this brief in whole or in part.  No party or other entity has made any financial contribution toward the preparation and submission of this brief.

*Authorization*.  All *amici* have authorized participation in this brief in accordance with their individual judgments or institutional processes as applicable.

Counsel for all parties consented to the filing of this brief.

## CERTIFICATE AS TO LENGTH

In accordance with Rule 32(g)(1), this brief consists of 6490 words in Times New Roman 14 point font.

## SUMMARY OF ARGUMENT

The district court's November 21, 2025, opinion rested in part on an interpretation of several provisions of 26 U.S.C. § 6103(i)(2), which substantially limit the Internal Revenue Service's (IRS) ability to transfer sensitive return information to other federal agencies for non-tax criminal investigative purposes. The district's court opinion is grounded in the clear language of the statute and supported by the legislative history of Section 6103.

Historically, the public debate regarding confidentiality of tax information has reflected two views. An earlier view favored publication of taxpayer information as a means of ensuring that the wealthy pay their taxes. The more recent view, however, is that taxpayer information is intensely personal, and that disclosure of this sensitive information may deter people from voluntarily paying their taxes.

After the enactment of the Sixteenth Amendment, Congress designated return information as public records and enabled the President and Secretary of the Treasury to determine when and to whom to disclose it. Congress' approach rested on trust that the Executive Branch would not abuse this authority to violate the privacy interests of taxpayers.

An egregious breach of this trust occurred during the Nixon Administration, when it wielded taxpayer information against political adversaries and shared

1

taxpayer information within the Executive Branch in ways widely regarded as unjustified. This led to the passage of provisions in the Tax Reform Act of 1976 (hereinafter, TRA) that centered confidentiality as the means to prevent repetition of these Watergate-era abuses. The Senate Finance Committee declared that tax information "was entitled to essentially the same degree of privacy as those private papers maintained in [the taxpayer's] home."[1] Thus, exceptions to the general rule of confidentiality should be interpreted narrowly.[2]

That approach is particularly warranted where, as here, an Administration breaks from decades of settled tax administration and purports to subject sensitive taxpayer information to mass, non-individualized disclosure. The Government's argument relies on the technical feasibility of such use. Congress may not have foreseen how modern technology would jeopardize confidentiality, but the wholescale use of taxpayers' confidential information for purposes divorced from legitimate law enforcement purposes is precisely what Congress sought to prevent.

---

[1] S. Rep. No. 94-938, at 328 (1976).

[2] *Id.* at 318 ("[R]eturns and return information should generally be treated as confidential and not subject to disclosure except in those limited situations delineated in the newly amended section 6103"); *see also Church of Scientology v. IRS*, 484 U.S. 9, 16 (1987) ("One of the major purposes in revising § 6103 was to tighten the restrictions on the use of return information by entities other than [the IRS].").

**STATUTORY AND FACTUAL BACKGROUND**

During the fifty years since the passage of the TRA, the government has complied with the statute's command that tax "[r]eturns and return information shall be confidential," 26 U.S.C. § 6103(a), and with the narrow exceptions set forth in 26 U.S.C. § 6103(c)-(o).  The Internal Revenue Manual (IRM) sets forth detailed procedures to ensure adherence to that command.   It adopted a "Privacy Policy" that narrowly limited sharing of tax return information with other federal departments and agencies.  *See* IRM §11.3.28.1.1 (April 17, 2025) ("Congress decided that federal law enforcement officials should not have easier access to information about a taxpayer maintained by the IRS than they would have if they sought to compel the production of that information from the taxpayer themselves.").

Confidentiality serves an overriding federal purpose.  It represents a compact with taxpayers, citizens and non-citizens alike.  In exchange for the voluntary submission of tax returns containing deeply private information, the IRS holds those returns in strict confidence. The assurance of confidentiality encourages taxpayers to submit their returns voluntarily.[3] *See, e.g.*, 60 Fed. Reg. 30,211,

---

[3] *Nat'l Treasury Employees Union v. FLRA*, 791 F.2d 183, 184 (D.C. Cir. 1986) ("This general ban on disclosure provides essential protection for the taxpayer; it guarantees that the sometimes sensitive or otherwise personal information in a return will be guarded from persons not directly engaged in processing or inspecting the return for tax administration purposes. The assurance of privacy secured by § 6103

3

30,213 (June 8, 1995) ("The [ITIN] and the information obtained by the IRS . . .

constitute confidential taxpayer information. Section 6103 strictly prohibits the

disclosure of this information to other government agencies, private entities, or

citizens.").

Undocumented residents are required to file income tax returns and pay

income taxes in the same manner as citizens and legal residents. *See* 26 U.S.C. §§

1, 7701(a)(30), 7701(b). For decades, the government has encouraged non-citizen

taxpayers to submit returns and to pay federal taxes on their income rather than to

work in the shadows. And they have done so, relying on the government's

promise not to punish their honesty by using that information, particularly

addresses, to find and deport them. The nation has thereby benefited substantially.

Undocumented immigrants paid an estimated $66 billion in federal taxes in 2023.[4]

The Trump Administration, however, upended that Congressionally

sanctioned compact when the IRS replaced the "Privacy Policy" with the "Data

---

is fundamental to a tax system that relies upon self-reporting."). *See also Aronson v. I.R.S.*, 973 F.2d 962, 966 (1st Cir. 1992) (". . . without clear taxpayer understanding that the government takes the strongest precautions to keep tax information confidential, taxpayers' confidence in the federal tax system might erode, with harmful consequences for a tax system that depends heavily on voluntary compliance.").

[4] *See* The Budget Lab, *The Potential Impact of IRS-ICE Data Sharing on Tax Compliance* (Apr. 8, 2025), https://budgetlab.yale.edu/research/potential-impact-irs-ice-data-sharing- tax-compliance.

Policy." *Ctr. for Taxpayer Rts. v. IRS*, Civ. No. 25-0457 (CKK), 2025 U.S. Dist. LEXIS 229803 at *59-63 (Nov. 21, 2025).  The Data Policy abandoned the promise of taxpayer confidentiality in favor of disclosure of private return information to the Department of Homeland Security to assist in mass deportation.

The "Data Policy" is memorialized in a Memorandum of Understanding (MOU) between IRS and ICE.  *Id*. at *62.  The MOU invokes the exception to return information confidentiality set forth in 26 U.S.C. § 6103(i)(2) to request just one data point – home addresses – to be furnished to a single ICE official.  On June 27, 2025, ICE requested that IRS furnish "the last known address of approximately 1.28 million individuals." *Id*. at *17.  On August 7, 2025, the IRS disclosed to ICE addresses of  47,289 taxpayers.  *Ctr. for Taxpayer Rts. et al. v. IRS*, 2026 U.S. Dist. LEXIS 43738 at *9 (D.D.C. Feb. 26, 2026).

This non-individualized dragnet is reminiscent of the Nixon Administration's 1973 attempt to transfer return information of all American farmers to the Department of Agriculture.  Sparking national outrage, this effort was withdrawn, but it was intended as a model for further requests by other agencies for taxpayer information *en masse*.  This grim prospect motivated Congress to pass the TRA.

The language and structure of Section 6103(i)(2) reflect Congress' intent to protect taxpayers against unauthorized and unjustified disclosures.  Framed in the

singular ("a request," "a proceeding" relating to "the taxpayer"), the statute requires that individualized return information be requested only by specific high-ranking government officials. The IRS may respond to the request and disclose information only to a narrow group of agency employees "personally and directly engaged" in the particular criminal proceeding or investigation underlying the request who must use the information "solely" for that proceeding or investigation.

To protect taxpayer confidentiality, the IRS has a parallel duty to ensure that the request complies with the statute. *See* 26 U.S.C. § 6103(i)(2)(B). The IRS must confirm that the request is warranted by a specific law enforcement purpose and that the request includes the name and address of the targeted taxpayer to avoid disclosure of return information of taxpayers in whom the agency has no law enforcement interest.

The statute does not contemplate requests for massive amounts of return information from thousands of taxpayers that (1) do not provide a justification based on the circumstances of each individual taxpayer, (2) do not ensure that the return information of each taxpayer will be disclosed only to personnel who are "personally and directly engaged" in the proceeding or investigation relating to that taxpayer, and (3) do not ensure that a taxpayer's return information will be used by such personnel "solely" for such proceeding or investigation. The arrangement at issue in this case therefore clearly fails to comply with statutory requirements and

6

purpose and breaches the promise of holding secret confidential taxpayer information.

## **ARGUMENT**

### I. THE PRE-1976 HISTORY.

The debate over taxpayer information dates back to the Civil War and has trended in favor of taxpayer privacy.[5] As one commentator put it, ". . . it makes sense to view tax secrecy as a bargain of sorts: an agreement between taxpayers and the state about how much the government needs to know and what that government must never reveal. Over the years, that bargain has been renegotiated repeatedly — in moments of war, depression, scandal, and reform. Yet there has also been a distinct trend: Americans have increasingly favored privacy over publicity."[6]

Congress enacted the first federal income tax laws during the Civil War. Tax assessment information was posted publicly on courthouse doors and in

---

[5] *See* George K. Yin, *Preventing Congressional Violations of Taxpayer Privacy*, 69 Tax Lawyer 103-160 (2015) (detailing the history of tax return confidentiality laws prior to 1921).
[6] Joseph J. Thorndike, *Taxpayer Confidentiality Evolves: From Public Lists to Presumptive Secrecy*, Tax Notes (Sept. 29, 2025), https://www.taxnotes.com/tax-history-project/taxpayer-confidentiality-evolves-public-lists-presumptive-secrecy/2025/09/26/7t1pv.

newspapers[7] to alert taxpayers of what was owed and to encourage honesty.[8] Public backlash caused Congress in 1870 to end newspaper publication of taxpayer information.[9] The income tax was abolished in 1872. "The furor surrounding publicity was one of the central causes of the early demise of the income tax as a revenue raising instrument."[10]

In 1894, Congress attempted to reinstitute a federal income tax. In response to broad opposition to public disclosure, the Revenue Act of 1894 required taxpayers to furnish certain information to the tax authorities and gave assurances that the information would not be disclosed publicly.[11]

The Sixteenth Amendment, which authorized the federal income tax, was adopted in 1909. Shortly thereafter, Congress sought to balance the privacy

---

[7] Revenue Act of July 1, 1862, 12 Stat. 432, 437; Revenue Act of June 30, 1864, 13 Stat. 218, 228; *see* Paul Schwartz, *The Future of Tax Privacy,* National Tax Journal, 883, 884 (2008).

[8] Richard Pomp, *The Disclosure of Individual Tax Returns: A Historical Overview*, FACULTY ARTICLES AND PAPERS, at 1121 (2019) https://digitalcommons.lib.uconn.edu/law_papers/563. *See also* George Yin, *Reforming (and Saving) the IRS By Respecting the Public's Right to Know*, 100 VA. L. REV. 1115, 1124-25 (2014). *See* Report on Admin. Procedures of the Int'l Rev. Serv. to the U.S. Admin. Conf., S. Doc. 94-266, 94th Cong., 2d Sess. at 837 (1975) (hereinafter "Admin. Report").

[9] Naturalization Act of July 14, 1870, ch. 255, § 11, 16 Stat. 256, 259.

[10] Admin. Report, *supra* note 8, at 838.

[11] S*ee* Tariff Act of 1894, ch. 349, § 34, 28 Stat. 509, 557; *see also Pollock v. Farmers' Loan & Trust Co*., 157 U.S. 429 (1895), *aff'd on reh'g*, 158 U.S. 601 (1895) (holding that the Tariff Act of 1894 statute is unconstitutional).

interests of taxpayers with the public interest in knowing whether wealthy people paid taxes and, if so, how much.

In 1913, Congress passed legislation that declared tax returns to be public records, but gave the President the power of disclosure: "returns shall be open to inspection only upon the order of the President under rules and regulations to be prescribed by the Secretary of the Treasury and approved by the President."[12] The Revenue Act of 1918 designated individual tax returns as "public records," but disclosure remained controlled by the President pursuant to Treasury regulations.[13] The Treasury Secretary did not allow public disclosure of returns, but did permit the dissemination of tax information to federal agencies.[14] That framework persisted until 1976 based on trust that the President would not use taxpayer information for political purposes.[15]

A provision of the Revenue Act of 1924 allowed public disclosure of tax return information: "[t]he Commissioner shall . . . cause to be prepared and made available to public inspection in such manner as he may determine, in the office of the collector in each internal-revenue district and in such other places as he may

---

[12] Tariff Act of 1913, Pub. L. No. 63-16, 38 Stat. 114, 117.
[13] Revenue Act of 1918, ch. 18, § 257, 40 Stat. 1057, 1086-87 (explaining how the 1918 Act required the publication of the names of taxpayers); Michael Hatfield, *Privacy in Taxation*, 44 Fla. St. U. L. Rev. 579, 600-01 (2018).
[14] Hatfield, *supra* note 13, at 600 (citing T.D. 2961, 2 C.B. 250-51 (1920)).
[15] Edward Morse, *Taxpayer Privacy Protections: Restrictions and Remedies for Releasing Return Information*, 12 BELMONT L. REV. 500, 505 (2025).

determine, lists containing the name and the post-office address of each person making an income-tax return in such district, together with the amount of the income tax paid by such person."[16]

This mandatory disclosure provision faced stiff public opposition.[17] Congress repealed it in 1926.[18] During the Depression, there was some public support for publicizing the incomes of the wealthy.[19] In 1934, Congress enacted legislation requiring public disclosure of tax information for the last time. Taxpayers were required to file a "pink slip" with their return which was available to the public and revealed their income, deductions, and tax payable.[20] Yielding to public pressure, Congress repealed this provision before it took effect.[21]

---

[16] Revenue Act of 1924, ch. 234 § 257(b), 43 Stat. 253, 293. *See United States v. Dickey*, 268 U.S. 378, 387 (1925) (affirming dismissal of indictment of a Kansas City newspaper for publishing tax return information, holding that "[i]nformation, which everybody is at liberty to acquire and the acquisition of which Congress seemed especially desirous of facilitating, in the absence of some clear and positive provision to the contrary, cannot be regarded otherwise than as public property, to be passed on to others as freely as the possessors of it may choose.").

[17] Morse, *supra* note 15, at 508.

[18] Revenue Act of 1926, 44 Stat. 9 (Pub. Law 69-20) (the statute continued to allow the disclosure of taxpayer names and addresses); Pomp, *supra* note 8, at 1121; Admin. Report at 843. Act of Nov. 2, 1966, Pub. L. No. 89-713, § 4(a), 80 Stat. 1107, 1109 (where Congress ended the release of names and addresses in 1966); *see also* S. Rep. No. 89-1625, at 8-9 (1966).

[19] Hatfield, *supra* note 13, at 601 (noting that "only the top 6% paid income tax" at that time).

[20] Thorndike, *supra* note 6.

[21] Revenue Act of 1934, ch. 277, 48 Stat. 680, 698, amended by Act of April 19, 1935, ch. 74, 49 Stat. 158; *see* Marjorie Kornhauser, *Shaping Public Opinion and*

Starting in 1930, regulations broadened access to taxpayer information by Executive branch departments and agencies and committees of Congress.[22]  By 1938, regulations afforded federal agencies access to tax return information for use in agency proceedings to which the United States was a party.[23]  Politically motivated disclosures to Congress and the Executive Branch ensued.[24]  During World War II, the Treasury Department reviewed the returns of antiwar activists and labor union leaders.[25]  The Admin. Report explained that, "[t]he 1940's, 1950's and 1960's were marked by almost unrestrained growth in the use of tax returns by government agencies. During this time tax returns became a generalized governmental asset."[26]

Administrative practice developed two methods by which executive branch departments and agencies obtained tax return information.  Rules described as "catchall" regulations by the Admin. Report allowed agency heads to ask the

---

*the Law: How a 'Common Man' Campaign Ended a Rich Man's Law*, 73 L. & CONTEMP. PROBS. 123 (2010).

[22] Admin. Report, *supra* note 8, at 845-846 (As the Admin. Report puts it, "these precedents were but the first drops of a gentle rain which nearly became a downpour.").

[23] T.D. 4873, Nov. 12, 1938, pt. III, art. 3.

[24] Morse, *supra* note 15, at 509 (Senate Committee on Investigations of Lobbying obtained returns of people opposed to the New Deal; President Roosevelt asked the Treasury Department to monitor the returns of William Randolph Hearst after he began to oppose him).

[25]  Morse, *supra* note 15, at 510.

[26] Admin. Report, *supra* note 8, at 849.

Secretary to permit agency officers or employees to inspect a tax record in matters before the agency head.[27]  These requests were individualized and required the name and address of the taxpayer, the type of tax, the periods covered by the return and the reason for the inspection.[28]  According to the Admin. Report, the Secretary or IRS Commissioner rarely if ever denied such requests.[29]

The other, called "blanket regulations," conferred  authority on "large volume user" agencies to inspect returns under particular circumstances and did not require disclosure of a particular taxpayer's name or address.[30]  The Admin. Report documented tens of thousands of requests made under these authorities and found that the requests provided little detail about the reasons for the requests: "the statement of "reasons" for inspection is largely a charade."[31]

## II.    THE PRELUDE TO THE 1976 TAX REFORM ACT.

In the wake of Watergate, Congressional investigations uncovered unprecedented efforts by the Nixon Administration to use the IRS to target perceived enemies. The White House identified political enemies and obtained their confidential tax information by pretending to consider them for political

---

[27] *Id.* at 850.
[28] *Id.*
[29] *Id.*
[30] *Id.* at 851.
[31] *Id.* at 859.

appointments.[32] Commissioner Randolph W. Thrower, who served from 1969 to 1971, resisted these efforts and was fired for it.[33] Nixon operatives provided his successor, Johnnie Mac Walters, with a list of enemies. He also resisted and provided the list to the Joint Committee on Taxation instead.[34] In draft Articles of Impeachment, the House Judiciary Committee alleged that Nixon had "endeavored to obtain from the Internal Revenue Service, in violation of the constitutional rights of citizens, confidential information contained in income tax returns for purposes not authorized by law."[35]

Clark R. Mollenhoff, Deputy Counsel to President Nixon, testified during Senate hearings about how White House employees had access to tax returns in a "loose manner."[36] Mollenhoff's system allowed certain White House employees to have unfettered access to return information upon oral request without direct communication from the President.[37]

Members of Congress decried these politicized tactics. During the course of hearings before the Senate Subcommittee on Administration of the Internal

---

[32] Admin. Report, *supra* note 8, at 991.

[33] Morse, *supra* at 15, at 510.

[34] *Id.* at 511.

[35] H.R. Rep. No. 93-1305, at 3 (1974); S. Rep. No. 93-981, at 130-43 (1974).

[36] Admin. Report, *supra* note 8, at 969.

[37] *Id.* at 969-970.

Revenue Code, Sen. Floyd Haskell offered a number of documents including one

titled, "Tax Return Privacy" which stated in part:

> Of all the Watergate abuses of power the most alarming
> to many citizens was the attempt by White House staff to
> use the Internal Revenue Service for political purposes –
> to help friends and to harm enemies.  The second article
> of impeachment adopted by the House Judiciary
> Committee last July charges this specific misuse of the
> IRS by former President Nixon.[38]

During the hearing before the House Subcommittee on Oversight of the

Committee on Ways and Means, Senator Lowell Weicker, Jr. expressed similar

concerns in prophetic terms:

> The Congress of the United States is on notice.  Do we
> need any more Watergate bombshells before this body
> acts decisively to prevent future abuses of the
> Constitution and the rights of individual citizens?  I hope
> not.  Over the past two years, a massive public record has
> been compiled documenting wrongdoing connected with
> the IRS.
>
> *     *     *
>
> The IRS was designed to collect taxes, not to be a
> lending library of private information on American
> citizens.
>
> Each taxpayer should be confident that the filing of his or
> her tax returns in no way compromises the right of
> privacy.

---

[38] *See* Federal Tax Return Privacy Hearing Before the Subcomm. on Admin. of the
Internal Revenue Code of the S. Comm. on Fin., 94th Cong. 147 (April 28, 1975)
("Tax Return Policy").

*　　*　　*

> Mr. Chairman, there will be those who will say that these
> flagrant abuses in our tax system could never occur again
> because no President or agency of government would
> dare risk the resulting outrage.  To believe this would be
> to ignore the lessons of Watergate.[39]

In enacting the Tax Reform Act of 1976, the Joint Committee on Taxation

addressed those concerns in their "reasons for change" of the existing tax code:

> Questions were raised and substantial controversy
> created as to whether the extent of actual and potential
> disclosure of returns and return information to other
> Federal and State agencies for non-tax purposes breached
> a reasonable expectation of privacy on the part of the
> American citizen with respect to such information. This,
> in turn, raised the question of whether the public's
> reaction to this possible abuse of privacy would seriously
> impair the effectiveness of our country's very successful
> voluntary assessment system, which is the mainstay of
> the Federal tax system.[40]

The Nixon Administration also provided IRS information to other

government agencies.  President Nixon issued two Executive Orders in 1973

allowing the Department of Agriculture to inspect the tax returns of all farmers.[41]

The specious rationales offered in the were to "obtain[] data about such persons'

---

[39] Proposals for Administrative Changes in Internal Revenue Service Procedures Hearings Before the Subcomm. on Oversight of the H. Comm. on Ways & Means, 94th Cong. 8-9 (1975) (Statement of Senator Lowell Weicker, Jr.).

[40] *See* General Explanation of the Tax Reform Act of 1976, 94th Cong. 314 (1976).

[41] Admin. Report, *supra* note 8, at 875-880. *See* Exec. Order No. 11,697, 3 C.F.R. 158 (1973) (revoked in 1974); Exec. Order No. 11,709, 3 C.F.R. 168 (1973) (revoked in 1974). *See* Exec. Order No. 11,773, 3 C.F.R. 857 (1974).

15

farm operations) and for "statistical purposes." Despite Agriculture's claimed need

for farmer tax information for statistical purposes, the efforts drew sharp criticism

that the request constituted an invasion of privacy and heralded additional mass

requests from the IRS.[42]  This USDA request had powerful political

consequences.[43]

Rep. Jerry Litton expressed those widely-held concerns as follows:

> Though it was the furor raised over the administration's
> stand invading the privacy of farmers' tax returns that
> prompted the current action in the Congress, the returns
> of other Americans are equally susceptible to mass
> inspection.   Under the regulations now in force, the
> returns of all taxpayers are open to their State
> governments, the Department of the Treasury, and the
> Department of Justice, the Department of Health,
> Education and Welfare, the Securities and Exchange
> Commission, the Department of Commerce, the Federal
> Trade Commission and sundry other organizations.  The
> first amendment rights so vigorously reaffirmed by the
> court at every opportunity are being violated daily and
> many American citizens are not even aware of it.  This

---

[42] *See* Joseph J. Thorndike, *How a Dispute Over Counting Farms Shaped Taxpayer Privacy Protections*, Tax Notes (Apr. 21, 2025) https://www.taxnotes.com/tax-history-project/how-dispute-over-counting-farms-shaped-taxpayer-privacy-protections/2025/04/18/7s0ly; Joseph J. Thorndike, *Nixon Gave USDA Access to Tax Returns; Farmers Decried 'Snooping'*, Tax Notes (Apr. 28, 2025) https://www.taxnotes.com/tax-history-project/nixon-gave-usda-access-tax-returns-farmers-decried-snooping/2025/04/25/7s16t.
[43]  *Id.*

massive invasion of the rights of taxpaying Americans can no longer be tolerated.[44]

The concern that these USDA Orders were a prelude to further abuses was well-founded. During hearings before the House Subcommittee of the Committee on Government Operations regarding proposed amendments to the Freedom of Information Act in 1973, Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, testified that Executive Orders 11697 and 11709 were "prepared by the Department of the Treasury in language designed to serve as a prototype for future tax return inspection orders."[45]

This led Senator Lloyd Bentsen, a member of the Senate Finance Committee, to state:

> It is very significant to note that these Executive Orders were formulated as a model or prototype for future Executive Orders opening tax returns for similar statistical use by other Federal agencies. . . .
>
> Although President Nixon revoked these Executive Orders last March, there are several reasons why Congress must now provide great statutory protection to the confidentiality of tax returns. . . .
>
> . . . the events of Watergate illustrate that easy access to confidential tax returns by Federal employees creates a

---

[44] *See* Confidentiality of Tax Return Information Hearing Before the H. Comm. on Ways and Means, 94th Cong. 90 (January 28, 1976) (statement of Representative Jerry Litton).

[45] *See* The Freedom of Information Act Hearings Before Subcomm. of the House Comm. on Government Operations, 93rd Cong. 168 (May 8, 1973).

potential for abuse.  We must not give Federal officials easy access to tax returns so that unprincipled employees of an Executive Department can engage in a "fishing expedition" to investigate taxpayers.  For example, if we were to allow Agriculture Department officials to inspect at random the tax returns of all farmers, soon the Commerce Department would be scrutinizing the returns of businessmen, HEW would be auditing doctors' returns and HUD would be reviewing the tax returns of large numbers of homeowners.  This potential for abuse must be prevented by clear statutory restrictions.[46]

These concerns were echoed in the influential October, 1975 report entitled

"Administrative Procedures of the Internal Revenue Service" to the Administrative

Conference of the United States:[47]

There was then from the beginning the notion that returns were confidential. This idea undoubtedly drew upon the Civil war experience.  However, by 1920, there had begun a process of administrative erosion of the confidentiality principle which was to turn tax returns into generalized governmental assets.  Congress did not object, but it rejected efforts to open returns to further inspection by statute.  Given this fact and the mythology that tax returns are fully confidential, there seems little to justify the exploitation of tax returns for investigative purposes, particularly on a dragnet basis.  As things now stand, the language of the statute is more consistent with mythology than practice.[48]

---

[46] *See* Federal Tax Return Privacy Hearing Before the Subcomm. on Admin. of the Internal Revenue Code of the S. Comm. on Fin., 94th Cong. p. 157, Statement of Sen. Lloyd Bentsen  (April 28, 1975).

[47] Admin. Report, *supra* note 8, at III (The Report was written by a team of tax experts headed by Professor Charles Davenport of the University of California Law School at Davis).

[48] Admin. Report, *supra* note 8, at 935.

## III. THE HISTORY OF THE TRA UNDERSCORES THAT EXCEPTIONS TO THE PRINCIPLE OF CONFIDENTIALITY OF RETURN INFORMATION SHOULD BE NARROWLY CONSTRUED.

The core principle of confidentiality set forth in 26 U.S.C. § 6103(i) is a clear legislative response to the abuses of the Nixon Administration.[49] It provides that, unless otherwise authorized in the statute, "returns and return information shall be confidential." 26 U.S.C. § 6103(a). Congress sought to protect this confidential information in order to safeguard the privacy of taxpayers and to avoid abuses that would undermine the "country's very successful voluntary assessment system which is the mainstay of the Federal tax system."[50]

The legislative history of the substantial changes made to Section 6103(i) teaches that Congress sought to curb (1) the particularized targeting of individual return information in the absence of evidence of criminal culpability and (2) the non-individualized sharing of return information associated with large groups of people. Both are at issue here.

---

[49] *Stokwitz v. United States*, 831 F.2d 893, 895 (9th Cir. 1987) (citing S. Rep. No. 94-938)("section 6103 was aimed at curtailing abuse by government agencies of information filed with the IRS."); *see also Baskin v. United States*, 135 F.3d 338, 340 (5th Cir. 1998) ("in response to these perceived abuses and in order to significantly tighten the restrictions pertaining to the use of information collected by the IRS by other government agencies, Congress enacted a general prohibition against the disclosure of information complied by the IRS.").

[50] S. Rep. No. 94-938, *supra* note 1, at 328.

The statute requires the IRS to make a meaningful and individualized assessment as to whether the requesting agency meets statutory requirements that justify a departure from confidentiality under Section 6103(i)(2). This reflects Congress's intention that the IRS serve as a rigorous guardian against disclosure of sensitive taxpayer information in order to prevent the recurrence of abuses carried out by the Nixon Administration. An overbroad interpretation to permit disclosure in response to requests for large-scale quantities of information is completely at odds with legislative purpose. *Pulsifer v. United States*, 601 U.S. 124, 125 (2024) (quoting *National Assn. of Mfrs.* v. *Department of Defense*, 583 U.S. 109, 128 (2018)) ("When a statutory construction would 'render an entire subparagraph meaningless,' the Supreme Court has noted, the canon against surplusage applies with special force.")

The statute imposes several obligations on the IRS which must be scrupulously satisfied to maximize confidentiality: (i) it must ensure that each of the requirements of Section 6103(i)(2)(B) are met; (ii) it must ensure that, if the request is granted, disclosure is made only to persons "personally and directly engaged" in the investigation relating to that taxpayer, and (iii) it must ensure that such return information is used "solely" for such investigation. *See* 26 U.S.C. §§ 6103(i)(2), 6103(p)(4). These constraints were designed to make certain that if a specific reason for disclosure of information relevant to an ongoing investigation is

provided, the least information related to the actual targeted taxpayer be disclosed only to those personally and directly engaged in the investigation to satisfy their particular investigative purpose.

The IRS can only meaningfully evaluate an agency's request when it has been provided with a specific rationale for breaching confidentiality. The legislative history underscores that this review be searching, not cursory. This requires the IRS to judge whether the request is narrowly tailored to achieve the stated law enforcement interest and whether information other than return information housed at the IRS can serve that purpose.

Those "specific reason or reasons" must be "relevant to such proceeding or investigation." *Id.* § 6103(i)(2)(B)(iv). "Relevant" in this context requires a logical nexus between the information sought and an existing investigation the requesting agency is pursuing. The statute makes clear that a request for return information of a particular taxpayer must be tied to an existing investigation of that taxpayer, not one that may be pursued in the future if the information justifies it. *See* 26 U.S.C. § 6103(i)(2)(A) (information is transmitted to "officers and employees of such agency who *are* personally and directly *engaged* in any investigation.") (emphasis added). This was Congress' response to the Nixon Administration's campaign to obtain information on people, not to further an existing investigation but in the hope that the return information would reveal something to justify an investigation.

Further, to determine whether specific reasons for disclosure are relevant to an ongoing investigation, the IRS must make an individualized assessment. The statute's use of the term "such" – twice – was no accident. 26 U.S.C. § 6103(i)(2)(B)(iv) ("the specific reason or reasons why *such* disclosure is, or may be, relevant to *such* proceeding or investigation") (emphasis added). As the district court rightly explained, "[i]n requiring the IRS to ensure that a request set forth the "specific" reason or reasons why disclosure is "relevant," Section 6103(i)(2)(B)(iv) confers a responsibility on the IRS to engage in some level of individualized, non-automated review when evaluating agency requests for disclosure of taxpayer information." *Ctr. for Taxpayer Rts. v. IRS*, Civ. No. 25-0457 (CKK), 2025 U.S. Dist. LEXIS at *54 (Nov. 21, 2025).

This requirement of individualization is also reflected in Congress' direction that return information be disclosed only to "officers and employees of such agency who are personally and directly engaged" in an investigation. Congress clearly sought to prevent disclosure of sensitive information more widely than necessary to accomplish the law enforcement purpose. It also understood that employees are capable of *personally and directly* handling a limited number of matters at a time because doing so requires individual attention. Congress restricted disclosure of information to those with personal responsibility as a means of avoiding the sort of wholescale information request that USDA attempted in

22

1973, and which provoked public outrage. *See* 26 U.S.C. § 6103(j)(5) (USDA may only receive return information to conduct the census of agriculture pursuant to 1997 law).

The reason ICE offered for the disclosure of address information of 1.28 million people was that such information was relevant to its authority to investigate possible violations of 8 U.S.C. § 1253(a)(1). *Ctr. For Taxpayer Rts.* at *93-94. That statute makes it a crime for a person to stay in the United States more than 90 days after a final order of removal is issued.

Here, the government argues that presence in the United States is an element of a violation of 8 U.S.C. § 1253(a)(1) and that the purpose of the mass address request was to "verify presence within the United States." Blue Br. at 52. The statutory language and history, however, make clear that a single request for disclosure of address information for 1.28 million people to a single government official is wholly at odds with Congress's intent.

First, the government claims that it does not know which of these 1.28 million people are within or without the United States and that it cannot initiate a specific investigation of any given taxpayer without that information. *Id.* at 56-57. ICE's request is just the sort of fishing expedition that the TRA prohibits. The government lacks any specific reason for disclosure of return information based on an actual ongoing investigation of any particular taxpayer.

23

It is not plausible that ICE opened simultaneous investigations into 1.28 million people before making the request to IRS. As the Court in *Community Economic Development Center* held, "the record lacks sufficient information to demonstrate that ICE is seeking the addresses to assist with criminal investigations or proceedings under 8 U.S.C. § 1253(a)(1)." *Cmty. Econ. Dev. Ctr. of S.E. Mass. v. Bessent*, 2026 U.S. Dist. LEXIS 24212, *45 (D. Mass. Feb. 5, 2026).

Indeed, the government apparently agrees, stating that the results of the search would allow it to determine "whether to open and assign additional staff to separate investigations that focus on specific individuals."[51] Blue Br. at 56. It got the order backwards: request, then investigation. *See Cmty. Econ. Dev. Ctr.*, 2026 U.S. Dist. LEXIS 24212, at *51 ("Instead of initiating a criminal investigation, determining that prosecution requires a taxpayer's return information, and requesting such information from the IRS, ICE requested taxpayer addresses and then attempted to ascertain which of those taxpayers may have potentially violated a criminal statute.")

Second, even if there were ongoing investigations of 1.28 million people, the reasons provided for disclosure of addresses are neither specific nor narrowly

---

[51] Blue Br. at 56-57 (elsewhere, the government calls analysis of address information "an initial high-level review," something far short of an "investigation." That information, it acknowledges, may trigger "individualized investigations that require additional staffing . . . officers and employees who might later be assigned to particular criminal matters.").

tailored to the government's asserted law enforcement purpose and seek information from the IRS which is available from other sources. The government seeks to determine who has a foreign address and is thus not subject to Section 1253(a)(1). Departure from the United States can be ascertained elsewhere, such as flight or vessel manifests. *See* 8 U.S.C. § 1221(b), (c). For others, presumably within the United States, a narrower request for whether or not the most recent address is domestic would be sufficient to serve the investigative purpose because Section 1253(a)(1) does not require as an element of the offense residence at a particular location.

Third, in keeping with Congress' desire to ensure investigative relevance and allow the narrowest disclosure of return information to satisfy it, the agency request must identify the tax period of information sought. 26 U.S.C. § 6103(i)(2)(B)(ii). The Defendant's non-individualized request for the period January 2022 through present, Blue Br. at 50, for each taxpayer whether or not that time frame aligns with the date of the order of removal is precisely the sort of overbroad request Congress sought to end. This is no minor detail; if permitted, it would potentially allow for the disclosure of years of irrelevant return information for thousands of taxpayers.

Fourth, the history of Section 6103 makes clear that Congress viewed return information as extraordinarily sensitive. It therefore required this information to

25

remain confidential unless the government satisfied one of the exacting exceptions. If such disclosure is to be made, the IRS must ensure that only return information associated with the correct taxpayer is released.

26 U.S.C. § 6103(i)(2)(B)(i) requires that agency requests set forth "the name and address of the taxpayer with respect to whom the requested return information relates." The government focuses on the "address" as the item of return information it believes (wrongly) is relevant the investigation. In fact, the name and address requirement in Section 6103(i)(2)(B)(i) is the method chosen by Congress to allow the IRS to match the targeted person with the same taxpayer in its records. True, as the government notes, ITIN numbers might better serve that matching function. But ITIN numbers were not introduced until 1996[52] and addresses, not ITINs, are required by Section 6103(i)(2)(B)(i).

The IRS cannot blindly accept the address supplied by the requesting agency and seek to find a match. That exposes the personal information of taxpayers to potentially erroneous disclosure. To reduce that risk of error, the IRS must confirm a match between the address supplied and an address it has associated with the named taxpayer. The modern use of ITIN numbers highlighted by the government, Blue Br. at 49-50, does not excuse the requesting agency's statutory duty to supply

---

[52] *See* Treas. Reg. § 301.6109-1(d)(3) (1974) (implementing 26 U.S.C. § 6109).

a taxpayer address and for IRS to confirm a match before supplying return information to the agency.

Last, even if the investigation, individualization and specific reason requirements are satisfied, the statute requires that disclosure be strictly limited to persons who are *personally and directly engaged* in the investigation or proceeding relating to that taxpayer. The history of the statute supports the district court's conclusion that it is implausible for one person to serve that function with respect to 1.28 million taxpayers.

Allowing the IRS to disclose the return information of 1.28 million taxpayers to a single supervisor (who cannot possibly be "personally and directly engaged" in the investigation of each taxpayer) for further dissemination to multiple other individuals (each of whom may or may not be "personally and directly engaged" in the investigation of any particular taxpayer) violates the clear language of the statute and constitutes an abandonment by the IRS of its mandated gatekeeper function.

The history of the statute counsels against an interpretation that permits a single person to receive the return information of thousands of taxpayers. Congress instead required that information be provided only to the employees who are *personally and directly* engaged in the specific investigation or proceeding against the particular taxpayer. Congress used two terms "personally" and

"directly" in the conjunctive for a reason – to prevent precisely the sort of request for disclosure of massive amounts of taxpayer information this is at issue in this case.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's Order of November 21, 2025.

Respectfully submitted,

*/s/ Jeffrey S. Gutman*

Jeffrey S. Gutman, Esq.  No. 49968
JEFFREY S. GUTMAN, PLLC
1712 Hobart St., N.W.
Washington, D.C. 20009
(202) 631-5129

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(g)(1) and D.C. Circuit Rule 32(e)(1), I certify that this brief: (i) complies with the type-volume limitation of Rule 32(a)(7)(B) and D.C. Circuit Rule 32(e)(1) because it contains 6,490 words including footnotes and excluding the parts of the brief exempted by Rule 32(f) and D.C. Circuit Rule 32(e)(1); and (ii) complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word 365, set in 14-point Times New Roman font.

*/s/ Jeffrey S. Gutman*

# CERTIFICATE OF SERVICE

I certify that on March 25, 2026, this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

*/s/ Jeffrey S. Gutman*